IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| VIRGINIA STATE CONFERENCE NAACP et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 5:24-cv-040 |
| COUNTY SCHOOL BOARD OF SHENANDOAH COUNTY, | ) ) ) | By:   Michael F. Urbanski Senior United States District Judge |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

In 2021, defendant County School Board of Shenandoah County renamed Stonewall Jackson High School and Ashby Lee Elementary School, aiming, according to the allegations of the complaint in this case, to eliminate the discriminatory impact of those Confederate names. In 2024, after intervening elections, a newly constituted School Board reinstated the Confederate school names. Associational plaintiff, the Virginia State Conference NAACP, and individual plaintiffs, parents of children who attend or will attend Stonewall Jackson High School and Ashby Lee Elementary School, challenged this 2024 decision to revert to the Confederate school names under the First Amendment, Fourteenth Amendment, Title VI of the Civil Rights Act of 1964 ("Title VI"), and the Equal Educational Opportunities Act ("EEOA"). Plaintiffs seek declaratory and injunctive relief as well as attorney's fees and litigation costs. The School Board moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF No. 29.

1

Because the School Board retired the Confederate school names in 2021 due to their discriminatory effect, and then abruptly reversed field in 2024, the unique facts alleged in this case are sufficient to state a First Amendment compelled speech claim, a Fourteenth Amendment Equal Protection Clause claim, a Title VI claim, and an EEOA claim. As such, these claims cannot be dismissed at this stage. Rather, given the idiosyncratic facts of this case, discovery is necessary to ascertain whether there is sufficient evidence to support the critical allegations of compulsion as to the First Amendment claim and discriminatory intent as to the Equal Protection claim. Further, as to the EEOA claim, factual development is necessary to determine whether the School Board's reversion to Confederate school names represents the renewed imposition of a vestige of a dual school system and a denial of equal educational opportunity. Accordingly, the motion to dismiss is **DENIED.**

## I. BACKGROUND

Plaintiffs' complaint contains allegations of historical facts concerning the Civil War and the history of segregation in Shenandoah County Public Schools. At this procedural stage, the complaint's allegations must be accepted as true. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (explaining the court's obligation, in deciding a motion to dismiss, to "accept as true the plaintiff's well-pleaded allegations").

Plaintiffs allege that the "Confederacy's fundamental unifying principle was the preservation of slavery in the United States and the continued subjugation of Black people," Compl., ECF No. 1, ¶¶ 29-35, and that Stonewall Jackson, Robert E. Lee, and Turner Ashby were Confederate leaders who "fought for the goals of the Confederacy: to preserve slavery." Id. ¶¶ 36-40.

2

Plaintiffs allege that Confederate symbols, including the names of Confederate leaders, have their own still-unfolding history as tools of White supremacy.[1] At the turn of the twentieth century, Civil War historiography saw a revival in reverence for figures like Lee, Ashby, and Jackson. Id. ¶¶ 41-42. The re-popularization of these figures coincided with the resurgence of the Ku Klux Klan, lynchings, and segregation. Id. ¶¶ 37-42. Plaintiffs cite scholarly evidence that "Confederate symbols are strongly associated with intentional hate and discrimination"—notably, "county-level frequency of lynching . . . predicts county-level frequency of Confederate memorialization." Id. ¶ 43.

Plaintiffs allege that in the mid-twentieth century, Confederate symbolism took on a new significance in conveying support for segregation. Plaintiffs allege that after Brown v. Board of Education, 347 U.S. 483 (1954), naming public schools after Confederate leaders became a symbol of "massive resistance"—the refusal to comply with constitutionally mandated desegregation. Id. ¶¶ 49-58. Shenandoah County built three White high schools in the 1950s, including Stonewall Jackson High School. Id. ¶¶ 60-61. Plaintiffs allege that "[a]s the school foundation was laid, White community members flew the Confederate flag." Id. ¶ 62. The all-White elementary school renamed Ashby Lee Elementary School in 1975 was also originally named after Stonewall Jackson. Id. ¶ 63. Both schools remained segregated until 1962. Id. ¶¶ 65-66.

---

[1] Justices of the Supreme Court have made different choices as to whether or not to capitalize the words "Black" and "White" when referring to groups of people. Compare Students for Fair Admissions v. President & Fellows of Harvard Coll., 600 U.S. 181, 203 (2023) (Roberts, C.J.) (referring to "black students" and "white students") with id. at 364, 374 (Sotomayor, J., dissenting) (referring to "Black students" and "white students"). This opinion will adhere to the convention of both the plaintiffs' complaint and the School Board's motion to dismiss briefing, which is to capitalize both "Black" and "White." See Compl., ECF No. 1; Mem. Supp. Mot. Dismiss, ECF No. 30.

According to the complaint, the movement to rename Ashby Lee Elementary School and Stonewall Jackson High School was sparked in the summer of 2020 due to the public outcry over the police killing of George Floyd and, in Shenandoah County, the wrongful arrest of Pastor Leon McCray.[2] Id. ¶¶ 69-70.

The School Board has final authority over decisions affecting Shenandoah County Public Schools, so the decision as to whether to rename the schools fell to the School Board. Id. ¶ 28. The School Board is comprised of six members elected by residents of Shenandoah County. Id. Shenandoah County Public Schools receive federal financial assistance, which means that the federal antidiscrimination laws at issue in this case apply to the School Board. Id.

On July 4, 2020, the School Board directed the Superintendent of Shenandoah County Public Schools to develop a process for changing the names of Stonewall Jackson High School and Ashby Lee Elementary School. Id. ¶ 78. Petitions for and against changing the names were circulated prior to a July 9 meeting at which community members presented their positions. Id. ¶ 80. The School Board voted 5-1 to retire the Confederate names. Id. ¶ 81. In doing so, the School Board explained that the name change was necessary because of the unwelcoming message sent to Black students by names honoring leaders who fought to preserve slavery. Id. ¶¶ 82-88. As one then-member of the School Board explained, "You can't keep a name and remove racist implications from it." Id. ¶ 85. Another then-member quoted a student, who

---

[2] "[O]n June 1, 2020, in Shenandoah County, Virginia, Pastor Leon McCray, a Black man, was wrongfully arrested by Shenandoah County sheriff's deputies when he tried to report an assault and hate crime against him. This led to rallies to protest racism, discrimination, and White Supremacy in Shenandoah County." Compl., ECF No. 1, ¶ 70.

4

had stated, "If you vote to keep the name, you would be making a conscious decision to maintain a symbolic reference to a time of inequality and racism." Id. ¶ 88. The new names Mountain View High School and Honey Run Elementary School were voted upon after community input and took effect on June 1, 2021. Id. ¶ 93.

Plaintiffs allege that the movement to reinstate the Confederate names began soon thereafter. During the 2021 campaign for School Board, two candidates ran and were elected on platforms opposing the name change. Id. ¶ 100. In his campaign, Dennis Barlow, who is now the chair of the School Board, called for a return to "quality objective teaching," rather than "indoctrination." Id. ¶ 101. In her campaign, Brandi Rutz, who is also a current School Board member, stated, "[The name change] robs many folks, like myself who have . . . Stonewall Jackson High Diplomas." Id. ¶ 102. Rutz also posted an article on Facebook from a "friend and fellow Patriot," which stated, "Only race pimps spend their time focusing on skin color or ethnicity." Id. ¶ 104. In 2023, three more candidates were elected to the School Board based on pro-Confederate school name platforms. Id. ¶ 108. Thus, by 2024, five out of six School Board members aimed to reinstate the Confederate names, and none of the School Board members who had voted to change the Confederate names in 2020 remained. Id. ¶ 120.

The School Board added reinstating the school names to its agenda for its May 9, 2024, meeting. Id. ¶¶ 117-18. At the meeting, 52 community members spoke against reinstating Confederate names, and 23 spoke in favor of reinstating Confederate names. Id. ¶ 122. Many speakers attested to the racial valence of Confederate names in Shenandoah County history. Id. ¶¶ 124-27 (explaining that the names serve as a "reminder to Black students"). As one

speaker put it, "[I]t's a loud and clear message to me as a parent and to any students of color that our wellbeing is none of your concern." Id. ¶ 126.

After listening to these statements, the School Board voted 5-1 in favor of reinstating the Confederate names. Id. ¶ 136. Three justifications emerged from the statements of School Board members explaining the decision to reinstate the names: (1) the public elected the current School Board members on platforms favoring Confederate school names; (2) the School Board thought it proper to honor Stonewall Jackson because of his "character, his loyalty, his leadership, how Godly a man he was" and to generally honor Stonewall Jackson, Robert E. Lee, and Turner Ashby; and (3) the School Board wished to signal its belief that racism no longer exists and that "if you really want to stop this racism and prejudice, let's just stop finding racism and prejudice in[] everything." Id. ¶¶ 128-34. Chairman Barlow acknowledged that the 1959 naming of Stonewall Jackson High School was part of massive resistance to desegregation, but Chairman Barlow nevertheless voted to reinstate the name because "at the same time, we still have great soldiers, great heroes." Id. ¶ 133. Barlow also acknowledged that "[he] would feel unsettled if [he] were Black and going through this." Id. ¶ 134.

By May 31, 2024, signs bearing the Confederate school names had been reinstated at both schools. Id. ¶ 138. At the high school, the School Board allegedly reinstalled the same sign that had been in place four years earlier—a sign depicting a Confederate flag being carried by a Confederate soldier on horseback. Id. ¶ 139. "Although [the portion of the sign showing the Confederate flag itself] has been covered with black duct tape, many in the community are aware of the image underneath." Id.

6

Individual plaintiffs and members of the NAACP allege that they have been harmed by the School Board's decision to reinstate Confederate school names. The Virginia State Conference NAACP's membership includes "Black and White families whose students attend Mountain View High School and Honey Run Elementary School." Id. ¶¶ 18, 23. Plaintiffs Kay and Edward Doe are the parents of two Black children—D.D., who will be starting high school at Mountain View/Stonewall Jackson High School, and J.D., who attends Honey Run/Ashby Lee Elementary School. Id. ¶¶ 19-21. Kim Wallace Carter is the mother of A.C., a Black student in the Shenandoah County Public School system who attends the Massanutten Regional Governor's School at Mountain View/Stonewall Jackson High School, a special program for qualified students interested in environmental science. Id. ¶¶ 22-23. Heather Brown is the mother of B.B., a Black student in the Shenandoah County Public School system who attends the Governor's School at Mountain View/Stonewall Jackson High School. Id. ¶¶ 26-27. These families are in the minority at both schools, as plaintiffs allege that less than 1% of students at Honey Run/Ashby Lee Elementary School and less than 2% of students at Mountain View/Stonewall Jackson High School are Black. Id. ¶ 140. Finally, Mary Johnson is the mother of A.J., a White student at Mountain View/Stonewall Jackson High School who plans to attend the Governor's School. Id. ¶¶ 24-25.[3]

Plaintiffs allege that they have suffered and will continue to suffer stigmatic harm and educational detriments due to the reinstatement of Confederate school names. For example, D.D. "disagrees vehemently" with the reinstatement decision and "feels unwanted" in her

---

[3] Individual plaintiffs are parents suing on behalf of their children pursuant to Federal Rule of Civil Procedure 17(c)(1)(A).

community and school. Id. ¶ 144-45. She "will be confronted daily with signs, apparel, and

school materials bearing the name of Stonewall Jackson" and will thus "feel inferior to her

White peers." Id. ¶ 146. This will impact her "ability to receive an education and participate in

school sponsored sports." Id. ¶ 147. D.D., who plays volleyball, basketball, and soccer, will be

required to wear a "Stonewall Jackson Generals" jersey to participate in school athletic

activities. Id. ¶¶ 143, 148. "Based on her experience participating in sports at Mountain View

High School, D.D. believes that if she refused to wear the odious team uniforms, the school

would not permit her to participate in sports or she would be subject to ostracization." Id. ¶

184. D.D. also "believes wearing the team uniforms would mean endorsing a threatening

message aimed at the Black students on opposing teams." Id. Being unable to participate in

sports and other activities to avoid association with the Stonewall Jackson name will harm

D.D.'s educational opportunities, particularly college applications. Id. ¶ 150.

The other individual students discussed in plaintiffs' complaint allege similar injuries,[4]

as do the members of the NAACP. Id. ¶¶ 182-86. The complaint bolsters these allegations by

---

[4] B.B.'s allegations differ in that B.B. attends the Massanutten Regional Governor's School and attends school
in the Shenandoah County Public School system, but not at Mountain View/Stonewall Jackson High School
in particular. Id. ¶¶ 27, 177-81. A.C. too is a student at a different Shenandoah County public high school that
competes against Mountain View/Stonewall Jackson High School, though A.C. also takes science, math, and
visual arts classes at the Governor's School hosted at Mountain View/Stonewall Jackson High School. Id. ¶¶
158-67. J.D.'s allegations differ from D.D.'s allegations only in that J.D. attends Honey Run/Ashby Lee
Elementary School. Id. ¶¶ 155-57.

Notably, only the NAACP, D.D., and A.J.—plaintiffs who participate in extracurricular activities on behalf of
Mountain View/Stonewall Jackson High School—allege that their First Amendment rights have been violated.
This is so because the compelled speech claim only concerns Mountain View/Stonewall Jackson High School,
not Honey Run/Ashby Lee Elementary School. Id. ¶¶ 191-206. In stating their First Amendment cause of
action, plaintiffs discuss only the Stonewall Jackson Generals and do not allege that any individual plaintiffs or
members of the NAACP are elementary school students participating in extracurricular activities and facing the
prospect of being compelled to speak. Id. Although the defendant here is the School Board, not either school
individually, only facts pertaining to the high school will be pertinent to the compelled speech claim going
forward.

8

citing research from the American Academy of Pediatrics, which found in 2019 that racism in schools can result in internalized racism and less than ideal youth development outcomes. Id. ¶ 188.

The harms A.J. has suffered differ somewhat from those experienced by the other students in that A.J. is White. Before the name change, A.J. was homeschooled, but after the name change, A.J. began attending Mountain View High School, where A.J. participates in marching band and track and field. Id. ¶¶ 168-69. A.J. disagrees with the School Board's decision to "idolize a history of enslavement, segregation, and racial injustice." Id. The complaint alleges, "If A.J. does not want to identify as part of the Stonewall Jackson 'Generals,' his only option is to resume homeschooling. If homeschooled, A.J. would not be able to participate in sports or activities . . . [or] attend the Governor's School." Id. ¶ 172.

## II. STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

A court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017). The allegations in this case concerning history and plaintiffs'

---

The Equal Protection and statutory claims are brought only on behalf of the NAACP, B.B., A.C., D.D., and J.D. A.J., who is a White student, was not included in these claims because these claims concern discrimination against Black students. Id. ¶¶ 207-47. Unlike the First Amendment claim, the three other claims concern both the elementary school and the high school.

subjective experiences are treated no differently. Where, as is the case for plaintiffs' Equal

Protection and Title VI claims here, a defendant's discriminatory intent is an element of a

claim, plaintiffs "must plead sufficient factual matter to show that [the defendant] adopted and

implemented the [challenged policy] . . . for the purpose of discriminating." Iqbal, 556 U.S. at

677. Still, the standard remains whether plaintiffs have stated their claims "plausibly." Equity

in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 108 (4th Cir. 2011).

## III.    DISCUSSION

Plaintiffs have stated plausible claims under the First and Fourteenth Amendments,

Title VI, and the EEOA. The First Amendment protects individuals from being forced to

speak the government's message, and plaintiffs have plausibly alleged that they are compelled

to serve as mobile billboards for the School Board's message by being forced to wear Stonewall

Jackson High School uniforms and compete on behalf of the Stonewall Jackson Generals or

else forsake extracurricular opportunities. Thus, plaintiffs have stated a First Amendment

claim, and discovery is needed to determine whether evidence supports plaintiffs' allegations

that symbolically honoring Stonewall Jackson is indeed a condition of participation in school

activities.

As to their Equal Protection claim, plaintiffs have plausibly alleged that the names

Stonewall Jackson and Ashby Lee convey a message of exclusion to Black students, thus

disproportionately damaging Black students' educational experiences. As required under the

Supreme Court's exacting disparate impact standard, plaintiffs have also plausibly alleged that

the School Board reinstated Confederate school names because of, not merely in spite of, the

names' discriminatory effect. Taking the complaint's allegations as true, an inference of

10

discriminatory intent can be drawn from the following unique factual allegations in this case: (1) as School Board members have recently acknowledged, Confederate school names have historically been used by the Shenandoah County school system with the intent to make Black students feel unwelcome; (2) the School Board retired the names in 2020-2021 in express recognition of the discriminatory effect of the names on Black students; and yet in 2024, (3) the School Board reinstated the Confederate names, with one School Board member acknowledging the names' discriminatory effect. Given these allegations, discovery is necessary to shed light on the School Board's intent.[5]

In their EEOA claim, plaintiffs allege that the reinstatement of the Confederate names denies them an equal educational opportunity, inter alia, because the Confederate names displayed on sports and band uniforms discourage participation of Black students in extracurricular activities. The School Board's motion to dismiss the EEOA claim fails because the Supreme Court has instructed district courts to fashion remedies to eliminate racial discrimination in all components of elementary and secondary school systems—including extracurricular activities. Freeman v. Pitts, 503 U.S. 467, 486 (1992) (citing Green v. Cnty. Sch. Bd. of New Kent, 391 U.S. 430, 435 (1968)). Discovery is necessary to ascertain whether plaintiffs' plausible allegations of an EEOA violation are borne out by the evidence.

Before proceeding to address each claim in turn, it is worth noting that the court recognizes, as the Fourth Circuit has cautioned, that "the 'federal courts should not lightly interfere with the day-to-day operation of schools.'" Coal. for TJ v. Fairfax Cnty. Sch. Bd., 68

---

[5] Plaintiffs' Title VI claim follows the Equal Protection Claim.

11

F.4th 864, 887 (4th Cir. 2023) (quoting Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426,

440 (4th Cir. 2013)). However, as the Supreme Court explained in Epperson v. Arkansas,

"[T]he vigilant protection of constitutional freedoms is nowhere more vital than in the

community of American schools." 393 U.S. 97, 104 (1968). Accordingly, federal courts,

including the Supreme Court, routinely decide cases involving public schools, often with the

goal of ensuring public schools serve their essential role in our democracy in compliance with

constitutional principles of "political neutrality" and equality. See West Virginia State Bd. of

Educ. v. Barnette, 319 U.S. 624, 637 (1943) ("Free public education, if faithful to the ideal of

secular instruction and political neutrality, will not be partisan or enemy of any class, creed,

party, or faction."); Brown v. Bd. of Educ., 347 U.S. at 493 (recognizing the "importance of

education to our democratic society" and thus the importance of ensuring that a public

education "is a right which must be made available to all on equal terms"). Thus, the school

setting of this case is certainly relevant, but it does not permit the court to abdicate its

responsibility to consider the constitutional claims before it.

## A. Compelled Speech

Freedom of speech "includes both the right to speak freely and the right to refrain

from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714 (1977).[6] Modern compelled

speech doctrine can be traced back to the Supreme Court's 1943 decision in West Virginia

Board of Education v. Barnette, a case, like this one, which concerned claims of compelled

---

[6] The First Amendment applies to state and local government defendants like the School Board by virtue of
the Fourteenth Amendment. Stromberg v. California, 283 U.S. 359, 368 (1931). Plaintiffs have a cause of action
for the violation of federal rights, including those under the First and Fourteenth Amendments at issue in this
case, under 42 U.S.C. § 1983.

speech brought by children and their parents in the school setting. 319 U.S. at 629.[7] In Barnette, the Court held that it was unconstitutional for public schools to force children to salute the American flag and recite the Pledge of Allegiance. Id. at 642. As Justice Robert H. Jackson explained, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in . . . matters of opinion or force citizens to confess by word or act their faith therein." Id. Plaintiffs contend that the School Board here has selected a pro-Confederate message and has "forced" students to "confess by word or act their faith therein"—specifically, by wearing uniforms and otherwise participating in extracurricular activities in ways that honor the Confederacy. Resp., ECF No. 39 at 12.

The Supreme Court has only fortified its compelled speech doctrine since Barnette. As recently as 2023, the Court held, "[T]he government may not compel a person to speak its own preferred messages. Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." 303 Creative v. Elenis, 600 U.S. 570, 584-87 (2023) (internal citations omitted).

Of all the Court's modern compelled speech precedents, this case is most similar to Wooley v. Maynard. In that 1977 case, the Court held that by requiring the Maynards to display the message "Live Free or Die" on their license plates, New Hampshire had unconstitutionally

---

[7] Neither party has argued that a different First Amendment standard should apply because the speech here takes place in a school. Although a "substantial disruption" test applies to cases where student speech is restricted to promote the learning goals of the school environment, Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 435 (4th Cir. 2013), compelled student speech has historically been analyzed under the ordinary compelled speech framework, including in Barnette itself. 319 U.S. 624, 642 (1943); see also Frudden v. Pilling, 742 F.3d 1199, 1204 (9th Cir. 2014). And here, compelling students to wear Confederate names on their jerseys and to score points in the name of Stonewall Jackson has nothing to do with curtailing disruption in the learning environment.

compelled the Maynards to speak. 430 U.S at 715. The Court reasoned that the license plate
transformed the Maynards and their vehicle into "mobile billboard[s]" or "instruments" for
"fostering public adherence to an ideological point of view [that the Maynards] find[]
unacceptable." Id. The Court found that the fact that the license plate was a "condition to
driving an automobile," which was a "virtual necessity for most Americans," constituted
compulsion. Id. Finally, the Court observed, "The fact that most individuals agree with the
thrust of New Hampshire's motto is not the test; most Americans also find the flag salute
acceptable." Id. Rather, the "First Amendment protects the right of individuals to hold a point
of view different from the majority and to refuse to foster . . . an idea they find morally
objectionable." Id.

Applying Wooley demonstrates that the plaintiffs here have plausibly alleged a
compelled speech claim.

1. **Plaintiffs have plausibly alleged that speech and expressive conduct are at issue.**

Emblazoning the words Stonewall Jackson Generals on a uniform is speech in the same
way that emblazoning the phrase Live Free or Die on a license plate is speech. Clothing,
particularly clothing displaying words and symbols, is speech. Hardwick ex rel. Hardwick, 711
F.3d at 436-37 (treating the wearing of "Confederate flag apparel" as student speech). This
includes clothing students must wear in schools. Frudden v. Pilling, 742 F.3d 1199, 1204 (9th
Cir. 2014) (finding that a uniform depicting a school's mascot and motto was compelled
student speech).

Competing on behalf of teams named in honor of Confederate generals further intermingles speech with expressive conduct. See Virginia v. Black, 538 U.S. 343, 358 ("The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech."). The First Amendment protects expressive conduct where the conduct conveys a "particularized message" and "the likelihood was great that the message would be understood by those who viewed it." Spence v. State of Washington, 418 U.S. 405, 411 (1974).

Even if sports are not always expressive, see, e.g., Jones v. Schneiderman, 974 F. Supp. 2d 322, 333-37 (S.D.N.Y. 2013) (declining to protect mixed martial arts as expressive conduct), scoring points on behalf of a team named after Stonewall Jackson conveys a message likely to be understood by the assembled crowd.[8] Although residents of Shenandoah County disagree as to the nature of the message conveyed by the name Stonewall Jackson, they agree that the name holds expressive import sufficient to arouse the passions that led to the name changes underlying this case. Compare Compl., ECF No. 1, ¶ 133 (statement of Chairman Barlow arguing that the school names convey a message honoring "great soldiers, great heroes") with id. ¶ 85 (statement of former member of the School Board Andrew Keller explaining the names convey a message that makes "students feel like they're excluded"). The Fourth Circuit has acknowledged the "association between [Confederate] symbols and the history of slavery in this country," Crosby by Crosby v. Holsinger, 816 F.2d 162, 163 (4th Cir. 1987), that the Confederate flag can be a "symbol of racial separation and oppression," United States v.

---

[8] Students at Stonewall Jackson High School also engage in artistic expression, such as musical performances, on behalf of Stonewall Jackson High School. Compl., ECF No. 1, ¶ 168 (explaining that A.J. is in the marching band). This artistic speech is protected by the First Amendment. Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos., Inc., 515 U.S. 557, 569 (1995) (explaining that the First Amendment "unquestionably shield[s]" music, regardless of whether the music conveys a clear message).

Blanding, 250 F.3d 858, 861 (4th Cir. 2001), and that Confederate imagery might be viewed by some as "a symbolic acknowledgement of pride in Southern heritage and ideals of independence," Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles, 288 F.3d 610, 624 (4th Cir. 2002). That different people might derive different meanings from Confederate imagery is irrelevant; different viewers of art or readers of a poem may well come away with different messages, but the First Amendment still applies. Hurley, 515 U.S. at 569 (noting that "a narrow, succinctly articulable message is not a condition of constitutional protection"). Thus, shooting a free throw on behalf of Stonewall Jackson High School is expressive, even if the same activity might not be expressive if done on behalf of Mountain View High School. Accordingly, the First Amendment applies, both to the speech (wearing Stonewall Jackson Generals apparel) and to the expressive conduct (representing Stonewall Jackson High School in school activities) at issue in this case.

The School Board argues that "merely attending a school" is not expressive. Mem. Supp. Mot. Dismiss, ECF No. 30 at 17. The School Board cites the Eleventh Circuit's decision in Coleman v. Miller, which held that "[t]he mere fact that appellant may on some occasions be required to enter public buildings that fly the Georgia flag"—which, when Coleman was decided, "incorporate[d] the Confederate battle flag emblem"—"does not infringe upon his First Amendment rights because entering public buildings does not manifest any particular attitude or belief and does not associate appellant with the flag's message." 117 F.3d 527, 528, 531 (11th Cir. 1997). However, students' association with Confederate symbolism here is more intimate than entering a building or simply being enrolled at Stonewall Jackson High School because students allegedly must identify as Stonewall Jackson Generals and wear uniforms

16

bearing Confederate names. Compl., ECF No. 1, ¶ 148. In <u>Coleman</u> itself, the court distinguished walking into a building from "carry[ing] or display[ing] the flag" or "participat[ing] in ceremonies honoring the flag." <u>Coleman</u>, 117 F.3d at 531. Wearing a uniform and being identified on the field as a Stonewall Jackson General is more like displaying a flag or participating in a ceremony than it is like visiting a building.

### 2. Plaintiffs have plausibly alleged that they object to the message conveyed.

In addition to plausibly alleging that protected First Amendment speech and expressive conduct are at issue, plaintiffs have plausibly alleged that they object to the message conveyed. <u>Wooley</u>, 430 U.S. at 715. As was the case in <u>Wooley</u>, it is irrelevant whether others in Shenandoah County view the Confederate school names as hateful or innocuous, or indeed whether a majority of Shenandoah County residents voted for a School Board promising to reinstate the names. <u>Id.</u> ("The fact that most individuals agree with the thrust of New Hampshire's motto is not the test; most Americans find the flag salute acceptable."). The First Amendment protects the rights of the plaintiffs here to "hold a point of view different from the majority." <u>Id.</u> "One's right to . . . free speech . . . may not be submitted to vote." <u>Barnette</u>, 319 U.S. at 638.

Having concluded that plaintiffs have plausibly alleged that speech with which they disagree is at issue, the next question is whether plaintiffs have alleged that they are the relevant speakers. The School Board argues that "[u]nlike a personal vehicle, . . . a school name and uniform is not 'readily associated' with the student" because "the individual student has no control over the school and team names or what is displayed on the team uniforms." Reply, ECF No. 43 at 6. While community members may understand that the School Board, not

individual students, selects school names, in Wooley, it was equally plain that the state, not the

Maynards, had control over what was displayed on state license plates. The majority in Wooley

directly rejected the dissent's argument that the Maynards were not themselves speaking

through their license plates, Wooley, 430 U.S. at 722 (Rehnquist, J., dissenting), instead rooting

the constitutional problem in the fact that the Maynards were made to be "instruments" for

the government's message, id. at 715 (Burger, J.). Similarly, in Hurley v. Irish-American Gay,

Lesbian & Bisexual Group of Boston, the Supreme Court found that parade organizers were

speakers compelled to speak where they were made to be a "conduit" for the message of

parade marchers with whom the organizers disagreed, although it would have been apparent

to observers of the parade that the organizers were not themselves voicing the marchers'

message. 515 U.S. 558, 575 (1995). Plaintiffs here plausibly allege that they too understand

themselves to be instruments or conduits for the School Board's message, so they are speakers

meriting the First Amendment's compelled speech protections.

### 3. Plaintiffs have plausibly alleged that they are subject to compulsion.

The final component of plaintiffs' compelled speech claim is compulsion. Plaintiffs

allege, "Upon information and belief, students who are unwilling to wear a uniform or apparel

with the name Stonewall Jackson 'Generals' or are unwilling to participate on a team as a

member of the Stonewall Jackson 'Generals,' will be excluded from full participation in certain

extracurricular activities." Compl., ECF No. 1, ¶ 198. Specifically, "[b]ased on her experience

participating in sports at Mountain View High School, D.D. believes that if she refused to

wear the odious team uniforms, the school would not permit her to participate in sports or

she would be subject to ostracization." Id. ¶ 148; see also id. ¶ 172 ("If A.J. does not want to

18

identify as part of the Stonewall Jackson 'Generals,' his only option is to resume homeschooling.").

The School Board argues that allegations "[u]pon information and belief" are too speculative. Mem. Supp. Mot. Dismiss, ECF No. 30 at 16. However, plaintiffs are "generally permittted" to rely on information and belief where "the plaintiff is in a position of uncertainty because the necessary evidence is controlled by the defendant," so long as the information and belief allegations are "supported by secondhand information that provides the plaintiff a good-faith reason for believing it to be true." Drzymala v. BAE Sys. Controls, Inc., No. 7:21-cv-522, 2022 WL 3971050, at *3 (W.D. Va. Aug. 31, 2022). Here, the School Board controls its policies for participation in extracurricular activities, including uniform requirements, and D.D.'s and A.J.'s personal experiences participating in extracurriculars at Mountain View High School provide the requisite good faith basis. Thus, plaintiffs have plausibly alleged that if they refuse to wear Stonewall Jackson Generals uniforms or represent Stonewall Jackson High School, they will be excluded from extracurricular activities.

The risk of exclusion from extracurricular activities constitutes compulsion. Wooley is once again informative. Just as the license plate in Wooley was a condition of driving a car, which the Court observed is a "virtual necessity" for most Americans, wearing a team or band uniform is a condition of participating in school extracurriculars, which is a "virtual necessity" for high school students to have a complete educational experience. 430 U.S. at 715. However, the "condition to driving an automobile" in Wooley was enforced with criminal penalties, id. at 708, and neither the Supreme Court nor the Fourth Circuit has clarified precisely what forms of coercion short of legal enforcement qualify as compulsion.

19

According to the Tenth Circuit in <u>Phelan v. Laramie County Community College Board of Trustees</u>, "In order to compel the exercise or suppression of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" 235 F.3d 1243, 1247 (10th Cir. 2000) (quoting <u>Laird v. Tatum</u>, 408 U.S. 1, 11 (1972)). However, compulsion might involve an "'indirect discouragement,' rather than a direct punishment," so long as the discouragement is not merely "'minimal' or 'wholly subjective.'" <u>Id.</u> (citing <u>Am. Comms. Ass'n v. Douds</u>, 339 U.S. 382, 402 (1950), and <u>United States v. Ramsey</u>, 431 U.S. 606, 623-24 (1977)). "Compulsion need not take the form of a direct threat or gun to the head." <u>Axson-Flynn v. Johnson</u>, 356 F.3d 1277, 1290 (10th Cir. 2004).

In <u>Axson-Flynn</u>, the Tenth Circuit applied this standard to find that a student's speech was compelled where she did not wish to say certain swear words in an acting class exercise. 356 F.3d at 1290. The court observed, "Although [the school] never suspended [the student, Axson-Flynn] from the ATP [Actor Training Program] or explicitly threatened her with expulsion, Defendants made it abundantly clear that Axson–Flynn would not be able to continue in the program if she refused to say the words with which she was uncomfortable." <u>Id.</u> The consequence of exclusion from extracurriculars here is analogous to the consequence of exclusion from the acting program in <u>Axson-Flynn</u>.

Ninth Circuit precedent further illustrates that prospective, threatened consequences (indeed, specifically for failure to wear school-issued clothing) can constitute compulsion, even where enforcement is somewhat uncertain. In <u>Frudden v. Pilling</u>, an elementary school instituted a "mandatory" uniform policy requiring students to wear uniform shirts bearing the

school mascot, a gopher, and the words "Tomorrow's Leaders." 742 F.3d 1199, 1201 (9th Cir.

2014). There, the school's policy handbook provided that if students failed to wear the

uniform, they would be sent home to change, and repeated offenses could result in suspension.

Id. The plaintiffs' children, however, never actually faced these disciplinary actions. Id. at 1205.

The court concluded that the fact "that [the elementary school] did not discipline the

Fruddens' children is irrelevant to their First Amendment challenge" because the Fruddens

sought prospective relief. Id. (citing Wooley, 430 U.S. at 711). "[P]reenforcement challenges

to government-imposed speech restrictions are not extraordinary." Id. (citing Brown v. Entm't

Merchs. Ass'n, 564 U.S. 786, 789 (2011)). As the Fourth Circuit has also explained, a

preenforcement challenge simply requires the plaintiff to allege "a credible threat of

enforcement." Grimmett v. Freeman, No. 22-1844, 2022 WL 3696689, at *1 (4th Cir. Aug.

25, 2022) (citing Susan B. Anthony List v. Driehaud, 573 U.S. 149, 159 (2014)). Here too, the

relief sought is prospective declaratory and injunctive relief, and it is irrelevant that plaintiffs

have not thus far faced adverse consequences for refusing to wear Stonewall Jackson Generals

uniforms.

The similarities between this case and Frudden do not end there. Threatened exclusion

from extracurriculars is a tool of coercion for enforcing a uniform policy on par with the threat

of being sent home to change or the threat of suspension. Though plaintiffs here have not,

like the plaintiffs in Frudden, pointed to an official manual to prove the school's policy, at the

motion to dismiss stage, it is enough that plaintiffs have plausibly alleged based on their own

prior experiences competing on sports teams that the School Board does have a policy of

excluding students from extracurricular activities if they refuse to wear team uniforms or

represent Stonewall Jackson High School. And notably, if the First Amendment protects children from being compelled to speak a message as imprecise as "Tomorrow's Leaders," Frudden, 742 F.3d at 1201, it should certainly protect students from being compelled to speak a message they allege endorses slavery and the subjugation of Black people.

### 4. This case is unlike Hanover County Unit of the NAACP v. Hanover County.

This case is distinguishable from Hanover County Unit of the NAACP v. Hanover County. In that case, a court in the Eastern District of Virginia considered whether students were compelled to speak when they represented schools named for Stonewall Jackson, Robert E. Lee, and Jefferson Davis in extracurricular activities. 461 F. Supp. 3d 280, 293 (E.D. Va. 2020). That court dismissed the complaint for lack of jurisdiction because the sole plaintiff, the NAACP, lacked associational standing where the "individual participation of the NAACP's members" would have been "indispensable to the proper resolution of the case." Id. at 290. On this point, this case is entirely different because the NAACP is joined here by individual plaintiffs, who are themselves members of the NAACP. Compl., ECF No. 1. Moreover, unlike in Hanover County, the allegations here indicate that individual participation by NAACP members is not necessary to the resolution of the case because the allegations are uniform across the association's membership. The NAACP's members here uniformly object to the Confederate names because they believe the names convey a message about race that contradicts the NAACP's mission, id. ¶ 18, and the NAACP has alleged, based on the personal experiences of multiple named members who have standing in their own right, that Stonewall Jackson High School will not permit those who refuse to compete on behalf of Stonewall Jackson to participate in extracurricular activities as a matter of generally applicable policy, id.

¶ 148. Thus, unlike in Hanover County, both the individual plaintiffs and the NAACP have standing in this case.

Having already concluded that jurisdiction was lacking, the Hanover County court went on to consider whether the complaint had stated a First Amendment claim. The court concluded that the NAACP's complaint had not plausibly alleged compulsion because it was not clear that students could not participate in extracurricular activities without wearing school uniforms or having their actions attributed to the school by its Confederate name. Hanover County, 461 F. Supp. 3d at 290-93. Notably, this was not the principal reason for dismissing the complaint in Hanover County. Nevertheless, the allegations here are further factually distinct in that, unlike in Hanover County, this complaint provides accounts from identified individual students based on their own prior experiences "participating in sports at Mountain View HS," attesting to the likelihood that Stonewall Jackson High School "w[ill] not permit [objecting students] to participate in sports." Compl., ECF No. 1, ¶ 148.

Significantly, the court in Hanover County recognized, "as long as there is some type of compulsion, requiring students to wear apparel with names or symbols associated with the Confederacy may constitute compelled speech" in light of the "historical meaning attached" to names associated with the Confederacy. Hanover County, 461 F. Supp. 3d at 293. Given the fact that the present case includes individual plaintiffs and more detailed allegations of compulsion, this recognition by the Hanover County court confirms the conclusion that plaintiffs have alleged a plausible claim.

Thus, plaintiffs have plausibly alleged that they face a choice between exclusion from extracurricular activities and becoming mobile billboards for the message the School Board

23

expresses with the name Stonewall Jackson, a name laden in historical meanings which are plainly significant in Shenandoah County. Accordingly, plaintiffs have stated a First Amendment claim, and the motion to dismiss this claim is denied.

### B. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.[9] This command applies to local government bodies, like the School Board. Brown, 347 U.S. 483. In Brown, the Supreme Court held that the Equal Protection Clause prohibits racial discrimination in public education, and in so doing, the Court noted that discriminating against children based on race "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." Id. at 494.

This case differs from Brown because Brown involved a facial classification—explicit segregation of schools by race. Id. The Confederate school names here are facially neutral because White as well as Black children will be confronted by the names Stonewall Jackson High School and Ashby Lee Elementary School. The only Equal Protection claim available on these facts is thus one relying on the disparate impact Confederate school names have on Black students. To survive a motion to dismiss an Equal Protection claim involving a "facially race-neutral policy," plaintiffs must plausibly allege: "(1) that the policy exacts a disproportionate impact on a certain racial group, and (2) that such impact is traceable to an

---

[9] Plaintiffs have a cause of action for the violation of federal rights, including those under the Equal Protection Clause, under 42 U.S.C. § 1983.

'invidious' discriminatory intent." <u>Coal. for TJ</u>, 68 F.4th at 879 (citing <u>Vill. of Arlington</u>

<u>Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 264-65 (1977)); <u>see also</u> <u>N.C. State Conf.</u>

<u>of the NAACP v. Raymond</u>, 981 F.3d 295, 302 (4th Cir. 2020).

### 1. Plaintiffs have plausibly alleged a disproportionate impact.

As to the first prong, plaintiffs have plausibly alleged that Confederate school names

"bear more heavily" on Black students because Black students disproportionately suffer both

feelings of inferiority and attendant educational detriments due to Confederate school names.

<u>N.C. State Conf. of the NAACP v. McCrory</u>, 831 F.3d 204, 231 (4th Cir. 2016). Plaintiffs

explain that Black students in general interpret Confederate names over school doors as the

functional equivalent of a "'No Blacks Allowed' sign on the schoolhouse gate." Resp., ECF

No. 39 at 19. Plaintiffs allege that this is precisely how such names were used by segregationists

in the era of massive resistance to <u>Brown</u>, and plaintiffs allege that that legacy objectively

informs the message conveyed to a Black audience observing Confederate school names today.

Compl., ECF No. 1, ¶¶ 48-58. At the motion to dismiss stage, plaintiffs' allegations about how

Confederate names are perceived by Black students are taken, like any other factual allegations,

as true. <u>Wikimedia Found.</u>, 857 F.3d at 208. And, albeit in dicta, courts have indeed concluded

that Confederate symbolism in schools has a unique effect on Black students. <u>See</u>, <u>e.g.</u>, <u>Crosby</u>

<u>by Crosby v. Holsinger</u>, 816 F.2d 162, 163 (4th Cir. 1987) ("[B]lack students undoubtedly

view[] . . . the Confederate symbols as a persistent affront, given the association between those

symbols and the history of slavery in this country."); <u>Smith v. St. Tammany Parish Sch. Bd.</u>,

316 F. Supp. 1174, 1176-77 (E.D. La. 1970) (deeming Confederate imagery "an affront to

every Negro student" and "a symbol of resistance to school integration").

25

More specifically, plaintiffs allege that the Black students at Stonewall Jackson High School and Ashby Lee Elementary School, unlike their White peers, feel personally denigrated by the Confederate names and will continue to suffer because the names will affect their academic performance and participation in school activities. See Compl., ECF No. 1, ¶¶ 145-52, 154-57, 160-67, 169-74, 176-81, 183-89. To again use the example of D.D., plaintiffs allege that she "will be confronted daily with signs, apparel, and school materials bearing the name of Stonewall Jackson" and will "feel inferior to her White peers." Id. ¶ 146. This will impact her "ability to receive an education and participate in school sponsored sports." Id. ¶ 147. These are specific allegations rooted in plaintiffs' personal experiences which must, at the motion to dismiss stage, be construed in the light most favorable to plaintiffs. Wikimedia Found., 857 F.3d at 208.

The School Board argues that forward-looking allegations that plaintiffs "'will undoubtedly . . . feel inferior'" are speculative. Mem. Supp. Mot. Dismiss, ECF No. 30 at 19-20 (citing Compl., ECF No. 1, ¶ 146).[10] This contention is meritless. In fact, because plaintiffs seek prospective declaratory and injunctive relief, they must allege future harm to have standing. City of Los Angles v. Lyons, 461 U.S. 95, 105 (1983).

The School Board similarly argues that psychological harms are not sufficient to state an Equal Protection claim and, though the School Board has not moved to dismiss for lack of jurisdiction, that psychological harms are not sufficient for standing. Mem. Supp. Mot.

---

[10] Defendants have not moved to dismiss under Federal Rule of Procedure 12(b)(1) for lack of standing, Mot. Dismiss, ECF No. 29, but their briefing argues that plaintiffs "also lack standing because even though they plan to continue attending in these schools . . . their allegations of psychological and stigmatic harm are vague, conclusory, and 'entirely speculative,'" Reply, ECF No. 43 at 10.

Dismiss, ECF No. 30 at 19-20. First, as to justiciability, dignitary harm is undoubtedly cognizable, even standing on its own. See TransUnion LLC v. Ramirez, 595 U.S. 413, 426 (2021) (recognizing that harm caused by discrimination is a cognizable injury in fact for standing purposes); Heckler v. Matthews, 465 U.S. 728, 739-40 (1984) ("[D]iscrimination itself . . . can cause serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group."). And here, plaintiffs have also alleged that feelings of inferiority will make it more difficult for students to learn, and Confederate school names allegedly deter Black students from participating in extracurricular activities. See, e.g., Compl., ECF No. 1, ¶¶ 176-81, 183-89. Plaintiffs further allege based on social scientific evidence that feelings of racial inferiority are detrimental to a child's development. Id. ¶ 188. This combination of dignitary harm, educational harm, and developmental harm is certainly a sufficient basis for standing.

Moreover, the dignitary, educational, and developmental harms alleged form an adequate basis for plaintiffs' Equal Protection claim that Black students disproportionately suffer these harms due to Confederate school names. Indeed, Brown itself concerned stigmatic harm underlying educational and developmental harm. The plaintiffs in Brown even relied on similar social scientific evidence to that cited in the complaint here. 347 U.S. at 494 n.11. The Court in Brown drew attention to the "well stated . . . finding" by one of the district courts below that "'[s]egregation of white and colored children in public schools has a detrimental effect upon the colored children. . . . A sense of inferiority affects the motivation of a child to learn.'" Id. at 494. And contrary to defendant's argument here that Brown is distinguishable because "the plaintiffs in Brown had suffered actual harm, i.e. inferior facilities, in addition to

their emotional and psychological harm," Reply, ECF No. 43 at 10, the <u>Brown</u> court relied on the fact that Black students suffered a "sense of inferiority" to find that "[s]eparate educational facilities are <u>inherently</u> unequal"—as opposed to only unequal insofar as they are materially worse. <u>Brown</u>, 347 U.S. at 495 (emphasis added). In other words, the conclusion that dignitary harm injurious to a child's education can be the basis of an Equal Protection claim was the linchpin of the <u>Brown</u> holding. Because plaintiffs here have alleged that the same harms at issue in <u>Brown</u>—feelings of racial inferiority injurious to a student's education and development—are felt disproportionately by Black students in Shenandoah County, they have sufficiently pled the disparate impact prong of their Equal Protection claim.

### 2. Plaintiffs have plausibly alleged discriminatory intent.

Plaintiffs have also plausibly alleged that this disparate impact is the product of discriminatory intent. In identifying discriminatory intent in the Equal Protection context, the Fourth Circuit has consistently reaffirmed that "the ultimate question remains" the question first articulated by the Supreme Court in <u>Personnel Administrator of Massachusetts v. Feeney</u>. <u>McCrory</u>, 831 F.3d at 220. Did the "decisionmaker . . . select[] or reaffirm[] a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"? <u>Pers. Adm'r of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979). "Stated differently, that a given law or policy may foreseeably have some adverse impact on a particular racial or ethnic group is not sufficient to demonstrate invidious discriminatory intent—the 'decisionmaker' must set out with that very purpose in mind." <u>Coal. for TJ</u>, 68 F.4th at 883.

However, even <u>Feeney</u> does not require a showing of "racial hatred or animosity." <u>McCrory</u>, 831 F.3d at 233; <u>see also</u> <u>Hassan v. City of New York</u>, 804 F.3d 277, 298 (3d Cir.

2015) (internal quotations omitted) ("In a school-segregation case, for instance, the intent which triggers a finding of unconstitutionality is not an intent to harm black students, but simply an intent to bring about or maintain segregated schools."). And plaintiffs "need not show that discriminatory purpose was the 'sole[]' or even a 'primary' motive for the [challenged government action], just that it was a 'motivating factor.'" McCrory, 831 F.3d at 220 (citing Arlington Heights, 429 U.S. at 266).

Determining whether discriminatory intent was a motivating factor calls for "'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" Coal. for TJ, 68 F.4th at 883 (quoting Arlington Heights, 429 U.S. at 266). The inquiry considers non-exhaustive factors set out by the Supreme Court in Arlington Heights: (1) whether the policy is "unexplainable on grounds other than race," (2) the policy's "historical background," (3) the "specific sequence of events leading up to" the policy's enactment, (4) "any departures from the normal procedural sequence," and (5) the "legislative or administrative record." Arlington Heights, 429 U.S. at 266-68.

A government defendant's intent is classically difficult for plaintiffs to ascertain without peering behind the curtain with the aid of discovery. NAACP v. City of Myrtle Beach, 476 F. Supp. 3d 308, 323 (D.S.C. 2020) (noting that "subjective motivation" is difficult to establish, particularly before trial, in an Equal Protection case). Plaintiffs here are entitled to engage in discovery because they have alleged unusual factual circumstances plausibly indicating discriminatory intent under the Arlington Heights framework.

First, the consideration of "historical background" under Arlington Heights embraces "any history of discrimination by the decisionmaking body or the jurisdiction it represents."

Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 819 (4th Cir. 1995) (discussing Arlington

Heights, 429 U.S. at 267). Plaintiffs allege that Shenandoah County Public Schools' initial 1959

decision to name a high school and elementary school after Stonewall Jackson was part and

parcel of the schools' founding as "Whites only" schools. Compl., ECF No. 1, ¶¶ 59-65.

Plaintiffs also cite historical evidence to allege, more generally, that "school names honoring

Confederate generals . . . have often been used as symbols in promoting segregation." Id. ¶

48. These historical allegations plausibly indicate that the School Board has previously acted

with discriminatory intent and that Confederate school names are known tools for

intentionally conveying a school's aim to exclude Black students.

Still, these alleged historical facts, taken alone, cannot conclusively demonstrate that

the School Board acted in 2024 with the same intent with which it acted in 1959. See

McCleskey v. Kemp, 481 U.S. 279, 298 n.20 (1987) ("Although the history of racial

discrimination in this country is undeniable, we cannot accept official actions taken long ago

as evidence of current intent."). However, the historical allegations here are exceptional not

only because of the particular historical facts indicating that Shenandoah County Public

Schools initially chose Confederate school names because of their discriminatory effect, but

also because the very School Board that reinstated the names in 2024 had, less than four years

earlier, acknowledged this historical record and its enduring legacy. See Compl., ECF No. 1,

¶¶ 77-88. As one Board member stated in 2020, "You can't keep a name and remove racist

implications from it." Id. ¶ 85. Thus, while the intentions of contemporary actors can

sometimes be separated from the intentions of their historical predecessors, this is a rare case

where the allegations bind the past and present.

Next, Arlington Heights counsels that this court should consider the "specific sequence
of events leading up to" the allegedly discriminatory government decision. Arlington Heights,
429 U.S. at 267. The sequence of events here—in which the school names were first selected
to convey resistance to Brown, then changed in 2020-2021 in recognition of harm inflicted on
Black students, then reinstated in 2024—sets this case apart. Although many institutions,
including schools, may have carried Confederate names since Confederate figures were re-
popularized in the early twentieth century, Compl., ECF No. 1, ¶¶ 41-42, 49-63, the
Confederate school names here cannot be explained away as products of history or inertia.
Rather, in 2024, the School Board deliberately chose to reinstate the very names it had itself
repudiated as discriminatory in 2021.

That the School Board acted affirmatively to double down on Confederate school
names so soon after acknowledging their discriminatory effect makes it plausible that the
reinstatement decision was intended to have the recently observed discriminatory effect.
Courts recognize that such sudden policy shifts can be suggestive of discriminatory intent. See,
e.g., McCrory, 831 F.3d at 227-29 (considering the fact that North Carolina voting legislation
transformed suddenly, expanding to include voting policies disproportionately affecting voters
of color, upon the Supreme Court's decision to eliminate Section 5 preclearance under the
Voting Rights Act). "Courts distinguish a 'strange about-face,' which might be evidence of
discriminatory intent, from a 'natural response to a newly identified problem.'" Mi Familia
Vota v. Hobbs, 608 F. Supp. 3d 827, 867 (D. Ariz. 2022) (citing Dep't of Homeland Sec. v.
Regents of the Univ. of Cal., 591 U.S. 1, 35 (2020) (concluding that an abrupt about-face on
immigration policy was attributable to newly identified problems)). The about-face here is not

31

a response to a newly identified problem. In 2020, after evidence poured in from the community indicating that Confederate names "'have a traumatizing impact'" on Black students, the School Board voted to retire the Confederate names with the stated goals of "condemning racism and affirming the division's commitment to an inclusive school environment for all." Compl., ECF No. 1, ¶¶ 71-81. As plaintiffs have described the facts leading up to the School Board's reinstatement decision, no new information had emerged by 2024 negating the likelihood the names would have a discriminatory effect. With the School Board's 2020 recognition that Confederate names have a discriminatory effect unimpeached, this swift reversal of course makes it plausible that the School Board acted in 2024 with the opposite intent with which it acted in 2020-2021—namely, with the intent to reinstate the discriminatory effect.

The final Arlington Heights factor plausibly indicating discriminatory intent in this case is the "legislative or administrative record." Arlington Heights, 429 U.S. at 266-68. In 2020, Board members individually and collectively explained that they decided to retire the Confederate names in 2021 because the Confederate names disproportionately harmed Black students. Compl., ECF No. 1, ¶¶ 81-88. Board members recognized that Black students "feel like they're excluded" because Confederate names are a "'symbolic reference to a time of inequality and racism.'" Id. ¶¶ 85, 88. And a resolution voted upon by the School Board as a whole stated that the names were retired to "condemn[] racism." Id. ¶ 81. The School Board itself, not its current membership as of 2024, is the defendant in this case, and "'discriminatory purpose for constitutional analysis is to be gleaned not from individual officials but from the relevant governmental institutions.'" Vaughns v. Bd. of Educ. of Prince George's Cnty., 574

32

F. Supp. 1280, 1370 (D. Md. 1983), aff'd in part, rev'd in part on other grounds, Vaughns by Vaughns v. Bd. of Educ. of Prince George's Cnty., 758 F.2d 983 (4th Cir. 1985) (quoting United States v. Bd. of Sch. Comm'rs of Indianapolis, 573 F.2d 400, 412-13 (7th Cir. 1978)). Accordingly, although the School Board's membership changed between 2021 and 2024, the 2021 Board's recognition that the Confederate names constitute "racism" can be attributed to the defendant here. Compl., ECF No. 1., ¶ 81. This is an extraordinary case where the defendant School Board acknowledged that the Confederate school names have a discriminatory effect, yet later voted to reinstate them.

In addition, in 2024, the School Board was reminded of the discriminatory effect of Confederate school names by statements from community members. Id. ¶ 126 ("[I]t's a loud and clear message to me as a parent and to any students of color that our wellbeing is none of your concern."). One Board member acknowledged in 2024 that he "would feel unsettled if [he] were Black and going through this." Id. ¶ 134. Yet the School Board voted to reinstate the names Stonewall Jackson and Ashby Lee anyway. Of course, under Feeney, awareness of a foreseeable discriminatory effect is not enough. Coal. for TJ, 68 F.4th at 883. But here, this patent acknowledgement of discriminatory effect is coupled with other allegations suggesting that the School Board acted because of the discriminatory effect.

Plaintiffs also allege that School Board members made statements indicating discriminatory animus. For example, plaintiffs allege one School Board member shared an article from a "friend and fellow Patriot" in which the author called opponents of Confederate school names "race pimps," Compl., ECF No. 1, ¶ 104, a term plaintiffs describe as a "slur that has historically been used against Black civil rights activists," Resp., ECF No. 39 at 26-27.

Although the article was not written by a School Board member, the School Board member herself endorsed the article, and a non-state actor's statement can demonstrate the government's intent where there is "insufficient evidence with which to draw a clear line between the motivations of state and non-state actors." NAACP v. City of Myrtle Beach, 476 F. Supp. 3d at 324-25 (finding sufficient evidence of discriminatory intent where emails exchanged between city leaders and community members indicated community members wanted to keep Black motorcycle rally from turning Myrtle Beach into a "slum only thugs would support"). "Racially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." Guimaraes v. SuperValu, Inc., 674 F.3d 962, 974 (8th Cir. 2012).

### 3. At the pleading stage, the School Board's justifications for reinstating Confederate school names are insufficient to negate discriminatory intent.

In making its 2024 decision and in briefing, the School Board has pointed to three nondiscriminatory justifications for the reinstatement of Confederate names: (1) honoring Confederate leaders due to their admirable leadership qualities; (2) responding to the will of the constituents who elected a pro-Confederate school name Board; and (3) a belief that racism no longer exists and that "if you really want to stop this racism and prejudice, let's just stop finding racism and prejudice in[] everything." Id. ¶¶ 128-31 (citing a School Board member's remark praising Stonewall Jackson's "character, his loyalty, how Godly a man he was").

However, plaintiffs "need not show that discriminatory purpose was the 'sole[]' or even a 'primary' motive for the [challenged government action], just that it was a 'motivating factor.'" McCrory, 831 F.3d at 220 (citing Arlington Heights, 429 U.S. at 266). The burden

34

then shifts to the government to show that the challenged policy "would have been enacted without this factor." Hunter v. Underwood, 471 U.S. 222, 228 (1985). Because plaintiffs have alleged enough to show that discriminatory intent was plausibly a motivating factor, plaintiffs have stated a disparate impact claim.

Finally, it bears emphasizing that whether the School Board followed the public will is irrelevant. Constitutional rights "withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities." Barnette, 319 U.S. at 638. The relevant inquiry is thus whether the decision to reinstate Confederate school names, however popular the decision may or may not have been in the community at large, was intended to and did disproportionately harm the already tiny fraction of the community comprised of Black students. Compl., ECF No. 1, ¶ 140. Plaintiffs have alleged precisely this with sufficient plausibility to justify proceeding to discovery.

### 4. This case is distinguishable from Hanover County.

Before addressing the statutory claims, one final note on the distinctiveness of the Equal Protection allegations in this case is in order. The plaintiffs in the Hanover County case also alleged an Equal Protection violation. However, the Confederate school names there had remained in place since 1958 and 1968 respectively. Hanover County, 461 F. Supp. 3d at 287. Accordingly, the court dismissed the Equal Protection claim as time-barred under the applicable statute of limitations. Id. at 296. The plaintiffs here filed their lawsuit almost exactly one month after Honey Run Elementary School and Mountain View High School were renamed Ashby Lee Elementary School and Stonewall Jackson High School. Compl., ECF No. 1, ¶¶ 136-39. This is well within the two-year statute of limitations applied in Hanover

35

County. 461 F. Supp. 3d at 296 (borrowing the two-year statute of limitations from Virginia personal injury actions as the state law claim most analogous to an Equal Protection claim under Section 1983). Although, as counsel for the School Board pointed out during oral argument, Hr'g Tr., ECF No. 59 at 5-6, there are plenty of other institutions, highways, and landmarks named for Confederate leaders, this case stands apart because the School Board discarded the names as symbols of discrimination and racism in 2021, only to reinstate them three years later.

In addition to affecting the statute of limitations issue, the unique timeline of the School Board's decision to reinstate the names Ashby Lee Elementary School and Stonewall Jackson High School gives rise to plausible indications of discriminatory intent in this case that simply were not present in Hanover County. As explained above, this includes the salient fact that the School Board here acknowledged that the Confederate names had a discriminatory impact just three years before reinstating them. Moreover, while history and inertia may explain some continued uses of Confederate names, the School Board's abrupt about-face makes this case different, rendering it uniquely plausible that the names here were reaffirmed because of, not merely in spite of, their discriminatory effect.

As a secondary justification for dismissing the Equal Protection claim in Hanover County, that court concluded that the complaint's allegations of discriminatory impact were "entirely conclusory." 461 F. Supp. 3d at 298.[11] Once again, this case is unlike Hanover County

---

[11] The Hanover County opinion emphasized that the plaintiffs there had cited psychological harms, not legal segregation. 461 F. Supp. 3d at 297-98. To the extent that the Hanover County opinion can be read as suggesting that an Equal Protection violation cannot be rooted in stigmatic injury or anything short of "de jure segregation," id., the court disagrees for the reasons explained in the above analysis of precedents like Brown.

because, due to the presence of individual named plaintiffs rather than a purely associational plaintiff, there are simply more specific facts alleged. Compare id. with Compl., ECF No. 1, ¶ 148.

Accordingly, the School Board's motion to dismiss the Equal Protection claim is denied because the unique facts alleged in this case warrant proceeding to discovery.

## C. Title VI

Title VI provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "[P]rivate individuals may sue to enforce [Title VI] and obtain both injunctive relief and damages." Alexander v. Sandoval, 532 U.S. 275, 279-80 (2001). Title VI applies to federally financed educational programs, Peters v. Jenney, 327 F.3d 307, 315 (4th Cir. 2003), including Shenandoah County Public Schools, Compl., ECF No. 1, ¶ 233. Because plaintiffs have stated a claim for relief under the Equal Protection Clause, they have also stated a Title VI claim. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 198 n.2 (2023) ("'We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.'") (quoting Gratz v. Bollinger, 539 U.S. 244, 276 n.23 (2003)). The motion to dismiss plaintiffs' Title VI claim is denied.

## D. Equal Educational Opportunities Act

The EEOA prohibits educational agencies from denying an equal educational opportunity to any individual on account of race. 20 U.S.C. §§ 1701 et seq. The statute defines

denial of equal educational opportunity to include "the failure of an educational agency which has formerly practiced . . . deliberate segregation to take affirmative steps . . . to remove the vestiges of a dual school system." 20 U.S.C. § 1703(b). "[P]ost-Brown actions that have the effect of increasing or perpetuating segregation constitute a violation of the affirmative duty." Stanley v. Darlington Cnty. Sch. Dist., 879 F. Supp. 1341, 1412 (D.S.C. 1995), rev'd in part on other grounds, 84 F.3d 707 (4th Cir. 1996). Shenandoah County Public Schools and the School Board fit the definition of "educational agencies" subject to this affirmative duty. 20 U.S.C. § 1720(a).

An EEOA claim differs from an ordinary disparate impact constitutional claim because "the existence of [a] former de jure dual school system [can] suppl[y] the necessary element of intentional discrimination and gives rise to the affirmative duty to eliminate all vestiges of the dual system." Stanley, 879 F. Supp. at 1413. The issue is instead whether the defendant has failed to eliminate vestiges of de jure segregation. To make out a prima facie case based on a failure to take affirmative steps to remove the vestiges of a segregated school system, the plaintiff must show (1) that the relevant "schools were racially segregated by law at the time of Brown [] (which requires little proof because that is a matter of undisputed historical fact)" and (2) "that current conditions within the District continue to require desegregation remedies." Id. at 1412 (citing Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 537 (1979)). Once this required showing is made, a presumption arises that present conditions are causally related to the former dual school system, and the defendant has the burden of showing that current conditions are not the result of "the former state-imposed dual system." Stanley, 879 F. Supp. at 1412. If the causal connection does exist, then "[t]he remoteness in time of the

38

school authorities' intentionally discriminatory actions is irrelevant." Jacksonville Branch, NAACP v. Duval Cnty. Sch. Bd., 883 F.2d 945, 951 (11th Cir. 1989).

As to the first prong of the prima facie case, Stonewall Jackson High School and Ashby Lee Elementary School did not exist at the time of Brown, but Shenandoah County Public Schools were segregated at that time. Compl., ECF No. 1, ¶ 65. They remained segregated through 1962. Id. ¶¶ 59-65, 67 ("Nearly a decade after Brown, the first Black students were enrolled in Stonewall Jackson High School for the 1963-1964 school year."). The first prong of the prima facie case is therefore satisfied. The next question is whether reinstating Confederate school names qualifies as "perpetuating segregation" or has produced "current conditions . . . continu[ing] to require desegregation remedies." Stanley, 879 F. Supp. at 1412.

Plaintiffs have alleged that current conditions deprive Black students of equal educational opportunities. Notably, Black students are allegedly discouraged from participating in extracurricular activities. Compl., ECF No. 1, ¶¶ 150-52. Plaintiffs also allege that Black students experience "psychological harm" and are thus "prevented from fully accessing the equal educational experience to which [they are] entitled." Id. ¶ 157. These allegations are somewhat different from those in the typical EEOA case of segregation reflected in the school's measurable demographic composition. See, e.g., Stanley, 879 F. Supp. at 1413 (discussing the school system's racial makeup); Freeman v. Pitts, 503 U.S. at 476 (discussing evidence of racial imbalance in student population); United States v. Hinds Cnty. Sch. Bd., 560 F.2d 619, 621 (5th Cir. 1977) (concerning a sex-segregated student assignment plan); United States v. Sch. Dist. of Ferndale, 577 F.2d 1339, 1341 (6th Cir. 1978) (discussing the racial balance between predominantly White schools and predominantly Black school in

39

district). Although plaintiffs here have alleged that less than 1% of students at Honey
Run/Ashby Lee Elementary School and less than 2% of students at Mountain View/Stonewall
Jackson High School are Black, they have not thus far indicated whether these numbers have
shifted in response to the 2021 and 2024 name changes. Compl., ECF No. 1, ¶ 140.

However, in Freeman v. Pitts, 503 U.S. at 486, the Supreme Court, citing Green v.
Cnty. Sch. Bd. of New Kent, 391 U.S. 430, stated:

> The objective of Brown [] was made more specific by our holding
> in Green that the duty of a former de jure district is to "take
> whatever steps might be necessary to convert to a unitary system
> in which racial discrimination would be eliminated root and
> branch." 391 U.S. at 437-38. We also identified various parts of
> the school system which, in addition to student attendance
> patterns, must be free from racial discrimination before the
> mandate of Brown is met: faculty, staff, transportation,
> extracurricular activities, and facilities. 391 U.S. at 435. The
> Green factors are a measure of the racial identifiability of schools
> in a system that is not in compliance with Brown, and we
> instructed the District Courts to fashion remedies that address all
> these components of elementary and secondary school systems.

Here, plaintiffs have alleged that Black students' educational experiences are made unequal by
the Confederate names and that the Confederate names plausibly have an impact on the racial
composition of sports teams, school bands, and other extracurricular activities. Consistent
with the Supreme Court's holdings in Green and Freeman, where the Court expressly directed
district courts to "fashion remedies that address all these components of elementary and
secondary school systems"—including "extracurricular activities," id., plaintiffs' allegations
state a plausible EEOA claim.

The court has considered whether the fact that the Confederate names were retired in
2021 before being reinstated in 2024 cuts the causal link binding the alleged present

discrimination and <u>de jure</u> segregation, meaning the reinstated names are products of alleged contemporary discrimination, not "vestiges" of alleged past discrimination. 20 U.S.C. § 1703(b). However, the question of causation under the EEOA is reserved for later stages of litigation. Having made out a <u>prima facie</u> case, plaintiffs are entitled to a presumption that present conditions are causally related to the former segregation of Shenandoah County Public Schools, and the burden shifts to the School Board to make a contrary showing. <u>Stanley</u>, 879 F. Supp. at 1412. Discovery is necessary to further assess this claim.

## IV. CONCLUSION

The unique facts alleged in this case, namely, the School Board's 2024 reinstatement of Confederate names it had removed in 2021 because of their discriminatory effect, taken as true at the pleading stage, require the court to deny the motion to dismiss and permit discovery to proceed.

An appropriate order will be entered.

Entered: January 22, 2025

Michael F. Urbanski
Senior United States District Judge