IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISON

| | | |
|---|---|---|
| VIRGINIA STATE CONFERENCE NAACP, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 5:24-cv-00040 |
| COUNTY SCHOOL BOARD OF SHENANDOAH COUNTY, | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant, Shenandoah County School Board (the "School Board"), by counsel, respectfully submits this memorandum in support of its Rule 56 motion for summary judgment on the Plaintiffs' First Amendment compelled-speech claim.

## INTRODUCTION

As the School Board argued in its motion to dismiss the plaintiffs' complaint, the fatal flaw in the plaintiffs' First Amendment compelled-speech claim is that the plaintiffs have not shown that they are, in actuality, compelled to "become a courier for" whatever message might be communicated by the school name "Stonewall Jackson High School" or the team name "Stonewall Jackson Generals." This Court allowed this claim to proceed because "discovery is needed to determine whether evidence supports plaintiffs' allegations that symbolically honoring Stonewall Jackson is indeed a condition of participation in school activities." (Mem. Op., ECF 61, at 10.) Discovery has now come to a close on the First Amendment claim, and there is simply no evidence to support the plaintiffs' belief that they are compelled to "honor," symbolically or otherwise,

Stonewall Jackson, or any message his name might represent, in order to participate in school activities.

At most, there is evidence that two of the student plaintiffs, D.D. and A.J., believe, based on their understandings of team and league rules, that they are required to wear name-tags bearing "Stonewall Jackson High School" and/or uniforms bearing "Generals." There is evidence that D.D. and A.J. are announced as members of "Stonewall Jackson High School" or the "Stonewall Jackson Generals" at extracurricular events, in publications, and on team rosters. However, these plaintiffs' allegations that they are compelled, or even encouraged, to honor Stonewall Jackson or promote any particular message that might be associated with his name, in order to participate in school activities, are simply not borne out by the facts.

Rather, the undisputed facts show that these student plaintiffs continue to attend Stonewall Jackson High School and participate in extracurricular activities there as "Generals"—and, accordingly, wear the uniforms bearing these names—in spite of their distaste with the school's namesake. Furthermore, the facts show that neither of these students has even taken the step of protesting the school and/or mascot name by altering or modifying their uniforms to conceal it. In fact, they have not even requested permission to do so, simply because they believe it would not be allowed, or they do not wish to set themselves apart from their fellow students.

Instead, these students, and presumably other student members of the NAACP, want this Court to change the school's name for everyone, simply because it offends them. Unfortunately for them, the applicable law does not support the notion that merely naming a school after a person—even one whose reputation is controversial—unconstitutionally compels the speech of those students who choose to attend the school and participate in its voluntary extracurricular activities. Quite the contrary. The law considers the naming of schools "government speech"—

which is exempt from the First Amendment—and the school's display of its name (on uniforms, school property, and in publications) "school-sponsored speech"—which school officials have wide latitude to restrict or compel.

Nor does the law support the notion that a person's name alone communicates a particular message. At most, the law supports the idea that a slogan—such as "Live Free or Die" or "Tomorrow's Leaders"—or a symbol—such as a Confederate flag or a historically-charged mascot (e.g. "Rebel")—can communicate an unambiguous message. But we are not dealing with slogans or symbols here. We are dealing with a man's name: Stonewall Jackson, and a class of military officers: Generals. These names do not inherently communicate a particular, coherent message, so they cannot fairly be said to compel "speech" under the First Amendment—even if they were not "school-sponsored speech."

If merely naming a school after a person and its student participants after a military rank, and displaying those names on extracurricular uniforms and gear, compels the speech of students who attend that school and participate in its extracurricular activities, it would open the courthouse doors to any student who disagrees with a school name or mascot. The School Board respectfully requests that this honorable Court grant summary judgment in its favor on the First Amendment compelled-speech claim and refrain from broadly expanding what qualifies as "compelled speech."

## THE UNDISPUTED FACTS

On July 9, 2020, amid the COVID-19 pandemic, the School Board—which at that time was composed of an entirely different set of members than the current School Board—voted 5-1 in a meeting—held virtually—to "retire" the names of Stonewall Jackson High School ("SJHS") and Ashby Lee Elementary School (together, the "Schools"). (First Joint Stipulations, ECF 85, ¶¶

17-19; Second Joint Stipulations, ECF 96, ¶ 68.) Beginning on June 1, 2021, the names used for the Schools were, respectively, Mountain View High School and Honey Run Elementary School. (ECF 85 ¶ 25.) After the July 9, 2020 vote to "retire" the original names, all six members of the School Board were replaced via popular vote by candidates who committed either to restore the original names or have them considered. (ECF 96 ¶ 68.) Then, on May 10, 2024, the School Board—composed of an entirely new set of members from the 2020 School Board—voted 5-1 to restore the original names of the Schools. (ECF 85 ¶ 42.)

On June 11, 2024, Plaintiffs, Virginia State Conference NAACP ("NAACP") and five of its minor members who, at the time, were students at the Schools, filed this lawsuit alleging violations of their rights under the First and Fourteenth Amendments to the U.S. Constitution, and under Title VI of the Civil Rights Act of 1964 and the Equal Educational Opportunities Act. (*See* Complaint, ECF 1.) Plaintiffs' claim under the First Amendment is that by restoring the original names of the Schools and requiring students participating in school/extracurricular activities to wear uniforms and other apparel while participating as a member of the Stonewall Jackson "Generals," and by otherwise requiring student participants to identify as Stonewall Jackson "Generals," including by identifying the team name on scoreboards and signs, and in announcements, the School Board is compelling Individual Plaintiffs and members of the NAACP to express a view with which they disagree. (Compl., ECF 1, ¶¶ 196-197.) The specific plaintiffs who brought the First Amendment claim are the NAACP and two of its minor members, pseudonymously called D.D. and A.J. (collectively, the "First Amendment Plaintiffs") (*See* Compl., ECF 1, at 51.)

The NAACP "includes students that believe that the uniforms bearing 'Stonewall Jackson,' 'SJ,' or 'Generals' compel them to identify with a message with which they disagree." (NAACP

Resp. Int. No. 2.)[1] The official team name for SJHS is the "Generals." (ECF 85 ¶ 45.) In the 2024-2025 school year (the "Current School Year"), SJHS sports teams and student groups participating in SJHS extracurricular events are sometimes referred to as "Stonewall Jackson," "Stonewall Jackson High School," or "Generals" in official written communications and in official announcements at sporting events. (*Id.* ¶¶ 48-51.) Additionally, student participants are identified as "Stonewall Jackson" students, "Stonewall Jackson Generals," or "Generals." (*Id.* ¶ 54.)

There is ample evidence that most extracurricular uniforms at SJHS bear "Generals" and some—though much fewer—bear "Stonewall Jackson" or "SJ." (*See generally* Uniforms.)[2] The uniforms are mostly red, black, or white. (*Id.*) In the Current School Year, for example, the SJHS football team uniforms displayed "Generals" on the jerseys. (*Id.* #4743–46.) The basketball, soccer, track and field, cross-country, softball, volleyball, wrestling, golf, Scholastic Bowl, and junior varsity baseball team uniforms all displayed "Generals." (Fourth Joint Stipulations, ECF 109, ¶ 112.) The varsity baseball team uniforms displayed "Generals" on the jersey and "SJ" on the hat. (*Id.* ¶ 113.) The cheerleading team uniforms displayed "Generals" on the top, and some cheerleaders wore hair bows that displayed "SJ." (*Id.* ¶ 114.) In the Current School Year, the SJHS varsity football team wore "throwback" team uniforms for Homecoming that displayed "Stonewall." (*Id.* ¶ 115.) The SJHS swim team wore swim jackets that displayed "Stonewall Jackson High School Generals" and swim caps that displayed "G." (*Id.* ¶ 116.)

---

[1] The NAACP's responses to Defendant's First Set of Interrogatories ("NAACP Responses to Interrogatories") are attached hereto as Exhibit A.

[2] Photographs of SJHS athletic uniforms for the 2024-25 academic school year, Bates Nos. SCSB #4701-4795 ("Uniforms"), are attached hereto as Exhibit B.

Specifically, D.D. testified that in the Current School Year she played basketball and soccer for SJHS and that her uniforms for those sports displayed "Generals." (Dep. D.D. at 6-11.)[3] The uniform colors are red, black, or white. (*Id.* at 9.) In the Current School Year, D.D. earned varsity letters that displayed "SJ." (*Id.* at 19). She testified that there are signs in the gym where she played basketball that display "Stonewall Jackson." (*Id.* at 12-13.)

D.D. disagrees with the team name, "Generals," because it stands for Confederate generals who wanted slavery to continue, due to the association with Stonewall Jackson. (*Id.* at 15.) D.D. believes the names "Stonewall Jackson" and "Generals" send a message of wanting slavery to continue. (*Id.* at 19.) She has shown her objection to that message by speaking against it at a School Board meeting and in interviews. (*Id.* at 20.) She believes she is made to represent that message when she plays sports and has to wear the name "Generals" on her jerseys, and when her teams are announced as the "Stonewall Jackson Generals" before games. (*Id.*)

She testified that she believes she is required to wear the uniforms to participate in her sports because of a Virginia High School League ("VHSL") rule or policy that was communicated to her by her soccer and basketball coaches at the beginning of the season. (*Id.* at 21-22.) Her understanding of the rule is that players on a team must all wear the same jerseys in order to participate. (*Id.*) [4]

A.J. testified that in the Current School Year he participated in marching band, track and field, scholastic bowl, debate, Future Business Leaders of America ("FBLA"), and National

---

[3] Defendant refers the Court to the unredacted copy of D.D.'s deposition transcript submitted to the Court as Exhibit 4 (filed under seal) to Plaintiffs' Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment on First Amendment Claims [ECF No. 120].

[4] There is no such rule in the 2024-25 VHSL Handbook, https://drive.google.com/file/d/1KqfNQfeuag0NfsMyfpG4zvRWsUZTvNK6/view, which can be found on the VHSL website. *See* https://www.vhsl.org/parents-and-students/.

Honors Society at SJHS and the Massanutten Regional Governor's School (the "Governor's School") within SJHS. (Dep. A.J. at 6-8.)[5] A.J. testified that, during track and field events, his team is referred to as the "Stonewall Jackson Generals." (*Id.* at 23.) During football games, his marching band is referred to as the "Stonewall Jackson marching Generals." (*Id.* at 22.) The marching band does not play any songs that reference the Confederacy. (*Id.*) The marching band's uniforms in the Current School Year are blue and white; in the past, they have been black and red. (*Id.* at 12-13.) The marching band uniforms display "Generals." (*Id.* at 13.) The track and field and Scholastic Bowl uniforms in the Current School Year are red and display "Generals." (*Id.* at 14-15.) He wears name-tags that display "Stonewall Jackson" for FBLA, debate, and Scholastic Bowl. (*Id.* at 10-11, 15.) He is referred to online on the team roster on MileStat as a "Stonewall Jackson athlete." (*Id.* at 32.) He testified that he is occasionally referred to as a member of the "Stonewall Jackson Generals" when receiving team or individual awards at track and field events. (*Id.* at 23.) At Scholastic Bowl events, his team is referred to as "Stonewall Jackson" throughout the matches. (*Id.*) When receiving personal awards at athletic events, A.J.'s name was announced along with the name "Stonewall Jackson." (*Id.* at 24.)

A.J. disagrees with the name "Stonewall Jackson" and the team name "Generals" because of their association with the Confederacy and Confederate ideals. (*Id.* at 12, 16.) He further disagrees with "Stonewall Jackson" because of the fact that Stonewall Jackson owned slaves and fought the United States in the Civil War. (*Id.* at 18.) A.J. testified that he learned about Stonewall Jackson in his world history class and from a speech by the Sons of Confederate Veterans during the senior awards for scholarships. (*Id.* at 19-20.)

---

[5] Defendant refers the Court to the unredacted copy of A.J.'s deposition transcript submitted to the Court as Exhibit 5 (filed under seal) to Plaintiffs' Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment on First Amendment Claims.

While A.J. has never been threatened or pressured by his teachers, instructors, or coaches to identifying with "Stonewall Jackson," he believes that he would not be able to participate in track and field events if he did not wear the school-provided uniforms, unaltered. (*Id.* at 28-29.) He believes this based on statements of rules made by his track and field coach at the start of the season, which he testified were based on VHSL rules. (*Id.*) He has never asked any of his coaches if they could make an exception for him based on his beliefs. (*Id.* at 30.) A.J. testified that he would feel "slightly uncomfortable" if he had to wear a uniform different from his teammates "because it would single [him] out." (*Id.* at 33.)

## ARGUMENTS AND AUTHORITIES

### I. Standard of Review.

A motion for summary judgment must be granted when "there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "This standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A party may use declarations, depositions, and interrogatory answers, among other things, to support his argument that summary judgment is appropriate. Fed. R. Civ. P. 56(c).

When reviewing a motion for summary judgment

> A judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

*Anderson*, 477 U.S. at 252. To withstand a motion for summary judgment, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l., Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249-50).

**II. The School Board's naming of its schools and their mascots is protected "government speech," and, by extension, so are those schools' displays of their school and mascot names.**

The government has the right, free from scrutiny under the Free Speech Clause, to convey any message it deems appropriate, including by advancing certain viewpoints to the detriment of others. *See Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 616-17 (4th Cir. 2002). The government has wide latitude in determining the content of its speech: by promoting a program, espousing a policy, or taking a position. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015). This latitude allows the political process to shape government functions: instead of being shaped by court cases, government is shaped by the votes of the governed. *Sons of Confederate Veterans*, 288 F.3d at 618.

Whether speech is indeed "government speech," or government regulation of private speech, is weighed by a four-factor test: "(1) the central purpose of the program in which the speech in question occurs; (2) the degree of editorial control exercised by the government or private entities over the content of the speech; (3) the identity of the literal speaker; and (4) whether the government or the private entity bears the ultimate responsibility for the content of the speech . . . ." *Id.* The third and fourth factors concern what message a person observing the speech would receive and who owns the means of the communication. *Id.* at 621.

A state government choosing which slogans or designs to allow in a specialty license plate program is government speech, *see Walker*, 576 U.S. at 219, but requiring a license plate to bear certain slogans compels the private speech of the individuals who must display the license plate on their vehicle. *See Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (finding compelled private speech when all passenger vehicles were required to bear the slogan "Live Free or Die").

In an oft-cited case out of the Eleventh Circuit, being required to enter a public building which flew the state flag did not infringe on the plaintiff's First Amendment rights because "entering a public building does not manifest any particular attitude or belief and does not associate appellant with the flag's message." *Coleman v. Miller*, 117 F.3d 527, 531 (11th Cir. 1997). This case is analogous to the Plaintiffs' claim that entering SJHS with the school name displayed over the entrance, or entering the playing field with Stonewall Jackson Generals displayed on the scoreboard, associates them with a particular message.

While the Supreme Court has not examined specifically the issue of whether uniforms bearing school or team names compel the speech of the student participants, the Ninth Circuit examined a required uniform shirt bearing a slogan as private speech of the individuals forced to wear the shirt as a condition of school attendance. *See Frudden v. Pilling*, 742 F.3d 1199, 1207 (9th Cir. 2014). There, elementary students were required to wear a uniform shirt that bore the school name, the school logo (a gopher mascot), and the words "Tomorrow's Leaders." *Id.* Parents objected to the slogan, and the court found that the students were forced to "endorse a particular viewpoint" on the basis of the slogan. *Id.* Importantly, the court specified in a footnote that it was not reaching the issue of whether the plaintiffs could state such a claim on the basis of the elementary school name and/or gopher logo, without the additional slogan. *Id.* at n.2 (quoting *Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419, 433 (9th Cir. 2008)) ("[A]llowing students'

otherwise solid-colored clothing to contain a school logo—an item expressing little, if any, genuine communicative message—does not convert a content-neutral school uniform policy into a content-based one.”).

When the School Board restored the original names of the schools, they did so for the central purpose of running the school district according to their electoral promises. (*See* ECF 96 ¶ 68)

> Since the July 9, 2020 vote to "retire" the names of Stonewall Jackson High School and Ashby-Lee Elementary School, all six members of the School Board were replaced by candidates who committed either to support the school names' restoration or to have the names reconsidered, and the average vote for those candidates (who ran opposed) was 67%.

They exercised full editorial control over the renaming and bore ultimate responsibility for the name change, in that no one else could have been viewed as making the decision. (*See* ECF 85 ¶¶ 32-42.)

> Shenandoah County Public Schools School Board Policy FFA: School Names states: "It is the responsibility of the Shenandoah County School Board to determine the name of schools, school facilities, and areas of school facilities or grounds in the division. The Board will solicit and accept input from the public regarding the names of schools or school facilities but reserves the right to make the final decision regarding the name of any school or school facility. . . . In fulfilling this responsibility, the Board shall make every effort to respect the preference of the local school community; however, the final decisions on the naming of school facilities and the dedicating of areas of school facilities or grounds shall rest entirely with the Board. . . . The Board may rename a school or school facility upon a determination that it is appropriate to do so. When a facility is reutilized for a new purpose or function, the School Board may rename that facility. The procedure for renaming a school or school facility will be the same as the procedure outlined above."

(Third Joint Stipulations, ECF 104, ¶ 81.) The identity of the literal speaker similarly could only be the School Board, because the names were restored by their votes and resolution and

implemented on their school buildings. (ECF 85, ¶¶ 32-44.) Therefore all four factors tend towards protected governmental speech in restoring the names.

Furthermore, merely naming a school or its mascot and allowing students to attend the school and participate in its extracurricular activities does not compel speech the way that mandating a slogan on every citizen's license plate does. *See Wooley*, 430 U.S. at 531. The instant case is more analogous to *Coleman*, where merely entering a building where a state flag is flown does not manifest any attitude or belief associated with that flag. 117 F.3d at 531.

Granted, even messages which are purely government speech may become compelled private speech when they become mandated to display at the individual level. However, *Frudden* correctly suggests that the school name and mascot alone, without the slogan, are not enough to state a compelled-speech claim. Here, there is no evidence of a slogan appearing on any school uniform or gear.

**III. If not "government speech," the use of the school and mascot names on uniforms and in announcements is "school-sponsored speech" and thus subject to the school's "editorial control."**

Whether being required to wear uniforms or name-tags bearing the school's name and mascot can be considered a violation of First Amendment free speech rights by compelling speech is an issue that no court has addressed. While there is some out-of-circuit precedent that enforcing a uniform shirt with a separate slogan compels the speech of the students who must wear it, *see Frudden v. Pilling*, 742 F.3d 1199, 1207 (9th Cir. 2014), even that court expressed doubt as to whether the school name and mascot also featured on the uniform shirt, alone, could have stated a similar claim. *Id.* at n.2.

The First Amendment rights of students in public schools "are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478

U.S. 675, 682 (1986). As the Supreme Court noted, "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Therefore, courts "do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). Selecting the name and mascot of a school is school board business, and the courts have historically refused to interfere with that business.

Other circuits have articulated a helpful test for determining what degree of restrictions a school is entitled to place on speech in the school setting, based on *Kuhlmeier*'s "imprimatur" exception. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1285 (10th Cir. 2004)[6]; *Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 923 (10th Cir. 2002); *Kuhlmeier*, 484 U.S. 260 (1988). The first type of speech in a school setting is "student speech" that happens to occur at school, such as when peaceful protest armbands are worn at school. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969). A school must tolerate this "pure student expression . . . unless it can reasonably forecast that the expression will lead to 'substantial disruption of or material interference with school activities.'" *Fleming*, 298 F.3d at 923 (quoting *id.*). The second type is government speech, such as when the principal speaks at an assembly, or prescribes a curriculum. *Id.* The third type is "school-sponsored speech" which the school "affirmatively . . . promotes" as opposed to merely "tolerating." *Kuhlmeier*, 484 U.S. at 270–71.

---

[6] *Axson-Flynn* was a compelled-speech case where the student was required to use swear words in pre-set monologues in acting class. By relying upon *Kuhlmeier*'s "imprimatur" concept, the *Axson-Flynn* court roped compelled speech into the body of case law dealing with "First Amendment rights of students in the public schools [that] 'are not automatically coextensive with the rights of adults in other settings.'" *Kuhlmeier*, 484 U.S. at 266 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682.)

When an expressive activity (such as theater productions or publications) might be reasonably perceived by the public as bearing the "imprimatur" of the school, those activities are "fairly . . . characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* "The imprimatur concept covers speech that is so closely connected to the school that it appears the school is somehow sponsoring the speech." *Fleming*, 298 F.3d at 925. Schools retain the right to exercise editorial control over school-sponsored speech if its actions are reasonably related to legitimate pedagogical concerns. *See id.* at 923-24 (citing *Kuhlmeier*, 484 U.S. at 271, 273).

As discussed previously, the naming of the school itself is government speech, without any truly expressive conduct by students or other attendees by the mere act of attending. The wearing of jerseys and name-tags bearing "Stonewall Jackson Generals" or "Generals," on the other hand, is school-sponsored speech.

Pure student speech that happens to occur on school grounds receives broad protection by the First Amendment, which prohibits forcing students to be "an instrument for fostering public adherence to an ideological point of view [they] find[] unacceptable." *Wooley*, 430 U.S. at 711. The Supreme Court first addressed this issue in *Tinker*, where students wore to school black armbands in protest of the Vietnam War. 393 U.S. at 514. The Court found that the school violated the students' First Amendment rights by prohibiting the peaceful act of protest because no material disturbance to school activities occurred. *Id.* The Court came to a similar conclusion when a West Virginia school required the students to salute and pledge to the American flag every day, with consequences for "insubordination" including expulsion, truancy, and resulting jail time for parents. *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 626, 629 (1943). Student speech was

impermissibly compelled by requiring students "to communicate by word and sign [their] acceptance of the political ideas [the flag]" represents. *Id.* at 633.

In contrast, when students produced a school newspaper as part of a journalism class, their speech was school-sponsored because it was a supervised learning experience, therefore within the purview of the school's editorial control over curricular matters. *See Kuhlmeier*, 484 U.S. at 271. And when a public university required acting students to deliver unedited monologues which contained profane language, despite religious objections to using such language, the course requirement was allowed as long as it was reasonably related to legitimate pedagogical concerns. *Axson-Flynn*, 356 F.3d at 1290 (remanding for additional factual development on the issue). The court noted that "substantial deference" is given to "educators' stated pedagogical concerns." *Id.* (internal quotations omitted).

The only expressive conduct at issue here is the wearing of athletic uniforms, t-shirts and name-tags at school-sanctioned events which bear the school and/or mascot name. The First Amendment Plaintiffs say that this forces them to embody a message glorifying the Confederacy. But these facts are not like the forced pledge to the flag, or banning of peaceful protest armbands, not least because those cases carried serious consequences for failing to conform. *See Barnette*, 219 U.S. at 626; *Tinker*, 393 U.S. at 514. Those cases both involved pure speech that happened to occur at school, and therefore the students were entitled to the full breadth of First Amendment protections. Here, no one is being forced to salute or pledge to a flag. No one is facing punishment for their peaceful protest. Students are at worst required to wear uniforms and gear bearing the school or mascot name at certain school-sponsored events.

These facts are much more similar to the "school-sponsored speech" cases. Much like a school-sponsored newspaper being subject to the school's editorial control because it was

produced in a classroom, here the uniforms are subject to the school's editorial control because the school provides the venue and coaches for athletic events, designs and pays for the uniforms, and arranges travel to these events for the students who wish to participate. *See Kuhlmeier*, 484 U.S. at 271. All of these contribute to a conclusion that the public should reasonably conclude that the school endorsed or sponsored such speech. Like the student in *Axson-Flynn* who was required to actually speak words over her objections, the students here are occasionally required to wear school uniforms that they object to. *Id.* Like the school in *Axson-Flynn*, SJHS has a legitimate pedagogical reason to compel the speech. *Id.* The school's legitimate pedagogical interest in its students being recognizable at interscholastic competitions and presenting as a cohesive group cannot be outweighed by individual students' objections to the same. *See Frudden v. Pilling*, 742 F.3d 1199 (9th Cir. 2014); *see also Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419 (9th Cir. 2008) (rejecting students' and their parents' challenge of a uniform policy requiring a plain polo shirt where they argued that the policy compelled them to convey a symbolic message of support for conformity in violation of the First Amendment); *Hardwick v. Heyward*, 711 F.3d 426 (4th Cir. 2013) (ruling that a school was permitted to prohibit clothing with Confederate iconography due to the history of racial tension in the school district and likelihood of future disruption due to such clothing)[7].

As Plaintiffs argue in their complaint, participation in extracurricular activities is an essential part of a well-rounded education. Extracurricular activities, such as athletics, teach leadership skills and teamwork. This means that they are sufficiently related to learning to be

---

[7] While it may seem counterintuitive to rely on *Hardwick* considering the school's prohibition of "Confederate iconography," *Hardwick* stands for the proposition that a school can have regulations on student clothing, i.e. a dress code, to promote cohesion and limit disruption. A policy or rule that student athletes or participants must all wear the same uniforms or nametags would do just that.

"pedagogical." *Axson-Flynn*, 356 F.3d at 1286. SJHS has a legitimate pedagogical interest in ensuring uniformity when its students represent the school at interscholastic competitions. If, on the other hand, athletics and other extracurricular activities are too far removed from the traditional curriculum for the school to have legitimate pedagogical interests in regulating the speech that occurs therein, then they must be optional, rather than essential to the learning experience of a well-rounded student. If participation is truly voluntary, then the speech is not compelled, and the First Amendment claim fails for lack of compulsion.

## IV. Schools are permitted to compel some speech by their students.

"It is clearly established that a school may compel some speech. Otherwise, a student who refuses to respond in class or do homework would not suffer any consequences." *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 350 (5th Cir. 2017) (*see* the court's discussion of the Supreme Court history on the issue of school-compelled speech). First Amendment protections have traditionally been for "matters of adult public discourse," and it is not true that "the same latitude must be permitted to children in a public school." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986). The First Amendment rights of students "are not automatically coextensive with the rights of adults in other settings." *Id.* Students must be afforded freedom of speech in school, but the right is "applied in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506.

School-sponsored speech may be restricted for legitimate pedagogical purposes, and alternatively a school may compel some speech for such purposes. *See C. N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 178 (3d Cir. 2005) (citing *Kuhlmeier*, 484 U.S. 260). "For example, a school may compel a student to write a paper on a particular topic even if the student would prefer to

write on a different topic. How far a school may go in compelling speech for what it views as legitimate pedagogical purposes is a difficult and unsettled question." *Id.*

"A school may exercise greater control over student speech uttered during participation in a school-sponsored activity than that expressed during an independent activity because 'students, parents, and members of the public might reasonably perceive [the school-sponsored speech] to bear the imprimatur of the school.'" *Henerey ex rel. Henerey v. City of St. Charles*, 200 F.3d 1128, 1133 (8th Cir. 1999) (quoting *Kuhlmeier*, 484 U.S. at 271). "Such control also 'assures that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.'" *Id.* (quoting *Kuhlmeier*, 484 U.S. at 271). "Although to be considered 'school-sponsored,' expressive activities must be 'curricular' in a broad sense, they need not 'occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.'" *Id.* (quoting *Kuhlmeier*, 484 U.S. at 271 (footnote omitted)).

"Restrictions on speech during a school's organized, curricular activities are within the school's legitimate area of control because they help create the structured environment in which the school imparts basic social, behavioral, and academic lessons." *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 96 (3d Cir. 2009) (citing *Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271, 275-76 (3d Cir. 2003)). "The curricular standards applied during these activities . . . should not be lightly overturned." *Id.*

Here, the First Amendment Plaintiffs believe they are required to wear uniforms or other gear bearing the name of SJHS, "SJ" or "Generals," and that such requirements compel them to speak a message with which they disagree. Even if this were true, the law permits SJHS to compel

its students' speech in this way because it serves a legitimate pedagogical purpose. As previously discussed, SJHS has a legitimate pedagogical interest in ensuring uniformity when its students represent the school at interscholastic competitions. Such uniformity ensures that its students are recognizable at such competitions and present as a cohesive group. It arguably teaches the students the value of being part of a team and sacrificing individuality for the good of the whole. In this way, SJHS is permitted to require the First Amendment Plaintiffs to wear the same uniforms as other students even if doing so compels them to communicate a message with which they disagree, because there is a legitimate pedagogical reason for doing so.

**V. Plaintiffs are not actually compelled to speak any message the school or mascot names might represent.**

The "freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006). Compelled speech occurs when "an individual is obliged personally to express a message he disagrees with, imposed by the government . . . ." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005).

Thus, the "crucial question is whether, in speaking, the government is *compelling* others to espouse or to suppress certain ideas and beliefs. In order to compel the exercise or suppression of speech, the governmental measure must punish, or *threaten to punish*, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" *Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)) (emphasis added) (internal citations omitted). For example, when an acting program made it abundantly clear that a student would not be able to continue in the program if she refused to say the words in a script, that coercion constituted compulsion. *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004). "A discouragement that is minimal and wholly subjective does not, however, impermissibly deter the exercise of free speech rights." *Phelan*, 235

F.3d at 1247-48 (quoting *United States v. Ramsey*, 431 U.S. 606, 623-24 (1977)). There must be some coercion or punishment for not "becoming a courier for such message." *Wooley*, 430 U.S. at 717. The Supreme Court has consistently required some punitive consequence in order for a compelled speech claim to have merit.

Here, the student plaintiffs testified that they believe they are required to wear uniforms bearing "Generals" and/or nametags bearing "Stonewall Jackson" while participating in sports or other extracurricular activities. They testified that they believe this based on statements of team or league rules made by their coaches at the start of the season. They claim that if they were not allowed to participate in their chosen extracurricular activities, they would be harmed both in their educational experience and in their future prospects. In this way, they claim, they are coerced into becoming couriers for a message that they believe is represented by the names "Stonewall Jackson" and "Generals."

**A. Plaintiffs are at most compelled to display the school and/or mascot names, which do not, in and of themselves, convey a particular message.**

While required student clothing displaying Confederate symbols or slogans (or mottos) could be considered compelled "speech," see *Hardwick ex rel. Hardwick*, 711 F.3d at 436-37 (treating the wearing of "Confederate flag apparel" as student speech) and *Frudden*, 742 F.3d at 1204 (finding that a uniform depicting a school's motto was compelled student speech), the First Amendment Plaintiffs are not required to wear uniforms or gear displaying symbols or slogans. Rather, they believe they are required to wear uniforms or gear displaying, and through announcements and advertisements are required to associate with, the school name "Stonewall Jackson High School," the school's namesake, or the mascot name "Generals" in order to participate in extracurricular activities.

Unlike the Confederate flag or a swastika, a school's name—or the person's name after which the school is named—is not a symbol of any particular ideology or message. Similarly, unlike a slogan or a motto, a name does not convey a clear and coherent message. A school's name merely identifies the school, which is a complex and multi-faceted institution. A person's name identifies a human being. Human beings are perhaps even more complex and multi-faceted, as evidenced by the stark contrast between opinions regarding Stonewall Jackson of the historical experts in this case. (*Compare* Seidule's Report[8] *with* Kerr's Report[9].) The name "Stonewall Jackson," for example, identifies a man who both fought against the United States as a member of the Confederate Army for the ostensible cause of preserving slavery (*see* Seidule's Report at 6-7) and taught young slaves to read in violation of Virginia law and likely at risk to his own liberty (*see* Kerr's Report at 7-9, 12-13). One cannot fairly equate a human being with a symbol of a particular ideology. Stonewall Jackson was a man who fought as a Confederate general; he was not a Confederate flag. Even if the First Amendment Plaintiffs are compelled to speak "Stonewall Jackson" via their uniforms and/or school announcements, they are not compelled to speak any particular message, good or bad, that might be associated with his name. If that were the case, then any school named after anyone associated with an ideology would be compelling the speech of its student participants.

The mascot name "Generals" is similarly vague enough to not be considered First Amendment "speech." *See Cressman v. Thompson*, 798 F.3d 938, 961 (10th Cir. 2015) ("[I]f the

[8] Defendant refers the Court to the copy of the expert report of Brig. Gen. Ty Seidule filed as Exhibit 6 to Plaintiffs' Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment on First Amendment Claims. (ECF No. 121-1 at 17-61.)

[9] Defendant refers the Court to the copy of the rebuttal report of Gibson Kerr filed as Exhibit 7 to Plaintiffs' Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment on First Amendment Claims. (ECF No. 121-1 at 63-78.)

speech is symbolic, then the only legally cognizable objectionable message is one that a reasonable observer would identify; if the plaintiff does not object to this reasonably discernible message, his compelled-speech claim fails.") It is not reasonable to identify "Generals" with the Confederacy, much less what Plaintiffs view as being "Confederate values." There were generals on both sides of the Civil War, for example. In sport, there are "court generals," and "ring generals." "Generals" does not necessarily equate to "Confederate Generals" just because the school is named after Stonewall Jackson.

As the student plaintiffs testified, they did not have an issue with the "Generals" mascot name when the high school was called "Mountain View." If the meaning of the mascot name is so drastically altered depending on the school's name, then the mascot name is vague *per se*. A word as vague as "Generals" cannot fairly be said to communicate a particular ideological message. And as the undisputed evidence shows, most of the uniforms only bear "Generals" without any reference to Stonewall Jackson.

While "[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech," *Virginia v. Black*, 538 U.S. 343, 358 (2003), protection is only afforded where the conduct conveys a "particularized message" and "the likelihood was great that the message would be understood by those who viewed it." *Spence v. State of Washington*, 418 U.S. 405, 411 (1974). It is true that the Fourth Circuit has acknowledged the "association between [Confederate] symbols and the history of slavery in this country," *Crosby by Crosby v. Holsinger*, 816 F.2d 162, 163 (4th Cir. 1987), and that the Confederate flag can be a "symbol of racial separation and oppression," *United States v. Blanding*, 250 F.3d 858, 861 (4th Cir. 2001), and that Confederate imagery might be viewed as "a symbolic acknowledgement of pride in Southern heritage and ideals of independence," *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't*

*of Motor Vehicles*, 288 F.3d 610, 624 (4th Cir. 2002). But, again, we are not dealing with Confederate symbols, the Confederate flag, or any Confederate imagery here. At worst, the First Amendment Plaintiffs are required to bear or be associated with "Stonewall Jackson High School," "Stonewall Jackson," or "Generals" while engaging in the "conduct" of participating in extracurricular activities through the school. For the reasons discussed, these do not inherently convey a message and are therefore not First Amendment speech.

**B. Plaintiffs choose to wear the school uniforms while participating in extracurricular activities based on their subjective belief that they would otherwise not be allowed to participate, and not based on any threats of punishment.**

In *Wooley v. Maynard*, 430 U.S. 705 (1977), the Maynards' opposition to displaying the motto "Live Free or Die" on their New Hampshire license plate resulted in fines and jail time. In *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), students were subject to expulsion from school for not saluting the American flag and reciting the Pledge of Allegiance, and parents were liable for prosecution and potential jail time if their children did not comply. Unlike *Wooley* and *Barnette*, the student plaintiffs here have never been threatened with punishment or otherwise coerced to wear school uniforms bearing "Stonewall Jackson" or "Generals."

Rather, they testified that they chose to wear the uniforms and never requested to alter them based on their own subjective belief that they would not be allowed to participate if they did not wear, or otherwise protested, the uniforms. In support of this belief, they point to oral statements from coaches at the start of the season regarding the league requirement to wear the team uniform. Reasonable or not, this belief is all that "compels" the plaintiffs to speak a message with which they fundamentally disagree. The student plaintiffs admit they have not even requested to alter the uniforms to remove or cover up objectionable words, much less done so without permission. A.J.

testified that he did not want to be "singled out" or have to discuss "controversial" topics with his peers. While understandable, feeling uncomfortable and electing to conform is not tantamount to being coerced or compelled. *See Burwell v. Portland Sch. Dist. No. 1J*, 857 F. App'x 377, 380 (9th Cir. 2021).

## CONCLUSION

The First Amendment Plaintiffs are simply not compelled to honor Stonewall Jackson or identify with any message that might be associated with his name. Even if they were, the School Board's naming of its schools is protected government speech. By extension, so is Stonewall Jackson High School's use of its name and mascot, including in extracurricular settings and on uniforms. At the very least, the school's use of its name and mascot is school-sponsored speech exempt from the strictures of the First Amendment Speech Clause. For the foregoing reasons, the Shenandoah County School Board respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment in its favor on the First Amendment compelled-speech claim.

SHENANDOAH COUNTY SCHOOL BOARD

By: /s/ John R. Fitzgerald

Jim H. Guynn, Jr (VSB #22299)
Christopher S. Dadak (VSB #83789)
John R. Fitzgerald (VSB #98921)
GUYNN WADDELL, P.C.
415 S. College Ave.
Salem, Virginia 24153
Phone: (540) 387-2320
Fax: (540) 389-2350
Email: jimg@guynnwaddell.com
christopherd@guynnwaddell.com
johnf@guynnwaddell.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify on the 10th day of June, 2025, I electronically filed the foregoing using the CM/ECF system, which will send notification of such filing to:

Kaitlin Banner (DC Bar #1000436)
Marja K. Plater (DC Bar #90002586)
Ryan Downer (DC Bar #1013470)
Washington Lawyers' Committee
for Civil Rights and Urban Affairs
700 14th Street, NW, Suite 400
Washington, DC 20005
(202) 319-1000
Email: kaitlin_banner@washlaw.org
marja_plater@washlaw.org
*Counsel for Plaintiffs*

Ashley Joyner Chavous (VA Bar #84028)
Jason C. Raofield (DC Bar #463877)
Elizabeth Upton (DC Bar #1031985)
Li Reed (DC Bar #90018796)
Stephanie Nnadi (DC Bar #90007365)
Cara E. Souto (DC Bar #90018434)
Lauren Smith (DC Bar #90029733)
Covington & Burling LLP
850 10th Street, NW
Washington, DC 20001
(202) 662-6000
Email: achavous@cov.com
jraofield@cov.com
eupton@cov.com
lreed@cov.com
snnadi@cov.com
csouto@cov.com
*Counsel for Plaintiffs*

/s/ John R. Fitzgerald
Jim H. Guynn, Jr (VSB #22299)
Christopher S. Dadak (VSB #83789)
John R. Fitzgerald (VSB #98921)
GUYNN WADDELL, P.C.
415 S. College Ave.
Salem, Virginia 24153
Phone: (540) 387-2320
Fax: (540) 389-2350
Email: jimg@guynnwaddell.com
christopherd@guynnwaddell.com
johnf@guynnwaddell.com
*Counsel for Defendant*