IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISON

| | |
|---|---|
| VIRGINIA STATE CONFERENCE NAACP, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 5:24-cv-00040 |
| | ) |
| COUNTY SCHOOL BOARD OF SHENANDOAH COUNTY, | ) ) ) |
| Defendant. | ) ) |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendant, Shenandoah County School Board (the "School Board"), by counsel, respectfully submits this memorandum in opposition to the Plaintiffs' motion for summary judgment on the First Amendment claims.

INTRODUCTION

The Plaintiffs' summary judgment argument rests on a foundation of misconstructions. They incorrectly presume that a school name and mascot are student speech. They contort an incongruent case to argue that statements made by certain individuals, years prior, on a different decision constitute party admissions by a board in the future composed of different individuals. They refer to imagery and symbols that do not exist in this case. The schools in question do not use whole or even portions of visual Confederate symbols or imagery, such as the "Confederate flag," Confederate uniforms, or any other visual reference to the Confederacy.

Furthermore, schools have the First Amendment right and authority over school-sponsored speech such as team names and uniforms, which the Plaintiffs concede serve a pedagogical purpose. Finally, local school boards are best suited to cater to local needs. Requiring the School

1

Board to change the names it selected for two schools, an explicit campaign promise of a majority of those elected, would be a violation of the School Board's First Amendment right to select from among various viewpoints those that it wishes to express as its own.

### ARGUMENTS AND AUTHORITIES

While students do not "shed their constitutional rights to freedom of speech and expression at the schoolhouse gate[,]" *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), those rights are "applied in light of the special characteristics of the school environment." *Id.* The First Amendment rights of students in public schools "are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). As the Supreme Court noted, "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Therefore, courts "do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). The connection to basic constitutional values of the current conflict—whether the School Board, by simply naming a school, compels the speech of students who elect to participate in extracurricular activities and wear uniforms—is too tenuous to "directly and sharply implicate" those values, so the Court should not intervene in the School Board's decision on this matter.

**I.    Statements from members of the 2020 School Board cannot be imputed to the 2024 School Board.**

Plaintiffs assert that the 2020 School Board who "retired" the school names and the 2024 School Board who restored them are "the same Defendant." (Pls.' Memo. in Supp., ECF 119, at 1.) Throughout this case, Plaintiffs have assumed this false equivalency. To the contrary, as the undisputed facts show, these boards were composed of an entirely different set of members.

Therefore, statements from Cynthia Walsh (*id.* at 5) and Andrew Keller (*id.* at 5-6) and Karen Whetzel (*id.* at 6)[1]—none of whom were still on the School Board when the names were restored in 2024, cannot be imputed to, or used to infer the motives of, the Defendant School Board. What the individual members of the 2020 School Board stated four years prior to the name restoration, and prior to their being ousted from the School Board in a democratic election, is frankly irrelevant. These individuals had no part in the events that spurred this litigation.

Plaintiffs cite *E.E.O.C. v. Watergate at Landmark Condominium*, 24 F.3d 635 (4th Cir. 1994) for the proposition that statements of members of the School Board serve as "party admissions" in arguing that the School Board admits that it is impossible to "remove racist implications" from Confederate symbols. (Pls.' Memo. in Supp. at 18, 18 n.1) (citing Pls.' SUMF ¶ 33). However, *E.E.O.C.* does not stand for that proposition for two reasons.

First, the *E.E.O.C.* court held that statements of members of a defendant board are admissible hearsay under Rule 801(d)(2) as "An Opposing Party's Statement" and not as an *admission* of any disputed fact. *E.E.O.C.*, 24 F.3d at 640 (limiting the holding "for the 801(d)(2)(D) purposes here at issue").[2]

Second, *E.E.O.C.* involved statements of two board members that were admitted as evidence of the intent of the board to discriminate based on age in terminating the employee. *Id*.

---

[1] Plaintiffs assert that "Defendant has further recognized that the Stonewall Jackson name is a 'symbolic reference to a time of inequality and racism'" and cite to a statement from then-Chairwoman Karen Whetzel. (Pls.' Memo. in Supp. at 18.) Setting aside the argument that a statement of a former board member cannot be imputed to the current board, the quote from above is not even Whetzel's—she is quoting a "high school student from Stonewall Jackson." (Pls.' SUMF, ECF 120, ¶ 35.) Obviously, a student's statement cannot be attributed to the current School Board either.

[2] The School Board expressly denies that statements of former board members qualify as admissible hearsay under F.R.E. 801(d)(2) and preserves all objections. Former school board members and their statements are not relevant to the subject of the current controversy.

3

Importantly, the two individuals were current, active board members at the time of the events in dispute in that case. *Id.* at 639 ("[The board members] were significantly involved in assisting Watergate's Board of Directors, the ultimate decisionmaker, in arriving at and implementing the solution to those problems."). In contrast, Plaintiffs seek to admit not just as evidence, but as admissions, the statements of *former* School Board members, speaking on a *different* decision. (Pls.' Memo. in Supp. at 18.) *E.E.O.C.* does not support the notion that the statements of former school board members are as a matter of law imputed to the motivations of different school board members on a current, sitting school board.

Furthermore, the statement cited in support of the School Board's supposed admission that "it is simply not possible 'to remove the racist implications from' the name Stonewall Jackson" is purely opinion.[3] There is nothing factual, i.e. falsifiable, about that statement. Accordingly, it is not admissible as a lay opinion under Rule 701 of the Federal Rules of Evidence, if for no other reason than such an opinion requires "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). The fact that Plaintiffs hired an expert witness to write a report on the issue of racist implications confirms that it requires such specialized knowledge.

In this case, the School Board experienced a change in direction as a natural product of the democratic process, its members having run on the promise of restoring names to schools that were beloved throughout the community. (*See* Sec. Joint Stip., ECF 96, ¶ 68.) Because these previous board members had no part in the events leading to this litigation, their statements should not be used to improperly infer the motivations of the Defendant School Board in rescinding the earlier

---

[3] The statement from the former School Board member is: "There's no way to preserve the traditions and heritage of one group and ease [] the inequity that another group may have felt. You can't keep a name and remove racist implications from it. You can't claim to be inclusive, which we do[,] and have students who feel like they're excluded."

4

name change. To hold otherwise would not only be illogical and unfair, but it could undermine the potential for change and progress through the political process.

## II. The school names do not inherently convey a message, much less the message with which Plaintiffs disagree.

It has not been clearly established that school names alone, as distinguished from symbols and slogans, convey a message for First Amendment purposes. Plaintiffs attempt to equate the name of Stonewall Jackson High School with Confederate symbols like the Confederate flag. However, as the School Board argued in its motion for summary judgment, "One cannot fairly equate a human being with a symbol of a particular ideology. Stonewall Jackson was a man who fought as a Confederate; he was not a Confederate flag." (Def's Am. Memo. in Supp., ECF 127, at 21.)

Plaintiffs cite *United States v. Blanding*, 250 F.3d 858, 861 (4th Cir. 2001) for the proposition that "sites honoring the name Thomas 'Stonewall' Jackson are a form of Confederate symbology that sends a message of 'racial separation.'" (Pls.' Memo. in Supp. at 17.) However, *Blanding* does not discuss "sites" honoring Jackson or other Confederates; it only discusses the Confederate flag, and only in the context of a *Batson* challenge, which is not analogous to the context of compelled speech. Moreover, no Plaintiff has alleged that they are made to wear or display a Confederate flag.

Unlike Fourth Circuit cases in which Confederate symbols or images were found to send a message of racial separation or oppression, the Plaintiffs here only claim to be compelled to speak the school name, "Stonewall Jackson High School," and the mascot name, "Generals." The only

5

symbols or images that are currently used in the schools involved in this case are the letter "G," the letters "SJ," and a cartoon bee (see, e.g., images below). [4]



These are a far cry from the school mascot and logo of "Johnny Reb," a caricature of the emblematic Confederate soldier, used at Fairfax High School, in Fairfax, Virginia (see images below). *See Crosby v. Holsinger*, 816 F.2d 162, 163 (4th Cir. 1987) (discussing the student body's change of the logo to a blue and gray version of the Confederate flag, the longstanding caricature of "Johnny Reb," the athletic teams called the "Rebels," and the drill team called the "Confederettes").

---

[4] While Plaintiffs also point to "a cartoon picture of Stonewall Jackson in a Confederate uniform" in the Student Handbook (Pls.' Memo. in Supp. at 7) (citing Pls.' SUMF ¶ 49) and "the silhouette of a Confederate general on a horse" in the 2025 graduation pamphlet (id.) (citing Pls.' SUMF ¶ 55), Plaintiffs are not compelled to display these images. Nor are the images Confederate in nature. The silhouette is just a generic soldier on a horse. The Stonewall Jackson cartoon contains no Confederate flags, symbols, or other Confederate reference on the otherwise neutral military uniform. There are no allegations that the bee at Ashby-Lee Elementary School is compelled speech.

 

In *Hardwick v. Heyward*, 711 F.3d 426, 437-38 (4th Cir. 2013), the Fourth Circuit found five t-shirts to be "Confederate flag apparel" and thus student speech because they either bore, revealed or represented an image of the Confederate flag. For example, the Court found a t-shirt bearing "Jesus and the Confederate Battle Flag: Banned from Our Schools but Forever in Our Hearts" to be a "Confederate flag shirt" because it included a censored Confederate flag, as well as the first Confederate national flag, the third Confederate national flag, and the Bonnie Blue flag, which are three other recognizable Confederate symbols. *Id.*

Compare those descriptions with uniforms at Stonewall Jackson High School, some of which the Plaintiffs themselves wear (see images below).

---

[5] Fairfax High School Class of 1975 - 40 Reunion Page (last visited June 18, 2025), FACEBOOK, https://www.facebook.com/FHS75/, (for demonstrative and illustrative purposes only).

[6] Fairfax High School (Fairfax, Virginia) Wikipedia (Mar. 7, 2025) https://en.wikipedia.org/wiki/Fairfax_High_School_(Fairfax,_Virginia)#/media/File:Johnny_Reb_Lunch_Tray.jpg (for illustrative and demonstrative purposes only).

7





Additionally, Plaintiffs assert that "[e]ven if other people might view the history of the Confederacy differently, and thus take away a different message, there is no dispute that the name conveys a message[, and t]herefore the First Amendment applies." (Pls.' Memo. in Supp. at 18.) To the contrary, the School Board disputes that the name conveys a message. Rather, the School Board asserts that it is axiomatic that if a message can only be connected with a school name by multiple branches of association—i.e., the message with which Plaintiffs disagree is associated with the Confederacy, which is associated with Stonewall Jackson, who is associated with the school—that tenuous connection removes the school name from the strictures of the First Amendment. Rather, the message must be represented by the name itself in order for the name to convey that message. Otherwise, any school named after someone within six degrees of separation from some appalling ideology is arguably unconstitutional. Such a holding could have unintended ripple effects: increased number of lawsuits school boards have to face; increased expenditure of taxpayer dollars—meant for education—to defend those lawsuits; decreased endowments to

8

schools; increasingly litigious students and parents; and so on. The School Board respectfully urges the Court to carefully consider this slippery slope before taking its next step.

**III.    Stonewall Jackson High School has a legitimate pedagogical purpose in having team names and in its students wearing identical uniforms while participating in extracurricular activities.**

School-sponsored speech, such as a school naming its sports teams and designing the uniforms,[7] may be restricted or compelled for legitimate pedagogical purposes. *See C. N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 178 (3d Cir. 2005) (citing *Kuhlmeier*, 484 U.S. 260). "A school may exercise greater control over student speech uttered during participation in a school-sponsored activity than that expressed during an independent activity because 'students, parents, and members of the public might reasonably perceive [the school-sponsored speech] to bear the imprimatur of the school.'" *Henerey ex rel. Henerey v. City of St. Charles*, 200 F.3d 1128, 1133 (8th Cir. 1999) (quoting *Kuhlmeier*, 484 U.S. at 271). "Such control also 'assures that participants learn whatever lessons the activity is designed to teach . . . and that the views of the individual speaker are not erroneously attributed to the school.'" *Id.* (quoting *Kuhlmeier*, 484 U.S. at 271). "Although to be considered 'school-sponsored,' expressive activities must be 'curricular' in a broad sense, they need not 'occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.'" *Id.* (quoting *Kuhlmeier*, 484 U.S. at 271 (footnote omitted)).

---

[7] Plaintiffs acknowledge that they participate in "*school-sponsored* sports and other extracurricular activities" (Pls.' Memo. in Supp. at 16), and that "[u]niforms are *school property*—specific to the sport—that students receive at the beginning of the sports season and are required to be returned at the end of the season." (*Id.* at 24.) These statements lend further support for the idea that wearing the uniforms and engaging in the "expressive conduct" at these school-sponsored activities is "school-sponsored speech" and not "student speech."

9

Extracurricular activities, such as athletics, teach leadership skills and teamwork, which means that they are sufficiently related to learning to be "pedagogical." *See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1286 (10th Cir. 2004).[8] Like the student plaintiff in *Axson-Flynn*, who was required to speak certain words despite her express objections, the student plaintiffs here are occasionally identified as "Stonewall Jackson Generals" and asked to wear uniforms bearing those names despite their objections. *Id.* And like the school in *Axson-Flynn*, Stonewall Jackson High School has a legitimate pedagogical purpose for compelling the school-sponsored speech. *Id.* The school's legitimate pedagogical purpose is its students being recognizable at interscholastic competitions and presenting as a cohesive group.

As Plaintiffs acknowledge as being undisputed facts: "Sports team names play a central role in school culture and help shape school identity and pride [and] . . . can provide for a shared sense of purpose, which is necessary for a team to be successful." (Pls.' Memo. in Supp. at 14.) "Team uniforms similarly promote a sense of belonging that is fundamental to teamwork [and] . . . are at the center of a team's messaging and serve as the key symbol of a team's shared calling to work together in pursuit of victory [and] . . . also serve the dual practical purposes of allowing athletes to identify one another on the field as well as to enable fans to identify the side they are supporting." *Id.* "Identical team uniforms enable players to focus on the game rather than be distracted by individual clothing choices on the field and what they might mean[, which] . . . also helps minimize peer pressure related to clothing choices and brand competition among student

---

[8] Plaintiffs themselves acknowledge the importance of sports and extracurricular activities to their educational experience. (Pls.' Memo. in Supp. at 13-14.) If, on the other hand, sports and other extracurricular activities are too far removed from the traditional curriculum for the school to have legitimate pedagogical interests in regulating the speech that occurs therein, then they must not be—as Plaintiffs argue—integral to their learning experience. If participation in extracurricular activities is truly dispensable, then the Plaintiffs' First Amendment claims fail for lack of compulsion.

10

athletes." *Id.* There is no dispute that team names and uniforms serve a legitimate pedagogical purpose. Thus, to the extent Stonewall Jackson High School compels the Plaintiffs to speak, the message is "school-sponsored speech" and the compulsion serves the school's legitimate pedagogical purpose.

**IV.** **Rules or instructions that student athletes wear or bring their uniforms to athletic events do not inherently threaten Plaintiffs with prospective harm.**

"In order to compel the exercise or suppression of speech, the governmental measure must punish, or *threaten to punish*, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" *Phelan v. Laramie Cty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)) (emphasis added) (internal citations omitted). "A discouragement that is minimal and wholly subjective does not, however, impermissibly deter the exercise of free speech rights." *Phelan*, 235 F.3d at 1247-48 (quoting *United States v. Ramsey*, 431 U.S. 606, 623-24 (1977)). There must be some coercion or punishment for not "becoming a courier for such message." *Wooley v. Maynard*, 430 U.S. 705, 717 (1977). The Supreme Court has consistently required some punitive consequence in order for a compelled speech claim to have merit.

For example, in *Wooley*, the Maynards' opposition to displaying the motto "Live Free or Die" on their New Hampshire license plate resulted in fines and jail time. In *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), students were subject to expulsion from school for not saluting the American flag and reciting the Pledge of Allegiance, and parents were liable for prosecution and potential jail time if their children did not comply. Unlike *Wooley* and *Barnette*, the student plaintiffs here have never been explicitly threatened with punishment or otherwise coerced to wear school uniforms bearing "Stonewall Jackson" or "Generals."

11

For the proposition that "students must wear ['uniforms branded with the name Stonewall Jackson'] or face threat of exclusion," Plaintiffs cite the cross country team contract, which states that team members who frequently neglect to bring their uniforms to meets will not be allowed to travel with the team or participate in meets. (Pls.' Memo. in Supp. at 24) (citing Pls.' SUMF ¶ 99.) First, the cross country team uniforms bear "Generals," not "Stonewall Jackson." (Pls.' SUMF ¶ 95.) Second, that rule is obviously designed to prevent careless student athletes, who otherwise have no issue with wearing the team uniforms, from neglecting to bring their uniforms to athletic events. It is clearly not intended to prevent student athletes who object to the school and/or team name from protesting the uniforms. Indeed, this applies to all the other coaches' instructions cited by Plaintiffs. (*See* Pls.' Memo. in Supp. at 24.)

While the Ninth Circuit in *Frudden* found that prospective, threatened consequences can constitute compulsion—even where enforcement is uncertain—the court suggests that a uniform bearing only the school name and mascot would not have been sufficient to state a compelled-speech claim and that it was the school motto that made the uniform "speech." *See Frudden v. Pilling*, 742 F.3d 1199, 1207 n.2 (9th Cir. 2014). Even so, in *Frudden*, the school's policy handbook provided that if students failed to wear the uniform, they would be sent home to change, and repeated offenses could result in suspension. *Id.* The repercussions were clearly defined.

Here, while there is evidence that coaches and league rules mandate student athletes to wear team uniforms, there are no such clearly defined consequences for refusal to wear uniforms. Even the cross country team contract only considers team members who frequently neglect to bring their team uniforms to meets. It is not at all clear what, if anything, would happen to team members if they were to, say, bring the team uniforms and wear them with the school or mascot name removed or covered up. Furthermore, it is not clear what would happen if they informed their

12

coaches that they refuse to wear uniforms bearing "Generals" or "Stonewall Jackson" for philosophical reasons. It is not clear because Plaintiffs concede they have not asked nor made any other effort. There cannot be "threatened" or "prospective" consequences for actions that have not even been considered by the coaches or conceived of by the team or league rules.

Accordingly, Plaintiffs are not compelled to represent Stonewall Jackson by their team or league rules, which do not address their situations at all and were designed for student athletes who do not object to the school or team name.

## CONCLUSION

For the foregoing reasons, the Shenandoah County School Board respectfully requests that the Court deny Plaintiffs' motion for summary judgment on the First Amendment claims and enter summary judgment in its favor on the First Amendment claims.

SHENANDOAH COUNTY SCHOOL BOARD

By: /s/ John R. Fitzgerald
Jim H. Guynn, Jr (VSB #22299)
Christopher S. Dadak (VSB #83789)
John R. Fitzgerald (VSB #98921)
GUYNN WADDELL, P.C.
415 S. College Ave.
Salem, Virginia 24153
Phone: (540) 387-2320
Fax:     (540) 389-2350
Email: jimg@guynnwaddell.com
           christopherd@guynnwaddell.com
           johnf@guynnwaddell.com
*Counsel for Defendant*

13

# CERTIFICATE OF SERVICE

I hereby certify on the 18th day of June, 2025, I electronically filed the foregoing using the CM/ECF system, which will send notification of such filing to:

Kaitlin Banner (DC Bar #1000436)
Marja K. Plater (DC Bar #90002586)
Ryan Downer (DC Bar #1013470)
Washington Lawyers' Committee
for Civil Rights and Urban Affairs
700 14th Street, NW, Suite 400
Washington, DC 20005
(202) 319-1000
Email:  kaitlin_banner@washlaw.org
           marja_plater@washlaw.org
*Counsel for Plaintiffs*

Ashley Joyner Chavous (VA Bar #84028)
Jason C. Raofield (DC Bar #463877)
Elizabeth Upton (DC Bar #1031985)
Li Reed (DC Bar #90018796)
Stephanie Nnadi (DC Bar #90007365)
Cara E. Souto (DC Bar #90018434)
Lauren Smith (DC Bar #90029733)
Covington & Burling LLP
850 10th Street, NW
Washington, DC 20001
(202) 662-6000
Email: achavous@cov.com
           jraofield@cov.com
           eupton@cov.com
           lreed@cov.com
           snnadi@cov.com
           csouto@cov.com
*Counsel for Plaintiffs*

/s/ John R. Fitzgerald
Jim H. Guynn, Jr (VSB #22299)
Christopher S. Dadak (VSB #83789)
John R. Fitzgerald (VSB #98921)
GUYNN WADDELL, P.C.
415 S. College Ave.
Salem, Virginia 24153
Phone: (540) 387-2320
Fax:    (540) 389-2350
Email: jimg@guynnwaddell.com
           christopherd@guynnwaddell.com
           johnf@guynnwaddell.com
*Counsel for Defendant*