CLERK'S OFFICE U.S. DISTRICT. COURT
AT ROANOKE, VA
FILED

SEP 0 9 2025

LAURA A. AUSTIN, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

VIRGINIA STATE CONFERENCE )
NAACP et al., )
 )
    Plaintiffs, )
 )
v. )    Case No. 5:24-cv-040
 )
COUNTY SCHOOL BOARD OF )    By:    Michael F. Urbanski
SHENANDOAH COUNTY, )    Senior United States District Judge
 )
    Defendant. )

## MEMORANDUM OPINION

Plaintiffs, who include the Virginia State Conference NAACP and individual parents

whose children, D.D. and A.J., attend Stonewall Jackson High School,[1] have challenged

defendant County School Board of Shenandoah County's 2024 decision to reinstate the name

"Stonewall Jackson High School" as a violation of plaintiffs' First Amendment rights against

---

[1] In addition to the compelled speech claim at issue in the motions for summary judgment addressed in this memorandum opinion, plaintiffs also brought three other claims based on the Equal Protection Clause, Title VI of the Civil Rights Act, and the Equal Educational Opportunities Act. In addition to challenging the School Board's decision to reinstate the name "Stonewall Jackson High School," the Equal Protection and statutory claims also challenge the School Board's simultaneous decision to reinstate the name "Ashby Lee Elementary School." Additional plaintiffs—the parents of B.B., A.C., and J.D., who attend other Shenandoah County Public Schools, but attend the Governor's School hosted at Stonewall Jackson High School, or attend Ashby Lee Elementary School—are pursuing those claims alongside the Virginia State Conference NAACP and the parents of D.D. Compl., ECF No. 1, ¶¶ 27, 155-67, 177-81. However, the First Amendment claim was brought only on behalf of the Virginia State Conference NAACP and the parents of D.D. and A.J., as D.D. and A.J. attend Stonewall Jackson High School and, importantly for their compelled speech claim, participate in extracurricular activities on behalf of Stonewall Jackson High School. Id. ¶¶ 191-206.

Pursuant to an agreed upon scheduling order, the Equal Protection and statutory claims will be addressed separately to allow more time for discovery on the Equal Protection and statutory issues. See ECF No. 97; ECF No. 84.

compelled speech.[2] Specifically, plaintiffs allege that the School Board's selection of the uniquely symbolic name "Stonewall Jackson High School" infuses their participation in extracurricular activities at that school with the School Board's message endorsing "Stonewall Jackson." Plaintiffs believe that when they are identified as "Stonewall Jackson Generals" and wear "Generals" team uniforms as they dedicate their hard work and athletic, academic, and musical talents to performances and competition victories attributable to "Stonewall Jackson High School," plaintiffs themselves become instruments for communicating the School Board's message. Plaintiffs disagree with the School Board's message, but they believe that so long as their school is named "Stonewall Jackson High School," they must either wear "Generals" jerseys and otherwise associate with "Stonewall Jackson High School" or be deprived of the essential educational experiences provided by extracurricular activities. Accordingly, plaintiffs seek declaratory and injunctive relief requiring the School Board to remove the name "Stonewall Jackson High School."

Both the School Board, ECF No. 115, and plaintiffs, ECF No. 118, have filed motions for summary judgment under Federal Rule of Civil Procedure ("Rule") 56. Plaintiffs have also moved for entry of final judgment on their compelled speech claim under Rule 54(b). ECF No. 138. The School Board's motion must be **DENIED.** ECF No. 115. The School Board's legal theories based on government speech and school-sponsored speech fail as a matter of law. The fact that the government is the ultimate source of the speech at issue advances, rather

_____

[2] The First Amendment applies to state and local government defendants like the School Board by virtue of the Fourteenth Amendment. Stromberg v. California, 283 U.S. 359, 368 (1931). Plaintiffs have a cause of action for the violation of their federal rights, including those under the First Amendment as incorporated through the Fourteenth Amendment, under 42 U.S.C. § 1983.

than hinders, plaintiffs' compelled speech claim, and the school-sponsored speech doctrine offers the School Board no shelter in the absence of any pedagogical interest—an interest related to teaching—supporting the School Board's selection of the name "Stonewall Jackson High School." Moreover, the School Board's motion must be denied and summary judgment must be **GRANTED** in plaintiffs' favor because plaintiffs have shown that there is no genuine dispute as to any material fact and plaintiffs are entitled to judgment as a matter of law as to both the speech and compulsion elements of their compelled speech claim. Plaintiffs' Rule 54(b) motion will be addressed by a separate memorandum opinion and order.

## BACKGROUND

The individual plaintiffs in this case are parents suing on behalf of their children, D.D. and A.J., pursuant to Rule 17(c)(1)(A). D.D. will be in the tenth grade at Stonewall Jackson High School during the school year beginning in 2025. D.D. Decl., ECF No. 121-5 *sealed*, ¶¶ 1-2. D.D. plays varsity basketball and soccer. Id. ¶ 7; D.D. Dep., ECF No. 121-7 *sealed*, 6:15-28, 7:7-9. A.J. will be in the twelfth grade at Stonewall Jackson High School during the school year beginning in 2025. A.J. Decl., ECF No. 121-6 *sealed*, ¶¶ 1-2. A.J. participates in marching band, scholastic bowl, track and field, Future Business Leaders of America, National Honor Society, and debate. Id. ¶ 8; A.J. Dep., ECF No. 121-8 *sealed*, 8:6-10. Other members of the Virginia State Conference NAACP attend Stonewall Jackson High School and participate in marching band, scholastic bowl, track and field, Future Business Leaders of America, chess club, debate, National Honor Society, soccer, basketball, cross country, wrestling, baseball, and orchestra. Va. NAACP Decl., ECF No. 121-1, ¶¶ 19-20.

3

I.    Reinstating the Name "Stonewall Jackson High School."

Plaintiffs' compelled speech claim arises out of the School Board's decision in 2024 to reinstate the name "Stonewall Jackson High School." 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 19, 42-44. The School Board voted in 2020 to retire the name "Stonewall Jackson High School" and replace it with the name "Mountain View High School." Id. at ¶ 25. The 2020 School Board removed the name "Stonewall Jackson High School" pursuant to a resolution "condemning racism." Id. ¶¶ 13-14. At the time, members of the 2020 School Board made comments further indicating that they decided to retire the name because they believed the name "Stonewall Jackson" was a symbol conveying a message of racial exclusion. One then-member stated, "[S]urely, Superintendent and School Board at the time [when Stonewall Jackson High School was founded in 1959] had to know that naming a high school after a Confederate General would send a clear message to Black families that they were not welcomed in that brand new school." 3rd Joint Statement of Stipulated Facts, ECF No. 104, ¶ 83. Another then-member similarly stated, "You can't keep a name and remove racist implications from it." 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶ 21. And the then-Chairwoman stated, "As one high school student from Stonewall Jackson challenged me today 'if you vote to keep the name, you would be making a conscious decision to maintain a symbolic reference to a time of inequality and racism.'" Id. ¶ 23.

After intervening School Board elections, the 2024 School Board received a request from The Coalition for Better Schools inviting them to consider restoring the name "Stonewall Jackson High School." 3rd Joint Statement of Stipulated Facts, ECF No. 104, ¶ 86. The request asked the 2024 School Board to consider the fact that a survey of community members

had indicated support for reinstating the name and the fact that "[t]he legacy of Stonewall Jackson, while complex, remains an important part of our local history." Id. ¶ 87. The 2024 School Board responded by adding the issue to their agenda for upcoming meetings. Id. ¶ 86. At a meeting held on May 9, 2024, the 2024 School Board heard over three hours of public comments, a majority of which were in opposition to reinstating the name "Stonewall Jackson High School." 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 32-34.

On May 10, 2024, the 2024 School Board voted 5-1 to restore the name "Stonewall Jackson High School." Id. ¶ 42. The 2024 School Board members made statements explaining their decision. Several members stated that they wished to repudiate the 2020 School Board's decision to condemn racism by removing the name because, from the perspective of members of the 2024 School Board, "[i]f you really want to stop this racism and prejudice, stop playing racism and prejudice into everything." Id. ¶ 37; see also id. ¶ 36 ("[T]he topic of racism, [] I don't really like to talk about it a lot because I don't believe in it."). Other 2024 School Board members identified the procedures used in the 2020 decision-making process as a reason for reverting to the name "Stonewall Jackson High School." 3rd Joint Statement of Stipulated Facts, ECF No. 104, ¶ 93 ("[T]he real issue with [the July 9, 2020 vote to retire the names of Stonewall Jackson High School and Ashby-Lee Elementary School] is the public . . . was not involved."). One member who nevertheless voted in favor of the name change acknowledged, "I would feel unsettled if I were Black and going through this," at least in part because when the name "Stonewall Jackson High School" was originally instituted at the school's founding in 1959 as a school serving only White students, the name was associated with resistance to integration. 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 40-41 ("[T]here were

5

people using the school system at that point for kind of a last-ditch effort to save what they saw as their world."); see also id. ¶¶ 5-10 (noting that Black students were excluded from Stonewall Jackson High School from the time the school opened in 1959 until 1963).

II.    **The Name "Stonewall Jackson" in Extracurricular Activities at Stonewall Jackson High School.**

The School Board's decision to reinstate the name "Stonewall Jackson High School" has suffused extracurricular activities at the school with references to "Stonewall Jackson." References to "Stonewall Jackson" are displayed in the settings in which extracurricular activities occur, such as the basketball gym. Def. Resp. Interrog. No. 4, ECF No. 121-1 at 112 (noting references to "Stonewall Jackson" on the football field score board, new and old gym score boards, and new and old gym floors); Image of Folding Chairs, ECF No. 121-2 at 12 (depicting folding chairs on the sidelines of the gym that read "Stonewall Jackson Generals"). The school's logo now reads "SJ Generals." 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 45-47. "SJ" refers to "Stonewall Jackson." Id. ¶ 47. The official team name for Stonewall Jackson High School is the "Generals." Id. ¶ 45. However, the team name was also the "Generals" when the school was called "Mountain View High School." A.J. Dep., ECF No. 121-8 *sealed*, 12:8-17 ("When the school name was Mountain View High School, the mascot simply signified a general.").

In conjunction with their participation in extracurricular activities, students wear clothing displaying their affiliation with the "Stonewall Jackson Generals." The School Board confirms that most sports uniforms worn by Stonewall Jackson High School students display the word "Generals," including the uniforms for "the basketball teams, soccer teams, track

and field teams, cross-country teams, softball teams, volleyball teams, the wrestling team, the golf team, the Scholastic Bowl team, and the junior varsity baseball team." 4th Joint Statement of Stipulated Facts, ECF No. 109, ¶ 112; Def. Resp. Interrog. App. A, ECF No. 121-1 at 114-20. However, most team uniforms do not include the name "Stonewall Jackson" itself. Images of Team Uniforms, ECF No. 127-2. The team uniforms do not portray Confederate soldiers, depict a Confederate flag, or incorporate any slogans. Id. Although athletes largely do not wear clothing displaying the literal name "Stonewall Jackson," students competing in Future Business Leaders of America events, debate tournaments, and scholastic bowl competitions do wear nametags that expressly mark them as "Stonewall Jackson" students. A.J. Dep., ECF No. 121-8 *sealed*, 10:15-11:2, 15:6-16. Additionally, "the varsity letters presented to students in recognition of their performance on a sporting team at Stonewall Jackson High School include 'SJ.'" 4th Joint Statement of Stipulated Facts, ECF No. 109, ¶ 117.

Beyond physical displays of "Stonewall Jackson," "Generals," and "SJ," during extracurricular events, "students who participate in sports and extracurricular activities are identified as 'Stonewall Jackson' students, 'Stonewall Jackson Generals,' or 'Generals.'" 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 45, 54. In particular, when D.D., A.J., and other students participate in sports, their teams are announced as the "Stonewall Jackson Generals" before a game or meet commences. See D.D. Dep., ECF No. 121-7 *sealed*, 20:7-12 (describing how the soccer and basketball teams are announced as the "Stonewall Jackson Generals" when they enter the field or gym); A.J. Dep., ECF No. 121-8 *sealed*, 23:5-8 (describing how the track and field team is announced as the "Stonewall Jackson Generals"). Similarly, when A.J. and his teammates compete in scholastic bowl, they are identified as

"Stonewall Jackson" students each time the announcer calls on the team to answer a question, and every point the students score is declared a point for "Stonewall Jackson." A.J. Decl., ECF No. 121-6 *sealed*, ¶ 21; A.J. Dep., ECF No. 121-8 *sealed*, 23:9-15. The marching band is also announced as the "Stonewall Jackson Marching Generals," and when A.J. and the other members of the band march in a parade, they do so behind a "Generals" banner. A.J. Decl., ECF No. 121-6 *sealed*, ¶¶ 12-13; A.J. Dep., ECF No. 121-8 *sealed*, 22:8-20. Finally, when A.J. has placed well in a scholastic bowl competition, a debate tournament, or a track meet, he has been celebrated as a "Stonewall Jackson General." A.J. Dep., ECF No. 121-8 *sealed*, 11:1-3; 22:12-15; 23:4-24:8. D.D.'s accomplishments in basketball have also been attributed to "Stonewall Jackson." Northern Virginia Daily Article, ECF No. 121-12 *sealed* at 3 ("Freshman [D.D.] had seven points to lead Stonewall Jackson."); Girls Basketball Leaders Statistics, ECF No. 121-11 *sealed* at 4 (attributing D.D.'s basketball statistics to "Stonewall").

### III.    The Message Conveyed by "Stonewall Jackson."

Plaintiffs object to competing in extracurricular activities on behalf of "Stonewall Jackson High School" because they believe that that name and references to that name, such as "Generals" jerseys and the attribution of the points they score to "Stonewall Jackson," transform their athletic, academic, and musical efforts into expressions honoring "Stonewall Jackson." Plaintiffs share the 2020 School Board's view that the name "Stonewall Jackson" is a symbol conveying a message supporting the Confederacy, slavery, and racial exclusion. D.D. believes the name "Stonewall Jackson" sends a message of "[w]anting slavery to continue," and she objects to that message in part because "if slavery were still a thing, I wouldn't be able

8

to go to school." D.D. Dep., ECF No. 121-7 *sealed*, 19:14-20:2. A.J. similarly believes that "the Confederacy signified ideals like slavery, racism, and oppression," and he does not wish to advance those ideals by participating in extracurricular activities in the name of "Stonewall Jackson." A.J. Dep., ECF No. 121-8 *sealed*, 16:19-24. Other students who are members of the Virginia State Conference NAACP share these objections. Va. NAACP Resp. Interrog. No. 2, ECF No. 127-1 at 3. Both D.D. and A.J. have made their objections clear by speaking at School Board meetings. See D.D. Dep., ECF No. 121-7 *sealed*, 20:3-6; A.J. Resp. Interrog. No. 5, ECF No. 116-6 at 5. A.J. has also raised his objections in emails to the School Board and in discussions with the coaches and instructors for the extracurricular activities in which he participates. Id. The School Board does not question the sincerity of plaintiffs' objections. Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 4-7.

The parties agree that Stonewall Jackson was a Confederate general and that "[t]he Confederacy existed, in part, to preserve slavery." 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 1-2. Although the parties have each put forth their own historical expert report concerning the Confederacy, Stonewall Jackson, and the messages historically conveyed by Confederate memorialization, the parties' experts agree on several significant points. Plaintiffs' expert, Ty Seidule, and the School Board's expert, Gibson Kerr, agree that Jackson himself endorsed slavery, at least in part because Jackson believed in a divinely imposed racial hierarchy. Seidule explains that "Jackson was a firm believer in slavery, holding that God sanctioned the imprisonment of Black people." Seidule Report, ECF No. 121-1 at 23. Kerr confirms that Stonewall Jackson believed "'slaves were children of God placed in subordinate situations for reasons only the Creator could explain.'" Kerr Report, ECF No. 116-8 at 9

9

(quoting James I. Robertson, Jr., Stonewall Jackson: The Man, the Soldier, the Legend 169 (1997)). The experts only diverge as to whether Jackson's views on race can otherwise be viewed as nuanced. Kerr argues that Jackson was a multi-faceted human being who "devoted considerable time to teach blacks how to read in his church's Sunday school." Kerr Report, ECF No. 116-8 at 8. Seidule disputes this appraisal of Jackson's pre-Civil War Sunday school, noting that "[t]he school promoted pro-slavery theology to counter Northern religious leaders who challenged the morality of slavery." Seidule Report, ECF No. 121-1 at 23.

The experts further agree that the name "Stonewall Jackson" has taken on an expressive life of its own. Jackson's real name was "Thomas Jonathan Jackson." Kerr Report, ECF No. 116-8 at 8; Seidule Report, ECF No. 121-1 at 23-24. The "Stonewall" in "Thomas Jonathan 'Stonewall' Jackson" is a nickname connected to Jackson's leadership in the Confederate military. Id. Seidule explains that the "Stonewall" nickname has contributed to Jackson's popularity as a figure in the "Lost Cause" narrative. Id. Because the name "Stonewall" calls to mind Jackson's military achievements and because Jackson died from wounds suffered in battle just before a series of decisive Confederate defeats, the name "Stonewall Jackson" symbolizes longing for an alternative ending to the war in which, had Jackson lived, he might have turned the war around. Id. The rise of the "Lost Cause" narrative is associated with a spike in Confederate commemorations that occurred between 1890 and 1920, "celebrat[ing] the return of White supremacy after the end of Reconstruction." Id. at 30-31. Kerr does not discuss the "Lost Cause" narrative. Rather, Kerr argues that "Confederate [m]onuments are a [t]estament to [r]econciliation and [f]orgiveness," signifying the healing of the division of the Civil War. Kerr Report, ECF No. 116-8 at 11; see also id. at

13 (citing the example of a stained-glass window commemorating "Stonewall Jackson" behind the altar at a historically Black church in Roanoke, Virginia as evidence that references to "Stonewall Jackson" can be used to convey "an inspiring message . . . of reconciliation and forgiveness"). Kerr further opines that removing Confederate monuments prevents people "from honoring their Confederate ancestors." Id. at 12. Regardless of whether invocations of the name "Stonewall Jackson" convey longing for the triumph of Confederate ideals or instead function as "[t]estament[s] to [r]econciliation and [f]orgiveness" and means of "honoring . . . Confederate ancestors," the critical point is that both experts agree that the name "Stonewall Jackson" is expressive.

Finally, both experts recognize that the name "Stonewall Jackson" has historically been used to signify racial exclusion in the particular context of naming public schools. Seidule explains that naming schools after Confederate leaders began to express a distinct message about "massive resistance" to school desegregation after Brown v. Board of Education was decided in 1954. 347 U.S. 483 (1954). Seidule writes, "Throughout the South, one way to protest integration and calls for equal rights was to name a school after a Confederate . . . to send a very particular message about the need to sustain a racial hierarchy." Seidule Report, ECF No. 121-1 at 33. A spike in schools named in honor of Confederate leaders occurred between 1955 and 1965. Id. at 30-31. Kerr agrees, "Yes, some people in those days chose to honor Confederates for racist reasons." Kerr Report, ECF No. 116-8 at 12. It was in this period that Stonewall Jackson High School was built in Shenandoah County between 1957 and 1959. 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶ 3. The Confederate flag was

flown on school grounds when construction began, and Black students were excluded from the school from the time it opened in 1959 until 1963. Id. ¶¶ 5-10.

Thus, the parties' experts validate the view expressed by plaintiffs and by various School Board members in both 2020 and 2024 that the name "Stonewall Jackson" stands as a symbol conveying an expressive message. As the Supreme Court stated in the leading case of West Virginia Board of Education v. Barnette, 319 U.S. 624, 632 (1943), "[s]ymbolism is a primitive but effective way of communicating ideas."

## IV.    Uniform Requirements in Extracurricular Activities at Stonewall Jackson High School.

Despite plaintiffs' objections to furthering the message conveyed by the name "Stonewall Jackson" through their participation in extracurricular activities, plaintiffs believe that there is no other way to participate in extracurricular activities at Stonewall Jackson High School other than to wear "Generals" attire and to associate with the "Stonewall Jackson Generals." As to uniforms in particular, both D.D. and A.J. believe that they must wear the same school-provided "Generals" team uniforms as their teammates without any alterations or else they will be excluded from competitions. See D.D. Dep., ECF No. 121-7 *sealed*, 21:5-22:9; A.J. Dep., ECF No. 121-8 *sealed*, 29:2-23. The School Board recognizes that plaintiffs believe this to be the case. Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 4-6.

However, there is no explicit school-wide or league-wide rule pertaining to all sports stating what kinds of penalties might follow from a students' failure to wear a "Generals" uniform. For instance, the Shenandoah County Public Schools/Virginia High School League Student Athletics & Activities Participation Handbook (hereinafter, "SCPS Athletics &

Activities Handbook") is silent on the matter, ECF No. 121-4 at 23-74, as is the Virginia High

School League Handbook and Policy Manual (hereinafter, the "VHSL Handbook"), ECF No.

121-3. The only clear rule set out by the SCPS Athletics & Activities Handbook concerning

uniforms is that uniforms are to be provided by the school and returned at the end of the

sports season because uniforms are "the property of the school." ECF No. 121-4 at 30. More

generally, the SCPS Athletics & Activities Handbook provides individual coaches leeway to

"establish rules for their sport and season that are specific to the sport." Id. at 27.

Specific sports teams do indeed impose rules and regulations mandating that students

wear their school-issued uniforms. For example, the VHSL Handbook requires, "All wrestlers

must wear a legal uniform as described in NFHS Rule 4-1-1 when competing." ECF No. 121-

3 at 160. "NFHS Rule 4-1-1" in turn requires that wrestlers wear a one-piece singlet uniform

that "shall be school-issued." 2024-25 NFHS Wrestling Rules, ECF No. 121-4 at 3. At

Stonewall Jackson High School, the school-issued wrestling uniform is a "Generals" uniform.

4th Joint Statement of Stipulated Facts, ECF No. 109, ¶ 112. Therefore, to be in compliance

with league rules, the members of the Virginia State Conference NAACP who participate in

wrestling at Stonewall Jackson High School must wear "Generals" uniforms.

Similarly, regarding track and field, in which A.J. and other members of the Virginia

State Conference NAACP participate, the VHSL Handbook states that "[p]articipants shall be

required to wear school uniforms and adhere to NFHS [National Federation of State High

School Associations] Track & Field Rules Book regulations." ECF No. 121-3 at 158. Those

regulations dictate, "The competitor's uniform shall be school-issued or school approved,

worn as intended by the manufacturer. . . . Removing any part of the team uniform, excluding

13

shoes, while in the area of competition, as defined by the games committee, is illegal." NFHS

Track & Field Rules Book, ECF No. 121-4 at 8-9. If a track and field athlete removes a

component of their uniform while in the area of competition, they will receive a warning, and

repeat violations will result in disqualification. Id. at 9. The track and field "school-issued or

school approved" uniform at Stonewall Jackson High School is a "Generals" uniform. 4th

Joint Statement of Stipulated Facts, ECF No. 109, ¶ 112. Thus, A.J. and his fellow track and

field athletes must wear unaltered "Generals" uniforms.

Stonewall Jackson High School's Cross Country Team Rules and Contract also

contains an explicit uniform requirement, which reads, "We dress for success and look the

part at home as well as away. You are expected to always have your team shirt, hoodie &

warm-ups with you every meet day. If you are a repeat offender of this rule YOU WILL NOT

BE ALLOWED TO TRAVEL with the team or participate at that day's home meet." ECF

No. 121-17 *sealed* at 2. The "team shirt" for cross country is a "Generals" shirt. 4th Joint

Statement of Stipulated Facts, ECF No. 109, ¶ 112; see also Images of Team Uniforms, ECF

No. 127-2 at 80. Accordingly, this contract requires members of the Virginia State Conference

NAACP who participate in cross country at Stonewall Jackson High School to wear

"Generals" shirts and informs students that failure to comply will be punished with exclusion

from competition.

However, although league and team rules instruct students to wear their school-issued

"Generals" uniforms, plaintiffs have not personally been threatened with or been subject to

punishment for failure to wear uniforms. For example, A.J. acknowledges that he has never

been threatened or pressured by his teachers, instructors, or coaches to represent "Stonewall Jackson." A.J. Dep., ECF No. 116-5 *sealed*, 28:7-30:12.

## V. The Possibility of Accommodations.

Plaintiffs believe that so long as their school is named "Stonewall Jackson High School," there is no way for them to participate in extracurricular activities without affiliating with "Stonewall Jackson." For example, plaintiffs do not believe that exemptions from uniform requirements are available. See D.D. Resp. Int. No. 6, ECF No. 116-4 at 6-7 (explaining that D.D.'s parents have raised objections to the school principal and athletics director concerning "Generals" soccer and basketball uniforms but that no alternative uniforms have been made available); A.J. Dep., ECF No. 116-5 *sealed*, 28:9-30:8 (explaining A.J.'s belief that, although he has never directly asked to alter his uniform, he would not be permitted to compete if he blacked out the word "Generals"). Regardless, even if students could obtain exemptions from uniform requirements, they do not wish to do so as they believe differentiating themselves would defeat the purpose of uniforms in team-based extracurricular activities. Id. at 32:19-33:20 (explaining that A.J. does not wish to be marked as separate from his teammates).

The parties agree that it is essential for all competitors on a team to identify as a cohesive unit, in part through sharing a common team name and a common team uniform referencing that name. The School Board itself claims an interest in "its students being recognizable at interscholastic competitions and presenting as a cohesive group." Def.'s Opp'n, ECF No. 134 at 9-11. The School Board specifically argues that references to the school name "Stonewall Jackson High School" and team name "Generals" must be the focal

15

point of this cohesion, particularly as displayed on team uniforms. Id. at 10 (citing the need

for uniformity as the School Board's justification for requiring that name to be used in

extracurricular activities). In this regard, the School Board embraces the report of plaintiffs'

expert on student athletics, Amy Bass, opining on the significance of team names and

uniforms. Id. As to school and team names generally, Bass states, "Mascots and team names

help shape school identity and school pride for [] students and families, as well as foster

community spirit . . . . The role of these symbols is especially important for student-athletes

[and] their teams, which rely on a shared sense of purpose—teamwork—in order to be

successful." Bass Report, ECF No. 121-1 at 84.

　　　　As to uniforms in particular, Bass explains:

> [Uniforms] are a critical component of generating the necessary
> sense of belonging that is fundamental to productive
> teamwork—to be able to identify one another on the field and
> off, and for fans to be able to identify the side they are
> supporting. Additionally, players are able to focus on the task at
> hand—the game—rather than be distracted by individual
> clothing choices on the field and what they might mean,
> eradicating peer pressure in terms of who is wearing what and
> ensuring that students understand that the game is constructed
> with rules they must adhere to, one of the many valuable
> takeaways from sport.

Id. at 89. Thus, as the parties agree, permitting students to opt out of uniform requirements,

let alone fashioning some means for permitting students to compete without associating with

their school or team by its name, is not a viable solution to plaintiffs' objections. The fact that

the School Board itself agrees that the names it has selected for its schools must serve as the

axes around which unity and identity in extracurricular activities at those schools revolve

explains why plaintiffs have directed their compelled speech challenge towards, and are

seeking injunctive relief from, the name "Stonewall Jackson High School" itself. Indeed,

because the School Board deems centering team unity around school names to be essential to

extracurricular activities at its schools, the School Board's selection of school names should

be understood as inherently entailing usages of its chosen names in extracurricular activities.

Finally, the parties agree that asking students to forgo participation in extracurricular

activities is not on the table. Plaintiffs themselves have expressed that they are unwilling to

forsake their ability to participate in sports and other extracurricular activities, despite their

strong objections to participating in those activities as "Stonewall Jackson Generals." See D.D.

Dep., ECF No. 121-7 *sealed*, 20:18-24 (Q: "[W]hy don't you chose not to participate in

sports? A: Because I really care about them. . . . It's a big part of my social life and I want to

be able to play sports in college."). As D.D.'s parents indicate on D.D.'s behalf in response to

an interrogatory:

> D.D. has not ceased participation in academic, sports, or
> extracurricular activities despite her belief that uniforms bearing
> the school or mascot name compel her to identify with a message
> with which she disagrees. D.D. is developing her resume to
> enhance her college applications, and abruptly departing from the
> academic, sports, and extracurricular activities that she has
> participated in for years would disrupt her resume and
> significantly weaken her college applications. It would also
> deprive D.D. of the enjoyment and other benefits of participating
> in school-based activities.

D.D. Resp. Int. No. 5, ECF No. 116-4 at 5. The Virginia High School League itself attests in

the mission statement on its website that "sponsored activities educate youth to the need for

trained minds and healthy bodies," while also providing opportunities for "personal growth"

and allowing students to "develop teamwork and leadership skills" and become "better

citizens." ECF No. 121-2 at 34. Bass further confirms:

> Numerous studies have found that participating in sport provides comprehensive physical and psychological benefits to K-12 students that lead to an overall improved social well-being. These benefits include enhanced physical health and somatic competence as well as improved cognitive performance, problem-solving skills, time management, and academic achievement. Sport environments provide opportunities for children to learn crucial life skills, such as respect for rules, discipline, and conflict resolution. As well, sport helps create better social-emotional outcomes, giving students a higher level of self-esteem and sense of belonging; promotes reduced levels of anxiety, depression, and feelings of isolation; and provides communication and leadership skills that lead to more positive peer relationships and a greater degree of social integration.

Bass Report, ECF No. 121-1 at 82. The School Board affirms that "participation in extracurricular activities is an essential part of a well-rounded education." Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 16. Thus, extracurricular activities are undoubtedly integral to a complete high school education. To the extent associating with the name "Stonewall Jackson High School" is indeed inescapable during extracurricular activities at "Stonewall Jackson High School," the importance of participating in extracurricular contributes to the pressure exerted on students to associate with the name "Stonewall Jackson High School" and confirms that relief from associating with the name "Stonewall Jackson High School" cannot be provided by means of opt outs.

## STANDARD OF REVIEW

Cross-motions for summary judgment have been filed in this case. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011). Here, the court will proceed by first examining the School Board's first-filed motion, which seeks

summary judgment based on legal arguments concerning government speech and school speech, before turning to plaintiffs' motion, which contends that plaintiffs have met their burden to establish the compulsion and speech elements of their compelled speech claim and that the government has not met its burden to satisfy strict scrutiny.

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The non-moving party must "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (alteration omitted) (citing Tolan v. Cotton, 572 U.S. 650, 651 (2014) (per curiam)).

"The court and the parties have great flexibility with regard to the evidence that may be used on a [summary judgment] proceeding." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721 (3d ed. 1998). "The court may consider materials that would themselves be admissible at trial, and the content or substance of otherwise inadmissible materials where the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form." Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538 (4th Cir. 2015) (quotation omitted).

A party may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A); see also Celotex, 477 U.S. at 322 (directing courts to consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" in evaluating a Rule 56 motion). Alternatively, a party may support its position by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(B).

In evaluating a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56 (c)(3). The court should abstain from making credibility determinations and otherwise weighing the

evidence. Anderson, 477 U.S. at 255. "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate." Ward v. Branch Banking & Tr. Co., No. cv-13-1968, 2016 WL 2930907, at *6 (D. Md. May 17, 2016).

## DISCUSSION

In the foundational compelled speech case of West Virginia Board of Education v. Barnette, the Supreme Court concluded that the West Virginia Board of Education violated students' First Amendment rights when the Board "forced" students to "confess by word or act their faith" in the government's message by saluting the American flag and reciting the Pledge of Allegiance. 319 U.S. at 642. In Wooley v. Maynard, the Court similarly held that New Hampshire unconstitutionally compelled objecting drivers to serve as "instrument[s] for fostering public adherence to an ideological point of view [they] find[] unacceptable" by requiring license plates to display the motto "Live Free or Die." 430 U.S. 705, 715 (1977). And, more recently, in 303 Creative LLC v. Elenis, the Court held that Colorado had unconstitutionally "conscripted" "a[] [wedding website designer] to speak in ways that align with [Colorado's] views but defy her conscience about a matter of major significance" by seeking to apply the state's public accommodations law to require her to create wedding websites for gay weddings. 600 U.S. 570, 592, 603 (2023). Plaintiffs claim that the School Board here has similarly "conscripted" them to "confess by word or act their faith" in the School Board's message endorsing "Stonewall Jackson" and forced them to serve as "instrument[s] for fostering public adherence" to that message. Plaintiffs argue that by reinstating the name "Stonewall Jackson High School," the School Board injected the symbolism of the name "Stonewall Jackson" into their participation in extracurricular

activities. When they compete in jerseys emblazoned with the word "Generals," march in the marching band behind a "Generals" banner, and score points for "Stonewall Jackson," plaintiffs believe their bodies and talents are enlisted to paint "Stonewall Jackson" in a positive light.

The School Board's motion for summary judgment raises four arguments disputing this claim: (1) the School Board's selection of school names is government speech subject to minimal First Amendment scrutiny; (2) alternatively, the School Board is entitled to deference because the selection and use of school names during extracurricular activities constitute either school-sponsored speech or a permissible form of compelled speech in light of the school setting; (3) plaintiffs are not asked to speak by wearing "Generals" jerseys and competing in extracurricular activities on behalf of "Stonewall Jackson High School;" and (4) plaintiffs are not subject to forms of coercion satisfying the compulsion element of a compelled speech claim. The first two arguments fail because government speech and school speech precedents are inapplicable to the facts and legal claim at issue. The latter two arguments fail because, to the contrary, plaintiffs have shown that there are no genuine disputes as to the facts material to proving the elements of their compelled speech claim.

## I.    Government speech is not a defense to a compelled speech claim.

First, the School Board argues that its decision to name one of its high schools "Stonewall Jackson High School" constitutes government speech. The Supreme Court has held, "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." <u>Walker v. Texas Div., Sons of Confederate Veterans, Inc.</u>, 576 U.S. 200, 207 (2015). However, the Court has never held that government speech is a defense

to a compelled speech claim. "[T]he Free Speech Clause itself may constrain the government's speech if . . . the government seeks to compel private persons to convey the government's speech." Id. at 208. Because this case concerns allegations of compelled speech, the fact that the government is the ultimate source of any speech at issue helps rather than hinders plaintiffs' First Amendment claim.

Government speech doctrine applies in cases where the government is resisting efforts by individuals and groups to shape the content of what the government says. For example, in Walker, the Supreme Court concluded that Texas's specialty license plate program was government speech and that, therefore, the Texas Department of Motor Vehicles Board did not unconstitutionally restrict speech by engaging in viewpoint discrimination when it rejected the Sons of Confederate Veterans' proposal for a license plate design containing the Confederate flag. Id. at 219. The Court reasoned that giving the government latitude to choose what it says, without having to accommodate all citizen viewpoints, is necessary in order to permit government to function. Id. at 207-08. For example, the court noted that the government must be free to speak a message encouraging vaccination without having to also voice the perspective of vaccine skeptics, thereby undercutting the government's own policy goal. Id. And elsewhere, the Supreme Court has concluded that for the same reasons, when the government decides to place privately donated monuments in a public park, it need not devote limited space to monuments that do not further the public image the government wishes to present, Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 481 (2009), and when the government elects to fund certain speech activities, it need not also devote limited resources to speakers with viewpoints contrary to the viewpoint the government seeks to

advance, <u>Rust v. Sullivan</u>, 500 U.S. 173, 194 (1991). Because these precedents concern plaintiffs claiming that their ability to speak their viewpoint was restricted by the government's need to select among competing viewpoints, these precedents have no bearing on the facts of this case.

Here, plaintiffs are not asking the government to speak their preferred message or to uplift their viewpoint. That might be the case if plaintiffs had proposed an alternative school name in line with their viewpoint and sued the School Board for failing to select their proposal. The government's right to determine the content of what the government says may well defeat such a claim, but the government's right to determine the content of what the government says is inapposite where compelled speech is at issue. A compelled speech claim focuses not on the government's <u>selection</u> of a message but on the government's <u>display</u> of that message by using plaintiffs as unwilling conduits. The School Board's display of its message is the focus of plaintiffs' challenge to the School Board's selection of the name "Stonewall Jackson High School," which plaintiffs frame as a decision that directly results in their being required to display the School Board's message endorsing "Stonewall Jackson" during extracurricular activities, including by wearing "Generals" jerseys and otherwise personally associating with the name "Stonewall Jackson."

Indeed, <u>Walker</u> expressly distinguished its holding from that of <u>Wooley</u>. The Court explained:

> Our determination that Texas's specialty license plate designs are government speech does not mean that the designs do not also implicate the free speech rights of private persons. We have acknowledged that drivers who display a State's selected license plate designs convey the messages communicated through those designs. And we have recognized that the First Amendment

> stringently limits a State's authority to compel a private party to
> express a view with which the private party disagrees. But here,
> compelled private speech is not at issue. And just as Texas cannot
> require SCV to convey the State's ideological message, SCV
> cannot force Texas to include a Confederate battle flag on its
> specialty license plates.

Id. at 219 (quotations and citations omitted). This case, like Wooley and unlike Walker,

involves "compelled private speech." Id. Namely, plaintiffs claim that students, as private

individuals, are compelled to act as instruments for the School Board's message because the

School Board's selection of the name "Stonewall Jackson High School" expresses a message

that is carried forward when that name shapes the meaning of students' participation in

extracurricular activities. Under Walker, plaintiffs cannot force the School Board to select a

school name of their choice, but, equally, the School Board "cannot require [plaintiffs] to

convey 'the [School Board's] ideological message.'" Id. (citing Wooley, 430 U.S. at 715).

There is a simple reason for the fundamental incompatibility between the government

speech analysis of Walker and the compelled speech analysis of a case like Wooley. The central

problem with compelled speech is that the government has selected a message that its citizens

must affirm. As the Court explained in Barnette, "If there is any fixed star in our constitutional

constellation, it is that no official, high or petty, can prescribe what shall be orthodox in . . .

matters of opinion or force citizens to confess by word or act their faith therein." Barnette,

319 U.S. at 642. In Barnette, the government selected a patriotic message that it sought to

require students to express by reciting the Pledge of Allegiance, 319 U.S. 624; in Wooley, the

government selected a message that one should "Live Free or Die" that it sought to require

drivers to express on their license plates, 430 U.S. 705; and in 303 Creative, the government

selected a message favoring LGBTQ equality that it sought to express by applying public

25

accommodations law to a wedding website designer who did not wish to make wedding websites for gay weddings, 515 U.S. at 597. In each of these cases, the fact that the government sought to express its own message formed the basis of the First Amendment violation. Thus, the School Board's argument that the School Board is the ultimate speaker here is hardly a means of evading the First Amendment.

The School Board cannot sidestep these precedents demonstrating that government speech is not a rejoinder to compelled speech by separating the School Board's selection of the name "Stonewall Jackson High School" from the effect of that name on extracurricular activities. The School Board argues that even if government speech is not a defense to compelled speech, the School Board's selection of the name "Stonewall Jackson High School" was not itself a decision to compel speech because any government acts compelling students to speak in this case, such as team policies requiring "Generals" uniforms, are distinct from the School Board's selection of the name. See Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 12; Hr'g Tr., ECF No. 147, 10:5-14. Thus, the School Board contends, the actual decision that is the subject of plaintiffs' constitutional challenge, the name reinstatement itself, is fully protected as government speech. Id.

However, disentangling the selection of the name "Stonewall Jackson High School" from the ways in which that name functions during extracurricular activities is factually impossible on this record. Where the School Board itself insists that team cohesion achieved by uniformly requiring students to wear jerseys referencing the school's name is integral to the benefits of extracurricular activities, it becomes inevitable that the decision to name the high school "Stonewall Jackson High School" entails the result that students at that school will be

26

required to compete in extracurricular activities in ways that associate them with the name "Stonewall Jackson." See Def.'s Opp'n, ECF No. 134 at 9-11; Bass Report, ECF No. 121-1 at 84, 89. League and team uniform requirements and the other practical realities of extracurricular activities that require references to teams by school name formed the background conditions against which the School Board selected the name "Stonewall Jackson High School." Thus, because any compelled speech at issue in this case was inherent in the School Board's decision to reinstate the name "Stonewall Jackson," that decision cannot be isolated and protected as government speech.

The court recognizes that the tension between the government's ability to select the messages it wishes to express and plaintiffs' rights against compelled speech is more pronounced in this case than in some other compelled speech cases because of the remedy plaintiffs seek. In some of the Supreme Court's compelled speech cases, remedying the compelled speech violation had at most a minor effect on the government's ability to select its message because the remedy was to permit the objector to opt out of the offensive speech. For example, by prohibiting the government from compelling students to salute the flag and recite the Pledge of Allegiance, Barnette did not eliminate the flag salute and Pledge of Allegiance from public schools but rather required that parents and students be permitted to request exemptions excusing students from participating. See Oliver v. Klein Indep. Sch. Dist., 448 F. Supp. 3d 673, 694 (S.D. Tex. 2020), aff'd sub nom., Oliver v. Champion, No. 20-20438, 2021 WL 4987481 (5th Cir. Oct. 26, 2021) (collecting cases upholding Florida and Texas statutes requiring students to say the Pledge of Allegiance unless a parent or guardian requests an exemption in writing); see also Frazier v. Winn, 535 F.3d 1279, 1284-85 (11th Cir. 2008)

(concluding that a Florida statute was unconstitutional to the extent it required students to stand to attention during the Pledge of Allegiance, but was constitutional to the extent it required students to obtain parental permission to be excused from reciting the Pledge of Allegiance). Wooley similarly did not call for the removal of the state motto from New Hampshire license plates but rather provided injunctive and declaratory relief prohibiting the state from arresting and prosecuting the plaintiffs for obscuring "Live Free or Die" on their license plates. 430 U.S. at 709, 717 (affirming district court's injunction). Here, however, plaintiffs are asking the court to "[e]nter injunctive relief requiring Defendant to remove the Confederate name[] and mascot[], and to prevent any future naming involving Confederate leaders or references to the Confederacy." Compl., ECF No. 1 at Relief Requested.

The record contains ample evidence explaining why plaintiffs are seeking relief of this scope. Students cannot opt out of the name of their school, and the parties agree that cohesion is integral to extracurricular activities. See Def.'s Opp'n, ECF No. 134 at 9-11; A.J. Dep., ECF No. 116-5 *sealed*, 32:19-33:20; Bass Report, ECF No. 121-1 at 84, 89. Accordingly, allowing dissenting students to wear alternative jerseys or otherwise disassociate themselves from the team's name is not viable and would further harm students by differentiating them from their peers. Moreover, while the Supreme Court has expressly stated that compelled speech is a limit on government speech doctrine, no decision holds the reverse to be true. See Walker, 576 U.S. at 207, 219. Indeed, in the heightened scrutiny analysis of Wooley, the Court acknowledged the government's interest in speaking through the state motto in order "to communicate to others an official view as to proper appreciation of history, state pride, and individualism." 430 U.S. at 717. But the Court reasoned that the right against compelled speech was supreme

28

because "where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." Id. Thus, plaintiffs' rights against compelled speech override the government's flexibility to choose the messages it wishes to express.

Finally, the court notes that although plaintiffs' rights against compelled speech may impose a constitutional limit on the School Board's ability to select school names that compel speech, thereby shrinking the universe of available school names to some degree, the School Board retains wide latitude to select any name that does not compel speech. This stands in contrast to the limit on the government's ability to select the messages it wishes to express at issue in government speech cases where plaintiffs seek, not to shrink the universe of available government messages, but to require the government to espouse one particular message, thereby eliminating the government's choice entirely.

Thus, the School Board's government speech argument does not support granting summary judgment in the School Board's favor.

## II.    The School Board is not owed special leeway to compel speech under school speech precedents in the absence of a pedagogical interest.

The School Board next seeks more permissive First Amendment review in light of the school setting of any speech at issue in this case. Several First Amendment doctrines do indeed recognize that although students do not "shed their constitutional rights to freedom of speech or expression at the school house gate," Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506-07 (1969), "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," Bethel Sch. Dist. No. 403

29

v. Fraser, 478 U.S. 675, 682 (1986). The School Board first relies on the school-sponsored speech doctrine. Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 12-17. That doctrine permits educators to "exercise[e] editorial control" over student speech in mediums that bear the school's imprimatur, but only "so long as [educators'] actions are reasonably related to legitimate pedagogical concerns." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988). The School Board next argues that even compelled speech can be justified in the school setting when compelling speech serves educational purposes. Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 17-19. However, neither the school-sponsored speech doctrine nor any other school speech doctrine justifies reducing First Amendment protection against compelled speech in this case because the School Board has never cited any interests related to teaching or otherwise stemming from the needs of the school environment to justify the decision to reinstate the name "Stonewall Jackson High School" and to thereby reintroduce references to "Stonewall Jackson" into extracurricular activities.

The Supreme Court has identified several "'special characteristics of the school environment'" that "call for special leeway when schools regulate speech that occurs under its supervision." Mahanoy Area Sch. Dist. v. B.L., 594 U.S. 180, 188 (2021) (quoting Kuhlmeier, 484 U.S. at 266). To safeguard other students' abilities to learn, schools have special leeway to regulate student speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." Tinker, 393 U.S. at 513. And because schools instruct minors and are tasked with inculcating values as well as academic lessons, schools have special leeway to regulate "sexually explicit, indecent, or lewd speech" and speech promoting "illegal drug use." See Fraser, 478 U.S. at 684-85 ("A high school assembly or classroom is no place for a

30

sexually explicit monologue directed towards an unsuspecting audience of teenage students."");

Morse v. Frederick, 551 U.S. 393, 408-09 (2007) (""[T]he governmental interest in stopping

student drug abuse . . . allow[s] schools to restrict student expression.""). Finally, as the School

Board emphasizes here, educators have special leeway to oversee ""school-sponsored

publications, theatrical productions, and other expressive activities that students, parents, and

members of the public might reasonably perceive to bear the imprimatur of the school.""

Kuhlmeier, 484 U.S. at 271. Greater control over student expression in these school-

sponsored mediums is justified ""to assure that participants learn whatever lessons the activity

is designed to teach, that readers or listeners are not exposed to material that may be

inappropriate for their level of maturity, and that the views of the individual speaker are not

erroneously attributed to the school""—for example, in a way that would ""associate the school

with any position other than neutrality on matters of political controversy."" Id. at 271-72.

However, the ""special leeway"" owed ""when schools regulate speech that occurs under

its supervision"" only applies in the presence of and in proportion to these ""special

characteristics"" of the school environment. Mahanoy Area Sch. Dist., 594 U.S. at 188. This is

clear from the tests the Supreme Court has crafted in order to carefully tailor reduced

protection for speech in the school setting to school-specific justifications.[3] For example, to

---

[3] Special characteristics of the school environment are a prerequisite to permissible regulation of speech in the school setting regardless of whether they are treated as triggers for applying school-specific First Amendment tests in the first place or are simply considered within those tests. In Mahanoy Area School District, the Supreme Court described indecent speech, speech promoting illegal drug use, and speech bearing the imprimatur of the school as the ""three specific categories of student speech that schools may regulate in certain circumstances,"" and the Court further identified Tinker's substantial disruption standard as a fourth ""special interest"" that may justify regulating student speech. 594 U.S. at 187-88. The Court thereby suggested that speech outside these three categories and unaffected by this fourth interest is, as a threshold matter, beyond the scope of the ""special leeway"" afforded ""when schools regulate speech that occurs under its supervision."" Id. at 188. In Hardwick ex rel. Hardwick v. Heyward, by contrast, the Fourth Circuit characterized the Tinker substantial disruption test as the ""basic constitutional framework for reviewing student speech"" and indicated that courts should apply

determine whether student speech can be regulated to prevent disruption, under Tinker, courts look to "the record" in search of "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." 393 U.S. at 514; see also Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 439 (4th Cir. 2013) (recognizing that "school officials" bear the "burden of showing that they could predict that a substantial disruption might occur"). In Tinker, school officials could not justify their decision to prohibit students from wearing armbands in protest of the Vietnam War where there was no evidence indicating that armbands would cause a substantial disruption of school activities. 393 U.S. at 514. Similarly, to determine whether educators have permissibly "exercis[ed] editorial control over the style and content of student speech in school-sponsored expressive activities," under Kuhlmeier, courts apply more deferential scrutiny but nevertheless must evaluate whether educators' "actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273. In Kuhlmeier, the Court concluded that a school principal did not unconstitutionally restrain student speech by restricting a student

---

Tinker as a default to any student speech, unless indecent speech, speech promoting illegal drug use, or speech bearing the imprimatur of the school are at issue, in which case "school officials may regulate student speech without undertaking Tinker's substantial-disruption analysis." 711 F.3d 426, 434-35 (4th Cir. 2013). Here, the School Board asks the court to consider the Tenth Circuit's distinct framework which sorts speech that occurs in schools into pure student speech to which Tinker applies, government speech to which negligible First Amendment scrutiny applies, and school-sponsored speech to which Kuhlmeier's pedagogical interests test applies. See Fleming v. Jefferson Cnty. Sch. Dist. R-1, 298 F.3d 918, 923 (10th Cir. 2002). However, regardless of whether school-specific justifications are a threshold trigger for application of school-specific First Amendment tests or whether Tinker applies as a default, because Tinker itself protects student speech unless that speech "substantially interfere[s] with the work of the school or impinge[s] upon the rights of other students," 393 U.S. at 509, it is clear that speech in the school setting receives ordinary First Amendment protection in the absence of school-specific justifications for regulation. Even under the School Board's preferred Tenth Circuit framework, into which the School Board argues this case fits as a case of school-sponsored speech, school-sponsored speech can only be regulated in ways that are "reasonably related to legitimate pedagogical concerns." Kuhlmeier, 484 U.S. at 273. Thus, as the School Board has not put forward a legitimate pedagogical concern or some other school-specific justification, the fact that the speech at issue in this case occurs in a school setting provides no freestanding justification for reducing constitutional protection.

newspaper's ability to publish articles on pregnancy and divorce where the record indicated that the principal was concerned that the articles' discussion of sexual activity was inappropriate for the younger students at the school. Id. at 263-64, 274-75. As the tests of Tinker and Kuhlmeier indicate, in the absence of special characteristics of the school environment justifying the regulation of speech, either no school-specific First Amendment test is triggered or the regulation of speech at issue will fail the relevant school-specific test.

No special characteristics of the school environment are apparent in this case. This case does not concern lewd speech, speech promoting illegal drug use, or any other kind of speech that might be inappropriate for a young audience. See Fraser, 478 U.S. at 684-85 (permitting regulation of indecent speech); Morse, 551 U.S. at 408-09 (permitting regulation of speech promoting illegal drug use). No party has argued and nothing in the record suggests that the School Board chose the name "Stonewall Jackson High School" in order to avoid "substantial[] interfere[nce] with the work of the school." Tinker, 393 U.S. at 509. And although the School Board has styled its argument as an argument based on school-sponsored speech, this case involves none of the justifications expressly contemplated by Kuhlmeier, such as teaching students the lessons a school-sponsored activity was designed to teach, censoring inappropriate content, or avoiding associating the school with a controversial issue. 484 U.S. at 271-72. Plainly, the name "Stonewall Jackson High School" was not selected to avoid associating the school with controversy, as, to the contrary, the School Board was well aware the name was ensnarled in controversy. See, e.g., 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶ 32 (noting that the School Board heard over three hours of public comment on the name change decision). And the parties have not suggested, nor does the record

indicate, that the name "Stonewall Jackson High School" was intended to convey any academic lessons or better impart any other skills associated with extracurricular activities undertaken in that name.

The only pedagogical interest the School Board has put forward in briefing its school-sponsored speech argument is "ensuring uniformity when its students represent the school at interscholastic competitions." Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 17. That interest would be served by requiring students to wear uniforms referencing any school name the School Board might have selected and cannot justify the school name "Stonewall Jackson High School" in particular.[4] When pressed at oral argument, the School Board proposed that perhaps reinstating the name "Stonewall Jackson High School," and thereby requiring students to associate with that name during extracurricular activities, teaches students about the democratic process because the name "Stonewall Jackson High School" was chosen through a democratic process—specifically, by vote of School Board members who had been elected on platforms supporting reinstating the name "Stonewall Jackson High School." Hr'g Tr.,

---

[4] The School Board's reliance on a justification for generally requiring students to compete in extracurricular activities in ways that identify them with the name of their school rather than on a justification for the name of the school in question being "Stonewall Jackson High School" flows from the School Board's mistaken belief that the School Board's selection of the name "Stonewall Jackson High School" can be disaggregated from the name's role in extracurricular activities. As explained in addressing the School Board's government speech argument, the decision to name the school "Stonewall Jackson High School" and the decision to require students to identify with the name "Stonewall Jackson" during extracurricular activities are one and the same. The School Board's argument that it need only justify the decision to require uniformity generally as a matter of school-sponsored speech flows from its argument that the selection of the name "Stonewall Jackson High School" is insulated from First Amendment review as an act of government speech. Once it is clear that government speech does not provide such doctrinal cover, the artificial shield around the fact that the name is "Stonewall Jackson High School" disappears, and the School Board's challenged regulation of speech must be confronted head on as the singular decision to reinstate the name "Stonewall Jackson High School," thereby ensuring that students will be associated with the name "Stonewall Jackson" during extracurricular activities. That is the decision to which the School Board's school-sponsored speech argument must be addressed if it is to have any relevance.

ECF No. 147, 16:22-17:10. However, that argument also applies equally to any conceivable name the School Board might have voted upon. Thus, neither of the School Board's proffered justifications pertains to the actual subject of plaintiffs' compelled speech claim. Plaintiffs do not challenge general requirements that students wear matching team uniforms and present as a cohesive unit but rather object to the message they are compelled to speak by competing or performing on behalf of "Stonewall Jackson High School" during extracurricular activities. Because Kuhlmeier requires that a given pedagogical interest be "reasonably related" to the regulation of speech at issue, the School Board's proposed pedagogical interests must be discounted. 484 U.S. at 273. With no pertinent legitimate pedagogical interest cited by the School Board and with no pedagogical interest otherwise evident in the record, the School Board's school-sponsored speech argument is unavailing.

Although the lack of a pedagogical interest suffices to defeat the School Board's summary judgment argument based on school-sponsored speech, the court notes that plaintiffs alternatively argue that the School Board's school-sponsored speech argument can be dismissed simply because this case concerns compelled speech, which presents the factual antithesis of the typical school-sponsored speech case. As plaintiffs point out, in Kuhlmeier, it was the student journalists who wished to speak in the pages of their student newspaper on the topics of pregnancy and divorce, and it was their principal who wished to exercise editorial control. 484 U.S. at 273-745. By contrast, here, the School Board is not exercising editorial control over something students wish to say; quite the reverse, the School Board is selecting the message to be expressed, and it is the students who are objecting to serving as mobile billboards for that message. The court agrees with plaintiffs that this factual distinction is

meaningful. No Supreme Court or Fourth Circuit precedent has applied the school-sponsored speech analysis of <u>Kuhlmeier</u> to justify compelling students to speak a government message with which they disagree. <u>Barnette</u> thus remains the most pertinent binding precedent on compelled speech in the school context. And indeed, in at least one case, a court outside this circuit applied <u>Barnette</u>, <u>Wooley</u>, and the Supreme Court's subsequent compelled speech precedents requiring strict scrutiny of compelled speech to compelled speech claims arising in the school setting. In <u>Frudden v. Pilling</u>, the Ninth Circuit concluded that a school uniform policy requiring students to wear shirts bearing the motto "Tomorrow's Leaders" was compelled speech; in doing so, the court specifically noted that "while Defendants are correct that <u>Wooley</u> did not involve compelled speech in the public elementary school context, <u>Barnette</u> did." 742 F.3d 1199, 1205, 1208 (9th Cir. 2014).[5]

Nevertheless, the court is unwilling to commit to the position that compelled speech could never be justified based on the special characteristics of the school environment. At least one circuit court has intermingled school-sponsored speech and compelled speech analysis. In <u>Axson-Flynn v. Johnson</u>, 356 F.3d 1277 (10th Cir. 2004), a case, unlike here, clearly involving pedagogical interests, the Tenth Circuit found that compelling a theater student to speak words in a script to which she objected during an in-class acting exercise was a regulation of school-sponsored speech that could be justified based on the academic objective of teaching the student to step outside of her own character when performing, though the court concluded

---

[5] A subsequent panel of the Ninth Circuit, <u>Frudden v. Pilling</u>, 877 F.3d 821, 827 (9th Cir. 2017), concluded that the earlier panel's decision to apply strict scrutiny was binding on a subsequent panel to hear the case, despite the subsequent panel's belief that intermediate scrutiny should have applied in light of the elementary school context.

that further evidence was needed to determine whether this legitimate pedagogical interest was a pretext for religious discrimination. Id. at 1290-93.

Other courts have raised hypotheticals in which compelled speech in the classroom might be justified to advance educational objectives; for example, requiring students to write an essay from a point of view with which they disagree might permissibly be used to promote critical thinking. See, e.g., Brown v. Li, 308 F.3d 939, 953 (9th Cir. 2002) (explaining that a history teacher may require students to write a paper from a particular viewpoint, such as a paper defending Prohibition); Brinsdon v. McAllen Indep. Sch. Dist., 863 F.3d 338, 343, 350-51 (5th Cir. 2017) (noting that at least some compelled speech must be justifiable in the school setting as "[o]therwise, a student who refuses to respond in class or do homework would not suffer any consequences"); C.N. v. Ridgewood Board of Education, 430 F.3d 159, 178 (3d Cir. 2005) (giving the hypothetical that "a school may compel a student to write a paper on a particular topic even if the student would prefer to write on a different topic"). The School Board invokes these cases in presenting its second school-based argument that schools generally have special leeway to compel speech. However, even where courts entertain the possibility of applying school speech precedents to justify compelling students to speak, the lodestar of the analysis remains pedagogical interests or, more generally, the special characteristics of the school environment.

Accordingly, the court has given due consideration to the weighty interests underlying school-sponsored speech and other school speech doctrines. Finding no such interests at issue in this case, the court concludes that the School Board's argument that schools have general leeway to compel speech fails for the same reason the School Board's school-sponsored

speech argument fails. Even if students could be compelled, for example, in the history classroom to write an essay from the perspective of Stonewall Jackson to learn about the Civil War, no similar interest related to teaching has been advanced by the School Board in naming a school after "Stonewall Jackson" and thereby requiring students to assume the identities of "Stonewall Jackson Generals" while playing basketball or performing in the marching band. Thus, the school setting of this case provides no justification for granting the School Board's summary judgment motion.

### III.    Plaintiffs have satisfied the speech element of compelled speech.

The School Board argues that even if neither government speech nor school speech is at issue, the School Board is still entitled to summary judgment because the undisputed material facts show that plaintiffs cannot satisfy the speech or compulsion elements of their compelled speech claim. Plaintiffs argue that the undisputed material facts instead show unequivocally that the name "Stonewall Jackson High School" introduces speech to which they object into their participation in extracurricular activities and that they themselves are compelled to convey that speech. Beginning with the speech element of compelled speech, the court concludes that the unique facts of this case, namely, the reasons given for the 2020 decision to retire the name "Stonewall Jackson High School" and the highly charged reversal of that decision in 2024, render the name "Stonewall Jackson High School" in Shenandoah County so exceptionally symbolic that the name transforms the conduct surrounding extracurricular activities into expressive conduct.

Several courts of appeals have broken down the standard for a compelled speech claim into the following elements: (1) speech, (2) to which the plaintiff objects, and (3) compulsion.

See, e.g., Cressman v. Thompson, 798 F.3d 938, 951 (10th Cir. 2015) ("[I]n order to make out

a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that

is (3) compelled by some governmental action."); Norgren v. Minnesota Dep't of Hum. Servs.,

96 F.4th 1048, 1057 (8th Cir. 2024) ("To establish a compelled speech claim, the [plaintiffs]

must demonstrate there was speech to which they objected that was compelled by some

governmental action."). The compulsion element can be set aside for now as it will be the

subject of the final section of this memorandum opinion. As to the second element, the School

Board does not dispute that plaintiffs object to any speech that would associate them with the

name "Stonewall Jackson" because plaintiffs believe the name "Stonewall Jackson" symbolizes

a message about the Confederacy, slavery, and racial exclusion. Def.'s Mem. Supp. Mot.

Summ. J., ECF No. 127 at 4-7 (recognizing plaintiffs' objections); see also D.D. Dep., ECF

No. 121-7 *sealed*, 19:14-20 (explaining that D.D. objects to the names "Stonewall Jackson"

and "Generals" because D.D. believes these names convey a message supporting slavery); A.J.

Dep., ECF No. 121-8 *sealed*, 16:19-24 (stating that A.J. objects to the name "Stonewall

Jackson" because of its association with Confederate ideals). The present question is whether

plaintiffs have satisfied the speech element of their compelled speech claim with the evidence

in the record concerning the role played by the name "Stonewall Jackson High School" in

plaintiffs' participation in extracurricular activities.

     The speech element of compelled speech can be satisfied by either pure speech or

expressive conduct. Barnette, 319 U.S. at 642 (including forced affirmations of a government

message by either "word or act" within the First Amendment's prohibition on compelled

speech); Virginia v. Black, 538 U.S. 343, 358 ("The First Amendment affords protection to

symbolic or expressive conduct as well as to actual speech."). The court must first determine whether the subject of plaintiffs' compelled speech claim in this case—references to "Stonewall Jackson" shaping the meaning of their participation in extracurricular activities—constitutes pure speech or instead constitutes conduct. If conduct is at issue, then the court must undertake a second inquiry into whether that conduct is sufficiently communicative to satisfy the speech element of compelled speech.

Pure speech includes expression through various recognized "medium[s] for the communication of ideas," Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501 (1952), such as written and spoken word and various forms of art, Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Bos., Inc., 515 U.S. 557, 569 (1995)("The Constitution looks beyond written or spoken words as mediums of expression."). Where pure speech is concerned, the speech element of compelled speech is easily satisfied. A plaintiff need not show that their pure speech is imbued with a particularized message in order to receive First Amendment protection, including First Amendment protection against compelled speech. See Cressman, 798 F.3d at 961-62 ("[B]ecause the First Amendment protection accorded to pure speech is not tethered to whether it conveys any particular message—i.e., the speech at issue could mean different things to different people—it is not clear at all that the message to which the plaintiff objects needs to be one a reasonable observer would perceive."); Anderson v. City of Hermosa Beach, 621 F.3d 1051, 1061 (9th Cir. 2010) (explaining that pure speech is not subject to the tests "reserved" for determining whether expressive conduct is sufficiently imbued with communicative elements to merit First Amendment protection). However, compelled pure speech does not offend the First Amendment where such speech is merely "incidental" to the

"regulation of conduct," as "'it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" Rumsfeld v. Forum for Acad. & Institutional Rts., Inc., 547 U.S. 47, 62 (2006) (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)). For example, in Rumsfeld, which concerned an association of law schools challenging a federal law requiring them to provide military recruiters access to school resources because the association objected to the military's policies on gay service members, the Supreme Court held that providing access to campus recruiting mechanisms was conduct and any speech involved, such as sending scheduling emails, was merely incidental to that conduct. This was so despite the fact that written and spoken words, including emails, are classically considered pure speech. Id.

Many of the most significant aspects of extracurricular activities, such as the actual playing of sports, are ordinarily considered conduct, not speech. See, e.g., Jones v. Schneiderman, 974 F. Supp. 2d 322, 333-37 (S.D.N.Y. 2013) (finding that mixed martial arts, "like other sports, is competitive conduct defined by who wins and who loses"). However, extracurricular activities may intermingle some elements of pure speech with conduct. For example, courts have found that clothing bearing words and symbols can constitute pure speech. See Frudden, 742 F.3d at 1204 (finding that a uniform depicting a school's mascot and motto was compelled student speech without engaging in an expressive conduct analysis). Music, with or without words, is pure speech. See Ward v. Rock Against Racism, 491 U.S. 781, 790-91 (1989) ("Music is one of the oldest forms of human expression."); Hurley, 515 U.S. at 569 (noting that even abstract music is "unquestionably shielded" by the First Amendment).

And banners, specifically the banners behind which marchers process during a parade, can constitute speech. See id. (noting that the "protected expression that inheres in a parade" includes but is not limited to "its banners and songs"). Accordingly, "Generals" jerseys, "Stonewall Jackson High School" nametags, and participation in the marching band may all involve at least some pure speech. Other aspects of extracurricular activities literally involve spoken and written words, such as announcements identifying students as "Stonewall Jackson Generals," cheers celebrating the "Stonewall Jackson Generals," and the text on chairs on the basketball court where D.D. and her teammates sit when they are not playing. However, because these utterances are not literally channeled through plaintiffs themselves, even if they do refer to plaintiffs themselves, there is some question as to whether plaintiffs are sufficiently closely associated with these spoken and written words to rely on them to state a compelled speech claim.

Despite the presence of some pure speech elements, the court will treat this as a case concerning conduct for several reasons. First, extracurricular activities overall may be deemed "conduct . . . in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" Rumsfeld, 547 U.S. at 62. In the same way the Supreme Court found scheduling emails to be speech incidental to the conduct of hosting military recruiters on campuses in Rumsfeld, one might find, absent other expressive elements, declarations identifying the school on behalf of which a student is competing, such as nametags and announcements attributing the points students score to "Stonewall Jackson High School," to be speech incidental to the conduct of extracurricular activities. Id.

42

Second, the court will not treat this as a case concerning pure speech because plaintiffs' objections in this case do not actually run to the pure speech elements at issue. Plaintiffs do not object to the music they are asked to perform, but rather object to performing that music on behalf of "Stonewall Jackson High School." Moreover, plaintiffs do not merely object to uttering the words "Stonewall Jackson" and "Generals," but rather, more specifically, object to adopting the message symbolized by those words. This adoption only comes into view when conduct is considered in connection with words. When plaintiffs wear "Generals" jerseys and "Stonewall Jackson High School" nametags on their bodies, that label is placed on the hard work and athletic, academic, and musical talent they display during the conduct of extracurricular activities, and when plaintiffs' conduct of scoring points or winning a competition is announced as belonging to "Stonewall Jackson High School," plaintiffs' achievements shine a positive light on "Stonewall Jackson." Because conduct is key to the overall context that plaintiffs argue conveys the message to which they object, it makes sense to hold plaintiffs' compelled speech claim to the standard for expressive conduct.

Finally, it is simply safest and most expedient to treat this case as a case concerning conduct because the bar for satisfying the speech element of compelled speech is higher where expressive conduct, rather than pure speech, is concerned. If plaintiffs can clear the bar for expressive conduct, then they certainly would clear the lower bar for proving their compelled speech claim based on pure speech.

Thus, the court must confront the question of whether the conduct at issue in this case is expressive. Conduct only falls within the scope of the First Amendment where it is "sufficiently imbued with elements of communication." Spence v. Washington, 418 U.S. 405,

43

410 (1974). "The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies." Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004) (citing Clark v. Cmty. for Creative Non–Violence, 468 U.S. 288, 293 n.5 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies.")). In the flag desecration cases of Spence v. Washington and Texas v. Johnson, the Supreme Court recognized at least one test the satisfaction of which qualifies conduct as expressive: "[i]n deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [the Court has] asked whether '[a]n intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.'" Texas v. Johnson, 491 U.S. 397, 404 (1989) (quoting Spence, 418 U.S. at 410-11). In Hurley, however, six years after Johnson, the Court recognized, "[I]f [constitutional protection were] confined to expressions conveying a 'particularized message,' [constitutional protection] would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." 515 U.S. at 569 (quoting Spence, 418 U.S. at 411). The court also enumerated "examples," such as the display of a simple red flag, of expressive conduct that the First Amendment protects despite lacking an immediately identifiable message. Id. Ultimately, the Court reasoned that "a narrow, succinctly articulable message is not a condition of constitutional protection." Id.

Lower courts are divided as to how to reconcile Spence-Johnson and Hurley. The Fourth Circuit has not provided clear guidance on the issue. See Amador v. Mnuchin, 476 F.

44

Supp. 3d 125, 156 n.10 (D. Md. 2020) (noting that "the Fourth Circuit has not addressed" whether Hurley modifies Spence-Johnson). Some circuits persist in treating Spence-Johnson's (1) "intent to convey a particularized message" and (2) "likelihood . . . that the message would be understood by those who viewed it" components as prerequisites for conduct to be considered expressive. See Church of Am. Knights of the Ku Klux Klan, 356 F.3d at 205 n.6 ("While we are mindful of Hurley's caution against demanding a narrow and specific message before applying the First Amendment, we have interpreted Hurley to leave intact the Supreme Court's test for expressive conduct in [Texas v. Johnson].");[6] United States v. Thompson, 896 F.3d 155, 164 (2d Cir. 2018) (stating that if conduct does not satisfy Spence-Johnson, the First Amendment does not "come into play") (quotation omitted); see also Edge v. City of Everett, 929 F.3d 657, 668-69 (9th Cir. 2019) (treating the components of Spence-Johnson as necessary conditions for First Amendment protection without discussing Hurley). However, other courts have concluded that, after Hurley, the Spence-Johnson "factors can no longer be viewed as the only criteria" for identifying conduct that is expressive; rather, in this view, Hurley makes clear that both Spence and Johnson spoke in nonmandatory language and thereby "set signposts rather than requirements." Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 160-61 (3d Cir. 2002). Among the available intermediary positions, consensus has coalesced around the notion that expressive conduct must convey "some" message, perhaps even a "particularized" or "discernable" message, but that such a message

_____

[6] Even the Second Circuit, despite holding that Hurley leaves Spence-Johnson intact, seems to believe that requiring a particularized message is not equivalent to requiring a succinct, narrowly articulable message. See Zalewska v. County of Sullivan, 316 F.3d 314, 319 (2d Cir. 2003) ("To be sufficiently imbued with communicative elements, an activity need not necessarily embody 'a narrow, succinctly articulable message,' but the reviewing court must find, at the very least, an intent to convey a 'particularized message' along with a great likelihood that the message will be understood by those viewing it.") (citations omitted).

45

need not be "narrow," "succinctly articulable," or "specific." See, e.g., Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 388 (6th Cir. 2005) (requiring a particularized message, but noting that the message need not be narrow or succinctly articulable); Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1270 (11th Cir. 2004) (looking to whether "the reasonable person would interpret [expressive conduct] as some sort of message, not whether an observer would necessarily infer a specific message"); Cressman, 798 F.3d at 961 (concluding that, at least for compelled speech purposes, "if the speech is symbolic, then the only legally cognizable objectionable message is one that a reasonable observer would identify"—i.e., a "reasonably discernible message"). This distinction suggests that the message in question need not be singular, in that it need not be understood in the same way by all audiences, or simple, in that it need not be reducible to a concise statement of meaning. After all, the possibility that expressive conduct might convey complex or even multifarious messages in the eyes of different beholders appears to be what the Supreme Court aimed to capture in using the example of a Jackson Pollock painting in Hurley. 515 U.S. at 569. The court finds this consensus approach requiring a message, but not a narrow, succinctly articulable message, to be persuasive.

Thus, the court concludes that plaintiffs bear the burden of demonstrating that their conduct conveys a message. Plaintiffs attempt to meet that burden by showing that the name "Stonewall Jackson High School" inescapably imbues their participation in extracurricular activities with a message celebrating the Confederacy, and along with it, slavery and racial exclusion. In its motion for summary judgment, the School Board argues that plaintiffs cannot meet their burden to show that a message is conveyed for three reasons.

46

First, the School Board argues that schools' names, schools' mascots, and persons' names are incapable of constituting speech or expressing a message under the First Amendment. Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 21. The School Board cites Frudden v. Pilling, in which the Ninth Circuit determined that students were compelled to speak when they were required to wear a uniform shirt including the school's name, which was "Roy Gomm Elementary School," the school's logo depicting the school's mascot, which was a gopher, and the slogan "Tomorrow's Leaders." 742 F.3d at 1201, 1208. Although the Ninth Circuit by no means held that a school's name or school's mascot alone could never constitute speech, the Ninth Circuit did expressly reserve the question of whether the name and logo, without the slogan, would constitute speech. Id. at 1205 n.2 ("[W]e do not address whether the [plaintiffs] can state a compelled speech claim based, without more, on the school logo (i.e., the 'stylized gopher' with the words 'Roy Gomm Elementary School')."). A prior Ninth Circuit case had suggested that "a school logo" on "students' otherwise solid-colored clothing" would be "an item expressing little, if any, genuine communicative message," in an opinion that did not otherwise describe the logo in question. Jacobs v. Clark Cnty. Sch. Dist., 526 F.3d 419, 433 (9th Cir. 2008). The School Board attributes the distinction between mottos, on the one hand, and schools' names, schools' mascots, and persons' names, on the other hand, to the fact that mottos convey "a clear and coherent message." Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 21. By contrast, the School Board argues, schools' names, schools' mascots, and persons' names cannot state a clear and coherent message because schools are "multi-faceted" institutions and human beings are complicated. Id.

The court agrees that many schools' names, schools' mascots, and persons' names are not inherently expressive. However, the First Amendment analysis of whether a message is conveyed for purposes of identifying expressive conduct does not turn on categorical exclusions but rather invites a context-dependent, case-by-case inquiry into both the intent to convey a message and the likelihood that the message would be understood by viewers. Spence, 418 U.S. at 410-11. Even if viewers are unlikely to discern any message from gopher logos, nondescript school logos, and school names not steeped in history familiar to the community, the court must evaluate the unique record in this case to determine whether the name "Stonewall Jackson High School," the mascot "Generals," and references to "Stonewall Jackson" are likely to be understood as conveying a message. Moreover, the School Board's argument that schools and persons are multi-faceted rests on the misconception that the First Amendment only protects messages that are easy to define. Particularly after Hurley, courts agree that even if a message must be particularized to justify applying First Amendment protections to conduct, the message need not be "narrow" and "succinctly articulable," 515 U.S. at 569, and certainly need not be "clear and coherent," Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 21.

Second, the School Board argues that plaintiffs cannot rely on their team uniforms in satisfying the "speech" prong of compelled speech. The School Board notes that team uniforms for sports at Stonewall Jackson High School largely display only the word "Generals," not "Stonewall Jackson Generals," and do not display images of Confederate soldiers or the Confederate flag. Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 22. The School Board further draws attention to the fact that the team name for "Mountain View High

School" was also the "Generals," and the School Board points to plaintiffs' statements indicating that plaintiffs did not object to wearing "Generals" attire at that time. Id.; see also A.J. Dep., ECF No. 121-8 *sealed*, 12:8-17 ("When the school name was Mountain View High School, the mascot simply signified a general."). This argument ignores the fact that students in Future Business Leaders of America, debate, and scholastic bowl do wear nametags that expressly mark them as "Stonewall Jackson" students, A.J. Dep., ECF No. 121-8 *sealed*, 10:15-11:2, 15:6-16, and the fact that students' varsity letters include "SJ," 4th Joint Statement of Stipulated Facts, ECF No. 109, ¶ 117.

Moreover, "the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol." Spence, 418 U.S. at 410. And here, in the context in which the school is now named "Stonewall Jackson High School," there is no mistaking that "Generals" means "Stonewall Jackson Generals." During extracurricular activities, countless visual and verbal reminders indicate that "Generals" means "Stonewall Jackson Generals," from the name "Stonewall Jackson" emblazoned on the gym floor, Def. Resp. Interrog. No. 4, ECF No. 121-1 at 112, to announcements identifying students wearing "Generals" jerseys as "Stonewall Jackson Generals," A.J. Dep., ECF No. 121-8 *sealed*, 23:5-8.

Third and finally, the School Board argues that plaintiffs themselves do not express any message that might be conveyed by the name "Stonewall Jackson High School." The School Board analogizes "entering the playing field with Stonewall Jackson Generals displayed on the scoreboard," Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 10, to the facts of Coleman v. Miller, 117 F.3d 527 (11th Cir. 1997). In Coleman, the Eleventh Circuit held that

49

"[t]he mere fact that appellant may on some occasions be required to enter public buildings that fly the Georgia flag"—which, when Coleman was decided, "incorporate[d] the Confederate battle flag emblem"—"does not infringe upon his First Amendment rights because entering public buildings does not manifest any particular attitude or belief and does not associate appellant with the flag's message." Id. at 528, 531. However, the record indicates that the scope of plaintiffs' affiliation with the name "Stonewall Jackson High School" is far broader than entering buildings and fields displaying references to that name. Identifications of plaintiffs themselves as "Stonewall Jackson Generals," whether by announcements, "Generals" jerseys, or "Stonewall Jackson High School" nametags, create a more intimate association than entering a building. This case is more akin to Wooley, in which the message to which the plaintiffs objected was physically affixed to their vehicle, 430 U.S. 705, 715, much as "Generals" is physically displayed on plaintiffs' bodies, or Barnette, in which the message to which the plaintiffs objected was conveyed in part by plaintiffs engaging in the physical act of a salute, 319 U.S. at 642, much as plaintiffs claim the message here is conveyed in part by their engaging in physical acts such as playing sports on behalf of the "Stonewall Jackson Generals." Indeed, in Coleman itself, the Eleventh Circuit distinguished walking into a building from expressive acts that would sufficiently communicate an "'affirmation of a belief,'" such as "carry[ing] or display[ing] the flag" or "participat[ing] in ceremonies honoring the flag." Coleman, 117 F.3d at 531 (quoting Barnette, 319 U.S. at 632). Here, if the name "Stonewall Jackson" conveys a message, then competing in extracurricular activities on behalf of "Stonewall Jackson High School" would seem to function like a ceremony celebrating

"Stonewall Jackson" because students' athletic, academic, and musical achievements bestow honor upon that name.

Thus, the School Board's three arguments claiming that plaintiffs cannot satisfy the speech element of compelled speech fall short of entitling the School Board to summary judgment. To the contrary, plaintiffs have met the burden as the movant on their own summary judgment motion to show that there is no genuine dispute as to any fact material to the speech element of compelled speech. Even construed in the light most favorable to the School Board, the record here contains unique facts indicating both that the name "Stonewall Jackson High School" was intended to convey a message and that the name "Stonewall Jackson High School" in fact conveys a message.

Spence focuses the inquiry into the expressiveness of conduct on context. In Spence, the Court considered whether the act of taping a peace symbol on an upside-down American flag was expressive. 418 U.S. at 410. The Court's conclusion that a message was in fact conveyed hinged on the political and historical moment in which the act occurred—right at the height of political controversy surrounding the Cambodian incursion and violence at Kent State. Id. The Court wrote, "A flag bearing a peace symbol and displayed upside down by a student today[, when the case reached the Supreme Court long after the underlying incident,] might be interpreted as nothing more than bizarre behavior, but it would have been difficult for the great majority of citizens to miss the drift of appellant's point at the time that he made it." Id. Thus, the strongest possible evidence of a message in this case is evidence concerning the immediate expressive context of the 2024 decision to reinstate the name "Stonewall Jackson High School," including the directly preceding 2020 decision to remove that name.

Regardless of whether reference to the name "Stonewall Jackson" can be deemed expressive at all moments in history, in the very specific context in which the name "Stonewall Jackson High School" was reinstated in 2024 amidst community controversy, just four years after the School Board had removed the name having expressly concluded that the name sent a message endorsing the Confederacy, slavery, and racial exclusion, "it would have been difficult for the great majority of citizens" in Shenandoah County "to miss the drift of [the 2024 School Board's] point at the time [the 2024 School Board] made it." Id.

The context provided by the 2020 decision to remove the name "Stonewall Jackson High School" supports both prongs of the Spence-Johnson test. In 2020, the School Board expressed unambiguously and unanimously that it believed removing the name "Stonewall Jackson High School" sent a message "condemning racism." 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 13-14. Individual School Board members indicated that they wished to remove the name to disavow the name's message associated with massive resistance, 3rd Joint Statement of Stipulated Facts, ECF No. 104, ¶ 83 ("[S]urely, Superintendent and School Board at the time [when Stonewall Jackson High School was founded] had to know that naming a high school after a Confederate General would send a clear message to Black families that they were not welcomed in that brand new school."), and associated with slavery, 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶ 23 ("As one high school student from Stonewall Jackson challenged me today 'if you vote to keep the name, you would be making a conscious decision to maintain a symbolic reference to a time of inequality and racism.'"). The unique facts of this case thus establish that in 2020 the School Board believed the name "Stonewall Jackson High School" was intended to symbolically express inequality and racism and was

likely to be understood in that manner, mirroring plaintiffs' objections to the name. See D.D.

Dep., ECF No. 121-7 *sealed*, 19:14-20:2; A.J. Dep., ECF No. 121-8 *sealed*, 16:19-24.

In 2024, the reasons cited in 2020 for removing the name were still fresh in the

community's memory. The community members, including plaintiffs, who spoke out against

the name change continued to view the name as expressing the same message endorsing the

Confederacy, slavery, and racial exclusion that the 2020 School Board had sought to condemn.

See D.D. Dep., ECF No. 121-7 *sealed*, 20:3-6; A.J. Resp. Interrog. No. 5, ECF No. 116-6

at 5; see also 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 33-34 (noting that the

majority of comments by public speakers at the May 9, 2024 School Board meaning were in

opposition to the name "Stonewall Jackson High School"). And indeed, at least one 2024

School Board member who voted in favor of the name "Stonewall Jackson High School"

confirmed his understanding that the name "Stonewall Jackson High School" sends a message

of racial exclusion connected to massive resistance to school integration. 1st Joint Statement

of Stipulated Facts, ECF No. 85, ¶¶ 40-41 ("[T]here were people using the school system at

that point for kind of a last-ditch effort to save what they saw as their world. . . . I would feel

unsettled if I were Black and going through this."). This evidence further supports the

"likelihood . . . that the message would be understood" prong of Spence-Johnson. Spence,

418 U.S. at 410-11.

To be sure, other 2024 School Board members may have intended to convey a different

message by selecting the name "Stonewall Jackson High School." For example, some 2024

School Board members stated that they wished to change the name to demonstrate a

repudiation of the 2020 School Board's decision to remove the name, explaining that removing

the name to condemn racism was mistaken because "[i]f you really want to stop this racism and prejudice, stop playing racism and prejudice into everything." 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶ 37; see also id. ¶ 36 ("[T]he topic of racism, [] I don't really like to talk about it a lot because I don't believe in it."). Still others expressed other intentions such as renouncing the procedures used in the 2020 decision-making process. 3rd Joint Statement of Stipulated Facts, ECF No. 104, ¶ 93 ("[T]he real issue with [the July 9, 2020 vote to retire the names of Stonewall Jackson High School and Ashby-Lee Elementary School] is the public . . . was not involved.").

Regardless, whether a given audience member at a Stonewall Jackson High School basketball game or scholastic bowl competition perceives the name "Stonewall Jackson" to convey a message more in line with some of the 2024 School Board members' statements supporting that name or more in line with the message endorsing the Confederacy, slavery, and racial exclusion identified by plaintiffs and the 2020 School Board, the context of both the 2020 and 2024 decisions demonstrates that audience members in Shenandoah County today are well aware that the name "Stonewall Jackson" is expressive. Particularly after Hurley, the fact that the name "Stonewall Jackson High School" might be intended and understood to convey multiple messages is no impediment to demonstrating a message qualifying conduct as expressive. See Holloman ex rel. Holloman, 370 F.3d at 1270 (11th Cir. 2004) (requiring "some sort of message, not whether an observer would necessarily infer a specific message").

A compelled speech claim does not require symmetry between the message to which the plaintiff objects and the message the government intended to convey, or the message likely to be perceived by other viewers. The School Board cites the Tenth Circuit's reasoning in

Cressman v. Thompson, which required that, to prevail on a compelled speech claim, "if the speech is symbolic, then the only legally cognizable objectionable message is one that a reasonable observer would identify." 798 F.3d at 96. Although Cressman is not binding on the court, the message to which plaintiffs object is certainly one "a reasonable observer would identify" in the name "Stonewall Jackson High School," even if it is not the only message members of the community in Shenandoah County are likely to see in the name "Stonewall Jackson." Id. The undisputed fact that the 2020 and 2024 name change debates drew extensive community engagement, see, e.g., 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 32-34, confirms that the reasonable observer in Shenandoah County is well aware that the name "Stonewall Jackson High School" is viewed by some as endorsing the Confederacy, slavery, and racial exclusion. Indeed, the record indicates that much of the dissensus over the value of naming a school "Stonewall Jackson High School" appears to stem from dissensus as to whether the message conveyed by the name "Stonewall Jackson High School" is one that is benevolent or harmful. Plaintiffs may disagree with the 2024 School Board and with those who elected them on the correct assessment, but as the Supreme Court observed in Wooley, the "First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable." 430 U.S at 715.

Although the unique context in which the 2024 School Board reinstated the name "Stonewall Jackson High School" just four years after the 2020 School Board retired the name is the most significant evidence in this case that the name "Stonewall Jackson" conveys a message, the record contains further undisputed facts providing an objective foundation for

the claim that the name "Stonewall Jackson" symbolizes the values associated with the Confederacy. The parties agree that "Stonewall Jackson was a Confederate General" and that "[t]he Confederacy existed, in part, to preserve slavery." 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 1-2. Although the parties' experts draw different conclusions about whether Jackson's personal views on slavery were nuanced, they agree that Jackson enslaved people and believed that slavery was justified by a divinely imposed racial hierarchy. Compare Seidule Report, ECF No. 121-1 at 23 ("Jackson was a firm believer in slavery, holding that God sanctioned the imprisonment of Black people.") with Kerr Report, ECF No. 116-8 at 9 (confirming that Stonewall Jackson believed "'slaves were children of God placed in subordinate situations for reasons only the Creator could explain.'" (quoting James I. Robertson, Jr., Stonewall Jackson: The Man, the Soldier, the Legend 169 (1997))). The School Board suggests there is a factual dispute as to the true nature of Jackson's character and therefore as to whether his name conveys a clear message because Jackson both fought to preserve slavery and taught Black people to read in Sunday school. Kerr Report, ECF No. 116-8 at 8. However, the disagreement between the experts as to whether Jackson's views on race were nuanced or reprehensible is not a dispute of fact material to the question of whether the name sends a message because the First Amendment does not require expressive conduct to convey a singular message.

Although historical evidence about Jackson the person certainly informs the message his name sends, historical evidence about symbolic uses of the name "Stonewall Jackson" is more directly related to the context-dependent message inquiry under Spence-Johnson and post-*Hurley* circuit precedents. Significantly, this is not a case about a high school named

"Thomas Jonathan Jackson High School"—Jackson's real full name. Rather, the School Board selected the name "Stonewall Jackson High School." The parties' respective experts agree that "Stonewall" is a nickname. Kerr Report, ECF No. 116-8 at 8; Seidule Report, ECF No. 121-1 at 23-24. Unrebutted evidence from plaintiffs' historical expert indicates that the nickname celebrates Jackson's military accomplishments on behalf of the Confederacy. Seidule Report, ECF No. 121-1 at 23-24. The nickname is therefore a reference to that very particular aspect of Jackson's identity, not to his broader and potentially more complicated life story. Plaintiffs' expert explains that this nickname has allowed Jackson to function as a leading symbol of the "Lost Cause" narrative. Id. The School Board's expert does not address the "Lost Cause" narrative but instead opines that Confederate monuments today function as a "[t]estament to [r]econciliation and [f]orgiveness" and allow people to "honor[] their Confederate ancestors." Kerr Report, ECF No. 116-8 at 11-12. The experts thus agree that the name "Stonewall Jackson" sends a message, whether that message is one about the "Lost Cause" endorsing the Confederacy and slavery or a message calling for national harmony and honoring Confederate ancestors. This is all that the First Amendment requires, particularly post-Hurley.

The record further indicates that the name "Stonewall Jackson" is expressive as a symbol of racial exclusion in public schools. Plaintiffs' expert explains that a spike in schools named after Confederate leaders occurred in the immediate aftermath of Brown v. Board of Education, 347 U.S. 483 (1954), writing, "Throughout the South, one way to protest integration and calls for equal rights was to name a school after a Confederate," thereby "send[ing] a very particular message about the need to sustain a racial hierarchy." Seidule Report, ECF No. 121-1 at 33. This includes Stonewall Jackson High School, which, as the

parties agree, was so-named in 1959 and remained segregated until 1963. 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶¶ 3-10. The parties agree that that the Confederate flag was flown at the school grounds as construction began, id. ¶ 5, and that the Confederate flag "can be a 'symbol of racial separation and oppression,'" Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 22 (quoting United States v. Blanding, 250 F.3d 858, 861 (4th Cir. 2001)). The School Board's expert agrees, "Yes, some people in those days chose to honor Confederates for racist reasons." Kerr Report, ECF No. 116-8 at 12. Thus, it is an undisputed fact that the name "Stonewall Jackson" historically conveyed a message advocating the exclusion of Black students from public schools. The 2024 School Board's decision to reinstate the name was made in a distinct political moment removed from this historical context. However, while the immediate context of the 2024 School Board's reinstatement decision provides the most significant evidence of meaning under Spence, this history remains worth noting because it undergirds the 2020 School Board's and plaintiffs' beliefs that the name continues to symbolize racial exclusion.

The record in this case thus confirms about the name "Stonewall Jackson High School" what courts have previously recognized about other Confederate symbols. The Fourth Circuit has acknowledged the "association between [Confederate] symbols and the history of slavery in this country," Crosby by Crosby v. Holsinger, 816 F.2d 162, 163 (4th Cir. 1987), that the Confederate flag can be a "symbol of racial separation and oppression," Blanding, 250 F.3d at 861, and that Confederate imagery might be viewed by some as "a symbolic acknowledgement of pride in Southern heritage and ideals of independence," Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles, 288 F.3d 610, 624 (4th Cir. 2002).

The name "Stonewall Jackson" is uniquely expressive, not only in light of this lengthy history of Confederate symbolism, but specifically in light of the 2024 School Board's decision to reinstate the name so soon after that very body had unanimously declared that the name conveyed a message endorsing the Confederacy, slavery, and racial exclusion. Although the record contains evidence indicating that members of the community in Shenandoah County disagree as to the nature of the message conveyed by the name "Stonewall Jackson," the First Amendment test of whether conduct is expressive requires a message, but does not require that the same message be perceived by all viewers. Hurley, 515 U.S. at 569. And indeed, the First Amendment protects plaintiffs' right to disagree. Wooley, 430 U.S at 715.

Because the name "Stonewall Jackson" is symbolically expressive, the name "Stonewall Jackson High School" has a unique effect on plaintiffs' conduct when they participate in extracurricular activities. Although soccer goals, scholastic bowl victories, and musical performances for schools with neutral names like "Mountain View High School" do not convey a message, this conduct becomes expressive when undertaken on behalf of "Stonewall Jackson High School." When plaintiffs' bodies, hard work, talents, and achievements are intertwined with the name "Stonewall Jackson," plaintiffs are enlisted in conferring honor on that name, and because that name conveys a message well-understood by viewers in plaintiffs' community, plaintiffs are enlisted in conferring honor on that message by extension. Thus, plaintiffs have satisfied the speech element of compelled speech.

IV.    **Plaintiffs have satisfied the compulsion element of compelled speech.**

The School Board's final argument in favor of its own summary judgment motion is that plaintiffs cannot satisfy the compulsion element of compelled speech because they are

not actually coerced into wearing "Generals" jerseys and otherwise associating with the name "Stonewall Jackson High School" during extracurricular activities. Plaintiffs argue to the contrary that there are no genuine disputes as to the facts material to the compulsion element of their compelled speech claim. The court concludes that the undisputed facts show that the School Board's reinstatement of the name "Stonewall Jackson High School" has permeated extracurricular activities at that school with references to "Stonewall Jackson," rendering association with the speech to which plaintiffs object practically inescapable. The undisputed facts further show that league handbooks and team rules penalize failure to wear school-issued "Generals" team uniforms. Because plaintiffs have no choice but to either speak the message with which they disagree or be excluded from an essential component of their education, plaintiffs are compelled to speak.

The legal standard for the compulsion element of compelled speech is somewhat unsettled. The Supreme Court has not stated an applicable test. Nor has the Fourth Circuit. The Supreme Court's compelled speech precedents have recognized a range of coercive mechanisms. In Barnette, students faced expulsion and parents faced possible criminal prosecution for failure to salute the flag and recite the Pledge of Allegiance. 319 U.S. at 626. In Wooley, drivers could be fined for an initial failure properly to display "Live Free or Die" on their license plates and could be sentenced to jail time for refusal to pay. 430 U.S. at 707-08. And in 303 Creative, failure to comply with Colorado's public accommodations statute could result in fines as well as "participation in mandatory educational programs." 600 U.S. at 581. However, the Supreme Court has never set a minimum threshold for First Amendment compulsion.

The circuit courts that have attempted to articulate a standard for First Amendment compulsion have accommodated flexibility as to whether direct punishment is a prerequisite. According to the Tenth Circuit in Phelan v. Laramie County Community College Board of Trustees, "In order to compel the exercise or suppression of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" 235 F.3d 1243, 1247 (10th Cir. 2000) (quoting Laird v. Tatum, 408 U.S. 1, 11 (1972)). However, compulsion might involve an "'indirect discouragement,' rather than a direct punishment," so long as the discouragement is not merely "'minimal' or 'wholly subjective.'" Id. (citing Am. Commc'ns Ass'n v. Douds, 339 U.S. 382, 402 (1950), and United States v. Ramsey, 431 U.S. 606, 623-24 (1977)).

Applying this standard, the Tenth Circuit has concluded that a county board of trustees' censure admonishing a board member for making a newspaper advertisement was not a sufficient penalty to constitute restraint of that member's speech, Phelan, 235 F.3d at 1248, and that a Colorado law requiring Colorado ballot initiative proponents to collect signatures from at least two percent of registered voters in each of Colorado's state senate districts did not compel ballot initiative proponents to speak where the only adverse consequence they risked was the failure of their ballot initiative, Semple v. Griswold, 934 F.3d 1134, 1143 (10th Cir. 2019). However, in Axson-Flynn, the Tenth Circuit found that the compulsion standard had been met where an acting student was required to say swear words in an acting class exercise by the implicit penalty of "not be[ing] able to continue in the program if she refused to say the words with which she was uncomfortable." 356 F.3d at 1290. Also relying on the Tenth Circuit's standard, the Third Circuit has concluded that students were not compelled to

speak when they were required to take a survey that asked them about religious and political beliefs where there was "no evidence of some type of disincentive or penalty" and students were merely "made to sit in chairs and put pen to paper during administration of the survey." C.N., 430 F.3d at 189. The Sixth Circuit has reasoned that owners of dangerous wild animals were not compelled to speak when a statute required them to either obtain a permit or join certain zoological associations because the owners of dangerous wild animals were not "penalized if they d[id] not join the [zoological associations]," but were merely "unwilling or unable to meet fourteen other options available to them." Wilkins v. Daniels, 744 F.3d 409, 415 (6th Cir. 2014). Finally, without articulating a compulsion standard, the Ninth Circuit found in Frudden that students had indeed been compelled to speak where noncompliance with a school uniform policy requiring students to wear shirts displaying the motto "Tomorrow's Leaders" could result in students being sent home to change or suspension for repeated offenses. 742 F.3d at 1201.

Putting these Supreme Court and circuit precedents together demonstrates that penalties like incarceration and fines certainly cross the threshold for compulsion, while passive mechanisms, mere criticism, and options for compliance fall short of the threshold for compulsion. In the school setting, being sent home, suspended, expelled, or, as Axson-Flynn makes clear, excluded from a school program are all sufficient to constitute compulsion.

Before determining whether the undisputed facts in this case include adequate coercive mechanisms to constitute compulsion, the court will further note that no precedent requires that a relevant coercive mechanism be expressed in writing to satisfy the compulsion element of compelled speech. For example, in Frudden, the Ninth Circuit found compulsion evinced

62

by requirements set forth in a school policy handbook, 742 F.3d at 1201, and in Axson-Flynn,

the Tenth Circuit found compulsion based on educators simply "ma[king] it abundantly clear

that [the plaintiff] would not be able to continue in the program if she refused to say the words

with which she was uncomfortable," 356 F.3d at 1290. Thus, here, the court will examine

relevant school and league policy documents but also other express or implied indications that

students cannot compete in extracurricular activities unless they wear "Generals" attire or

otherwise affiliate with "Stonewall Jackson High School."

Plaintiffs have satisfied the compulsion element of their compelled speech claim

because the undisputed facts show that plaintiffs cannot participate in extracurricular activities

at "Stonewall Jackson High School" without doing so on behalf of "Stonewall Jackson." First,

league handbooks and team-specific rules expressly state that students on the wrestling team,

track and field team, and cross country team, including A.J. and other members of the Virginia

State Conference NAACP, will not be permitted to travel or compete at home meets if they

do not wear their school-issued uniforms, which are "Generals" uniforms. VHSL Handbook,

ECF No. 121-3 at 160 (requiring wrestlers to wear their school-issued uniform); id. at 158

(requiring track and field athletes to wear school issued or school approved uniforms); Cross

Country Team Rules and Contract, ECF No. 121-17 *sealed* at 2 (stating that cross country

athletes will not be permitted to travel or participate in home meets if they are repeat offenders

of the rule requiring them to wear their team shirt, which is a "Generals" shirt). Explicit rules

in policy handbooks undoubtedly qualify as a sufficient source of compulsion. See Frudden,

742 F.3d at 1201. The rules here further establish qualifying coercive mechanisms not only by

indicating that uniforms are a necessary condition of participation, but also by stating that

simply removing or altering parts of the uniform will trigger penalties such as warnings and disqualifications in certain circumstances. Track & Field Rules Book, ECF No. 121-4 at 8-9. Because there is no dispute as to whether "Generals" uniforms are mandatory for participation in wrestling, track and field, and cross country, and because "Generals" uniforms are just one element of the expression involved in extracurricular activities undertaken by plaintiffs on behalf of "Stonewall Jackson High School," there is no need for plaintiffs to also prove that similar requirements exist for soccer, basketball, and each of the other individual activities in which plaintiffs participate. It is nevertheless notable that the record contains no evidence that other sports lack the uniform requirements unambiguously applied in wrestling, track and field, and cross country.[7]

"Generals" uniforms are just one aspect of the expression affiliating plaintiffs with "Stonewall Jackson" during extracurricular activities. The expressive conduct to which plaintiffs object also includes simply performing music as a "Stonewall Jackson Marching General" or scoring a soccer goal or scholastic bowl point for "Stonewall Jackson." No policy handbook states that students must identify as "Stonewall Jackson Generals" in these ways.

_____

[7] As for other sports, plaintiffs themselves attest that it is, as the Tenth Circuit put it in Axson-Flynn, "abundantly clear," 356 F.3d at 1290, to them that they must wear their school-issued "Generals" uniforms in order to be permitted to play. See D.D. Dep., ECF No. 121-7 *sealed*, 21:5-22:9; A.J. Dep., ECF No. 121-8 *sealed*, 29:2-23. The School Board contends that students' "subjective" beliefs ought not be considered, particularly where they are based on hearsay statements from coaches telling students that league rules are the source of these requirements. Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 6, 23. The School Board further notes that the VHSL Handbook does not in fact appear to contain any such generally applicable uniform requirement. Id. at 6 n.4. However, while the VHSL Handbook does not contain an overarching uniform requirement, it does contain sport-specific uniform requirements, such as those for wrestling and track and field. Additionally, the VHSL Handbook's lack of uniform policies as to some of the other sports in which plaintiffs participate is insignificant in light of the SCPS Athletics & Activities Handbook's delegation of rulemaking responsibility for individual sports and teams to coaches. ECF No. 121-4 at 27. At least some coaches appear to have exercised this responsibility by incorporating uniform requirements into their sport-specific rules, such as the Cross Country Team Rules and Contract. ECF No. 121-17 *sealed* at 2.

However, the nature of extracurricular activities, as substantiated by the record in this case, makes it "abundantly clear" that students have no choice but to associate with their school's name. Axson-Flynn, 356 F.3d at 1290. Practically, sports and activities like scholastic bowl could not function without points being attributed to the school by either the name "Stonewall Jackson High School" or some variation of the "Stonewall Jackson Generals." Even if one imagines that individual students opposed to the name could theoretically compete as unaffiliated athletes in certain individual sports, unaffiliated participation is impossible in team sports, and the VHSL Handbook and SCPS Athletics & Activities Handbook contain no such procedure.

Indeed, the School Board here has not argued that such accommodations are possible or that plaintiffs otherwise have "options" that might defeat the compulsion element of their compelled speech claim. See Wilkins, 744 F.3d at 415 (finding that plaintiffs are not compelled to speak if the government has provided them options for avoiding the speech to which they object). To the contrary, the School Board has insisted repeatedly that it is invested in ensuring that students benefit from participation in cohesive teams unified by reference to the school's name. See Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 17 ("SJHS [Stonewall Jackson High School] has a legitimate pedagogical interest in ensuring uniformity when its students represent the school at interscholastic competitions" that justifies requiring students to be identified based on their school and team name and to wear uniforms displaying their team name); Def.'s Opp'n, ECF No. 134 at 9-11 (same). The School Board fully endorses plaintiffs' expert report finding that uniforms, team names, and team mascots are integral to "the necessary sense of belonging that is fundamental to productive teamwork," which in turn is

integral to students receiving the full benefits of extracurricular activities. See Bass Report, ECF No. 121-1 at 89; Def.'s Opp'n, ECF No. 134 at 10. The parties further agree that "participation in extracurricular activities is an essential part of a well-rounded education." Def.'s Mem. Supp. Mot. Summ. J., ECF No. 127 at 16; see also Wooley, 430 U.S. at 715 (finding it significant that driving a car is a "virtual necessity" for most Americans in analyzing whether plaintiffs were compelled to speak by a requirement that their car's license plates display "Live Free or Die").

Thus, it is undisputed that plaintiffs can only access extracurricular activities—an essential component of their public school education—by engaging in the speech to which they object. The practical conditions surrounding extracurricular activities exert perhaps a more subtle form of compulsion than would be the case if plaintiffs were explicitly told, "If you do not affiliate with 'Stonewall Jackson,' you will be punished." However, just as the plaintiff in Axson-Flynn faced a choice between saying words to which she objected and being excluded from the acting program, plaintiffs here face a choice between serving as conduits for a message honoring "Stonewall Jackson" and being excluded from extracurricular activities. 356 F.3d at 1290. Thus, exclusion from extracurricular activities is certainly a "disincentive," C.N., 430 F.3d at 189, or "indirect discouragement," Phelan, 235 F.3d at 1247, if not literally a "penalty," C.N., 430 F.3d at 189, or "direct punishment," Phelan, 235 F.3d at 1247.

The School Board contends that plaintiffs cannot satisfy the compulsion element of compelled speech where the undisputed facts show that plaintiffs have not themselves been directly threatened or punished. Def.'s Opp'n, ECF No. 134 at 12. For example, A.J.

66

acknowledges that he has never been threatened or pressured by his teachers, instructors, or coaches to represent "Stonewall Jackson." A.J. Dep., ECF No. 116-5 *sealed*, 28:7-30:12. However, "[c]ompulsion need not take the form of a direct threat or gun to the head." Axson-Flynn, 356 F.3d at 1290.

The School Board similarly argues that plaintiffs have not tested the likelihood of punishment by attempting to mark out the word "Generals" on their jerseys or by otherwise violating team uniform requirements. Def.'s Opp'n, ECF No. 134 at 12-13. This argument is really a question, not of the First Amendment standard for compulsion, but of Article III justiciability. To satisfy the Article III injury-in-fact component of standing in a pre-enforcement First Amendment challenge, a plaintiff need only demonstrate a credible threat of future punishment. See Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158-59 (2014); see also Frudden, 42 F.3d at 1205 (concluding that the fact "that [the elementary school] did not discipline the Fruddens' children is irrelevant to their First Amendment challenge" because the Fruddens sought prospective relief (citing Wooley, 430 U.S. at 711)). For example, in 303 Creative, the Court found that a would-be wedding website designer who did not wish to make wedding websites for gay weddings had satisfied the injury-in-fact requirement by establishing that "'a credible threat' existed that Colorado would, in fact, seek to compel speech from her that she did not wish to produce." 600 U.S. at 580-82. This was so despite the fact that the wedding website designer had not yet actually set up her wedding website business, let alone actually refused a customer's request to create a website for a gay wedding and been subject to punishment. Id. at 580 ("While Ms. Smith has laid the groundwork for her new venture, she has yet to carry out her plans."). The Court thus confirmed that compelled speech

67

violations are so grave that a plaintiff need not take even minimal steps to provoke the very First Amendment harm they seek to avert. As the Court recently reiterated in Mahmoud v. Taylor, "[W]hen a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit." 145 S. Ct. 2332, 2358 (2025) (citing Susan B. Anthony List, 573 U.S. at 158).

Because explicit rules require students in certain sports to wear "Generals" team uniforms and because the undisputed facts show that the practicalities of extracurricular activities make association with "Stonewall Jackson High School" inescapable, plaintiffs have shown both sufficient coercive mechanisms and clear sources thereof to satisfy the compulsion element of their compelled speech claim. The undisputed facts show that the School Board's reinstatement of the name "Stonewall Jackson High School" has saturated extracurricular activities at that school with references to "Stonewall Jackson." The School Board's decision to restore that name was made in a context in which league and team rules require students engaged in extracurricular activities to wear school-issued uniforms, which are now "Generals" uniforms referencing the "Stonewall Jackson Generals." The School Board's decision was also made in a context in which the School Board itself insists that references to the school's name are integral to extracurricular activities. Thus, the reinstatement of the name "Stonewall Jackson High School" entailed the forms of compulsion plaintiffs have identified, in addition to introducing the unique symbolism of the name "Stonewall Jackson" into plaintiffs' participation in extracurricular activities.

**V.    The School Board has not satisfied strict scrutiny.**

Because no alternative standard derived from the school context applies in this case, strict scrutiny applies. Compelled speech is presumptively unconstitutional unless the government can meet the heavy burden of demonstrating that the compulsion of speech at issue is narrowly tailored to a compelling government interest. See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 795 (1988) ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech," thereby rendering compelled speech "content-based regulation of speech"); Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 585 U.S. 755, 766 (2018) (stating that strict scrutiny ordinarily applies to content-based regulations of speech in a case concerning compelled speech); Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt., 879 F.3d 101, 111 (4th Cir. 2018) (finding that a government compelled disclosure triggered "[e]xacting First Amendment scrutiny" under Barnette and examining whether the compelled disclosure was "narrowly tailored to achieve a weighty government interest").

No compelling interests are present in this case. The School Board's proffered pedagogical interest in promoting team uniformity fails as a compelling interest for the same reason it fails as a pedagogical interest, as the need for team uniformity only justifies having school and team names generally, not the particular name "Stonewall Jackson High School." The record indicates that the highly symbolic name "Stonewall Jackson" was selected to convey a message or messages, such as a message signaling that the 2020 School Board's efforts to condemn racism were counterproductive. See 1st Joint Statement of Stipulated Facts, ECF No. 85, ¶ 37. The government's interest in expressing this and other messages plainly is not compelling, as compelled speech doctrine exists precisely because the First

69

Amendment does not permit the government to pursue its interest in expressing its chosen messages by means of compelled speech. See Barnette, 319 U.S. at 642 (prohibiting the government from using compelled speech to "prescribe what shall be orthodox in . . . matters of opinion"). The only other justification hinted at in the record is that the School Board's name change decision was the result of a democratic process and a rejection of the 2020 School Board's failure to use certain procedures when it voted to remove the name. See, e.g., 3rd Joint Statement of Stipulated Facts, ECF No. 104, ¶ 93. The will of the voters is the very definition of an interest that must be rejected under strict scrutiny. Barnette, 319 U.S. at 638 ("One's right to . . . free speech . . . may not be submitted to vote."). Thus, the School Board has not come close to satisfying the rigors of strict scrutiny.

## CONCLUSION

Under the unique, yet undisputed, facts of this case, plaintiffs are entitled to summary judgment. By reinstating the name "Stonewall Jackson High School" and thereby compelling students to advance the School Board's chosen message favoring "Stonewall Jackson" through the conduct of extracurricular activities rendered expressive by that name, the School Board has violated plaintiffs' First Amendment rights, as incorporated by the Fourteenth Amendment, against compelled speech. The School Board's motion for summary judgment, ECF No. 115, is **DENIED**, and plaintiffs' motion for summary judgment, ECF No. 118, is **GRANTED**. Plaintiffs' motion for entry of final judgment, ECF No. 138, will be addressed by a separate memorandum opinion and order.

An appropriate order will be entered.

Entered: September 8, 2025

Michael F. Urbanski
Senior United States District Judge