UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| VIRGINIA STATE CONFERENCE NAACP, *et al.*,<br><br>      Plaintiffs,<br><br>      v.<br><br>COUNTY SCHOOL BOARD OF SHENANDOAH COUNTY,<br><br>      Defendant. | Case No. 5:24-cv-00040<br>PLAINTIFFS' MOTION IN LIMINE NO. 2 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. WANJIRU NJOYA**

**INTRODUCTION**

County School Board of Shenandoah County ("Defendant") proffers Dr. Wanjiru Njoya as an expert in this case to purportedly opine on issues related to Confederate history and symbology and the harm that such symbology causes to Black students. But Dr. Njoya's report fails entirely to address the factual issues in this case. Instead, the report largely consists of legal and philosophical debates about historical interpretation. Indeed, Dr. Njoya is not a historian, nor is she medical professional, psychologist, or sociologist—the types of experts that would be qualified to opine on the issues Dr. Njoya claims to address in her report. As demonstrated by her testimony, social media, and publications, Dr. Njoya is a fervent advocate for the Confederate cause who cannot, and does not, maintain objectivity in her opinions, as required of any expert. In short, her opinions are neither relevant nor reliable. Because Dr. Njoya's opinions fail to satisfy the standards for admissibility under Rule 702 and should be excluded.

## BACKGROUND

Plaintiffs offer four expert witnesses regarding the remaining claims in this case. Dr. Amy Bass's report analyzes the effects of Confederate names and symbols used for school sports teams on students and their education. Ex. 1, Dr. Amy Bass Expert Report. Dr. Brian Daugherity's report provides a historical analysis of the Confederacy and Confederate symbology as it relates to Shenandoah County and its schools, opining that the schools were named "in honor of Confederate icons in part to discourage Black students from seeking admission into all-White schools and to protest federally mandated school integration efforts." Ex. 2, Dr. Brian Daugherity Expert Report ("Daugherity Report"), at 22. Brig. Gen. Ty Seidule's report addresses similar issues, including the history of the Confederacy, as well as segregation, desegregation, and Massive Resistance in Virginia and Shenandoah County, concluding that the names of the schools commemorate Confederate generals and send a message of white supremacy. Ex. 3, Brig. Gen. Ty Seidule Expert Report. Dr. Adiaha Spinks-Franklin opines in her report that, in her opinion as a developmental-behavioral pediatrician, Confederate school names and symbology are perceived as racist by Black students and cause those students physical and psychological harm. Ex. 4, Dr. Adiaha Spinks-Franklin Expert Report.

In rebuttal, Defendant offers Dr. Wanjiru Njoya as an expert witness to "testify regarding the issues of vestiges of resistance to de-segregation, harm or disproportionate impact on students, and relevant historiography." Ex. 5, Defendant's Rule 26 Disclosure (July 25, 2025), at 2. Dr. Njoya's report does not identify which of Plaintiffs' experts she responds to, nor did she clarify this during her deposition. Her expert report purports to offer opinions on "two key issues"—"[d]ebates about [C]onfederate history and the American Civil War" and "[h]arm alleged to be suffered by children today." Ex. 6, Dr. Wanjiru Njoya Expert Report ("Njoya Report"), at 2.

Dr. Njoya is a legal academic trained in Europe. Njoya Report at 18. She is not an expert on Confederate history or symbology, racism in the United States, school segregation, or any aspect of American history. Ex. 7, Transcript, Deposition of Wanjiru Njoya ("Njoya Dep. Tr."), 9:11–19, 22:4–23:10, 24:2–25:20, 161:16–162:16, 183:2–185:18, 202:21–203:15; 206:4–209:17, 213:20–215:13, 233:2–11; Njoya Report at 18. Nor is she a medical doctor, a psychologist, or a sociologist. *See* Njoya Dep. Tr., 248:12–250:5; Njoya Report at 18. Though Defendant offers her as an expert on harm related to Confederate school names, Dr. Njoya is not an expert on these topics and her CV reflects no experience in these areas. Indeed, Dr. Njoya testified repeatedly that her expertise is in "the rule of law," not schools or their names. *See, e.g.*, Njoya Dep. Tr., 202:21–203:8 ("[A]s somebody who's … got expertise in law, my expertise is not in school names."); *id.*, 248:1–7 ("I was asked to give my opinion on how the issues I identified in this case would impact on what I see, in my expert opinion, as the importance of the rule of law.").

Consistent with her experience, Dr. Njoya offers primarily legal and philosophical conclusions. *Id.*, 203:6–204:2 ("I was here to offer my expert opinion that in a democracy people decide the names of their schools" and "we don't use legal concepts of harm to bypass that process"). In that vein, Dr. Njoya concludes that lawsuits like the instant case are "weaponizing the legal system, and [are] inimical to the rule of law." *Id.*, 203:6–204:2.; *see also id.*, 180:21–183:1 ("The main point that I'm trying to make … is that we don't use the law to resolve … disputed historical debates or disputed debates about how people are remembering history.").

Dr. Njoya's report does not engage in historical analysis or reach any fact-based conclusions about Confederate history or any other relevant issue. Instead, it largely discusses normative debates about historical interpretation, democracy, and race. Njoya Report at 5–13. Her report also does not engage in any examination or discussion of harm caused to the students; rather she focuses on her belief that "critical race theories" have wrongfully imputed a "collective harm" to Black people. Based

3

on these opinions, she concludes that "collectivist allegations [are] merely [ ] historical interpretations," and "the alleged vestiges are particularly susceptible to historical interpretations and therefore should not be the basis for changing the name of a school." *Id.* at 17.

## LEGAL STANDARD

Testimony from an expert qualified "by knowledge, skill, experience, training, or education, may testify" is only admissible if (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of expert testimony must satisfy each of the requirements of Rule 702 by a preponderance of the evidence. *See* Fed. R. Evid. 702 committee's notes on rules – 2023 amendment.

Under Federal Rule of Evidence 702, trial judges "special gatekeeping obligation" to ensure that expert testimony is both relevant and reliable. *See, e.g.*, *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). Expert testimony is relevant when it bears a valid connection to the issues in dispute. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). Expert testimony is reliable when it is based on "scientific, technical or specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) (citations omitted) (emphasis in original).

## ARGUMENT

**I.     Dr. Njoya's testimony should be excluded because her central opinions are irrelevant and unhelpful.**

Dr. Njoya organizes her report around the central question of "whether the[] [Confederate school] names reinforce racially discriminatory opinions and seek to restore the 'white supremacy' that once prevailed in society." Njoya Report at 2. Her report, however, is bereft of any historical analysis

4

or assessment of how, why, or under what circumstances the schools at issue were named. This is to be expected given that, per her own testimony, she "wasn't asked to write an expert report on schools"; "ha[s]n't offered expertise on school naming" and has not studied it; is not an expert on the period of Massive Resistance when the schools were originally named; and did not even consider Plaintiffs' expert reports on those exact subjects despite the fact that she is proffered as a rebuttal expert. Njoya Dep. Tr., 202:21–203:15, 211:2–213, 246:23–249:4.

Instead of addressing her own stated question in a concrete or useful way, the "main point" of Dr. Njoya's testimony is that "we don't use the law to resolve … disputed debates about how people are remembering history," *id.*, 182:6–183:1, and "how the issues" in this case "would impact … the importance of the rule of law," *id.*, 213:3–19, 248:1–7; *see also id.*, 203:10–13. As a result, her report focuses not on clarifying the meaning and effect of Confederate symbols in the school context, but on, as she describes it, "trying to show" that this type of lawsuit is "weaponizing the legal system" and "a threat to the rule of law." *Id.*, 182:6–183:1, 202:21–204:7; *see also* Njoya Report at 17 (opining that "critical race theories" and "presentis[m]" pose a threat to "liberal democracies"). This "main point" is either legal conclusion or political theory that cannot possibly assist the trier of fact. In other words, Dr. Njoya testified to her own irrelevance. *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (explaining that a "connection to the pertinent inquiry" is "a precondition to admissibility").

Dr. Njoya's specific opinions on the "two key issues" raised by the question she purports to answer fare no better. Her opinions concerning "[d]ebates about [C]onfederate history and the American Civil War" and "[h]arm alleged to be suffered by children today" are irrelevant or otherwise unhelpful because they do not go to any disputed question of fact. Njoya Report at 2.

    **A.    Dr. Njoya's philosophical and political conclusions about historical interpretation and debates are irrelevant and inadmissible.**

Dr. Njoya's discussion of debates about Confederate history consists primarily of rhetorical questions, complaints that race discrimination in the North is not the focus of this or other lawsuits,

5

and block quotes from other academics about the complex nature of historical interpretation; it contains virtually no fact-based conclusions or analysis. *See generally* Njoya Report at 2–17. That the "Confederacy existed, in part, to preserve slavery" is not in dispute here. ECF No. 85, Joint Statement of Stipulated Facts, at 1. And Dr. Njoya offers no opinions about how or why Confederate symbols came to be used after the Civil War period, *see* Njoya Dep. Tr., 230:19–233:15, therefore presenting nothing to counter Plaintiffs' experts on this point.

A significant portion, if not a majority, of Dr. Njoya's opinions about the Confederacy are tangential discussions of legal and political theory that do not assist the factfinder in resolving any contested issue. These include the suggestion that "[e]rasing historic names does not promote true history" and tangents about "[w]ho gets to decide the correct interpretation of historical events," "presentists" using "history as a weapon with which to crush one's political or ideological opponents," the "Marxist" underpinnings of "critical race theories," the 1619 Project, and racism and slavery in the North. *See* Njoya Report at 2–13. To be direct, none of this matters.

### B. Dr. Njoya's opinions on whether Confederate schools' names cause harm are not relevant.

Dr. Njoya's testimony on what she states as the second "key issue"—whether Confederate school names cause harm to Black children—is also neither helpful nor relevant. Dr. Njoya's opinion on harm does not relate to whether Plaintiffs or others have *actually* been harmed by Defendant's conduct, but rather to her opinion on whether that harm is or should be legally cognizable. That, in fact, is her testimony. *See* Njoya Dep. Tr., 183:2–185:18 ("I'm an expert on the . . . concept of harm . . . I'm speaking here in the context of the law . . . and my expertise is in the law, and that's what I'm commenting on."); *see also* Njoya Report at 4–5 (Plaintiff's theory of harm "rel[ies] on critical race theories" and those "explanations of 'harm' caused to black people by historical memorials undermine individual liberty, objective reason, and rationality."). Dr. Njoya's opinion is that such harm cannot be legally cognizable because, if it was, "civil rights laws would not only function as the de facto

6

constitution in the United States, [they] would threaten to supersede the de jure constitution." *Id.* at 5; *see also id.* at 13–16; Njoya Dep. Tr., at 186:6–188:10 ("And so that's my argument . . . that the law can't have this concept of harm that just applies to Black people. Harm in the law should treat everyone the same as equally entitled to the protection of law."). This is all quintessential legal conclusion, not a proper subject for expert testimony. *See, e.g.*, *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002); *W.C. Eng., Inc. v. Rummel, Klepper & Kahl, LLP*, 2020 WL 534532, at *2–3 (W.D. Va. Feb. 3, 2020). Indeed Dr. Njoya repeatedly emphasized in her deposition the legal nature of her expertise and conclusions, acknowledging her opinions on this case are legal ones and underscoring that those opinions are irrelevant and inadmissible. *See, e.g.*, Njoya Dep. Tr., 182:6–185:18, 213:20–215:13, 247:21–248:11.

II.  **To the extent any of Dr. Njoya's opinions are relevant, she is not qualified to testify about Confederate history or harm to Black students.**

To the extent any of Dr. Njoya's opinions are arguably relevant to the factual issues in this case, she is not qualified to testify as an expert on those matters. An expert witness may only testify on matters within the scope of her expertise. *See* Fed. R. Evid. 702(a); *vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 451 (D.S.C. 2019); *Jain v. Abbott Labs., Inc.*, 2014 U.S. Dist. LEXIS 175242, *8 (W.D. Va. Dec. 19, 2014). Nothing in Dr. Njoya's CV, her report, or her testimony suggests any basis for her to provide expert opinions on historical topics of the Confederacy, segregation, Massive Resistance, or physical or psychological harm to students from discriminatory experiences and exposure. Her opinions on those subjects should be excluded on that basis. *See Waterhouse v. R.J. Reynolds Tobacco Co.*, 368 F. Supp. 2d 432, 436 (D. Md. 2005), *aff'd*, 162 F. App'x 231 (4th Cir. 2006); *Jain*, 2014 U.S. Dist. LEXIS 175242, at *8.

7

### A.    Dr. Njoya is not qualified to opine on the meaning of Confederate symbols today or at the time of the schools were named.

Plaintiffs have proffered two university-trained historians, tenured professors who have extensively studied the periods of American history relevant to this case. That only makes sense—a well-developed expert analysis assessing the historical meaning and use of Confederate symbols requires specific historical knowledge and expertise. But Dr. Njoya is not a historian; as she testified, Plaintiffs' expert Dr. Brian Daugherity, a historian and scholar of the civil rights movement in Virginia, is "not in [her] field." Njoya Dep. Tr., 246:23–248:11; *see* Daugherity Report at 1. There is no indication that she has any knowledge or experience beyond a well-read layperson's as to Confederate history and symbology.

Historical analysis, like other academic disciplines, requires specialized skills and training to ensure that the interpretation of primary texts rests on sound academic bases rather than personal belief or erroneous conclusions. *See, e.g.*, *United States v. Hammoud*, 381 F.3d 316, 337 (4th Cir. 2004) (overruled on other grounds); *Waterhouse*, 368 F. Supp. 2d at 436; *vonRosenberg*, 413 F. Supp. 3d at 450 (noting that "synthesizing voluminous historical texts [] is precisely the type of expertise that courts acknowledge historians possess"). Dr. Njoya, a legal academic, lacks such specialized skills. *See* Njoya Report at 18; Njoya Dep. Tr., 17:8–18:22, 25:21–27:20, 249:15–250:5. Dr. Njoya acknowledged that she has *never* been a student in a history department or taken a course in American history. Njoya Dep. Tr., 23:11–25:20. Nor has Dr. Njoya pursued a career in historical research or analysis. She has spent most of her career teaching law and legal philosophy outside of the United States, focusing on "the rule of law." Njoya Report at 18; *see also* Njoya Dep. Tr. 17:17–18:22, 22:4–23:10, 23:21–24:1, 31:23–37:21, 161:16–162:16, 183:2–184:5, 202:21–203:15; 206:4–209:17, 213:20–215:4.

Dr. Njoya also has no specialized knowledge of the history relevant to this case. She has no knowledge of when Stonewall Jackson High School was named and did not review any records about the naming. Njoya Dep. Tr., 211:2–213:19. When asked about the adoption of Confederate names

8

for Southern schools during the era of Massive Resistance, Dr. Njoya replied, "I haven't offered expertise on school naming, and that hasn't been part of my research and expertise." *Id.* She has not studied how the KKK and others used Confederate symbols to advance white supremacy during the relevant period. Njoya Dep. Tr., 230:19–233:15.

Although her report argues "Confederate history is not uniquely 'racist' or 'white supremacist,'" Njoya Report at 12, she is also not qualified to offer an expert opinion on Confederate history or the use of Confederate symbols during the relevant time periods. When asked whether "Confederate history is the subject of [her] professional work," Dr. Njoya testified that "as a lawyer, as a legal scholar, [my professional work] has related to people saying that because of that historical injustice, there need to be this or that legal responses …, and my work looks at the implications of that for the rule of law." Njoya Dep. Tr., 160:16–162:16. She further explained that she has studied "the legal and philosophical debates surrounding how law responds to those … alleged injustices," including Confederate history. *Id.* But studying "legal and philosophical debates" about injustices throughout history does not make someone an expert in Confederate history, Confederate symbology, or the harm such symbology may cause in the context of Confederate history. In fact, Dr. Njoya has only "recently been engaging with public debates concerning Confederate history and heritage," and has read about Confederate history "over the last few years." Njoya Report at 2; Njoya Dep. Tr., 159:18–160:12. Simply reading literature in a subject area cannot qualify someone as an expert in that field. To find such minimal exposure the basis for expertise would make a mockery of the term "expert." *See United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (finding that a lawyer who merely read literature and co-authored a law review on the relevant topic was not "any more qualified to testify as an expert . . . than a lay person who read the same articles"). Because Defendant has not demonstrated that Dr. Njoya is a qualified historian, Dr. Njoya's historical opinions should be excluded.

9

### B.  Dr. Njoya is not qualified to opine on the harm Confederate symbols cause Black students.

Dr. Njoya is not qualified to offer an expert opinion on whether Plaintiffs have suffered harm due to the Confederate names. Nevertheless, she argues in her report that Confederate names "do not automatically harm African American students." Njoya Report at 4; Njoya Dep. Tr., 188:11–23. As noted above, Dr. Njoya refers to the *legal concept* of harm rather than actual harm, which is the subject of Plaintiffs' expert, Dr. Spinks-Franklin's, report. To the extent that her opinion on harm could be construed to be about actual harm, she is plainly not qualified to make such an assessment.

Someone outside of the medical or psychological fields may not provide opinions concerning medical or psychological injury. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 198 (4th Cir. 2001) (noting that biomedical engineer was not qualified to opine on medical aspects of the case because "[h]e is not a medical doctor"); *Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 370 (W.D. Va. 2020). Dr. Njoya possesses no specialized knowledge required to offer an expert opinion on harm to Plaintiffs. *See* Njoya Dep. Tr., 248:12–249:4. When asked how she is an expert on harm, Dr. Njoya explained that she is an expert on the "concept of harm because [she] taught the law of torts for years and did extensive reading," and she knows "the philosophical underpinning of the law of torts." Njoya Dep. Tr., 183:2–184:5. Dr. Njoya may be qualified to opine on that legal question, but she is not qualified to assess the actual harms Plaintiffs allege in this case.

### III.  To the extent any of Dr. Njoya's opinions are relevant, they are unreliable because she provides no methodology, insufficient factual bases, and is an activist masquerading as an expert.

None of Dr. Njoya's opinions are reliable because they are not based on any discernible methodology, analysis, or sufficient facts and data and because she is an activist and advocate for the Confederate cause, not an objective expert.

10

### A.  Dr. Njoya's opinions are not based on reliable methodology nor are they supported by sufficient facts and data.

Unsurprisingly given her lack of qualifications, Dr. Njoya offers no discernable methodology for the opinions she offers regarding the Confederacy and harm to Plaintiffs, providing a further basis to exclude her testimony. An expert may not rely on vague, speculative, or conclusory methodology in forming opinions. *See Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Failure to identify or apply a sound methodology is grounds for exclusion, either in part or in whole. *See, e.g., Price v. White*, 2025 U.S. Dist. LEXIS 182473, at *18–19 (W.D. Va. Sept. 17, 2025). In addition, an expert's opinions must be "based on sufficient facts or data." Fed. R. Evid. 702(b); *Peters-Martin v. Navistar Int'l Transp. Corp.*, 410 F. App'x 612, 617, 621 (4th Cir. 2011) (upholding a district court's exclusion of an expert who claimed to be qualified by experience when he "cited no tests, studies, or other scientific support for [his] conclusions").

Unlike a trained historian who studies, synthesizes, and compares competing primary sources, or a medical expert or psychological expert who consults prevailing literature relevant to the opinion proffered, Dr. Njoya employs no discernible methods for her conclusions. Dr. Njoya offers opinions on Confederate symbols and whether Plaintiffs have suffered harm, including psychological injury, without relying on any accepted methods. Instead, her conclusions on harm appear to be premised on her normative position that people of a given race do not experience "collective harm" due to "systemic racism." *See* Njoya Report at 13–17.

Dr. Njoya offers an insufficient factual foundation for her opinions. She did not review deposition transcripts, primary sources from Shenandoah County regarding the School Board, or other case-specific evidence. *See* Njoya Dep. Tr., 211:9–17, 246:23–249:4. The only empirical data she consults is a single poll of North Carolina residents that she uses to support the broad and irrelevant conclusion that "[p]olls of ordinary Americans consistently show a majority in favor of retaining historic memorials." Njoya Report at 13. Moreover, Dr. Njoya fails to address or reconcile

11

the assertions of Plaintiffs' experts (likely because she did not really read them, Njoya Dep. Tr., 246:23–249:4), whose opinions directly contradict hers, nor does she evaluate Plaintiffs' experts' sources. Dr. Njoya admitted that she only "had a quick glance" at the expert reports on Confederate symbology and harm to which she was purportedly responding because those experts were not "lawyers defending individual liberty and the rule of law." *Id.*, 246:23–249:4.

### B. Dr. Njoya's opinions are not reliable because she is an advocate and activist, not an expert.

Dr. Njoya's testimony is also unreliable because she is a pro-Confederate activist who cannot offer an objective expert opinion on the relevant issues. Experts may not testify "in a form of an advocate editorializing, or present a conclusory narrative akin to attorney argument, rather than as an expert witness." *United States v. Novo Nordisk, Inc.*, 2025 WL 1955136, at *2 (W.D. Wash. July 16, 2025); *see also McGee v. Zurich Am. Ins. Co.*, 2021 WL 6070590, at *6–7 (D. Ariz. Dec. 22, 2021) (excluding expert because they were an advocate where report was "argument riddled with inflammatory statements and one-sided propaganda").

Dr. Njoya's deposition testimony, publications, and social media posts demonstrate that she is a staunch advocate for the Confederate cause and an anti-civil rights activist. Dr. Njoya's X page is replete with pro-Confederate propaganda. Ex. 8 ("Njoya Social Media"), at 1, 5, 8, 11, 14, 17, 18, 20. More broadly, Dr. Njoya has called for the outright abolition of the "illegal" Fourteenth Amendment, advocated for the repeal of the Civil Rights Act of 1964, and testified that *Brown v. Board of Education* was wrongly decided. Njoya Dep. Tr., 67:6–13, 123:15–25, 215:14–20, 239:19–240:16; Njoya Social Media at 9; Ex. 9, Wanjiru Njoya, *The Tyranny of the 1964 Civil Rights Act*, Mises Wire (Feb. 24, 2024). Dr. Njoya endorses the freedom to racially segregate. Njoya Social Media at 7, 24; Njoya Dep. Tr., 84:11–85:16 (testifying that a law that forces people to racially integrate is "wrong" and a "bad law"). And she has repeatedly described Black people in categorical, discriminatory terms. Njoya Social Media at 2 (posting a picture of the Charlotte train stabbing suspect, who is Black, and stating: "Now

12

people can see who's really causing the problems"); *id.* at 31 ("[Marxists] just use black people to go do rioting for them, because blacks are very reliable and experienced rioters."); *id.* at 4 ("Blacks are obsessed with whites and they believe the feeling is mutual!"); *id.* at 10 (criticizing Virginia "Republicans" for "fielding an immigrant from Jamaica" as a candidate); *id.* at 22 ("It's the designated role of blacks in society – to disrupt everything by behaving badly. … It's why liberal judges set them loose."); *see also id.* at 12, 13, 14, 21.

Consistent with those views, Dr. Njoya has also sharply criticized this Court regarding the instant case. She has repeatedly characterized this Court's First Amendment summary judgment ruling as an attack on white students in Shenandoah County, posting "What about THEIR rights?" and calling Plaintiffs in this case "blacktivists." Njoya Social Media at 6, 19, 27, 28, 29. She has complained that "[y]ou have a free speech right to vandalize churches, but Southerners don't have a free speech right to name a school after Stonewall Jackson as that violates the free speech rights of blacks who don't want to say his name." *Id.* at 23; *see also id.* at 26. After her deposition, Dr. Njoya posted an article again criticizing this Court's summary judgment opinion as "convoluted," giving "protected groups a veto over the liberties of others," and as "good grounds to argue that Fourteenth Amendment should be abolished." Ex. 10, Wanjiru Njoya, *How Civil Rights Activists use the Fourteenth Amendment to Bypass the First Amendment*, Mises Wire (Oct. 14, 2025).[1]

---

[1] Dr. Njoya's "expertise" in the rule of law clearly does not extend to the constitutional principles governing this case. Her "analysis" evidences a profound confusion about the basic mechanics of American constitutional law. She argues that this Court found that "the equal protection clause protects the right to free speech" and that, "[i]n this way," the "Fourteenth Amendment bypasses" or "thwart[s]" the First Amendment in cases like this one. Ex. 10. That, of course, makes no sense. The Equal Protection Clause obviously does not protect free speech, nor did this Court find that it did. It also plays no role in selective incorporation, as that process is governed by the Fourteenth Amendment's Due Process Clause. And contrary to *bypassing* the rights articulated in the Bill of Rights, selective incorporation facilitates the *application* of those constitutional rights directly to the states. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (incorporating the Second Amendment). These errors of reasoning—on matters over which Dr. Njoya claims expertise—are so basic that they cast additional serious doubt on the reliability of any of her other testimony.

13

Although bias is generally not a proper basis for exclusion, Dr. Njoya's extreme activism goes beyond typical bias. She has assumed the role of advocate in the court of public opinion and has staked a claim in the outcome of this case such that she cannot be counted on to provide reliable testimony about the facts at issue. *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 184 (E.D.N.Y. 2001) ("When expert witnesses become partisans, objectivity is sacrificed to the need to win." (internal citation omitted)). This fact provides yet another basis for exclusion.

## IV. Plaintiffs' motion is timely.

Local Rule 26(b) requires objections to the admissibility of expert testimony be made through a motion filed within a reasonable time before trial, allowing the Court adequate time to consider it, and it is common practice in the Western District of Virginia for parties to challenge expert testimony under Rule 702 through motions in limine. *See, e.g., Pitt Ohio Exp., LLC v. Pat Salmon & Sons, Inc.*, 532 F. App'x 439 (4th Cir. 2013); *McKenna v. Police Chief, Bristol Va. City Police Dep't*, 2025 WL 2051114 (W.D. Va. July 22, 2025); *Kristensen ex rel. Kristensen v. Spotnitz*, 2011 WL 4380893, at *20 (W.D. Va. Sept. 21, 2011).

In this case, the Court's revised pre-trial schedule (ECF No. 143) did not set a specific deadline for motions to exclude expert testimony. Instead, the scheduling order set the deadline for "dispositive motions on the second, third, and fourth causes of action" for October 24, 2025, and the deadline for motions in limine for November 14, 2025. Plaintiffs reasonably understood the scheduling order to require such motions to be filed by the deadline for motions in limine—there was no bad faith, prejudice, or impact on case management. *See Barricks v. Wright*, 2024 WL 3625212, at *3 (W.D. Va. Aug. 1, 2024). In fact, the Parties' Joint Motion for Extension of Time to Conduct Discovery, ECF No. 187 (requesting additional time to depose one of Defendant's experts) requested that if that expert's deposition ended within seven days of motions in limine deadline, that deadline be extended accordingly. Until shortly before the November 12 status conference, Plaintiffs had no

14

idea Defendant would take a contrary position based on a draft scheduling order that was never entered in this case.

## CONCLUSION

For the reasons set forth herein, the Court should exclude Dr. Njoya's expert report and testimony.

Dated: November 14, 2025                    Respectfully submitted,

                                            /s/ Ashley Joyner Chavous
                                            Ashley Joyner Chavous (VSB #84028)

                                            Jason C. Raofield (DC Bar #463877)*
                                            Kevin Collins (DC Bar #445305)*
                                            Elizabeth Upton (DC Bar #1031985)*
                                            Li Reed (DC Bar #90018796)*
                                            Samuel Greeley (DC Bar #1656254)*
                                            Tyler Smith (DC Bar #1735958)*
                                            Stephanie Nnadi (DC Bar #90007365)*
                                            Amber Lowery (DC Bar #1780982)*
                                            Lauren Smith (DC Bar #90029733)*
                                            Analese Bridges (DC Bar #90029992)*
                                            Alyssa Greenstein (DC Bar #90029046)*
                                            Covington & Burling LLP
                                            850 10th Street, NW
                                            Washington, DC 20001
                                            (202) 662-6000
                                            achavous@cov.com
                                            *Counsel for Plaintiffs*

                                            /s/ Ryan C. Downer
                                            Kaitlin Banner (DC Bar #1000436)*
                                            Marja K. Plater (DC Bar #90002586)*
                                            Ryan Downer (DC Bar #1013470)*
                                            Melissa Colon (DC Bar #90006144)*
                                            Washington Lawyers' Committee
                                            for Civil Rights and Urban Affairs
                                            700 14th Street, NW, Suite 400
                                            Washington, DC 20005
                                            kaitlin_banner@washlaw.org
                                            *Counsel for Plaintiffs*

                                            * *Admitted pro hac vice*

15

## CERTIFICATE OF SERVICE

      I hereby certify that on November 14, 2025, I electronically filed the foregoing using the CM/ECF system, which will send notification of such filing to:

Jim H. Guynn, Jr (VSB #22299)
Christopher S. Dadak (VSB #83789)
John R. Fitzgerald (VSB #989221)
GUYNN WADDELL, P.C.
415 S. College Ave.
Salem, Virginia 24153
Phone: (540) 387-2320
Fax: (540) 389-2350
Email:  jimg@guynnwaddell.com
        chrisd@guynnwaddell.com
        johnf@guynnwaddell.com
*Counsel for Defendant*

                                              /s/ *Ashley Joyner Chavous*
                                              Ashley Joyner Chavous
                                              VA Bar #84028