IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

December 08, 2025

LAURA A. AUSTIN, CLERK
BY:  s/J.Vasquez
DEPUTY CLERK

| | |
|---|---|
| Virginia State Conference NAACP et al., | ) ) ) |
| Plaintiffs, | ) **Case No. 5:24-cv-040** ) ) |
| v. | ) ) |
| County School Board of Shenandoah County, | ) **By:  Michael F. Urbanski** ) **Senior United States District Judge** ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION

Plaintiffs have filed motions to exclude the testimony of defendant's experts Dr. Wanjiru Njoya, Gibson Kerr, and H.K. Edgerton. ECF Nos. 193, 197, 203. Defendant has filed a motion to exclude some of the testimony of plaintiff's expert Dr. Adiaha Spinks-Franklin. ECF No. 200.[1] A bench trial is scheduled to commence in this case on December 11, 2025. The court has reviewed the motions in limine, expert reports, depositions, and briefing. For the following reasons, the court **GRANTS** plaintiffs' motion in limine regarding the proposed expert testimony of Dr. Njoya and Mr. Edgerton. The court **GRANTS in PART** and **DENIES in PART** the motion in limine regarding the proposed expert testimony

---

[1] Defendant also moved to exclude some of the testimony of two other experts offered by plaintiffs, that of Brig. Gen. Ty Seidule and Dr. Brian Daugherity. ECF No. 200. However, defendant withdrew its objection to these experts' testimony after plaintiffs agreed that they would not ask Seidule to offer an opinion as to whether restoring the original name of the school was cruel to Black students and would not offer Daugherity's opinion as evidence of the 2024 school board's intent. See Pls.' Opp'n to Def.'s Mot. in Limine, ECF No. 204 at 3, and Def's Reply in Supp. of Mot. in Limine, ECF No. 209 at 7 n.2.

of Mr. Kerr. Defendant's motion in limine regarding the proposed expert testimony of Dr. Spinks-Franklin is **DENIED**.

## I.

The admissibility of expert reports and their proposed testimony at trial is governed by Federal Rule of Evidence 702.[2] Rule 702's prescriptions are guided by the Supreme Court's decisions in <u>Daubert v. Merrell Dow Pharms. Inc.</u>, 509 U.S. 579 (1993), and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999). In <u>Daubert</u>, the Court explained that the "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. Under Rule 702, "expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful" to the trier of fact. <u>Id</u>. at 591. In <u>Kumho Tire</u>, 526 U.S. at 141, the Supreme Court made clear that these principles apply to all proposed expert witnesses. The language of Rule 702 "'makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge. It makes clear that any such knowledge might become the subject of expert testimony.'" <u>Id.</u> at 147.

An expert may be qualified based on experience. <u>United States v. Wilson</u>, 484 F.3d 267, 274 (4th Cir. 2007) (citing Fed. R. Evid. 702 advisory committee's note). Experiential expert testimony does not "rely on anything like a scientific method," <u>id.</u>, (quoting the advisory

---

[2] Rule 702 states:
    A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
        (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
        (b) the testimony is based on sufficient facts or data;
        (c) the testimony is the product of reliable principles and methods; and
        (d) the expert has reliably applied the principles and methods to the facts of the case.

committee note), making a district court's task in examining the reliability "somewhat more opaque." Id. "[T]he district court must nonetheless require an experiential witness to 'explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.'" Id. (quoting the advisory committee note). "The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Fed. R. Evid. 702 advisory committee's note (citing O'Connor v. Commonwealth Edison Co., 13 F.3d 1090 (7th Cir. 1994)).

"The question of whether a witness is qualified to testify is context-driven and can only be determined by the nature of the opinion he offers." RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc., 609 F. App'x 731, 738 (4th Cir. 2015). "[C]ourts should be conscious of two guiding, and sometimes competing, principles[:] Rule 702 was intended to liberalize the introduction of relevant expert evidence [and] expert witnesses have the potential to be both powerful and quite misleading." Hickerson v. Yamaha Motor Corp., 882 F.3d 476, 481 (4th Cir. 2018) (citing Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999)). "[A] trial judge has wide discretion in the admission or exclusion of opinion evidence. This discretion, expansive in all events, is at maximum girth in the context of a bench trial." Chicago Title Ins. Co. v. IMG Exeter Assocs. Ltd. P'ship, No. 92-1440, 1993 WL 297392, at *4 n.6 (4th Cir. Feb. 8, 1993) (citing Northern Heel Corp. v. Compo Industries, Inc., 851 F.2d 456, 468 (1st Cir. 1988)); see also United States v. Dorsey, 45 F.3d 809, 814 (4th Cir. 1995).

3

The court is obligated to act as a gatekeeper for expert opinions, but the "traditional and appropriate means" of challenging expert testimony are "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof...." Glass v. Anne Arundel Cnty., 38 F. Supp. 3d 705, 714 (D. Md. 2014), aff'd, 716 F. App'x 179 (4th Cir. 2018). Accordingly, "[t]he court need not determine that the expert testimony is irrefutable or certainly correct." United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006), overruled on other grounds, U.S. v. Foote, 784 F.3d 931 (4th Cir. 2015).

"The gatekeeping function of the court is relaxed where a bench trial is to be conducted ... because the court is better equipped than a jury to weigh the probative value of expert evidence." Traxys v. North America, LLC, v. Concept Mining, Inc., 808 F.Supp.2d 851, 853 (W.D. Va. 2011). The gatekeeper doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial. S. Indus. Contractors, LLC v. O'Brien & Gere of N. Am., D.S.C. No. 2:19-CV-1691, 2021 WL 1244872, at *1 (D.S.C. Apr. 2, 2021) (quoting Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 852 (6th Cir. 2004), and United States v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005)) (cleaned up). "'There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.'" United States v. Wood, 741 F.3d 417, 425 (4th Cir. 2013) (quoting Brown, 415 F.3d at 1269). In addition, a court in a bench trial "'does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.'" Id. (quoting In re Salem, 465 F.3d 767, 777 (7th Cir. 2006)).[3]

---

[3] While the Fourth Circuit has not addressed whether a court errs if it does not conduct a Daubert analysis at a bench trial, at least three circuit courts have held that the court must conduct the analysis at some point in a bench trial. See Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 748, 760 (7th Cir. 2010) ("Although we have

Having reviewed the motions in limine, expert reports, depositions, and briefing, the court has had a fulsome opportunity to assess the admissibility of the proposed expert testimony under the framework of Daubert and Kumho Tire and the requirements of Rules 401, 701, and 702 of the Federal Rules of Evidence.

## II.

With this general framework in mind, the court provides the following assessment of the expert witness motions in limine in this case.

1. Dr. Wanjiru Njoya, Legal Academic and Walter E. Williams Research Fellow at the Ludwig von Mises Institute.

Plaintiffs have filed a motion to exclude the expert opinions of Dr. Wanjiru Njoya, a legal academic, arguing that she lacks qualifications as a historian, medical professional, psychologist, or sociologist. Pls.' Mem. in Supp. of Mot. to Exclude Expert Test. of Dr. Wanjiru Njoya, ECF No. 194. After reading Dr. Njoya's report, deposition, and the briefing on the topic, the court concludes that the subject matter of Dr. Njoya's report does not fall within the confines of permissible expert opinion testimony under Federal Rule of Evidence 702 relevant to this case.

---

held that the court in a bench trial need not make reliability determinations before evidence is presented, In re Salem, 465 F.3d 767, 776–77 (7th Cir. 2006), the determinations must still be made at some point."); Attorney General of Oklahoma v. Tyson Foods, Inc., 565 F.3d 769, 779 (10th Cir. 2009) (commenting on interlocutory review of a district court's denial of a motion for a preliminary injunction that "[f]urthermore, while Daubert's standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial"); and Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1302 (Fed. Cir. 2002) ("While these concerns are of lesser import in a bench trial, where no screening of the factfinder can take place, the Daubert standards of relevance and reliability for scientific evidence must nevertheless be met.").

Dr. Njoya is a legal academic whose scholarship has focused on the rule of law and historical injustice. Dr. Njoya Dep., ECF No. 194-7, at 9:14-19, 161:21-24.[4] Dr. Njoya received her first law degree from the University of Nairobi, id. at 15:8-12, and obtained a Master's of Law in International Business Law from the University of Hull in England. Id. at 15:22-16:2. At that time, her studies were "very focused on the common law and specifically on questions of the common law that were important in Kenya at that time, which had — which were derived directly from English law." Id. at 16:7-17:2. Dr. Njoya obtained a Doctor of Philosophy from Cambridge, and she described her studies as follows:

> I studied — the entire program was called International Business Law. It had two main components. The first was business law, corporate law, organizational law, and the other component was international law as part of which I studied the international law of armed conflict and just ideas of how organizations are important for international peace, so we looked at issues like the transition from communism in the USSR.
>
> And so what I wanted to study in more detail was how organizational structure, in particular, in relation to conflicts between master and servant, investors and employees, how those are resolved and how the law helps to resolve those types of questions.
>
> So when I went to Cambridge, my doctoral proposal was based on what was going on in the UK at the time, which was a debate about fiduciary duties of directors and what role directors as fiduciaries play in the questions that I've just been describing. People call it corporate social responsibility.
>
> So that was the way that I framed my proposal, and I also wanted a comparative element that would help me to understand better developing countries, such as the one that I was coming from,

---

[4] The citations to the depositions of Dr. Njoya and Mr. Kerr refer to the page number and line number of their deposition transcripts, rather than the corresponding ECF page numbers. The citations to the deposition of Mr. Edgerton refer to the page numbers on the rough draft of the transcript, which was filed with the court on Box.

> the context of Africa, and how that also has implications for
> global interrelationships and global peace.

Id. at 17:11-18:22. Dr. Njoya described her doctoral thesis as follows:

> It was an analytical and conceptual study of how the common
> law conceptualizes these relationships. So although it had a
> strong historical component, it was a thesis in law not – I wasn't
> in the history department.
>
> So my methodology was to look at the history for the purpose of
> understanding how those concepts had evolved, and it was
> focused primarily on the master-servant relationship, as they
> called it then.
>
> And so I was tracing that through from the earliest master and
> servant acts in England and tracing that through to today or at
> the time, the contemporaneous understanding of these ideas as
> reflected in the literature.
>
> I did a lot of secondary research reading the literature in the field,
> and so that's the way that I was tracing it through to the time at
> which we were – at the time I was writing the thesis.

Id. at 21:8-22:3.

When asked whether her written thesis discussed slavery in America, Dr. Njoya

responded:

> There was mention of it. But as I say, the focus was on the master
> and servant acts, which were particular statutes, and so I was
> focused on what those statutes said and what implications they
> had. So in that sense, I would say master and servant, not master
> and slave.
>
> But, of course, looking back to the history of the British Empire,
> there was no way to – there are some circumstances where you
> can – distinguish the form. You can distinguish between servant
> and slave, but the practice of subordination would be the same.
>
> So I did look at what we mean by subordination, and I did look
> at how subordination was understood. Coerced labor, I think, is
> the word that I used in the thesis. Coerced labor could be a

servant or could be a slave or could be a serf, so I also looked at
indentured servitude.

Id. at 22:9-23:1. Dr. Njoya clarified that "[t]he discussion was on subordination, relations of

subordination and coerced labor. And, yes, the doctrinal focus was on the Master and Servant

Acts of England." Id. at 23:7-10.

Dr. Njoya has never been a student in a history department and her "degrees are all in

law." Id. at 23:20. Although not part of her formal education, Dr. Njoya testified that she has

studied the American Civil War during her academic career. She stated: "So I would describe

my study of Civil War history over the last approximately – ever since I – I started writing my

last book on redressing historical injustice, I would describe that as academic study, even

though I didn't do it in the PhD." Id. at 25:15-20.

Dr. Njoya moved to the United States in January 2024, just after completing the book

*Redressing Historical Injustice: Self-Ownership, Property Rights and Economic Equality* (Palgrave Studies

in Classical Liberalism 2023) co-authored with Dr. David Gordon. Id. at 37:22-24, 38:1-6. Dr.

Njoya's first book, entitled *Property in Work: The Employment Relationship in the Anglo-American*

*Firm* (Routledge, 2007), addressed debates on the social responsibility of capitalism.  Id. at

41:9-42:4. The premise of her second book, *Economic Freedom and Social Justice: The Classical Ideal*

*of Equality in Contexts of Racial Diversity* (Palgrave Studies in Classical Liberalism, 2021), was to

situate the growing debates about racial justice, including the Black Lives Matter movement,

in the context of the classical liberal ideal. Id. at 42:11-21. Dr. Njoya testified that in that book

she argued against the notion that the law should confer "special protection on specific groups

based on their race, their sex, their, you know, in different jurisdictions, sexual orientation,"

id. at 66:13-16, "because I say that is not compatible with a classical ideal of liberty, which is

8

based on formal equality. Nobody in the classical ideal of liberty has different legal rights based on their race, based on their sex or, you know, their religion. Everybody has the same rights. That's what is meant when we say blind justice. Justice doesn't say what's your race, what's your sex in order to determine your rights." Id. at 66:22-67-5. In her deposition, Dr. Njoya explained:

> It's not correct when you have a bad law, that the way you fix it is by introducing another bad law. You know, if – if the old bad law forced people to segregate, you don't fix that by introducing a new bad law that forces people to mix. You're just replacing one wrong with another wrong.
>
> And I talk about this at great length because I know there are critical race theorists who believe that that's what you should do. Like when they were running this thing called the only way to defeat racism is with reverse racism, that's wrong.

Id. at 85:4-16. Dr. Njoya's third book, *Redressing Historical Injustice: Self-Ownership, Property Rights, and Economic Equality*, was premised on "the idea of self-ownership." Id. at 45:19-20. Dr. Njoya testified that:

> [T]he real purpose or goal of this final book was to show how the idea of self-ownership gives coherence to the debates we have about historical injustice. . . . I suggested that we think about this as an emanation of self-ownership. Each man owns – himself owns his own life, and that's why we're equal, and that's why we have the rights, the natural rights that we·claim to have.

Id. at 45:24-46:13.

As discussed in her deposition, Dr. Njoya is critical of the Civil Rights of 1964 and Title VII's protections of race. She testified:

> I'm critical of the law. So all the groups that are listed, race, sex – I mean, in the UK, there are even more than in the US. They have, the last time I checked, nine different protected groups.

> My critique is a principled one, and it applies to all the groups,
> race, sex, religion, you know, all different types of things that —
> that go against what I consider to be the classical liberal principle
> that we should all have the same rights. That is what is meant by
> formal equality before the law.

Id. at 123:3-14. For the same reason, Dr. Njoya believes that <u>Brown v. Board of Education</u>

<u>of Topeka</u>, 347 U.S. 483 (1954), was wrongly decided, testifying "I think that the <u>Brown</u>

decision wrongly gave support to the use of force to desegregate schools. Yes, I think that

was wrong." Id. at 215:16-18.

The overview section of Dr. Njoya's report summarizes the areas of her opinions in

this case as follows:

> This report focuses on the claim that the names Stonewall
> Jackson, Turner Ashby, and Robert E. Lee are specifically
> "harmful" to school children who trace their ancestry back to
> slavery in the United States. The question is whether these names
> reinforce racially discriminatory opinions and seek to restore the
> "white supremacy" that once prevailed in society. This report
> focuses on two key issues raised by that question: a) Debates
> concerning confederate history and the American Civil War and
> b) Harm alleged to be suffered by children today.

Dr. Njoya Report, ECF No. 194-6, at 2.

The first issue is addressed on pages 5 through 13 of Dr. Njoya's report, which she

frames as follows: "The issue is who gets to decide what legacy should, or should not, be

honored. Is that best decided by experts, or by the courts, or by the American people?" Id. at

6. Over the next several pages, Dr. Njoya faults those "who seek to remove statues and erase

names," considering their method "flawed in that it seeks to bypass the usual process of open

debate and democratic decision-making, in order to impose one specific version of history

onto the public." Id. at 7. Dr. Njoya's report cites the view of certain historians who disagree

10

that slavery was the cause of the Civil War and that different interpretations exist as to the

history of the American South.  Given these differing views of history, she advocates as

follows:

> Given that this is a deeply contested political and cultural
> question among historians, neither perspective should
> automatically have the power to override the others. Such
> disputes are best left to the resolution mechanisms of free speech,
> open debate, historical inquiry, and ultimately, the democratic
> process. Although the plaintiffs in this case describe the decision
> of the School Board as a "government action," the truth is that
> School Boards have a democratic mandate of the people in their
> school district.   Election processes are essential to liberal
> democracy. Board representatives have an open decision-making
> process and are accountable to members of the public. To
> describe their decisions as "government action" overlooks this
> important aspect of their role.

Id. at 12. Dr. Njoya continues: "In the context of the nineteenth century, Confederate history

is not uniquely 'racist' or 'white supremacist." Id. She concludes this first section of her

opinion by posing the following questions: "That being the case, who should decide the legacy

of a people, and which of their forebears they are permitted to honor and remember? Should

the entire history of the world be erased on grounds that it is all tainted by slavery?" Id. at 12-

13.

Thus, the first aspect of Dr. Njoya's opinion is that in her view of the proper function

of the rule of law, the question whether the schools in Shenandoah County should be named

after Confederate generals should be left to the elected School Board, and is not the proper

subject of a constitutional lawsuit in ·federal court. While the first issue raised by Dr. Njoya

may well be one for academic debate, it has nothing whatsoever to do with the factual and

legal issues facing the court in deciding whether plaintiffs can meet their burden of proving

their Equal Protection, Title VI, and Equal Educational Opportunities Act claims. As such, the first issue framed in Dr. Njoya's report does not have any tendency to make a fact more or less probable than it would be without the evidence and is of no consequence in determining the action. The requirements of Rule 401 of the Federal Rules of Evidence are simply not met. In addition, this aspect of the opinion also fails under Rule 702 as it cannot help the trier of fact to understand the evidence or to determine a fact in issue.

In her deposition, Dr. Njoya stated:

> The main point that I'm trying to make, based on my scholarly expertise and as somebody with a deep and deeply grounded knowledge of this field of law, is that we don't use the law to resolve historical – you know, disputed historical debates or disputed debates about how people are remembering history. I would say that is the main point that I want to make.

Dr. Njoya Dep., ECF No 194-7, at 182:12-19. But Dr. Njoya's main point does not bear on the factual and legal issues that the court faces in trying this case. This case is not about resolving the age-old historical debate about the causes of the Civil War. Rather the Equal Protection claim in this case will be decided based on whether plaintiffs can prove that the School Board in 2024 acted with discriminatory intent in restoring the Confederate School names and whether that action had a disproportionate impact on Black students. Neither will the statutory claims in this case under Title VI and the Equal Educational Opportunities Act resolve that historical debate. Again, the question before the court is whether the plaintiffs can prove the elements of those claims.

The second aspect of Dr. Njoya's opinion is contained on pages 13 through 17 of her report. In that section, entitled "3.2 Critical Race Theory Explanations of 'Collective Harm'

Caused to Black People," Dr. Njoya addresses her view of the harm caused to school children

from the Confederate school names.

> The concept of collective harm suffered by members of a race
> emanating from legacies of oppression is derived from theories
> of collective racial experience often referred to as "critical race
> theories." A key concept of such theories is the doctrine of
> "systemic racism." This doctrine is highly controversial, due to
> its origins in Marxist theories which highlight the role of systems
> and social structures in causing oppression and exploitation in
> society. The idea is that the behavior of individuals, or the effect
> of that behavior on other individuals, should not be the focus of
> law and policy. Instead, Marxists argue, law and policy should
> focus on how systems and structures affect groups of people
> such as the ruling class, the working class, white people, black
> people, women, or other groups of people defined based on their
> identity. Hence, the complaint in this case is not really about the
> conduct of specific men, but about what they describe as a
> "discriminatory environment" (paragraph 14). Thus the
> complaint against the school board observes, in paragraph 28,
> that none of them are black, as the race of decision-makers is
> considered by critical race theorists to be a key factor in
> evaluating the decision at which they have arrived. Critical race
> theories reject the principles of classical liberalism, in which
> principles of reason and logic are independent of race.

Id. at 13-14. Dr. Njoya assumes that the harm claimed by the plaintiffs in this case is entirely

collective in nature, without regard to the legal concept of standing or their actual experience,

and that liability too is somehow collective. Her report states:

> The hallmark of critical race theories is that they are collectivist
> in nature, therefore they reject the notion of individual human
> will or agency. The experience of individual black children is then
> presumed to be uniform for all children of their race. By the same
> collectivist reasoning, white people today are deemed to be
> responsible for actions committed in the past by other white
> people, in a form of collective guilt. It is notable that Stonewall
> Jackson, Turner Ashby, and Robert E. Lee are under attack not
> for opinions they in fact personally held, but for opinions
> ascribed to members of their group under theories of collective
> responsibility.

13

Id. at 15.

But Dr. Njoya's philosophical criticism of critical race theory does not inform any issue in this case. Rather, this case will turn on whether plaintiffs can prove the elements of the Equal Protection, Title VI, and Equal Educational Opportunities Act claims. Nothing in Dr. Njoya's report speaks to these issues.

Moreover, nothing in Dr. Njoya's report or deposition suggests that she is qualified to testify as an expert witness as to the impact of the 2024 school naming decision on the plaintiffs. She has no medical or psychological training, Dr. Njoya Dep., ECF No. 194-7, at 248:12-249:1, and can offer nothing helpful to the court to assess whether having to attend schools named for Confederate generals disproportionately impacts plaintiffs.

When asked in deposition about "the specific qualifications that make you an expert on whether the school names harm the students at the schools, the Black students at the schools," Dr. Njoya Dep., ECF No. 194-7, at 183:14-18, Dr. Njoya answered:

> I'm an expert on the con – concept of harm because I taught the law of torts for years and did extensive reading. And I know the philosophical underpinning of the law of torts is we say what you've done – like negligence or, you know, nuisance or trespass, whatever you've done has caused harm to the other side. That has a particular meaning in the law.
>
> I'm speaking here in the context of the law, because this is a case based on the law. It's – it's a legal case, and my expertise is on the law, and that is what I'm commenting on.

Id. at 183:19-184:5. Dr. Njoya's testimony makes it clear that she is offering a legal opinion on the harm suffered by plaintiffs in this case.

> Q. Right. And so you're saying that there's no legally cognizable harm here, correct?

14

> A. I'm saying that Confederate names do not automatically harm
> Black people.
>
> Q. Okay. And have you reached a conclusion as to whether or
> not they have harmed the Plaintiffs in this case?
>
> A. The way that I would put it is that Confederate names do not
> automatically harm Black people. That's the way that I would put
> it.
>
> Q. Okay. And that's your expert legal opinion?
>
> A. Yes.

Id. at 188:11-23. Whether the plaintiffs suffered cognizable injury in this case is dependent

on the evidence presented at trial and the court's findings of fact and the law to be applied. It

is the court's job, and not that of an expert witness, to determine whether the evidence at trial

as to harm meets the legal standard. "[Experts] do not testify about the law because the judge's

special legal knowledge is presumed to be sufficient." SunTrust Banks, Inc. v. Robertson, No.

2:09cv197, 2010 WL 11566593, at *6 (E.D. Va. Aug. 12, 2010) (quoting United States v. Scholl,

166 F.3d 964, 973 (9th Cir. 1999)). "Though this case involves a bench trial and no jury is

involved, such expert legal testimony remains problematic because it opens the door for 'legal

experts' to usurp the role of trial counsel and the judge and because it simply is unnecessary."

Id. at *6. See United States v. Barile, 286 F.3d 749, 760 (4th Cir. 2002) (noting that expert

testimony that merely states a legal conclusion is less likely to assist the trier of fact in its

determination, and therefore it is excludable under Rule 702); SunTrust Banks, Inc., 2010 WL

11566593, at *6 ("Counsel for the parties may argue the history and application of the law in

oral argument, and the Court will make an appropriate determination regarding the application

of the law. An expert is not needed to instruct the Court on the history or state of the law.");

15

United States v. Zipkin, 729 F.2d 384, 387 (6th Cir. 1984) ("Expert testimony on the law is excluded because the trial judge does not need the judgment of witnesses.").

In its opposition to the motion to exclude Dr. Njoya, defendant concedes that she is not trained as a historian or a psychologist, explaining:

> Dr. Njoya does not purport to be an expert in the meaning of Confederate symbols, either today or during the time of school segregation in Shenandoah County. Nor does she purport to be an expert in the alleged psychological harm to Black students from the school names. But these are not her opinions. Her opinions are strictly philosophic in nature, which a Doctor of Philosophy is most certainly qualified to give.

Def.'s Opp'n, ECF No. 206, at 3-4. But this lawsuit will not turn on philosophy—it will turn on the facts and the law.

While Dr. Njoya is a learned scholar in her field of law, after reviewing her report, deposition and briefing on the subject, the court can discern no basis as to which Dr. Njoya's opinion could be helpful to resolving the legal issues to be tried. As such, the court **GRANTS** plaintiffs' motion to exclude the testimony of Dr. Njoya under Federal Rules of Evidence 401 and 702.

2. Gibson Kerr, Rebuttal Expert to Report of Brig. Gen. Ty Seidule.

Plaintiffs have filed a motion to exclude the rebuttal opinion of Gibson Kerr on the grounds that he is not qualified as an expert historian and his opinions are unreliable, speculative, and unsupported by sound methodology, facts, or data. Pls.' Mem. in Supp. of Mot. to Exclude Expert Test. of Gibson Kerr, ECF No. 198. Plaintiffs argue that "Mr. Kerr's education in European history and business and his work as a realtor are irrelevant and reflect that he does not have the specialized knowledge of the Civil War, the history of Confederate

commemorations, or the history of school desegregation." Id. at 3. While lacking a degree in American history or the Civil War, Mr. Kerr's report indicates that he is "[a] lifelong student of history, . . . particularly fascinated by the story of Robert E. Lee since childhood." Gibson Kerr Rebuttal Report, ECF No. 198-2, at 1. As such, plaintiffs argue that "Mr. Kerr is not more a qualified expert historian than any other layperson with an interest in history." Mem. in Supp. of Mot. to Exclude Kerr, ECF No. 198, at 3.

Defendant argues that "formal education is not the only path to expertise. Mr. Kerr is hardly a layperson with an interest in history, considering he has authored and published entire books on historical figures." Def.'s Opp'n, ECF No. 206, at 5.

The court has reviewed Mr. Kerr's report, deposition and briefing on the subject. Mr. Kerr's report indicates that he has written two books, a nonfiction work entitled *Un-Cancel Robert E. Lee: An Open Letter to the Trustees of Washington and Lee University*, (Bombardier Books 2024), and a novel entitled *States of Rebellion: The Rise and Fall of the Ocasio-Cortez Administration*, (Bombardier Books 2022). Mr. Kerr's book on Robert E. Lee has not been subject to peer review. Kerr Dep., ECF No. 198-3, at 51:19-52:1. Mr. Kerr's report indicates that he has published four articles, two of which appear to concern Robert E. Lee or the Civil War. His expert report provides his views as to the Civil War, the Confederacy, Stonewall Jackson, Robert E. Lee, confederate monuments, and massive resistance.

In his deposition, Mr. Kerr explained that that while his college studies focused mostly on European history, he also took courses in American history, including on the Civil War. Kerr Dep., ECF No. 198-3, at 13:3-9. Mr. Kerr works in commercial real estate, and although he has never been paid to teach a course on American history or the Civil War, he considers

17

himself a historian from his reading and lifelong interest in history. Id. at 16:5-17:24. Mr. Kerr

considers his primary expertise to be knowledge of Robert E. Lee. Id. at 21:17-20. Mr. Kerr

has not published anything related to the history of Confederate commemorations, history of

school desegregation and massive resistance in the civil rights era. Id. at 29:17-24. Nor did his

studies in college concern these issues. Id. at 13:22-14:10. When asked in deposition about

Confederate memorials erected in the 1950s and 1960s, Mr. Kerr testified that "I'm not an

expert on that timeframe, so that would just be speculation on my part." Id. at 74:14-15. Kerr

also stated that "I'm not an expert on massive resistance." Id. at 138:18-19. In his deposition,

Mr. Kerr expressed views as to Robert E. Lee's motivation to fight in the Civil War and Lee's

position on slavery garnered from his research, see, e.g., id. at 44:10-46:3, 120:2-123:4. Mr.

Kerr stated that he did not have an opinion that Stonewall Jackson opposed slavery or believed

in white supremacy. Id. at 130:14-22.

After review of Mr. Kerr's report, deposition, and briefing on the subject, the court

concludes that Mr. Kerr will be allowed to provide expert opinions limited to Robert E. Lee's

motivation to fight for the Confederacy and his position on slavery. By his own admission,

Mr. Kerr is not an expert on Confederate memorials, naming of schools, or massive resistance.

As made clear in his deposition, many of the opinions set forth in Mr. Kerr's report are his

personal opinions not subject to admission under Federal Rule of Evidence 701 and which do

not meet the requirements for admission as expert testimony under Federal Rule of Evidence

702. The court may make further rulings at trial and will provide an evaluation of Mr. Kerr's

testimony in its anticipated Findings of Fact and Conclusions of Law.

   3.  Harold K. Edgerton, Confederate Names and Symbols.

18

Mr. Edgerton's report states that the complaint in this case and plaintiffs' expert reports are a "malicious lie" and "poppycock." Edgerton Rep., ECF No. 203-5, at 1. The headings in the analysis portion of Mr. Edgerton's report opinion state that "Confederate Imagery is Not Racist, White Supremacist, Segregationist, or Discriminatory;" "Attending the Stonewall Jackson High School Should be a Source of Pride for Black Students and Parents;" "Stonewall Jackson was the Black man's friend;" "Other Reasons for the Stonewall Jackson School Name;" Jackson did NOT fight to Perpetuate Slavery;" "the Confederate Soldier School Names are NOT 'vestiges of segregation;'" and "School Names Don't Cause Harm to Students."

Plaintiffs have filed a motion to exclude the rebuttal opinion of Mr. Edgerton on the grounds that he is not qualified to be an expert in this case, nor are his opinions sufficiently reliable. Pls.' Mem. in Supp. of Mot. to Exclude Expert Test. of Harold K. Edgerton, ECF No. 203. The court has reviewed Mr. Edgerton's report, both volumes of his deposition testimony,[5] and the briefing regarding this subject. The court agrees that the opinions in Mr. Edgerton's report are not based on any "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

In the "Experience and Qualifications" section of his report, Mr. Edgerton identifies himself as a Black man born in the South during Jim Crow. Edgerton Rep., ECF No. 203-5, at 3. Mr. Edgerton indicates that he graduated high school in 1967, and "went to two different

---

[5] A rough draft of the transcript of Mr. Edgerton's deposition, taking place over two days, was filed with the court on Box as two separate volumes and there is no corresponding ECF number.

high schools, one a Black school and one an 'integrated' school." Id. Mr. Edgerton served in the U.S. Army and attended college in Minnesota. Id. He described the "greatest civil rights experience for me was walking from Texas from Asheville, North Carolina on the 'Historic March Across Dixie,'" which he described as "a Black man on a historic journey that no other man had ever made, carrying a Confederate flag from North Carolina to Austin, Texas" to protest the removal of "two historic memorial plaques given in remembrance to the great soldiers of Texas who served with Gen. Lee." Id. Mr. Edgerton's report states that he's "been in the civil rights rodeo for a long time," id. at 4, and detailed his work on programs to restore and improve cemeteries, including as president of the Asheville, North Carolina, NAACP. Id. His report states that his "life has been filled with public service," id., recounts his "public service leadership positions, and business ownership positions," id., and involvement in the Asheville community involving a local Drug Commission, the Asheville NAACP, and as "supporter and leader of youth sports and education." Id. at 4-5. Mr. Edgerton has served as a community golf team founder, middle school basketball coach, and elementary school teacher's aide. Id. at 5.

Mr. Edgerton's report reflects his opinions on Confederate imagery, Confederate school names, and Stonewall Jackson. In his deposition testimony, Mr. Edgerton described himself as an advocate for the Confederacy. Edgerton Dep. Vol. 1, at 58. While Mr. Edgerton has walked many miles carrying the Confederate flag, he has no academic degree in history. To be sure, Mr. Edgerton's experience on his "Historic March Across Dixie" provided him with many personal experiences and anecdotes, see, e.g., Edgerton Dep. Vol. 2, at 28-30, but the perspective gleaned from this experience is far different from the "scientific, technical, or

other specialized knowledge [that] will help the trier of fact to understand the evidence and determine a fact in issue." Fed. R. Evid. 702. While testifying that he has read thousands of books and talked to thousands of people on Confederate issues, Edgerton Dep. Vol. 1, at 78, Mr. Edgerton holds no formal training in American history, Confederate history, or the Civil War. Mr. Edgerton has authored no books or peer-reviewed articles on the subjects of his report, though he does post items on Substack. Edgerton Dep. Vol. 1, at 91. Nothing in his employment history provides him with what Rule 702 would require for him to render the opinions on Stonewall Jackson and the Confederacy in his report.

Mr. Edgerton testified that he had not read any testimony or statements concerning the impact of the school names on the plaintiffs, Edgerton Dep. Vol. 2, at 31-32, and has no medical, clinical, or psychological training. Id. at 36. In short, he does not possess specialized knowledge beyond that of a layperson enabling him to offer an opinion within the confines of Rule 702. Undoubtedly, Mr. Edgerton has strong opinions about the Confederacy, Stonewall Jackson and his place in history. But these opinions are not based on scientific, technical or other specialized knowledge as required by Rule 702. Rather, they are his personal opinions. As such, there is no basis for their admission as expert opinions under Rule 702.

At this point, defendant has not offered Mr. Edgerton's personal opinions under Federal Rule of Evidence 701. Opinion testimony by a lay witness may be admitted into evidence if it is rationally based on the witness's perception, is helpful to determining a fact in issue, and is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Should defendant seek to offer Mr. Edgerton's opinions as lay opinion under Rule 701, the court will consider that issue at trial.

4. Dr. Adiaha Spinks-Franklin, Developmental-Behavioral Pediatrician.

Defendant has filed a motion in limine as to only one portion of the opinion of plaintiffs' expert, Dr. Spinks-Franklin. Defendant objects to the admission of her opinion that plaintiffs "are experiencing a form of cultural racism and may experience internalized racism due to Defendant's" restoration of the school names. Def.'s Mot. in Lim., ECF No. 200, at 3. Defendant raises no challenge to Dr. Spinks-Franklin's education, training, experience, or other qualifications. Therefore, the court finds that her testimony is admissible under Rule 702. See Fed. R. Evid. 702 advisory committee's note ("Once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence.").

Rather, defendant challenges one part of Dr. Spinks-Franklin's opinion because she did not evaluate plaintiffs in the same manner as she would in her clinical practice. This objection goes to the weight of Dr. Spinks-Franklin's testimony, rather than its admissibility. Dr. Spinks will be permitted to offer the opinions contained in her expert report and may be cross-examined by defense counsel. The court may make further rulings at trial and will provide an evaluation of Dr. Spinks-Franklin's testimony in its anticipated Findings of Fact and Conclusions of Law.

III.

Accordingly, the court orders as follows:

(1) Plaintiffs' motion in limine to exclude the expert testimony of Dr. Wanjiru Njoya, ECF No. 193, is **GRANTED**.

(2) Plaintiffs' motion in limine to exclude the expert testimony of Gibson Kerr, ECF No. 197, is **GRANTED in Part and DENIED in Part.**

(3) Defendant's amended motion in limine, ECF No. 200, is **DENIED** insofar as it challenges the testimony of plaintiffs' expert Dr. Adiaha Spinks-Franklin. The motion is **DENIED as moot** insofar as it challenges the testimony of plaintiffs' experts Brig. Gen. Ty Seidule and Dr. Brian Daugherity, based on defendant's representation that it has withdrawn those objections.

(4) Plaintiffs' motion in limine to exclude the expert testimony of Harold K. Edgerton, ECF No. 203, is **GRANTED.**

(5) The Clerk is **DIRECTED** to terminate ECF No. 199, as it was replaced by defendants' amended motion at ECF No. 200.

It is so **ORDERED.**

Entered: December 8, 2025

Michael F. Urbanski
Senior United States District Judge