UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

HARRISONBURG DIVISION


```
* * * * * * * * * * * * * *
VIRGINIA STATE NAACP        * CIVIL ACTION 5:24-CV-40
                            * DECEMBER 12, 2025   8:58 A.M.
            Plaintiff,    * BENCH TRIAL
                            * VOLUME II OF V
vs.                         * REDACTED
                            *
SHENANDOAH COUNTY           * Before:
                            * HONORABLE MICHAEL F. URBANSKI
            Defendant.     * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiff:        KAITLIN BANNER, ESQUIRE
                          Washington Lawyers' Committee for
                          Civil Rights and Urban Affairs
                          700 14th Street, NW, Suite 400
                          Washington, D.C. 20005


For the Defendant:        JIM H. GUYNN, JR., ESQUIRE
                          Guynn & Waddell, PC
                          415 S. College Avenue
                          Salem, VA 24153


Court Reporter:           Whitney M. Stier, CVR-CM-RVRM/CCR-VA/MO
                          116 North Main, Room 314
                          Harrisonburg, Virginia 22802
                          (540)434-3181, Ext. 8510


Proceedings recorded by voice stenography.  Transcript produced
by computer.

APPEARANCES CON'T:

For the Plaintiff :      KEVIN B. COLLINS, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         JASON C. RAOFIELD, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         LI REED, ESQUIRE
                         COVINGTON & BURLING, LLP
                         800 10th Street
                         Washington, D.C. 20001

                         MARJA PLATER, ESQUIRE
                         Washington Lawyers' Committee for
                         Civil Rights and Urban Affairs
                         700 14th Street, NW, Suite 400
                         Washington, D.C. 20005

                         SAMUEL J. GREELY, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         LAUREN T. SMITH, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         MELISSA COLON, ESQUIRE
                         Washington Lawyers' Committee for
                         CivilRights and Urban Affairs
                         700 14th Street, NW, Suite 400
                         Washington, D.C. 20005

                         ELIZABETH UPTON, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         AMBER LOWERY, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 10th Street
                         Washington, D.C. 20001

```
APPEARANCES CON'T:


For the Plaintiff :      STEPHANIE U. NNADI, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         RYAN C. DOWNER, ESQUIRE
                         Washington Lawyers' Committee for
                         Civil Rights and Urban Affairs
                         700 14th Street, NW, Suite 400

                         ASHLEY J. CHAVOUS, ESQUIRE
                         COVINGTON & BURLING, LLP
                         800 10th Street
                         Washington, D.C. 20001

                         ALYSSA GREENSTEIN, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         ANALESE M. BRIDGES, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001


For the Defendant :      JOHN R. FITZGERALD, ESQUIRE
                         Guynn & Waddell, PC
                         415 S. College Avenue
                         Salem, VA 24153

                         CHRISTOPHER S. DADAK, ESQUIRE
                         Guynn & Waddell, PC
                         415 S. College Avenue
                         Salem, VA 24153
```

\* \* \* \* \* \* \* \* \*

INDEX


WITNESSES ON BEHALF OF THE PLAINTIFFS:

WITNESS NAME                                                    PAGE

BRIAN DAUGHERITY

    Cross-Examination By Mr. Fitzgerald . . . . . . . . . . . 64

    Redirect Examination By Ms. Banner  . . . . . . . . . . 88

    Recross-Examination By Mr. Fitzgerald . . . . . . . . . 95

D.D.

    Direct Examination By Ms. Reed  . . . . . . . . . . . . 98

    Cross-Examination By Mr. Guynn  . . . . . . . . . . . .120

J. D.

    Direct Examination By Ms. Reed  . . . . . . . . . . . .124

    Cross-Examination By Mr. Fitzgerald . . . . . . . . . .131

BRIANA BROWN

    Direct Examination By Ms. Reed  . . . . . . . . . . . .132

    Cross-Examination By Mr. Fitzgerald . . . . . . . . . .158

    Redirect Examination By Ms. Reed  . . . . . . . . . . .171


\* \* \* \* \* \* \* \* \*

INDEX OF EXHIBITS

For the Plaintiffs:

| **Exhibit No.** | **Marked** | **Received** |
|---|---|---|
| No. 30 | 102 | 104 |

INDEX OF EXHIBITS CONT.

For the Plaintiffs:

| Exhibit No. | Marked | Received |
|---|---|---|
| No. 33 | 105 | 106 |
| No. 72 | 177 | 179 |
| No. 80 | 33 | 34 |
| No. 111 | 146 | 147 |
| No. 112 | 143 | |
| No. 113 | 140 | 142 |
| No. 115 | 150 | 151 |
| No. 125 | 177 | 179 |
| No. 126 | 177 | 179 |
| No. 128 | 177 | 179 |
| No. 129 | 177 | 179 |
| No. 130 | 177 | 179 |
| No. 131 | 177 | 179 |
| No. 132 | 177 | 179 |
| No. 133 | 177 | 179 |
| No. 135 | 177 | 179 |
| No. 137 | 177 | 179 |
| No. 138 | 177 | 179 |
| No. 139 | 177 | 179 |
| No. 140 | 177 | 179 |
| No. 247 | 48 | |
| No. 258 | 26 | 28 |

INDEX OF EXHIBITS CONT.

For the Plaintiffs:

| Exhibit No. | Marked | Received |
|---|---|---|
| No. 298 | 177 | 179 |
| No. 299 | 177 | 179 |
| No. 300 | 177 | 179 |
| No. 301 | 177 | 179 |
| No. 302 | 177 | 179 |
| No. 303 | 177 | 179 |
| No. 304 | 177 | 179 |
| No. 305 | 177 | 179 |
| No. 306 | 177 | 179 |
| No. 307 | 177 | 179 |
| No. 308 | 177 | 179 |
| No. 317 | 177 | 179 |
| No. 318 | 177 | 179 |

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

(Proceedings commenced at 8:58 A.M.)

THE COURT: Good morning. I hope everyone had a good evening. Let's bring the witness back up, please, if we can find him.

MS. BANNER: He's coming in. Thank you, Your Honor.

THE COURT: Kristin, swear him in again. It's a new day, okay?

MS. BANNER: Your Honor, while we're waiting for Professor Daugherity to come back, maybe just a quick preview of what we're expecting today, because we have two video testimonies. So we just wanted to remind the Court that the two plaintiffs who will be testifying today will be by video, and then one will be testifying in person. One of the plaintiffs is non-anonymous.

Our hope would be to do the two video plaintiffs before lunch and then break at that point. We think that will work out in terms of clearing the courtroom and bringing people back that way we don't have to sort of keep doing that. So just wanted to flag that that was our plan for everybody.

THE COURT: After those two, do you expect any more -- are there any more Zoom witnesses from the plaintiff?

MS. BANNER: There are no more Zoom witnesses from our case --

THE COURT: The plaintiffs?

MS. BANNER: -- but we understand defendants are

calling one of the plaintiffs as well --

THE COURT:  Oh, okay.

MS. BANNER:  -- and that will also be by video.

THE COURT:  And that will be by video?

MS. BANNER:  Yes.

THE COURT:  Okay.  Thank you for the heads up.

I asked the law clerks this morning if you could let us -- for each side, if you could let us know the night before who you're -- other than letting each other know, if you could let me know, too, who your witnesses are for the next day so I just know what to expect.

MS. BANNER:  Understood.  And we will do that.

THE COURT:  Thank you.  Go ahead and call your witness.  He has arrived.

MS. BANNER:  Yes.  I call Professor Daugherity back to the stand.

THE COURT:  And since it's a new day, Professor Daugherity, I've asked the clerk to swear you in again.

THE CLERK:  Please raise your hand to be sworn.

BRIAN DAUGHERITY, CALLED BY THE PLAINTIFF, SWORN

THE WITNESS:  I do.

THE COURT:  Good morning.

THE WITNESS:  Good morning.

BY MS. BANNER:

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Q    Good morning, Professor Daugherity.  When we left off yesterday, we were just beginning to talk about the Massive Resistance time period in Shenandoah County, and I wanted to start out by asking you, in your opinion, did the Shenandoah County School Board resist the desegregation of schools following *Brown*?

A    Yes.

Q    And how do you know that?

A    The Shenandoah County School Board took no steps that I was able to discern to comply with *Brown v. Board of Education* until the County School Board was forced to do so by African-American parents and students in the county who requested transfers into the formerly all-White schools.

Q    And what kind of evidence did you review to help you come up with that conclusion?

A    School board meeting minutes in which they continued to talk about -- and I apologize, but I'm going to use the language of the time -- colored schools versus White schools throughout the period after *Brown v. Board of Education*.  In those meeting minutes, the school board talked about constructing new schools which would be segregated schools and all sorts of different policies and decisions were made relating to these public schools that reflected their continuing segregated bases on a deliberate manner.

Q    Can you tell us a little bit more about why the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

construction of new schools was something that was furthering

segregation?

A     Yes.   The mandate after *Brown v. Board of Education* was

that public school districts move toward a nonsegregated

system.   In Shenandoah County, the school board continued to

make all decisions made based on the preservation of

segregation within the public schools.   You see this reflected

throughout the meeting minutes of the mid-to-late 1950s and

into the early 1960s when school board members made it clear

that their intent was to maintain racial segregation in the

public schools.

          MS. BANNER:   I'd like to bring up what's been

introduced in evidence as Plaintiffs' Exhibit 104.

BY MS. BANNER:

Q     And, Professor Daugherity, are you familiar with this

document?

A     I am.

Q     Okay.   And can you tell us what this is?

A     This is a transcript of the meeting minutes of the

Shenandoah County School Board from May 23, 1958.

Q     Are these documents that you relied on in the preparation

of your report in this case?

A     Yes.

Q     I want to start by looking on Page 1 of this document

where we are.   And actually, you could zoom right back in to

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

where you were.  That's very helpful.  Thank you.  It talks here about the construction of new schools, as I understand that.  Can you tell us how you interpret this part of the school board meeting minutes?

A    Yes.  In 1956, Shenandoah County voters approved a bond referendum to construct new schools within the county.  Those schools were to be afforded to the White students of the county only.  This particular set of meeting minutes talks about the construction of the three new high schools.  And as you can see, they are delineated by race.  You see a category in which all three high schools are listed as White schools.  And again, throughout the meeting minutes of this time period, you will see references to colored schools, colored students, requests from colored parents and so forth.  I do hesitate to use the language of the time, but I think it's relevant.  And you see the same for White parents, schools, and students as indicated here.

Q    I'd like to turn to Page 9 of this document.  Can you tell us what this page of the document is?

A    So this is transcript of the meeting minutes from November 9, 1959.

Q    And I want to draw your attention to the paragraph beginning with the board authorized Mr. Robinson to continue to explore the possibilities of obtaining a colored teacher for the Strasburg colored Elementary School and of taking the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

colored students at New Market to school in Harrisonburg.  Can you tell us what this is an example of?

A    This is an example of the school board's continued reliance and effort to maintain racial segregation within the public school system.  In this particular instance, by addressing the role of an African-American teacher and an individual with regard to transporting students.

I will add that it's, to me, telling that during this same time period, the Shenandoah County School Board began to take more concrete steps to improve the African-American schools in the county and, in my opinion, was clearly more responsive to African-American requests for improvement during this time period.  It's my belief that they did so as a means of dissuading African-American's from requesting transfers and to then all-White public schools, meaning the school board -- and this was common in Virginia at the time -- was equalizing its schools or taking step towards the equalization of its schools as a means of helping to preserve racial segregation in the schools.

Q    You said that that would dissuade parents, Black parents, from requesting transfers.  Can you explain, during this time period of desegregation, what you mean by that?

A    Well, two things.  First, one of the great concerns of African-American parents and school children themselves was the fact that the educational opportunities that were afforded to

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

them within the public school system reflected financial disparities and other inequities that hindered, in their opinion, the educational opportunities that were afforded to them.  And so were the school district to provide better educational opportunities by, let's say, providing transportation or improving the facilities of a school or the resources within a school or reducing the teacher-pupil ratio, those sorts of things, for many African-American parents, would have been welcome.

In terms of transfer requests, what I mean by that is that the Pupil Placement Board, as we discussed yesterday, created in 1956, became the mechanism for placing students in schools throughout the state of Virginia.  And when African-American parents wanted to seek a transfer of their child into the then all-White schools in most localities, they would submit an application to do so, a transfer applications they're typically referred to.  Those applications would initially go to the local school board or school district and then, depending on the time period and their relationship with the Pupil Placement Board, they would generally be forwarded to the Pupil Placement Board for a decision.

Q    So just so I understand, the burden of requesting the transfer was on the families.  It wasn't something that the school board was doing automatically at this time?

A    That's correct.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    I want to turn next to Page 12 of this document.  And can you tell us -- actually, let's go back to Page 11 first so we can see what the start of this document is.  Can you tell us what this document is?

A    This is the minutes of the school board meeting from December 14, 1859.

Q    Okay.  And then let's go to the next page, and starting with the sentence that begins the school board held a meeting in the courtroom.  It says the school board held a meeting in the courtroom on December 18, 1859, at 7:30 p.m. for the purpose of discussing the problem of building a new school or schools for the colored peoples of Shenandoah County.  Can you tell me how you interpret this statement in the school board minutes?

A    Yes.  This is part of the school board's efforts to provide better educational opportunities for African-American students in the county following the *Brown v. Board of Education* decision, in my opinion, in order to help perpetuate segregation within the public schools.  What they were discussing was part of a conversation that unfolded over several years in which county school board members discussed the possibility of constructing a new school for African-American pupils in the county.  Sometimes they say a consolidated school, which might have even included high school grades, which I think is important to recall.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

The point that I made yesterday was that the county offered no high school educational opportunities for its African-American schoolchildren, so were they to offer a high school educational opportunity within the county, that may have, and in their opinion might have, encouraged African-Americans to remain within the, quote-unquote, colored schools.

THE COURT:  Could I ask you a question about that?

THE WITNESS:  Please.

THE COURT:  During what period, based on your research, did the Shenandoah County not offer Black students the ability to attend high school?  During what time period?

THE WITNESS:  Well, I can say with certainty from roughly the 1930s through the time period in question, meaning through *Brown v. Board of Education* and all the way up until 1962 because there is no high school grades that are offered after *Brown v. Board of Education*.

THE COURT:  So throughout the entire period, from the '30s up until 1962?

THE WITNESS:  Yes.  And I would speculate, without 100 percent certainty, that that also extended back into the early 1900s.

THE COURT:  Okay.  All right.  Thank you.

THE WITNESS:  I'll add one other point here that's relevant.  During this time period, you know, we spoke

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

yesterday about how Massive Resistance was impacting the decision-making of this period, and I made the point that one of the principal components of Massive Resistance is the concept of states' rights, and the idea, of course, during the Civil War was that it was the states' rights to maintain slavery and so on and so forth. We had an expert witness testify to that yesterday.

The argument that's made during this time period is that it was the states' rights to segregate and that the *Brown v. Board of Education* was therefore an imposition on that state's right. That is a highly important relationship between the Massive Resistance era and the era of the Civil War. There's a connection there that I think is important to emphasize. The individuals that were talking about states' rights in the 1950s are reflecting back on that same argument that was used during the period of the Civil War and, particularly, during the period of secession.

BY MS. BANNER:

Q    Thank you for explaining that.

MS. BANNER:  I want to turn next to what's been admitted into evidence as Plaintiffs' Exhibit 82.

BY MS. BANNER:

Q    And do you recognize this document, Professor Daugherity?

A    I do.

Q    Is this one of the documents that you relied on in forming

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

your opinions in this case?

A     It is.

Q     And I want to look particularly at this article that's up in the screen entitled the question of colored elementary schools considered by the County Board of Supervisors.  It says here in the opening paragraph that the County Board of Education appeared with a request to exercise an option for the construction of schools for colored.  What does this article tell you about what's happening in Shenandoah County at the time?

A     Essentially, reiterating some of the points that we've just made about the county's intent to deliberate, at the very least, and perhaps to construct new schools for the African-American students in the county as a way of addressing long-standing concerns about the inequities within educational opportunities that were offered, and, in my opinion, to also perpetuate the long-standing and strongly desired racial segregation within the public school system.

Q     And then scrolling down a little bit, I believe in the same column, there's a paragraph called to consult an attorney. Can you tell us how you interpret what's stated here in the news article?

A     Yes.  Following *Brown v. Board of Education*, these sorts of actions -- meaning the deliberate maintenance of segregation within the public schools, was of -- how would I phrase it --

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

questionable legality?  And so it was in the board's interest to obtain legal representation, or at the very least legal consultation, about its decision-making when that decision-making was in possible violation of federal law.

Q    And then last in the second column, there's a discussion of the number of African-American high school students.  If we could zoom out a little bit into the second column, where it says -- again, apologize for the language of the time -- Negro high school children transported to Winchester.  Can you tell us how you interpret this part of the article?

A    Yes.  This is a reference to a school outside of the county in Winchester, Virginia, where African-American students could complete a high school education because that same education was not offered within Shenandoah County.  So African-American students, during the period in question, generally traveled to either Winchester or Harrisonburg to complete their high school education.  Previously, many had also traveled to Manassas.  The point that I highlighted yesterday, which I think is relevant, is that that's a trip of in the range of 30 miles one way through mountainous roads and at great sacrifice of time and at some danger.

Q    Do you draw a conclusion from this article and from the other records that you read that high school students at this time, which I believe is in -- we can scroll up to the date -- I believe it's 1969?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    Sixty-one, I believe.

Q    Sixty-two, excuse me.  That that was because Shenandoah County was still not providing a high school education to it's Black students?

A    That's correct.  And I would add one of the things that this article makes perfectly clear.  In Shenandoah County, we were talking about a relatively low number of African-American students, meaning that had the County School Board chose to desegregate its schools, in my opinion, the impact would have been somewhat minimal.  We're not talking about districts that are majority African-American or anything even close to that. The disruption, if you will, or the incidental impact on the school system would have not been great and could have been, in my opinion, easily managed were school officials willing to take that step.  The fact that they did not, I think, is quite telling.

Q    Thank you.  We can take this document down.  We talked a little bit about the Pupil Placement Board already in your testimony yesterday and today.  Can you explain the interactions between Shenandoah County School Board and the Pupil Placement Board at this time?

A    Yes.  So the Pupil Placement Board's actions starting in 1956 were to place students throughout the state of Virginia into schools.  They did so, as publicly stated, to maintain racial segregation.  However, the policies and the board itself

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

were immediately challenged in federal court by the NAACP.  And over time, the authority and the decision-making processes of the Pupil Placement Board were severely limited by the federal courts, so much so that school desegregation began in Virginia February 2, 1959.  That was despite the Pupil Placement Board's efforts to maintain segregation via its placement policies.

Once school desegregation began in the state of Virginia -- and I'll note that that was initially just in a couple of localities -- so initial desegregation in February 1959, and then we enter a period of token school desegregation where the number of localities slowly grows over time.  The number of African-American students in formerly all-White schools grows over time.  The number of schools that were impacted also grows over time.  That begins from 1959 and unfolds over a period of many years.

After initial school desegregation in Virginia begins, the general assembly reconvened and altered its Pupil Placement Board policies.  And one of the important changes was that they allowed localities to opt out of the Pupil Placement Board's assignment processes and take control over the pupil placement process themselves, meaning the school districts could do so. This was generally referred to, at the time, as local option. A wide variety of school districts chose to do that in the early 1960s, and in many cases, they did so as a means of increasing the amount of school desegregation within their

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

localities.

Shenandoah County, rather than choose the option of taking control of its school desegregation processes, continued to allow those to be handled by the Pupil Placement Board throughout the period in question, meaning, African-American parents who wanted to request a transfer submitted their applications to the local board. The local board then processed those on to the state Pupil Placement Board for a decision.

One of the things that I thought was also telling was that Shenandoah County never gave recommendations as to whether those students should be admitted or not, which was part of its -- an opportunity that it had, also, in my opinion, reflecting its desire to maintain segregation within the public schools. I'm sorry, that was a long-winded response, and I hope I answered your question.

Q    You absolutely answered my question. Let me ask a couple of follow-up questions.

So you just testified that the Shenandoah County School Board continued to use the Pupil Placement Board transfer process even after the local option was added by the state legislature. Is that right?

A    That's correct.

Q    And can you explain why that was something that you believe demonstrated that Shenandoah County wanted to further

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

segregation in its schools?

A    Yes.  Had the county wanted to increase the amount of school desegregation in schools, it could have simply taken control of the process, the assignment process itself, and processed those applications according to its purview.  By that point, the state had already experienced school integration, so it was no longer a question of any incompatibility with state policy, and the school district could have then taken steps to admit a larger number of African-American pupils into the formerly all-White schools.

The reason I think that's particularly relevant in a county like Shenandoah, where we're talking about a relatively small number of African-American students, is this.  The county was paying for two school systems.  The economic cost of segregation was substantial.  The county could have saved an amount of money in addition to generating goodwill and bringing about a society in which, you know, individuals from all backgrounds could study together, work together, essentially live together into the future.

Q    Thank you.

MS. BANNER:  I'd like to bring up what's been entered into evidence as Plaintiffs' Exhibit 85, and this is a compilation of records from the Shenandoah County Archives. I'd like to start on page --

BY MS. BANNER:

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Q    Do you recognize this document?

A    I do.

Q    And are these documents that you relied on in forming your expert opinion in this case?

A    Yes.

Q    I'd like to start actually with Page 13 of this exhibit. And can you tell us what this is?

A    This is minutes from the Shenandoah County School Board from March 11, 1963.

Q    Okay.  And the minutes here, if we scroll down, talk about the applications.  The board was informed that applications had been received from four Negro pupils who wished to enter Woodstock Elementary School in September.  The applications have been referred to the state Pupil Placement Board.  And this is in, as we said, 1963.  What does this tell you about what's happening in Shenandoah County at the time?

A    This is one of many indications that the county continued to rely on the state Pupil Placement Board to assign students to schools within its purview.

Q    And then I'd like to turn to Page 10 of this exhibit. What is this document, Professor Daugherity?

A    This is an article from the *Shenandoah Valley Newspaper* from May 9, 1963.

Q    And is this something also that you relied on in your expert report?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A    It is.

Q    And I want to draw your attention to the paragraph that's beginning with since plans to build new schools for Negro pupils did not materialize, the school board has taken other means to improve the situation for these pupils.  Can you tell us how you interpret that statement?

A    Yes.  This is a reflection of the long-term or long-standing deliberations among school board members as to whether or not they would construct a new school for African-American students within the county.  And in the end, the decision is that that school would not be built.

Q    And what's your understanding of why those schools were not built?

A    Because the previous fall, school desegregation had began in the county, and I think, in some ways, it was the kind of writing on the wall that transfer requests were going to increase and that the process of school desegregation would increase and the county would have to make a decision as to how to proceed with its schools.

I'll go ahead and add that as the school desegregation process unfolded in the county, what school officials chose to do was to begin to close the African-American schools and fire or layoff -- in some cases, they chose to leave on their own -- the African-American teachers.  So rather than use the formerly all-Black schools as a desegregation plan, they chose to close

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

those schools.

Q    What does the choice to close those schools indicate to you?

A    Well, financially, to me, it didn't make any sense, but the thinking at the time was that White students would not want to attend -- this is the commonly-accepted thinking at the time -- was that White students would not want to attend schools that had formerly been Black schools, to use the language of the time, nor would the White students or their parents like to have their children educated by Black teachers.  Again, language of the time.  So much so that the school superintendent at the time explicitly said that when school desegregation came to the county, that they would not include black teachers.

Q    Professor Daugherity, do you have an opinion about whether Shenandoah County intentionally maintained segregation in the county's public school system in the years immediately following *Brown v. Board of Education*?

A    Absolutely.  I don't think there's any other reasonable explanation accorded by the documents that we've just reviewed.

Q    Thank you.  I want to talk about happened after this period of Massive Resistance.  Did there come a time when the school board admitted Black students into the formerly all-White schools?

A    Yes.  In the fall of 1962, an African-American student

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

entered into one of the formerly all-White high schools in the county marking the beginning of school desegregation in Shenandoah County.

Q    And how was that process initiated?

A    Her parents requested a transfer into the formerly all-White school in part because her other option was to travel a great distance to attend a high school outside of the county, outside of the district.  And I'll go ahead and add, I think it is important that those other schools were not operated by Shenandoah County School Board.  They were operated by other public officials.  To me, that's a dereliction of its responsibilities.

MS. BANNER:  I'd like to pull up that's been marked as Plaintiffs' Exhibit 258.

(Plaintiffs' Exhibit No. 258 was marked for identification.)

BY MS. BANNER:

Q    Professor Daugherity, do you recognize this document?

A    I do.

Q    And what is this?

A    This is a letter that was sent to the state Pupil Placement Board on behalf of an African-American family requesting a transfer into the then all-White schools in Shenandoah County.

THE COURT:  Which exhibit is this?

MS. BANNER:  This is Exhibit 258, and it has not yet been introduced into evidence, Your Honor.

THE COURT:  Okay.

MS. BANNER:  I understand that defendants have an objection to this document.

THE COURT:  Have an objection to it or no objection?

MS. BANNER:  My understanding is that they have had an objection, and given the opportunity -- I was going to move it into evidence and then give them the opportunity to object.

THE COURT:  All right.  Fair enough.  Thank you.

MS. BANNER:  Thank you.

BY MS. BANNER:

Q    And can you tell us how you know this is what you described it to be?

A    Yes.  This is one of many, many similar examples located in the records of the Pupil Placement Board at the Library of Virginia.

Q    Are those records --

THE COURT:  Is that where you got it?

THE WITNESS:  This, I believe, was given to me by Plaintiffs' counsel, but I did review the records myself.  The Library of Virginia is the state library located in Richmond, and I've gone through this entire collection with regard to Shenandoah County.

MS. BANNER:  At this point, I'd like to introduce

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

what's been marked for identification as 258 into evidence.

THE COURT:  All right.  Any objections?

MR. FITZGERALD:  Yes, Your Honor.  We'd object to this exhibit on relevance grounds.

THE COURT:  All right.  Would you like to explain your objection?  Do you have anything else you would like to add.

MR. FITZGERALD:  Yes, Your Honor.  So our understanding is this is a letter from a mother seeking to have her child admitted into a so-called White school.  I think the parties have stipulated that the schools were segregated until 1962 through 1964.  I just don't see what issue in the case it's relevant to.

THE COURT:  Okay.  Thank you, Mr. Fitzgerald.

Any response?

MS. BANNER:  We believe this is an example of the Shenandoah County School Board's process of maintaining Massive Resistance, which is relevant to the intention behind the name of Stonewall Jackson High School, and we'll make those connections with the next set of questions that we ask.

THE COURT:  Overrule the objection.  I'll allow its admission.

(Plaintiffs' Exhibit No. 258 was admitted.)

BY MS. BANNER:

Q    Professor Daugherity, can you tell us a little bit

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

about --

THE COURT:  And I will say intent is at the key of -- is one of the two prongs on equal protection, and it also bears on the intent issue.  Also bears on the Title VI claim as well.  And I believe I understand the plaintiffs' theory as to intent in this case and that -- as being that the choice of this school name was part and parcel of the intent to maintain separate school systems for White and Black students, so therefore, it would be relevant to your theory of intent.

Is that fair, Ms. Banner?

MS. BANNER:  I think that's exactly right, Your Honor.

THE COURT:  Okay.  The Court is going to parse this evidence in connection with the burdens of proof in this case on the various elements of the various claims, but I think it is relevant to the plaintiffs' theory of the case, and I'll allow its admission.

MS. BANNER:  Thank you, Your Honor.

BY MS. BANNER:

Q    Professor Daugherity, can you tell us a little bit about why this parent was seeking transfer of her daughter into an all-White school?

A    Yes.  In fact, this letter spoke to me personally, if I might add.  I started my career as a high school teacher, and one of the principal concerns of this parent was that the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

student was attending a school in which the teachers each had several grades to teach, and I cannot imagine teaching more than one grade at a time as a former teacher myself.  So I found that to be a strongly legitimate concern on the part of a parent.

And I'll go ahead and add that in some of the Black schools, all-Black schools of Shenandoah County Public Schools at the time, that teachers taught multiple grades from, in some cases, the earliest grades all the way through seventh grade, perhaps.  So it's a real challenge to teach in such circumstances.  And in this case, to answer your question more directly, the parent was concerned that their student child was not getting the attention and the instruction that they deserved.

Q    And then in --

THE COURT:  Is it your understanding, in looking at Exhibit 258, that this Sunset Hill Elementary School was an African-American segregated school?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  All right.  Thank you for that. Go ahead.  I'm sorry.

MS. BANNER:  No.  Thank you.

BY MS. BANNER:

Q    I also just want to just focus on the first paragraph of the letter as well, which is about her high school student.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

And it says I think she will receive a better education there than at Winchester and will get along better if she does not have to make the 18-mile bus trip every day.  Can you explain what this is evidence of?

A    Yes.  This is, again, a reflection that the county didn't offer a high school education for its African-American students that those students that chose to obtain a high school education were forced to leave the county to do so and to get that education in other school districts, in this specific case, referring to Winchester.  And the relevant point also is that the commute, as well as the amount of time it took, would have severely restricted the ability to participate in extracurricular activities and athletics and so on and so forth.

Q    Thank you.

        MS. BANNER:  We can take this exhibit down.

BY MS. BANNER:

Q    Actually, one more question we don't need the exhibit for. That was a request that would have gone to the Pupil Placement Board.  Is that right?

A    That's correct.  Initially, to the local school board office and then forwarded to the Pupil Placement Board.  And I'll just add for the record that that is one example of many, many, many similar letters from parents in Shenandoah County at the time that are located in the records of the Pupil Placement

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Board at the state library in Richmond.

Q    And around this time, which was 1962, 1963, did the Pupil Placement Board begin assigning African-American students to formally all-White schools?

A    Yes, it did.  After its authority was restricted and limited by federal courts starting in the late 1950s, the Pupil Placement Board periodically updated its policies and essentially was forced to begin to require local districts to desegregate their schools.  In other words, the Pupil Placement Board began to make decisions that African-American transfer requests be accepted that would then lead to those students being admitted into formerly all-White schools.

I'll add one other relevant point here, and that is this. We do not see, in Shenandoah County on behalf of White parents or the school board itself, any movement toward desegregating schools in what you might say is the opposite direction, meaning we do not see White transfers into formerly all-Black schools within the school district.  School desegregation, during this time period in the county, is essentially a one-way street, and that is that the burden for desegregation fell upon Black parents and their children.  The black community bore the burden of desegregating schools in Shenandoah County in part because school officials refused to act on their own.

MS. BANNER:  I'd like to pull up what's been marked for identification as Plaintiffs' Exhibit 80.  And this is a --

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

actually I want to sort of zoom out on this.  This is a

compilation of newspaper records from the Shenandoah County

Archives, and it's a number of pages long.

     (Plaintiffs' Exhibit No. 80 was marked for

identification.)

BY MS. BANNER:

Q    Are you familiar with these documents, Professor

Daugherity?

A    I am.

Q    And can you identify what they are?

A    This is a series of newspaper articles from the Shenandoah

County region related to race issues and desegregation.

Q    Are these --

          THE COURT:  What exhibit number is this?

          MS. BANNER:  This is Exhibit 80.  It's been marked

for identification and not yet admitted.

          THE COURT:  Okay.

BY MS. BANNER:

Q    Have you -- are these articles that you reviewed in the

preparation of your report?

A    Yes.

          MS. BANNER:  At this time, I understand that

defendant does not have an objection, although, of course, will

have the opportunity to raise one, but I'd like to move what's

been marked for identification as Plaintiffs' Exhibit 80 into

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

evidence.

THE COURT: All right. Any objection to 80?

MR. FITZGERALD: No, Your Honor.

THE COURT: 80 received without objection.

(Plaintiffs' Exhibit No. 80 was admitted.)

BY MS. BANNER:

Q    I'd like to draw your attention to Page 36 of this document and to the article entitled Robinson's statement assignment of Negroes not made at county's request. And this states specifically the assignment of 68 Negro pupils to predominantly White schools in Shenandoah County was not made at the request of county school officials. The school board office merely transmitted the applications, as made by the Negro parents, to the Pupil Placement Board. This is in accordance with the present state law. Can you explain what this means?

A    Yes. This is a statement by the superintendent of the Shenandoah County Public School System indicating that the transfer of -- the approval of transfer applications of the 68 African-American pupils that are mentioned in the article, approval was done by the state Pupil Placement Board and not by or at the recommendation of local authorities, meaning the Shenandoah County School Board.

Q    How do you interpret this statement that the superintendent made?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    I interpret this statement as essentially a publicity statement to county residents that the school board was continuing to act to preserve segregation within the county and its public schools, and that it was the preference of county school officials that these transfer applications, in my opinion, not be approved.

Q    In what year did Shenandoah County end racial segregation in its schools?

A    That's a very difficult question to answer.  I guess it would depend exactly on what you meant by end racial segregation.  The county made the argument that it had ended racial segregation in 1964 when the last African-American student was admitted -- from a formerly all-Black school admitted into what had been a formerly all-White school.

Q    And explain a little bit about what you mean by that's a difficult question to answer?

A    The argument made by county officials at the time was that the county, at that point, was integrated.  Historians typically use the phrase integration to talk about a later time period in the school desegregation process when schools reflected more what was legally known as unitary status, meaning that all of the vestiges and remnants of the previously segregated school system were eliminated and removed, and that that formerly dual school system -- again, to use the legal phrase of the time -- had been eliminated.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

At this point in time, in the mid-1960s, we have a wide variety of evidence from the county that demonstrates that there were still vestiges of the segregated school system, that there were inordinate challenges that African-American students faced within the, quote-unquote, now desegregated school system.  There were no African-American teachers in the school system nor administrators, to my opinion.  There was never an African-American on the school board during any of this time period.  And African-American students talked about, in detail, their challenges, their discomfort, their isolation.  The fact that their grades fell despite previous academic success and on and on.

In addition, as I've indicated previously, the county began the process of closing Black schools rather than utilize those as a mechanism of what I believe would have been an easy process of furthering the integration of the schools.  And in fact, at the same time that the county was closing Black schools, it was paying money to expand the white schools, including Stonewall Jackson High School in 1964.  It's expanded at the same time that Black schools in the county are being closed.  All of those things indicate to me that the county was complying, at best, with the mandate that it was hesitant to accept.

Q    And can you tell us a little bit about how you went about researching those vestiges or remnants of segregation that you

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

just described?

A    Yes.  Examples or information related to the vestiges of racial segregation in the county are available in yearbooks, for instance.  Newspaper articles talk about this process. Interviews with African-American students and employees of the school district.  Newspaper articles.  And the school board minutes itself, to some extent.

Q    You mentioned Stonewall Jackson High School, so I want to turn to talking a little bit about that high school and the naming process.  But first -- and we talked a bit about this yesterday -- but in your research on Shenandoah County for this case, did you find evidence of commemoration of the Confederacy in Shenandoah County?

A    I did.

Q    And can you describe what some of that commemoration was?

A    Yes.  Similarly to the testimony that was given yesterday talking about United Daughters of the Confederacy and Confederate memorial organizations and similar groups, we see a lot of activity with regard to the memorialization of Confederate soldiers in the county, most notably Confederate leaders like Lee and Jackson and others.

I think the thing that I would emphasize is that these commemoration activities, on a very, very regular basis, impacted students in schools.  We see a number of Confederate Memorial events in which the high school band played.  We see

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

events in which students were involved carrying flowers to memorials. We see, you know, events in which students were encouraged to attend commemoration and reenactments. We see the donation of books and other materials about Confederate leaders to county school libraries and community libraries, and a wide variety of other similar activities.

I'll add that members of the school board were involved in these activities. Chairman Glenn Bowman, who is a part of this entire process from the '50s all the way through the 1970s, was a regular at these events and a speaker at several of them. And, you know, in my opinion, the individuals that went to the public schools in Shenandoah County during the period of Jim Crow all the way through the 1950s received a pretty, you know, heavy, ongoing lesson of Lost Cause Civil War ideology.

Q    How were Confederate symbols used at this time in relation to the Massive Resistance movement?

A    Well, we see an increase, as I discussed yesterday, in Confederate naming -- excuse me, the naming of schools after Confederate officials. This is taking place in Warren County, which as most of you know, is located immediately to the east of Shenandoah County just across the mountains. We see the naming of Confederate schools in Rockingham County where we are. Well, just outside of the limits of the city of Harrisonburg. We see naming of Confederate schools in Hanover County, Virginia. We see this process unfolding in many, many

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

locations in which commemorations of the Civil War grew after *Brown v. Board of Education*, and in my opinion, in response, at least in part, to *Brown v. Board of Education* and the new federal mandate.

We also see, within Shenandoah County, for instance, when the construction of the new high schools is unfolding, there's a yearbook photograph that shows a Confederate flag being flown over the grounds on which Stonewall Jackson School was constructed, and we see the flying of Confederate flags elsewhere in the county at the time as well. So, yeah, Confederate memorialization is growing in the period after *Brown v. Board of Education*. It's reflected in the state political leadership, as I indicated yesterday, the language of the leaders and so on and so forth. It's shown in the increased usage of the Confederate battle flag, and it's shown in the naming of schools and in many other ways as well.

Q    And in your opinion, why did we see that rise in the use of Confederate symbology at the time?

A    Well, I think similar to Southern opposition to the election of Abraham Lincoln and the United States of America's position in the 1860-1861 time period, there's a reaction against federal imposition. There's a reaction against the possibility of racial change. There's a reaction against the unfolding of challenges, and in this case, new and very pointed challenges to the racial norms of Shenandoah County. And by

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

that, I mean the county's extensive exhibition of segregation throughout its public facilities, as I indicated yesterday. Restaurants and theaters and so forth.

Q    I want to turn to the new schools that were being built in Shenandoah County in 1959, which we saw in the meeting minutes earlier.  Was one of those schools what we've come to know as Stonewall Jackson High School?

A    Yes.

Q    And when was that school built?

A    Constructed -- I believe school opened in the fall of 1959.  In fact, I know it opened in the fall of 1959.  It was officially dedicated in the spring of 1960.

Q    I know we've talked a little bit about this already, but just to center ourselves.  What was happening in Shenandoah County with respect to the desegregation of schools in 1959?

A    The county was still taking clear steps to maintain racial segregation within the public schools in the county in 1959.

        THE COURT:  As I understand it, there were three high schools built in '59?

        THE WITNESS:  That's correct.

        THE COURT:  In Shenandoah County?

        THE WITNESS:  That's correct.

        THE COURT:  Only one of them named for a Confederate general?

        THE WITNESS:  That's correct.  The other two schools,

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Your Honor, took names -- one of them was a name that was in existence -- Strasburg High School -- and the other, Central High School, was named after its geographic location within the county. Shenandoah High School -- excuse me, Stonewall Jackson High School was the largest in the county, and it was the only one named after a Confederate leader.

BY MS. BANNER:

Q    Can you talk a little bit more about when the school opened. Were Black students permitted to attend?

A    No, they were not.

MS. BANNER:  At this point, Your Honor, I'd like to read a few stipulated facts into the record from our statements of stipulated facts, and I'm going to direct to my cocounsel, Stephanie Nnadi, to do that.

MS. NNADI:  Joint statement of stipulated facts, Paragraph 3.  Stonewall Jackson High School was built between 1957 and 1959.

Paragraph 4.  The Shenandoah County School Board in place at the time named Stonewall Jackson High School in honor of the Confederate general, Stonewall Jackson.

Paragraph 5.  The Confederate flag was flown at the school grounds when construction began.

Paragraph 6.  Stonewall Jackson High School opened to students in the fall of 1959.

Paragraph 7.  In the fall of 1959, Black students

were not permitted to attend Stonewall Jackson High School.

Paragraph 10.  Until the fall of 1963, Black public school students in Shenandoah County Public schools were only permitted to attend separate schools for non-White students.

BY MS. BANNER:

Q    Professor Daugherity, do you have an opinion on why the Shenandoah County School Board chose the name Stonewall Jackson?

A    Yes, I do, and I'd first like to kind of set the stage, because I do think context is important.  The naming of Stonewall Jackson High School took place in January of 1959.  Virginia experienced its first public school desegregation anywhere in the state in February of 1959.  We were in the midst of an intense battle in Virginia over the implementation of *Brown v. Board of Education*.

Warren County, just to the east of Shenandoah County, was an extraordinarily important part of that battle.  Warren County was one of the counties in Virginia -- one of the localities in Virginia, I should say, in which the governor closed the public schools in the fall of 1958 because of federal court orders to desegregate public schools in Warren County.

Meaning, that starting in the fall of 1958, just prior -- and actually, we know for a fact it was during the discussions over the naming of Stonewall Jackson High School that the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

public schools in Warren County were closed as a result of this ongoing battle over school desegregation, and we know that in Warren County, a private, segregated academy was created for the White students during the closures of the schools in Warren County, and we know that that school was then named after a Confederate military leader, Mosby.

I think it's highly important to recognize the impact of a neighboring or adjacent county undergoing this challenge and -- you know, within this battle of school desegregation and that it be known that the school authorities in Warren County also made it perfectly clear their intent to preserve racial segregation within the public schools to the extent that they were able to do so. In my opinion, the news of that, the relative closeness of that, the geographic proximity to that, did shape events in Shenandoah County as well.

I'll also add that the naming of Stonewall Jackson came just prior to the annual celebration of the birthdays of Robert E. Lee and, at the time, Jackson. So I think it's important to recognize kind of this context. Virginia had been battling for almost five years after *Brown v. Board of Education* in that local officials in most of those localities preferred to maintain segregation within the schools. It's within that context that the naming of Stonewall Jackson takes place.

Q    And what --

A    And --

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Q    Please, go ahead.

A    I was just going to answer your question directly.  My opinion is that the naming of Stonewall Jackson High School was undertaken by the Shenandoah County School Board, in part, to dissuade African-American students from requesting transfers into the newly constructed and newly opened high school.

Q    Did the naming of Stonewall Jackson, was it different from the way that they named other schools at the time?

A    It was.  Shenandoah County had customarily named its public schools after communities and towns, physical locations, geographic locations like Central High School, or environmental features, community leaders, local educators, and the like.

Q    Were there any procedural irregularities in the naming of Stonewall Jackson High School?

A    There were.  At the school board meeting of January 12, 1959, when the names were adopted, Mr. Glenn Bowman, the chairman of the school board, introduced the motion himself, which was unusual.  Atypical, within my review of the Shenandoah County School Board minutes.  Mr. Bowman essentially gave up the chair in order to introduce the motion that Stonewall Jackson High School be adopted as the name of the new school.  That was something that I did not come across anywhere else within the review of my minutes -- within my review of the minutes.  Excuse me.

Q    You mentioned earlier that there was the use of the

Confederate battle flag during the construction of Stonewall Jackson.

MS. BANNER: I'd like to pull up what's been introduced into evidence as Plaintiffs' Exhibit 94.

BY MS. BANNER:

Q    Can you tell us what this is?

A    This is a series of photographs from the Jackson Heritage yearbook from Stonewall Jackson High School.

Q    And what do these pictures display?

A    The construction of Stonewall Jackson High School and in the left-hand page of the yearbook, a display of the Confederate battle flag at the site of the construction of the school.

I'll go ahead and remind you that there was -- in decades past, this was a site that the Ku Klux Klan had used in Shenandoah County for some of its rallies and meetings, and that that was also something that was associated with this area.

Q    What does the use or the flying of the Confederate flags at the construction site tell you about the intention of the name Stonewall Jackson?

A    To me, you know, the use of Confederate symbolry (ph.) on moralization, if you will, was part of an effort to preserve racial segregation in the schools by designating or sending a message, if you will, to the African-American students and

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

their parents within the county.

Q    Do you know what the mascot of Stonewall Jackson High School was at the time?

A    I do.  It was a Confederate general on horseback carrying a Confederate battle flag.

        MS. BANNER:  I'd like to pull up what's been introduced as Plaintiffs' Exhibit 93.  Excuse me, what's been admitted as Plaintiffs' Exhibit 93.

BY MS. BANNER:

Q    Can you describe what this is, Professor Daugherity?

A    Yes.  This is the cover of the Jacksonian Heritage yearbook from 1960, the first year of the operation of Stonewall Jackson High School.

Q    And can you describe for us the image in the middle of yearbook there?

A    Yes.  This is the mascot of the Confederate general on horseback carrying a Confederate battle flag that was adopted for Stonewall Jackson High School.  This image was utilized for the next -- well, we did the math yesterday, but I don't recall -- 60 years, roughly.  It adorned the school, it adorned the students.  It's shown in many different ways on emblems and paraphernalia, and, as you can see here, yearbooks as well.

Q    What did the use of this image tell you about the choice of the name Stonewall Jackson?

A    I think that the image reflects an effort on the part of

the school board, in part, to dissuade African-American students from seeking admission to the school and to participating within the educational aspects that were offered there.

MS. BANNER:  I'd like to pull up what's been introduced into evidence as Plaintiffs' Exhibit 96.

BY MS. BANNER:

Q   Can you describe what this is?

A   This is a photograph also from the Jacksonian Heritage yearbook showing the basketball team, I believe, with an image of Stonewall Jackson in Confederate regalia in the gymnasium.

Q   And is there -- they use the phrase encampment of the generals.  What does that mean to you?

A   I believe that's a reference to Jackson's military activities within Shenandoah County at the time or within the Valley at the time.

MS. BANNER:  And then I'd like to also pull up what's been introduced in evidence as Plaintiffs' Exhibit 98.

BY MS. BANNER:

Q   And can you tell us what this is?

A   This is a photograph of the entry into the school compound or school property showing the same image that we just discussed of Stonewall Jackson as a military leader.

Q   And in your opinion, what do these images tell us about the naming of Stonewall Jackson High School and the use of that

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

name?

A    Well, as stated previously, I think that the school board was -- chose to name the school after Stonewall Jackson in part in recognizing the context of the time and in part to dissuade African-American students from seeking transfer to the school. We know that when African-Americans did begin to seek transfer into the schools that the other high schools were chosen first, and so perhaps that was a successful endeavor in the end.  But it certainly reflected the school board's desire to maintain racial segregation at the time and a strong segregationist intent of Chairman Bowman.

Q    Were there other ways that Shenandoah County Public Schools used Confederate symbols in the years following the founding of this high school?

A    Yes.  The same year that the first African-American students were admitted, you see the establishment of a portrait of Stonewall Jackson within the school.  As I indicated, the mascot is utilized for decades thereafter, and all of the symbolry associated with that as well.

MS. BANNER:  I'd like now to pull up what's been marked for identification as Plaintiffs' Exhibit 247, which is Profess Daugherity's expert report, and specifically want to look at Page 17.

(Plaintiffs' Exhibit No. 247 was marked for identification.)

BY MS. BANNER:

Q    And I just want to draw your attention to a few other examples in your expert report to ask you about them.  You say in your expert report that in January of 1960, the Strasburg chapter of the United Daughters of the Confederacy -- let me just make sure we're on the right page.  Excuse me.  It's in the first paragraph, the second sentence, in January 1960.

You say that they took part in assembly of students at Strasburg Elementary School, donated a book on Robert E. Lee, *Robert E. Lee and the Road to Honor* to the school.  What does this tell you about the use of Confederate symbology in the schools?

A    It indicates that the Confederate memorialization that I discussed earlier, my initial focus primarily during the Jim Crow era continued through the period of *Brown v. Board of Education* and thereafter, and that the Confederate memorialization within Shenandoah County oftentimes included its public schools and its public school students.  That was presumably the case even after the desegregation of the public schools and continuing for an unknown period of time.

Q    And then I want to look at the next paragraph beginning with in 1960 yearbook for Stonewall Jackson.  You say that the yearbook was dedicated to Lieutenant General Thomas Jonathan Jackson, C.S.A., and that the dedication stated, because among all of the great men of our nation, no one today captures more

strikingly the admiration of the high school student nor affords a stronger pattern of human character, and because these traits deserve emulation by the youth of our land, this annual is dedicated to him.  Can explain to us how you interpret this yearbook dedication in 1960?

A    Yes.  It's associating General Jackson and his military exploits with the naming of the school and the commemoration within the school.  As Dr. Seidule mentioned yesterday, I don't recall any commemoration of Stonewall Jackson prior to the Civil War.  The naming of the school itself, Stonewall, is a reference to his exploits during the Civil War.  It's clearly a commemoration to the Civil War in that regard.

I find the quote shocking, to be perfectly honest, but it's just an opinion.  But the idea that among all great men of our nation, no one today captures more strikingly the admiration of the high school students I find hard to believe but, again, that's my personal opinion.  But more broadly speaking -- and if you'd continue down a little bit further, you'd see some quotes that refer to all men but are clearly directed at the time toward the White residents of the county, the White students, and so on and so forth.  It's not a reference towards African-American students because at the time of the adoption of that particular quote, they were not allowed to attend the school.

Q    I want to look next at Page 18, continuing in this

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

section, starting with the paragraph in early 1963.  The Strasburg UDC organized a student assembly to commemorate the birthdays of Robert E. Lee and Stonewall Jackson.  That the band of the county's three high schools participated in the commemoration of the Battle of New Market.  That there was a blue and gray ball, and that schools were closed on the day of the ball.  Can you talk a little bit more about your understanding of these events in the fall of 1963, or in early 1963.  Excuse me.

A    Yes.  So United Daughters of the Confederacy is a Confederate Memorial organization that Dr. Seidule mentioned in detail yesterday.  One of the more common ones in the county at the time.  Had multiple branches within Shenandoah County at the time.  And as you can see, they're organizing events here that involved the high school band and other students related to commemoration of Confederate activities.

THE COURT:  Wasn't there a state holiday in Virginia known as Lee-Jackson Day?

THE WITNESS:  Yes.

THE COURT:  And I don't know if it was during this period, but I remember it in the '70s, and I don't know when it was ended.  Do you have any information about that?

THE WITNESS:  I believe that it ended when Governor L. Douglas Wilder petitioned, as he did petition against the state song, "Carry Me Back to Old Virginny" that we discussed

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

yesterday also.  But he petitioned to move toward celebrating the birthday of Martin Luther King, Jr., and I believe that's when Virginia adjusted that holiday, but not 100 percent certain.

THE COURT:  I remember in the '70s there was a Lee --

MS. COLON:  Yeah.  So Wilder was elected --

THE COURT:  You were too young, but I remember it.

THE WITNESS:  Your Honor, that's not accurate, but no.  Wilder was elected, I believe, in the fall of 1989, if I'm not mistaken.

THE COURT:  Okay.  Yeah.  I just remembered that.  Thank you.

THE WITNESS:  Absolutely.

BY MS. BANNER:

Q    And I just want to look at one more example from your report on Page 19 at the very top.  And it states that -- I'll give our exhibit a minute to catch up.  So it's on the next page, at the top.  It says during the 1964-65 school year, the year that the PPB admitted the greatest number of Black students to Stonewall Jackson High School, the school wrote its official alma mater poem that is still used today, which states, to your, our noble high school, which bears proudly the name of Stonewall Jackson, fearless leader, may you e're remain to us an inspiration to live our lives aright for God and country and us and everlasting light.  Again, can you just tell

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

us how you interpret the alma mater and the poem?

A    Yes.  Reference to Stonewall Jackson as a fearless leader, of course, refers to his military exploits and the reference here is to the desegregation of Stonewall Jackson High School. I believe it's the end of that year in which the school invites Harry Flood Byrd, Junior, which was the son of Senator U.S. Harry Flood Byrd, Senior.  Junior came to the high school to deliver a graduation speech or a speech in some capacity.  I think that's very relevant because the Byrd family had been the leaders of Massive Resistance and the architects of Massive Resistance and the leaders of Virginia's effort to maintain segregation in the public schools.  And this particular poem, you know, reflects, in my opinion, part of the effort to connect those two movements, if you will.

THE COURT:  And you said connect those two movements. What two movements are you talking about?

THE WITNESS:  I'm talking about the effort to preserve racial segregation within the public schools and the movement to commemorate the Civil War, in this case, military leaders.

MS. BANNER:  We can take down this exhibit for now.

BY MS. BANNER:

Q    I want to fast-forward a little bit to talk about Ashby-Lee Elementary School.  And to set the stage, because that school was a bit later, can you tell us what was happening

in the early 1970s with respect to the school desegregation movement in Virginia?

A    Yes.  So the process of school desegregation in Virginia underwent a monumental change starting in 1968.  In that year, the United States Supreme Court decision issued its first major school desegregation ruling since the 1950s, arguably.  That case was *Charles Green v. New Kent County, Virginia*, which is -- I don't want to plug myself, but that's my next book.

THE COURT:  Well, and looking at your report, you've lectured on that subject.

THE WITNESS:  Absolutely.  It's close to my heart. So *Green v. New Kent County* initiated a new era of school desegregation in Virginia and more broadly.  Rather than simply requiring the elimination of segregation, as *Brown v. Board of Education* had done*, Green v. New Kent County* mandated that school districts promote the active integration of their schools and it placed the burden on those localities to do so, and it said that they do so immediately.  The word in the text or the ruling is now.

What that meant is that the school districts had to eliminate any vestiges of the dual school system and ensure that all schools within their locality were administered on a unitary basis.  And the Supreme Court then gave a number of factors indicating its emphasis on results that could be used to determine whether a district was in compliance with this new

federal mandate.

Importantly, the Supreme Court reiterated that decision the following year in 1969 in a case based in the Mississippi Delta, where I began my teaching career, called *Alexander v. Holmes County*. And then two years after that, in a third key decision, *Swann v. Charlotte-Mecklenburg, North Carolina*, the Supreme Court issued a follow-up decision that helped to address the mechanisms by which these new federal mandates would be accomplishment.

In Virginia, this unleashed a tremendous debate over compliance. No offense, Your Honor, but one of my favorite Federal District Court judges is Robert R. Merhige, Jr., from the City of Richmond, who ordered busing --

THE COURT: I know he's the favorite, so it doesn't matter.

THE WITNESS: I say that because I had the chance to interview him, and it was a wonderful experience. In jest, of course.

But Judge Merhige and others around the state began to require busing, particularly in urban areas, because the elimination of segregation in urban areas, which had mandated residential segregation from the 1910s until roughly the late 1960s, the elimination of segregation in those areas would not truly lead to integrated schools. So additional measures such as busing were required. And the federal courts,

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

including the Supreme Court, upheld that and justified that.

That engendered tremendous opposition within the White Virginia community at the time.  Many White Virginians were upset about the busing experience and mandate.  And Judge Merhige, for instance, had federal marshals projecting him for two years and explained how his dog was shot and the guesthouse behind his home burned down and things such as this because he had mandated busing.  That takes place in roughly 1970, 1971.

So during the time period that we're talking about, there is a new federal mandate with regard to achieving, within the school systems, truly integrated systems in which students would be able to participate in all aspects of the school experience without reflection of race, meaning athletics, extracurriculars, transportation, curriculum, the disciplinary systems within the school, as well as the integration of teaching staff, which is most relevant in Shenandoah County because it was still an all-White teaching staff.  Administrators as well, and other aspects of the school experience.

BY MS. BANNER:

Q    Did Shenandoah build any new schools in the county at this time.

A    Yes, it did.

Q    And what new school did it build?

A    The school that was eventually named Ashby-Lee Elementary

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

School was constructed during the time period in question.

Q    And where was that school located?

A    The school was located in the southern portion of the county adjacent to Stonewall Jackson High School.

Q    How was the school referred to in the school board minutes before it was named Ashby-Lee Elementary School?

A    So during the initial parts of the process, during the purchasing of the site and so forth, the school was named -- generally referred to as the southern campus or language similar to that.  Starting in 1972, the school board begins to refer to what would eventually be known as Ashby-Lee as Stonewall Jackson Primary School or Stonewall Jackson School. That becomes pervasive in the minutes until the fall of 1974 when the school is officially named Ashby-Lee Elementary School.

I'll add that many members of the school board were still serving from the 1950s, including Chairman Bowman, and others who had long demonstrated their preference for racial segregation.

Q    And is your understanding that the school served the generally same geographic area of students as Stonewall Jackson High School?

A    Yes.

Q    And were the county schools desegregated at this time?

A    There was a wide variety of evidence that suggests that

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

the counties had not yet achieved what we might call unitary status.  I think the most important piece of information would be the teaching staffs and that record of administration as well.  But there are other examples that suggest with regard to Confederate memorialization and so forth that there were remnants or vestiges of the segregated system evident within the County at the time.

I will add that there was some deliberation back in 1959 during the naming of Stonewall Jackson High School that also included Ashby and Lee.  At the time, there was some debate as to whether Stonewall Jackson High School might have been named Ashby-Lee or Lee-Ashby I think was the name that was officially floated as well.  So there is, in my opinion, a connection to the 1950s with regards to the naming process because that name was essentially resurrected.

Q    And just so it's clear for the record, what was the name that was ultimately selected for this school what we're talking about, the elementary school?

A    Ashby-Lee Elementary School.

Q    And what is your understanding about who the school is named for?

A    Named after Confederate commander Turner Ashby, as we discussed the school in Rockingham County here, as well as Robert E. Lee.

MS. BANNER:  I'd like, at this time, to read into the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

record a few of the stipulated facts, and I'll turn it over to my colleague, Ms. Nnadi, again.

MS. NNADI:  Second joint statement of stipulated fact.

Paragraph 59.  Turner Ashby was a Confederate officer.

Paragraph 60.  Robert E. Lee was a Confederate general.

Paragraph 62.  In 1974, the Shenandoah County School Board in place at the time named Ashby-Lee Elementary School in honor of Turner Ashby and Robert E. Lee.

BY MS. BANNER:

Q    Professor Daugherity, do you have an opinion on why the county school board chose the name Ashby-Lee Elementary School at this time?

A    In my opinion, the naming of Ashby-Lee Elementary School was chosen in part to reflect the county's opposition to federal mandates with regard to school integration and the broader movement for racial change at the time.

Q    Why is that your opinion?

A    For all the reasons that we've honestly just discussed. Going through the connection to the previous school board, the previous discussions utilizing the same names in 1959, the indications or preferences to maintain racial segregation within the schools, and so forth.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Q    You referenced this a little bit earlier when we were talking about Stonewall Jackson High School.  Did you find any evidence that Black citizens in Shenandoah County participated in the decisions to choose the name Stonewall Jackson or Ashby-Lee of the schools?

A    Well, first, I think it's important to recognize that until the mid-1960s, the passage of the Voting Rights Acts by United States Congress, African-Americans in the county and in the state more broadly were still largely politically disenfranchised.  There's not a political outlet for expressing, via participation in the ballot process and so forth, an interest in that regard.  To answer your question more directly, no, I did not come across any evidence such as that.

Q    And that would be consistent with your understanding of the time period, that it would have been hard for African-American residents to contribute to the political process?

A    Yes.

Q    I have just a few more questions, Professor Daugherity.  You've been using the term vestige throughout your description of the desegregation process.  Can you describe a little bit more what a vestige is in this context?

A    Yes.  Vestige is a legal term that's utilized.  It's similar to the phrase remnants.  These are signs, legacies, if

you will, of a segregated school system.  So in the legal language of *Green v. County* -- *Green v. New Kent County* and *Alexander v. Holmes*, in the legal language of the federal court system in the late 1960s and 1970s, it was the obligation of local school authorities to remove all remnants, all vestiges, all signs of what had formerly been or previously been a segregated school system.  So they were -- again, to use the legal language of the time -- required to move from a dual school system to unitary system.

Q    And what were some examples of vestiges or remnants of segregation that the courts would look at at the time?

A    They would look at all aspects of the schools that were in operation at the time.  So it would be the teaching staffs, it would be whether students were accorded access to the same curriculum or whether there were tracked.

So I'll introduce another phrase that scholars oftentimes use when they talk about this time period, which is second-generation segregation.  That means that even after African-American students were admitted into formerly all-White schools, there was sometimes still tracking of students.  So African-American students would be more likely to be placed into lower-level courses, vocational courses, as opposed to AP or college preparation courses.  There might be disciplinary discrepancies in terms of disciplinary action that were evident by race.  There might be vestiges within the staffs or the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

administrators of the schools or access to athletics or clubs and so forth.

Q    In your expert report, you opined that the names given to Stonewall Jackson High School and Ashby-Lee Elementary School are vestiges of the formerly segregated dual school system. Can you explain that opinion?

A    Yes.  I view the naming process of both schools to be relevant to the process of school desegregation in Virginia. And as indicated previously, I viewed the naming of both schools, most notably in 1959 with the similar connections in 1974, as related to the Massive Resistance Era and the county's preference to maintain segregated schools.

Q    And Professor Daugherity, just to sum up, is it your opinion today that the Shenandoah County Public Schools were segregated by race at their founding?

A    Yes, it is.

Q    And is it also your opinion that it maintained its segregated schools for years following *Brown v. Board of Education*?

A    Yes, it is.

Q    And is it your opinion that the naming of Stonewall Jackson High School and Ashby-Lee Elementary School were done in part to discourage Black families from seeking admission or from attending those schools?

A    Yes, it is.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Q    And is it because of this history that it's your opinion that these schools are -- these names are remnants or vestiges of segregation?

A    Yes, it is.

Q    And are these opinions all based on your expertise as a professor and your research in this case?

A    Yes.

MS. BANNER:  I have no further questions.  Thank you.

THE COURT:  All right.

I have a question before we take a break.  In response to one of the questions asked by counsel a minute ago, she asked is it your opinion that the Shenandoah County Public Schools were segregated by race at their founding.  That wasn't true with Ashby-Lee.  Ashby-Lee was not segregated when it was founded in 1974.  Is that correct?

THE WITNESS:  I believe the question was referring to the founding of the public school system.  Is that correct?

THE COURT:  Okay.  You weren't talking about an individual school.  You were talking about the public school system?

MS. COLON:  Yes, sir.

THE COURT:  Okay.  And that certainly was segregated before *Brown*, after *Brown*, until segregation really started in the -- I think -- I mean, integration started in -- excuse me.  Desegregation started in 1964.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

THE WITNESS: '62 in the county and then proceeded from that point forward. When Ashby-Lee was named in 1974, it did include African-American students, but not African-American staff, and I think there's signs that there were still vestiges of the segregated system in the schools at that time.

THE COURT: Okay. So your point was, at the time when Shenandoah County started having public schools at their founding, they were segregated schools?

THE WITNESS: That's correct.

THE COURT: Okay. Thank you for that clarification so I understand your testimony. Thank you so much.

Okay. This is what we're going to do. Let's take a break before cross-examination. We've gone an hour-and-a-half. Let's take about a ten-minute recess. While we're in recess, Professor Daugherity, please don't discuss your testimony with anyone. Don't permit anyone to discuss it with you.

We'll stand in recess for ten minutes, and then we'll begin cross examination. Okay. Stand in recess. Thank you.

(A recess was taken from 10:28 until 10:46)

THE COURT: Professor Daugherity, you're still under oath.

Cross-examination?

MR. FITZGERALD: Yes. Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. FITZGERALD:

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Q    Good morning, Dr. Daugherity.

A    Good morning, John, if I might.  Feel free to call me Brian.

Q    Feel free to call me John.

THE COURT:  I'll call you Professor Daugherity and Mr. Fitzgerald, but go ahead.

THE WITNESS:  We met previously, so I'll leave that up to you.  I have no preference.

BY MR. FITZGERALD:

Q    Yes.  The last time we spoke was at your deposition, and we had a wide-ranging conversation that was very informative and you gave fulsome answers to all my off-the-wall questions. Today's going to be a little bit different.  I'm going to ask you a series of yes or no questions, and in a benevolent effort to preserve your voice.  For the record, I'm being a little facetious there.

So you just testified that your expertise is in the Black Civil Rights era in Virginia, specifically the desegregation process.  Is that correct?

A    That's correct.

Q    So that's the mid-1900s.  Is that correct?

A    Roughly from kind of the turn-of-the-century through the later 19 -- I would say into the 1970s is what I write about.

Q    So you don't claim to have expertise in any other time period than that?

A    I don't claim to have any expertise outside of American history, Virginia history during the Jim Crow era up through the period of desegregation.

Q    So you're not an expert in the American Civil War?

A    That's correct.

Q    You're not an expert on Stonewall Jackson?

A    Also correct.

Q    Or Robert E. Lee?

A    Correct.

Q    Or Turner Ashby?

A    Correct.

Q    Or the so-called Lost Cause myth?

A    Correct.

Q    Or whether it's harmful to modern-day Black students to commemorate a Confederate general?

A    Correct.

Q    You didn't interview or survey any of the plaintiffs in this case, did you?

A    No, I did not.  Not to my knowledge.

Q    You're not a psychologist or a doctor of medicine?

A    I am not.

Q    You don't have an expert opinion regarding whether the school board, in 2024, had discriminatory intent in restoring the school names?

A    It's not my expertise to evaluate the intent of the 2024

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

school board.

Q    And you're not claiming to be a legal expert, are you?

A    I do study legal history, so I have a bit of a background in the law, but I have not presented myself as a legal expert, an attorney or anything in that capacity.

Q    So when the Shenandoah County School Board voted unanimously to name the south area high school Stonewall Jackson High School at the January 12, 1959, school board meeting, they did not state that the school was being so named in order to maintain segregation in the school, did they?

A    The school board did not opine in any real capacity as to its intent.  Specifically, they didn't state that they were doing it for that reason or against that reason.

Q    And they did not say it was being so named in order to deter Black students from attending, did they?

A    Not to my knowledge.

Q    In fact, the Shenandoah County School Board that named Stonewall Jackson High School never stated that they named it in order to maintain segregation, did they?

A    To my knowledge, the school board did not express its intent.

Q    You testified that the ceremonial handing over of the chair before the naming of Stonewall Jackson High School was revelatory of discriminatory motive, yes?

A    I said that it was an unusual process within the school

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

board minutes and that I did not come across any other examples of the school board chair, Mr. Glenn Bowman, taking such steps to introduce a motion in that regard.

Q    So you're not saying that the ceremonial handing over the chair is an uncommon thing to happen on school boards, generally?

A    I'm saying that in my review of the school board minutes from Shenandoah County School Board during the period in question, I did not personally come across any other instances in which that particular set of circumstances unfolded.

Q    You opined that the late 1950s school board, that its use of terms like colored, Negro versus White when referring to schools, evidenced their racial prejudice in their decision-making process, yes?

A    I opined that the use of language such as you've referenced by the Shenandoah County School Board in the years after *Brown v. Board of Education* reflected the school board's decision and preference to maintain segregated schools in the county without regard to federal law, or in defiance, if you will, of federal law.

Q    So is that a yes?

A    I'm sorry.  If you'll restate the question.

Q    Sure.  You opined that in the late 1950s, the school board's use of terms like colored Negro versus White when referring to schools evidenced their racial prejudice in their

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

decision-making process, yes?

A    Evidenced their preference to maintain racial segregation in the schools.

Q    But in your report, you note that it was not uncommon for White officials during the mid-1900s to refer to Black schools as colored or Negro, correct?

A    That's correct.  During the period of Jim Crow, similar language was used.  The difference after *Brown v. Board of Education* is at that point, the school districts' legal obligation was to begin to comply with a nonsegregated mandate, meaning move towards a desegregated school system.  The language that was used -- and I think this gets to your question -- the language that was used clearly reflected the county school board member's decision and intent to maintain a segregated system.

Q    So if particular Shenandoah County schools in the 1950s had only White students in attendance while others had only Black students in attendance, isn't it just factually accurate to refer to those schools as White schools?

A    Well, during the time period in question, the legal mandate was that the county begin to move toward a non-segregated school system.  So to utilize language -- and here I'm thinking most notably -- and I think this is the most relevant example -- for the construction of the new schools, the fact that those new schools are referred to as White

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

schools during a period in which the county is supposed to be

moving toward a desegregated system in my mind, in my opinion,

reflects the county's desire to maintain racial segregation

within those schools.

In other words, it was in the interest of the county, if

it preferred to comply with *Brown v. Board of Education*, to

construct schools without regard to race.

Q    I understand, but my question was, is it factually

accurate to refer to those schools as White schools if there's

only White students in attendance.

A    In my opinion, after *Brown v. Board of Education*, those

schools should have been referred to as just schools, and they

could have used phrase like all White to delineate if it

remained all White or formerly all-White if it was a school

that was attended by African-American students.  But to refer

to schools, and particularly newly-constructed schools after

*Brown v. Board of Education*, as White schools is problematic.

Q    In preparation of your report in this case, you did not

find any records of Black students in Shenandoah County

applying for so-called White schools within the county, did

you?

A    I'm sorry.  Could you clarify your question?  What era are

we speaking of?

Q    Yes.  Fair.  I'm talking about the time period between

*Brown v. Board of Education* and when the Shenandoah County

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Public Schools began to be desegregated in 1962.

A    The first --

THE COURT:  I think the premise of your question is wrong.  I think you said -- unless I heard it wrong.  Did you say it began to be desegregated in 1962?  Was that the word you used?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  I apologize.  I misheard you.  Pardon my interruption.  Please restate your question.  Thank you.  That's my fault.

MR. FITZGERALD:  That's quite all right, Your Honor.

BY MR. FITZGERALD:

Q    Brian, in preparation of your report in this case, you did not find any records of Black students in Shenandoah County between the *Brown v. Board of Education* decision and 1962 applying for so-called White schools within the county, did you?

A    The first transfer application that I came across as official record was in 1962.  I do think it's important to recognize that we are speaking of a segregated system and that, as I indicated yesterday, African-Americans who challenged that segregated system oftentimes faced consequences for doing so.

Q    I understand.  And you did not find any written policy of the Shenandoah County School Board that only White students could attend the county's high schools, did you?

A    I did not come across a specific written policy, but it is my professional opinion based on a wide variety --

Q    Respectfully --

A    -- of records --

Q    Respectfully, Doctor, that wasn't my question.

A    Okay.  Please restate the question.

Q    My question was, you didn't find any written policy of the Shenandoah County School Board that only White students could attend the county's high schools, did you?

A    I think that it is clear in the records that I consulted that that was the official policy of the school board, but I did not come across an official written policy to that manner.

Q    Thank you.  And you did not find any threats of retribution from the Shenandoah County School Board to Black students should they apply to so-called White schools, did you?

A    Not from the school board itself.

Q    In fact, in your report, you cited reports from some Black students who refused to attend so-called White schools despite their parents' wishes, didn't you?

A    I'm sorry.  Could you restate the question?

Q    Certainly.  In fact, in your report, you cited reports from some Black students who refused to attend so-called White schools despite their parents' wishes, didn't you?

A    Yes.  There were African-American students who expressed concern about their academic success at White schools and the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

threats that they may endure and the harassment they may endure in the White schools, and they strongly preferred to remain within African-American schools in order to preserve their academic well-being, if you will.

Q    And you cited a report from a Black student who transferred from a Black school to a White school during desegregation in Shenandoah County who felt that the quality of the education at Black schools was superior to the quality of education at White schools?

A    Well, we spoke about that exchange in detail during the deposition, and my response to that, or my impression of that was that -- or how should I say it -- my opinion of that is that there were African-Americans who strongly supported the teaching staff, the sense of community, the well-being, the level of comfort that they experienced within African-American schools and that were aware of the change that they would experience if and when they entered into a desegregated school system.

I believe it was the same student, if I'm not mistaken, that later talked about the threats that her family received over the course of an extended period of time before she desegregated into an informally all-White school.  So that was not an unusual statement.  However, it's important to recognize that those same students that felt some allegiance, if you will, or some support for African-American schools were also

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

well aware of the educational inequities that existed within those schools.

And they then, in most cases, made what I would argue to be a sacrifice on their own behalf in order to enter into desegregated schools because they knew in those desegregated schools that they would have a greater curriculum.  They would have more foreign languages to study.  Higher level mathematics and science classes.  They knew that it would be better for their future to enter into the formerly all-White school system despite the fact that some of the aspects of the Black school system struck home.

Q   Okay. We're not talking about those students.  We're talking about this particular student that you cited in your report.  She felt that -- she went to a desegregated White school and felt that the quality of the education that she got at the Black school was superior.  Isn't that right?

A   No.  That's not correct.  We could pull up the exact exchange again, if you'd like, but I'll remind you that that same student, if I recall the one we're talking about correctly, also went back and spoke about how the Confederate names were, in her view, vestiges or symbols of hate and so on and so forth.  And so I think that it's a relevant point to make, that while members of the African-American community supported their schools and raised money for those schools and so on and so forth, that they also recognized the educational

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

inequities within those schools.

Q    Thank you, sir.

MS. BANNER:  John, do you have a copy for me, please?
Whatever that was?

MR. FITZGERALD:  So this is the --

THE WITNESS:  Yes, this is the correct interview that
I was referring to, and this is the woman that --

MS. BANNER:  Do you have a copy for me?

MR. FITZGERALD:  Yeah, I'm sure we do.

MS. BANNER:  I can see if we do, too.  I just -- I
don't know.  I don't thinks this was on the --

MR. FITZGERALD:  It was Exhibit 2 to Dr. Daugherity's
deposition, if that helps.

I'm going to resume.

BY MR. FITZGERALD:

Q    So Dr. Daugherity --

MS. BANNER:  Can I just ask that I -- I'm sorry,
John.  I'd just like to have the document in front of me before
you resume asking him questions about it.  So if you can just
either hand me a copy or give us a minute to pull it up, we
would appreciate it.

MR. FITZGERALD:  Sure.  Just let me know when you're
ready.

MS. BANNER:  I think the WiFi's just giving us some
pause.  Give us one second.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

THE COURT:  Is it not marked as an exhibit?

MR. FITZGERALD:  If probably is.  It's not one of defendant's exhibits.  It's Exhibit 2 to Dr. Daugherity's deposition.

THE COURT:  Well, do you have it for the Court to look at while we're examining him on it?

MR. FITZGERALD:  Maybe we could pull it up on the screen?

THE COURT:  You can use the ELMO right there.  I mean, you can use the ELMO, which is that little machine, that will allow you to broadcast that document to the entire courtroom.

THE CLERK:  There's a drawer on the side.

THE COURT:  I think, Mr. Fitzgerald, that will be the easiest way to do this, and probably fastest.  Kristin can help show you how to do that.

BY MR. FITZGERALD:

Q    So my version -- that's blurry.  Let's see here.

THE COURT:  There's a way to focus it.

MR. FITZGERALD:  There we go.  Okay.  That's too close.  All right.

BY MR. FITZGERALD:

Q    So my version obviously has the highlighting, but Dr. Daugherity, the trick with this exhibit, there's no page numbers on it, but if you could just turn to the seventh page.

Obviously, they're printed front and back, so just count the back of the page as a page.

A    I believe I'm on the correct page.

Q    All right.  So down there at the bottom, the second to last paragraph, the interviewer, Zach, he asks, so you saw a big difference between that and the White schools?  And Delois Wore, the Black student during desegregation I was referring to, she answers, yes.  What story do I want to use?  Characteristics of the building?  I'm going to tell you the truth.  I learned more in a Black school than I ever would have in a White school.  White schools don't teach.

A    So, John, as we discussed during my deposition, we're comparing apples and oranges a little bit here.  We're speaking -- she's speaking in this interview of the period after *Brown v. Board of Education* and the desegregated era.  She's speaking about a different time period, in a different context than I think the premise of your question is.

What I will say about Delois Wore is when she does desegregate, Stonewall Jackson High School, she speaks about how she wasn't allowed to participate in cheerleading and drill team and other extracurricular activities that she had been in in the Black school, and she talks, you know, in great detail about the sacrifices that she made to desegregate the public schools in the county.  And when she refers to her education at Creekside Elementary School, which is the school here in

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

question, the school that as I testified earlier had no

cafeteria and no indoor plumbing, you know, very limited

resources, a schoolteacher that taught multiple grades and so

on and so forth, she describes it -- and I'm on the same page

as you -- and I'll quote her.  Creekside was just awful.

Q    Okay.  I'm going to take this down.

Brian, in your report, you say the Virginia Pupil

Placement Board had the sole jurisdiction between 1956 and 1960

to make school assignment decisions for all public school

students in Virginia who sought to transfer schools or apply to

attend school for the first time.  Isn't that right?

A    Yes.  The Pupil Placement Board had the authority accorded

by the Virginia General Assembly for making pupil placements to

public schools in Virginia at the time.

THE COURT:  Was this for all students, both Black and

White?  All students across the board?

THE WITNESS:  Yeah.  So many of the applications, if

you will, are essentially pro forma reiterations of their prior

assignments.  So when the Pupil Placement Board began the

process in 1956, they utilized the previous records and, as I

mentioned yesterday, birth certificates of students to

essentially continue them on the path that they were on.  The

challenge for the Pupil Placement Board was when a student

let's say matriculated from elementary school to middle school

or high school.  Then the Pupil Placement Board had to make a

decision as to whether they would be -- you know, what schools they would be in, and they would utilize that racial determination to keep them within the all-White schools or the all-Black schools, the path that they had been on.

THE COURT:  And this legislation that sets up the Pupil Placement Board only comes about after *Brown v. Board of Education*.  Is that right?

THE WITNESS:  The Pupil Placement Act is adopted in I believe September of 1956.  That's correct.

THE COURT:  All right.  I'm sorry.  Go ahead, Mr. Fitzgerald.

MR. FITZGERALD:  No problem, Your Honor.

BY MR. FITZGERALD:

Q    So to be clear, Shenandoah County did not have this opt-out option until 1960?

A    That's correct.

Q    So they could not make decisions about where pupils were placed between *Brown v. Board of Education* and 1960?

A    That is -- well, let me back up and say this.  The Pupil Placement Act is adopted in 1956, and so from that point moving forward, and as you know, legislation likely goes into effect at the beginning of the next calendar year.  I'm not 100 percent certain when it -- if it's an immediate effect or not. But soon thereafter, the assignment process is taken over by the Pupil Placement Board.  But prior to that, between 1954 and

1956, a variety of localities in Virginia begin to take steps to comply with *Brown v. Board of Education*, and they make that intent well known. It's my opinion that the Pupil Placement Act is adopted in part by state leaders to prevent those localities from moving forward.

The most notable example of that is Arlington County, Virginia, where the state legislature actually makes a decision to remove the local authority to elect its school board from Arlington County as a result of its express intent to comply with *Brown v. Board of Educations*. So in some ways, it's viewed as kind of a punitive measure toward districts that had taken steps towards compliance. I did not see any steps or any language or anything in Shenandoah County from its public school officials that they had that intent to comply with *Brown v. Board of Education*.

Q   Okay. Let me rephrase my question. So from the time when the Pupil Placement Board was established to 1960, Shenandoah County School Board did not have the jurisdiction to place pupils who sought to be transferred to other schools or sought to enter school for the first time?

A   That is correct.

Q   And you say in your report that between 1960 and 1962, the year when Shenandoah County schools began to be desegregated, the Virginia Pupil Placement Board, and not the Shenandoah County School Board, made those decisions for students of

Shenandoah County schools.  Right?

A     Because the county school board chose to not exercise its local option and to continue to refer applications to the Pupil Placement Board.  And I'll just add that, at that time, a wide variety of localities around Virginia did take on that local option and utilize it to begin to desegregate their schools.

Q     But Shenandoah County wasn't the only county in Virginia that didn't exercise that option?

A     That's correct.

Q     Okay.  In 1959, when Stonewall Jackson High School was named, the six districts in Shenandoah County were named Madison, Johnston, Davis, Ashby, Lee, and Stonewall, weren't they?

A     That's correct.  The magisterial districts in Shenandoah County were renamed in the spring of 1870 after five Confederate leaders and former President Madison.  The magisterial districts previously had been referred to by number, one through six.  And I did find it not coincidental that the renaming took place exactly five years after the conclusion of the Civil War and that the names that were adopted were in honor of those Confederate military leaders.

     I'll also add for the record that Virginia was readmitted to the United States of America in January of 1970 -- excuse me.  January of 1870.  That's an important slip of the tongue, Your Honor.  January of 1870.  And so the decision to rename

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

magisterial districts a few months later, I think, is telling

of the situation in Shenandoah County at the time.

Q    So you mentioned prior to the naming of these magisterial

districts, they were by number only.  Correct?

A    Primarily, to my knowledge.

Q    And currently -- I know this isn't your area of

expertise -- but currently, are you aware that the counties and

Shenandoah County are by number?  They're one, two, three,

four, five, six?

A    I am aware of that.  I was not entirely clear as to when

that decision, when the reversion was made, but yes, I am aware

of that.

Q    Okay.  So on November 11, 1974, the Shenandoah County

School Board voted to name the southern campus primary school

Ashby-Lee Elementary School.  Right?

A    Correct.

Q    Shenandoah County Public Schools were all desegregated ten

years earlier, in 1964, weren't they?

A    If by desegregated you mean that all of the

African-American students had been admitted into formerly

all-White schools within the county, yes, that's true.

However, I think it's very important to recognize that there

were still vestiges of the segregated system in effect in

Shenandoah County in November of 1974.  The most, I think,

important fact, relevant fact that is in the stipulations that

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

were read earlier was that there were no African-American high schools in the -- excuse me. No African-American educators within the schools at that time within Ashby-Lee and so forth.

THE COURT: Just no African-American teachers at Ashby-Lee, or no African-American teachers in the entire Shenandoah County School System in November of 1974?

THE WITNESS: We know for certain not at Ashby-Lee Elementary School. I do not know for certain, but I am highly confident in stating that it was likely the entire county, the entire school district, Your Honor.

THE COURT: All right.

THE WITNESS: And I would also extend that statement to school administers as well.

BY MR. FITZGERALD:

Q    Okay. Brian, but by your own definition of desegregated as opposed to integrated, in 1964, all Shenandoah County Public Schools were desegregated?

A    Again, the language -- the phrase desegregation is used to describe an entire process, and that process unfolds over time. You know, the first thought that came to my mind when you asked that question, John, is the African-American students that were in those formerly all-White schools in 1964 are talking about things like my grades were dropping like a rock. My teachers wouldn't respond to my questions. And one teacher explicitly said, we don't want you here. There's no African-American

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

administrators in the formerly all-White school.  It's an environment in which African-American students face a great deal of real challenges.

So to answer your question directly, all of the African-American students had, by that point -- meaning the end of 1964 -- been admitted into the formerly all-White schools.  In that capacity, the schools are desegregated.  However, the context I think is very important to recognize.

Q    I understand.  I understand that context is important.  I'm just asking a straightforward question.

A    I appreciate that.

Q    So Ashby-Lee Elementary School couldn't have been named to maintain segregation because Shenandoah County schools had already been desegregated.  Correct?

A    So my opinion with regard to that is that Ashby-Lee was named in part because of the new federal mandates that I described earlier with regard to moving from a dual school system to a unitary system, and that those new federal mandates which unfold between roughly 1968, 1971, in the context of busing and so forth.  When the school board begins to refer to Ashby-Lee Elementary School as Stonewall Jackson Primary School in 1972, it's in the midst of this climate of new federal mandates that were in some ways more, you know, impactful than the initial *Brown v. Board of Education* decision.  So I find that to be relevant.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

I also -- I speculate as to whether it was more likely that the county would name a second school after two Confederate leaders, in this case, having already named a school after a Confederate leader such as Stonewall Jackson High School.

Q    So that's your speculation?

A    Correct.

Q    So Ashby-Lee Elementary School, which was named that in 1974 when it opened, that school served Ashby district and Lee district.  Correct?

A    The school was in that part of the county.  However, one of the stipulations that we've already agreed to is that it was named after Turner Ashby and Robert E. Lee.

Q    I understand.  The magisterial districts were named after Turner Ashby and Robert E. Lee?

A    I'm sorry, John, but the stipulation says that the schools were named after Turner Ashby and Robert E. Lee.  Excuse me. The school, Ashby-Lee Elementary School.

Q    I understand.  But my question was a little different. The Ashby-Lee Elementary School served Ashby district and Lee district.  Correct?

A    I believe that's correct.

Q    And as with the naming of Stonewall Jackson High School, the Shenandoah County School Board did not state that Ashby-Lee Elementary School was being so named in order to maintain

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

segregation in the school, did they?

A    To my knowledge, the school board did not indicate its intent.

Q    Nor did they say it was to deter Black students from attending.  Correct?

A    Nor did they say any other intent.

Q    You opine that historians of desegregation distinguish between desegregation and integration of schools.  Correct?

A    Correct.

Q    In your report, you write that desegregation refers to the process whereby a small number of Black students were admitted to formerly White schools and generally refers to the beginning or early years of the transition from segregated schools to compliance with *Brown v. Board of Educations*.  Is that accurate?

A    I believe so.

Q    And that integration, on the other hand, refers to the federal compliance requirement that emerged in the late 1960s that schools no longer reflect their previous dual school status and promote a unitary school system in which all vestiges of the segregated system were eliminated.  Isn't that right?

A    That's correct.

Q    And you opine that Shenandoah County had clearly not accomplished integration of its schools in 1964 when all its

schools were desegregated, yes?

A    That's correct.

Q    But you would agree that Shenandoah County schools are currently integrated.  Right?

A    I have no opinion as to the current status of the schools. That's far outside of the scope of my expert report.

Q    Okay.  So you're not aware of the joint stipulation that the schools are now integrated --

A    I am not.

Q    -- between the parties?

    MR. FITZGERALD:  I'd like to read joint stipulation number 8 into evidence.

    THE COURT:  You mean Paragraph 8 of the first joint stipulation?

    MR. FITZGERALD:  Correct, Your Honor.

    THE COURT:  Thank you.

BY MR. FITZGERALD:

Q    Are you able to see that, Brian?  Number 8?

A    I am.

Q    All right.  Joint stipulation number 8.  In 1962, the NAACP filed and later withdrew a lawsuit challenging segregation in Shenandoah County schools, which later were integrated.  Did I read that correctly?

A    Yes.

    MR. FITZGERALD:  I have no further questions.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

THE COURT:  Thank you.

Any redirect?

MS. BANNER:  Just a couple of questions, Your Honor.
Court's indulgence for just a minute.

THE COURT:  Take your time.

REDIRECT EXAMINATION

BY MS. BANNER:

Q    Professor Daugherity, based on your experience studying
this time period in Virginia, what was the experience of being
the first people to desegregate schools like for Black
students?

A    I'm sorry.  Can you restate the question?  And
specifically, are you asking me about Shenandoah County, or are
you asking me more broadly?

Q    Let's start with more broadly.  Can you tell us what the
experience was like for Black students who desegregated schools
in the years following *Brown*?

A    Yes.  Again, my expertise is mainly on Virginia, so I'll
speak to the Commonwealth, and I would say that the experience
was traumatic.  It was difficult.  I have interviewed dozens of
African-American students who were the first to desegregate
schools within their localities or to attend formerly all-White
schools in their localities, and it was a painful process.
They described things like running their fingers through their
hairs and -- I'm going to take just a moment.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Q    Please do.

A    And coming up with a handful of spitballs.  They talk about the name-calling, tripping in the hallways.  Sorry.  They talk about going into the cafeteria to sit down at a lunch table and all the students getting up and moving, literally standing around the cafeteria rather than sitting with them. Talk about riding school buses.  Goodness.  I'm sorry.  Some of these individuals have become close friends.

Q    Take your time, please.

A    I think it's easier if I just say it was a traumatic and very difficult experience for them.

Q    Professor Daugherity, to your understanding, why did people do it anyway?

A    That's a great question.  In many cases, their parents wanted them to do it.  Their parents knew that it was in their long-term interest.  Their parents oftentimes knew that it was in the community's interest.  They felt the country as a whole needed to address this challenge of race, and they knew that their children would live in a multiracial society, and that it would be in their interest and in the interest of White students as well to break down what we today refer to as racial stereotypes, which are all too common in 2025.

They sometimes made the decision on their own, and they were well -- you know, they were well enough aware at a very young age, in many cases, that the schools that they were

attending were not providing the opportunities that they needed, and they knew that it was not fair, to use the quotes from some of the transcripts that we reviewed, that they were placed into schools that reflected those inequities.

So I think the short answer is, for their own future, for their community's future, and for the future of the country.

Q    And turning specifically to Shenandoah County, I'd like to pull back up the interview that my colleague on the other side was showing you earlier.

MS. BANNER:  I think I might need to borrow your copy of that, though.

MR. FITZGERALD:  That's all right.

MS. BANNER:  And then I also might need --

MR. FITZGERALD:  Mine's paginated, handwritten.  I handwrote the pages on there, so it should help.

MS. BANNER:  I just want to make sure I'm on the right page.  Thank you so much.

BY MS. BANNER:

Q    Do you still have the copy of this document?

A    I do.

Q    So on Page 2, there's an interview, there's a part that starts in the middle of what I have up on the screen that starts with, there were some rough times for me.  Once I came -- even in grade school, I was a good student and had good grades and everything, even at Sims.  And I believe we talked

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

earlier that Sims was an all-Black segregated school.  Is that right?

A    That's correct.  Located here in Harrisonburg.

Q    Yeah.  And then it says, once I came to Stonewall, that all just fell.  I can remember sitting in the back of the classroom and there was an algebra question to be answered and nobody knew it.  The ones that held up their hand did not know it.  I held up my hand for I know 15 or 20 minutes and finally, the teacher told me that by law, I had to let your answer.  That still stays with me today.  What does this experience describe to you?

A    I think the quote, there were some rough times for me, is pretty indicative of what we're talking about here.  This is -- the experiences of Delois Wore was one of the first African-American students to desegregate public schools in Shenandoah County, and she's specifically referring to the reaction that she faced from her school teachers.  There were other accounts that validated or corroborated this point.  I referred to a quote earlier where we had a schoolteacher that explicitly told a young African-American student that she didn't want her there.

Q    And in this interview and in the other interviews that you reviewed, was there anything to suggest to you that -- excuse me -- was there anything to suggest to you that families in Shenandoah County were okay with the segregated system?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    That's a complex question.  It's difficult question.  I think what I would say in response to Mr. Fitzgerald's questions earlier is that there was some -- African-American families in the community as a whole strongly, strongly supported education.  And when the only opportunities that were afforded to them were segregated education, they put a great deal of time and effort and money into those schools.  They boarded the teachers.  They, you know, physically constructed additions.  They raised money for things that were accorded by the school board to the White schools.  They made sacrifices for those schools.

So there was some pride in those schools and support for those schools.  And if you interview individuals even in 2025, they'll speak of that.  However, they knew that they were not getting -- and I'll go back to the word that I used before -- they knew that they were not getting fair treatment as citizens, as residents, and they were determined to get that, as was their right.  And so the inequities within the public school system and the desire to integrate society more broadly in the end outweighed any support for an all-Black system.  And they knew also that the process of desegregation would lead to the dismissal of those African-American educators.  They knew that it would lead to the closure of Black schools.  And those schools were not just schools.  They're community centers.  They're histories.  That was lost.  And they took the

sacrifices, as indicated her, you know, as individual students as well.

So the transition to desegregated schools in Virginia is not only about educational opportunities. That is a principle and I would argue probably the primary reason. But they were also thinking about the restaurants that would not serve African-Americans. The movie theater in which they had to sit in the balcony. The pools that would not admit them. They're thinking about the fact that they can't participate in the political process. African-Americans were aware that this was a tiered system, a tiered society, and they were determined to break it down.

Q    Just a few more questions.

A    I'll just add one other point that I think is relevant.

Q    Please.

A    And that is that the legacies of that tiered system are with us in 2025. They're all around us.

Q    Thank you. Professor, Mr. Fitzgerald asked you a number of questions about whether you found statements of the school board's intent. In your experience reviewing school board minutes from this time, was it unusual to not find those statements of intent?

A    Individuals at the time were well aware of the legal danger of stating positions and decision-making processes that could be considered violations of the law. So it was not

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

entirely unusual to have no statement of intent.

Q    Did the fact that you didn't find those statements change your opinion at all, or --

A    I built my opinion as holistically as I could.  I looked at all the records.  Before I made a decision or determination, I tried to bring in as much evidence as possible.  My opinion is based on that cumulative review of the evidence.

Q    And then I just have one or two questions about Ashby-Lee Elementary School, and just because I want to make sure it's clear for the record.  So when Ashby-Lee Elementary School was founded, the Shenandoah County School Board at that point was letting Black students attend.  Is that right?

A    Correct.

Q    And in your opinion though, the school was not fully integrated because there were still vestiges of the segregated school system?

A    Correct.

Q    And then you testified earlier that Ashby-Lee Elementary School and Stonewall Jackson were in the southern part of the campus.  Is that right?

A    Correct.

Q    Do you know anything about the historic population in the southern part of Shenandoah in terms of its racial makeup?

A    In terms of its racial makeup, I know that at various points in the county's history, that was where the largest

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

proportion of African-Americans lived.  I don't recall any other specific details or relevant details, I suppose, about that issue.

Q    Thank you.

MS. BANNER:  I have no further questions.

THE COURT:  Mr. Fitzgerald, do you want ask any other questions of Dr. Daugherity while he's here?

MR. FITZGERALD:  Just a moment of your indulgence, Your Honor.

Yes, Your Honor.  Just one question.

RECROSS-EXAMINATION

BY MR. FITZGERALD:

Q    Brian, isn't it true that Shenandoah County was the second County in Virginia to desegregate its schools?

A    The statement that was made in newspapers at the time was that -- I'll be perfectly honest with you, John.  I would have to compare it to all of the other roughly 120 school districts at the time to verify that that statement was accurate.  What I will say is because of the relatively small number of African-American children and the decisions made by the Pupil Placement Board, that those African-American children had been admitted into the formerly all-White school system by 1964, and that that would be one of the measures of school desegregation.

Q    Thank you.  No further questions.

THE COURT:  All right.  I'll give the plaintiff, if

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

they want, a chance to follow up on that question.

MS. BANNER:  No, Your Honor.  Thank you.

THE COURT:  Okay.  All right.

Thank you, Dr. Daugherity.  Appreciate you being with us here yesterday and today.  Safe travels.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Okay.  Who do you intend to call as your next witness?

MS. BANNER:  Plaintiffs intend to call plaintiff D.D. as our next witness, and that's one of the video and pseudonym plaintiffs.

THE COURT:  Yes.

Consistent with prior rulings on the issue of the status of these plaintiffs as children and their ability to be identified by pseudonyms in this case given the prior written rulings and my written ruling in this case that allows them to testify by Zoom, I need to -- and as I said yesterday, in the balance of providing full access to the public, to their testimony, and protecting them as individuals and particularly children, allowing the Court an opportunity -- the finder of fact, which is me -- to assess their credibility, in this balance, the Court has determined to allow these folks and their mother to testify remotely for their protection.

So what I need to do is for the next two witnesses, I believe -- I think it's D.D. and J.D.?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

MS. BANNER:  That's correct, Your Honor.

THE COURT:  We're going to clear the courtroom and we'll do those two witnesses remotely.  I will say that in this balance, the Court is mindful of the first amendment right of the public and the common-law right of the public to understand the bases on which the Court makes its decision.  And so the transcripts of these testimonies will be -- of this testimony will be docketed following an appropriate opportunity by the parties and the Court to review the transcripts to make sure, again, to provide protection for the identities of these children, and obviously the identity of the mother of these children as well.

With that, I need to ask everybody who is not a party or a lawyer or an expert witness to leave the courtroom at this time while we take this testimony.  Thank you all.

(The courtroom was cleared of all spectators.)

Do you need a minute to set up?

MS. BANNER:  Just a minute, I think, Your Honor. Thank you, and make sure that we get everybody out.

**

THE COURT:  Okay.  Are we ready to go?

MS. REED:  I'm confirming that the Court is aware that these witnesses are testifying via Zoom.

THE COURT:  Yes, I understand.  I understand.  Call your next witness.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

MS. REED:  We'd like to call D.D.

THE COURT:  All right.

THE CLERK:  Ma'am, you're going to talk a little louder, closer to the microphone.

MS. REED:  Better?

THE CLERK:  Yes, ma'am.

MS. REED:  Thank you.

THE CLERK:  Which one?  They're all muted.  Who's your witness here?  The one that says witness is not muted.  There you are.  Okay.

All right, ma'am, if you'll raise your right hand, please, and be sworn.  D.D.?  I can't hear you.  I'm talking about the witness.  I didn't hear her.  Did you?

MS. BANNER:  I don't think we're going to be able to see her on screens.

THE CLERK:  Hold on.  That's my fault.  We'll try them again.  Witness, can you hear me?

THE WITNESS:  Yes.

THE CLERK:  Okay.  If you'll raise your right hand, please, and be sworn.

D.D., CALLED BY THE PLAINTIFF, SWORN

THE WITNESS:  Yes.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. REED:

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    Can you please introduce yourself for the Court?

A    D.D.

Q    Where are you testifying from today?

A    A hotel room.

Q    Are you alone?

A    Yes.

Q    Do you have any notes with you?

A    No.

Q    Are you a plaintiff in this case?

A    Yes.

Q    Why did you choose to bring a lawsuit against the
Shenandoah County School Board?

A    Because I do not like the names of the high school and the
elementary school.

Q    Why don't you like the names of the high school and the
elementary school?

A    They're named after Confederate Generals who fought for
slavery.

Q    Why is this issue important to you?

A    Because some of my ancestors were slaves, and if slavery
was still a thing, me and my family could have been slaves.

Q    How do you identify your race, D.D.?

A    Biracial.  I'm part Black and part White.

Q    Where do you live?

A    Shenandoah County.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Q    How old are you?

A    Sixteen.

Q    Are you a member of the NAACP?

A    Yes.

Q    And where do you currently attend high school?

A    Stonewall Jackson High School.

Q    What grade are you in?

A    Tenth.

Q    Where did you attend middle school?

A    North Fork Middle School.

Q    When you were in middle school, did you take high school classes?

A    Yes.  I took Algebra I.

Q    How often did you attend the high school for that class?

A    Every day.

Q    Did you play any sports at the high school when you were in middle school?

A    I played volleyball, basketball, and soccer.

Q    And how often did you go to the high school to practice or play those sports?

A    Every day.

Q    When you were in eighth grade, attending Algebra I and playing sports at the high school, what was the name of that high school?

A    Mountain View High School.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    Is that the high school you planned to attend?

A    Yes.

Q    And were you excited to attend Mountain View High School?

A    Yes.

Q    Why were you excited?

A    Because the name Mountain View doesn't offend me.

Q    What happened at the high school the summer before you started ninth grade?

A    They decided to change the name to Stonewall Jackson.

Q    Who decided to change the name to Stonewall Jackson?

A    The school board.

Q    How did you first hear that the school board wanted to change the name to Stonewall Jackson?

A    My parents told me about it.

Q    And how did you feel about that?

A    I was upset because I was excited to get to go to Mountain View because the name didn't offend me in any way, but the name Stonewall Jackson offends me and it makes me feel unwelcome and uncomfortable.

Q    Why does the name Stonewall Jackson make you feel unwelcome?

A    Can you repeat the question?

Q    Why does the name Stonewall Jackson make you feel unwelcome?

A    Because Stonewall Jackson thought that Black people were

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

less than and he fought for slavery, and the names were originally named Stonewall Jackson to make Black people feel unwelcome.  So me being part Black and a lot of my family being Black, it made me feel unwelcome.

Q    When you learned the name was going to be changed to Stonewall Jackson, did you express these feelings to anyone?

A    Yes.

Q    Who did you talk to?

A    Close friends and my family.

        MS. REED:  Your Honor, I'd like to publish what's been premarked for identification as Plaintiffs' Exhibit 30. It's an April 11th text thread between D.D. and her friends.

        (Plaintiffs' Exhibit No. 30 was marked for identification.)

        MR. GUYNN:  I'm sorry.  I didn't hear the last part. D.D. and?

        MS. REED:  Her friends.

        MR. GUYNN:  Okay.

        THE COURT:  You want to show that to her?  Okay.

BY MS. REED:

Q    D.D., do you recognize this text thread?

A    Yes.

Q    How do you know what it is?

A    Because I remember texting my friends.

        MR. GUYNN:  I'm not sure what I'm looking at.  It

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

doesn't look like a text.

THE COURT:  Okay.  Is there an objection?

MR. GUYNN:  Yes.

THE COURT:  Okay.  Basis?

MR. GUYNN:  On the fact that it's hearsay with regard to her friends, and with regard to her, you know, she's testifying to it.  She doesn't need to read an email to us -- or a text message to us.

THE COURT:  Well, thank you, Mr. Guynn.

Any response from the plaintiffs?

MS. REED:  Yeah.  Your Honor, we believe this falls under the hearsay exception 803(3), and it goes to D.D.'s then existing mental state.

THE COURT:  I agree, and I'll overrule the objection. It -- it is as to her mental state, it goes to that.  As to the statements in this thread that are offered by others, are they being offered for the truth of the matter asserted?

MS. REED:  The statements of others are not being offered for the truth of the matter asserted, and in fact, we won't reference statements made by anyone other than D.D.

THE COURT:  Okay.  Well, the Court won't consider the statements made by others in this text thread for the truth of the matter asserted.  Therefore, they fall outside the definition of hearsay under the hearsay rule, and the Court will consider these statements as being offered for -- to show

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

the mental state of the plaintiff at the time, D.D. at the time the statements were made.  Okay.  Thank you.  They're offered to show her mental state, and the Court will consider them as such.  Thank you.  Overrule the objection.

        (Plaintiffs' Exhibit No. 30 was admitted.)

BY MS. REED:

Q    D.D., can you please read the text message you sent on April 11, 2024, at 10:12 p.m.?

A    Can you zoom in on it?

            MR. GUYNN:  I can't read it.

            THE COURT:  Perhaps the technology people can make it bigger.

            What exhibit is this, Ms. Reed?

            MS. REED:  This is Plaintiffs' Exhibit 30.

            THE COURT:  Thank you.

            That's bigger.  Thank you.  Please proceed.

            THE WITNESS:  Since they changed the high school's name back to Stonewall Jackson, I'm not going to that school.

BY MS. REED:

Q    D.D., why did you say that?

A    Because I didn't want to have to go to a school named Stonewall Jackson because the name makes me feel unwelcome and uncomfortable.

Q    Is this statement an accurate reflection of how you felt at the time?

A     Yes.

Q     Did you eventually go to the school?

A     Yes.

Q     Why?

A     I wasn't able to move.  It just wasn't something that my parents could make happen.

Q     Okay.  And do you still feel the way you just described, unwelcome attending the school?

A     Yes.

MS. REED:  Okay.  We can take this exhibit down.

BY MS. REED:

Q     D.D., do you recall e-mailing the school board ahead of their vote to restore the school names?

A     Yes.

Q     How many board members did you e-mail?

A     All of them.

MS. REED:  At this time, plaintiffs would like to publish Plaintiffs' Exhibit 33, which is an April 24, 2024, e-mail from D.D. to school board member Gloria Carlineo.

(Plaintiffs' Exhibit No. 33 was marked for identification.)

THE COURT:  Did you want to move into evidence Plaintiffs' Exhibit 30?

MS. REED:  Yes, Your Honor.  My apologies.  Can we please move Exhibit 30 in?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

THE COURT:  Yes.  Admitted for the reasons stated previously.

And you all need to check, during breaks, to make sure that these things that you want admitted into evidence, you've moved them into evidence.  Okay?

MS. REED:  We will, Your Honor.

THE COURT:  Check with the clerk.  Thank you.

All right.  Plaintiffs 33.  Go ahead.

BY MS. REED:

Q    D.D., do you recognize this document?

A    Yes.

Q    Can you describe what it is?

A    It's an e-mail that I sent to the school board members.

Q    How do you know?

A    Because I remember sending it.

MS. REED:  Your Honor, at this time, plaintiffs move to admit Exhibit 33 into evidence.

THE COURT:  Any objection?

MR. GUYNN:  Same objections as before, Your Honor.

THE COURT:  Well, she can certainly testify about her e-mail.  I'm going to admit it and overrule the objection. This is -- certainly, she can testify about it, and so the Court overrules the objection.

(Plaintiffs' Exhibit No. 33 was admitted.)

THE COURT:  Please proceed.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

BY MS. REED:

Q    D.D., I'm going to ask you to read portions of your e-mail, starting with the fifth line, the sentence that starts with Stonewall Jackson.

A    Stonewall Jackson, Robert E. Lee, and Turner Ashby were all soldiers who fought for slavery.  If they had won, my family and I would not have the opportunities we have now.  I play three sports at Mount View, including volleyball, basketball, and soccer.  Every time I put on one of those jerseys, I'm asked to proudly represent my school, which is something I cannot do my school if my school is named after someone who fought for something so horrible and cruel.

I am also a devoted student in school, and I'm taking algebra at the high school.  I cannot keep devoting my time to a school that represents these people.  Changing the name back doesn't just affect me or my family, but it affects our community and schools.  Changing the name also makes our community seem like a place full of racist, ignorant, and selfish people because the names of racist, ignorant, and selfish people are all over around, whether it's on shirts, sweaters, the schools, et cetera.

Mountain View and Honey Run are amazing names for the high school and elementary school, so please take the words I have said into consideration and keep the names how they are.

Q    D.D., is that an accurate reflection of how you felt at

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

the time you sent the e-mail?

A    Yes.

Q    Why did you choose to send this e-mail?

A    I wanted the school board members to know how the names Stonewall Jackson and Ashby-Lee made me feel.

Q    Did Ms. Carlineo respond to your e-mail?

A    Yes.

Q    What did she say?

A    I don't remember.

Q    Do you know if Ms. Carlineo voted to restore the name or not?

A    (No audible response.)

Q    Do you know if the school board voted to restore the school name Stonewall Jackson or not?

A    Yes.

Q    Yes, they voted to restore the name?

A    Yes.

Q    Do you think the school board took your message into consideration?

A    No.

Q    Why not?

A    Because I told them how it made me feel and how it made me feel unwelcome and uncomfortable, and they still decided to change it back anyway.

        MS. REED:  We can take this exhibit down.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

BY MS. REED:

Q    Do you recall attending the school board meeting on May 9, 2024, when the board voted to restore the names?

A    Yes.

Q    Why did you attend that meeting?

A    Because I wanted to talk about how I felt about them wanting to change the names back again and hopefully make them decide to want to keep it Mountain View.

        MS. REED:  I'd like to show the witness Plaintiffs' Exhibit 24, which has already been entered into evidence, and we can start on Page 39.

BY MS. REED:

Q    D.D., the exhibit I'm showing you now is a transcript of the May 9th meeting.  Do you recognize your words on the page that we're looking at?

A    Yes.

Q    Okay.  I'm going to ask you to read your statement, but obviously, not reading your actual name.  Okay?

A    Okay.

Q    Go ahead.

A    My name is D.D., and I am currently an eighth-grade student at North Fork Middle School.  This year, I played three sports at Mountain View, and I take Algebra I there.  I'm a Black student, and if the names are restored, I would have to represent a man that fought for my ancestors to be slaves.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

That makes me feel like I'm disrespecting my ancestors and going against what my family and I believe, which is that we should all be treated equally, and that slavery was cruel and an awful thing.

I think it is unfair to me that restoring the names is up for discussion.  People don't take the time to think about students like me who would not be proud to graduate from a school with the name Stonewall Jackson.

Q    You can continue.

A    I can't see the rest.

Q    Can you see it now?

A    It stops at he fought for slavery to be a.  Constitutional right that would be carried out forever.  Stonewall Jackson was passionate in his belief in that the Black student -- the Black race was inferior to the White race.  He fought and died for that belief, and had he won, I wouldn't be allowed to attend public school, and I would not be speaking here -- and I would not be here speaking to you today.

It is your job to make decisions that are in the best interest of all your students.  You cannot ignore the heritage and feelings of your Black and brown students just because we are the minority.  It is your job to make our schools a place where all students are valued and respected.  The names Mountain View and Honey run do not devalue and disrespect an entire race of people, but the names Ashby-Lee and Stonewall

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

do.  They honor men who believed that I have less value and worth because I'm Black.  If this board decides to restore the names, I would not feel like I was valued and respected, and you would not be doing your job.  Thank you.

Q    D.D., why did you choose to give this statement at the school board meeting?

A    Because I wanted the school board to feel how I felt about the name Stonewall Jackson and that it makes me feel uncomfortable and like I have less value and am unwelcome and I wanted them to keep the name Mountain View.

Q    How did you learn all the history about the Confederate generals you spoke of?

A    I learned about it in school, and my parents have talked to me about them.

Q    Were you nervous giving this statement?

A    Yes.

Q    Why did you give it anyway?

A    Because I felt like it was important for a student to say how they felt because I'm more impacted than an adult would be, because I actually go to the school and I'm more impacted than White students because I don't think that they really think about what the name means or care, but I do.

Q    Did you feel heard by the school board after giving this statement?

A    No.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    What did the school board's decision to revert back to the names Stonewall Jackson and Ashby-Lee after you've given your e-mail and made your statement signal to you?

A    That they didn't really listen or care about what I had to say, because I told them that it made me feel like I had less value and that I was unwelcome and that I felt uncomfortable, and they still decided to change it back anyway.

Q    And in fact, after this meeting, the school board did vote to restore the school name Stonewall Jackson.  Is that correct?

A    Yes.

Q    And you attended the school after that with the name Stonewall Jackson?

A    Yes.

Q    While attending Stonewall Jackson, do you encounter names and symbols of Stonewall Jackson?

A    Yes.

Q    How often do you see the name and symbols of Stonewall Jackson and the Confederacy?

A    Throughout the whole day.

Q    Can you give any specific examples?

A    People wear it on their clothes, and some teachers have it around their classrooms.  It's on the front of the buildings. I'm pretty sure it's on the score boards in the gym, and there's posters around the school with it.

Q    Who wears it on their clothes?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    Students and teachers.

Q    How does it impact you when you see students wearing clothes that say Stonewall Jackson?

A    It makes me upset because it makes me feel like I don't really have people at school or friends, people that I trust that I can talk to about the names because I feel like if I say how I feel that they'll think of me differently or be mean to me about it.

Q    How does it impact you when you see teachers wearing clothing that says Stonewall Jackson?

A    It makes me upset because when I'm at school, teachers are the adults that I'm supposed to be able to go to if I'm upset or uncomfortable about anything, but I can't go to them because when they wear clothes that say Stonewall Jackson, that makes me upset and uncomfortable.

Q    Can you share any specific examples of someone who's made you feel uncomfortable about the name Stonewall Jackson since you've started attending the school?

A    In history class, one day this year, a student who wasn't in the class came in and asked my history teacher if he wants the name to be Stonewall Jackson or Mountain View, and my teacher said that he didn't want to answer.  He would rather do it in private.  But then the student asked everybody in the class to raise their hand if they liked the name Stonewall, and then the majority of the class raised their hand.  And then he

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

asked if anybody in the class didn't want it to be named Stonewall, and I don't think anybody raised their hand.  And there were some people who didn't raise their hand at all.  I didn't raise my hand at all.  But it made me feel uncomfortable and upset knowing that so many people in the class liked the name Stonewall Jackson, and it made me uncomfortable because I felt like I couldn't say that I didn't like it because I would be bullied or people would be mean to me.

Q    Do you currently participate in sports at Stonewall Jackson High School?

A    Yes.

Q    Which sports?

A    Basketball and soccer.

Q    Can you describe how you're doing in those sports?

A    Good.

Q    Do you see references to Stonewall Jackson or the Confederacy in your sports participation?

A    Yes.

Q    Can you describe them?

A    Before games, when we're announced, they announce us as the Stonewall Jackson Generals, and for basketball, they name Stonewall is on the score board.

        MS. REED:  Your Honor, at this time, I'd like to read several stipulations into the record and my colleague, Stephanie Nnadi, is going to assist with that.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

THE COURT: Okay.

MS. NNADI: First joint statement of stipulated facts.

Paragraph 48. In the current school year, Stonewall Jackson High School sports teams are sometimes referred to as Stonewall Jackson, Stonewall Jackson High School, or Generals in official written communications.

Paragraph 49. In the current school year, student groups participating in Stonewall Jackson High School extracurricular events are sometimes referred to as Stonewall Jackson, Stonewall Jackson High School, or Generals in official written communications.

Stipulation Paragraph 50. In the current school year, Stonewall Jackson High School sports teams are sometimes referred to as Stonewall Jackson, Stonewall Jackson High School, or Generals in official announcements at school events.

Paragraph 51. In the current school year, student groups participating in Stonewall Jackson High School extracurricular events are sometimes referred to as Stonewall Jackson, Stonewall Jackson High School, or Generals in official announcements at sporting events.

Paragraph 52. In the current school year, Stonewall Jackson High School cheerleaders have performed cheers that reference Stonewall Jackson at official school sporting events.

Paragraph 53. In the current school year, Stonewall

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Jackson high school cheerleaders have held up signs that say

Stonewall at official school sporting events.

Paragraph 54.  In the current school year, Stonewall

Jackson High School students who participate in sports and

extracurricular activities are identified as Stonewall Jackson

students, Stonewall Jackson Generals, or Generals.

BY MS. REED:

Q    D.D., are you ever identified as Stonewall Jackson or a

Stonewall Jackson student?

A    (No audible answer.)

Q    Are you ever announced with the name Stonewall Jackson?

A    Yes.

Q    Can you explain how it happens?

A    Before games, they will announce the starters, and I'm one

of the starters so they'll say, like, from Stonewall Jackson,

they'll say I'm a sophomore, then they'll say my name, and then

I'll run out.

Q    How does being associated with the name Stonewall Jackson

and the name Stonewall Jackson in general impact your sports

participation?

A    It makes me feel conflicted because whenever I do

something good during my games when I play sports, it's like

I'm doing something good for the name Stonewall Jackson, which

is a name that I don't like, I feel uncomfortable with, makes

me feel unwelcome.  But I also don't want to do bad in my

sports.  So I want to do good.  But when I do good things, it represents a name that doesn't make me feel good.

Q    Have you ever thought about quitting your sports because of the name Stonewall Jackson?

A    I think it's a difficult thing to think about because I really love sports and it -- they really, like, shape who I am.  But I wouldn't want -- I don't like being announced under the name Stonewall.  And I don't know if it would be different if I had to wear the name Stonewall on my jersey, because right now, it's just Generals.  I think now that the names are just Generals on my jersey, it makes it easier to play sports.  But if I had to wear the name Stonewall, it would be more of a discussion about me quitting.

Q    Let's move and talk about some of the other ways you're impacted by the name Stonewall Jackson on your school.  Okay?

A    Okay.

Q    Do you ever feel distracted in class because of the name Stonewall Jackson?

A    Yes.

Q    Can you explain how so?

A    Whenever I see it in classrooms or on people's shirts or clothes, it's just a reminder of how I don't feel welcome or valued and it makes me uncomfortable.  And it just -- it distracts me throughout the day because it's just an extra thing to think about.  I can't just think about what I'm

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

learning or what I'm doing in class.

Q     How are your grades?

A     Good.

Q     Can you describe what types of grades you get?

A     A's.

Q     How is it that you maintain all A's if you're distracted by the name Stonewall Jackson?

A     Because I'm still smart and I still understand what I'm learning and I can still do my schoolwork, but it just makes learning throughout the day harder because I'm distracted and I'm just reminded of how I feel unwelcome and uncomfortable.

Q     Does going to a school named Stonewall Jackson impact your mental health?

A     I'm still, like, a happy person, but the name Stonewall Jackson, it just reminds me of everything that my ancestors, my family and I, have gone through and how it makes me feel unwelcome and uncomfortable.  And it just makes me upset throughout the day even though, like, I'm still happy.  It just makes me upset when I have to think about it.

Q     Can you describe a little bit more what you mean when you say it reminds you of everything your family and your ancestors have gone through?

A     My ancestors were slaves and my granddad and his siblings had to be bused to different schools when they were younger because his parents didn't them going to Stonewall Jackson and

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

the school's name is Stonewall Jackson to keep Black people away. And I know my mom has fought. When she was in school, she had to do stuff because she didn't like the name. She didn't like how Confederacy was represented in school. And I know that my family has gotten -- like, things have been said to them about how they feel about the school names.

Q    Does going to a school named Stonewall Jackson make you feel inferior your White peers?

A    Yes.

Q    How so?

A    Because Stonewall Jackson thought that Black people were inferior to White people, so me having to go to a school named Stonewall Jackson makes me feel inferior.

Q    I want to ask you another question about your sports participation. You mentioned that the jerseys -- your jerseys currently say Generals. Is that correct?

A    Yes.

Q    Do you like wearing jerseys that say Generals on them?

A     It's better than them directly saying Stonewall Jackson, but I still know that it means Confederate generals, because Stonewall Jackson was a Confederate general. So I don't really like, but it's definitely better than saying Stonewall.

Q    Okay. One last question for you. What would you like to have change as a result of this lawsuit?

A    I want the names to go back to Mountain View and Honey

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Run.

MS. REED:  No more questions from plaintiffs.

THE COURT:  Okay.

Any cross?

MR. GUYNN:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. GUYNN:

Q    I was going to say good morning, but I think it's afternoon.  So, good afternoon, D.D.

Just a couple of questions here.  You mentioned earlier that you make good grades, but you're rather modest, aren't you?  I mean, you make straight A's, don't you?

A    Yes.

Q    And in fact, you have since you were at North Fork and at Mountain View.  Right?

A    Yes.

Q    Okay.  And again -- and nobody's faulting you for being modest --

Q    Okay.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    We're helping the court reporter when we do that.  You can't see her, but she's thanking us.

You mentioned being introduced at games.  At your -- I guess at both home and away games, they announce, what, Stonewall Jackson High School, and then they announce each individual player?

A    Yes.

Q    Okay.  And people clap when you get announced, don't they?

A    Yes.

Q    In the -- I'm curious how many of your friends have straight A's and ████████████████████████████ ████████████    Do you know of anybody else?

A    No.

Q    This is no time for modesty.  I'm not trying to make you out that way.  But what I'm trying to figure out is, with all that going for you why you have any reason to feel inferior to anybody.

A    Because I still have to represent a man who fought for slavery and who thought Black people were inferior to White people, and everything good that I do, it goes to him, saying that I'm doing something good for him, even though he thought Black people were inferior.  So it makes -- it makes me feel bad because I'm doing good things for him.  So I guess it just feels like more people are, like, proud of the name whenever I

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

do something good, but I don't want it to be that way because

the name makes me feel less -- like I have less value and

unwelcome and uncomfortable.

Q    Okay.  Do you have a lot of friends at school?

A    Yes.

Q    Okay.  And you get along with most everybody there, don't

you?

A    Yeah.

Q    Okay.  And other than that young man that came into your

class that you described earlier, have you had any other

problems with any other students about the name?

A    No.

Q    Any problems with any teachers about the name?

A    No, but I don't like it when people wear clothes that say

Stonewall Jackson because it makes me feel unwelcome and

uncomfortable and that maybe they don't respect me or like me

as much as other people.

Q    Have any of your teachers ever refused to help you with

any of your subjects?

A    No.

Q    They take a pretty special interest in you, don't they?

A    I don't understand what you mean by that.

Q    Well, you've got straight A's.  ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  You strike me as the type of student that

teachers usually take a pretty strong interest in.  Aren't they

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

always willing to help you?

A    Yes.

Q    Okay. ███████████████████████████████████████

████████████████████████████████

█  ███████████████████████████

Q    Okay.  And I guess basketball season's kind of just getting underway, isn't it?

A    Yes.

Q    And when it finishes, you're going to play soccer?

A    Yes.

Q    And again, it's no time for modesty, but you're a pretty good soccer player, too, aren't you?

A    Yes.

Q    You said in your direct testimony that the school was originally named Stonewall Jackson High School to make Black people feel unwelcome.  Who told you that?

A    My parents.

        MR. GUYNN:  That's all I have, Your Honor.

        THE COURT:  Okay.

        Is there any redirect of this witness?

        MS. REED:  No, Your Honor.

        THE COURT:  Okay.

        Thank you for testifying here today.  I know it is --

this entire matter and your testimony today is not easy on you, but, you should be proud of your accomplishments.  Being a

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

straight A student ████████████████████████████████ you are an impressive young woman, far more impressive than I was when I was a sophomore in high school, and I want you to know you should be very, very proud of yourself.  And I thank you for sharing your heartfelt feelings with the Court and views with the Court today.  Thank you so much.

Okay.  Do we have another witness now?

MS. REED:  Yes, Your Honor.

THE COURT:  Okay.  Let's call your next witness.

MS. REED:  The plaintiffs would like to call J.D. And Court's indulgence.  It will just take a moment.

THE COURT:  Take your time.

Okay.  As soon as we're ready, let's proceed with the next witness.  Thank you.

THE CLERK:  This is J.D.?

J.D., will you please raise your right hand to be sworn?

J.D., CALLED BY THE PLAINTIFF, SWORN

THE CLERK:  Okay.  I didn't hear you.  Can you speak a little louder?

THE WITNESS:  Yes.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. REED:

Q   Good morning.  Can you see me?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    Yes.

Q    Can you please introduce yourself to the Court?

A    J.D.

Q    Is there anyone there in the room with you?

A    No.

Q    Do you have any notes with you today?

A    (No audible answer.)

Q    One more time.

A    No.

Q    Where do you live?

A    Shenandoah.

Q    How old are you, J.D.?

A    Eleven.

Q    What school do you currently attend?

A    North Fork.

Q    Where did you attend elementary school?

A    Ashby-Lee.

Q    And where do you plan to attend high school?

A    Stonewall Jackson.

Q    Why do you think you'll go to Stonewall Jackson?

A    Because we don't plan on moving.

Q    Is it your neighborhood school?

A    Yes.

Q    How do you identify your race, J.D.?

A    Black.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    Are you a member of the NAACP?

A    Yes.

Q    Why did you decide to be a plaintiff in this case?

A    (No audible answer.)

        THE COURT:  I'm sorry, I couldn't hear that.

BY MS. BANNER:

Q    Can you say it one more time?

A    Because I disagree with the school names.

Q    What school names?

A    Ashby-Lee and Stonewall Jackson.

Q    Do you remember what your elementary school was called before it was Ashby-Lee?

A    Honey Run.

Q    How did you feel about the name Honey Run?

A    I didn't really think about it.

Q    How do you feel that your school changed the name of your -- sorry.  How do you feel that the school board changed the name of your school to Ashby-Lee?

A    Sad.

Q    Why did it make you sad?

A    Because my family gave them good reasons and they didn't take it.  They didn't listen to them, and it made me think that they might not want me or my sister there.

Q    Who is they?  Who made you think -- made you think who might not want you and your sister there?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A     The school board.

Q     Do you know who the school Ashby-Lee is named after?

A     Robert E. Lee and Turner Ashby.

Q     And who are they?

A     Confederate generals.

Q     How do you know?

A     Because I learned about them.

Q     Where did you learn about it?  Do you remember who taught you?

A     My history teacher.

Q     Did the school board voting to change your school name back to Ashby-Lee signal anything to you?

A     That they might not want me or my sister to attend.

Q     Why do think they might not want you or your sister to attend?

A     Because they might want schools to still be segregated.

Q     Did you notice any changes in your school after the school name was changed to Ashby-Lee?

A     The names on the wall changed to Ashby-Lee and teachers and students wore shirts.  They didn't wear Honey Run shirts anymore.  They wore Ashby-Lee shirts.

Q     How did you feel when you saw other students wearing Ashby-Lee shirts?

A     Sad.

Q     Why did that make you sad?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    Because it made me think that they understand, that they know what the names represent and that they might not -- and that they might want the schools to be segregated, too.

Q    How did you feel when you saw teachers wear shirts that said Ashby-Lee?

A    The same way.

MS. REED:  Your Honor, at this time, we'd like to read in stipulations, and my colleague, Melissa Colon, will help with that.

MS. COLON:  Second joint statement of stipulated facts.

Paragraph 73.  Since June 6, 2024, the main entrance to Ashby-Lee Elementary School has included the words Ashby-Lee Elementary School.

Paragraph 74.  On July 25, 2024, Ashby-Lee Elementary School advertised on Facebook a store to purchase apparel bearing the words Ashby-Lee.

Paragraph 76.  At times, students and teachers at Ashby-Lee Elementary School wear, during school hours, apparel including the words Ashby-Lee.

Paragraph 78.  Students at Ashby-Lee Elementary School see signs, apparel, and school materials bearing the words Ashby-Lee or ALES daily.

Paragraph 79.  Students at Ashby-Lee Elementary School are sometimes referred to as Ashby-Lee students.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Ashby-Lee Elementary School students, or ALES students in official written communications.

BY MS. REED:

Q    J.D., did you get a report card when you were at Ashby-Lee Elementary School?

A    Yes.

Q    What kind of grades did you get?

A    Good grades.

Q    Did your grades change from when the school was Honey Run to when the school was Ashby-Lee?

A    No, but it made me put extra effort into my schoolwork.

Q    Why did you have to put extra effort into your schoolwork?

A    Because I was thinking about the school names and I was -- and I had to be thinking about my schoolwork, so it made me.

Q    Do you have lots of friends at Ashby-Lee?

A    Yes.

Q    Did your relationship with your friends or any other classmates change after the name of the school was changed to Ashby-Lee?

A    It made me a little bit more -- a little -- it made me a little bit -- a little bit closed off with them like I couldn't tell them as much stuff.

Q    Why did you think you couldn't tell them as much stuff?

A    Because I thought that they might think that I shouldn't be there and I -- that the school should still be segregated.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Q    Has attending a school named Ashby-Lee impacted your mental health?

A    No.

Q    Has attending a school named Ashby-Lee caused you any stress or anxiety?

A    (No audible answer.)

Q    One more time, because the reporter couldn't hear you.

A    No.

Q    What's the main way that attending a school named Ashby-Lee has impacted you?

A    What does impacted mean?

Q    How does it make you feel?  What's the main thing that it makes you feel?

A    Uncomfortable.  Intense.

Q    Okay.  What do you hope will change as a result of this lawsuit?

A    That the names go back to Honey Run and Mountain View.

MS. REED:  Your Honor, for the record, I'd like to state that the stipulations read by Melissa Colon were read from Plaintiffs' Exhibit 2, which is already admitted into evidence.

THE COURT:  Yeah.

MS. REED:  And no further questions for plaintiff J.D.

Thank you, J.D.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

THE COURT:  Yes.  Thank you.

Is there any cross-examination of this witness?

MR. FITZGERALD:  Yes, Your Honor.  Just briefly.

Where do I look if I want to look at the witness?
Where's the camera?  Okay.

CROSS-EXAMINATION

BY MR. FITZGERALD:

Q    Hello again, J.D.  I'm curious.  How were tryouts for the
North Fork basketball team?  Last time I talked to you, you
said you were going to try out for that.

A    Good.

Q    I hope you made the team.
Are you still playing sports at North Fork in addition to
basketball?

A    Could you please rephrase that?

Q    Sure.  Are you playing sports at North Fork?

A    Yes.

Q    And you're still making good grades?

A    Yes.

Q    Okay.  Do you know any members of the school board?

A    Not really.

Q    Thank you for your time, J.D.  I appreciate it.

MR. FITZGERALD:  No further questions.

THE COURT:  Any redirect?

MS. REED:  No, Your Honor.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

THE COURT:  May this witness be excused?

MS. REED:  She may.

THE COURT:  Young lady, this is the Court.  Thank you so much for taking the time and sharing your testimony with us today.  You are an exceptional and a very bright and charming young person, and I'm really glad I got to meet you.  I wish you the very best of luck.

We'll stand in recess.

(A recess was taken from 12:45 until 1:45)

THE COURT:  Good afternoon, folks.

Call your next witness.

MS. REED:  Plaintiffs call Briana Brown.

THE COURT:  All right.

Come on up and be sworn.

THE CLERK:  If you could raise your right hand.

BRIANA BROWN, CALLED BY THE PLAINTIFF, SWORN

THE WITNESS:  I do.

THE COURT:  Good afternoon.

THE WITNESS:  Good afternoon.

THE COURT:  Please proceed.

DIRECT EXAMINATION

BY MS. REED:

Q    Can you introduce yourself to the Court?

A    I'm Briana Brown.

Q    Are you a plaintiff in this case?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    Yes.

Q    Are you a member of the NAACP?

A    Yeah.

Q    Where do you attend school?

A    The University of Virginia.

Q    Where did you attend school --

THE COURT:  How do you think about them losing that game?  I mean, really.  They would be in the playoffs if they had just -- if they had just beaten -- who was it?  Duke.  Last weekend, right?

THE WITNESS:  Yeah.

THE COURT:  Yeah.  Sorry to bring up --

THE WITNESS:  It's unfortunate.

THE COURT:  Sorry to bring up a sore subject.  Go right ahead.

(Off-the-record conversation.)

THE COURT:  None of that's on the record.  Let's go on.

BY MS. REED:

Q    Before college, where did you attend high school?

A    I attended Strasburg High School and Massanutten Regional Governor's School, which is housed inside of Stonewall Jackson High School.

Q    What is the Massanutten Regional Governor's School?

A    It's a -- kind of an integrated learning program for

environmental science and math and basically, it's kind of just for students who want, like, an extra challenge.  So I would get picked up from Strasburg in the morning and brought to Stonewall for my two classes and then a bus would pick me up and bring me back to Strasburg for my other two classes.

Q    How many days a week would you go to Stonewall Jackson for the Governor's School?

A    Five.

Q    And how did you get selected to attend the Governor's School?

A    My sophomore year, I applied and then I was accepted.

Q    So you attended your junior and senior year?

A    Yes.

Q    About how many students were in the Governor's School?

A    I'm not sure exact numbers, but maybe a little over 50, maybe?

Q    What kind of qualifications do students have to have to get into the Governor's School?

A    It's usually just based off of, like, good grades and also teacher recommendations.

Q    So it was a selective program?

A    I would say so, yes.  Yeah.

Q    Do you have any idea why the Governor's School was at Stonewall Jackson?

A    I don't.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    Generally, where did students at the Governor's School come from?

A    Different parts of Virginia, like Harrisonburg, Page County, Rockingham.  I think there might be more, but those are the ones I can remember off the top of my head.

Q    And how long is the program?

A    It's two years.

Q    When you began attending the Governor's School in 11th grade, what was the name of the school it was in?

A    It was Mountain View High School.

Q    And when did it change to Stonewall Jackson?

A    It changed at -- well, it -- it was changed by my senior year.

THE COURT:  You were there two years?

THE WITNESS:  Yes.

THE COURT:  Two years, and that the first year it was Mountain View and the second year it was Stonewall Jackson?

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.

BY MS. REED:

Q    To shift gears a bit, how do you identify your race?

A    I identify as mixed Black and White.

Q    What has your experience been as a biracial person?

A    It's definitely been a complicated experience, for sure. Kind of growing up with two identities definitely, like, it

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

kind of -- it makes it hard to feel like you fit in in any one group.  But it also adds, like, a lot of kind of -- it's also a good thing because you're kind of -- you can relate to, like, kind of both -- both races, like, culturally.  And yeah, I would definitely say it was, like, an interesting experience, like, not necessarily just because of being mixed, but also because of, like, attending predominantly White schools.  You don't always have, like, other people that look like you, so that definitely caused, like, some, like, anxiety and, like, kind of second guessing, but yeah.

Q    Have you ever experienced racism?

A    Yes.

Q    Can you give an example?

A    Yeah.  So, it's definitely been, like -- I've definitely -- one time I can recall -- my earliest memory was -- honestly, it was from -- it was either preschool or elementary school, and some kids told me I couldn't play with them because I was brown.  And then just other things like people touching your hair, commenting about how much darker you are than them, having, you know, like, stereotypes and things like that placed on you, so yeah.

Q    How did those experiences make you?

A    Definitely just made me feel out of place and just like I didn't belong and, you know, like nobody was really familiar with, you know, the -- the Black experience and also just made

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

me feel, you know, kind of I guess just like it -- kind of like an outcast.  Just like, you -- it makes you wonder, like, when you're talking to other people and things like that, like, if they are racist or if they're going to say, like, racist things to you.  So I kind of learned from a young age to kind of put a guard up with people before I get to know them.  So I would say that's kind of, like, the biggest impact that it's had on my kind of -- my -- my mental -- my mental health.

Q    You said the school name was changed from Mountain View to Stonewall Jackson before your senior year.  Is that correct?

A    Correct.

Q    How did you feel when you found out the school board was considering changing the name to Stonewall Jackson?

A    I felt mostly just disappointed and confused because, clearly, the school board had changed the name to Mountain View because they were aware that, you know, the name caused, you know, discomfort.  It caused, you know, possibly, like -- it caused me, like, feelings of just, like, not being welcome and not kind of a -- a good look on our community, and because of the racial implications that the name Stonewall Jackson carries with it.  And so kind of -- I think because of all of that, I was -- it just made me really second-guess, like, does the school board really care about the perspectives of -- of Black students and, you know, it just -- it makes you think about the, you know -- the -- any, like, ulterior motives or anything

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

behind, you know, changing the names back to Stonewall Jackson.

So it was really just -- it made me realize that, you know,

there wasn't really much consideration of Black students.

Q    Let's back up for a minute.  You said twice that they

changed the name back to Stonewall Jackson.  You're aware of a

time that the school was previously named Stonewall Jackson?

A    Yes.

Q    And then it changed to Mountain View?

A    Yes.

Q    About how old were you, what grade were you in when it

changed to Mountain View?

A    I think I was in -- I was in eighth grade, I think.

Q    And how did you feel about that decision?

A    I felt just I guess like it was a -- a step in the right

direction and kind of a step towards being a more kind of

diversity and inclusion kind of driven community, and it made

me feel like, you know, when people come visit here or new

students attend the schools, that they can feel, you know,

welcome and not like they don't belong.  So I think I was just

happy and I was excited to see, you know, what progressive

changes would come -- come next after that.  So it kind of was

just oh, nice.  I don't -- I don't really have to, you know,

worry about -- worry about that anymore.

Q    How did you feel when the school board did in fact vote to

reinstate the name Stonewall Jackson?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    Yeah.  I definitely felt just like I said, very -- very confused because, you know, obviously, the school board was aware that the name Stonewall Jackson made people feel uncomfortable and unwelcome at the school.  It made me feel that way.  Made other students feel that way.

And, you know, even just, like, other people from the community, they clearly knew that, and so they did it anyway and, you know, it -- Stonewall Jackson, as a person, stood for, you know, the Confederacy and continuing to keep Black people like me enslaved and didn't believe that, you know, Black people should have the same education as everybody else.  So, you know, knowing that, it makes me feel like the -- the school board just really doesn't care about, you know, racism or, you know, the different things like that.

Q    Briana, who was Stonewall Jackson?

A    He was a Confederate general.

Q    What did it communicate to you when the school board decided to return the name Stonewall Jackson to the school in 2024?

A    It communicated to me that they may have some of the same racist ideals as Stonewall Jackson, and they don't care about minority students.

Q    Did you speak to anyone at the time about how you felt?

A    I definitely spoke to my family and also my classmates.

Q    Did you speak to anyone in the news?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A     Yes.

Q     Why did you choose to speak to the news?

A     I chose to speak to the news because mostly, I chose to speak out for people who can't or wouldn't feel safe doing so. And I also spoke about it just because I -- I care.  I care about the future of our community, not just our school community, but the community at large, and I care about the community feeling inclusive and welcoming to everybody, including me, because I truly do love where I'm from, I love where I live, and I want it to reflect the majority of people that are there, which are nice people, nondiscriminatory people.

     And so that was part of -- most -- mostly part of my reasoning.  And also just because I was upset.  Just upset about the name Stonewall Jackson being reinstated.  So -- and I just wanted to make sure that even if I hadn't previously spoken out against it, that I did now.

          MS. REED:  We'd like to show the witness a document that's been marked for identification purposes as Plaintiffs' Exhibit 113, which is a June 11, 2024, CNN article.

     (Plaintiffs' Exhibit No. 113 was marked for identification.)

BY MS. REED:

Q     Briana, do you recognize this document?

A     Yes.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    What is it?

A    It is a CNN article about the -- the -- the school name change.

Q    Do you remember providing a statement to a CNN reporter?

A    Yes.

Q    And are your statements in this article accurate?

A    Yes.

MS. REED:  Your Honor, plaintiffs move to admit Exhibit 113.

THE COURT:  Any objections?

MR. FITZGERALD:  Yes, Your Honor.  I don't see any exception to the hearsay exception 803(3) rule for this document.

THE COURT:  What is the purpose for offering this exhibit?

MS. REED:  Your Honor, this exhibit also goes to the plaintiff's then exiting mental state at the time.

THE COURT:  Well, the part of it I see doesn't -- which exhibit is this?

MS. REED:  It's Exhibit 113, and we're going to refer the witness to Page 2, a quote from her that starts with the word, when I found out.

THE COURT:  Can you pull that up?  Okay.  The Court will admit this exhibit.  I'll overrule the objection.  I'm admitting it only for the purpose that it reflects the

plaintiff's mental state.  I'm not -- the stuff about the lawsuit and all that other stuff, it's not relevant.  I mean, it's a news article about the lawsuit.  I mean, we know what the lawsuit is.  I'm not admitting it for that.  I will admit the article over the hearsay exception 803(3) objection and the relevance objection to go toward the hearsay exception 803(3) exception dealing with the mental state of the plaintiff at the time.  So I'll consider it for that purpose.

(Plaintiffs' Exhibit No. 113 was admitted.)

BY MS. REED:

Q    Briana, can you read your quote in the article beginning with the word when?

A    Yes.

When I found out about the school board's decision, I felt unwelcome in a place that I go to every day, which should never be the case.  This decision has made me realize that I need to speak out about what I believe in and empower people to use their voices for positive change.  I refuse to be afraid any longer.

Q    Can you clarify what you meant by the school board's decision?

A    I was talking about the school board's decision to reinstate the name Stonewall Jackson.

Q    Briana, why did you feel unwelcome?

A    I felt unwelcome because of the racist implications that

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

come from having the name Stonewall Jackson on a building that is a public building that's meant to serve everyone.  And I felt like it was just kind of historically, you know, those names, the name Stonewall Jackson, was originally given to the school to deter Black students from attending.  And I'm sure back then, they felt just as unwelcome as I do now.  So, yeah.

Q   Why did you say the name was originally given to the school to deter Black students from attending?  Can you explain that?

A   Yeah.  It -- I would say it was just kind of -- you know, it was during segregation and, you know, a lot of schools, especially around here, wanted to, you know, resist integration and -- yeah.

Q   Does the statement you made in the article accurately reflect how you felt at the time?

A   Yes.

          MS. REED:  We can take that down.

          I'd like to show the witness a document that's been marked for identification purposes as Plaintiffs' Exhibit 112. This is an article from July 28, 2024, from *The Virginia Mercury* also discussing the school name change.

          (Plaintiffs' Exhibit No. 112 was marked for identification.)

BY MS. REED:

Q   Do you recognize this document, Briana?

A    Yes.

Q    What is it?

A    It's an article about the -- the court case.

Q    Do you recall providing a statement to *The Virginia Mercury*?

A    Yes.

Q    And are your statements in this article accurate?

A    Yes.

Q    Briana, can you please read starting at the end of Page 2, the statement that begins with nobody really cared?

A    Nobody really cared about how this mentally affects students.  Makes -- makes them feel unsafe and unwanted in their learning environment, and that's something that should have never been the case.

Q    Did the school board's decision to change the name of the school to Stonewall Jackson make you feel unsafe?

A    Yes.

Q    Can you explain?

A    Like I've said, kind of the name Stonewall Jackson, to me, kind of makes the school a place that is accepting of racist ideas and is accepting of, you know, people who, you know, have those ideals, and you -- you never know how people who think that way will -- you know, will react to you and will react to your opinions and things that you have to say.

Q    Did the changing of the name to Stonewall Jackson make you

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

feel unwanted?

A    Yes.  Kind of it ties back to the -- the history of the school and, you know, how I most certainly wouldn't have been welcome there back then when it was, you know, first named. And it still, you know, makes me feel just as unwanted and uncomfortable being there today.

Q    Are you saying you would not have been welcome there at the time because of your racial identity?

A    Yes, I am.

MS. REED:  We can take this down.

BY MS. REED:

Q    Briana, after the school board voted to change the name of Mountain View to Stonewall, did you return to the school?

A    Yes.

Q    Why did you return to the school if it made you feel unsafe and unwelcome?

A    Yeah.  So I returned because I -- I would have risked not being able to graduate, and graduating high school was not not an option for me, and also I wanted to choose to attend despite the -- you know, the struggles and the anxieties that the -- that comes with the name Stonewall Jackson and attending a school named that, and I just wanted to reach my goals despite of that.

MS. REED:  I'd like to show the plaintiff a document that's premarked as Plaintiffs' Exhibit 111, which is a June

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

11th *Washington Post* article.

(Plaintiffs' Exhibit No. 111 was marked for identification.)

BY MS. REED:

Q    Briana, do you recognize this document?

A    Yes.

Q    What is it?

A    It's a -- an article talking about the -- the school name change.

Q    Do you recall making statements to the *Washington Post* at this time?

A    Yes.

Q    And are your statements and the summary of your statements in this document accurate?

A    Yes.

        MS. REED:  Your Honor, plaintiffs move to admit Exhibit 111.

        THE COURT:  Any objection?

        MR. FITZGERALD:  Yes, Your Honor.  Same objections. Relevance and hearsay exception 803(3).

        THE COURT:  Yeah.  As with the other exhibit that was admitted -- I think that may have been 113, which was the CNN article -- let me be clear.  I'm sustaining in part and denying in part this objection.  The reporting on the lawsuit is not relevant.  Okay?  I'm not considering that.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

I am considering only this aspect of Exhibit 113 and now Exhibit 111, the statements of this witness as to her -- on the hearsay exception as to the mental state at the time because it is relevant.  It goes to one of the prongs of the equal protection analysis as to impact.  So overruled in part, sustained in part.  I'm ignoring the parts that just talk about the lawsuit.  I can read the lawsuit.  But I am going to consider the parts that relate to Ms. Brown's statements because they are relevant to the issue of disparate impact and admissible under the hearsay exception 803(3) exception for her mental state.

(Plaintiffs' Exhibit No. 111 was admitted.)

MS. REED:  Thank you, Your Honor.

BY MS. REED:

Q    Briana, can you read the third paragraph of the first page, your quote with that starts with it just feels like?

A    Yes.

It just feels like a huge step in the wrong direction, and if we let them get away with this, what's next?

Q    What were you referring to when you said it?

A    I was referring to the names being changed back to Stonewall Jackson.

Q    Why did you think the school board's decision to change the name back to Stonewall Jackson was a huge step in the wrong direction?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    Yeah.  So, I feel like when the name was changed to Mountain View, it was in an effort to, you know, make everybody feel welcomed in the school and also just make everybody feel welcome in the county to kind of show, you know, the community, the world, the students that this is -- we don't believe in the racist ideals of Stonewall Jackson and this isn't what we stand for in this community and, you know, we want everybody to feel welcome.  And then I felt like that that was a step in the right direction.  And so reverting the names back to Stonewall Jackson really just -- it -- it was kind of a step in the wrong direction.  And that's just -- that's how -- that's how I feel. And, like, it's definitely just going back to, you know, times when I wouldn't have been allowed to attend the school and it just felt like, you know, if we go back on this, you know, what other things that are crucial for making sure that Black students feel safe and comfortable in the school environment, what might they change next that will affect -- that will affect us?

Q    Does this statement accurately reflect how you felt at the time?

A    Yes.

Q    I'd like to direct you to the end of Page 2.  Can you read the second to last paragraph of the article that begins with B.B.?

A    One of the student plaintiffs attends the Massanutten

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Regional Governor's School, which is housed in Mountain View High School.  In an interview, she said she doesn't want to be part of a school named after a Confederate leader, but leaving the prestigious program would hurt her academic record.  She said it feels like slipping back into -- back to the old name was intended to make Black students feel unwelcome.

Q    And then can you read the last sentence of the article?

A    I just think it's very important for us to speak out for what we believe in.

Q    Briana, are you the student who's being quoted here?

A    Yes.

Q    How do you know?

A    Because I -- I remember saying it.

Q    Does this paragraph accurately reflect what you said in that interview?

A    Yes.

Q    Did you think about leaving the Governor's School when the name Stonewall Jackson was reinstated?

A    I think I -- I did think about it for sure, but again, just it -- it wasn't an option, and also, you know, there were so many great things about the program.  I met so many wonderful people.  I got to learn a lot and it really enriched my education.  So it was very unfortunate that I even had that bought because of the name Stonewall Jackson being on the school.  But I definitely did -- did -- did think about it,

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

yeah.

Q    Why wasn't it an option to leave the program?

A     Yeah.  I wouldn't have been able to graduate on time and that was just something that would have really been detrimental to me.  So, yeah.

Q    Could you have attended the Governor's School anywhere else?

A     There are other Governor's Schools in Virginia, but this is the only one that I -- it would have been offered, yeah, unless I wanted to move somewhere else.  Yeah.

Q    Does this statement -- the two statements we just read, do they accurately reflect how you felt at the time?

A     Yes.

        MS. REED:  We can take this article down.

        I'd like to show the plaintiff a document that's been premarked as Plaintiffs' Exhibit 115.  This is an August 13th article from the *BBC*.

        (Plaintiffs' Exhibit No. 115 was marked for identification.)

BY MS. REED:

Q    Briana, do you recognize this document?

A     Yes.

Q    What is it?

A     It's an article about the school names being changed back to the Confederate ones.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    Do you recall providing statements to the *BBC* reporter around that time?

A    Yes.

Q    And are your statements in this article accurate?

A    Yes.

MS. REED:  Your Honor, plaintiffs move to admit Exhibit 115 for the limited purpose of showing Briana's then mental state at the time.

THE CLERK:  That was moved in yesterday.

THE COURT:  This one was moved in yesterday?  Okay. Any objection?

MR. FITZGERALD:  Same objection, Your Honor, but with that stipulation, we don't have an issue with it.

THE COURT:  Okay.  So no objection?

MR. FITZGERALD:  We object based on relevance and hearsay exception 803(3).

THE COURT:  Yes.  Thank you, Mr. Fitzgerald.

To the extent that the article reports about the lawsuit, it's not relevant.  I will -- and I won't consider it. But to the extent the article references the witness's testimony and it's reflective of her mental state at the time, I'll admit it under the hearsay exception 803(3) exception. And since it was only offered for that limited purpose, the exhibit will be -- Exhibit 115 will be admitted as such.

(Plaintiffs' Exhibit No. 115 was admitted.)

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

THE COURT:  Please proceed.

BY MS. REED:

Q    Briana, I'd like to direct you to Page 5 of the article. Can you please read the paragraphs that start with whenever I see?

A    Yes.  Whenever I see it, it makes me think of a time where I wouldn't have been welcomed at that school, referring to the fact that the school was designated Whites only from when it opened in 1960 until 1963 when it integrated.

Q    What is -- I'm sorry.  Is this a quote from you, Briana?

A    The first section is.  The second section is not.

Q    When you say whenever I see it, what is the it that you're referring to?

A    Yeah.  I'm just referring to the name Stonewall Jackson being on the front of the school.  Also the name being on signs that face the road that, you know, everyone has to drive by. Also at sporting events and things.  Different, you know -- you know, clothing items and different, you know, chants and things like that.

Q    How often do you -- did you, rather, encounter these references to Stonewall Jackson?

A    Every day.

Q    How did these encounters with the name Stonewall Jackson make you feel?

A    They just made me feel small and unwelcome and just unsafe

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

in a place where I should have felt very comfortable being able to attend every day.  And it's just -- and also the -- not -- not just the name that bothers me.  The -- you know, the fact that the names were changed to Mountain View to make everybody feel welcome and safe in the school and the school board knew that, and they still decided to change it back anyway despite that.  So it really just made me feel like I am not being supported by a school board that's supposed to support me and care about how I feel in the school environment.

Q    Did you ever experience feelings like this before the name Stonewall Jackson was reinstated?

A    I would say yes, I definitely -- being a Black person that attends a predominantly White school, these things, you know, they're just things you have to think about it.  You know, having anxiety about not knowing if people will have prejudice toward you, things like that.  And also just, you know, looking different from most people that you're friends with and things like that, looking different from most of your peers can have an impact on, you know, your self-esteem and things like that.

But I would say it was definitely amplified by -- by the decision to change the names back to Stonewall Jackson, and it made me feel like the school was becoming a safe space for, you know, people to be racist, for people to be close-minded, and so I would say that it definitely impacted me more after -- after the names were changed back.

Q    Did attending a school named Stonewall Jackson impact you academically at all?

A    No, it didn't impact me academically, but it definitely impacted my -- my mental health.  I had to think about these things.  I had to think about how I didn't feel comfortable, didn't feel, you know, seen in my community.  And it was kind of just something that I was like, I am going to succeed despite this.  And I definitely -- I mean, there were a lot of times where I was anxious or I was worried thinking about this, but I would say that I definitely had great support systems that also helped me.  So it was -- it was no small feat to succeed academically.  It was definitely hard.  But, yeah.

Q    Apologies.  I'm going to go back to the quote that you gave before.  I'll reread it to you.  Whenever I see it, it makes me think of a time where I would not have been welcome in the school.  Is that an accurate reflection of how you felt at the time?

A    Yes.

Q    Did attending a school named Stonewall Jackson ever make you feel insecure?

A    Yes, it definitely made me feel insecure because as far as I see it, having a school named after a Confederate general that was racist and didn't -- didn't want me to attend or wouldn't have wanted me to attend, it definitely make me feel just like I -- I just -- like I wasn't welcome there.  And so

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

definitely, like, having insecurities around, like, you know,
if the people you talk to will be discriminatory against you
because of your views, things like -- and things like that.

Q    Did attending a school named Stonewall Jackson change your
interaction with other students.

A    I would say it -- it did.  I -- I was always wary, you
know, about interacting with new people, but it was definitely
amplified, you know, as I had, you know, spoken out against the
name of the school being Stonewall Jackson.  It definitely made
me, you know, second-guess, you know, talking -- talking to
people, being open about how I feel, and things like that.  So
I would say it -- it definitely stopped me from probably
making -- making more friends that I might have otherwise.

Q    Why?  Why did it make you second-guess yourself or --

A    It made me second-guess myself because I -- I honestly
just would second-guess if I was even meant to be in the
building, be at the school in the first place, because the name
Stonewall Jackson was there to -- originally, and also now, to
make people second-guess.  Make Black people second-guess
whether they should be there, make Black people feel
uncomfortable and unwelcome.  So it's just -- it's this --
honestly, it's the same -- it's the same feelings reflected
now.

Q    Did you ever feel inferior to your White peers in any way
because of attending a school named Stonewall Jackson?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    I would say the only way that I felt inferior was in that I had to worry about these things.  I had to feel, you know, unwelcome and I had to worry about, you know, what people would think of me, what people would say.  And also, it's just knowing, you know, the history of slavery and how Black people were oppressed for so long in such a terrible way.  You know, and feeling that connection, personally, I feel like really just has a different impact than it might have on -- on -- on White students.

Q    You testified before that attending a school named Stonewall Jackson impacted your mental health.  Can you explain a little bit more about how?

A    Yeah.  It was -- it's mostly, like, I would just have more anxiety talking to new people.  More anxiety just being -- being there.  And also just having to feel like I wasn't welcome or didn't fit in.  Really can just -- it took a toll on my -- my -- my self-esteem and my self-worth.  And also, just always having to worry about if people are going to take you seriously or not.  Really just -- it kind of has an affect and it makes you become -- made me become kind of more introverted and -- yeah.

Q    Do you still have any of those feelings now?

A    I -- I definitely do.  You know, having these kind of interactions and, you know, having racist things happen to you, having, you know, the name Stonewall Jackson on the school and

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

seemingly not -- not the people who are supposed to care if you feel comfortable, they don't care, really just -- it can -- it's -- it's not something you -- you easily forget.  So I have definitely carried, like, some of that weariness, some of that, you know, unwillingness to kind of talk to new people or, you know, have, you know, certain conversations with people because you just -- you never know how they might react and it -- it definitely has carried.  It's not something that you kind of get rid of, especially the insecurity aspect.  You know, it -- it's really just -- it's -- it's definitely been hard to overcome those things.

Q    What would you like to happen as a result of this lawsuit?

A    I, first of all, would like for the names of the schools to be named, even if it's -- even if it's not -- not Mountain View again, just anything that is reflective of the community at large and is, you know, not something that has racist implications, not something that makes racist people think that this is a place where they should be comfortable expressing their ideals.  And I would just like the names to be something that makes everybody -- people who are visiting, anything -- feel comfortable in this community, because I -- I truly think that it's possible.

And I'd also just like more education about Black history and accurate history, because it seemed that that's lacking in a lot of our schools.  And -- yeah.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q      Thank you, Briana.

MS. REED:  No further questions, Your Honor.

THE COURT:  Any cross?

MR. FITZGERALD:  Yes, Your Honor.

Before I do, I'd request a one-minute break?

THE COURT:  Yes.  Let's take a five-minute break.

Ms. Brown, you don't know this, but while we're on break, since we're in the middle of your testimony, I need you to make sure that you don't speak to anyone about your testimony between the time the other side gets a chance to question you.  Okay?  And that includes the other plaintiffs or the lawyers on the plaintiffs' side.  Just don't talk to anybody about your testimony right now when we're in the middle of it.  Okay?

THE WITNESS:  Okay.

THE COURT:  All right.  Thank you.

Let's take a recess for five minutes.

(A recess was taken from 2:35 until 2:44)

THE COURT:  Thank you.

Ms. Brown, come on back up.  You are still under oath, okay?

Mr. Fitzgerald, cross-examination, please.

MR. FITZGERALD:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. FITZGERALD:

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    Hello again, Ms. Brown.

A    Hi.

Q    I hope you've been well since we last spoke at your deposition.  Your professors at UVA aren't working you too hard, are they?

A    No.

Q    Okay.

THE COURT:  Have you finished with exams, or are we right in the middle of it?

THE WITNESS:  I have one, yeah, on the 18th.

THE COURT:  On the 18th?

THE WITNESS:  Yes.

THE COURT:  I want to make sure you have enough time to study.

THE WITNESS:  Oh, I do.  Yeah.

THE COURT:  Good.  What class is it?

THE WITNESS:  It's African-American Studies.

THE COURT:  Okay.  Well, I wish you good luck with all your exams.

THE WITNESS:  Thank you.

BY MR. FITZGERALD:

Q    I'm sure you'll do well, Ms. Brown.  It's fair to say you're an excellent student, yes?

A    Yes.

Q    In fact, in your time attending Strasburg High School and

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

the Governor's School for 11th and 12th grade, you were practically a straight A student, yes?

A    Yes.

Q    Maybe a handful of B's and it looks like one C in precalculus?

A    Yeah.

Q    And that C in precalculus --

THE COURT:  Did you have to bring that up, Mr. Fitzgerald?

MR. FITZGERALD:  I wouldn't if it weren't relevant.

THE COURT:  Okay.

BY MR. FITZGERALD:

Q    I hate to dwell on it, but that C in precalculus, it had a happy ending.  Right?  The next year, you got B's in calculus?

A    Yes.

Q    So that was 12th grade that that happened?

A    Yes.

Q    You had an improvement from precalculus to calculus. Calculus is generally considered more difficult, more advanced level of math than precalculus.  Right?

A    I suppose.

Q    Okay.

THE COURT:  I never took calculus.  I wasn't smart enough.

THE WITNESS:  Good.  You don't want to.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

BY MR. FITZGERALD:

Q    So it's fair to say your grades were superior, including in a more advanced math when the school was named Stonewall Jackson?

A    Yes.

Q    So you just testified that the name Stonewall Jackson made you feel uncomfortable.  Setting aside the name for a moment, the people within the building did not do anything to make you feel unwelcome, did they?

A    No.

Q    You testified that the name change to Stonewall Jackson High School created a, quote, safe space for racial prejudice, but that didn't actually happen, that racial prejudice, did it?

A    It didn't.

Q    Ultimately, your GPA when you graduated from Strasburg High School was a very impressive 4.2.  Isn't that right?

A    Yes.

Q    And now you are enrolled as a student at the most prestigious university in Virginia and one of the most prestigious universities in the whole country?

A    Yes.

Q    So you would agree that your grades do not reflect that your educational experience at Strasburg High School or the Governor's School was diminished in any way by the name change during your senior year?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    I feel that my educational experience was diminished because I wasn't able to complete those classes and get those good grades without having to worry about racial prejudice or being in a school that felt like that it was fostering a safe place for racists.

Q    Okay.  So your thoughts on this have changed since your deposition?

A    No.

Q    Okay.  Because in your deposition, you said that no, your educational experience had not been diminished.

A    I would say that my --

THE COURT:  I'm sorry.  Is there an objection?

MS. REED:  Objection.  Counsel is referring to a question that causes the plaintiff to make a legal conclusion. It's not necessarily asking about her actual experience.  I believe the question that counsel asked the witness today is specifically about her own educational experience.  The separate question that he's referencing from her deposition is a question that called the defendant -- I'm sorry, called the plaintiff to make a legal conclusion for which she's not qualified to make.

THE COURT:  Well, there is an appropriate way.  If you want to cross examine someone based on prior testimony that you believe is inconsistent, show it to the witness and there's an appropriate way to do it, Mr. Fitzgerald.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

MR. FITZGERALD:  Yes, Your Honor.  Absolutely.

THE COURT:  I'll sustain the objection.  Let's start over.

MR. FITZGERALD:  Yes, Your Honor.  May I approach the witness?

THE COURT:  Yes, please.

MR. FITZGERALD:  I'll just project it on the ELMO if that's all right.

THE COURT:  Even better.  We've taught you something today.

MR. FITZGERALD:  Yes, you did.

BY MR. FITZGERALD:

Q    Ms. Brown, you see this packet of paper here?

A    Yes.

Q    Based on the cover there, do you recognize this document? I'll refer you to a specific page in a minute.

A    Yes, I do believe I recognize it.  Yeah.

Q    Okay.  And is this a copy of your deposition transcript from --

A    Yes.  Yeah.

Q    -- from September 26, 2025?

A    Yes.

Q    Okay.  And this here, is that your signature certifying that you have read your deposition, made any changes or corrections that were deemed necessary, and approved the same

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

as now written?

A      Yes.

Q      Okay.  So I want to direct your attention to deposition Page 14, lines 14 through 19.  So here's Page 14.  You see that?

A      Yes.

Q      Okay.  So starting on Line 14, I asked you, and coming back to, like -- I hate that I used the word like there -- and coming back to, like, the whole theme of this case, do you feel that your grades reflect that your educational experience was diminished in any way by the school name change at the school that housed Governor's School.  And your answer on Line 19 was no, full stop.  Is that accurate?

A      Yes.

Q      Thank you.

       You would also agree that the decision to restore the Confederate names did not damage or remove any educational opportunities for you?

A      Yes, I would say that it didn't remove any educational opportunities for me, but I would say it definitely damaged the educational opportunities that I was offered, and it was always something that had to be in the back of my mind when I was at school.  So, I would say that it did damage my educational experience in the fact that it was extra anxiety, extra -- you know, unsure.  Extra feelings of feeling like I was unsure if I

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

belong in the school.  So in that way, it did damage my experience.

Q    Okay.  So if I'm understanding you today, as you sit on the stand, your opinion has changed from when you answered that question at your deposition?

A    I would say that my opinion has not changed.  The way that the question was asked was changed.

Q    Okay.  Fair enough.  Let's take a look at deposition Page 46.  Sorry, 45.  So do you see down there on Line 22 of Page 45 of your deposition transcript where I asked, okay.  That is good to know.  So does the school board's decision -- did the school board's decision to restore the names, did it damage -- and this is Page 46 -- your educational opportunities or remove any educational opportunities for you?  What's your answer there on Line 3?

A    No.

Q    Thank you.  You also participated in a number of extracurricular activities during your high school experience at Strasburg High School, yes?

A    Yes.

Q    And you participated in those as a Strasburg Ram, yes?

A    Yes.

Q    At no time were you ever a Stonewall Jackson General.  Correct?

A    Correct.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    As Strasburg, you competed in a STEM competition called Envirothon?

A    No.  I competed in the Envirothon as a Governor's School student.

Q    Thank you.  I appreciate that correction.  You ran cross-country all four years at Strasburg.  Is that right?

A    Yes.

Q    In your senior year, you were the team manager for the cross-country team.  Is that right?

A    Yes.

Q    And your senior year, that's when the school that housed the Governor's School was named Stonewall Jackson High School?

A    Yes.

Q    You were the president of the Strasburg High School Music Honor Society your senior year?

A    No, not my senior year.  My senior year, I was the secretary.  But my junior year, I was the president.

Q    You're making me look terrible, Ms. Brown, but I appreciate the corrections.  And you were the vice president of the National Honor Society.  Is that right?

A    Yes.

Q    So you would agree the name change between your junior and senior year at Strasburg High School and the Governor's School, it did not prevent you from having a rewarding educational experience?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A    I would say that it didn't prevent me from having a rewarding experience, but it -- I had to make that experience for myself despite these names and having to feel like I didn't belong and having to feel like I wasn't welcome.

Q    I understand.  And other than occasionally competing against Stonewall Jackson High School in cross-country and having to see the school name or initials on their uniforms and gear, your extracurricular experience was not negatively impacted by the school name change?

A    Yes, I would say -- I would say other than that, no, it wasn't negatively impacted.

Q    I'm sorry.  I didn't understand.

A    Other than competing against -- against Stonewall Jackson and seeing the -- the gear and the memorabilia.  Yeah, other than that, it didn't affect me in another way.

Q    It didn't negatively impact your extracurricular experience?

A    It negatively impacted in that way, yes.

Q    Okay.  I understand.  So only in that way did it negatively impact your extracurricular experience?

A    Yes, for -- yes.

Q    Thanks.  And even then, your discomfort when competing against Stonewall Jackson in cross-country had nothing to do with the attitudes or behaviors of the student competitors at Stonewall Jackson?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A    I would say yes, it didn't have much to do with any one person saying anything to me or any actions having been taken against me.  But I would say that it's just the principle of having to worry that those things may happen and also -- I mean, I would think that it -- you know, it shouldn't -- it shouldn't have to happen.

Q    Okay.  But to be clear, those things -- meaning, you know, behaviors or attitudes of players, coaches, fans, those things -- they didn't actually make you uncomfortable?

A    They -- yes, they -- they didn't happen.

Q    It was simply the name of the school, Stonewall Jackson High School, that you had to see when you were competing?

A    The name and all the implications behind it, yes.

Q    Sure.  You see yourself as an activist.  Right?

A    Yes.

Q    And you believe the role of an activist is to, quote, stand up and fight for what you believe in if you think there's something wrong happening in the world?

A    Yes.

Q    And you believed, and you still believe, that restoring the Confederate names of the schools was wrong?

A    Yes.

Q    But you didn't stand up and comment at the school board meeting when the names were restored, did you?

A    I didn't.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q    In fact, you didn't even attend that meeting, did you?

A    I didn't.  I -- I was sick at the time.

Q    And you've never actually spoken to any of the board members, have you, about this issue?

A    I haven't -- no, I haven't -- I haven't personally, no.

Q    Or Principal Mike Dorman of Stonewall Jackson High School?

A    No, I haven't -- I haven't talked to him about this, no.

Q    At the time of your deposition in this case, you didn't know when Stonewall Jackson High School was named?

A    Yes, I -- I wasn't sure of the exact date, no.

Q    You only knew that it was somewhere in the second half of the 20th century?

A    Sure, yes.

Q    You had not reviewed any school board meeting minutes from that time period?

A    No.

Q    You did not know when Stonewall Jackson High School began to be desegregated?

A    No, I didn't know an exact date, no.

Q    You did not know when Stonewall Jackson High School became integrated?

A    No.

Q    You did not know where or when you had learned the notion that Stonewall Jackson High School was named in order to resist desegregation?

A    Can you repeat that?

Q    Sure.  You did not know where or when you had learned the notion that Stonewall Jackson High School was named in order to resist desegregation?

A    Yes.

Q    You were first contacted by the NAACP in the summer of 2024.  Is that right?

A    Yes.

Q    And that was through their legal counsel?

        MS. BANNER:  Objection.  Calls for attorney-client privileged information.

        THE COURT:  No.  The fact of a contact is not privileged.  The communications during the contact would be privileged.  The fact of a communication is not privileged.  Okay?

        MS. BANNER:  Okay.

        THE COURT:  But what is said is plainly privileged.  Okay?

        MR. FITZGERALD:  Agreed, Your Honor.

BY MR. FITZGERALD:

Q    So you were first contacted by the NAACP in the summer of 2024 through legal counsel.  Is that right?

A    Yes.

Q    And that was shortly after the vote to restore the Confederate school names?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A      Yes.

Q      No further questions.

            THE COURT:  Thank you, Mr. Fitzgerald.

            Ms. Reed, is there any redirect that you'd like to do?

            MS. REED:  Yes, Your Honor.

            THE COURT:  Okay.

                    REDIRECT EXAMINATION

BY MS. REED:

Q    Briana, Mr. Fitzgerald asked you do you feel that your grades reflect that your educational experience was diminished in any way by the name change.  Can you remind us what your grades were like?

A      My grades were -- were very good.  Mostly -- mostly A's and some B's and the C.

Q    And you testified in your deposition that you did not feel that your grades reflected that your educational experience was diminished by the school name change.  Right?

A      Yes.  My -- I didn't feel like my grades reflected that, yeah.

Q    I'd like to give you an opportunity to explain how your educational opportunity was diminished despite the fact that that was not reflected in your grades.

A      Yeah.  So my educational experience, it had, you know, a lot of -- of good moments, but despite that, there's still, you

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

know, a lot of times when I felt unwelcome.  I felt like I didn't belong.  I felt like there -- you know, this wasn't a place where I was meant to be.  Not a place where I was welcome to learn like everybody else.  And I would say that despite all of that, I didn't let -- I didn't let those -- you know, those anxieties and things reflect in my grades.

And it wasn't easy.  It's not like it was a breeze.  But I chose to continue to do well in school and continue to be involved in things despite that, just to show that, you know, even though you -- you feel like you don't belong, even though you feel discriminated against, like, you can still succeed and beat the odds even though, you know, you sometimes feel like the world wasn't -- wasn't -- wasn't meant for you.

So I -- I would just say yeah, I -- I continued to receive good grades and be involved just kind of, you know, to show everyone that despite -- despite these issues, I could still succeed and, you know, anybody else who's experiencing similar situations, they can still succeed as well.

MS. REED:  Nothing further, Your Honor.  Thank you, Briana.

THE COURT:  Okay.  May this witness be excused?

MS. REED:  She may.

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Okay.  Good luck in your exam.  Really nice to meet you, and take care of yourself.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

THE WITNESS:  Thank you.  You, too.

THE COURT:  All right.

Call your next witness.

Yeah.  Counsel, approach.  Counsel, approach.

(Bench conference.)

THE COURT:  I just want to say this.  To be fair to each side, yesterday, I chided the defendants when one witness -- one lawyer was handling the witness and the other one objected, and the plaintiffs just did the same thing.  So, you know, it's not written down in the rules of evidence, but let's make sure that the lawyers who are handling the witness and the lawyers who are doing the objections -- we only want one lawyer speaking per witness.  Let's not tag-team it.  Okay?

MS. BANNER:  If you want to chide me on the public record, you can.

THE COURT:  No, no, no, no.

MR. FITZGERALD:  Same.  That's just ignorance on my part.

THE COURT:  No, it's all right.  We're all, you know, trying to do the best we can.  I just thought I would just make that point.  Thank you.

MS. BANNER:  No, I appreciate it.  Thank you, Your Honor.

(End of bench conference.)

MR. GREELEY:  Thank you, Your Honor.  So the parties

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

will now play by video designation -- Sam Greeley, Your Honor, for the plaintiffs.  The parties will now play --

THE COURT:  I've seen your name.

MR. GREELEY:  What's that?

THE COURT:  I've seen your name.

MR. GREELEY:  Excellent.  Hopefully for good things.

So, Your Honor, the parties will now play by video designation from the deposition of Lewis Michael Scheibe who is the corporate representative of the Coalition for Better Schools, which is the third party that conducted the survey in 2024 as has been discussed in this case.

Your Honor, the parties have conferred, and I'm happy to report there's no objections for the Court to resolve with respect to the deposition designations that we'll play for you today.  Also, the parties have agreed to move into evidence without objection certain exhibits that will be discussed in the video of the deposition designations that we'll be playing today.

THE COURT:  Okay.  So that the record is clear as to which portions of this deposition are being played for the Court, is there a way you're identifying it by page and line number?  Could we do that later, just to make sure that -- because I don't know whether -- or are you -- do you have the deposition itself, the video of it, that you can make -- that we can attach to the record somehow?  Obviously, it will be

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

transcribed.  She'll transcribe it.

So, let's do this.  After this -- you don't have to
do it today.  But after this, if you could file some sort of
stipulation or something that just -- next week's fine -- to
indicate which pages and lines of this particular video
deposition are being read.  Okay?

MR. GREELEY:  Yes.

(Court reporter clarification.)

THE COURT:  Oh, so you're not taking it down?  Okay.
So yeah, I really need then -- what we're going to need as part
of the record in this case -- because we need to make a record
-- we'll need to make sure that we have the deposition and that
-- so that the Court of Appeals can follow along, that we have
the pages and lines that are read as -- because the Court of
Appeals will need to know what pages and lines I considered.
Okay?

MR. GREELEY:  I understand, Your Honor.

THE COURT:  And you can file that next week.  That's
totally fine.

MR. GREELEY:  Just one point of clarification, Your
Honor.  Would you prefer to see the full transcript with the
parties' designations highlighted?  I believe we've done that
previously.

THE COURT:  Yeah.  That's great.  Yeah, if you can do
that, that's very helpful, Mr. Greeley.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

MR. GREELEY:  Thank you.  Thank you, Your Honor.

To ensure a clean record before we get started, if acceptable to the Court, we think it would make sense for me to identify the exhibits now for the record.

THE COURT:  Great.

MR. GREELEY:  So the first will be what's been marked as PTX, Plaintiffs' Exhibit 72 and that's an April 3, 2024, letter from the Coalition For Better Schools to the school board requesting that they restore the Confederate names.

There's Plaintiffs' Exhibit 125 and 126, 128, and -- sorry, 128.  Those three are survey cards that were filled out, Coalition For Better Schools survey cards that were filled out.

There is what was previously marked as Plaintiffs' Exhibit 129, and that's a document from the Coalition For Better Schools tabulating the survey results.

There's Plaintiffs' Exhibit 130.  That's a March 13th, 2024, email about the survey cards.

There's Plaintiffs' Exhibit 131, which is a March 7, 2024, Freedom Press Facebook post about the survey cards.

There is Exhibit 132, which is an April 20, 2024, Freedom Press Facebook post.

There's Exhibit 133, which is a December 2020 edition of the Freedom Press.

There's Plaintiffs' Exhibit 135, which is May 8, 2022, e-mail from Michael Scheibe to the school board.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

137, which is an April 4, 2022, e-mail from Keven Walker to the school board.

Plaintiffs' Exhibit 138.  That's a May 5, 2022, e-mail from Keven Walker to Dennis Barlow.

There's Plaintiffs' Exhibit 139, which is a February 27th, 2024, text messages from Michael Scheibe.

Plaintiffs' Exhibit 140, April 8, 2024, e-mail from the Freedom Press.

There's Plaintiffs' Exhibit 298, which is a Coalition for Better Schools, the homepage, their website homepage.

299 is the Freedom Press homepage online.

Plaintiffs' Exhibit 300 is the Freedom Press Facebook page.

Then Plaintiffs' Exhibit 301, 302, 303, 304, 305, and 306 are also survey cards, filled out survey cards from the Coalition for Better Schools.

307 is a March 12, 2024, Freedom Press Facebook post.

Almost getting to the end here.

308 is a June 2023 edition of the Freedom Press.

Plaintiffs' Exhibit 317 is a March 6, 2024, Freedom Press Facebook post about the survey cards.

And last is Plaintiffs' Exhibit 318, which is a September 1, 2021, e-mail from Dennis Barlow to Brad Pollock.

(Plaintiffs' Exhibit Nos. 72, 125, 126, 128, 129, 130, 131, 132, 133, 135, 137, 138, 139, 140, 298, 299, 300, 301,

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

302, 303, 304, 305, 306, 307, 308, 317, and 318 were marked for identification.)

THE COURT:  Okay.  And with regard -- is that it for exhibits?

MR. GREELEY:  Yes, Your Honor.

THE COURT:  Have the parties agreed that those -- have those already been admitted, or are they going to be moved now?

MR. GREELEY:  Plaintiffs intend to move those now, Your Honor.

MR. FITZGERALD:  We have no objection, Your Honor.

THE COURT:  Okay.  You just need to check, Mr. Greeley, and make sure the clerk's got them all.  And these are the ones I wrote down, so check with your notes right here.  125, 126, 127 -- no.  125, 126, 128.

MR. GREELEY:  Correct.

THE COURT:  129, 130, 131, 133, 137, 139, 298, 299, 300, 301, 302, 303, 305, 306, 307, 308, 318.  Did I miss any?

MR. GREELEY:  I think there's a few missed in there.

THE COURT:  I'm not surprised.

Tell you what.  Let's make this easy.  Read them off again, just one by one so we can make sure we have them all.  Okay?

MR. GREELEY:  Appreciate that, Your Honor.

So we've got 72, 125, 126, 128, 129, 130, 131, 132,

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

133, 135, 137, 138, 139, 140, 298, 299, 300, 301, 302, 303,

304, 305, 306, 307, 308, 317, and 318.

THE COURT:  Wow.  I missed a lot.

MR. GREELEY:  Apologies, Your Honor.  I think that's

on me.

THE COURT:  Mr. Greeley, I appreciate you pointing

out my inability to multitask.  Okay.  That's great.

All those will be admitted without objection.  Okay?

(Plaintiffs' Exhibit Nos. 72, 125, 126, 128, 129, 130,

131, 132, 133, 135, 137, 138, 139, 140, 298, 299, 300, 301,

302, 303, 304, 305, 306, 307, 308, 317, and 318 were admitted.)

THE COURT:  All right.

MR. GREELEY:  Thank you, your Honor.

THE COURT:  You're going to play it now?

MR. GREELEY:  Yes.  One more piece of housekeeping.

We've prepared a binder of the exhibits discussed in

the deposition for the Court and for the Court's clerk and for

opposing counsel.  And I'll note that the documents in the

binder, they've been stamped with the trial exhibit number that

we just gave you for admission.  However, to allow the Court to

find the exhibits during the video -- I'm sorry Judge, I'll

provide that to you in just a moment.  You don't already --

THE COURT:  Oh, you haven't given this to us yet?

MR. GREELEY:  Haven't given it to you yet.

THE COURT:  Okay.  All right.  See, I was going to

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

juggle all these exhibit books, but if you've got a special exhibit book for this deposition, that makes it easy for my feeble mind to grasp.

MR. GREELEY:  Well, no comment there, Your Honor.

May I approach the bench to bring up the -- I disagree with that, actually.  I do comment.

THE COURT:  Don't give Mr. Guynn the chance to comment.

MR. GREELEY:  May I bring up the --

THE COURT:  Yes, please.

Okay.  Thank you, Mr. Greeley.

MR. GREELEY:  Thank you, Your Honor.

And so Your Honor, we'll be playing the video.  We anticipate that -- well, we know that it will run about two hours and 30 minutes.  When playing the video, as each exhibit is announced, would the Court like us to pause the video for a few seconds to allow the Court to turn to the document and we can resume the video without comment from counsel?

THE COURT:  Are the exhibit numbers used in the depositions the same as the exhibit numbers for the trial exhibits?

MR. GREELEY:  They are not, Your Honor.  That's why we provided the binders.  You'll see that the tabs have the -- it's in order.  The tabs in the binders I just provided are in the order of the deposition.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

THE COURT:  No, don't pause the video.  If I get lost and I need to pause, I'll let you know.

MR. FITZGERALD:  Your Honor?

THE COURT:  Mr. Fitzgerald?

MR. FITZGERALD:  May I just propose that unless plaintiffs have any objection to this that we allow the Court to watch this video on its own time?  I'm just only concerned about the weather south of us.

MR. GREELEY:  Yeah, Your Honor, this is our last -- this is our last witness --

THE COURT:  No, let's play it.

MR. FITZGERALD:  Okay.

THE COURT:  Let's play it because there is -- not only is there the Court's ability to hear the evidence, the public has the right to hear the evidence that's to be considered by the Court in open court.  So I have no issue with that.

Let's play it and we'll traverse the weather on the way home together, Mr. Fitzgerald.

MR. GREELEY:  And Your Honor, one last very quick housekeeping point.

During the playing of the video, we don't plan to publish the exhibits on the monitor.  Some of the exhibits have personal identifying information that we plan to redact and provide to the Court.  We can provide the Court those updated

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

exhibits this weekend via Box.

THE COURT:  Okay.  That's fine.

MR. GREELEY:  Thank you, Your Honor.

THE COURT:  Mr. Greeley, it's not the whole deposition.  Right?

MR. GREELEY:  That's correct.  It is not the whole deposition.

THE COURT:  It's just parts of the deposition?  He's going to designate which parts they're playing.

This is what we'll do.  You get those designations of pages and lines with the deposition itself, and then the court reporter can put it in this record.  Okay?

Thank you.  Let's watch it now.  Let's do it.  It's only 3:30.  Let's go.  We'll be done by 6 o'clock.

MR. GREELEY:  Thank you, Your Honor.

(Excerpts from a video deposition were played in open court.  The text that follows was taken directly from the certified transcript of the deposition as taken and have not been altered in any way by this reporter.)

VIDEOGRAPHER:  Today's date is October 23rd, 2025.  The time is 9:02 a.m.  This remote video deposition is being held in the matter of the Virginia State Conference NAACP, et al., versus the County School Board of Shenandoah County, in the United States District Court for the Western District of Virginia.  The deponent is Lewis Michael Scheibe, II.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.   And did the Coalition collect from anyone else's -- collect anyone else's documents in response to the subpoena?

A.   I believe our -- from -- we put in some documents regarding the name change cause.  So there were some billings and things that came back, and invoices, from the one who acts as our treasurer, Mr. Moomaw.

Q.   And who is Mr. Moomaw?  What's his name?  What's his full name?

A.   Richard Moomaw, and he is the treasurer for the Coalition.

Q.   So turning to your background, am I correct that you currently live in Shenandoah County?

A.   Yes.

Q.   And how long have you lived there?

A.   We moved in September 1st, 2017.

Q.   Is that for both of those organizations?

A.   No.  The more -- I've been working with the Shenandoah Valley Battlefields Foundation for roughly eight years, and the American Battlefield Trust, about four.

Q.   And what's your role at the Shenandoah organization?

A.   Well, I -- I work for them as a contractor, doing maintenance and monument restoration.

Q.   And how about for the other organization?

A.   Same thing.  And I also organize living history programs for both, as well as, you know, probably too many to

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

list, smaller battlefield preservation organizations, to raise money for them.

Q. And what's -- what is living history? What do you mean by that?

A. Uniforms, wearing uniforms, teaching how artillery works, doing kids programs, kids camps, all sorts of things. But typically in the uniform or dress of the period that we're presenting.

Q. And is that multiple periods that you're presenting?

A. It's typically the Civil War years. I mean, 1850 to 1866, in that range.

Q. And is that -- maybe colloquially, but is that known as kind of Civil War re-enactments?

A. Yeah, they're very similar. Living histories don't have battles. Re-enactments typically do. But I've been involved with both.

Q. And you mentioned wearing the dress of the period. What dress is that? What are you referring to?

A. Variation of -- depends on what we're presenting -- or representing that weekend, but federal infantry, artillery, most of the time. And then sometimes I'll portray a Confederate infantry or artillerist, depending on where we're doing the living history.

Q. All right. Mr. Scheibe, can you see the document?

A. Yes.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.   And what is this?

A.   It's -- looks like a screenshot from our website, the Coalition's website.  And I can't read what the print says.

Q.   And so, zooming back out, what is the Coalition for Better Schools?

A.   Exactly what it says there.  It's a group of citizens who came together to help improve the education of the kids in Shenandoah County.

Q.   And when was the Coalition founded?

A.   It was very loose until, I guess, last year.  So, I mean, there's -- it was a loose-knit organization until we started to solicit funds, because we had to incorporate and everything per the rules of the state in Virginia.  So there is no exact start date.

Q.   Roughly when would you say it came into being as a loose-knit organization?

A.   2022, somewhere around there.

Q.   And who are the original officers of the Coalition?

A.   Rick Moomaw and myself.  We are the only officers.

Q.   Was anyone else authorized to act on behalf of the Coalition?

A.   No.

Q.   And is that -- is that still the case?  Is it still the case that it's you and Mr. Moomaw?

A.   Yes.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.   Are there any other officers or any other individuals who can act on behalf of the Coalition?

A.   No.

Q.   And what's your role in the Coalition?  President and -- is what it says on the -- the incorporation documents -- and the spokesperson.

Q.   And what is Mr. Moomaw's role?  I think you said treasurer?

A.   Treasurer.  Yeah, he handles the money and any donations that would come into the bank account.

Q.   Does he have any other role?

A.   No.

Q.   And are there any other official positions at the Coalition?

A.   No.

Q.   And so, I guess, what was the Coalition's -- what was the kind of animating reason11 that the Coalition was founded in or around 2022?

A.   The original name changes of the schools is what brought citizens together, which was in 2020 and 2021.

Q.   And by "the original changes," do you mean removing the names Stonewall Jackson and Ashby-Lee from the high school and elementary school, respectively?

A.   Yes.

Q.   And going back to your role in the Coalition, has

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

that role changed at all over the past few years?

A.    Yes.

Q.    How so?

A.    In the beginning, I wrote some articles here and there and helped with the Freedom Press, and now I basically run the whole thing, as far as, you know, the -- the everyday operations or what the Coalition puts forward.

Q.    Mr. Scheibe, do you recognize this document?

A.    Yes.

Q.    And what is it?

A.    That is the -- looks like the cover page from the Freedom Press website.

Q.    And what is the Freedom Press?

A.    It's a newspaper that is put out in Shenandoah County.

Q.    And who puts it out?

A.    Myself and the Coalition does the funding.

Q.    And when was the Freedom Press founded?

A.    It started before I got involved, and I don't know the exact date, but they started writing newspapers not long after the name change in July of 2020.

Q.    And who founded it?

A.    Whoever -- the loose-knit group of people that were getting together.  I don't know who originated it.

Q.    And for the Freedom Press specifically, who was that

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

loose-knit group?

A.   Citizens who were concerned about how the name change was facilitated.

Q.   How is it distributed?

A.   U.S. mail.

Q.   And who is it distributed to?

A.   Every Shenandoah County address.

Q.   Is that residential addresses only, or is it all addresses across the board?

A.   All addresses.

Q.   And what was the purpose of the Freedom Press?

A.   To bring information and knowledge of the current events to people in Shenandoah County who wouldn't get it from elsewhere.

Q.   And what do you mean by "current events"?

A.   Anything from the name issues to county finance, and now it focuses a lot on the improvement of Shenandoah County public schools.

Q.   Why did you originally want to contribute to the Freedom Press before you took it over?

A.   I felt I had different perspective to give, and I like to write.

Q.   And why did you feel you had a different perspective?

A.   Because I'm new to the area.  I'm from Philadelphia, or the outskirts of Philadelphia, so it gives a different

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

perspective than people who have grown up in Shenandoah County.

Q.   And what's the relationship between the Freedom Press and the Coalition?

A.   the Coalition puts out the Freedom Press.  I do.  Now.

Q.   Okay.  And if we look -- it's a little bit small, but if we look in the top right corner of this document, I see a gmail address, fpmedia62@gmail.com.  Is that the e-mail address of the Freedom Press?

A.   Yes.

Q.   Do you manage that e-mail account?

A.   Yes.

Q.   Does anyone else manage it or have access to it?

A.   No.

Q.   Are there any other e-mail accounts associated with the Coalition or the Freedom Press?

A.   There is one new one that was just started in, let's say, June of this year, and I think it's freedompress@gmail.com.

Q.   Mr. Scheibe, do you recognize this document?

A.   Yes.

Q.   And what is it?

A.   It's the Freedom Press Facebook page.

Q.   And this is the Facebook page that we were just referring to that was linked on the Freedom Press website?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.    Yes.

Q.    Who manages the Freedom Press Facebook page?

A.    Myself primarily.  And another member of the Coalition.

Q.    And so that other member is -- is -- are they authorized to post on behalf of the Freedom Press?

A.    Yes.

Q.    So, Mr. Scheibe, am I correct that, for the Freedom Press Facebook page, the only people who have the ability to access and post are yourself and one other individual?  Is that correct?

A.    Yes.

Q.    Is that other individual authorized to make posts on the Facebook page?

A.    On occasion, yes.

Q.    Is there any oversight by you as to what that other person posts?

A.    Yes.

Q.    And what's that oversight?

A.    I have to okay it, or if they're a surrogate for me, and if I'm not available, they may post something, which I will either accept or remove later.

Q.    Are they able to post anything without your approval?

A.    No.

Q.    And who would you say drafts the majority of the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

posts on the Freedom Press website?

A.   Me.

Q.   All right.  I think we can take this -- take this exhibit down.

So, Mr. Scheibe, did the Coalition for Better Schools conduct a survey in March and April of 2024 about the preferred school name for what was then Mountain View High School and Honey Run Elementary School?

A.   Yes.

Q.   Mr. Scheibe, do you recognize this document?

A.   Could we blow it up?

Q.   Sure.

A.   Yes, I recognize it.

Q.   And what is this document?

A.   That was the request for the School Board to reconsider and readdress the name change of the two schools.

Q.   And it says, Subject:  Request to restore historic school names:  Stonewall Jackson High School and Ashby-Lee Elementary School.  Is that correct?

A.   Yes.

Q.   And it's dated April 3rd, 2024.  Is that when this letter was sent?

A.   Yes.

Q.   Who drafted this letter?

A.   I did.

Q.    What was the goal of sending this letter?

A.    To request that the School Board consider discussing restoring the names of the two schools.

Q.    Was this letter sent to the members of the Shenandoah County Public School Board?

A.    Yes.

Q.    Was it sent to anyone else?

A.    The superintendent of Shenandoah County public schools.

Q.    How was it sent to them?

A.    E-mail.

Q.    And if we look at -- if we look at the second paragraph there, it says, As you already know, we have conducted a survey of the citizens in Districts 1, 2, and the Edinburg area of District on their choice of school names. What does that mean?

A.    Well, it was well known throughout the county, when people started receiving the survey cards, that there was a survey that had been conducted.  And then the areas are the ZIP codes and postal areas that would attend those two specific schools.

Q.    Did the survey go to all the residents of Districts 1, 2, and the Edinburg area of District 3?

A.    To the best of my knowledge, yes.

Q.    I think earlier you testified that the Freedom Press

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

goes to all addresses, not just residential addresses.  Was that the case with the survey cards as well?

A.   No.  Oh, I'm sorry, yes, it went to all addresses in that area.

Q.   Including nonresidential addresses, correct?

A.   Yes.

Q.   And am I correct that Districts 1 and 2 attend Stonewall Jackson High School and Ashby-Lee Elementary School?

A.   Yes.

Q.   Is Edinburg in District 3?

A.   Part of it is in District 3.  Part of it is in District 2.  The county district lines do not correspond with postal routes.  So there was no way, unless it was specifically addressed, to get it just to people in that district.  So there was a small amount of overlap.

Q.   And what do you mean by "overlap"?

A.   Some cards would have been mailed to people on -- and specifically one side of the road is District 3, which goes to Central High School.  The other side of the road goes to District 2, which would be Stonewall Jackson High School.

Q.   And the mailings were done based on the ZIP codes, which don't necessarily correspond with where someone attends a school; is that correct?

A.   Yes.

Q.   And aside from Districts 1 and 2 and part of District

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

3, none of the other districts attend Ashby-Lee Elementary School or Stonewall Jackson High School; is that correct?

A.   No, no part of District 3 goes to that school.  The -- the reason that was listed is because, unfortunately, we couldn't limit it.  So only Districts 1 and 2 go to those two schools.

Q.   And 8,000, what's that refer to?

A.   How many cards were sent out.  I don't know how many specific people live at each address.

Q.   And how did the Coalition decide to send survey cards to these specific postal codes?

A.   We -- we used the addresses of people that are -- we used all the addresses in Districts 1 and 2 that would have gone to the schools.

Q.   And why just those districts?

A.   Because we -- I felt that those -- getting a pulse of how they felt about the name on their schools was the most important.

Q.   Has a survey been conducted since then?

A.   Not by us, but yes.

Q.   And who conducted that survey?

A.   I'm not 100 percent sure, but it was a telephonic survey that came out of -- from someone in Woodstock.

Q.   And when was that?

A.   I'm not sure exactly who it was.  Not long after ours

came out.  So I'm going to say sometime in May or June, if I remember correctly.

Q.    May or June of 2024?

A.    Yes, yes, sorry.

Q.    And that was of the -- to your knowledge,  that was of the full county?

A.    Yes.

Q.    So, Mr. Scheibe, how was the Coalition survey conducted?

A.    We sent out self-addressed -- or, I mean, postage-returned and return-address survey cards to all the addresses in Districts 1 and 2.

Q.    And when were the survey cards mailed?

A.    I don't remember the specific date, but I think it was March of 2024, late March.

Q.    And was there a deadline for returning the surveys?

A.    Yes.

Q.    And do you remember what that deadline was?

A.    No, but it's listed on the card, if I remember correctly.

Q.    Okay.  Yeah, and I think we can show some documents that will refresh the recollection on there.  But, roughly, what was the window of time between sending the surveys and asking for them to be returned?

A.    Two weeks, I believe.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.   And who chose that period?

A.   I did.

Q.   And why did you choose that period?

A.   Because I wanted to have -- have prompt responses and not let it linger on.  And doing a lot of studying on surveys, that's usually an adequate time period.

Q.   You mentioned doing studying on surveys.  Who did that studying?

A.   I did.

Q.   And how did you -- how did you study that?

A.   I called and spoke to some survey companies and used online methods and researched scientific surveys.

Q.   What do you mean by "researched scientific surveys"?

A.   I looked up they're -- how they're conducted and how different survey companies conducted surveys.

Q.   Had you ever conducted a survey before?

A.   Yes.

Q.   And what survey was that?

A.   It was a survey of living historians and re-enactors.

Q.   And when was that?

A.   Geez, 2012 or '13.

Q.   And what was the purpose of that survey?

A.   To get wants and likes of different living history outfits and interest in -- trying to get them more interested in preserving battlefields.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.    Any other surveys?

A.    No.

Q.    And we covered your current work history. But at any point in the past, have you been employed by a company that runs surveys?

A.    No.

Q.    And you mentioned your educational history, but what was -- what was your field of study or intended major?

A.    History and business administration.

Q.    You're not a professional survey maker; is that correct?

A.    No.  I mean, yes, I am not.

Q.    Are you a statistician?

A.    No.

Q.    And you mentioned that you did some research on how to conduct surveys.  But do you have any formal education in how to conduct surveys?

A.    No.

Q.    For the survey, who came up with the idea of doing a survey?

A.    Members of the Coalition and the citizens -- it had been asked for for almost four years at that point.

Q.    What do you mean "the citizens"?

A.    People -- after the name change in the beginning, people were asking and asking for the School Board and the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

County to survey the citizens about the decision.

Q.    How were you aware of those requests?

A.    School Board meetings, social media, and verbal communications with people complaining about not being asked about that decision.

Q.    Did you personally attend School Board meetings?

A.    Yes.

Q.    When did you start attending School Board meetings?

A.    In the beginning, they were virtual when all this happened, because it was during the COVID shutdowns.  So, I mean, when I started going personally in the building, it would have been after the COVID restrictions had come up.

Q.    Did you attend any of the School Board sessions that were conducted virtually?

A.    Yes.

Q.    And when did you start doing that?

A.    I don't remember the exact ones, but 2022, I guess.

Q.    2022 is when you started attending School Board meetings?

A.     Yes.  And I may -- I think I did a virtual one or two in 2021, but I don't remember the exact dates.

Q.    So what was your role in coming up with the survey?

A.    I was the one who found somebody to put it out for us, and that was really it.  I -- I facilitated getting it done.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.    Who put the survey together?

A.    The company, which, you know, I don't remember the name of, but we -- we reached out to a company who does mail orders and surveys.

Q.    And who provided the contents of the surveys to that company?

A.    I did.  The text and what we wanted it to say.

Q.    Were there meetings to discuss planning the survey?

A.    No.

Q.    Were there phone calls related to planning the survey?

A.    Yes.

Q.    Was there other correspondence related to planning the survey?

A.    There was some brief e-mail, if I recall correctly.

Q.    How many people were involved in those phone calls planning the survey?

A.    A few members of the Coalition.

Q.    And could you quantify "a few" for me?

A.    Three or four.

Q.    And when did these -- when did this planning take place?

A.    Within -- or prior to when the survey went out, probably over two or three weeks' time.  And, I'm sorry, let me correct something.  There was one in-person meeting where we

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

discussed maybe we should do a survey.  And that was probably six weeks or so before we did it.

Q.   And was it only Coalition -- I guess, is there a former -- a formal membership list of the Coalition?  Not asking for the names, but is there a list?

A.   No, not -- nothing formal.

Q.   Is there any formal determination for who is in the Coalition or isn't in the Coalition as a member?

A.   Not formal, but there's only certain people that would come to a meeting or something, if we have one.

Q.   Would non-Coalition members potentially go to meetings hosted by the Coalition?

A.   If -- if invited, yes.

Q.   Did you invite any non-Coalition members to the meeting to discuss the survey?

A.   No, not to my -- no.

Q.   All right.  Mr. Scheibe, do you recognize this document?

A.   Yes.

Q.   And what is it?

A.   It's the return-address side of the surveys that we mailed out.

Q.   And what were the instructions provided for filling out the survey card?

A.   To check off which -- which name you preferred and

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

write your names on it and mail it back to the Coalition.

Q.    So turning to this card specifically, the back of the card says, The names can be restored at no expense to the taxpayer.  And in parentheses, it says, (Please indicate your choice of one name for each school.)  And then below that, there are boxes for Stonewall Jackson High School, a box for Ashby-Lee Elementary School, a box for Mountain View High School, and a box for Honey Run Elementary School.  And then below that, there's a column for names and then another column for -- that says address, and it lists that as optional; is that correct?

A.    Yes.

Q.    And so what was the process -- what was the process for counting the -- for counting the votes for these survey cards?

A.    After the time had expired and we -- that we asked for them to be returned by, we had a group of Coalition members and some other citizens as witnesses, and we tabulated the results in person.

Q.    And those citizen witnesses, they were  non-Coalition members?

A.    Correct.

Q.    And who were they?  What are their names?

A.    I don't recall who they were.  I just know that they were local citizens.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.    Did you know them personally?  Well, scratch that.
Were you present at the counting of the surveys?

A.    Yes.

Q.    Was everyone counting the surveys in the same room?

A.    Yes.

Q.    And how long did that process take?

A.    About four hours.

Q.    And did you know everybody in the room?

A.    No.

Q.    Who -- so you were not -- you were not personally
familiar with everybody in the room?

A.    No.

Q.    How many people were you not familiar with?

A.    Four.

Q.    Out of the how many people you said were in the room?

A.    Well, I didn't say.  But 12, I think.

Q.    And the four people that you were not familiar with,
were those Coalition members?

A.    No.  Although, once again, there is no formal
membership in the Coalition, so they weren't officers, no.

Q.    And do you recall any of their names?

A.    No, I don't.

Q.    Have you seen them since the counting of these
surveys, at any point in time?

A.    One person came up to me and said hello at the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Shenandoah County fair, and I didn't recognize him, and he said, I was there to count the surveys. But I still don't remember his name.

Q. And who invited the nonmembers?

A. I'm not sure.

Q. Who was involved in selecting the nonmembers to join -- or the citizens to watch the counting of the survey?

A. Not me. So I'm not sure, but it would have been somebody else in the Coalition or that attends our meetings.

Q. So looking at this survey card here, looks like there's a check in the box for Stonewall Jackson High School and a check in the box for Ashby-Lee Elementary School. How would these results have been tabulated?

A. With nothing on the lower lines, we would have put it in the anonymous category. We tabulated them differently, with one vote for each.

Q. And why did you put them in the anonymous -- in an anonymous category?

A. Because there's no names on it.

Q. And with no names and no address, would any of the counters know who submitted this survey card?

A. No.

Q. Would they know where the person lived who returned the survey card?

A. No.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.   Would they know if someone had -- if this was a duplicate vote of somebody who had already submitted a survey card?

A.   No.

Q.   And you have a survey card.  It lists the address as -- it says Address, and then in parentheses, it says (optional).  Why did it list the address as optional?

A.   To -- to allow people to vote who didn't want to put down their addresses.  It was mass mailed, so we weren't looking to create a mailing list or anything like that.

Q.   And if there's no address listed, there's nothing on the front of the mailer that would indicate where the survey card came from; is that correct?  There would be no information on the survey card to indicate the address or location of the person who filled it out; is that correct?

A.   Correct.

Q.   It could have been someone outside of Districts 1 and 2, correct?

A.   If they were able to obtain one from a mailing address in Districts 1 and 2, yes.

Q.   And what was the verification process for connecting the names with the listed address?

A.   There was not one.

Q.   And am I correct that there's no verification process for confirming that any of these individuals lived in Districts

1 or 2?

A.    No.

Q.    There was no verification process?

A.    Other than -- than receiving a card, no.

Q.    And was there a process for checking that person's work?

A.    Yes.

Q.    And what was that process?

A.    The card would be handed to another person, and they would -- they would look it over, and then a third person would look it over to verify that it was correct. And if there was a question, the card would have been set aside and the votes would not have been counted until we came back and looked at it again.

Q.    So there's -- am I understanding you that there were effectively two rounds of counting? One was for all the cards, and then there's a second round just for cards that had been set aside that had questions?

A.    Yes. And those were -- there was three.  The one on the first -- first one, as you described.  And then the questionable ones, we counted twice.

Q.    Were there protocols in place for how to count names generally with these survey cards?

A.    Yes.

Q.    And were those written down?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A.    No, they were discussed at -- when we began the counting.

Q.    They weren't discussed before you did the counting?

A.    No.

MR. GREELEY:  All right.  Let's go to Tab M.

MS. GREENSTEIN:  This will be Exhibit 119.

(Exhibit 119 was marked for identification.)

BY MR. GREELEY:

Q.    All right.  And so looking at this survey card, looking the front page, it looks like there are different names written all over the front of the card.  It looks like at least 20 names, by my quick count.  Are you seeing that as well, Mr. Scheibe?

A.    Yes, I am.

Q.    And if we go to the back page, looks like more -- more names written down, maybe 15, maybe 20 written down. Without holding you to the exact numbers, of course, how would these have been counted?  How would this survey card have been counted?

A.    I -- if I remember correctly, we wouldn't have counted all these names, because there were so many and they were all over the paper.  But if we did count them, which I don't remember, it would have been, you know, individual -- you know, each individual name would have counted as a vote for the respective schools.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.    And it looks -- it looks like on the right there, looks like a 5-1.  51.  Is it possible that that's the number of names that are listed on this survey card?

A.    Possible, yes.  I didn't handle the cards, so I don't -- I don't remember that specifically.

Q.    And what was your role while the cards were being counted?

A.    I tab -- I had tabulated -- each time a card was written off, I wrote how many votes for each one.

Q.    And how did you do that tabulation?

A.    On sheets of -- notebook paper at that point, sheets of paper.

Q.    You did it by hand; is that correct?

A.    Yes, yes.

VIDEOGRAPHER:  Did you say Q, sir?

MR. GREELEY:  Yes, Q.  Q as in question.

MS. GREENSTEIN:  This will be Exhibit 121.

(Exhibit 121 was marked for identification.)

BY MR. GREELEY:

Q.    And so it looks like this one was 3 postmarked March 18th, 2024; is that correct?

A.    Yes.

Q.    And if we go to the second page on this one, I see two names listed on the Name column, and I'm seeing Stonewall Jackson checked and Mountain View High School checked and no

checks for either of the elementary schools.  Are you seeing the same thing?

A.    Yes, I am.

Q.    And how would this have been counted?

A.    I believe it would have been counted as one vote for Stonewall Jackson and one vote for Mountain View.

Q.    And was this scenario -- was this scenario covered in your precounting protocol?

A.    I don't believe -- I don't remember addressing this until it came up, but I believe the consensus was we would count one for each.

Q.    And that consensus, for scenarios like this, you have to come up with them kind of on the fly; is that fair to say?

A.    Yes, with some discussion.

MS. GREENSTEIN:  This will be Exhibit 123.

(Exhibit 123 was marked for identification.)

BY MR. GREELEY:

Q.    And it looks like this one was mailed on March 25th, 2024; is that correct?

A.    Yes.

Q.    Go to the second page.  All right.  So it looks like I see a check for Mountain View High School, a check for Honey Run Elementary School.  And then under the name, I read:  D3 resident.  Will not sign due to potential backlash.  Do you see that?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A.   Yes, I do.

Q.   And then under address, there's no address listed, but it -- instead, it's written, if it was truly about the process, then names would stay but process could change ... Did I capture that correctly?

A.   Yes.

Q.   And how many votes would this have counted for?

A.   One for Mountain View, one for Honey Run.  But there's a possibility we would not have counted it because it says District 3, which does not go to the school, so this one may have been discarded.  But kept, obviously.

Q.   Right.  Physically kept.  When you say that it may have been discarded for D3, what do you -- what do you mean "may have been"?

A.   If we -- if -- remember -- if I'm remembering correctly, if they were non -- if they were obvious nonresidents of District 1 or 2, we would have set those votes aside and not put them into the tabulation, whether they were for -- no matter what they were for or against.

Q.   And would those have been tabulated elsewhere?  Would those have been notated anywhere, how many cards were --

A.   I believe, when we stored them, we put them in a Ziploc bag, you know, all together.

Q.   So you say obvious cases.  How about for cards that came back with a name, and then the address, it just said

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Edinburg; how would those have been kept?

A.    If that happened, we -- since some Edinburg post offices go to the school, we would have counted it.

Q.    Even if it only said Edinburg and didn't have any specific address with it or postal?

A.    I believe so, yes.

Q.    Were you aware of anybody being concerned about backlash from filling out the survey cards?

A.    Other than what was written here, no, and somebody did verbally tell me that at one point.

Q.    And who was that -- who told you that?

A.    Russell Kohrs called me and said -- you know, asked about the survey, and I assured him that there would be nothing coming from us, and that it would stay anonymous.  So none of these names were given out to.

Q.    But they were available to the 12 people who were reviewing all the cards, correct?

A.    Not all 12.  The three people that looked -- read the cards and read them were the only ones who really looked at them.  I did have access to them later, but I never looked through all of these cards.

Q.    And for the non-Coalition members who were observing, would they have been able to see and check the names?

A.    Well, they would have been able to see them to verify that the card -- how it was read was correct.  There was no

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

record by the witnesses, to my knowledge, of who voted for what.

Q.   And I believe you testified previously that you don't know any of those -- you didn't know any of those individuals at the time and can't name any of those individuals presently?

A.   Correct.

Q.   So to -- if I'm understanding correctly, there are at least -- sorry, was it three or four individuals?  Was it four?

A.   There were three people reading and verifying the cards, and -- I'm sorry, and there were two people who were there only as witnesses.

Q.   And I think you previously testified there were four people, though, that you did not know; is that correct?

A.   Yes.

Q.   And they would potentially have access to and have seen the names on these cards and how people voted?

A.   Yes.

Q.   Did you have any nondisclosure agreements with any of the people present at the counting?

A.   Nothing written.  Verbal.

Q.   And what was the verbal nondisclosure agreement?

A.   That, you know, all this was done confidentially, and that we -- that we did -- were going to protect the anonymity of anybody who sent their cards in.

Q.   And what was the enforcement mechanism for that

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

confidentiality agreement?

A.    People's word.

(Exhibit 124 was marked for identification.)

BY MR. GREELEY:

Q.    If we go to the second page, looks like there is a check for Mountain View, a check for Honey Run.  Under the name, it says, and I quote, This is not necessary.  And under the address, it says, quote, I do not want to be on your target list for disagreeing with you.  Did I read that correctly?

A.    Yes.

Q.    How many votes would this have been counted as?

A.    One for Mountain View, one for Honey Run.

Q.    And what do you understand the person to mean, I do not want to be on your target list for disagreeing with you?

A.    I -- I don't know, because I don't know of any target list or, you know, any -- any blowback or repercussions from anybody associated with - with the Coalition.  So I think that's pure speculation.

Q.    Speculation on the part of the person who wrote this card?

A.    Yes.

Q.    Fair to say the person is expressing  concerns that they would be targeted or have negative consequences from if they had added their name and address to the survey card?

A.    That seems to be the -- their intent, yeah.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

MR. GREELEY:  All right.  Looking at -- let's go to Tab Y.  Sorry, go ahead.

MS. GREENSTEIN:  This will be Exhibit 125.

(Exhibit 125 was marked for identification.)

BY MR. GREELEY:

Q.    So here, I see a check for Mountain View, a check for Honey Run.  No address listed, but under the Names section, it says, Three citizens.  And then, quote, No name - would only be harassed.  How many votes would this count as?

A.    Three for each school checked.

Q.    So aside from these examples that we've shown, do you recall seeing messages like these written on the cards returned for votes with votes for Stonewall Jackson -- well, let me -- let me back up.  Do you recall seeing any other messages like these on the survey cards?

A.    I didn't personally see them, but I do vaguely recall some being read off, and I believe there may have been some also that people didn't want to give their name for voting or Stonewall or Ashby-Lee either, if I remember correctly.

Q.    And do you remember -- for that bucket, do you remember them raising concerns about being harassed?

A.    No, I don't.  I don't recall any of the -- you know, any specifics being read off like that.

Q.    All right.  Mr. Scheibe, so this was -- do you recognize this document?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.   I think so, yes.  Yeah, this was the -- I recognize

it now.

Q.   Okay.

MR. GREELEY:  And let's -- let's go ahead and mark this

exhibit Exhibit 126.

(Exhibit 126 was marked for identification.)

BY MR. GREELEY:

Q.   And what -- what is this document?

A.   It's the -- the tabulation or, you know, kind of the

verification of who -- who was in the room and who -- who

counted and verified that the surveys were counted the way that

-- that -- fairly.

Q.   Does this reflect the two witnesses, the

non-Coalition member witnesses, who you said were there to

verify the accuracy of the vote counting?

A.   Yes.

Q.   And do you remember who these non-Coalition member

witnesses are, now that you've seen this document?

A.   No, I do not.

Q.   So if we zoom in on that top text block.  You know,

reading this handwriting, what I read is, I -- and then the

name is redacted -- was present for the counting of the name

change surveys.  The process was entirely fair and unbiased.

There were 4 sets of eyes that viewed every ballot; 2 that

sorted the ballots and 3 that counted the ballots.  I am

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

satisfied in the accuracy of the count and the honesty of all involved.  So can you explain for me what it means that there were four sets of eyes that viewed every ballot, two that sorted the ballots, and three that counted the ballots?

A.   One person was reading them.  And then the -- there was a second person and then the two witnesses that looked at each ballot, and then the -- that would be the four sets of eyes.  And then when they were handed over into each respective pile, you know, so versus, you know, here's -- here's ones for Mountain View, here's ones for Stonewall.  Those two peopled sorted them, and then myself and two others counted the ballots via verbal, you know, so they would call out how many votes of each, and we would create tally sheets, which you would show, and then we counted them that way.

BY MR. GREELEY:

Q.   So the three people creating the tally sheets were doing so independently; they were duplicating each other's work?

A.   Yes.

Q.   I think you said that there were -- well, you testified previously, there were non-Coalition members counting the surveys.  Were any School Board members present for the counting of the surveys?

A.   No.

Q.   And what was the process for determining who would be

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

present for the counting?

A.   People who wanted to come and be a part of it.  I mean, we -- we had discussed it, and different coalition members had -- or people who came to Coalition meetings, I should say, voiced interest in helping count them.

Q.   And how about, was the counting process discussed other than Coalition meetings?

A.   Not to my knowledge.  Well, I'm sorry, the counting process wasn't discussed until we kind of -- until we got there.  It became some laborious.  If we had told them beforehand, I bet you we probably wouldn't have had that many people.

Q.   I think you said there were 12 people total?

A.   I -- yes.  I think there was a couple who were just in the room but were not part of the process.

Q.   And I think you testified, it took four hours?

A.   Or more.  It was -- I remember it being at least four hours.

Q.   When did you start, roughly?

A.   5:00 p.m., I think.

Q.   And that four-hour period, did that include the three counting periods that we discussed earlier?

A.   Yes.

Q.   I guess, to put it differently, was -- was all the counting conducted on the same day?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.    Almost all of it.  We got surveys that came in late that were put aside on -- as late entries after the deadline, and we did count those on another date.

Q.    And when was that?

A.    I don't remember the date, but it would have been, I think, maybe ten days, a week or ten days after this original counting.

Q.    And was it the same individuals involved, all of them?

A.    No, there was only three of us.  It was Mr. Moomaw, myself, and another person who is a member of the Coalition.

Q.    And so then that counted cards that had been received after the deadline; is that correct?

A.    Yes.

Q.    How many cards were received after the deadline?

A.    I don't remember.

Q.    Do you have a rough approximation for how many were received and that you counted on that day?

A.    No, but they were tallied separately.  But I'm going to say maybe 30, maybe 30 cards, maybe a little more.  Somewhere in that time frame -- or that -- that area.

Q.    Okay.  And how long did that process take?

A.    An hour, maybe.  Because we did count them a couple times to make sure that they were right.  And when we stored them, they were stored separately in a different bag or, you

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

know, however we had them put together.

Q.   And then would have stopped there?  There was no third counting; is that correct?

A.   No, no, we -- thinking back, we did receive, I don't know, probably a dozen to 20 after that, that we did not count, and we didn't -- we didn't store.  We just discarded.

Q.   Let's go down to Bates Number 497.  All right.  So this -- this reflects the tally marks for votes for the names; is that correct?

A.   Yes.

Q.   Is this one of the sheets that you filled out?

A.   I believe so.

Q.   And it looks like there's totals on the bottom of this list.  Who -- who checked the totals that you had added up?

A.   The counters.  The three of us collectively would. And then we would verbally, you know, go back and say, Do you -- you have the same amount?  That sort of thing.

Q.   So am I understanding correct that you would count up the votes that you tallied on your sheet, and then you would check that total with the other two people who were also doing their tallies?  Is that correct

A.   Yes.

Q.   Okay.  All right.  Get to PDF page -- okay.  Let's go to PDF page 111.  Mr. Scheibe, do you recognize this document?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.    Yes, that's the outside of the survey or the -- you know, that would have been seen on the9 recipient's end.

Q.    Okay.  And if we go to the second page, or the next page, is this the back side of those survey cards?

A.    Yes.

Q.    So the section -- the section at the top with the three Confederate generals, was that attached to the surveys that people then mailed in?

A.    No, that -- it was perforated, if I remember correctly.  So the cards, that was half of it.  The bottom part came back, which on the back side of that had the choices.  The top part was discarded.

Q.    So I believe you mentioned -- sorry.  Go ahead.

A.    No, the -- yeah, the -- the parts with the -- with the images did not get returned to us.

Q.    And so, based on this, if we go up one more page, we go up a page to 601, at the top, what I'm seeing is -- says The Freedom Press and then has an icon.  And then below that, it says, From the Coalition for Better Schools.  And then in bold upper case text, it says, OPEN AT ONCE.  And then below that, it says, You can decide how -- all caps -- YOUR SCHOOLS WILL BE NAMED!  RETURN BY DATE OF MARCH 15TH.  Did I read that correctly?

A.    Yes.

Q.    And so does this reflect that the ballots were to be

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

returned by March 15th?

A.    Yes.

Q.    And I think when we were going through survey cards, we saw some that were returned on March -- that were postmarked March 18th, or even postmarked in April; is that correct?

A.    Yes.

Q.    So those would all have been returned after the deadline, correct?

A.    Yes.

Q.    And does this refresh your recollection of when that second count of late ballots occurred?

A.    Yes.

Q.    And when did that occur?

A.    I don't remember the exact date.  I believe -- I mean, it would have been after the -- the last April ones that we had on there, so -- but we also didn't count them on the 15th.  And I believe that I posted online to give people some more time because the post office hadn't delivered them all at the same time and everything, so we gave it another week or so, if I remember correctly.

Q.    Mr. Scheibe, do you recognize this document?

A.    Yes.

Q.    And what is it?

A.    It was an e-mail received that somebody wanted a survey, and they didn't -- or post office isn't the most

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

efficient, so, evidently, they hadn't received one.

Q.    And so this -- it looks like this is dated March 13th, 2024.  The deadline on the face of the cards was for March 15th, 2024, but the cards had been mailed out sometime before that; is that correct?

A.    Yes.

Q.    Okay.  And if we get rid of this zoom-in.  And if we go to the next page, zoom in there.  Fair to say this is a similar request?

A.    Yes.

Q.    This is on March 7th, 2024.  And then we can scroll out of this and look at the last page.  And fair to say this is also a request to receive a survey?

A.    Yes.

Q.    Who responded to these e-mail requests?

A.    I did.

Q.    And what did you respond?

A.    If I recall, I responded to them to find out where they lived, and I hand-delivered a few of the surveys.

Q.    About how many of these e-mails did you receive from people who said that they didn't receive a survey but wanted one?

A.    A few.  This may be all of them.  I think I delivered three individually, so this -- this is probably all of them.

Q.    Are you aware of other people living in Districts 1

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

and 2 who didn't receive surveys?

A.   Not specifically, but later down the road I had heard that there were some.

Q.   And when was that that you heard this?

A.   Gosh.  Probably June, July.  I mean, it  was here or there.  It wasn't in any significant Number.  One or two.

Q.   That's June and July 2024?

A.   Yes, yeah, it would have been after the survey was back, and after this June 6th date.  And, specifically, it would have been somebody saying, Oh, my neighbor, or somebody, said they didn't get a survey.

MS. GREENSTEIN:  That will be Exhibit 128.

(Exhibit 128 was marked for identification.)

BY MR. GREELEY:

Q.   And we can scroll in on the top section of text there.  Mr. Scheibe, are you familiar with this post here?

A.   Yes.

Q.   And what is it?

A.   It was a post letting people -- alerting them to look out for the surveys, or if you hadn't received one, you know, to let us know and we would try to get you one.

Q.   And did you write this post?

A.   Yes, I did.

Q.   And so if I read the kind of middle text there, it says, Please return the surveys signed.  We will not be

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

publishing or sharing who chose what with anyone.  Filling your name out only verifies your vote.  Did I read that correctly?

A.  Yes, you did.

Q.  But, ultimately, you did end up counting unsigned ballots; is that correct?

A.  Yes, we did.  And I can further explain that.  We were not going to do any, but when we started tabulating them, the amounts that came in for the name -- to change the names back, it would have been even more overwhelming.  So taking into account that people may have been nervous about signing their name, we decided to count the anonymous ones, too.

Q.  Regardless of whether they voted for Stonewall Jackson or for Mountain View; is that correct?

A.  Yes, but the -- I would imagine that the -- it would have been way more slanted, had we not -- that was to help the Mountain View side.

Q.  Because people who voted for Stonewall Jackson and/or Ashby-Lee tended to include their names on the ballot; is that correct?

A.  Yes, it is.

MS. GREENSTEIN:  That will be Exhibit 129.

(Exhibit 129 was marked for identification.)

BY MR. GREELEY:

Q.  Mr. Scheibe, do you recognize this document?

A.  Yes.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.   And am I correct that this is a Facebook post from the Freedom Press on March 7th, 2024?

A.   Yes, it is.

Q.   And at the top, it says, and I quote, Due to the inconsistencies of USPS delivery, you may have not received the survey as of yet.  Is that the kind of postal service issue that you were referring to earlier?

A.   Absolutely, yes.

MS. GREENSTEIN:  That will be Exhibit 130.

(Exhibit 130 was marked for identification.)

BY MR. GREELEY:

Q.   If we scroll in the top there.  Do you recognize this document, Mr. Scheibe?

A.   Yes.

Q.   Am I correct this is a Facebook post from the Freedom Press dated March 12th, 2024?

A.   Yes.

Q.   And did you write this post?

A.   Yes, I did.

Q.   And so what were the post -- can you describe more about the postal issues that you were explaining?

A.   Well, I mean, there -- some of the postal -- some people in District 1 or 2 just didn't get them, even though their neighbors did.  So I would assume that was mail carrier, you know, inconsistencies.  But this case here was because

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

there was an entire postal route that part of it was in District 2 and part of it was in District 3 that was overlooked.  So we had to do a secondary mailing to those areas.

Q.    Looks like this post is on March 12th.  When did that additional mailing go out?

A.    Shortly thereafter.  I believe this was when this really came to light, so it would have been soon thereafter; but we then gave them two weeks, which is what puts a lot of those late ones into that April time frame.

Q.    And you said you gave them two weeks.  What does that mean?

A.    We tried to, when we sent the -- the surveys out, to have a two-week, or roughly -- I think it was two.  It was roughly two weeks for people to receive them, write them, and then mail them back to us.

Q.    And for this later mailing or this kind of remedial mailing, you used the same cards, correct?

A.    We did.  We did not change the dates on there.  At least I don't think we did.  But I'm -- we may have.  But I think they were the same cards.

Q.    So it's fair to say someone, if they received the card, they would have seen that the deadline was March 15th, even if they received the card after that date?

A.    I believe so.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.   And they may not have responded if they thought the deadline had passed; is that fair?

A.   Yes.

Q.   Do you know if the person who wrote that they didn't get a card, do you know if they did e-mail their names of choice to the Freedom Press e-mail address?

A.   I don't recall, but they may have.  There was two or three, maybe, that did that.

Q.   And how, if at all, were those counted?

A.   Separately.

Q.   What do you mean "separately"?

A.   We didn't put them into -- I mean, we -- we had a category somewhere in our tabulations of e-mails, and I believe it was sent a couple of pictures of people's names on a paper. And then we got another one or two like where they just wrote it  on a notebook paper and sent -- and physically mailed it to the Freedom Press' PO Box.

Q.   So those were tabulated separately, but they were still included in the overall totals, Correct?

A.   I think so.

MR. GREELEY:  All right.  Let's look at Tab FF.

MS. GREENSTEIN:  That will be Exhibit 131.

(Exhibit 131 was marked for identification.)

BY MR. GREELEY:

Q.   Mr. Scheibe, do you recognize this document?

A.    Yes, I do.

Q.    And am I correct that this is a Facebook status update from the Freedom Press dated April 20th, 2024?

A.    Yep.  Yes.

Q.    Okay.  And it says, and I quote, The Save the Names people have put out a text survey as well.  It's anonymous and sent out to various people, but not all in Shenandoah County.  And so breaking that down, what -- what or who are the Save the Names people?

A.    The -- the group of citizens and people that worked with the 2020 School Board to change the names in the first place.  That's a Facebook group of -- of people that wanted it changed.

Q.    That wanted it changed in 2020?

A.    Yes, yeah, that wanted the names Stonewall Jackson and Ashby-Lee removed originally.

Q.    And how were you aware of that Facebook group?

A.    When the first -- when it first came up, I was a member of it.  I looked at both sides.  So I -- I'm aware of that group.  And I would hear from them on occasion after I had started writing for the Freedom Press, et cetera.

Q.    Were you a member of that group?

A.    I was.

Q.    And when was that that you were a member of the group?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.   Right after the names -- they voted to change the names.  So in 2020-ish.

Q.   And so after the names were changed, what was the focus of that group?

A.   To -- to further -- to further get support for keeping -- for the changing the names.  I mean, I don't -- you know, I can't really speak for their purpose, but they were pro-Mountain View.  And they were large in trying to determine the new names at that point.

Q.   And so why -- I guess, why were you involved in that group at that time?

A.   I was involved because I was looking at both sides of the issue.

Q.   And what was the other side of the issue at that point?

A.   The ones who did not want the names changed away from Stonewall Jackson and Ashby-Lee.

     -- looking back at this, the Save the Names people in the beginning were the people who wanted the names kept the same.  But then when the restoration stuff -- was about to happen, it -- they kind of switched spots.

Q.   Yeah, I think it's fair to say there's a -- there's some flip-flopping?

A.   Yes.  Yeah, and, I mean, yeah, you know, so now that I'm looking at that, that makes it look like it was the

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

original people who were trying to save the names, but it wasn't.

Q.   And I think you previously testified about this -- this survey that they sent out to the county; is that correct?

A.   Yes.

Q.   And is this the survey that you were referring to?

A.   Yes.

Q.   And you note that the survey -- sorry.  Did you write this post?

A.   Yes, I did.

Q.   Okay.  And so you wrote that the survey, quote, it's anonymous and sent out to various people, but not all in Shenandoah County.  What did you mean that "it's anonymous"?

A.   Well, it -- no one knew where it was coming from, and people thought it was coming from us, that we were doing a telephonic one, so I got a lot of communications, and I said, No, it has nothing to do -- you know, We didn't do this one. And I got calls, because it was done via telephone, from people who did not live in Shenandoah County who were getting -- who got the -- the names, and then people in Shenandoah County, like my wife, who has a -- you know, a Pennsylvania area code, she didn't get the survey.

Q.   And with that survey, did it identify Save the Names as the group behind it?

A.   Negative.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.    Did you receive the survey?

A.    No, I did not.  Not directly, but I was sent a link to it.

Q.    And then the next line says, Interestingly enough, it is discriminatory as well, as it only permits you to answer as binary, end quote.  What does that mean?

A.    It was sarcasm.  From myself to the people who were saying that our survey was -- was not all-inclusive.

Q.    And why are people saying that the Freedom Press or Coalition survey was discriminatory?

A.    They didn't make specifics.  They just said that it was.

Q.    And you're saying that the Save the Names survey was discriminatory because it permits you to answer -- "it only permits you to answer as binary."  What does "answer as binary" mean?

A.    There was -- a number of people brought that up to me when they received the call, you know so that -- that was just -- it was sarcasm, meaning it would have excluded nonbinary people.

Q.    Okay.  So you're not referring to the choices. You're not referring to the name-change choices.  You're referring to identifying -- the identification -- the gender identification of the people who responded to the survey; is that correct?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A.    Yes.

Q.    Okay.  And then at the bottom, it says, quote, Fill it out, though.  We want fair results if you receive it!  Did I read that correctly?

A.    Yes.

Q.    Do you think people did vote in the survey because of that -- the note that was included in your post?

A.    I have no idea.

Q.    Okay.  All right.  We can take this exhibit down. And let's go to -- let's go back to Exhibit 126.  And We can go to PDF -- we can go to PDF page 111.

Q.    And the language right below that, From Coalition for Better Schools, OPEN AT ONCE, You can decide how YOUR SCHOOLS WILL BE NAMED!  RETURN BY DATE OF MARCH 15TH, did you generate that text, or did the company generate that text?

A.    The company did.

Q.    And what parameters did you give them for them to generate that text?

A.    We gave them a general synopsis of what we wanted it to say, and then they sent us back the mockup and we worked from there.

Q.    And did you edit the mockup?

A.    I believe we did once, and the edit would have been to put the Freedom Press logo on there because it would have been recognized.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.    And, ultimately, you approved all the content on the survey cards, correct?

A.    Yes.

Q.    Fair to say that people were more familiar with the Freedom Press than they were with the Coalition?

A.    Yes.

Q.    And, publicly, there's no -- was there any mention of the membership of the Freedom Press or the membership of the Coalition?

A.    No.

Q.    Is it fair to say that some members of the community agree with the Freedom Press and the articles that it contains?

A.    Yes.

Q.    And it's fair to say that some members of the community disagree with the Freedom Press?

A.    Yes.

Q.    And that some people, some members of the community, would strongly disagree with the positions taken in the Freedom Press; is that fair?

A.    Yes.

Q.    Is it also fair to say that if someone receives a postcard from the Freedom Press and they disagree with the Freedom Press generally, they may not be inclined to respond to that postcard?  Is take fair?

THE WITNESS:  I mean, possibly.  You know, I can't really

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

answer for individuals, because there are clearly people who, by your term, strongly disagree with the Freedom Press that returned their survey cards.

BY MR. GREELEY:

Q.  But it's fair to say some people may not have, because of the Freedom Press branding?

A.  Yes.

Q.  And looking at some of the text there, it says, You can decide how YOUR SCHOOLS WILL BE NAMED!  Did I read that correct?

A.  Yes.

Q.  And at that point, both the high school and the elementary school did have names; is that correct?

A.  Yes.

Q.  And the names were Honey View -- Mountain View High School and Honey Run Elementary School; is that correct?

A.  Yes.

Q.  So if the schools already had names, is it fair to say some people may not respond to a survey looking for different names for the schools?

A.  I imagine so, yes.

Q.  And when it says restored, that only refers to Stonewall Jackson and Ashby-Lee, those names, correct?

A.  Yes.

Q.  So if someone doesn't want those names restored, they

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

may not respond, correct?

A.    Yes.

Q.    And I believe that, subsequently, the Coalition for Better Schools was responsible for funding the return of the names Stonewall Jackson High School and Ashby-Lee to the school buildings' signage, jerseys, and other places; is that correct?

THE WITNESS:  Yes.

Q.    Is it fair to say people in the community are concerned about the expenditures of school funds on changing the names of the schools?

A.    I imagine so, yes.

Q.    Is it fair to say someone may be skeptical of the claim that the names could be changed, once again, at no expense to the taxpayer?

A.    Absolutely, because that was portrayed by the 2021 School Board, and they used taxpayer dollars, so that was a very big discussion point, yes, sir.

Q.    So fair to say, if someone is skeptical that the names can be changed at no expense to the taxpayer, they may not want to be involved in the process because they don't want those funds spent; it that correct?

THE WITNESS:  Possibly.  I mean -- yes, I imagine that some people could feel that way.

BY MR. GREELEY:

Q.    So if we go to the second page, which is Bates Number

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

CBS000602, looks like at the top of this part of the mailer, it includes images of Stonewall Jackson, Robert E. Lee, and Turner Ashby; is that correct?

A.   Yes.

Q.   And those individuals are who the schools were originally named after; is that correct?

A.   Yes.

Q.   And they were all generals, Confederate generals; is that correct?

A.   Yes.

Q.   Is it fair to say that some people object to the Confederacy?

THE WITNESS:   Yes.

BY MR. GREELEY:

Q.   Why did the Coalition put these images on the mailers?

A.   The design company putting out the mailers did.   We did not.

Q.   And why did the Coalition approve those images being put on the mailers?

A.   We didn't -- I mean, I'm answering for the Coalition? Because that's what the majority wanted to be put on there, after they saw the mockup.

Q.   And in your personal capacity, did you approve the inclusion of those images on the cards?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.   I would have preferred that they were the symbols of the school, the SJ and the Ashby-Lee logo over the Confederate ones.

Q.   Did you have concerns that people receiving the mailers would be turned off by seeing the images of the Confederate?

A.   I -- in retrospect, possibly, but at the time, I thought it would have been better to have the high school, you know, especially the letters SJ and stuff, which is more of a part of the community than the images of these fellows.

Q.   Would you also have included the Mountain View and Honey Run logos?

A.   I hadn't thought of that, but possibly.

Q.   Is it possible people wouldn't have voted or wouldn't have participated in the survey that included clear Confederate iconography?

A.   Possibly, but it was more to the point, from my own perspective, that I bet you that over three-quarters, or maybe more, speculating, but they don't know who -- what Turner Ashby looked like.

Q.   And so below the Confederate generals, it says, and I quote, With support from the Coalition for Better Schools and the Freedom Press, you have8 elected a new School Board for Shenandoah County, end quote.  Is that referring to the three new School Board members that were elected in 2024?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A.    Yes.

Q.    Was it also referring to the three new School Board members who had been elected in 2022?

A.    Yes.

Q.    Fair to say that not everybody voted for those new School Board members in Shenandoah County; is that correct?

A.    Yes.

Q.    And what is the -- what is the relevance of saying "a new School Board"?

A.    The School Board and superintendent that changed the names originally, none of them were running for re-election. And the superintendent retired.

Q.    Am I correct that some of the new School Board members ran on a platform of restoring the Confederate names? Is that correct?

A.    Not as their entire platform, but we did ask the question where they stood on it.

Q.    And some of them stood for restoring the Confederate names, correct?

A.    Yes.  Although they stood for the names, yes, for restoring them.

Q.    What was the -- Mr. Scheibe, what was the response rate for the surveys?

A.    13 -- little over 13 percent, if I remember correctly.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.   Out of how many surveys that went out?

A.   I think you had that number.  The 8,000.

Q.   8,000, yeah.  Doesn't -- doesn't the fact that only 13 percent of the people responded indicate that people may have been turned off by the survey and chose not to respond?

A.   I can't speculate why -- why they wouldn't.  So maybe.

Q.   For the survey itself, the options given were either Stonewall Jackson or Mountain View, or the options were Ashby-Lee or Honey Run, correct?

A.   Correct.

Q.   There's no option to choose a different name; is that correct?

A.   That's correct.

Q.   Why is that?  Why is that not an option?

A.   Because the intent of us getting the School Board to consider was restoring the names, not name it something else.

Q.   And so I guess I'm also trying to understand, you know, why more neutral language wasn't used in the survey.  For example, couldn't the survey have said, It is time to decide if we keep the current names or revert to the pre-2021 school names?

A.   It could have, yes.

Q.   Do you think you would have been more likely to get more responses with more neutral language?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A.   Possibly.

Q.   If you had partnered with a more liberal-leaning organization, might that have added more credibility to the survey?

THE WITNESS:   Credibility, I don't know, but it may have resulted in people being less -- or it may have resulted in people being more open to giving their responses.   But I don't really know.

Q.   And this survey was not conducted by the School Board, correct?

A.   Correct.

Q.   It wasn't sponsored by the School Board?

A.   No, they had nothing to do with it.

Q.   And there's no indication on the survey cards that it came from the School Board or from any county organization?

A.   No, none whatsoever.

Q.   The only information that it did have was that it came from the Freedom Press and from the Coalition, and both of those organizations were generally composed of anonymous members, correct?

A.   Yes.

Q.   And you mentioned earlier -- or you testified earlier that people had asked the School Board to conduct a survey on the name change; is that correct?

A.   Numerous times, yes.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.    And that was brought to a vote in 2020 by the School Board; is that correct?

A.    Yes, I think that was the year.

Q.    And, ultimately, they voted not to do a survey at that time, correct?

A.    Well, yeah, it was a 3-3 tie.

Q.    And a 3-3 tie means the vote does not pass?

A.    Correct.  And then previously, in -- when the names were originally changed, there was a pushback from the community, asking that School Board to survey everyone, and they refused.

Q.    So in 2024, the Coalition decided to do a survey of Districts 1 and 2, correct?

A.    Yes.

Q.    And spent funds to do that, correct?

A.    Yes.

Q.    And then the Coalition shared those survey results with the School Board?

A.    Yes.

Q.    And asked the School Board to vote on whether to restore the Confederate names, correct?

A.    Not directly.  We asked for them to consider bringing it back up.  And our -- our intent, also, was hoping that they would have decided to do a survey on their own, but they did not.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.   And you didn't ask them to do a survey, correct?

A.   I think I may have, you know, in verbal things, but officially, no.

Q.   Why not press for that survey to be deducted by the School Board?

A.   Well, I mean, they had ours, and after we turned it over to them, we -- you know, we stepped back to wait and see what they were going to do.  And then that secondary survey that came out telephonically went out, so we -- we kind of, or me, individually, left it up to them.  We brought it up, and we wanted them to go through.

Q.   If the School Board had put out an authorized survey that covered the same population, do you agree that it likely would have had a higher response rate?

THE WITNESS:  You know, maybe.  I'm not -- you know, I'm not sure, you know.  But in my studies of surveys, you get different response rates all the time.

BY MR. GREELEY:

Q.   And if you had pressed for a survey to be conducted by the School Board in 2024, with its six new members, including some who were in favor of the name change, would you have been likely to have them go forward with that survey?

THE WITNESS:  If -- yes, I mean, we had hoped that they would have surveyed, done a survey.

Q.   Are you aware of him freeing any of his slaves?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A.    No.

Q.    And do you know where Stonewall Jackson was born?

A.    I believe it was West Virginia.  What is now West Virginia.

Q.    And where did he die?

A.    In -- close to Fredericksburg, Virginia.

Q.    Is that in Shenandoah County?

A.    No.

Q.    So is -- did Stonewall spend the majority of his life in Shenandoah County?

A.    Not the majority, no.

Q.    So what makes Stonewall Jackson legacy, then, "an important part of our local history," quoting this document here?

A.    The Shenandoah Valley campaign of 1862 was -- a lot of it took place in Shenandoah County and the surrounding counties.  And Stonewall Jackson's men actually fortified and manned the stretch of ground, Roots Hill and Roots Ridge, that the high school sits on.

Q.    But I'm correct that he didn't -- he wasn't born in Shenandoah County, he didn't die in Shenandoah County, and he didn't live most of his life in Shenandoah County?  Is that correct?

A.    That is correct.  Yes, that is correct.

Q.    What connection does Robert E. Lee have to Shenandoah

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

County?

A.    Well, both he and Ashby were there during the Civil War, but the name of the -- they both were -- the magistral districts were Ashby and Lee magistral districts, and the original name of the elementary school was named because it was where those two merged.  So, you know, it -- it has local connections, from what I understand, and that's why they chose those names for the elementary school.

Q.    But in terms of the -- you know, this says, The community values the historical connections to both Turner Ashby and Robert E. Lee as prominent Virginians and local heroes.  So I'm asking what connections Ashley and Lee themselves had to Shenandoah County.

A.    Oh, okay, I'm sorry.  So Ashby's cavalry moved through and defended the county and the homes up until his death.  Lee was in New Market and reviewed Jackson's troops when they marched by.  And both -- and including Jackson as well -- command troops that were raised and marched out of Shenandoah County to go into the defense of Virginia during the Civil War.

Q.    But neither of them was born, lived predominantly, or died in Shenandoah County, correct?

A.    Correct, yes.

Q.    Are there members of that community who do not value the historical connections to these Confederate generals?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A.    I would imagine so, yes.

Q.    At the end, it says -- it says they are prominent Virginians and local heroes.  Who are they heroes to?

A.    It's the local community members that voice their opinions on the matter.

Q.    And some local community members voice their opinions on the Confederate names with regard to whether they should be on the schools, and they did not want those names restored, correct?

A.    Correct.

Q.    And fair to say they would not view Lee and Ashby as local heroes?

A.    Yeah, I would speculate that, yes.

Q.    So this bullet point isn't referring to those people who are opposed to the Confederate names, correct?

A.    No.  I mean, yes, that's correct.  They would not be directly referring to that.

Q.    How would restoring the Confederate General names demonstrate a commitment to inclusivity?

A.    In that it would include the statement or the feelings of the community overall.

Q.    As we established, portions of the community do not approve of the Confederate general names; is that correct.

A.    Yes.

Q.    And adding the Confederate names back to the schools

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

would exclude those people, correct?

A.    It may exclude their -- you know, their wishes, but, you know, it's -- it's -- not everyone will feel the same about something.

Q.    Well, let me ask you:  What does "inclusivity" mean as you've used it here?  How do you define that term as you've used it here?

A.    Including all points of view or, you know, and everything, rather than excluding the community and the community's wishes, which I feel was done in '20 and '21.

Q.    And you say -- you talk about the majority here, and you mention responsiveness to community feedback.  What's the basis for that statement?

A.    Speaking to people.  Hearing from people.  Being in the schools.  Talking and hearing from students in the schools. And the overwhelming amount of people who were upset that the name of their school was changed without their input.  And so it was speaking, hearing from people, our survey.  You know, and our survey, once again, was put out to get a pulse, like, are people still upset about this?  Do people still feel wronged by that decision?

Q.    I guess, how do you quantify all those discussions that you say you've had with people about their feelings regarding the name change?

A.    Just overall, I mean, consensus and different

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

discussions. I mean, I've had discussions with people on the other side of this, too. You know, of -- people who wanted the names for Mountain View and so forth. And, I mean, I had several discussions with them. And not being from the community, I felt I was in a unique place to talk to both sides of the issue, because there were friends and families in the area that don't talk to each other because of this.

Q. Again, in terms of kind of quantifying this, you mentioned a majority. For example, it's not the case that you've talked to every single person in the county, correct?

A. Definitely not.

Q. Would you say that you've talked to a majority of the people in the county about this issue?

A. Well, not the county, but -- and probably not even the majority of people who go to the school. So, you know, a lot of it was relying on the survey, and I do know the results of that other survey that was put out by the other group. And when those numbers were told to me by the people that put it on, countywide, I was actually shocked at the overwhelming number that they got, too.

Q. But you didn't conduct that survey, correct?

A. No.

Q. And you didn't tabulate the results of that survey?

A. No, the company that they hired to do the telephonic, you know, and text message one did.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

MS. GREENSTEIN:  That will be Exhibit 132.

(Exhibit 132 was marked for identification.)

BY MR. GREELEY:

Q.   And, Mr. Scheibe, are you familiar with this document?

A.   Yeah, that looks like one of the Freedom Press's -- I don't know the date.

Q.   So if we look at the June 13th entry, it says, Circulation of a petition begins throughout Shenandoah County to keep the names on the schools.  It would be delivered to the School Board prior to the July 9th virtual meeting.  The petition collected approximately 3,100 signatures (registered voters only).  Do you know what this is referring to?

A.   Yes, a petition that was circulated by some local citizens when they got wind of -- that the School Board was thinking about doing this.

Q.   And who were those local citizens?

A.   I don't remember.  I just remember signing a copy of that petition at a -- I think it was at a store that I went, and I saw it there and signed it.

MS. GREENSTEIN:  That will be Exhibit 133.

(Exhibit 133 was marked for identification.)

BY MR. GREELEY:

Q.   Mr. Scheibe, do you recognize this document?

A.   Yes, I do.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

Q.    And what is it?

A.    It's -- I don't remember the date, but it's a Freedom Press edition.

Q.    Did the Freedom Press solicit such articles from anybody?

A.    No.

Q.    At the bottom left, am I correct that that represents an advertisement for Tom Streett, who was also running for the position at District 2 School Board?

A.    Yes.

Q.    Did the -- did the Freedom Press solicit these advertisements?

A.    Not directly.  But candidates and businesses had started to reach out because we were offering advertising.

Q.    And were there also advertisements for Gloria Carlineo and Mike Rickard for their candidacy for the School Board?

A.    Yes, I think they both placed ads.

Q.    And so why was the Freedom Press running School Board committee ads at this time?

A.    To help fund the paper.  They're paid advertisements.

Q.    Did any School Board candidates request to run an ad that was not included in this paper?

A.    No.

Q.    And looking through this advertisement, am I correct

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

that it explains what the Freedom Press -- it explains what the Freedom Press is and what its mission is; is that correct?

A.    Yes.  Overall, yes.

Q.    And in the middle there, the third paragraph says, and I quote, And it all started when we were incensed that our own school names were changed to cancel the legacy of our ancestors in order to satisfy the political whims of our School Board and superintendent.  Did you write this advertisement?

A.    No.

Q.    Did you approve the advertisement?

A.    Yes.

Q.    So it says, it started when we were incensed that our own school names were changed.  Who is the "we" in that sentence?  Who is that referring to?

A.    The -- some of the members of the -- the Coalition and contributors of the Freedom Press.

Q.    It says, the school names were changed to cancel the legacy of our ancestors.  What does that mean?

A.    It could be -- it could mean two different things. It could mean the ancestors who were around during the Civil War, and it could also mean the ancestors which specifically went to those two schools since 1959.

Q.    The next paragraph says, and I quote, What happened? All three of the School Board candidates who challenged the incumbents this past fall were elected, and we have a new

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

superintendent who is an education professional dedicated to analytical and thoughtful decision-making. We believe Coalition for Better Schools has made a difference. Does that reflect that the Coalition for Better Schools made a difference by supporting the three School Board candidates who challenged the5 incumbents?

A.  No.  It -- it refers to the differences that we brought up over the -- the numerous editions that pointed out needs our schools -- or things our schools were in need of, addressing the falling test scores, et cetera. So it more or less means by11 getting information out that was available really nowhere else.

Q.  But it doesn't say that in this ad, correct?

A.  No, it doesn't.

Q.  And the Freedom Press ran articles and advertisements from some of those School Board members; is that correct?

A.  Yes, and we ran candidate profiles for all -- all candidates. And, I'm sorry, we did send e-mails out to all School Board candidates, and to offer advertising and to take part in the candidate profiles.

Q.  Okay.  Thank you.

MS. GREENSTEIN:  That will be Exhibit 135.

(Exhibit 135 was marked for identification.)

BY MR. GREELEY:

Q.  All right.  Mr. Scheibe, do you recognize this

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

document?

    A.   Yes.

    Q.   And am I correct this is a Freedom Press, Volume 4,
Issue 2, dated July 2024?

    A.   Yes.

    Q.   And below that, it says, The Truth Behind the 2020
Name Change.  And it looks like the by line there is by Gloria
Carlineo.  And am I correct that this was written when she was
a School Board member?

    A.   Yes.

    Q.   And this article explains from Ms. Carlineo's point
of view the name change and the process in 2020; is that
correct?

    A.   Yes.

    Q.   Did the Freedom Press or the Coalition ask her to
write an article for this edition of the Freedom Press?

    A.   No, we did not.

    Q.   How did this article come to be published in the
Freedom Press?

    A.   Ms. Carlineo sent it in and asked for it to be
published.

    Q.   And who is responsible for reviewing submissions from
people like Ms. Carlineo?

    A.   Myself, and then after I've put together a list of
articles, it's sent out to Coalition members to get their

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

input.

Q.   And why did you add this to the list of articles to go with this edition of the Freedom Press?

A.   Because of its extreme relevance to the recent vote to change the names back.

Q.   And did you or anyone else at the Freedom Press help her draft this article?

A.   No.

Q.   Did you provide any edits to the article?

A.   Other than going through and looking for typos or misspellings, no.

Q.   So you mentioned that it was -- that this article was relevant to the circumstances at the time, but what was the purpose of including this article after the names -- the Confederate school names had already been restored to the schools, after that vote had already happened in 2024?

A.   Well, we did not have it before the vote in May of 2024, and Gloria Carlineo sent it in to give her perspective on it.

Q.   Okay.  And so why did you send an e-mail about the name restoration to the School Board in May 2022?

A.   I believe they were discussing doing the survey then.

Q.   And we can -- we can zoom out of this section here.

A.   I don't recall the specifics of this e-mail, so ...

Q.   Well, let's -- let's go to the first paragraph.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Yeah, that's perfect.  And so the first line says, My wife and I have been here in New Market since 2017.  And that's when you moved into -- into Shenandoah County, correct?

A.   Yes.

Q.   And it says -- it's kind of third line, I think, counting down.  It says, I am certainly willing to understand how some people feel the names of Stonewall Jackson and Ashby-Lee on our southern campus schools may be an issue and should be changed in the names of inclusiveness or diversity. What did you mean by that?

A.   Exactly what it says, that some people felt that way.

Q.   And you say -- you say, I'm certainly willing to understand how some people feel that way.  Why were you willing to understand that?  What does that mean?

A.   I spoke to them and learned their -- you know, their points on the issue.

Q.   And I'm trying to understand -- I'm trying to understand the words "willing to understand."  Does that convey that you accept the validity of their feelings?

A.   Not necessarily.  I mean, well, yeah.  I mean, everyone's feelings are valid.

Q.   And so if people feel that the names of Stonewall Jackson and Ashby-Lee on the southern Campus schools may be an issue and should be changed in the name of inclusiveness or diversity, that's a valid feeling, correct?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.    To those people, yes.  And to me personally, it may or may not be.  It depends on the situation.

Q.    Well, in this specific situation, for you, do you feel that the names Stonewall Jackson and Ashby-Lee may be an issue?  They may be an issue to some people, yes.

Q.    And are they an issue to you personally?

A.    No.

Q.    Do some people feel that the names should be changed in the names of inclusiveness or diversity?

MR. BRUCE:  Objection.  Speculation.  Go ahead.

THE WITNESS:  They may.  You know, now, the definition of those words varies from person to person, so I can't make a blanket statement there.  But I'm sure some people feel those -- those -- that that is true, I would imagine.

BY MR. GREELEY:

Q.    Has anyone told you that they feel the names should be changed in the names of inclusiveness and diversity?

A.    Yes.

Q.    They were using the terms "inclusiveness" and "diversity"?

A.    Absolutely.

Q.    And saying that the names -- the names of the Confederate generals did not support inclusiveness or diversity?  Is that what you were hearing?

A.    Yes.  And in their minds or, you know, using their

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

terminology, yes.

Q.   And the next sentence says, Coming from a larger area with more common ideas on such things in the suburbs of Philadelphia, I truly see both sides of this controversy.  What does "more common ideas on such things" mean?

A.   Now, the common -- you know, I should have written that differently, with more common use of those terms.  But there's a lot broader spectrum of people in that area and a lot more diversity in people's opinions.

Q.   Is there a lot more racial diversity as well?

A.   No.  I mean, I grew up there.  My best friend is African-American.  I have three mixed-race grandchildren.  You know, and speaking from me to them, we have similar views on most things.

Q.   And so it says here, quote, I have, however, sided and become involved with the cause to restore the names back to what they were.  I have done so not because of the merits of Stonewall Jackson or Confederate ideologies.  I have done so because the actions of the previous administration and School Board really have divided our community.  There clearly was lack of public inclusiveness and due process in what was done. Did I read that correctly?

A.   Yes.

Q.   And in the Freedom Press issues that we looked at, the issues of the Freedom Press that we looked at, there are

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

articles discussing the history of the Confederate general, correct?

A.   Yes.

Q.   But would you agree that the names of the schools were originally instituted as a way to honor the Confederate generals and preserve their local heritage?

A.   Possibly.  You know, I -- I believe that, you know, the high school, they're from -- when I went and looked at the School Board minutes and things from back when the schools were named, there was some local push to name the school Stonewall Jackson.  Noticeably, though, in the same county, there was none in the other two high schools being named at that time.  And, specifically, they -- they agreed to not name the elementary school Stonewall Jackson, but they named -- they decided to name it after the two magistral districts.  So I don't know what the methodology is on -- that they named them to glorify them or celebrate them, no.  But they certainly chose those names.

Q.   You're not sure if they chose them to glorify or celebrate them?

A.   No, it was -- you know, I could speculate that maybe they did, but it was very nonspecific.

MS. GREENSTEIN:  This will be Exhibit 141.

(Exhibit 141 was marked for identification.)

Q.   Are you familiar with Dennis Barlow?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.    Yes.

Q.    Who is he?

A.    He's the School Board chairman now.

Q.    And what was -- if I read this document, it looks like it's a gmail e-mail from Dennis Barlow to Brad Pollack, dated September 1st, 2021, with the subject line Thanks Brad. What was Dennis Barlow's role with respect to the School Board on September of 2021?

A.    He was a member at that point.  Yeah.

Q.    Okay.  In September 2021?

A.    Wait a minute.  No.  He's -- yes.  I'm sorry, yeah. No, no, he wasn't running yet, so he didn't have one yet.

Q.    Oh, okay, okay.

A.    He took -- he took office on January 1st, 2022.  And he's up January 1st, 2026.  So, yes, he had no -- he was not on the School Board.

Q.    Okay.  But how about, are you familiar with Brad Pollack?

A.    Yes.

Q.    And who is he?

A.    He was somebody who used to come to meetings before the Coalition was formal, and he used to be an attorney.  I think he lost his license.  And he -- he's -- his only real ties were that he was the agent that got us our first LLC.

Q.    Got who their first LLC?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

A.   The Freedom Press.

Q.   But you remember Dennis Barlow attending some of these Freedom Press meetings?

A.   Before he ran for School Board, yeah, he was -- he would have been at least one that I remember him being at.

Q.   And how about after?

A.   After he ran for School Board, no.

MS. GREENSTEIN:  That's Exhibit 145.

(Exhibit 145 was marked for identification.)

BY MR. GREELEY:

Q.   Let's zoom in on the top section there.  So if I'm looking at this e-mail, it appears to be an e-mail from Keven Walker, sent on April 4th, 2022, to the School Board members at that time, including Superintendent Sheppard.  And the subject was Draft Resolution for Consideration of School Board - Naming of Schools.  Are you familiar with this document, Mr. Scheibe?

A.   Vaguely, because I -- once again, I didn't receive it directly.  So I'd like to see what it says, to see if I recall.

Q.   Sounds good.  Yeah, let's pull up -- let's pull up the body of the message.  I'll give you a minute to review.

A.   Okay.

MS. GREENSTEIN:  This will be Exhibit 146.

(Exhibit 146 was marked for identification.)

BY MR. GREELEY:

Q.   And zoom in on the top bit.  All right.  So this --

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

the subject line of this e-mail says -- it is, quote, Name Change Motion and Proposed Process, Unquote.  And appears to be an e-mail from Keven Walker on May 5th, 2022.  And, as produced, the To line is empty.  However, the e-mail starts, Dennis, comma.  Does this reflect an e-mail from Keven Walker to Dennis Barlow?

THE WITNESS:  Yeah, it seems to be, yes.

Q.   And when did you make the decision to focus on restoring the Confederate names versus keeping the new names?

A.   I don't remember the exact time, but when I found out more about the process of how it was done, so I'm going to say a few months, maybe, after the names were changed originally, that was when I fully made up my mind.

Q.   So by the -- is it fair to say that by the end of 2020, you had made up your mind to restore the name Stonewall Jackson and Ashby-Lee?

A.   Roughly, yes, you know, somewhere around there.

(Exhibit 147 was marked for identification.)

BY MR. GREELEY:

Q.   All right.  Mr. Scheibe, if we zoom in on the top section there, this appears to be a production of text message conversations, and the name listed in this document is Scheibe, and it gives a phone number there that's -- ends in 3326.  Do you see that?

A.   Yes.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.    And is that your phone number?

A.    Yes, it is.

Q.    Okay.  And it gives a date range of February 27th, 2024.  So if we zoom out and go to the second page.  We can zoom it there.  And so, you know, represent to you that this is the document as we have it.  This is how it was produced to us.  And it looks like the opening communication is a text message from you.  And it says, quote, Survey for restoration of names.  And this was sent on February 27th, 2024.  And who were you texting?

A.    I don't remember, because I -- I mean, that phone was wiped clean, as described before.  But I believe it was probably Chairman Barlow, to give him a heads-up that the survey was coming.

Q.    And so you gave him a heads-up that the survey would be coming before it was actually mailed; is that correct?

A.    Yes.

Q.    And why were you giving Chairman Barlow a heads-up?

A.    Just so the School Board would have an idea of, you know, if they started getting e-mails and things, what it was in reference to.

Q.    And had you previously discussed the survey with Chairman Barlow?

A.    Not that I recall.

Q.    But you could have discussed it with him?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.    Yeah, I think we did have a conversation at one point that -- that the Coalition was getting ready to do it.

Q.    And when would that -- when would that have taken place?

A.    I'd say probably in the week before this -- this text message I would guess.

Q.    And did you -- did you attach the survey in this text message.

A.    No.  At least I don't think I -- no.  Yeah, the School Board had no knowledge of the content of what the survey was going to be before we sent it out.  I just let them know we were going to send out a survey.

MS. GREENSTEIN:  This is Exhibit 148.

(Exhibit 148 was marked for identification.)

BY MR. GREELEY:

Q.    And Mr. Scheibe, do you recognize this document?

A.    Yes.

Q.    And what is it?

A.    It's me e-mailing the -- well, I can't see what the -- it's me sending something to the people who put together the Freedom Press to get it into an article.

Q.    And so if we zoom in on your top e-mail,  so it looks like it's an e-mail from Freedom Press to Graphic Mac on April 8, 2024.  And the text says, Please put together a shadow box asking for donations towards restoration of the names to be

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

sent in when, in upper case, the School Board votes to restore the names. What did you mean "when the School Board votes"?

A. When they voted on the name restoration. We were preparing to fund raise.

Q. And this reflects that in April you knew that the School Board would vote to restore the Confederate names, correct?

A. It was speculation, but we assumed yes.

Q. And why did you assume that?

A. They -- the six School Board members at that point had all advocated at one point or another that they wanted the names restored.

Q. Mr. Scheibe, was the Coalition for Better Schools involved in the physical process of restoring the name Stonewall Jackson and Ashby-Lee to those schools in 2024 following the vote?

A. Yes.

Q. And how were you involved?

A. We coordinated all of it.

Q. And what do you mean by coordinated?

A. We fund raised. We got the contractors. I personally communicated with the schools, and for scheduling purposes, and provided them information on costs and everything. So I mean really other than checking in with scheduling with the building principals, asking them for design

of logos and things, we did it 100 percent.

Q.   And how about the funding for those -- those changes? Who paid the bills for making those changes?

A.   the Coalition for Better Schools.

Q.   And for those physical changes, when were those conducted?

A.   Through the beginning of June, I think, of '24 and we ended -- the physical changes were all done before school got back in in early August.  But some of the uniform things because they -- Nike doesn't make certain team uniforms at certain times, so we dealt with that through probably the winter, which is when we would have helped get the spring sports uniforms done.  But it was all, it should have all been completed in '24.  Yeah, there was nothing left in '25.

Q.   And in the summer of 2024, were the schools -- were the schools open while you were making these changes?

A.   No.  The school dismisses for the summer right -- like right before Memorial Day, in Shenandoah County so we had -- there was still some summer activities, and there was still some spring sports going on.  But no, there was no -- you know, the bulk of the student population was not in the schools.

Q.   Were there any disruptions to those summer activities or did you work at times when there weren't students there?

A.   The -- there were -- there was never really students in the buildings unless they were going in to use the locker

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

room or to change or something.  But we did it primarily when there was nobody in the building.

Q.    How did you have access to the buildings?

A.    Through the building personnel, the principals and whomever else, the custodians and stuff; we would schedule ahead of time and we would be let in.

Q.    I'm asking because I assume were they, were there school personnel there at all times when you were making the physical changes?

A.    Yes.

Q.    So the schools were physically open with school personnel at times when otherwise they would have been closed and locked; is that corrected?

A.    Yes.  Although, hold on.  For the most part because they would have been open to a certain point because kids are there practicing sports outside and things.  And nothing was done at night or any time there weren't custodians in the building.

Q.    But you had to coordinate with the custodians to open things up at least at some points to let your team or contractors in?

A.    Yes.  For the most part, yes.

Q.    And did you reimburse the school system for the times of any of the custodians or other officials were there to oversee any of these name restoration processes?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.   No, because they weren't there to oversee  us.  Alls they did was open the door, and they were typically people who were already in the building or the principal themselves.

Q.   And you say typically, but not necessarily in every case.  Is that correct?

A.   No, that's -- in every case there was somebody already in the building that could let us in.  I would communicate directly with the principals and say I'd like to be in and they would say okay.  It if they weren't there, we'll have the custodian open the door.

Q.   And they would stay there until you were done with your work, correct?

A.   Long past we were done because they were there anyway.  And I made it a specific point not to, you know, to interfere or to have anybody stay late, but at the high school, the custodians are there until 8:00 or 9:00 o'clock at night even during the summer so it was all done during regular operating hours.

Q.   So Mr. Scheibe, am I correct that you are currently running for the School Board?

A.   Yes, I am.

Q.   And which district is that for?

A.   District 1.

Q.   And who would you be replacing?

A.   Dennis Barlow.

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

Q.   So why do you think you would be a good fit for the School Board?

A.   I do not know if you'll find, I'm on many committees.  I'm on the Citizens Advisory Committee to the superintendent.  I was on the Library Book Review Committee, the Mental Health Task Force.  So -- and I'm also -- I have two kids in the schools.  And throughout this process of writing the Freedom Press and things, I've become very knowledgeable on how things work in the schools, and the needs that the schools currently -- well, the things that the schools currently need.

Q.   And why were you involved in so many different committees and organizations?

A.   Because I care about the schools and want to see the -- the positive improvement in scores and education and teacher retention.  I'd like to help see that they continue and to help Melody Sheppard keep improving the schools.

Q.   And have you been endorsed by the Coalition and the Freedom Press?

A.   No.  The Coalition for Better Schools is a 501(c)(3) so that prohibits any endorsements.  And even back in the past, I was not for the Freedom Press endorsing candidates.  I wanted to put their information out and let people decide for themselves.

Q.   But did the Freedom Press endorse candidates in the past?

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

A.    I was kind of outvoted during the -- the one where Carlineo and Streett and everyone ran.  I always said we should do no endorsements, but they endorsed the School Board members at that point.

Q.    They endorsed Carlineo, Street and?

A.    Yes.

Q.    Rickard?

A.    Yeah, they were the -- yeah, they put checkmarks there.

Q.    And when did you start viewing them live -- viewing School Board meetings live to the extent they were held virtually?

A.    Not long after the original date, I mean the original vote, when all this came up, I started watching them.  Oh, I'm sorry.  I watched them via video live.  I didn't start going to to meetings and it wasn't consistently probably until after the COVID-19, you know, restrictions were lifted.

Q.    And fair to say that as the kind of spokesperson for the Coalition and writer of the Freedom Press, both of which are heavily focused on restoring the Confederate names, that you invested a significant amount of time and effort in getting the Confederate names restored to those two schools, correct?

A.    I put a significant time and effort into getting the details of all this put out and in bringing, you know, more information to people on what's going on in the schools, this

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 - REDACTED

being a part of it.  This is what started that, yes.  So I've put a significant time into -- into getting the names put back on the schools.

Q.   So why is the name Stonewall Jackson so important to you?

A.   Because it was the name of -- and the center of the local community, and it's important to me, you know -- personally it's not -- I would -- it's not about the name. It's about how this took place, once again, to reiterate, the process, and how I feel that, you know, the democratic, you know, representative government that we have wasn't followed.

So if it was named, once again, you know, it could have been any other name and I would have been equally as annoyed or, you know, as -- as -- I don't know.  I mean I wasn't annoyed.  But I didn't -- I didn't like how it was done.  So it wasn't really about the name.  It could have been, you know, Great Valley High School like I went to, but if somebody said, no, we're changing that, we're not letting anybody who went there really have a voice in it, that kind of put up a red flag for me.

Q.   And this is all to reinstate the name of a former Confederate general on a high school that you didn't attend for a community that you've moved to fairly recently; is that correct?

A.   Yeah, I mean -- yes, looking at it from that way, but

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

the least important part of that in my personal opinion is the Confederate general part.

(End of video deposition testimony.)

MR. GREELEY:  Thank you, Your Honor.  That concludes the testimony from Mr. Scheibe.

THE COURT:  Okay.

I'll note that the courtroom is sparse of counsel. The Court and all of the Court's staff are present.  Many of the counsel have deserted us on Friday evening.

We'll adjourn for the weekend.  I'll see you all at 9 o'clock on Monday morning.  I appreciate your efforts to get the evidence presented before the Court.  If you all need the Court for anything over the weekend, you may e-mail the clerk or any of my law clerks and we'll be responsive.

Is there anything I can do for you all before we adjourn for the evening?

From the plaintiffs?

MR. GREELEY:  I don't think so, Your Honor.

THE COURT:  From the defendant?

MR. GUYNN:  No, Your Honor.  I would just say in Mr. Fitzgerald's defense, he has young children and I wanted him to get home before they went to bed.

THE COURT:  Yeah.  We all have lots of reasons, and I'm not faulting anyone.  We were watching the video.  I did that for the benefit of the public, the members of the public

12/12/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 2 -
REDACTED

who are here.  I wanted them to see it, and so, it doesn't bother me.  I'm not offended.  But I just note that we're here.

I hope everybody has safe travels home, and we'll see everyone bright and early Monday morning.  If anything comes up, if you need the Court for anything over the weekend, I will be tuned in, so let me know.

We stand in adjournment.

(Proceedings concluded for the day at 5:55 P.M.)


                              CERTIFICATE

I, Whitney M. Stier, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/  Whitney M. Stier                    Date:  1/2/2026