UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

HARRISONBURG DIVISION


* * * * * * * * * * * * * *
VIRGINIA STATE NAACP          * CIVIL ACTION 5:24-CV-40
                              * DECEMBER 15, 2025   9:01 A.M.
            Plaintiff,        * BENCH TRIAL
                              * VOLUME III OF V
vs.                           *
                              *
SHENANDOAH COUNTY             * Before:
                              * HONORABLE MICHAEL F. URBANSKI
            Defendant.        * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA

APPEARANCES:

For the Plaintiff:      KAITLIN BANNER, ESQUIRE
                        Washington Lawyers' Committee for
                        Civil Rights and Urban Affairs
                        700 14th Street, NW, Suite 400
                        Washington, D.C. 20005



For the Defendant:      JIM H. GUYNN, JR., ESQUIRE
                        Guynn & Waddell, PC
                        415 S. College Avenue
                        Salem, VA 24153


Court Reporter:         Whitney M. Stier, CVR-CM-RVRM/CCR-VA/MO
                        116 North Main, Room 314
                        Harrisonburg, Virginia 22802
                        (540)434-3181, Ext. 8510



Proceedings recorded by voice stenography.  Transcript produced
by computer.

```
APPEARANCES CON'T:

For the Plaintiff :     KEVIN B. COLLINS, ESQUIRE
                        COVINGTON & BURLING, LLP
                        850 Tenth Street
                        Washington, D.C. 20001

                        JASON C. RAOFIELD, ESQUIRE
                        COVINGTON & BURLING, LLP
                        850 Tenth Street
                        Washington, D.C. 20001

                        LI REED, ESQUIRE
                        COVINGTON & BURLING, LLP
                        800 10th Street
                        Washington, D.C. 20001

                        MARJA PLATER, ESQUIRE
                        Washington Lawyers' Committee for
                        Civil Rights and Urban Affairs
                        700 14th Street, NW, Suite 400
                        Washington, D.C. 20005

                        SAMUEL J. GREELY, ESQUIRE
                        COVINGTON & BURLING, LLP
                        850 Tenth Street
                        Washington, D.C. 20001

                        LAUREN T. SMITH, ESQUIRE
                        COVINGTON & BURLING, LLP
                        850 Tenth Street
                        Washington, D.C. 20001

                        MELISSA COLON, ESQUIRE
                        Washington Lawyers' Committee for
                        CivilRights and Urban Affairs
                        700 14th Street, NW, Suite 400
                        Washington, D.C. 20005

                        ELIZABETH UPTON, ESQUIRE
                        COVINGTON & BURLING, LLP
                        850 Tenth Street
                        Washington, D.C. 20001

                        AMBER LOWERY, ESQUIRE
                        COVINGTON & BURLING, LLP
                        850 10th Street
                        Washington, D.C. 20001
```

```
APPEARANCES CON'T:


For the Plaintiff :    STEPHANIE U. NNADI, ESQUIRE
                       COVINGTON & BURLING, LLP
                       850 Tenth Street
                       Washington, D.C. 20001

                       RYAN C. DOWNER, ESQUIRE
                       Washington Lawyers' Committee for
                       Civil Rights and Urban Affairs
                       700 14th Street, NW, Suite 400

                       ASHLEY J. CHAVOUS, ESQUIRE
                       COVINGTON & BURLING, LLP
                       800 10th Street
                       Washington, D.C. 20001

                       ALYSSA GREENSTEIN, ESQUIRE
                       COVINGTON & BURLING, LLP
                       850 Tenth Street
                       Washington, D.C. 20001

                       ANALESE M. BRIDGES, ESQUIRE
                       COVINGTON & BURLING, LLP
                       850 Tenth Street
                       Washington, D.C. 20001


For the Defendant :    JOHN R. FITZGERALD, ESQUIRE
                       Guynn & Waddell, PC
                       415 S. College Avenue
                       Salem, VA 24153

                       CHRISTOPHER S. DADAK, ESQUIRE
                       Guynn & Waddell, PC
                       415 S. College Avenue
                       Salem, VA 24153
```

* * * * * * * * *

INDEX

WITNESSES ON BEHALF OF THE PLAINTIFFS:

WITNESS NAME                                                    PAGE

A.D. CARTER

        Direct Examination By Mr. Greeley . . . . . . . . . . . 24

        Cross-Examination By Mr. Fitzgerald . . . . . . . . . . 55

ADIAHA SPINKS-FRANKLIN

        Direct Examination By Ms. Banner  . . . . . . . . . . . 69

        Cross-Examination By Mr. Dadak  . . . . . . . . . . . .122

        Redirect Examination By Ms. Banner  . . . . . . . . . .163

        Recross-Examination By Mr. Dadak  . . . . . . . . . . .171

COZY BAILEY

        Direct Examination By Ms. Banner  . . . . . . . . . . .178

        Cross-Examination By Mr. Guynn  . . . . . . . . . . . .229

        Redirect Examination By Ms. Banner  . . . . . . . . . .236

* * * * * * * * *

INDEX OF EXHIBITS

For the Plaintiffs:

| Exhibit No. | Marked | Received |
| --- | --- | --- |
| No. 28 | 22 | 22 |
| No. 50 | 22 | 22 |
| No. 51 | 22 | 22 |

INDEX OF EXHIBITS CONT.

For the Plaintiffs:

| **Exhibit No.** | **Marked** | **Received** |
|---|---|---|
| No. 55 | 22 | 22 |
| No. 56 | 22 | 22 |
| No. 108 | 41 | 43 |
| No. 112 | 45 | 46 |
| No. 169 | 22 | 22 |
| No. 175 | 22 | 22 |
| No. 177 | 245 | 246 |
| No. 179 | 245 | 246 |
| No. 180 | 245 | 246 |
| No. 185 | 22 | 22 |
| No. 186 | 22 | 22 |
| No. 187 | 22 | 22 |
| No. 188 | 22 | 22 |
| No. 189 | 22 | 22 |
| No. 194 | 245 | 246 |
| No. 200 | 22 | 22 |
| No. 201 | 245 | 246 |
| No. 202 | 245 | 246 |
| No. 209 | 22 | 22 |
| No. 211 | 22 | 22 |
| No. 216 | 245 | 246 |
| No. 228 | 22 | 22 |

INDEX OF EXHIBITS CONT.

For the Plaintiffs:

| Exhibit No. | Marked | Received |
| --- | --- | --- |
| No. 229 | 236 | 237 |
| No. 237 | 245 | 246 |
| No. 253 | 22 | 22 |
| No. 256 | 22 | 22 |
| No. 297 | 245 | 246 |
| No. 321 | 22 | 22 |
| No. 322 | 22 | 22 |
| No. 326 | 19 | |
| No. 328 | 224 | 225 |

(Proceedings commenced at 9:01 A.M.)

THE COURT:  Good morning.

All right.  Are the plaintiffs ready to proceed?

MS. BANNER:  We are, Your Honor.

THE COURT:  The defendant ready to proceed?

MR. GUYNN:  Yes, Your Honor.

THE COURT:  Okay.

There is a couple things that I thought I would address.  First, one of the counsel for the plaintiffs was in the hospital and is now recovering and asked permission of the Court, since she's been active in this case, to listen to the trial over Zoom.

Is there any objection to that from the defendant?

MR. GUYNN:  No, Your Honor.

THE COURT:  Okay.  I'll allow that just for that one counsel.  I hope she's doing well.

Next, yesterday afternoon, there was an issue raised with regard to the deposition designation, some pages of one of these school board members, Brandi Rutz.  As you know, from what I've told you previously, I think I told you this the week before we started trial when we had an issue with regard to -- maybe it was two weeks before trial -- when we had an issue regarding legislative privilege.

You know, I ruled on legislative privilege back in the summer, and then the issue came up again in terms of a

motion in limine.  To fully educate and immerse myself in the factual and legal issues concerning the motion in limine with regard to legislative privilege, I read all the depositions over the Thanksgiving holiday.  I read all of the depositions of all of the school board members that were provided, including the deposition of Ms. Rutz.  So I was already familiar with her testimony.  And then it was a week ago I entered ECF 215 which was a ruling on the motion in limine addressing legislative privilege.

And then yesterday, sort of a motion seeking clarification supplemental clarification regarding my ruling, and I'm sorry if I wasn't clear.

As I said in chambers, and I may have said on the record last week, the defendant's choice to invoke legislative privilege is going to cut across all the evidence in this case. On equal protection, plaintiff's have the burden of showing that the 2024 school board vote, that a motivating factor -- a motivating factor -- was discriminatory intent.

If the plaintiffs prevail making a prima facie case of discriminatory intent, the burden then shifts, as I understand the case law, to the defendant to show, on the issue of intent under equal protection, that the school board would have made the decision notwithstanding that a motivating factor was discriminatory intent.  In other words, the school board would have voted the same way.  Okay?

I don't know how the school board is ever going to be able to put on evidence sufficient to meet that burden because the school board has chosen not to allow discovery. They directed their school board members -- or their school board members chose, on the advice of counsel, not to answer questions, not to answer requests for admissions, not to answer interrogatories on the issue of the reason for the 2024 school board vote to change the names back to Stonewall Jackson and Ashby-Lee.

That litigation decision made by the defense in this case has monumental impacts on the party's ability to meet their burden of proof. I just -- I can't say it enough. But there is a difference, obviously, between admissibility and weight. And so I have chosen to allow the testimony that the plaintiffs objected to from Ms. Rutz where she said she had an opinion prior to being on the school board of -- that there was a problem with the process. I'm allowing that. I'm not ruling that that testimony is inadmissible. I'm allowing it, even though I think it's a closed question.

But we don't have a jury here. We have me. Okay? And I am fully capable of parsing the evidence. I am fully capable of considering a bit of evidence for one purpose and not another. And this evidence that Ms. Rutz testified to, and some of the other school board members are likely to testify to, that they had -- they may have had a problem with the

process in 2020 or any other reason that they tout with regard to the name is not going to be considered by the Court on the issue of the school board members intent in 2024.

The invocation of legislative privilege precludes the defendant from making an argument or putting on evidence on the issue of the intent of the school board members in 2024. This case would be very different, I believe, had the defendant chose to allow discovery into what the school board thought when it was making that change. I don't know why the defense chose to do this. I don't know, and I'm not going to speculate.

But they made that choice, and that choice is going to preclude the school board from -- and preclude the Court -- the Court -- from considering statements made by school board members as to their intent in 2024. It just has to. You cannot use the privilege as a shield in discovery and then seek to use it as a sword in litigation.

So while I'm allowing, over the objection of the plaintiffs, some of these statements from Ms. Rutz as to her personal opinion as to the process in 2020, I will not consider that evidence and it is not admissible as to the reasons or the factors considered by the school board in making the change in 2024. I can parse that evidence. If this was a jury trial, I probably would have ruled the other way. I probably would have said it's not admissible out of concern that the jury wouldn't

be able to parse the difference between admissibility and weight. Okay? But I can to that. That's what I do. Okay? So I want to be very clear about what I'm doing. I'm allowing it in to testimony. We're going to get a full record in this case, and then I will access the weight as the finder of fact.

But I am telling you, as I told you -- I've told you all a couple of times -- this case is going to come down to the burden of proof under the law and the evidence as to whether the plaintiffs can meet their burden of proof on the three claims that they've raised, and if they do make a prima facie case of discriminatory intent under the equal protection claim, whether the defendants can meet their burden of proof that they would have made the decision regardless.

So that's my reason for overruling the plaintiffs' objections. Okay? In other words, I understand the plaintiffs' objections. I probably would have ruled differently if this was before a jury because I would be worried about confusion. I'm not confused, okay, about the invocation of legislative privilege. I know the significant and manifest evidentiary and burden of proof consequences that litigation decision has over this case. It overshadows this whole case.

Okay. The defendants made a number of objections to some of the designations by the plaintiffs on 403 grounds, relevance grounds, including, surprisingly, an objection as to

a couple of passages that the plaintiffs can't put into evidence of intent.  Well, that's just absurd.  The plaintiffs, of course, can use the testimony of the school board members in an effort to meet their burden of proof on discriminatory intent.

So the plaintiffs raised some other objections, defendants raised some other objections.  I've considered them all, and I am excluding some portions of Ms. Rutz's testimony as there's no foundation for her view based on a newspaper article as to why the school was named in 1959.  There's no foundation.  She has no personal knowledge of that.  So I'm not admitting that.

But those are my rulings on those objections.  I hope I've been clear.  The testimony is admissible as to what Ms. Rutz's opinion maybe, but it's not admissible as to what her intent was on voting in 2024.  Period, end of story.  The defendant's defense strategy has precluded that evidence.

Okay.  Anything plaintiffs want to say?

MS. BANNER:  No, Your Honor.  Thank you?

THE COURT:  Defense?

MR. GUYNN:  Yes, Your Honor.

With regard to your criticism of our defense strategy --

THE COURT:  It's not criticism.  You made the choice.  You made the choice.  You made the choice.  It's your decision,

and I'm just telling you.  I'm not criticizing it.  It's your choice.  You made the decision to invoke legislative privilege, and it cuts across the evidence in this case.  That's all I'm saying.

MR. GUYNN:  But that isn't all you said, unfortunately, Your Honor.  The record is going to reflect that you said that you don't know why we would do that.

THE COURT:  I don't know why.

MR. GUYNN:  And to me, that sounds like criticism.  You know, I -- with all due respect to the Court, I -- you know -- I mean --

THE COURT:  Thank you, Mr. Guynn.  Your comment is noted, and I appreciate it.  I don't know why it was chosen, but it is a strategy that the defense has to live with.  All right?

Yes, sir.

MR. GUYNN:  But I want to make sure we're on the same page.  We've got a situation where the plaintiffs -- our position is the plaintiffs don't have any direct evidence of discrimination.

THE COURT:  And I think that issue is one that we're going to have to parse on burden of proof.  Right?

MR. GUYNN:  Right.  And I understand -- I think I understand what the Court will have to do is look at all the facts and make that determination.  And our position is there

are a lot of facts in this case that the school board folks can testify to such as how it was done previously that they were aware of.  They don't have to say it's a reason, Your Honor. They can say they were aware of that at the time that they made their decision.  That's all they have to say, and they're entitled to say that.

THE COURT:  The Court cannot consider that as evidence of why they chose to vote in 2024 because you and Mr. Fitzgerald did not allow the school board members to testify as to why they made that vote.  It's not admissible for that purpose.  Cannot be considered by the Court.

In interrogatory or Request for Admissions, it was asked, what are the factors you considered?  Or was the process considered or was the survey.  I think it was a survey question.  Was the survey done by the Coalition for Better Schools considered in making the decision to vote in 2024?  And you all objected on the grounds of legislative privilege. Okay?

I'm just telling you, I'm going to weigh the evidence.  I have to as the finder of fact.  Okay?  I'll weigh the evidence.  And you can put on your evidence and argue whatever you want to argue.  Okay?  I'm not precluding you from arguing that the plaintiffs have not met their burden of proof on intent.  Okay?  And I'm going to allow what the school board members had in their minds, their personal opinions about the

process.  Okay?  I'm going to let that in.  Okay?

But it doesn't go to the weight of -- if they sustain their burden -- and I'm not saying they are, because I don't know.  Right?  Got to hear all the evidence.  But that testimony is not admissible for the purpose of showing that if they sustain their burden on tenant, that the school board would have voted the same way despite that intent.  Okay?  It can't support that burden because the school board members invoked their legislative privilege and chose not to testify as to what the reasons for their vote was in 2024.  I think this would be a far different case, from an evidentiary standpoint, were that evidence coming in.

MR. GUYNN:  And I guess --

THE COURT:  So I'm not being critical of you, at all.  You made your choice for whatever reason.  And you know, I'll say this.  Sitting up here on the bench, I only get what you all give me.  Okay?  I only get what you all give me.  I don't know what's in the rest of the world.  I don't know what all the considerations were in the plaintiffs choosing their litigation strategy, the defendants choosing.  I don't know.  I'm not being critical.

All I'm saying is I've got to sort through it, Mr. Guynn, and I've got to figure out -- I've got to figure out, in terms of weight of the evidence and what it goes to, how this shakes out.  Okay?  And so I'm just telling you that's

why I ruled with regard to Ms. Rutz's testimony in that way. I'm going to allow her statements in about her views as to the process in 2020, and I'm going to allow the other school board members to testify as to that.  Okay?  But it does not go to the reasons why they voted in 2024 because that testimony is not admissible.

MR. GUYNN:  But an inference from the testimony would be, Your Honor --

THE COURT:  As I said two weeks ago, with all due respect, you're asking me to guess.  Okay?  You're asking me to guess as to what their intent is.  And you know what it is?  On that issue -- if it gets to that.  It may never get to that, you know?  I mean, they may not be able to meet their burden of proof on the first prong on equal protection.  I don't know. We have to see.  Right?  They have their theory and we'll have to see whether it carries water.

But that issue of inference -- and I know you all have talked about this the whole time we've been talking about legislative privilege.  That issue of inference goes to the weight of the evidence, and that's for me to decide.  And I appreciate your perspective.  I'm going to allow the admission of that evidence.  Okay?  But what I have to think about and sort through -- and it will come out in my written ruling -- is the weight to be accorded that inference.  Okay?  The weight to be accorded that inference in light of the shifting burden of

proof in this case.  I don't how that's going to come out. We've got more evidence to get.  Right?

So I'm going to -- I've overruled the plaintiffs' objections.  I'm going to allow it in.  At the end of the day, I have to juxtapose that, your argument for an inference, with -- and I may never need to get there because they may not meet their prima facie burden of proof.  I don't know.  Right?  But what you're talking goes to that, your burden of showing on the burden shifting under equal protection.  If the burden shifts back to you and you have to show me they would have voted the same way anyway.  You want me to infer from these other statements that there were other reasons.  Right?

MR. GUYNN:  Yes.

THE COURT:  Okay.  Yes.  Right.  But what that -- the question that doesn't answer -- and we'll have to sort it out once all the evidence is in -- is that the same thing -- saying that there are other reasons, is that the same thing as saying they would not have made their decision regardless of the discriminatory intent.  That's a different question that I'm sorting through.

I appreciate your sentiments.  I'm not critical at all.  Mr. Guynn, I've known you for many, many, many, many years, and you're a highly regarded lawyer.  I don't know the evidence in this case like you do.  I don't know the facts in this case like you do.  I appreciate you all's efforts to

present it to me.  I'm not being critical at all.  All I'm doing is making an observation that the issue of legislative privilege -- the legislative intent privilege is going to cut across all the evidence in this case, and it's going to impact the shifting burdens of proof.  And I don't know how that's going to sort out right now, but it will be sorted out when I write my ruling in this case.  And I thank you.  Thank you.

Okay.  Call your next witness.

MS. BANNER:  Your Honor, we have a couple of brief other housekeeping issues, if we could do that first.

THE COURT:  I'm happy to hear from you.

MS. BANNER:  Thank you.

THE COURT:  It is Monday morning, after all.

MS. BANNER:  It sure is, and I think both parties appreciate the Court's attention to our matters over the weekend for today's trial.  So, thank you for that.  We know it was a Sunday afternoon email, and I think we both are grateful we have those deposition designations sorted out for today.

THE COURT:  Yeah.  I wanted you to have time to do the editing.

MS. BANNER:  Yeah.  Our folks who were doing that also appreciate that in advance, so thank you to everyone for that.

THE COURT:  You know, when I was trying cases, I thought that judge just sat there and didn't do anything.  I

thought oh, we have to do all the work.  The judge is just sitting up there.  Well, I've learned over the last 20 years, that is not the case.  There's a lot of work that we have to do and we continue to do, and I'm happy to help you all with as an efficient presentation of evidence as we can.

MS. BANNER:  Well, we are grateful for that attention.

In terms of housekeeping, the first thing is that we wanted to raise that over the past few days, witnesses have testified and there's been conversation in court regarding the historic role of this courthouse and dismantling race-based segregation.  And we wanted to respectfully request that the Court take judicial notice of the existence, placement, and content of the Virginia Department of Historic Resources historical marker that is located immediately outside of this courthouse addressing the judicial rulings arising from the era of Massive Resistance following *Brown v. Board of Education*. And we have it marked as Plaintiffs' Exhibit 326 for identification, and I do have a copy of the picture here if I may approach, Your Honor.

(Plaintiffs's Exhibit No. 326 was marked for identification.)

THE COURT:  I know what it is.  Yeah, you can approach if you want.

Any objection to that from the defense?

MR. GUYNN:  Again, Your Honor, as I think I said earlier, it's not out of the ordinary where I feel like I need to object.  First off, I mean, it's from 1959 or something.  Anyway, I would object to it having any relevance to our case.

THE COURT:  Thank you, Mr. Guynn.  The Court will sustain the objection.  The historical marker that was put up last summer outside the courthouse, noting the efforts -- the rulings of my predecessor, Judge Paul, here related to cases in the city of Charlottesville and Warren County.  Okay?  Didn't relate to Shenandoah County, although -- but in any event, we heard evidence for hours about Massive Resistance in this case from Professor Daugherity.

Professor Daugherity's testimony referred to this marker that is outside the courthouse that he actually reviewed and edited the language on it going forward.  Okay?  Massive Resistance is obviously a historical fact and an issue in this case because it goes to the *Arlington Heights* factors, and the Court has already heard evidence about this sigh.  I heard evidence from the experts.  I don't need to admit the sign itself.  Professor Daugherity testified about it and testified at length about Massive Resistance.  Massive Resistance is a historical fact that will bear on some of the intent issues in this case.

So I'm not going to admit that as a separate -- I don't need to take judicial notice of it.  We've already heard

testimony about it.  So I'll sustain Mr. Guynn's objection.

MS. BANNER:  Thank you, Your Honor.  Understood.

The other matter of housekeeping today is, as in previous days, the parties have agreed to a set of exhibits for admission at the beginning of the day.  With thanks to our counsel on the other side, have been able to work out the majority of our objections to exhibits.  So I wanted to enter into the record of a series of exhibits that will be used during the third day of trial today.

And like previously, and like we just had a discussion regarding, we note that these exhibits are not being admitted for all purposes and are subject to the limitations that have already been articulated by the Court under the ruling at ECF 215.

And I will, as last time, read them slowly into the record.

So it's Plaintiffs' Exhibit 28, Plaintiffs' Exhibit 50, Plaintiffs' Exhibit 51, Plaintiffs' Exhibit 55, Plaintiffs' Exhibit 56, Plaintiffs' Exhibit 169, Plaintiffs' Exhibit 175, Plaintiffs' Exhibit 185, Plaintiffs' Exhibit 186, Plaintiffs' Exhibit 187, Plaintiffs' Exhibit 188, Plaintiffs' Exhibit 189, Plaintiffs' Exhibit 200, Plaintiffs' Exhibit 209, Plaintiffs' Exhibit 211, Plaintiffs' Exhibit 228, Plaintiffs' Exhibit 253, Plaintiffs' Exhibit 256, Plaintiffs' Exhibit 321, and lastly, Plaintiffs' Exhibit 322.

(Plaintiffs's Exhibit Nos. 28, 50, 51, 55, 56, 169, 175, 185, 187, 188, 189, 200, 209, 211, 228, 253, 256, 321, and 322 were marked for identification.)

MS. BANNER:  And that was all I have for housekeeping this morning, Your Honor.  Thank you.

THE COURT:  The last one was which one, Ms. Banner?  322?

Okay.  Mr. Guynn or Mr. Fitzgerald, you all agree that those exhibits just listed by Ms. Banner are admissible?

MR. FITZGERALD:  One moment, Your Honor.

Yes, Your Honor.

THE COURT:  Okay.  Those are admitted.

(Plaintiffs's Exhibit Nos. 28, 50, 51, 55, 56, 169, 175, 185, 187, 188, 189, 200, 209, 211, 228, 253, 256, 321, and 322 were admitted.)

THE COURT:  Please proceed.

MS. BANNER:  Thank you.  I'm going to --

THE COURT:  Does defense have any housekeeping matters you want to raise this morning before we hear our first witness?

MR. FITZGERALD:  Your Honor, if we may just request.  Kyle Gutshall is going to be in Harrisonburg tomorrow morning for a breakfast meeting, and it would be convenient for him, for us, if he could testify tomorrow afternoon.  I know the plaintiffs still have a witness to put on tomorrow.  We just

wanted to put that before the Court.  Thank you.

THE COURT:  Yeah.  We'll try to do whatever we can to work out the schedule of folks.  Yeah, absolutely.  And I really appreciate the parties fulsome cooperation on all these logistical issues.  Thank you for that.

MS. BANNER:  Thank you.

THE COURT:  Okay.  Call your next witness.

MR. GREELEY:  Thank you, Your Honor.  This is Sam Greeley for the plaintiffs, and we call A.D. Carter to the stand.

THE CLERK:  Sir, if you would raise your right hand, please.

A.D. CARTER, CALLED BY THE PLAINTIFFS, SWORN

THE WITNESS:  Yes.

THE CLERK:  Thank you.  Have a seat.

THE COURT:  Good morning, sir.

THE WITNESS:  Good morning.

THE COURT:  Have you warmed up from being outside yet?

THE WITNESS:  I have.  I had the heat on nice and warm in the car.

THE COURT:  Good.  Good, good, good.  It's chilly out there.

THE WITNESS:  It is.

THE COURT:  Go ahead.

MR. GREELEY:  It sure is, Your Honor.  Thank you.

DIRECT EXAMINATION

BY MR. GREELEY:

Q    Thank you, A.D.  Could you please introduce yourself to the Court?

A    Yes.  My name is A.D. Carter, V.

Q    And are you a plaintiff in this case?

A    I am in fact a plaintiff in this case.

Q    All right.  How old are you?

A    I'm 18 years old.

Q    And are you a member of the NAACP?

A    I am.

Q    And A.D., with respect to race, how do you identify?

A    I refer to myself as mixed with Black and White.

Q    And a slightly different question.  How do other people tend to identify your race?

A    Anywhere between mixed and Black.

Q    A.D., where do you attend school?

A    I currently attend James Madison University.

Q    Did you just wrap up finals?

A    I did.

Q    Congratulations.

A    Thank you very much.

Q    And so before --

THE COURT:  It feels good to be done with exams,

doesn't it?

THE WITNESS:  I very much agree.

THE COURT:  Yeah.  I can relate.

Go ahead.

BY MR. GREELEY:

Q   So A.D., before attending James Madison, where did you attend high school?

A   I attended high school at Strasburg High School and in my junior and senior year, I duly attended Strasburg High School and Massanutten Regional Governor's School.

THE COURT:  Strasburg are the Rams, right?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

BY MR. GREELEY:

Q   And A.D., can you explain to us what the Massanutten Regional Governor's School is?

A   Yes.  The Massanutten Regional Governor's School is a program for students that -- well, so, you have to apply to get in, and if you get in, you have a chance to take more academically rigorous courses, and most of the classes there are dual enrolled, and it's really just an opportunity for students to take their academics as seriously and as far forward as possible.

Q   And what does dual enrolled mean in that context?

A   Dual enrollment would mean that you're enrolled in a class

at your high school as well as through a local community college, which in our case was Laurel Ridge.

Q    So you mentioned applying to the Governor's School.  When did you do that?

A    I applied in my sophomore year of high school.

Q    So how many days a week were you at the Governor's School?

A    Every day.  Well, every schoolday, of course.

Q    That's fair.  And now, when you first started at the Governor's School during your junior year, where was it located in your junior year?

A    In my junior, it was located the then-named Mountain View High School.

Q    And how about your senior year.  What was the building named then?

A    The name of the building my senior year was Stonewall Jackson High School.

Q    So during your senior year, you were at Stonewall Jackson High School every day for half of the day for Governor's School.  Is that right?

A    Yes, that's the truth.

Q    A.D., were there any other Governor's School options for students in Shenandoah County?

A    No, there were not.

Q    And when did you graduate from high school?

A    May of 2025.

Q    So A.D., I want to talk about school names at issue in this case.  So in 2020, were you aware that the school board had voted to remove the Confederate names from Stonewall Jackson High School and Ashby-Lee Elementary School?

A    I was.

Q    And what grade were you in at the time?

A    In 2020, I was in seventh grade.

Q    And so how were you made aware that the name was changed?

A    Actually, my mom and a couple of my friends had also brought it up to me.

Q    Starting with your mom, why did your mom bring it up to you?

A    She brought it up to me because she thought I would find it -- I mean, clearly, it applies to me.  Like, it matters to me because it's a school inside the county where I attend school, and she also thought that I would think it was great, and I did simply because her school that she teaches at was also renamed just before it.  It was also named Stonewall Jackson High School.  So it was good to hear about sort of taking a step forward.

Q    And what did you discuss -- why did you discuss it with your friends?

A    My friends, for the same reason, had brought it up to me. They just thought it was something I would appreciate and find interesting, and I did, and so we had a little conversation

about it.

Q   So then jumping ahead a few years, how did you feel when you found out that the school board -- actually, before we jump ahead --

THE COURT:  Where did your mom teach?

THE WITNESS:  She taught at Stonewall Jackson High School in Prince William County.

THE COURT:  In Prince William County?  Okay.

THE WITNESS:  Yes.  That's totally separate.  Yes.

THE COURT:  I understand.  And she taught there, and then you're saying in 2020, that name was changed as well?

THE WITNESS:  Yes.  It's now Unity Reed High School.

THE COURT:  Unity?

THE WITNESS:  Unity Reed.

THE COURT:  R-E-E-D?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Of course.

BY MR. GREELEY:

Q   So A.D., why were you interested in the name change?  What did that mean to you in 2020?

A   It really just -- yeah, it felt like we were taking a big step forward as a community, and I felt that we were, you know, stepping out of the days of glorifying the name of Stonewall Jackson.

Q    And who was Stonewall Jackson, to your?

A    To my understanding, he was -- he fought very valiantly for, you know, the cause of the Confederacy, which was -- you know, they were fighting to maintain slavery.

Q    And what does the kind of Confederacy represent to you?

A    Just that they had broken apart from the northern states in an attempt to preserve slavery as an institution in the South.

Q    And what does the name Stonewall Jackson represent to you?

A    It represents someone who not only owned slaves but fought -- yeah, really fought hard for -- to preserve slavery as an institution, and he really -- I mean, he must have fought pretty well if he got a nickname for one of his battles. Right?  So, yes, that's what that means to me.

Q    And where does that kind of background come from?  Where did you learn about the Civil War and Stonewall Jackson?

A    Well, not only living in Strasburg, you know, right here in the Shenandoah Valley where kind of -- some of that stuff happened.  But, of course, in school, I've learned about Virginia history, but also being of mixed race between Black and White, I really -- my parents have really made an effort to inform me about those kinds of things and issues in the past that have related to race and they've led to -- they pertain to who I am, you know, as my identity is Black and White.  So I appreciate and understand both sides.

Q    So now jumping ahead.  In 2024, were you aware that the school board was planning to vote to reinstate the Confederate names?

A    Yes.  I became aware not long before the meeting and vote actually happened.

Q    And how did you become aware, do you remember?

A    Some of my friends had brought it up to me.  They were talking about going to the meeting and speaking against the -- the reversion of the names, and they were asking me if that was something I would be interested in and I said yes, surely, I would.

Q    And how did the fact that a vote was coming up, how did that make you feel?

A    It really took me by surprise.  I had no idea that this would ever -- like, I had never even dreamed that this would happen, you know?  That we would ever think about ever returning to the names Stonewall Jackson and Turner Ashby and Robert E. Lee, you know, being on the names of schools.

Q    I'd like to show what's been marked as Plaintiffs' Exhibit 50.  A.D., do you recognize this document?

A    I do.

Q    And what is it?

A    It is an e-mail between -- that my mom had sent to me and it was -- she was asking about what I thought about a letter she was drafting to write to the school board.

Q    And how do you know this e-mail exchange was between you and your mom?

A    Well, frankly, because I received it from my mom.

Q    And did you discuss it with her?

A    I did.

        MR. GREELEY:  Your Honor, plaintiffs move to admit Exhibit 50.

        THE COURT:  Any objection?

        MR. FITZGERALD:  No objection.

        THE COURT:  Oh, no, its already in.  Fifty's in. Yes, received.

BY MR. GREELEY:

Q    A.D., can you please read the sentences of your mom's statement starting with changing the name back?

A    Yes.  Just read the highlighted section?

Q    Yes, please.

A    Got it.

    Changing the name back to Stonewall Jackson High School is moving backwards into the past.  It is time to let the past stay in the past.

Q    And what does that statement mean to you?

A    Quite simply, to me, it means that the name Stonewall Jackson was in the past and it deserved to stay there, and it was time to let it be.

Q    And do you agree with that?

A    I do.  I agree.

Q    And can you please read the sentence of your mom's statement starting with a name?

A    Yes.

A name that conjures up people who fought to preserve slavery and to break apart our union is not unifying nor does it bring hope to many minority students who attend these schools.

Q    And what does that mean to you?

A    Well, it means that -- yeah.  Stonewall Jackson, of course, being one of the names in question, it's a name that signifies sort of the South and their secession, which quite literally was breaking up the union of the states at the time, and therefore, it does conjure up the names that fought to preserve slavery and break apart our union.

Q    And can you read the final sentence there, starting with I urge you?

A    Yes.

I urge you to consider the impact of school names on our students' well-being and take steps towards inspiring unity, resilience, and hope for a better future by keeping the names of Mountain View High School and Honey Run Elementary.

Q    And A.D., what did you hope that the school board would do in response to this letter?

A    Plain and simple, I hoped they would read it and possibly

agree with it.

Q    And do you know if this letter was sent?

A    It was.

MR. GREELEY:  So we can take this exhibit down.

BY MR. GREELEY:

Q    So we've talked about the May 9, 2024, school board meeting where they were going to vote to potentially restore the Confederate names, and you mentioned talking to your friends about going to the meeting and speaking at it.  Did you attend that meeting?

A    I did.

Q    And did you speak at the meeting?

A    Yes, indeed.

Q    And why did you choose to speak at the meeting?

A    I felt that it was almost my duty to speak for a cause that I believed in, which was maintaining the names that weren't, you know, invoking the names of Confederate generals.

Q    And did you feel like you had any kind of certain perspective to bring to the school board?

A    Most definitely.  Being a student at not only another high school in the county but also at the Governor's School, which was housed within the high school that was in question, and I felt that my position being between both was certainly unique.

Q    And did you have any other unique perspective that you could potentially bring to the school board?

A    Yes.  Of course, the fact that I'm mixed between Black and White, I felt that that was also something that made my perspective different and therefore possibly valuable in this situation.

MR. GREELEY:  I'd like to pull up what's been previously marked and admitted as Plaintiffs' Exhibit 24.

BY MR. GREELEY:

Q    So A.D., let's turn to Page 135.  A.D., do you recognize this document?

A    I do.

Q    And what is it?

A    It's the transcript of the SCPS school board meeting.

Q    And do you see your name on the transcript?

A    I do.

Q    All right.  And if we scroll through to the next page, and then scroll through to the page after that, does that accurately reflect your statements at the school board meeting?

A    It does.

Q    I think they spelled Strasburg wrong.

A    Good chance.  Yeah.

Q    That might be on the transcription end on our side.

A    They did.

Q    So A.D., I want to ask you about one part of your statement, beginning at Page 137 here.  And can you please read the last section starting, if we're going to talk about

repeating history?

A     Yes.

If we're going to talk about repeating history, they name the school due to racist thought processes and so we're going to rename the school back to it?  Don't understand that, either.  Thank you.

Q     And what did you mean by that?

A     Well, the name, of course, was -- the name of the school, of course, was named after Stonewall Jackson who, of course, was racist, quite plainly.  He fought for slavery, and slavery was based in the idea that the slaves, which in this case were Black people, were less than White people who were, you know, their masters or, you know, otherwise not enslaved.

Q     And so how does it make you feel to have someone associated with these racist thought processes being voted on to be put back on the school you attend?

A     It really put a knot in my stomach, at the very least. It -- it really didn't make me feel good to know that, you know, we were talking about glorifying the name of a man who had fought for that once again.

Q     And so what are you trying to communicate to the school board during your statement?

A     My statement, the purpose really was that I hoped they would listen to me and hear what I had to say and possibly that what I had to say could sway, you know, their vote in some way,

of course, in the direction of maintaining the names Mountain View and Honey Run.

Q    And how did you observe the school board members react to your statement?

A    I really didn't see much of a reaction at all.

Q    And how did you get that impression?

A    I really -- I don't know if it's because I spoke later on in the night, but it really felt like it was just on to the next.  Like, it felt like -- I don't know.  It felt like it was sort of something that they had to sit through.  It almost felt like -- I mean, I was looking at them and it felt like their eyes were kind of glazed over and it felt like they were, you know, tired, which I can't lie.  I probably would be, too, if I was in their seat.  But it feels like something where more attention would be required.

Q    So ultimately, were you still at the school board meeting when they did vote to reinstate the Confederate names?

A    I was.

Q    How did that feel?

A    Gosh.  Initially, it didn't even feel real.  I -- it stunned me for a little bit and I really had to take some time to let it sink in that it actually happened.  That, you know, any community would take such a big step backward, and it really felt like what I had to say and the opinions of others who spoke, you know, alongside my claims that reverting the

names back was not the right thing to do, and it felt like we just weren't heard.

Q    And what did the school board's vote to revert back to the Confederate names, what did that signal to you?

A    As I just said, I felt like -- it really felt like what I had to say really wasn't heard or taken fully as it was meant to be taken.  You know?  It felt as if they really weren't hearing what I was saying or wanting to hear what I was saying, I guess.

Q    And about how soon after the school board voted to reinstate the Confederate names did these school signage begin to change?

A    It was actually being changed -- I walked out of -- so Governor's School ended after -- like, the school year for Governor's School ended after the school year for Shenandoah County Public Schools, so it was on a day that Shenandoah County Public Schools were already on summer break and Governor's School was still in session, and I had walked out of Governor's School that day, and I saw the big truck, you know, lifting the guy up and he was changing the signage on the front of the school.  And as I was, you know, driving away from the school, I saw the sign out front being changed back to the Stonewall Jackson sign as well.

MR. GREELEY:  I'd like to pull up what's been marked as Plaintiffs' Exhibit 51.  That's the first page.  If we could

go to the second page there.

THE WITNESS:  Oh, yes.

BY MR. GREELEY:

Q    A.D., do you recognize this document?

A    I do.

Q    And what is it?

A    It's a text conversation between me and my mom.

Q    And there's some redactions here.  How do you know that it's the text exchange between you and your mom?

A    Frankly, because I sent and received these messages here.

MR. GREELEY:  Your Honor, plaintiffs move to admit Exhibit 51.

THE COURT:  Fifty-one's already been admitted without objection.

MR. GREELEY:  Apologies, Your Honor.

THE COURT:  No worries.

BY MR. GREELEY:

Q    So A.D., what prompted this conversation between you and your mom?

A    Well, it was the -- I had actually taken a picture of the folks that were changing the name on the front of the school and as well as I got a picture of the sign out front of the school being changed as well, and so I sent it to my mom.

Q    And can you read this conversation between you and your mom?

A    Yes.  I said point of view, leaving Stonewall Jackson High School today.  And, of course, the pictures were sent with that message, and my mom said, ridiculous.  And I said, yeah.  And mom goes, I'm wondering if they used school employees to put these signs up and who paid them.  I said, the school custodians put up the sign out front but it looks like they contracted a company to change the name on the front of the school.

Q    So how did you feel when the school signage changed from Mountain View to Stonewall Jackson as you were leaving the building?

A    It really started to feel real.  Like, that whole time, I was aware that, of course, the name had changed, but no one really started changing the name -- or no one had really started calling it anything other than Mountain View until it felt like it really was not Mountain View anymore, and it felt like, you know, seeing the names being changed, it just became more real.

Q    And this was at the end of your junior year of high school?

A    It was.

Q    So you'd be going back to the Governor's School with it having the Stonewall Jackson name at the front.  Is that right?

A    Yes, I was.

Q    And knowing that feeling, why did you still want to --

THE COURT:  How old were you then?

THE WITNESS:  Let's see.  At the end of my junior year, I must have been 17.

THE COURT:  Seventeen?  Okay.  I didn't know whether you were 16 or 17.  Okay.

THE WITNESS:  It's all good.

MR. GREELEY:  Thanks, Your Honor.

THE COURT:  I'm sorry, Mr. Greeley.  I interrupted you.

MR. GREELEY:  No worries, Your Honor.  Of course.

BY MR. GREELEY:

Q    So A.D., after the school board voted to restore the Confederate school names, did you ever speak to anybody about how you felt about that name change?

A    Yes.  I spoke to my friends.  I spoke to my mom.  Well, really, my whole family.  Yeah.  It really just didn't make me feel good at all, and I just felt like I just wanted to talk to people about it.

Q    And did talking to people about it make you -- how did that make you feel?  How did that -- what did that do for you?

A    Well, it kind of depended who I talked to, of course.  I mean, my family kind of not necessarily tried to comfort me, but they were in agreement with how I felt, that they were really disgusted that that happened and they really didn't feel that it was the right move at all for our county or the school.

Q    And how about your friends?  How were those discussions?

A    My friends also agreed with me.  They really were also disgusted by it.  They thought it -- thought it was terrible, especially some of my friends, too, were some of the seniors at the Governor's School, so they wouldn't be attending the school next year as the name Stonewall Jackson would be on the front, but they were in agreement with me.

Q    And you would be attending when it had Stonewall Jackson on the front?

A    I did, my senior year.

Q    Did you also speak to -- did you also speak to the press, to the media, about the changing of the names?

A    I did.

MR. GREELEY:  I'd like to show what's been marked and already admitted as Plaintiffs' Exhibit 108.

(Plaintiffs's Exhibit No. 108 was marked for identification.)

BY MR. GREELEY:

Q    And A.D., do you remember speaking to a reporter from *The Northern Virginia Daily*?

A    Yes, I believe I spoke to *The Daily* multiple times.

Q    And if we turn to Page 4, kind of at the top there, it looks like there's a quote that's attributed to you.  Is that, in fact, a quote from you to the reporter?

A    It is.

Q    And did they capture it accurately?

A    They did.

Q    A.D., can you please read this quote to us?

A    It says, I have been shown racism multiple times and it's been towards me and my fellow students of color, and I've seen it happen in the schools.  I don't like it, and I don't want it to happen anymore.  I would like to put an end to that and restore the names of Mountain View High School and Honey Run Elementary School.

Q    A.D., can you tell us about the racism that you were referring to here?

A    Oftentimes, you know, it would come across as a joke or something that, you know, someone would take lightheartedly, and oftentimes, you know, people think they're being funny when they're not or, you know, they're just trying to, you know, make everybody laugh.  Of course, it's high school.  Everyone's trying to make everybody laugh.  But some -- yeah, I mean, some of these topics that are joked about are serious.

          THE COURT:  Okay.  I'm sorry.  I didn't want to interrupt you, sir.

          THE WITNESS:  You're all good.

          THE COURT:  Mr. Greeley, the Clerk tells me 108 has not been admitted.

          MR. GREELEY:  Apologizes, Your Honor.  My note said it was.  Well, with the prior identification of the statement,

Your Honor, plaintiffs would move to admit Exhibit 108.

THE COURT:  All right.

Any objection?

MR. FITZGERALD:  Yes, Your Honor.  Just the same objections as yesterday on hearsay grounds.  Friday, sorry.

THE COURT:  Well, the witnesses has identified it as his statements.  He's here.  He's testified about his statements.  He can be cross-examined about it.  Overrule the objection.

(Plaintiffs' Exhibit No. 108 was admitted.)

THE COURT:  Please proceed.

MR. GREELEY:  Thank you, Your Honor.

BY MR. GREELEY:

Q   So A.D., you were mentioning --

THE COURT:  So I'm going to admit this Exhibit 108 as to this witness's testimony.  Okay?  So you can cross-examine him on it, Mr. Fitzgerald.

BY MR. GREELEY:

Q   Thank you, A.D.  So going back to the statement of the racism that you've experienced before, was some of that in Shenandoah County schools?

A   Most definitely.

Q   And was it just in one of the schools, was it several schools?

A   I will say it was more so in Strasburg because, of course,

that's where I spent -- you know, I did spend all four years at Strasburg.

Q    But you did experience it while in high school?

A    Yes, in high school, for sure.

Q    And you mentioned that some people would bring things up as a joke maybe, but they were serious to you.  Did you always react even when something was serious to you, when someone said something that you felt was racist?

A    In some instances, I would, though in other instances, of course, I was just trying to fit in and not be the guy trying to take everything seriously.  So in some instances, I did not necessarily say something about it when I definitely should have.

Q    Well, did you kind of report these instances of racism when you experienced them?

A    No, I really didn't.

Q    And can you give us an understanding of why that is?

A    Really, again, I just didn't -- I didn't want to be the guy that was getting people in trouble for trying to make what they saw as a joke.  So I really felt that, especially in the instances where I did speak up and say something, I felt that -- that it would be better to do that than to really get someone in some more serious trouble for something that it's not necessarily their fault that they didn't understand necessarily the weight that's behind something like that,

especially if they thought that it was okay to make an open comment about it.  I'm sure they didn't necessarily understand the weight of what they were saying.

Q    But was there a weight to those statements and how they affected you?

A    Most definitely.

Q    And in your statement, you said you wanted to put an end to that and restore the names Mountain View High School and Honey Run Elementary School.  Why did you want to keep Mountain View High School and Honey Run?  Why did you want to keep those names in connection with -- I guess to phrase my question better, how would the names Mountain View and Honey Run have impacted the racism that you experienced in Shenandoah County schools?

A    I felt that when the names were changed to Mountain View and Honey Run, it felt that it was sort of sending a message that racism's not something that we support and that, you know, of course, we were taking down the names of these Confederate generals from the high schools, and it felt that we were, again, taking a step forward away from racism and all those things that we would really like to leave in the past.

Q    All right.

          MR. GREELEY:  All right.  And I'd like to pull up what's been marked as Plaintiffs' Exhibit 112.

          (Plaintiffs' Exhibit No. 112 was marked for

identification.)

BY MR. GREELEY:

Q    And A.D., do you recognize this document?

A    I do.

Q    And what is it?

A    It's an article.  Sorry, a news article, of course, that's covering the press conference.

Q    And do you remember giving a statement to this reporter? I think it's *The Virginia Mercury*.

A    Yes, I do.

MR. GREELEY:  Your Honor, I believe this one has not been admitted into evidence, Plaintiffs' Exhibit 112, so plaintiffs would make that into evidence.

THE COURT:  Okay.  Any objection to 112?

MR. FITZGERALD:  Same objection, Your Honor.

THE COURT:  I'll -- if it quotes -- I'll admit it to the extent that it quotes from this witness.  He can -- because he is here and he can be subject to cross-examination about it, just as the other plaintiff B.B. was here and was able to be cross-examined in this courtroom.  So I'll admit it for that purpose, and I'm not going to consider the rest of the news article for the truth of the matter asserted.

(Plaintiffs' Exhibit No. 112 was admitted.)

MR. GREELEY:  I understand.  Thank you, Your Honor.

BY MR. GREELEY:

Q    And if we turn to Page 3 and look at the quote in the middle there, starting with the reason.  A.D., can you read that out to us?

A    I can.

The reason they had done that was that they were trying to disincentivize Black people from attending the high school, and so they had used it specifically as a scare tactic to try to keep them out.

Q    And when you say the reason they had done that, what were you referring to?

A    I was speaking about the reasoning for the initial naming of Stonewall Jackson High School.

Q    And why do you believe that the naming of the school Stonewall Jackson High School was to disincentivize Black people from attending school?

A    Not only was it named kind of in the wake of Massive Resistance, but it was also -- he was -- it was -- yeah, it was during when they were trying to -- well, I suppose they were trying not to integrate the schools but, of course, it was law at that point.

Q    And when did you kind of learn about that background?

A    It was shortly after the meeting where they voted in 2024. I decided to go and do some research, as well as my mom, and we both found ourselves paying a lot more attention to this issue.

Q    And once you learned that information, how did that make

you feel?

A    It really made me feel even worse that I was, you know, attending Governor's School within the building or that I would be, I suppose, because this was before I was really attending Governor's School within the newly renamed Stonewall Jackson High School.  But it really added a new weight to the name of Stonewall Jackson High School.  It was kind of another level of how bad it was, that it was named in the face of Massive Resistance where they were actively trying not to allow people of color to attend the school.  Not disallow, necessarily, but sort of as a last-ditch effort to at least make them feel unwelcome.

Q    And, you know, having the -- turning now to senior year, when you did attend the school with the Stonewall Jackson name, did that make you feel unwelcome?

A    Definitely.

Q    How so?

A    I mean, initially just walking under the name every day, it really was -- I mean, it was a reminder of the fact that, like we just stated, they had named it that in the face of Massive Resistance to try to disincentivize people of color from attending the school, and then also the fact that Stonewall Jackson was who he was and fought for what he fought for.

Q    And to that point, you mentioned that the -- you know, you

attended Stonewall Jackson and see the name at the top of the school.  Can you walk us through kind of a morning going to Stonewall Jackson where you encounter the Confederate name and Confederate symbols?

A    Yes.  I -- on a regular day, I get to the school on a bus and, you know, walking in -- well, actually driving in on the bus, I would see the sign out front first, immediately, and then of course, we would get off the bus and walk into the school under the name of Stonewall Jackson High School.  And I'd walk in and as I was on my way to the Governor's School, which is mostly housed, you know, in one specific section of the school, I still have to, of course, walk through the school lobby and things to get to where I needed to be.  So I would see the name Stonewall Jackson just around in the hallways.

It was more so, you know, in reference to, like, there was a team or something of that sort that had won some sort of competition, and of course, they competed under the name Stonewall Jackson High School.  So, you know, nothing against that team itself, but of course, I've seen the name, once again, on my way down to the Governor's School.

Q    And would you kind of see or hear announcements about that?  Is that what you're referring to?

A    Yes.  I would -- I would hear it especially, you know, if any of the faculty made mention of the school and said the school name, it would have to be Stonewall Jackson High School

because, of course, that's what it was called at that point.

Q    And how about in kind of school gear and athletic gear and things like that.  Did you see it in other places?

A    Yes.  Of course, it was more SJ than Stonewall Jackson written out, but yes, I would see SJ quite often, even, you know, playing against other sports teams or even around the school, some people would have jackets on or T-shirts or whatever.  Of course, it's a school T-shirt, but it's still Stonewall Jackson.

Q    And did you wear any Stonewall Jackson gear at any point?

A    Most definitely not.

Q    So seeing the name Stonewall Jackson, you know, throughout the day as you're at Stonewall Jackson High School, how did that make you feel?

A    It really lended (sic) itself to the fact that, once again, it just made me feel uncomfortable and even unwelcome as, of course, it was named Stonewall Jackson, like we stated earlier, in an effort to disincentivize, you know, people of color, but specifically Black people from even wanting to attend the school.  So it was certainly achieving its goal of making me feel unwelcome.

Q    And how did encountering the Confederate name and symbols, how did that impact your social interactions at the school?

A    I would certainly steer away from honestly even the topic of the school name oftentimes in an effort to, you know, not

have to get confronted about it.  I -- not that I ever really was, but I just felt that it would be uncomfortable if I had to have a conversation with someone that happened to have, like, a different viewpoint on the subject.  And of course, I'm not opposed to talking about it, but it's not a conversation I want to have all the time.  And of course, if I bring it up on the premises, I'm kind of looking for it, you know?

Q    Well, is there something I guess then, if you're open to discussion about issues but you didn't want to bring this up, was there something kind of specific about this name change topic, about the Stonewall Jackson name, that made it harder to bring up?

A    Yes.  I -- I really -- I didn't necessarily want to bring it up, especially if someone, like I said earlier, did have a different viewpoint, it could maybe affect the way I even see the person, of course, if they were in full support of this name or didn't really see the weight that I felt behind it. And of course, everyone, you know, walks a different path, but on the path that I walk, I have seen that this is not something that I want to support.

Q    And in those interactions, was that students, was it faculty, was it both?

A    I just -- I really just tried to avoid the topic altogether with anyone I talked to, just in case.

Q    Did the Stonewall Jackson name being on the school, did

that make you feel ostracized at any point?

A    I certainly felt I was experiencing it differently from many other people, especially since, of course, I am half Black, and so therefore, I feel that I have a certain viewpoint on the topic that not a lot of other people in SCPS have, you know?  I feel that, of course, my White counterparts necessarily wouldn't have the same experiences that I've had and the same -- or necessarily feel the same way that I do about it.  And of course, I wouldn't expect them to because, again, we all walk different paths and, you know, the color of our skin sometimes does affect the path that we walk.

Q    And so because we're talking about school, how did, you know, encountering the Confederate name and symbol at the Governor's School your senior year impact you academically?

A    I will say my grades did actually drop off a little bit, truly.  And it's not -- I won't say it's specifically because of the name.  Of course, I was taking harder coursework.  But it -- it did almost feel like I -- like, it was always there. You know?  Like, I felt it.  I was inside the high school named Stonewall Jackson High School.  I felt it, you know?

    And while, you know, I would do my best to focus on the work and just do my work, talk to my friends, something like that, just to take my mind off of it, it was always there.  You know, I felt that I was -- not I felt that I was.  I was.  I was inside a building named Stonewall Jackson High School, and

I could tell.  Like, it was -- you know, it was just there, and it just weighed on me.  It was -- really, it was like I had -- it felt like -- almost like an invisible ball and chain.  Like, I was just -- had that weight that I was carrying around.

And the reason I say it was invisible is because not a lot of other people really saw or felt the way that I was feeling about it.  And of course, I didn't want to bring it up to, you know, become, like, a burden or that I felt, like, uncomfortable about it a lot of times because, you know, other people might feel differently and I was, again, trying to steer away from that conversation.  Or like I said earlier, I don't want to be a burden.  Like, tell people how I was feeling and then, of course, they would, you know, try and help me through it.  I felt like I should be able to take care of it myself, handle my own feelings.

Q    And with the kind of academics, I think you mentioned that there was an impact senior year when the name was changed.  What -- can you tell us what your grades were like junior year?

A    Junior year, I believe that I only had one C, and in senior year, I did have two, I believe.

Q    And A.D., you know, how did encountering the Stonewall Jackson, the Confederate name every day at school, how did that impact your mental health?

A    It's like I said.  I felt like I had an invisible ball and chain on.  It felt like I wasn't necessarily as free as

everyone else.  Like, I always had some mental real estate that was kind of held back by the fact that I was in a Stonewall Jackson High School, inside of the building, and it really felt that I was not welcome there as a result of the name.  I really just felt by naming that -- by naming the school Stonewall Jackson High School, it felt that I was not really heard or my viewpoint wasn't really valued.

Q    A.D., did you feel that way when it was named Mountain View?

A    No, most definitely not.

Q    Thank you.

A    Of course.

THE COURT:  Any cross?

MR. FITZGERALD:  Yes, Your Honor, but if I may just request a brief restroom break before I start.

THE COURT:  Let's take a break until 10:30.

MR. GREELEY:  Mr. Carter, sir.

THE COURT:  Mr. Carter -- it's A.D. Carter.  Right?

THE WITNESS:  Yes, sir.

THE COURT:  Mr. Carter, while we're in recess, since you're on the witness stand and you're still under oath, please don't discuss the case with anyone, including counsel for the plaintiffs, while we're in recess during this break in your testimony.  Okay?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  We'll stand in recess until 1030.

(A recess was taken from 10:22 until 10:35)

THE COURT:  Mr. Carter, you're still under oath.  Okay?

THE WITNESS:  Yes, sir.

THE COURT:  Cross-examination.

MR. FITZGERALD:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. FITZGERALD:

Q    Hello again, Mr. Carter.

A    Hello.

Q    Would you prefer I call you A.D. or Mr. Carter?

A    Whichever you prefer.

Q    Okay.  I'll call you A.D.  It's going to be hard for me not to call you A.C.  I've been calling you that for so long, but if I slip up and call you A.C., forgive me.

I hope you've been well since we last spoke at your deposition.  Did finals go all right?

A    Yes, finals went quite well.

Q    Good.  I'm sure you did well.  You're an exceptional student.  That's fair to say, isn't it?

A    I try to be.  Certainly try.

Q    You're humble.  Only three absences your entire time in high school?

A    Wow.

Q    3.5 overall high school GPA?

A    It should have been so much higher.

Q    Well, that's mostly A's and B's, isn't it?

A    I suppose.

Q    You had a slight dip in your grades in your senior year at the Governor's School, but nothing too drastic, right?  Just a few C's?

A    I wouldn't say that's not too drastic, though.  I really would expect more from myself, and I'm really sort of embarrassed about that.

Q    I understand.  You've got high standards for yourself. That's a good thing.  So junior year was all A's and B's. Right?

A    I really think so.  I can't quite remember.

Q    And you attribute that, in large part, to more rigorous coursework and substantially increased homework?

A    Yes, especially in my junior year.  I fell that that was really almost harder academically than my senior year.

Q    But that little dip in grades didn't prevent you from getting into Howard University, James Madison University, and George Mason University.  Correct?

A    That's true.

Q    Three outstanding schools, especially JMU, if I may say so.  Ultimately, you chose JMU right here in Harrisonburg.

Isn't that right?

A    I did.

Q    You know James Madison owned slaves.  Right?

A    I'm aware of that fact.

Q    But you don't think the name JMU should be changed?

A    I don't.

Q    You're having too much fun at JMU to be worried about that, aren't you?

A    Not necessarily.

Q    But you're having some fun.  Right?

A    When's college not fun?

Q    Being an alumnus myself, I would know.  But you're keeping up with your studies as well, I'm sure?

A    Doing my best, for sure.

Q    And staying away from that jungle juice?

A    What's jungle juice?

Q    Good answer.  That stuff's dangerous.

So you played sports at Strasburg High School as well, didn't you?

A    I did.

Q    So to be clear, you were a Strasburg Ram in all of your sports?

A    I was.

Q    You were never a Stonewall Jackson General?

A    No, I was not.

Q    You played football for Strasburg?

A    I did.

Q    You were the starting kicker, weren't you?

A    I was.

Q    You went to state championship your senior year, didn't you?

A    That's true.

Q    And you didn't play against Stonewall Jackson's football team, did you?

A    We didn't.

Q    So the name change had no impact on your football performance?

A    Not football.

Q    You played soccer as well, yes?

A    I did.

Q    And swim team?

A    Yes.

Q    And you did play Stonewall Jackson in those sports. Correct?

A    I did.

Q    And when you played Stonewall, you got a little boost of motivation to win, didn't you?

A    I suppose you could say that.  More or less competition between folks I used to play travel with.

Q    Well, you suppose I could say that, but you said that,

didn't you?  You got a little boost of motivation.  Is that right?

A    I don't quite remember, but I wouldn't put it past myself to say that.

Q    All right.  Well, I'm happy to just refresh your recollection.  A.D., do you recall giving your deposition on September 25, 2025?

A    Yes.

Q    Is that your signature there certifying that you read your deposition, made some changes, and approved as now written?

A    Yes.

Q    You recognize this copy of your transcript, deposition transcript?

A    I do.

Q    Turn to Page 72.  So I asked you there on Line 4 -- I'm sorry.  Let's go to Line 2 of that page.  You answered, well, I'll say that in swim team and soccer, we did play against them, meaning Stonewall Jackson.

A    Yes.

Q    And I asked, okay, tell me more about that.  And can you read your answer for me there, starting on Line 5?

A    I said so, well, when we did swim, I actually -- their swim coach, I've known that guy forever.  But sometimes we would talk about the issue and, you know, he's not really supposed to say anything, so I would just kind of tell him my

views and he would just kind of nod and did nothing more than -- well --

Q    Sorry.  Are you able to read it?

A    Yes.

Nod and listen whenever I spoke to him.  But, you know, it kind of did nothing more than make me a little -- little more competitive against -- when I was swimming against them.

THE COURT:  What strokes were your best strokes?

THE WITNESS:  I went to states in butterfly and freestyle.

Should I continue to read?

BY MR. FITZGERALD:

Q    Yes, please.  Just finish up your answer there.

A    Understood.

And then in soccer, I was actually friends with a lot of their soccer players because we had played travel together before.  I mean, of course, once again, it gave me a little -- a little more, I guess, internal motivation to beat them.

Q    Thank you.

A    So I suppose I've now, yes, refreshed my memory that I did, in fact, say that it gave me more motivation to win and beat them.

Q    So it gave you a little extra motivation even though you didn't hold it against the players that their school was named after a Confederate general.  Right?

A    Of course not.  It's not their choice.

Q    Because you understood that they really had no say in the name of their school.  Right?

A    Yes.

Q    It wasn't like the players were beating their chest for Stonewall Jackson, the Confederate general.  Right?

A    Not that I saw.

Q    In fact, all the players on their team, in your words, displayed perfectly fantastic sportsmanship, didn't they?

A    Yes.

Q    You never felt inferior to your White peers at the Governor's School, did you?

A    No, I did not.

Q    And that's because you have a high self-esteem?

A    I suppose you could attribute it in part to that.

Q    Well, you said you have a high self-esteem, haven't you?

A    I like to think that.

Q    It's a good thing.  And some of your White peers were allies to your cause of keeping the non-Confederate names, weren't they?

A    They were.

Q    You told a reporter at *The Northern Virginia Daily* that you saw racism in high school.  That was at Strasburg, though. Right?

A    Yes.

Q    And you've never experienced any overt racism while you were attending the Governor's School within Stonewall Jackson High School.  Right?

A    That's correct.

Q    And you feel that you got the education that you were looking for at the Governor's School, didn't you?

A    I do.

Q    You offered public comment on the name change at the May 9, 2024, meeting, didn't you?

A    Yes, I did.

Q    You've never spoken directly to any of the 2024 school board members, have you?

A    I have.

Q    Was that before or after your public comments?

A    Would I be allowed to say who I've spoken to?

Q    Was it before or after your public comments?

A    It was before.  It wasn't necessarily about this topic.

Q    So you've never spoken directly to any of the 2024 school board members about this topic, have you?

A    No, I have not.

Q    Before or after public comments?

A    I haven't.

Q    So you don't know what they thought of your comments, do you?

A    Not necessarily.

Q     You don't know any of them personally?

A     I would say I know one of them personally.

Q     But you don't believe that the 2024 school board members harbored any discriminatory motives or animus toward Black students, do you?

A     I don't know that for sure.

Q     But you don't believe that?

A     I don't necessarily disbelieve it, either.

Q     But you don't believe it?

A     Not necessarily.

Q     Rather, you believe that by restoring the old names, they inadvertently invited the same implications that those names had in the first place?

A     Yes.

Q     And you recalled multiple speakers -- sorry.  And you recalled multiple members speaking about how the process of changing the name in 2020 was flawed and about how the board at the time had not gathered enough public opinion?

A     I do recall that.

Q     Earlier, you testified to having only three absences your entire time in high school.  Two of those absences were because you got sick in December of 2021.  Right?

A     I suppose.  I -- I really don't quite remember.

Q     And the third was in September of 2024 for court.  Is that right?

A    Yes.

Q    That was the Motion to Dismiss hearing in this case, wasn't it?

A    Yes.

Q    Your mom called the school and gave you express permission to be absent from school to attend the hearing?

A    She did.

Q    When you found out that the school board was considering restoring the original name, you conducted independent research on the original naming of Stonewall Jackson High School.  Isn't that right?

A    Yes.  Well, apologies.  I really did more of my research after the meeting.

Q    And you told *The Virginia Mercury* reporter that they were trying to disincentivize Black people from attending.

A    That's correct.

Q    But you never spoken to any of those board members, have you?

A    From the board that initially named the school?

Q    Yes.

A    No, I have not.

Q    So you've never spoken to any of those board members that originally named the school.  Correct?

A    That's correct.

Q    So you don't know what they were trying to do?

A    I suppose not.

Q    And your mom conducted research as well, didn't she?

A    She did.

Q    And the two of you would compare your findings with each other?

A    Every once in a while.

Q    Your mom feels strongly about this topic, doesn't she?

A    I believe so.

Q    Your mom is a high school teacher, yes?

A    Yes, she is.

Q    And she teaches an African-American history class?

A    I'm not quite sure.  The school has gone back and forth between having that class and not having that class due to lack of participation some years.

Q    But she did teach an African-American history class at some point?

A    Yes.

Q    At Unity Reed High School?

A    Yes.

Q    Formally Stonewall Jackson High School?

A    Yes.

Q    Was your mom teaching there already when it changed from Stonewall Jackson High School in 2020?

A    She was.

Q    And she still works there, yes?

A     Yes, she does.

Q     How long has your mom taught at Unity Reed High School, formally Stonewall Jackson High School?

A     I suppose -- well, I really don't know the exact amount of time that she's been teaching there.

Q     What about approximately?

A     I really don't have a good guess.

Q     I'll show you Page 31 of your deposition.  One moment. Would you say it was about 20 years?

A     I really don't know.

Q     Was it 30?

A     It likely was not 30.

Q     Was it ten?

A     Definitely not ten.

Q     So somewhere between ten and 30?

A     Sure.

Q     I could turn through your deposition and find the page that I misnumbered in my notes, but in your deposition, you said it was 20 years, approximately.  Is that right?  Does that sound right?

A     That sounds right.

Q     Okay.  So when your mom started working at Unity Reed High School in Manassas, it was named Stonewall Jackson High School?

A     Yes, it was.

Q     So she continued to work there for approximately 15 years

while it was named Stonewall Jackson High School?

A    I suppose so.

Q    And your dad, where did he go to high school?

A    He actually attended the Stonewall Jackson High School that my mom -- he attended Stonewall Jackson High School in Prince William County long before, of course, my mom started teaching there.  Sorry, I figured that was important to clarify.

Q    Didn't you remember him telling you that when he was attending high school at Stonewall Jackson High School, that the name didn't affect him that much and it was just a place that he went?

A    Yes, I do.  I do recall that.

Q    Your dad enlisted in the military after high school, didn't he?

A    He did.

Q    Which branch?

A    He was in the Navy.

Q    What line of work did he go into when he was discharged from the military?

A    I'm not sure about immediately after, but the most recent -- or the furthest back that I am aware of is his work in restoration in kind of, like, insurance.

Q    So much like yourself, the name of this high school didn't hold him back from succeeding, did it?

A      (No audible answer.)

Q      Thank you, A.D.  Go Dukes.

MR. FITZGERALD:  No further questions, Your Honor.

THE COURT:  I'm sorry.  Did the court reporter -- I'm not sure that answer was audible, Mr. Fitzgerald.

MR. FITZGERALD:  I'm sorry.

MR. GUYNN:  He nodded.

THE WITNESS:  Apologies.

MR. FITZGERALD:  You nodded?

I'll ask it again.

THE COURT:  He needs to answer audibly so the court reporter can get it.  Thank you.

MR. FITZGERALD:  I understand, Your Honor.

BY MR. FITZGERALD:

Q      So I asked, much like yourself, the name of his high school didn't hold your dad back from succeeding, correct?

A      That's correct.

Q      Thank you, A.D.

THE COURT:  Is there any redirect of this witness?

MR. GREELEY:  None, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you.

Call your next witness.  Off the record.

(A recess was taken from 10:53 until 10:54)

THE COURT:  Call your next witness.

MS. BANNER:  The plaintiffs call Dr. Adiaha

Spinks-Franklin to the stand.

Just give me one second, Your Honor.

(Off-record conversation.)

THE COURT:  Good morning.

THE CLERK:  Ma'am, could you please your right hand to be sworn?

ADIAHA SPINKS-FRANKLIN, CALLED BY THE PLAINTIFF, SWORN

THE WITNESS:  Yes, ma'am.

THE CLERK:  Thank you.

THE WITNESS:  Your Honor, I have a request.

THE COURT:  Yes?

THE WITNESS:  I'm in that season of life where I have private summers.  I brought a fan, just in case.  Is that okay?

THE COURT:  Yes, of course.

THE WITNESS:  Thank you, sir.

DIRECT EXAMINATION

BY MS. BANNER:

Q    Good morning.  Could you please introduce yourself for the Court?

A    Good morning.  My name is Dr. Adiaha Spinks-Franklin.

Q    And what is your current occupation?

A    I am a board certified developmental behavioral pediatrician.

Q    What is a developmental behavioral pediatrician?

A    A developmental behavioral pediatrician is a medical

doctor.  We're pediatricians, and we have additional subspecialty training in child development and behavior.  So we are trained to evaluate and care for children, adolescents, and young adults that have developmental delays, developmental disabilities, and behavioral health conditions.

MS. BANNER:  I'd like to pull up what's been marked as Plaintiffs' Exhibit 256.

BY MS. BANNER:

Q    And do you recognize this document, Dr. Spinks-Franklin?

A    Yes.

Q    And what is it?

A    It's my resume, my CV.

Q    And does this fairly and accurately represent your current professional background and experience?

A    Yes.

Q    Did you prepare this document?

A    Yes.

MS. BANNER:  Your Honor, and I apologize because I did not write this down.  Plaintiffs would like to move this into evidence if I did not do that this morning, because I forgot to check.

THE COURT:  Any objection?

MR. FITZGERALD:  No, Your Honor.

THE COURT:  I'm sorry.  256 is in already.

MS. BANNER:  Okay.  Thank you.  I wrote most of them

down, but I forgot to write that one down.

THE COURT:  It's on my list, and if I wrote it down wrong, it's admitted now without objection.

BY MS. BANNER:

Q    I want to turn, Dr. Spinks-Franklin, to Pages 3 and 4 of this document, which talked about your education.  Can you tell us where you completed your undergraduate degree?

A    I went to Southwestern Christian College in Terrell, Texas, right outside of Dallas and earned my associate of science degree.  My parents went there.  It's a family tradition.  And then I completed my bachelor's degree at the University of Texas at Austin.  I'm a Longhorn.  And then I attended medical school at Meharry Medical College School of Medicine in Nashville, Tennessee.

Q    And did you also receive a master's in public health?

A    Yes.  I did that during my fellowship.  I completed residency at Children's Hospital of Michigan, which is a part of Wayne State University, and my fellowship in developmental behavioral pediatrics, and I did a second fellowship in the Dyson Child Advocacy Fellowship, and that was at Austin Children's Hospital, which is affiliated with Harvard Medical School, and I earned a master's in public health from the Harvard School of Public Health during my fellowship.

Q    And what did you concentrate on during those fellowship programs?

A    My fellowship program, one was in child advocacy, so understanding how to advocate for children at a local and the legislative level.  Learning how to work with local lawmakers, federal lawmakers in promoting child health.  And my developmental behavioral fellowship is where I learned how to evaluate children with developmental delays, developmental disabilities, behavioral health conditions, and learn how to manage those conditions longitudinally.

Q    And then I'd like to turn to Page 8 of your resume here, which is your board certifications and licensures.  Can you tell us about your board certifications?

A    I am board certified in developmental behavioral pediatrics.

Q    And what does that mean?

A    That means I passed the test.  Doctors take a lot of tests.  So after I completed fellowship, thank the Lord, I successfully passed the board exam for developmental behavioral pediatrics, and I have maintained my board certification, which means I continue to take tests to show my proficiency and knowledge.

Q    How long have you been practicing medicine for?

A    Medicine?  Well, I graduated medical school in 1999, so it's been at least 25 years.

Q    Do you have a current clinical practice?

A    Yes.

Q    And do you also conduct research or provide trainings or lectures in your practice?

A    Yes.

Q    I want to turn to Pages 2 and 3 of your resume here, your CV.

Can you describe your current clinical practice to us?

A    I have a telehealth clinical practice where I provide a variety of clinical services that includes parent guidance and coaching to parents around the country who just need help in understanding their child's developmental behavior.  I conduct developmental behavioral pediatric evaluations by telehealth. I do adoption evaluations.

I provide guidance to primary care doctors who are caring for children who have disabilities and want to review cases with me.  Also to junior-level developmental behavioral pediatricians who like to review cases.  They will consult my expertise as a part of my clinical practice.  I also do adoption evaluations for children who have been adopted domestically and intercountry, which means adopted from another country here.

Q    And then I want to turn to Pages 9 and 10 of your CV, which is about your research.

Can you talk a little bit about the research and scholarship that you work on?

A    I've been a part of a number of research studies that

examine a variety of developmental disabilities and behavioral health conditions as well as the effect of trauma and racism being a trauma on the development, behavior, and health of children.

Q    Have you published peer-reviewed articles in this area?

A    Yes.

Q    And are those articles listed here under select publications?

A    Yes.

Q    Have you contributed to any medical textbooks?

A    Yes.

Q    Can you tell us what topics those are on?

A    Well, I've written book chapters that talk about the management of behavior disorders in children and adolescents. I've written book chapters on the -- excuse me, please -- the impact of racism on children who have neurodevelopmental disorders. I've currently just re-edited, over the weekend, a book chapter on the transgenerational transfer of racial and colonial trauma. Book chapters on teaching primary care pediatricians and pediatric providers in providing culturally-affirming care for families.

     And then we've got a book chapter that's still pending on the historical root causes, the analytical framework of looking at how child development behavior today is influenced by these historical factors that set the foundation for healthcare

today.

Q    As part of your research role, are you familiar with the scientific and medical literature on racism as a health determinant in children?

A    Yes.

Q    And how are you familiar with that?

A    I'm familiar with that research because I have been studying it since I was a medical student, I started teaching on this literature when I was a fellow, and I started conducting research in this field as an attending.

Q    And lastly, I just want to look at Pages 10 and 11 of your CV, which is entitled professional membership and leadership roles.

Can you tell us a little bit about what other professional activities you engage in related specifically to issues of developmental behavior pediatrician work that you do?

A    I finished my three terms, thank the Lord, as president of the Society for Development and Behavioral Pediatrics. I've served on the Board of Directors, and I was cochair of the advocacy committee for six years and really bolstered that committee to do a lot of national work. We've been able to meet with legislators a few times to discuss issues related to legislation that would be beneficial to disabled children in the society for developmental behavioral pediatrics.

I also founded the Diversity, Equity, and Inclusion

Committee and have served as cochair.  I'll be rotating off soon.  So that's a society.  That's our national organization for developmental behavioral pediatricians, psychologists, nurse practitioners, social workers, et cetera., that care for disabled kids.  And then in the American Academy of Pediatrics, that is our -- the pediatricians national organization.  Right? Tens of thousands of pediatricians in the United States are members of the AAP, American Academy of Pediatrics.  I serve --

Q    I'm sorry.  I'll ask you to slow down just a little bit to help out our court reporter.

A    Oh, I'm so sorry.

Q    That's okay.

A    Please forgive me.  Okay.  I serve on the executive committee of the section on developmental and behavioral pediatrics for the American Academy of pediatrics, and in that role, help to educate pediatricians in the organization on the needs of children with neurodevelopmental disabilities.  And within the American Academy of Pediatrics, I have and am co-writing and have co-written policy statements related to the needs of children with developmental disabilities such as young children in foster care, and I'm currently the lead author on two policy statements related to the care of children with fetal alcohol spectrum disorders.

And then I am on the American Board of Pediatrics.  The American Board of Pediatrics is the organization that writes

the tests that we all have to take.  So not only do I have to take the test, I now write the questions for the test.  So I'm a question writer for the Developmental Behavioral Pediatrics sub-Board of the American Board of Pediatrics.  And I've served in that role since 2020, I think, or 2021.  And then for a number of years, I presented workshops at the Pediatric Academic Societies meeting which is the largest pediatric research conference in North America.  We meet in different cities in the U.S. and in Canada, alternating years, and have conducted numerous training workshops there as well.

MS. BANNER:  Your Honor, at this time, the plaintiffs would like to offer Dr. Spinks-Franklin as an expert in the field of developmental behavioral pediatrics and on racism as a health determinant in children.

THE COURT:  Okay.

Would the defendant -- does defendant have any objection to that?

MR. DADAK:  No, Your Honor.

THE COURT:  Okay.  The Court will hear evidence from Dr. Spinks-Franklin as an expert in the field of developmental behavioral pediatrics and on racism as a health determinant in children without objection.

Please proceed.

MS. BANNER:  Thank you.

BY MS. BANNER:

Q    Dr. Spinks-Franklin, can you briefly describe your understanding of the case you're here to talk about today?

A    My understanding of the case is that in 2020, school names in the Shenandoah Public School System were changed from the names of Confederate generals to names related to, like, the environment.  And then in 2024, the school board decided to revert the names of the schools back to Confederate general names, and some of the students and parents did not agree with reverting back to the Confederate general names of the schools.

Q    And did you write an expert report in this case?

A    Yes.

         MS. BANNER:  Your Honor, I'd like to pull up what's been marked as Plaintiffs' Exhibit 253 for identification.

BY MS. BANNER:

Q    Dr. Spinks-Franklin, do recognize this document?

A    Yes.

Q    And what is it?

A    It is my expert witness report.

Q    I want to start by turning to Pages 2 and 3 of this expert report, the bottom paragraph starting with I understand.

     Can you tell us what you were asked to do this case?

A    Do you want me to read the statement, or just say it?

Q    You can either read it, or you can sum up, in your own words, what you were asked to do this case.

A    Okay.  I was asked to opine on how Confederate school

names and symbols harm Black students, and I was also asked to opine on how Confederate names and symbols or Confederate iconography disproportionately affect Black students.

Q    And how does your experience as a developmental behavioral pediatrician help you to offer opinions on these topics in this case?

A    Well, I've been a developmental behavioral pediatrician for more than 20 years, and I've taken care of numerous children who have experienced all sorts of adverse childhood experiences and trauma, including the trauma of racism and have had to work with families whose children are experiencing racial stress and trauma on how to mitigate the effects of the racial stress and trauma.

Q    What methods did you use to reach your opinions in this case?

A    Well, I read the transcripts from the school board meetings.  I've read the media interviews of the students that the plaintiff's counsel provided me.  They provided me the media interviews as well, Your Honor.  And I read the deposition transcripts of the students that plaintiffs' counsel provided me, and then I reviewed the literature.  I'm familiar with the literature, but I wanted to update my knowledge and look for new data that has emerged, considering that science is always updating information.

MS. BANNER:  And I'd like to turn to Page 34 of this

document.

BY MS. BANNER:

Q    And is this -- this is Exhibit B of this expert report.

Is that this an accurate list of the documents resources that you reviewed?

A    Yes.

Q    And it contains both the medical literature that you reviewed and the plaintiff materials that you just discussed?

A    Yes.

Q    Okay.

MS. BANNER:  Your Honor, at this point, we'd like to move to admit Pages 34 through 38 of Exhibit 253, which is the documents and resources reviewed by Dr. Spinks-Franklin.

THE COURT:  I have 253 as admitted already without objection by agreement this morning.  It was on the list you read to me, Ms. Banner.

MR. DADAK:  Still no objection.

THE COURT:  Okay.  Received.

MS. BANNER:  Thank you.  I needed a longer break between those witnesses to update this list, I suppose.

BY MS. BANNER:

Q    I want to talk about your selection of the medical literature materials that you reviewed.  How did you go about selecting what literature to review in this case?

A    Boy, there's such a wealth of literature on this topic of

the impact of racism on Black child development, behavior, and health.  So I reviewed the literature in a variety of sort of subdomains of the umbrella.

I looked at the literature reviewing Black student experiences with racism in the school environment.  I looked at the literature that examines the effect of racism on the physiology, the physiological health of Black students.  I looked at the literature on how experiences with racism affect their mental health and behavioral health.  I also examined the literature that looks at the correlation between living in a region of the country that has Confederate iconography and the effect on the mental health and behavioral health of Black Americans.  And then I just reviewed the general literature of experiences of racism and the effect on the development, behavior, and health of Black students.

Q    Are these the types of studies and literature that a medical expert in your field would review when reaching opinions on these topics?

A    Yes.

Q    I want to turn now to your actual findings in this case. Can you start by summarizing for us what the medical literature says about the impact of racist or racially-discriminatory messages on Black children?

A    The literature is very clear.  Decades of literature has found that racism has a very negative impact on the

development, behavior, and health of Black children, adolescents, and adults.  Racism in the literature has four levels.  That's structural racism.  That's within the society.  There's institutional racism within our organizations.  There's interpersonal racism where people interact with each other in discriminatory methods.

And then there's internalized racism where a Black person believes in their own inferiority and the superiority of a White person or a White person believes in their own superiority and the inferiority of Black and brown people.  So all of the literature shows all four levels of racism are harmful to the health of Black folks.

And then racism has six forms, and each of those six forms of racism have a detrimental effect on Black child development, behavior, and health.

Q    I'd like to pull back up your report, Dr. Spinks-Franklin, on Page 4.  You talk about that racially-discriminatory messages lead to race-based traumatic stress.  Can you tell us what race-based traumatic stress is?

A    Yes.  Race-based traumatic stress is described in the literature as a type of stressor that Black people, indigenous people, and brown people experience based upon their racial designation in the United States.  It is the effect of experiences of racism on the body.  It's called a race-based traumatic stress.

Q    Do you have an opinion on what race-based traumatic stress does to the body?

A    Yes.

Q    Can you tell us with that opinion is?

A    Race-based traumatic stress causes a variety of psychological and physiological harms in the body of Black folks, according to the literature.

Q    And I want to start by talking about what those harms look like, and I want to start by talking about the psychological effect.  Or excuse me, let me talk about the physical effects of race-based trauma.

A    Okay.

Q    Can you tell us what some of the physical effects of race-based trauma are on students?

A    Yes.  The literature is very clear.  Decades and decades of literature have found that there are numerous physiological effects when a Black person experiences racism, and those effects occur in multiple systems of the body from the brain and the nervous system to the endocrine, or the hormone system. The immunological system, the cardiovascular system, and even the DNA is affected by experiences with racism.

            MS. BANNER:  I'd like to pull up now a demonstrative exhibit that I hope will help us explain this a little bit more.

BY MS. BANNER:

Q    So can you tell us a little bit about what this picture is demonstrating?

A    Yes.  This picture is demonstrating the very complex pathophysiological processes that occur in the body of Black people when they experience racism, no matter what form or what level of racism it is.

Q    And I believe you talked about the way that this stress affects a variety of different systems.  Can you start by telling us what happens to the neurological system when the body produces these stress hormones?

A    Yes.  So if you start on the left-hand side, exposure to race-based traumatic stress.  What the literature has found is that an experience with racial discrimination -- a micro-aggression, a racial micro-aggression, something that a Black person perceives as being racially discriminatory -- the brain perceives it as a social rejection.  Social rejection meaning that I'm being rejected by the people around me in my environment.

What the neurological literature shows is that experiencing racial discrimination is experiencing a form of social rejection, and the regions of the brain that light up are the same regions of the brain that light up if you have a severely painful event, like being stabbed or having a leg amputated.  Therefore, experiencing racial discrimination is a social pain in the brain.

When that happens, it alerts a variety of regions of the brain because now the brain perceives racially-discriminatory messages as rejection, as a threat. So there's a region of the brain called the amygdala. The amygdala in the brain is like our inner cave person. Our inner caveman or inner cavewoman. The job of the amygdala is to look for danger and to keep us safe and to alert us if there is a saber-toothed tiger, right, or grizzly bear around.

And what that amygdala does is, it sends out signals to the brain where you either fight the grizzly bear, you fly or run away from the grizzly bear, or you lay down and freeze and play dead. Now, with our caveman ancestors, that was really good. It worked in the short-term. You got away from the grizzly bear. Right? You fought the grizzly bear. You just laid down and played dead and the grizzly bear went away.

But when that experience is day in and day out racially-discriminatory messages, racial micro-aggressions, being in an environment where you're constantly reminded of your Blackness and of White superiority, then that means that those stress hormones the brain produces become on overdrive. So once the brain begins to produce those stress hormones, it alerts the rest of the body to start producing stress hormones as well and this whole cascade of events in the nervous system. So your sympathetic nervous system gets turned on.

And research has found, over and over again, that Black

children, Black adolescents, and Black adults, who live in environments where they're experiencing racism on a regular basis have higher levels of stress hormone in their bodies compared to Black folks that don't live in areas where they're experiencing regular racial discrimination and compared to their White counterparts who live in areas that have high levels of racial discrimination.

And those high stress hormone levels are very harmful over time to the health of that individual, the physical health as well as the mental health, because stress hormones, over a long period of time, begin to tear down the body's organ systems. So in the brain in particular, what we see in the literature is that this long-standing form of stress, which is called toxic stress, where it's like this unending stressor, begins to actually kill brain cells. It's called neurological apoptosis. So brain cells begin to die in children, in adolescents who have developing brains that are vulnerable to the insults of high levels of toxic stress over time.

Another thing that the literature has found is that the regions of the brain that are responsible for learning and memory, recalling what you've learned, making good decisions, having self-control, actually lose brain cells. So, over time, it can make it hard for a Black student to learn, to remember what they learned. That they're putting extra effort in order to get their work done. To concentrate. To have self-control.

To be organized.  This is what the literature has found.
That's what's happening in the nervous system.

Q    And what about the cardiovascular system?

A    Well, you know, it's one body.  Right?  One body.  So all the organs get affected.  So with high levels of stress hormones in the body, the chronically high level of stress hormone is called an allostatic load.  Allostatic.  What that means --

THE COURT:  How do you spell that?

THE WITNESS:  A-L-L-O-S-T-A-T-I-C load.  What that means is the body is constantly reacting to some kind of a stressor.  It's not getting a break.  So your brain is swimming full of stress hormones are so are the rest of your organs.  So in the cardiovascular system, that includes your heart and your blood vessels.  The literature finds that because of the high levels of stress hormones that are produced in the body as a reaction to experiencing racism, is that that places the person at higher risk for having a higher level of high blood pressure, having difficulty regulating the blood pressure, having problems with regulating their whole cardiovascular system.  So now the cardiovascular system is overworking because of the stress of racism.

BY MS. BANNER:

Q    And how about the immune system?

A    The immune system ends up being primed by the nervous

system and the endocrine system and producing all these stress hormones.  So over time, what happens is the immune system gets weakened, so you end up with these abnormal inflammatory processes in the body that leave the body very vulnerable for acute infections as well as chronic disease.

The job of the immune system, they're sort of like the Marines of our body.  The soldiers of our body.  And they are -- the cells of the immune system are surveying all through the bloodstream and through all the organs looking for abnormalities.  They're looking for infections.  They're looking foreign bodies.  They're also looking for cancer and any abnormally-growing cells in the body.  And when the immune system does its normal job under normal circumstances, it's able to -- right now, we're all fighting cancer in our bodies. We're all fighting infections.  The immune system can do its job.  But when the immune system is stressed because of the allostatic load and the chronic bombardment of stress hormones, it can't function properly.  It becomes weekend.

So what the literature has found is, people, Black folks who've experienced racism on a regular basis, have immune system abnormalities.  They have issues with chronic inflammation, problems with catching infections and fighting off infections.  That puts them at risk of chronic diseases in the body and poor health overall.

Q    And you talk in your report that this exposure to toxic

stress can also impact somebody's DNA.  Can you explain that?

A    Absolutely.  We've learned in science that DNA is influenced by our environment, and DNA can change the way it expresses itself based on life experiences.  Those changes are called epigenetic changes.  Epigenetic.  It's how the environment and the DNA work together.

In the racism literature, what studies have found is that people who experience -- Black people, particularly -- who experience racism on a regular basis -- whether it is structural racism, whether it's interpersonal racism, whatever form of racism it is -- when their DNA has been evaluated, they have found that they show signs of premature aging in their DNA and the genes that are related to chronic disease are actually turned on in a process called methylation.

THE COURT:  How do you spell that?

THE WITNESS:  Methylation.  M as in Michael, E-T-H-Y-L-A-T-I-O-N.  Methylation.

THE COURT:  And what does that mean?

THE WITNESS:  It means that you get this methyl group.  It's a criminal group.  Right?  And it attaches to a gene within the DNA sequence to turn that gene on.  So it might be a gene for lupus.  It might be a gene for cancer, breast cancer.  It could be a gene for diabetes.  It could be a gene for multiple sclerosis that otherwise may not turn on.  Just because you have a gene for something doesn't mean your body's

going to develop that condition.  That gene has to be activated.

So what the research has found is that because of the weight of the stress of racism has on the bodies of Black Americans, that their DNA shows signs of premature aging and chronic disease, and that has even been found in placental DNA. Black pregnant women who reported having significant experiences with racism giving birth to a Black baby, right, they checked the DNA of the baby's placenta, and they find signs of premature aging and risk of chronic disease in the fetus.  So this racial stress and trauma gets passed down from generation to generation.

BY MS. BANNER:

Q    I want to go back to your expert report on Page 4, and you say the physiological impact is increased risk of poor health including asthma exacerbations, poor metabolic control, poor glucose tolerance, diabetes, obesity, increased waist circumference, hypertension, and many other chronic diseases. Is it your opinion that these are related to the exposure to toxic stress?

A    Yes.  And this is specifically -- this data that I report here is the toxic stress related to racism.  Racism as the toxic stressor puts Black folks at risk of these poor health outcomes.

Q    You mentioned that --

THE COURT:  And what study is this based on?

THE WITNESS:  There's so many, Judge.  There are a lot.

THE COURT:  Are they cited in your report?

THE WITNESS:  Yes, sir, they're cited in my report.

THE COURT:  In --

THE WITNESS:  Just a few.

THE COURT:  Just a few?

THE WITNESS:  Yes, sir.  Just a few studies, but there's a whole wealth.  A whole wealth of data show this.

BY MS. BANNER:

Q    Dr. Spinks-Franklin, do you want to talk about some of those specific studies that you relied on?

A    Yes.  So very interesting studies.  Do you want me to just do the studies that I relied on for this report?

Q    Sure.  Why don't you just maybe try to sum up --

A    Just those?

Q    -- one or two the key studies --

A    Yes, ma'am.

Q    -- that you relied on.

A    Yes, ma'am.

So the American Academy of Pediatrics, our national organization, published a policy statement in 2019 about the effect of racism on the health of Black children and adolescents.  And in that report, they do a really masterful

job at summarizing the literature.  And I published literature with the Centers for Disease Control and Prevention during the pandemic where we measured school-based racism experiences among thousands of teenagers across the country of various racial backgrounds.

So what we found in the American Academy of Pediatrics policy statement on racism, they described in the literature that Black children who experience racism, for example, in school settings or in their communities show higher levels of anxiety, depression, difficulty concentrating in school.  They tend to have more difficulty with academic achievement, a harder time finishing their work.

Black adolescents also report difficulties with interpersonal relationships, getting along with their peers when they're expensing racism at school.  Students report that the school environment feels hostile and unwelcoming.  They might feel uncomfortable in those settings because they're experiencing racism at school.  Black students are also reporting suicidal ideologies.  That means thoughts of dying and thoughts of killing themselves because of constant experiences with racism and even suicide attempts.

These are reported in the American Academy of Pediatric policy statement and the study that I conducted with the Centers for Disease Control and Prevention, the CDC.  We surveyed thousands -- I believe it was tens of thousands of

high school students around the country of all racial backgrounds.  Black high school students, First American high school students, Latine, Asian American, Pacific Islander high school students, and White high school students.

And we asked them questions about experiences with racism in the school setting, and in our study, what we found is that the majority of the Black students reported experiences with racism.  The Latine students reported it as well.  The Asian-American students, the First American students, and even White students reported experiencing racism at school.  But the Black students reported the highest levels of racism.  Also, the Black students in our population reported the worst psychological and school-based outcomes compared to their peers of other racial groups who reported experiencing racism in school.

So those Black students described feeling stress within the school setting.  Feeling uncomfortable in the school setting.  Feeling like a second-class citizen in the school setting.  Having difficulty concentrating, getting their work done, and being organized.  Having difficulty getting along with their peers.  Not trusting their teachers.  Things of that sort within the school setting.

So we also note in the literature that chronic experiences with racial stress and trauma affect physiologically.  So they affect the digestive system.  Right?

They affect the ability to lose weight appropriately if a teenager is overweight. They affect sleep, and sleep is critical to child development. Right? It's critical to human functioning. And so we know that in the literature as well.

There's just a wealth of literature on the physiological and psychological impact that racism has on the development, behavior, and health of Black people.

THE COURT: I see in Exhibit B to your report the American Academy of Pediatric section on adolescent health. That report, the 2019 report on impact of racism on childhood and adolescent health.

THE WITNESS: Yes sir.

THE COURT: I don't see a reference to the CDC study that you did.

THE WITNESS: It's in there. I'm not the first author.

THE COURT: You're not the first author?

THE WITNESS: I'm not the first author.

THE COURT: Do you member who the first author is?

THE WITNESS: Her name is -- can you we please pull up the references?

MS. BANNER: Yeah. Can we please pull up Exhibit B? It's Page 34 of this report, and I'm looking through it, too.

THE WITNESS: Okay. Hold on.

MS. BANNER: Is it number 6, Dr. Spinks-Franklin?

THE WITNESS:  Yes.  That's it.  The MMWR.

THE COURT:  Okay.  So that CDC study is number 6?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Yeah.  I wrote the questions for that study.

BY MS. BANNER:

Q    Dr. Spinks-Franklin, turning back just briefly to Page 4 and 5 of your report where you talk about the psychological impacts on the bottom of Page 4 into Page 5, you talk about increased risk of anxiety and depression, poor self-esteem, substance abuse, poor attendance or memory, difficulty learning, chronic absenteeism, et cetera.  Is this an accurate summary of the impacts of the exposure to race-based traumatic stress on children?

A    Yes.

Q    Okay.  Are there both short- and long-term effects of this exposure?

A    Yes.

Q    Can you talk about what some of the short-term effects might look like?

A    Short-term effects tend to be more acute stress related where in the moment or at the time the student expresses feeling stressed or, in the literature, they might describe having a headache or a stomachache.  Something related to sort

of acute stress.  So they may have difficulty finishing an assignment.  That's been described in the literature.

They may not feel comfortable speaking up.  That's been found in the literature, too, where they will silence themselves in a situation where they're expensing racism but they don't know how or feel comfortable defending themselves in a moment, like if it's an act of interpersonal racism and micro-aggression.  Those can be some of the acute effects that the literature describes.  Just a few of them.

Q    And what about the chronic or long-term effects?

A    The long-term effects are based on what is called weathering.  Weathering is the tearing down of the systems of the body from chronic exposure to racism.  And that's when you see, over time, anxiety disorders developing.  Depression disorders developing.  Problems with asthma control or blood sugar control.  Issues with poor sleep, self-esteem, suicidal thoughts, substance use, getting into trouble at school.  Things of that sort.  That's just from that chronic, unrelenting exposure to racial -- race-based trauma and stress.

Q    And you've said a few times exposure on a regular basis or a chronic basis.  Can you tell us a little bit more about what it means to be exposed to racism on a regular basis?

A    Yes.  There are forms of racism that we are exposed to on a regular basis.  One of the forms of racism is what's called cultural racism.  Cultural racism is a form of racism that's

really ubiquitous in our society, and in cultural racism, Whiteness is propped up as being superior to every other cultural or racial group and Whiteness is seen as the standard.

At the same time, Blacks are seen as inferior, as being stereotyped, and negative racial stereotypes are very pervasive in cultural racism. Cultural racism manifests itself in our traditions, in symbols, our songs, our metaphors, media images, et cetera. And the literature on cultural racism shows that it really helps to engender our implicit biases, our unconscious biases, because whenever two thoughts are constantly connected in society, we pair them in our brain subconsciously.

So for example, if we're constantly pairing Black men with criminal activity, over time, our brains begin to automatically criminalize Black men subconsciously because those -- it's a way -- that is the way cultural racism puts those two ideas together in our society.

Confederate iconography is a form of cultural racism. They are symbols that the literature says are overwhelmingly viewed as negative by Black people and are seen as racist by Black people. So a chronic exposure to racism means being in an environment where cultural racism is pervasive. So in this particular case, it would be seeing Confederate iconography on a regular basis and being constantly reminded of one's second-class citizenship, which is what the literature says about Blacks' views of Confederate iconography.

Q    I want to turn to a different part of Page 5 which begins with Confederate school names and mascots are forms of culture racism, which I believe you just talked about.  You say here that they communicate to Black students that they are inferior and this disproportionately harms their development, behavior, academics, and health.  Can you tell us how you concluded that cultural iconography is a form cultural racism?

A    That Confederate iconography is a form of cultural racism? Well, when you look at the literature about Confederate iconography particularly and how it affects Black residents, Black people who live in those communities, what the literature says is, one, Confederate iconography is more common in regions of the country that actually have larger Black populations and that Confederate iconography is a signal to Black people of their lower social status.  This is what the literature says.

     And Black people in those regions, overwhelmingly in the literature, report Confederate iconography as having a very negative impact on them, such as higher rates of depression and anger and frustration and lower self-esteem has been found in Blacks living in areas of the United States that have Confederate iconography compared to Blacks that live in areas of the country that don't have Confederate iconography.

     And in the literature of cultural racism, it refers to any type of symbols that are related to a racist past or racist messaging, and Confederate iconography is seen as racist

messaging by Black people, according to the literature. Therefore, because it is a racist symbol and a racist message, it is a form of cultural racism that communicates the superiority of Whites and the inferiority of Blacks.

Q    Are there -- can you talk a little bit more about how Confederate symbols or icons communicate this message to individuals?

A    Yes.  When you look at the literature, as I said before, the literature finds that when viewing where Confederate iconography is most prevalent in the United States, including school names or Confederate statues or symbols and so forth, they have found that they tend to be in areas that have a higher concentration of Black residents.  They also find that in those areas, White residents have very high negative anti-Black prejudicial attitudes.  The two go together.  You have White residents that have high levels of anti-Black racial bias and you have a larger Black population.

The literature also has found that although the Black people in those regions report how much they do not like the Confederate iconography, how offensive it is to them in the literature, that the White residents who were interviewed apart of the research expressed that they have no empathy for what the Blacks are experiencing.  So they do not accept the fact or acknowledge the fact that the Confederate iconography in that region is actually harmful to the Black residents.  So there's

a lack of empathy to the suffering of Blacks in those communities.

That is what the literature has found, and therefore, the Black residents tend to have higher levels of negative physical health and mental health outcomes in those communities compared to Black residents who live in communities without Confederate iconography.

Q    Can you tell us a little bit about how the studies on cultural racism relate to the concept you talk about in your report of ancestral knowledge or ancestral memory?

A    Ancestral knowledge and ancestral memory are two constructs in the literature that are really compelling.  And it refers to the passing down of information from one generation to the next so that in the contemporary generation, they did not -- I'm talking about Black folks specifically. Okay?

Today's living Black people did not directly experience slavery.  Right?  The younger people today who were born post-Civil Rights did not directly experience Jim Crow. However, they are aware of those experiences because of the stories that have been passed down from generation to generation in their families.  So that ancestral knowledge as well as an ancestral memory.

What the ancestral memory refers to is getting back to this idea of the transgenerational transfer of trauma.  Your

conscious mind may not necessarily pick up that this is a negative experience, but your brain cells, your body cells, and your DNA never forget. So at the cellular level, what the literature is finding is that Black folks are responding and their bodies are reacting to race-based traumatic stress based on this historical record that lies in their DNA.

Q    And I think you mentioned earlier that this is something that you're either have published or soon to be published a chapter in a book about --

A    Absolutely.

Q    -- transgenerational trauma?

A    Absolutely. My colleagues and I were on Zoom editing that chapter this weekend. It's an American Academy of Pediatrics textbook.

Q    How might Confederate symbols or school names, in this case, trigger that kind of ancestral memory or knowledge?

A    Right. So for the Black who are attending these schools today, they are the descendents of the formerly enslaved. Those who survived and lived through slavery, and those who survived and lived through Jim Crow. And with those stories going down and passing down from generation to generation, the students attending those schools today have a different understanding of what Confederate icons mean to them because of what those Confederate symbols meant to their ancestors during slavery and during the period of Jim Crow.

Q    What happens if this kind of memory or knowledge is triggered in a student?

A    Well, it's considered a trauma trigger.  So considering that the ancestors of the Black students in the Shenandoah schools that are attending schools with Confederate school names and symbols, that was traumatic for their ancestors, it was traumatic for their parents, grandparents who lived through Jim Crow, and it is a trauma trigger for them.

Q    Do you have an opinion on whether exposure to cultural racism such as Confederate school names affects Black students differently than their White peers or other students at the school?

A    Yes.

Q    What is that opinion?

A    My opinion is that the Black students are disproportionately affected by the Confederate school names compared to their White peers.

Q    You also say that, in your report, the Confederate symbols communicate to Black students that they're inferior.  Can you explain why you make that statement?

A    Yes.  According to the literature, when researchers look at regions of the country where Confederate iconography is placed, whether it is through the names of schools, streets, buildings, statues, et cetera, even holidays that are celebrated, the Black participants in the research have

consistently reported across studies that they recognize those symbols as a reminder of their inferior status in society, their second-class citizenship in society.  That's what those symbols represent to them.  That is consistently reported in the literature.

Q    And you also report that that exposure harms Black students' development, behavior, academics, and health.  Can you explain how it does that?

A    Yes.  Because it's a stressor.  So when Black people -- this is what the literature says.  When a Black student or a Black adult is exposed to racism on a regular basis, the brain becomes primed to look for racism, to look for that danger, and it becomes what we call hypervigilant where your brain is constantly surveilling the environment, looking for the threat of a racially-discriminatory message or encounter.

And so that sets up that cascade of producing stress hormones on a regular basis, and that causes a cognitive load for the Black students who are constantly thinking about the Confederate icons, what they mean, and what that status means within the school setting or in their environments.

Q    And what are the consequences of prolonged exposure to that kind of stress?

A    As we stated before, it has deleterious effects on the development, behavior, and health of Black students.  Over time, you can see Black students struggling academically.  This

is all according to the literature.  There can be issues with absenteeism.  There might be issues with school underperformance, not performing well in school academically.  Difficulty getting along with peers or feeling safe in the school environment.

Students have reported that in the literature.  Feeling unsafe and unwelcomed.  There's also concerns for anxiety and depression.  As we've talked about before.  Problems with substance use, other high-risk behaviors in adolescents, and problems with their physical health as well, like we talked about.  Poor metabolic control, blood sugar, blood pressure, asthma, et cetera.

THE COURT:  Can I ask a question?

THE WITNESS:  Please.

THE COURT:  Does the -- going back a couple of questions ago, does the -- when you're talking about the research suggesting that these Confederate symbols, this Confederate iconography -- names of schools, names of streets, holidays, all these things -- disproportionately affects Black people.

THE WITNESS:  Yes.

THE COURT:  Correct?

THE WITNESS:  Yes, sir.

THE COURT:  Does the research suggest that White people have a different view of Confederate iconography than

Black people do?

THE WITNESS:  Yes, it does.

THE COURT:  Tell me about that, if you will.

THE WITNESS:  So what the research shows, Your Honor, is that in general, Whites see the Confederate iconography as their heritage, as their culture, as reflecting their White racial identity.  So it is viewed positively.  And in those studies, when those White participants are asked about how it affects Black people, they say, oh, it doesn't have an effect on them.  And then they're told, well, actually, this is what the Black participants say, the White participants describe having a lack of empathy for the suffering of their Black neighbors because they view the Confederate iconography as bolstering their White identity.

THE COURT:  In other words, because the White people in general do not have a negative view or a racist view of Confederate iconography, they likewise, as I understand what the literature shows, don't understand how this could affect Black people?

THE WITNESS:  Exactly.

THE COURT:  Okay.  Thank you for that.

THE WITNESS:  Yes, sir.

BY MS. BANNER:

Q    You also mentioned in your report, Dr. Spinks-Franklin, and talked about today the concept of internalized racism.  Can

you tell us what that is?

A    Yes.   Internalized racism is one of the levels of racism described in the literature where a person believes in the superiority of White people and the inferiority of Black, Indigenous, and brown people.  It's like my grandmother used to say.  Some folks think the White man's ice is colder.

Q    And in your opinion, how do Confederate symbols or iconography trigger internalized racism?

A    Well, for Black Americans, for Blacks who live in the regions where there are Confederate icons, if Blacks deem themselves as being inferior, in the literature, it's found that the Confederate iconography reinforces that message to them, that yes, you are inferior.  So the literature shows overwhelmingly that Black folks view Confederate iconography as a message to them that they are inferior.  And --

THE COURT:  The White people don't feel that way.

THE WITNESS:  Correct.  They don't.  White people don't feel that White people are inferior.

THE COURT:  No, no, but I think what you told me earlier is that White people don't recognize that Confederate iconography causes Black people to feel inferior.

THE WITNESS:  Not necessarily.  It depends on how the study is done.

THE COURT:  Right.

THE WITNESS:  In some studies, the White participants

said they did not know that the Confederate iconography made Black folks feel inferior or was a message communicating inferiority in Black folks.  In other studies, the participants knew that but did not care.  They did not have empathy of how it affected them.

THE COURT:  Okay.

MS. BANNER:  Dr. Spinks-Franklin, I'm just going to remind you to slow down a little bit.

THE WITNESS:  Oh, I'm sorry.

MS. BANNER:  That's okay.  I just want to make sure.

THE COURT:  Can you point out in your report a couple of those studies, because I may want to read further?

THE WITNESS:  Yes, sir.  Can you pull it back up? The list, please.

MS. BANNER:  We sure can.  Can we pull up Exhibit B again, and --

THE WITNESS:  There's one on Black suffering, it's called.

MS. BANNER:  It might take us a minute to find the right study.

THE WITNESS:  Just pull up the list and I can find it.

MS. BANNER:  It's page -- hold on.  It's not the CV. It's page --

THE COURT:  Thirty-four is the --

MS. BANNER:  Is Exhibit B.  Yeah, 34 of Exhibit 253. It looks like it might be number 9, Confederate Monuments and Anti-Black Stereotypes.

THE WITNESS:  That's part of it.  Yeah.  That shows -- I believe this is the study that showed the high level of anti-Black racial attitudes among Whites in regions of the country where there is Confederate iconography.  Study 13 is showing how Blacks and Whites react differently to seeing Confederate flag.  Very interesting study.  And hold on one second.  Is there a third -- there should be a -- oh, wait. There should be a third page.

MS. BANNER:  Yeah.  If you could go to the next page.

THE WITNESS:  Okay.  Thank you.

MS. BANNER:  I'll direct your attention, Dr. Spinks-Franklin, to number 30.

THE WITNESS:  Yeah, that's about the school names. Yeah, that's a good one.  And Black students in those areas.

MS. BANNER:  Also perhaps number 34, but you let me know if that's the right one.

THE WITNESS:  Well, this one is -- yeah, this is more about, in general, going to a school that has a very racist climate.  I don't remember if this one specifically dealt with Confederate iconography.  Is there another page of references?

THE COURT:  Not articles, though.  Page 4 is other things.

MS. BANNER:  Page 4, I think, is mostly information specific to the students.

THE WITNESS:  Hold on.  I thought I had put --

THE COURT:  There's a fifth page, too.

THE WITNESS:  There is?  Okay.

THE COURT:  Yeah.  Take a look at those on your bibliography, and focusing on this issue about Confederate iconography, which ones the Court ought to focus on.

THE WITNESS:  Yes, sir.  You said there was a Page 5?

THE COURT:  There's five pages in Exhibit B.

THE WITNESS:  Can you show me Page 5?  I don't see that paper in here.  I'm really surprised.  The title is something about White blindness to Black suffering with Confederate iconography.  Oh, my goodness.

MS. BANNER:  Hold on.  Let me consult with my colleagues one second.  I think if you go back to the first page and look at number 8, Dr. Spinks-Franklin.

THE WITNESS:  Okay.  Thank you.

MS. BANNER:  I can also bring you a copy in paper if that's easier for you.

THE WITNESS:  No, that's the telomeres.  Hold on.

THE COURT:  Telomeres.  That's DNA.  Right?

THE WITNESS:  Correct.  There's a shortening of the telomeres in Black folks who have experienced racism, and that's a sign of premature aging, shortened life expectancy.  I

cannot believe that I don't see that article.

BY MS. BANNER:

Q    Dr. Spinks-Franklin, let me --

A    I'm so sorry.

Q    That's all right.  Let me address you to the footnotes in your report instead of the bibliography?

A    Okay.

Q    On Page 8 of your report.

A    Okay.

Q    I believe.  And let me direct you to footnote nine.  There's three articles listed there?

A    There it is.  Sarapin.  The next one down.  Sarapin.  Living Among Confederate Icons: Perpetuating White Supremacist Beliefs and Blindness to Black Suffering.  That's it.  It's a 2023 article.  Very interesting.

          THE COURT:  Do you -- can I ask you this question?

          THE WITNESS:  Yes, sir.

          THE COURT:  Do you have -- you, the footnotes that are referenced in your bibliography and to your -- excuse me.  The works, the articles, the research --

          THE WITNESS:  Yes, sir.

          THE COURT:  -- that's referenced in your footnotes and your bibliography.  You've read all those?

          THE WITNESS:  Yes, sir.

          THE COURT:  And your opinion is based on, at least in

part, on this literature?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Do you have access to all of these articles?

THE WITNESS:  I do.  I have them on my laptop but I didn't bring my laptop with me because I didn't know if I could.

THE COURT:  No, it's okay.  I just wanted to know if you had access to them because sometimes if I try to go in online, sometimes in the academic world --

THE WITNESS:  Yes.

THE COURT:  -- if I try to go in online and look at a particular article, it will tell me that I have to join some group --

THE WITNESS:  Yes, you do.

THE COURT:  -- in order to -- be a professional in order to --

THE WITNESS:  You have to join us as a medical professional.  Yes, sir.

THE COURT:  In other cases, I've tried that before.

THE WITNESS:  Yes, sir.

THE COURT:  But if I ask your lawyers -- excuse me. If I ask counsel for the plaintiffs to provide me with these articles that are cited in your footnotes and in your bibliography, you could do that?

THE WITNESS:  Yes, sir.  Gladly.

THE COURT:  Thank you for that.

THE WITNESS:  Yes, sir.

MS. BANNER:  We'd be happy to provide a copy those, Your Honor.

THE COURT:  I'm not sure I'm asking for it yet.

MS. BANNER:  Please let us know if it would be helpful.

BY MS. BANNER:

Q    And Dr. Spinks-Franklin, just because we're on the topic, I think you were saying moments ago that there's two parts of the study on how living among Confederate iconography or symbols can impact White people's perceptions of how those names impact Black people.  Can you just explain those again?

A    Okay.  It depends on how the study was conducted.  So across all the studies, the vast majority of Black folks viewed Confederate iconography very negatively, saw it as a reminder of slavery and Jim Crow, saw it as a signal that they are second-class citizens, that they are inferior to Whites.

And then among the White populations who live in areas where there is Confederate iconography, they overwhelmingly view it as positive, as a symbol of their White identity and of their culture.

Now, in some studies, Whites were not aware of the negative effect that Confederate iconography had on the Black

residents.  In other studies, they had awareness but did not have empathy for the experiences, the negative experiences of Black people living under Confederate iconography.  So that last paper we brought up was about that lack of empathy.

Q    Do --

THE COURT:  The Sarapin article?

THE WITNESS:  Yes, sir.

BY MS. BANNER:

Q    And do the studies talk about whether the impact on Black people is different depending on whether White people understood the harm or not?

A    What do you mean?

Q    Is there impact even if there's no intent?

A    Oh, absolutely there's impact no matter what the intent is.

Q    And I want to just go back because we were talking a few questions about internalized racism and you were explaining that.  What are the harms that are associated with internalized racism?

A    Oh, it's really bad.  In the literature examining internalized racism in Black students and in Black adults -- Black children, adolescents, and adults -- they found this belief in their own inferiority.  So you tend to see a very pro-White, anti-Black implicit racial bias among people who have -- Black people who have internalized racism, meaning that

they like White people more than they like Black people.  They have poor self-esteem and also a lower -- a poor racial identity.  They don't have a positive view of their own racial group.  And the literature says that they are really prone to higher levels of poor mental health outcomes, substance use problems, suicidal attempts, et cetera.

Q     Dr. Spinks-Franklin, do you have an opinion on whether exposure to Confederate school name at issue in this case causes race-based traumatic stress?

A     Yes.

Q     And what is that opinion based on?

A     My opinion that Confederate icons in school names cause race-based traumatic stress based upon the statements of the students that I read.

Q     Okay.  And did you make any assumptions in reaching this opinion?

A     The assumption that I made is that Confederate iconography is a form of racially-discriminatory messaging, that Confederate iconography is racist.

Q     Why are you relying on that assumption?

A     Well, according to the literature, Black Americans overwhelmingly view Confederate iconography as racist.

Q     Did you consider any materials from the plaintiffs that support that assumption?

A     Yes.  The plaintiffs' counsel provided me with the school

board transcript -- the school board meeting transcript, media interviews from the students, as well as the student plaintiffs' transcripts of their depositions.

Q    All right.  And how did reviewing these statements help to inform your opinion in this case?

A    Well, it was very helpful because what I found was the student statements were consistent across all three sources of information.  So the way they describe their experiences and their beliefs and their feelings related to the school names being changed back to Confederate general names.  They describe the same feelings across the deposition, the media interviews, and the school board meetings where they -- where they spoke.

Q    And why was it significant to you that those were consistent?

A    Well, it helps be -- you know, as a developmental behavioral pediatrician, when we are thinking about how an experience affects a child, we're looking for a pattern.  And this was a pattern that the students showed consistently describing feeling uncomfortable, feeling stressed, feeling unwelcome, et cetera.  And it aligned with what the literature says about experiences of racism at school, what Black students report nationally in a variety of studies, that they feel uncomfortable, they feel unwelcomed.  They sometimes feel like a second-class student.  What the students stated in this case really reflected what's in the literature.

Q    And so, in your opinion, were the student testimony and statements that you read consistent with what you would expect to see from students experiencing race-based traumatic stress.

A    Yes.

Q    In what ways?

A    In the literature about race-based traumatic stress among children, adolescents, and adults who are Black, especially in the school setting, the studies are done different ways.  In some studies, they've had the students fill out questionnaires. In other studies, they interview the students and ask them to tell them what their experiences are.

And the students consistently report that -- the Black students do.  When they are experiencing racism at school, it makes them feel so uncomfortable, so unsettled.  It makes them feel either spotlighted -- like they have to be the representative for the entire African diaspora if they attend a school that is majority White students and very few Black students, for example.  And other times, the students report feeling that they are just unwelcomed in the school environment, and that would be a hostile school environment to those students.

They describe -- some students in some studies describe self-esteem problems.  That begins to make them doubt their own abilities going to a school where they are experiencing racial micro-aggressions or macro-aggressions, which are in the

environment in the school setting.  So with the literature, across studies, across regions of the country, and different study designs are showing this pattern of Black students experiencing psychological harm by going to a school where they're experiencing racism.  In those studies, the students, in this case, their statements really aligned with student statements in those studies.

Q    And Dr. Spinks-Franklin, just to clarify, were you asked to evaluate or diagnose any of the plaintiffs or students in this case?

A    No.  No, ma'am, I was not.

Q    And did you interview the students or the plaintiffs?

A    No, I did not.

Q    And in your opinion, did that -- were you still able to draw conclusions about how the medical literature and findings were reflected in the student statements?

A    Yes.

Q    And how were you able to do that?

A    Well, there's something called a saturation of ideas.  A saturation of ideas when you're reviewing information is that themes begin to repeat themselves.  And I read all of the media interviews, I read school board meeting transcripts, I read all of the depositions, and the themes were consistent across how the students -- the Black students described how they felt about the name changes and what it felt like to go to a school

that's named after a Confederate general.  And I saw consistency in how the students described their discomfort. And that consistency aligned with the literature, that that's what Black students report across the country when they attend and experience racism in school.

Q    Dr. Spinks-Franklin, as I imagine you saw in the deposition transcripts, the student plaintiffs in this case have been pretty successful academically and in sports and extracurriculars.  How is that consistent with the research that you described today?

A    So there is a body of literature examining how high-achieving Black students -- high school students, college students, even professionals -- how do they manage working in a racist environment?  And among high achievers, they tend to have this ethos of excellence and achievement.  So they use their academic success as a form of resistance to having to attend a racist environment school.

So what the literature finds is that these students say, for example, in the qualitative research, where they interview the students, the students, the Black students who are high achievers, very successful in school, describe it is very racist at my school and I want to counter the narrative of Black inferiority by making straight A's.  By being excellent at everything that I do.

And those students also describe the stress of being in

that type of environment, constantly reminded of their second-class citizenship. They describe being what's called racially spotlighted where everyone's looking at them because they are the only one, or as I said before, there might be a discussion in class about race, racism, slavery or something, and everybody looks to that student to be the spokesperson for the entire African diaspora.

At other times, they are racially ignored where it's almost as if they aren't even there until they are there. Right? And so then the students in the studies describe different ways of responding to racist experiences in schools. So one thing the students consistently do is maintain excellent grades, excellent performance in sports and extracurriculars. They maintain excellence. But when they're dealing with those interpersonal interactions with peers and with teachers, sometimes they just silence themselves and say, I don't even want to talk about it. I just avoid these interactions. I'd rather not even address it. Like the young man said earlier today. Sometimes I just avoid it altogether. I don't want to be that guy that brings it up.

And then at other times, those same high-achieving students decide to go ahead and address acts of micro-aggressions within the school, and they do it in different ways. It's very interesting how the students in these studies do not want to perpetuate the stereotypes of

cultural racism.  The aggressive Black male.  The angry Black female.  So they're always conscious.  They said they're constantly thinking about their own behavior so as to not reinforce a negative stereotype while also maintaining high grades and excellent performance in school because that is their way of resisting and protesting against a racist school environment.

Q    And what are some of the impacts from racial stressors that you expect to see in high achieving students, if not for academic performance?

A    Well, it's really stressful for them.  In the studies, they talk -- the students talk about just the level of stress.  Like the young man said earlier today, that it just has a lot of real estate in your brain.  You can't just go to school and do algebra and just be smart.  You have to counter the narrative that Black people are dumb.  So you study extra hard.  You stay up extra late.  You lose sleep.  You are on high alert to be this high-achieving student, and that causes a lot of extra stress to these kids.  And what that can lead to over time is something that's called racial battle fatigue.

     And racial battle fatigue is when Black folks just get tired of constantly having to fight against racism in their school environments or their work environments or communities.  It's kind of a wearing down of a person over time.  And the students described in these research papers, they say, man,

it's exhausting.  It's exhausting doing this all the time.

Q    Is it also possible that the health and other impacts of racial stressors would not show up immediately in adolescents?

A    Absolutely.

Q    Can you explain that a little bit?

A    Well, Black kids are resilient.  And so there's a lot of coping mechanisms that Black kids may use to help mitigate the effects of the racial stress and trauma.  It's not going to take it away.  They can't make racism disappear.  But there are strategies that Black kids often learn at home from their parents through a process called racial socialization.

Racial socialization is where a Black parents and parents raising Black children, brown children, Native American children, teach them to have a very healthy cultural identity and teach them how to live and thrive in the world that may discriminate against them so to prepare them for bias as well as giving them very positive racial identity in the process.  So those racial socialization practices can include the transfer of ancestral knowledge.  Well, let me tell you about your great uncle so-and-so and what he did that changed our community.  Let me tell you what your grandma did.  Let me tell you what I did when I went to college and I was the first, you know, Black person to do X, Y, and Z.

So those stories present a counter-narrative, and the literature has found that it helps to mitigate the effect of

racial stress and trauma on the Black students.  It doesn't take it away, but it helps to give a little bit of a buffer to them.

Q    Dr. Spinks-Franklin, I have just a few more questions to sum up.  Is it your opinion that the Confederate names at Stonewall Jackson High School and Ashby-Lee Elementary School cause harm to Black students?

A    Yes.

Q    And is it also your opinion that they disproportionately impact Black students?

A    Yes.

Q    Are those opinions supported by your training and your research and your professional experience?

A    Yes.

Q    I have no further questions.

A    Thank you.

        THE COURT:  Okay.  Cross-examination?

        MR. DADAK:  Good afternoon.  Chris Dadak on behalf of the defendant.

                    CROSS-EXAMINATION

BY MR. DADAK:

Q    Good afternoon.  Well, I think we're still in morning. Good morning, Doctor. How are you today?

A    Well, thank you.

        THE COURT:  I think it's afternoon, Mr. Dadak.

MR. DADAK:  I lost track already, Your Honor.

THE WITNESS:  I'm sorry.  What is your last name?

MR. DADAK:  Dadak.

THE WITNESS:  Can you spell that for me, please?

MR. DADAK:  Yeah.  D-A-D-A-K.

THE WITNESS:  Thank you.

BY MR. DADAK:

Q    Doctor, when were you first retained to work on this case?

A    Early in 2025.

Q    Do you recall approximately when?

A    Somewhere around maybe February, March of 2025.

Q    And you've testified as an expert in the past.  Is that correct?

A    Yes, sir.

Q    Have you've prepared expert reports in the past?

A    Yes, sir.

Q    And what is your understanding of what you need to including in your expert report?

A    I include in the expert report the assignment that I've been given by the lawyers that retained me.

Q    Okay.  Do you understand what your report needs to cover from your assignment?

A    Yes.

Q    And what does it need to cover?

A    You mean in this case or in general?

Q    In general.

A    In general, if the retaining attorneys have a question that they'd like for me to answer or a concern that they'd like for me to address, then that is what my report covers.

Q    Is it your understanding that your report needs to cover all your opinions and all your bases?

A    Yes, based on the assignment that the retaining lawyers give me.

Q    In how many civil cases, approximately, have you rendered an expert opinion about the cause of a physical harm to someone?

A    Can you -- can you explain what you mean?

Q    Sure.  You've served as an expert in the past.  Correct? You've already said that.  Right?

A    Yes, sir.

Q    In those cases, how many of them involved you rendering an expert opinion about the cause of a physical harm to an individual?

A    I've rendered opinions on the long-term developmental effect of a particular incident.  Let me think.  Hold on. Probably about 12 cases total.

Q    And that's specific to physical harm.  Is that correct? They all --

A    Well, it's -- it's not like a broken leg.  It's the developmental impact of a particular incident.

Q    But in this case, you specifically reference physical harm in your report.  Is that correct?

A    Right.  Physical and psychological harm.

Q    In those other cases, did you make specific findings as to physical harm with those individuals?

A    Sometimes.  It depended on what the incident was.

Q    And in those cases, out of how many of them did you review medical records related to the person you are opining on?

A    Well, in the cases where there was an actual medical concern, then I would review medical records.

Q    Would that be all of them, then?

A    Most of them.  Not all of them, but most of them.

Q    And in what cases do you recall you did not review medical records related to the individual that your opining suffered physical harm?

A    Sometimes it might have been, like, a school-related incident or it might have been a divorce case or something like that.

Q    Okay.  And what were your opinions then in those types of cases?

A    It just depends on what I was asked.  Did the child get appropriate school services?  If not, were they harmed in some way.

Q    And in those cases that you just identified, those specific examples, did you review school records related to

those individuals?

A    If school was an issue, yes, sir.

Q    In the cases where you testified on behalf of a plaintiff in the case, in how many did you interview or talk to the plaintiff?

A    It just depended on what the lawyers asked me to do.  I don't talk to the plaintiffs often.  Just only in some cases.

Q    Did any of your cases involve you rendering an opinion as to an individual suffering from cognitive issues?

A    Yes.

Q    In those cases, in how many did you perform cognitive testing on the subject of your opinion?

A    Not that many.  I've only had to do testing on maybe two kids total.  The rest of them, I just reviewed documents.

Q    And when you reviewed those documents, were you relying on cognitive testing performed by others?

A    Yes.

Q    In any of the cases where you testified as a medical expert, did any of them involve multiple potential causes of a physical or psychological harm?

A    Some.

Q    And in those cases, what was your methodology in approaching those alternative causes of the physical or psychological harm?

A    That would require -- it depends on the case, right, and

the nature of the case.  So I would have to review all of the records that were provided to me by the counsel that retained me, and I always do a literature search.  Always.

Q    Would you ignore those alternative causes, or would you address and rule them out?

A    I have to take them into consideration with -- depending on the nature of the case.

Q    Right.  You have to consider them in your opinions and your report.  Correct?

A    Yes, sir.

Q    Okay.  So you agree with me, wouldn't you, in terms of your methodology as it relates to opining on the cause of physical harm, in order to properly identify the cause of that physical harm, you need to address and rule out alternative causes of that physical harm.  Is that correct?

A    I'm not sure if I fully understand your question, sir.

Q    Sure.  I'll rephrase.  You've testified that in cases where there are multiple potential causes of physical harm, you would address those alternatives in your opinions.  Correct?

A    If it's a part of that case, yes.

Q    Right.  So you would agree, then, in terms of your methodology, when there are multiple potential causes of a physical harm, to properly identify the correct cause of that physical harm, you need to address and rule out those alternative causes.  Is that correct?

A    If it's a part of the case.  If it isn't clear what the particular cause of the physical harm is, I have to take multiple things into consideration.  If the retaining counsel says, this was the incident and one of the consequences of this incident, that's a different type of review that I do.

Q    And that methodology would be true for cases where you're opining on psychological harm.  Is that correct?

A    Yes.

Q    In writing a report and forming your opinions, did you review any documents, the demographics of Shenandoah County Public Schools?

A    I'm sorry.  Say that again, sir?

Q    Yeah.  In writing your report and forming your opinions, did you review any documents related to demographics of Shenandoah County Public Schools?

A    No, I did not.

Q    In your writing your report and forming your opinions, did you review any documents of the demographics of Shenandoah County itself?

A    No, I did not.

Q    Okay.  In writing your report and forming your opinions, did you review any documents as to the history of Stonewall Jackson in Shenandoah County?

A    The history of Stonewall Jackson, the name of the school?

Q    That person.  General Stonewall Jackson.

A    Oh.  I don't remember reviewing that.

Q    Okay.  In writing your report and forming your opinions, did you review any documents as to the history of Turner Ashby in Shenandoah County?

A    You know, I may have, but I really don't remember, sir, because I did this review and report this report several months ago.  So I may have just to give myself some historical context, but I can't say for sure.

Q    But you would have -- if you had, you would have cited that in your bibliography.  Correct?

A    Right.  I would have.

Q    In your writing your report and forming your opinions, did you review any documents as to the history of Robert E. Lee in Shenandoah County?

A    Not that I know of.

Q    Okay.  In your report, you reference Confederate iconography.  Can you define that term and how you're using it?

A    Confederate iconography, the way that I'm using it, refers to any symbols from the Confederate States in the United States.  That can include actual symbols, pictures, names, references, songs that are in reference to the Confederate States of the United States and the work of the Confederacy during the Civil War.

            THE COURT:  Would that include, like, flags?

            THE WITNESS:  Absolutely.

THE COURT:  Statues?

THE WITNESS:  Like the Dixie flag, statues, names of streets, songs, terminology we use.

BY MR. DADAK:

Q    To your knowledge, what Confederate iconography is there currently at the two Shenandoah County Public Schools that are subject to this lawsuit?

A    What I read in the documents is the names of the generals on the school buildings and throughout the schools, and at the Stonewall Jackson High School, the emblem of the general representing him as a general in the Confederate Army.  That's what the students, the plaintiff students, described in their -- the documents that I reviewed.

Q    Can you describe that -- you mentioned a silhouette or how did you describe the actual mascot or symbol?

A    I don't know what it looks like, but according to the depositions and school board minutes, I believe the students described that their mascot is the general, and that that general -- picture of a general is on uniforms or school T-shirts.  There's a picture, I believe, of Stonewall Jackson in, like, a display in the high school.  You read about him, there's some information about him, and that if they go to tournaments, the name of the school is on their badge.  Sometimes, if they're in extracurricular activities, the symbol of the general might be on their uniform.  And when the

students described, in this case, in the depositions, the interviews and whatnot, that when they saw the symbol of the general, it completely reminded them of who Stonewall Jackson was as a human.

Q    But you have not seen any -- you don't know what that looks like.  Correct?

A    I do not.

Q    Okay.  So you've never personally seen or observed any of the iconography involved in this case.  Is that right?

A    No, sir, I have not.

Q    Do you recall the date of your report?

A    I believe I submitted it in June of 2025.

Q    When you wrote that -- your report and formed your opinions, do you recall which deposition transcripts you had reviewed?

A    You know what?  I don't exactly remember.  I know that I had -- did not have J.D.'s transcript at that time, because that deposition was done after my report had been finished. But I did -- let's see.  At the time that I wrote the report, I had reviewed, I believe, A.C., D.D.  Is there a B.B.?  I believe I had reviewed those -- at least those three.

Q    But sitting here today, you don't have a specific recollection of what depositions you reviewed in forming your opinions, do you?

A    I know I didn't do J.D.  I had the rest of the kids'

depositions by that point.

Q    I'd like to go through your report.  I'm going to read from Page 4, and I may butcher some names -- some words so --

A    Yes, sir.

Q    -- I appreciate your patience.

A    Can you please pull it up so I can follow along?

Q    Sure.

        MS. BANNER:  I can give her a copy or you can pull it up.

        THE WITNESS:  You all have an overhead projector, right?

        MR. DADAK:  I do.

        THE COURT:  Oh, they do.  I taught them how to use it last week.  Not Mr. Dadak.  He already knew.

        THE WITNESS:  That's nice and big.  Thank you.

BY MR. DADAK:

Q    And about halfway down that top paragraph, two examples of the harmful neurological effect including neuronal apoptosis, early brain cell death, and impaired synaptogenesis -- clearly, I was not a STEM major, doctor -- reduced nerve connection between brain cells, of which can cause overall diminished brain functioning.  As a result, Black students repeatedly exposed to racist messages become more vulnerable to cognitive issues, including hindered learning, memory, abstract thinking, and self-control.

You're not opining in this case that plaintiffs suffer from inhibited learning.  Is that correct?

A    What do you mean?

Q    Well, are you opining that these specific plaintiffs, the plaintiffs in this case, that they are suffering from inhibited learning?

A    Well, one of the students, in their deposition, reported how much longer it takes them to get their schoolwork done because they are constantly thinking about Stonewall Jackson as a former Confederate general.  And because that was constantly on their mind, it took them longer to get their work done. That was in one of the deposition reports that one of the students described.

That would be an example of having difficulty getting an assignment done, and that is what the type of learning and memory issues that are also described in the literature and in the studies that I've done.

Q    Respectively, Doctor, that wasn't my question.  My question was, are you opining that the plaintiffs suffer inhibited learning.  Yes or no?

A    I don't think so, but I don't know for certain other than that one student's statement about having difficulty finishing the assignment because they're constantly thinking about the racism.

Q    Dr. Spinks, I understand, but I'm asking as to what your

opinion is, not what someone else said.

A    I mean, it's the student.  My opinion is based on what the students said.  It was one of the students in the depositions.

Q    In your report, do you reference that deposition testimony anywhere?

A    I don't remember referencing that specifically in the report.  I don't remember.

Q    Anywhere in your report, do you state that you are opining that specific student is suffering from cognitive issues?

A    I did not.

Q    So are you opining whether any specific plaintiffs are suffering from inhibited learning?  Yes or not?

A    No.  No.  Sorry.

Q    And are you opining as to whether any specific plaintiff is suffering from impaired memory?  Yes or no?

A    No, I can't comment on specifics other than what I read in the depositions.

Q    Well, respectfully, Doctor, I'm not asking you to comment. I'm asking as to what your medical opinions are.

A    Right.  My medical opinion is that these experiences with racism in the school setting and being exposed to Confederate iconography increases the risk for having learning problems and memory problems in Black students, according to the literature.

Q    I understand.  But you're not opining that any plaintiff in this case is specifically suffering from that risk, namely

impaired memory.  Correct?

A    Correct.

Q    Okay.  And you're not opining that any specific plaintiff suffers from impaired abstract thinking.  Correct?

A    Correct.

Q    And you're not opining that any specific plaintiff suffers from impaired self-control.  Is that correct?

A    Not that I know of.  I didn't see evidence of that in the documents.

Q    And you've not reviewed any educational or any medical records from any Black student in Shenandoah County that documents these issues.  Correct?

A    I don't have access to any medical records or school records.

Q    Well, did you ask for access to any of those records?

A    No, I did not.

Q    About five lines down, Doctor, looking at your report. Further, because persistent, combined exposure to social ambient stress becomes toxic stress, daily exposure to Confederate school names and symbols similarly can become a toxic stressor that triggers hypervigilance and the subsequent cascade of dysregulating pathophysiological processes that harm multiple body systems in Black children, adolescents, and adults.

Now, you're not opining that any specific plaintiffs in

this case suffers from hypervigilance.  Is that correct?

A    Correct.

Q    And you have not reviewed any educational or medical records in this case that document such issues of any Black students in Shenandoah County.  Is that correct?

A    Correct.

Q    All right.  I'm going to read the last sentence for you from your report, Doctor, in that top paragraph.

Due to the Shenandoah County School Board's decision to reinstate the Confederate school names, these Black students are at increased risk of poor mental health, physical health, and developmental and educational outcomes, which can include impaired social skills, interpersonal relationships, negative attitudes towards authority figures, and suppressed creativity.

You are not opining that any specific plaintiff in this case suffers from impaired social skills.  Is that correct?

A    Correct.

Q    And you're not opining that any specific plaintiff in this case is suffering from impaired interpersonal relationships.  Is that correct?

A    Correct.

Q    And you are not opining that any specific plaintiff in this case suffers from negative attitudes towards authority figures.  Is that correct?

A    Correct.

Q    And you're not opining that plaintiffs are suffering from any suppressed creativity.  Is that correct?

A    Correct.

Q    And you have not reviewed any educational or medical records from any Black student in Shenandoah County that documents these issues.  Is that correct?

A    I'm sorry.  I saw her raise her hand.

Q    I need to slow down.  I apologize.

A    Okay.  That's okay.  I'm sorry.  Would you please repeat the question?

Q    Yes.  You have not reviewed any educational or medical records or any Black students in Shenandoah County that documents any of these issues.  Is that correct?

A    Correct.

Q    And you're not opining that any specific Black students in Shenandoah County currently suffers from any of these issues. Is that correct?

A    Correct.

Q    This is the top of Page 5 from your report, Doctor.

     In addition, prolonged exposure to race-based traumatic stress as a toxic stressor leads to premature shortening of the telomere of the Black child's DNA which poses risk of chronic disease, premature aging, and shortened life expectancy.

     You did not measure the telomere of anyone's -- any plaintiffs DNA in this case, did you?

A    Correct.

Q    And you're not opining that Black students in Shenandoah County have premature shortening of the telomere of their DNA. Is that correct?

A    Correct.  People only measure telomeres in research.  We don't do that clinically anyway.

Q    In your report, you opine that social -- social stressors disproportionately affect people who are relegated to a lower marginal social status, such as Black people.  Is that correct?

A    Would you please put that page up so I can see what you're talking about?

Q    Well, do you recall making that opinion?

A    I do, but I'd still like to see the page.

Q    Did I accurately state your opinion?

A    I'm sorry?

Q    Did I accurately state your opinion, Doctor?

A    I believe so, but I still would like to see the page, because that way I can see the context around what I wrote.

Q    And you wrote that disadvantaged people, like Black people, tend to have less access to psychosocial resources than their more advantaged White counterparts.  Is that correct?

A    Yes.

Q    In writing your report and forming your opinions, did you consider any documents or information related to psychosocial resources available to the plaintiffs in this case?

A    I did not.  That is what the literature states.

Q    In writing your report and forming your opinions, you did not consider any documents related to the psychosocial resources available to Black students in Shenandoah County.  Is that correct?

A    I'm sorry.  Is that the same question you just asked me previously?

Q    Well, no.  The first one was about the plaintiffs.

A    Okay.

Q    Right?  You didn't consider any documents related to the plaintiffs?

A    Correct.

Q    My second question was related to Black students generally in Shenandoah County.

A    Correct.  I did not.  I was reviewing the literature.

Q    And in writing your report and forming your opinions, you did not consider any information related to any other potential sources of social stressor in the plaintiffs' daily lives.  Is that correct?

A    Would you please ask me that again?

Q    Yeah.  In writing your report and forming your opinions, you did not consider any information related to any other sources of social stressors in the plaintiffs' daily lives.  Is that correct?

A    Well, I was only asked to discuss the stress related to

Confederate iconography in the students' lives.  That was my assignment.

Q    Right.  And so the answer is yes, you did not.  Correct?

A    Right.  I didn't.  I wasn't asked to.

Q    Okay.  And in writing your report and forming your opinions, you did not consider any information related to other sources of social stressors for Black students generally in Shenandoah County.  Is that correct?

A    That was not my assignment.  My assignment was to focus on the effects of Confederate iconography and the harms to Black students.

Q    All right.  This is from Page 5 in your report.  You wrote, when Black students face race-based traumatic stress at school, including through racist and racially-discriminatory messages, they are at increased risk for academic underachievement, chronic absenteeism, externalizing behaviors, substance use, school failure, and impaired interpersonal relationships with peers, teachers, and school staff.  Correct?

A    Yes.

Q    Okay.  You are not opining that any specific plaintiff in this case is suffering from academic underachievement.  Is that correct?

A    Correct.

Q    And you're not opining that any specific plaintiff in this case is suffering from chronic absenteeism.  Is that correct?

A    Correct.

Q    And you are not opining that any specific plaintiff in this case suffers from substance abuse disorder.  Is that correct?

A    Correct.

Q    And you're not opining that any specific plaintiff in this case suffers from externalizing behavior.  Is that correct?

A    Correct.

Q    And you have not reviewed any information or statistics related to Black students in Shenandoah County specifically suffering from these issues.  Is that correct?

A    Correct.  This is what the literature across the country says.

Q    And I want to be clear on that, Doctor.  When you say the literature, you mean the literature you have cited in your report.  Correct?

A    Correct.  The literature I've cited in my report and national literature in general.  I didn't cite every single article that addresses the effect of racism on Black student health.

Q    I understand.  But specifically, you did not rely on any study, research, or journal outside of the ones you cited in your report.  Correct?

A    Correct.  Correct.

Q    Have you spoken with any Black student in Shenandoah

County?

A    No, sir, except today when I said hello to the young man, A.D.

Q    And we briefly spoke about Confederate iconography.  You mentioned the mascot or symbol.  Correct?  The General?

A    Yes, sir.

Q    Do you have an opinion as to whether that symbol itself has the same impact identified in your report, all these negative risks and outcomes that you specify in your report?

A    Yes.  According to the literature, since it is the -- it symbolizes Confederate generals.  Then it is a racist symbol that will have a negative effect on the psychological and physiological effects of the Black students in that school because of what it represents.  It's a racist symbol.

Q    And that's true regardless of the name of the school. Correct?

A    No.  It's a racist symbol because of the name of the school.  There's an association.  Remember, in cultural racism, there's always associations.  So the General mascot is affiliated with Stonewall Jackson who was a general.  That specifically references his name.

Q    So in your professional opinion -- well, expert opinion, excuse me -- the mascot or symbol does not need to be changed in this case?

A    The mascot or symbol?

Q    Yeah.  The General.

A    Well, I wasn't asked to -- I didn't -- I wasn't asked about changing the General.  But the students in the depositions reported that the General represented Confederate racism to them.  I think you should change it because that's harmful to the students.  It's a constant reminder to Black kids that they're second-class citizens in the school.  It's a racist symbol.

Q    I just want to make sure I understand your testimony correctly.  In your expert opinion, even if the school board changed the name of the school, that General symbol would remain racist because of the connotation of it?

A    Because of the connotation.  What I read in the depositions of the students is that the General mascot remained when the high school was changed to Mountain View.  And in that case, the kids reported, what I read in the deposition, is that having the same general really didn't bother them because now the school name had changed to Mountain View.  However, today, the school's name is Stonewall Jackson again.  So now the General mascot takes on a whole new meaning to these students, and it is directly affiliated with a Confederate general who was a slave master and fought to maintain the system of slavery.  So now it takes on a very negative meaning to these students, and as the school name should be changed, so should the mascot.

Q    So short answer to my question was yes.  Correct?  In your expert opinion, the general symbol is racist.  It needs to be changed.  Correct?

A    Yes, sir.

Q    You mentioned studies talking about the impact of racism on high school students.  Can you tell us how racism was measured in that study?

A    There's lots of different studies and they're measured differently.  In some studies, there were questionnaires like what I did with the CDC.  Questionnaires on experiences of racism within the school setting.  And there are other studies where they interviewed students directly, and those are called qualitative studies about what their experiences are.  And then there's another form of studies where they've done all three.  They'll interview students, they'll have them do questionnaires, and then talk about experiences of -- experiences with racism within the school setting.

Q    But in your report, at the end, you cite a survey of high school students who experienced racism.  Correct?

A    Yes.  At school.

Q    And in that specific survey, how did they measure racism?

A    We had questions.  That was from the CDC.

Q    And do you know, what was the question?

A    The questions are students being treated differently at school because of their race?  Are students being

discriminated against because of their race?  Feeling that they were unwelcome because of their race?  Very specific related to the school environment.

Q    And that was a nationwide survey; correct?

A    Yes, sir.

Q    Do you have any knowledge as to how many schools in that survey had names of Confederate -- Confederates?

A    I don't, and I actually asked the CDC about that.  So we did not have access to specific school names or specific school demographics.  It was a part of the Youth Behavior Risk Surveillance system which is this national teenager questionnaire that the CDC does every year.  And during the COVID-19 pandemic, we made a separate questionnaire called the ABES.  So the paper I was a part of published data on the ABES subset of the Youth Behavior Risk Surveillance System, and we did not have access to specific school demographics, which I was very interested in, like school climate, school names, demographics, et cetera.

Q    Can you identify which, if any, of the literature you cited provides an empirical analysis of the impact of a school name on students?

A    Yes.

Q    Can you name them, please?

A    Yeah.  You'd have to pull up the list of sources for me. I don't remember off the top of my head.

Q    So off the top of your head, you can't cite any specific study?

A    They're all in my report, sir.  If you pull them up, I can show you, just like I did for the other counsel.  I can show you exactly which one it was because there was one specifically that looks at school Confederate names around the country and how students are doing, Black students in particular.  I just don't remember the names of the authors.  It was one of the papers that I showed the judge.  Okay.  You have to move up, please.  Keep going.  Okay.  Go to the next page, please, sir. I appreciate you for doing this.

Q    Absolutely.  And sometimes I just need to ask my question, Doctor, make sure you can't tell me, then we can refresh your recollection.  Is that fair, Doctor?

A    Say that again?

Q    Sometimes I just need to ask you -- have you answer my question that you don't recall and then we can refresh your recollection.

A    But I can show you.  I just don't recall off the top of my head.

Q    I understand.

A    I'm sorry.  I'm menopausal.  My brain can't hold information like it used to.

Q    I'm just explaining to you my process, why sometimes I'm asking you to answer the question first and then we refresh

your recollection.

A    Oh, okay.  Okay.  Yes, sir.

Q    All right.  Do I need to keep scrolling, Doctor?

A    Yes, please.  Hold on.

THE COURT:  Would it be easier if you had a hard copy in front of you to look at?

THE WITNESS:  Yes, it would.  It would be so much easier.  Can we please do that?

THE COURT:  Does anybody have a hard copy we could give her?

THE WITNESS:  Oh, my gosh.  I wanted to ask, Your Honor, but I didn't know if I could.

THE COURT:  No.  Of course you can.

THE WITNESS:  Thank you so much.  This is awesome. Okay.  Okay.  It is citation number 30 on Page 3.

BY MR. DADAK:

Q    Can you read it out loud, please?

A    You want the name of the article?

Q    Please.

A    The Persistence of Confederate, Enslaver, and Segregationist Namesakes in U.S. Public Schools: A Critical Quantitative Toponymic Analysis.

Q    Okay.

A    It's a 2025 article.  It just came out this year.

Q    Yes, and I'm familiar with it.

A    Okay.

Q    What in that study do you recall in terms of its empirical analysis of the effect of Confederate names on Black students?

A    What I can recall from that study, it talked about general Confederate -- just general names of Confederates, enslavers, and segregationists where Black students, where Black children lived, whether it was school names or street names or statues, icons, and building names, et cetera.  And it showed that the higher the concentration of a Black population in former Confederate states, the more likely that Black population was to live in an area that had the names of Confederates, segregationists, and enslavers.  That's what that particular paper found.

Q    I'm sorry.  Could you repeat that?  The higher the concentration of what?

A    The higher the concentration of Black folks in a given area in the South, in the former Confederacy, the higher concentration of Confederate, enslaver, and segregationist names there were in the environment.  The schools, the streets, the buildings, et cetera.

Q    But it didn't quantify the impact of a school name on anyone, did it?

A    No, not that study.

Q    Well, are you aware of any -- any other studies that have?

A    Yeah.  Okay.  So if you look at -- hold on.  This is

missing a page. Hold on. Let me go back. Okay. If you look at number seven, Local Confederate Memorialization and Gender Ethnic Variations and Mental Health Among Black Residents. If you look at number nine, Confederate Monuments and Anti-Black Stereotypes in the U.S. South. If you look at number 13. How do you react to seeing the Confederate flag? Examining public reactions by racial -- by race-ethnicity, and region.

I believe number 34 mentions Confederate iconography. It's Institutional Racism and Campus Racial Climate: Struggles for a sense of belonging and academic success among Black students in K-12 public schools. I don't have Page 5 and what those -- I believe there's at least one reference on Page 5.

THE COURT: Well, I'll hand you my Page 5.

THE WITNESS: Thank you, Judge.

The last source, White People Stress Me Out All the Time: Black students define racial trauma. And it is mentioned.

THE COURT: Does that have a number?

THE WITNESS: It's number 54. It's the last source. And I believe Confederate school names is mentioned in that article. It's referenced in that article.

BY MR. DADAK:

Q    But which, if any, of those studies actually quantively (ph.) accessed or measured the impact of Confederate school names on Black students?

A    That last one I mentioned and --

Q    And I want the record to --

A    Several of them do, sir.  They actually describe the students mentioning the negative views that they have of Confederate iconography.  That it sets up a stressful environment for them.  There's measures of higher levels of depression in regions where there is Confederate iconography among Black people.  So there's a variety of studies.

Q    And I believe you started your answer by saying that last one, that last one being White People Stress Me Out All the Time?

A    Yes, sir.

Q    You believe that study quantifies or measures the impact of Confederate school name on Black students?

A    It references it.  The whole study is not about school names or Confederate iconography, but I do believe, if my memory is correct, that that paper references Confederate iconography as a stressor within the school setting.

Q    I understand.  But respectively, my question's specific as to what, if any, studies empirically studied the impact of Confederate school name on Black students?

A    Hold on, because I feel like I've already answered this question.  What I remember of the literature is that when there are Confederate icons in an environment where Black students live, be they school names or statues or otherwise, there is

poor mental health outcomes for those kids in those regions of the country.  And I cannot state one paper.  It's a -- it's a conglomeration of all of the data from all of those various papers.

Q    You're familiar with the concepts of cognitive, affective, and somatic responses to racism.  Is that correct?

A    Yes, sir.

Q    What is a cognitive response to racism?

A    It's the intellectual.  How you think and problem solve. How you choose to respond.

Q    And what is an affective response to racism?

A    Affective refers to emotions.  It's the emotional responses to racism.

Q    And what is a somatic response to racism?

A    Soma refers to the body, and so how racism affects the physical health of a person.

Q    In your report, you did not identify any cognitive responses to racism specific to any individual plaintiff.  Is that correct?

A    Correct.  Not to any individual plaintiff.

Q    In your report, you did not identify any affective response to racism specific to any individual plaintiff.  Is that correct?

A    Not to individual plaintiffs, but I cited the literature, the national data.

Q    In your report, you did not identify any somatic response to racism specific to any individual plaintiff.  Is that correct?

A    Correct.  But I cited the national data.

Q    There's a difference between race-based stress and racial trauma.  Correct?

A    No.  It's a category called race-based traumatic stress or racial stress and trauma.  Those terms are used interchangeably.  It depends on the scholar and what term they use.

Q    So in your expert opinion, those terms are interchangeable?

A    Race-based traumatic stress and racial stress and trauma are used interchangeably in the literature, depending on who the researchers are, who the scholars are.  It's just that racism is a stressor.  It's a traumatic experience for Black people.  That's the bottom line.

Q    Does race-based stress equal trauma?

A    In many cases, yes.

Q    But not always.  Correct?

A    Well, in the literature, it actually -- they're used interchangeably.  So when they say race-based stress, it is in the racial trauma literature.

     (Off record conversation.)

BY MR. DADAK:

Q    In your understanding, how would you define racial trauma?

A    You mean racial stress and trauma, or just racial --

Q    Just racial trauma.

A    Okay.  So racial trauma refers to the chronic, unrelenting stress of experiences of racism that are traumatic for Black people.

        MR. DADAK:  May I approach, Your Honor?

        THE COURT:  Sure.

        MS. BANNER:  Is it possible to put it up on the ELMO?

        MR. DADAK:  Sure.

        MS. BANNER:  Thank you.

BY MR. DADAK:

Q    Do you recognize this document, Doctor?

A    Yes, sir.

Q    And what is it?

A    It's one of the papers.  I think that's number 54 in my citation.

Q    Can you read for me the first two sentences from the paragraph, academic definition of racial trauma?

A    Racial trauma is the experience of enduring cognitive, affective, and/or somatic responses to racism, including race-based stress reactions and subsequent race-based stress symptoms that may manifest based on the intensity and/or frequency of racist stressors a person has experienced or witnessed.

Q    Can you read the next sentence, Doctor?

A    Not every racist stressor leads to racial trauma, but those that are especially intense or frequent are more likely to elicit racial trauma.

Q    Thank you, Doctor.

A    Yes, sir.

Q    When asked questions by Ms. Banner, you talked about high -- explained high achievers.  Correct?

A    Yes, sir.

Q    In your report, do you make any reference to high achievers or racial fatigue?

A    I don't mention racial battle fatigue in my report.  I believe I did say something about high-achieving students.  I'm not 100 percent sure.  I thought I did.

Q    But in writing your report, you knew you have to provide every opinion and every basis for your opinions.  Is that correct?

A    Yes.

Q    In your report, you write about a recent chapter you wrote about transgenerational transfer of racial and colonial trauma.  Correct?

A    Yes.

Q    And you wrote that the trauma and changes in the target person's DNA could cause premature aging and increased risk of chronic diseases is passed down from one generation to another.

Correct?

A    Yes.

Q    And that's regardless of whether that second generation experiences any racism.  Is that correct?

A    No, actually, that's not correct.  In this literature, because we're talking about specifically in the United States, Black people today continue to experience racial stress and trauma even if they didn't live during the Jim Crow area and they didn't live during slavery.  So although Black Americans today possess the DNA that was passed down from their enslaved ancestors and from their ancestors that survived Jim Crow, they continue to be second-class citizens in a society where they continue to experience all forms and all levels of racism.

So you've got the DNA you were born with and then you have the ongoing changes to your system based on your daily experiences with racism.

Q    Did you review any information related to the ancestors of any of the plaintiffs in this case?

A    One of the students stated that their grandparents had been denied access to the Stonewall Jackson school during the Civil Rights Movement and that felt very personal to them.  And some of these students mentioned, you know, slavery and their ancestors being enslaved.

Q    Besides that, any information you reviewed or relied on?

A    No, sir.  Just their statements.

Q    In your clinical practice, do you treat anyone who suffers from racial trauma or stress?

A    Yes, sir.

Q    And what is your methodology when those patients come into your office?

A    Well, kids come to my office because they're having some type of a developmental problem or behavioral problem or both. Usually both. And in a clinical evaluation, I do a detailed interview with the family. I have them fill out various questionnaires, including questionnaires about experiences with racism. I conduct a comprehensive developmental evaluation. I review the child's records, and then we piece apart, based on their experiences, how the role of racism plays a role in their life. And then I connect them with a therapist who can provide culturally-concordant, trauma-informed care for them.

Q    And do you conduct -- you conduct research on people suffering from race-based stress and?

A    Trauma yes, sir. Or racism -- or racism as an adverse childhood experience, racism as a trauma.

Q    And what's your methodology when you conduct research like that in terms of gathering the information?

A    Well, my research experience has been primarily through questionnaires or conducting a literature review.

Q    And what kind of -- explain to me the use of questionnaires. When and how are they used?

A    The questionnaires are empirically created, validated, and sometimes even normed questionnaires, and they are standardized.  So everybody fills out the same questionnaire.  They're validated, so you know you're going to get the results that you're looking for.  And they're normed if the questionnaires are based on the age of the person filling it out.

And they have specific questions that have been found to be valid and reliable based on the experiences of a person they may have with racism.  So if it's children, it would be within the school environment.  If it's adolescents, it's school and community.  If it's adults, it's work and community.

Q    Do you have any knowledge or information regarding the race of any of the teachers that teach the plaintiffs in this case?

A    No, sir.

Q    Do you have any knowledge or information regarding the relationships any of the plaintiffs have with any of their teachers?

A    Not other than statements in the depositions where some of the students were asked whether or not teachers had mistreated them, and the students said no.  But I don't have any other information.

Q    And you would agree with me, wouldn't you, Doctor, that student relationships and interactions with their teachers are

an important component of their perception of racism in the school?

A    Say that again?

Q    I'll rephrase my question.  You would agree with me, wouldn't you, Doctor, that student interactions and relationships with their teachers, especially White teachers, are a major factor as to students' perceptions of how they're treated racially at school?

A    It's a -- it's a part of it, and it also depends on how the study is conducted.  So it depends.  It's not 100 percent, but it's a part of it.

Q    So in writing your report and forming your opinions, even though you would have in your prior cases as a medical expert, even though you would have in your clinical practice, and even though you would have in your research practice, you did not conduct any history-taking of the plaintiffs in this case.  Is that correct?

A    Well, I don't take history in all of my expert witness cases.  Only a few of them.  But my clinical practice, definitely.  But this is not my clinical practice.  This is expert witness work.

Q    In writing your report and forming your opinions, even though you would have in your research practice, did not administer any questionnaires to the plaintiffs.  Is that correct?

A    Correct, because this wasn't research.  This was expert witness, and I was following my assignment.

Q    You would agree with me, wouldn't you, Doctor, that the school name is not the only racial race-based stress -- stressor in the plaintiffs' lives.  Correct?

A    I would agree that it's not the only one, but it is a major one because of the daily exposure to the students.  It's a daily, chronic, unrelenting exposure because they have to go to school.

Q    But you don't have any data or information as to what other race-based stressors they encounter in their life, do you?

A    I do not.  But I do have the information that this is the stressor that they encounter every single day and they spend most of their day, awake hours, at school.  So it would be considered a chronic, unrelenting stressor.

Q    You would agree with me, if I applied the framework of your report, the studies you rely on, that witnessing Confederate flags in close proximity to your home would be a significant race-based stressor and trauma, would you not?

A    Yes.

Q    And even would you agree with me, Doctor, that in cases involving multiple causes of an issue, to properly address the cause of that medical issue, you need to address and rule out other causes.  Correct?

A    That's if I'm evaluating, like, a kid in clinic for a medical issue, yes.

Q    And you have not even attempted to address any other race-based stressors in these plaintiffs' lives.  Correct?

A    I was asked about the role of Confederate iconography specifically, and that's what I focused on for this expert review.

Q    And in the demonstrative you looked at, that demonstrative would be true for any stress or trauma in someone's life. Correct?

A    Not all of them.  Some of them.  But what I described was specifically from the literature on race-based trauma. Race-based traumatic stress.

Q    In writing your report and forming your opinions, you did not look into any other stressors or traumas in the plaintiffs' lives.  Correct?

A    I was asked to focus on Confederate iconography as the -- as the stressor.  I did not look at other stressors.

Q    In your clinical practice, if you were to evaluate the impact of the school names as a race-based stressor, you would have done all these things.  Correct?

A    Because I would be in clinic and I'd have a doctor-patient relationship with them.  I don't have a doctor-patient relationship when I do expert work.  I review documents.

Q    And in your research practice, if you're assessing the

impact of this Confederate school name on the plaintiffs, you would have done all these things.  Correct?

A    It depends on how the research was set up.  But, again, that's my research work.  That's very different than doing expert witness work.  Very different.

MR. DADAK:  I don't have any further questions, Your Honor.

At this point, I would move to strike the expert's testimony based on foundation and relevance.  Inherently unreliable methodology.  She already admitted she didn't follow any the methodology she would have normally.

THE COURT:  Would the plaintiffs like to respond to that last-minute objection?

MS. BANNER:  Yes, Your Honor.

I think in addition to being out of time, because we had opportunities to brief and argue about the qualifications of the witnesses prior to trial, Dr. Spinks-Franklin has testified what her opinion is about, what it's based on.  We've had extensive discussions about the articles that support her opinions and the research that she has done in order to support her opinion.  She's been offered and qualified as an expert.

And I have a few redirect questions that may also help to clarify.

THE COURT:  Okay.  I'm going overrule the objection.  Dr. Spinks-Franklin is extraordinarily qualified and was

admitted as an expert witness in this case on the subject, without objection, both on -- as a developmental behavioral pediatrician and as -- and on racism as a health determinant in children.  She has testified at length about what she has done in this case, her examination of the research, the literature. She's testified about her background.  She has differentiated her work in this case from what she may do in a clinical setting.  I will overrule the objection.  She is plainly qualified to render the opinions that she has done in this case, and the Court will consider them appropriately.

Let's hear any redirect questioning that you have.

THE WITNESS:  May I give this back to the counsel?

THE COURT:  You might need it.

THE WITNESS:  Oh, you're right.  I might need it. You're right.  Sorry.

MS. BANNER:  Is that a full copy of the expert report?

THE WITNESS:  The first four pages.  No, it's not the whole report, ma'am.

MS. BANNER:  Why don't we switch and I'll just --

THE WITNESS:  Okay.

MS. BANNER:  -- give you a full copy in case you need it.

THE WITNESS:  Thank you, ma'am.

MS. BANNER:  I am hoping not to have too many

questions, Your Honor, but I'll also note that it's -- I know it's past lunch and --

THE COURT:  No, no.  Let's finish the witness --

MS. BANNER:  I just wanted to flag in case --

THE COURT:  No, let's finish the witness before lunchtime.

MS. BANNER:  Okay.

THE COURT:  Out of mercy to Dr. Spinks-Franklin.

THE WITNESS:  Thank you.

REDIRECT EXAMINATION

BY MS. BANNER:

Q    Dr. Spinks-Franklin, is it fair to say that your opinions today are not about any particular student?

A    Correct.

Q    And what were you asked to do in this case?

A    I was asked to opine on the effect --

THE COURT:  Hold on.  Hold on.

THE WITNESS:  Sorry.

THE COURT:  Hold on.  He objected.

I'm sorry.  Mr. Dadak?

MR. DADAK:  She's asking the exact same questions she already asked on direct.

THE COURT:  All right.  Well, since we've been going for some time and the finder of fact has been trying to pay attention attentively, it may have been asked and answered, but

I'll allow it.

BY MS. BANNER:

Q    Can you just briefly, Dr. Spinks-Franklin, sum up what you were asked to do in your expert report?

A    I was asked to determine the effect of Confederate names on Black students -- on Black students and Black people and to determine whether Confederate names and icons are racially discriminatory and have a disproportionate effect on the Black students as opposed to White students.

Q    Okay.  Is it fair to say that your opinions today are intended to explain the medical literature to the Court about race-based traumatic stress and its impact on students?

A    Yes.

Q    And is also fair to say that your opinions are intended to explain how Confederate symbols or names can cause race-based traumatic stress?

A    Yes.

Q    And what the impact of that stress might be?

A    Yes.

Q    Opposing counsel asked you about whether you considered particular documents like education records or medical records, and you answered no.  Did you need to review any of those things in order to reach the opinions you reached in the report?

A    After I read the news articles, the depositions,

especially, and the school board minutes, I felt like I had enough information from reading those documents of the students describing how they felt and what their experiences were, and I saw that what the students described really aligned with what I already knew was in the literature, and then I did an updated literature review and saw the -- how much they -- the students here in Shenandoah reflected what was in the literature.  I did not feel the need to have to then go and review other documents in order to address the question.

THE COURT:  Can I ask you a question about that?

THE WITNESS:  Yes, sir.

THE COURT:  On Page 7, your report is dated June 13, 2025.  Okay?

THE WITNESS:  Yes, sir.

THE COURT:  But if you look over at the materials reviewed in Exhibit B on Page 37 --

THE WITNESS:  Okay.

THE COURT:  -- it references two depositions that were taken in September of 2025.  That was the deposition of A.C. and the deposition of B.B.

THE WITNESS:  Yes.

THE COURT:  So your report was written and signed before you reviewed these two depositions transcripts?

THE WITNESS:  Correct.  So from what I can remember, the plaintiffs' counsel added them because before I did my

deposition, I had reviewed at least one of them.  And when I --

THE COURT:  If you look at Paragraph 40, it says deposition transcript and errata sheet of A.J. taken on May 20, 2025.  That's on Page 37 of your report.

THE WITNESS:  Okay.  Hold on, Judge.  Thirty-seven. Yes.  Yes, sir.

THE COURT:  Okay.  And there was up on 38, deposition transcript and errata sheet of D.D. on May 16, 2025.

THE WITNESS:  Yes, sir.

THE COURT:  Before you wrote your report, you had -- you reviewed those depositions.  Correct?

THE WITNESS:  Yes, sir.

THE COURT:  And you read these other ones afterwards?

THE WITNESS:  Yes, sir.

THE COURT:  Was there anything about those depositions you read after that were in conflict with the conclusions you have reached in your report?

THE WITNESS:  No, sir.  They were consistent.  All the kids describe the same experiences.

THE COURT:  All right.  Go ahead.  Sorry to interrupt.

MS. BANNER:  No, it's no problem.  Thank you, Your Honor.

BY MS. BANNER:

Q    I wanted to also ask you about your opinions about

high-achieving students.  Is your understanding of the impact of racism on high-achieving students part of your opinion on the impact generally on racism on Black child development?

A    I'm sorry.  Would you --

Q    That was --

A    -- repeat that question?

Q    -- a long question.

A    That was.

Q    Yeah.  So you -- in your testimony today, you gave some opinions about the impacts of racism on high-achieving students.

A    Yes.

Q    Do you consider those opinions part of your general opinion about how racism affects Black students?

A    Yes.

Q    Okay.  And I wanted to direct your opinion on your report to Page 5 of your materials reviewed, number 52.

A    I'm sorry.  You said Page 5 of materials reviewed?

Q    Yeah, it's that Exhibit B.

A    Okay.

Q    I don't have actually that full page number.

A    Hold on.  Exhibit B.

Q    I believe it's on --

A    Oh, yeah.  Page 5.

Q    -- Page 38.

A    Okay.  Yes, ma'am.

Q    And to number 52.

A    Okay.

Q    And what article is that?

A    Oh, yeah.  Black achievers experience with racial spotlighting and ignoring in a predominantly White high school.

Q    Is that one of the studies that you relied on to reach that opinion?

A    Yes.  That's one of the studies I was quoting.

Q    And I also want to look on Page 6 of the report, footnote 58.

A    I'm sorry.  Page 6?  I don't see footnote 58.

Q    I'm sorry, on Page 6 of the report, not of Exhibit B.

A    Of the report.  I'm on Page 6, but I don't see a footnote.

Q    Maybe I wrote that down wrong.  Oh, Page 15.  I'm sorry.

A    Oh.  No, ma'am, I didn't see it.  Okay.  Page 15.  Okay. I'm on Page 58.

Q    Footnote 58.

A    Okay.

        THE COURT:  They're actually endnotes.

        MS. BANNER:  Endnotes.

        THE WITNESS:  Endnotes.  That's it.  Thank you.

        MS. BANNER:  That's the problem that I have.  I'm used to footnotes.

        THE WITNESS:  Yes, ma'am.

BY MS. BANNER:

Q    And do either of these studies also talk about the high-achieving students and how racism may play out differently?

A    No, not in these -- wait, actually.  I don't remember if the AAP article does, the one by Trent, about Maria Trent and them.  I don't remember if they talk about high-achieving Black students.  The Shonkoff article does not.

Q    Okay.  And then lastly, can you explain how your expert work -- excuse me.  Close to lunchtime.  How your expert work and they way you approach it differs from your clinical or your research work, and why?

A    Oh, my gosh.  Expert work is totally different.  I don't have a personal doctor-patient relationship with the folks that I work with in expert work.  I just don't.  And so, in most of cases that I do, I never actually meet the families who are represented by the counsel that retain me as an expert.  I'm just reviewing documents and then meeting with the counsel.  Only in a minority of cases so far that I've done do I actually meet with the family, and even a smaller number do I actually evaluate the child.

My clinical practice is totally different.  We have a patient-doctor relationship.  I'll be your doctor until you graduate high school, you know what I'm saying?  So I see these babies from the nursery all the way through until they

graduate.  I get prom pictures, I go to birthday parties.  I show up at IEP meetings at the school.  Some of my patients, they consider me like their godmother.  So we have a longitudinal relationship, and I'm managing that child's developmental disability.  So I'm making referrals for whatever care that they need.  I'm talking to their teachers.  I'm helping to set up special education services.  I'm prescribing their medicines.  I'm referring to therapies.  It's a therapeutic relationship I have with my patients.

That is completely different than my expert witness work.  When I'm conducting research, if the research is clinic-based research, then I have a relationship with the patients that I'm -- that are filling out the questionnaires and doing it.  If its national database research, that's totally different.  I don't have individual relationships with the students in the study.  I'm collecting and analyzing the data that the students submitted to a national database system.  That's totally different than expert witness work.

Q    And does the fact that those methodologies are different, does it cause you to change or doubt any of the opinions you reached in this expert report?

A    No, ma'am.  Not at all.

MS. BANNER:  No further questions for me.

THE COURT:  Okay.  While we have Dr. Spinks-Franklin with us, Mr. Dadak, I'll give you a chance.  Do you want to ask

any additional questions, sir?

RECROSS-EXAMINATION

BY MR. DADAK:

Q    Just briefly, Doctor.  When you made the assumption that Black students viewed a school name as racist and a discriminatory message, did you make that assumption for all students -- Black students in Shenandoah County?

A    Well, based on the literature --

Q    Yes or no?

A    Yes.

Q    And none of your opinions are based on any fact specific to Shenandoah County Public Schools.  Is that correct?

A    No, that doesn't make sense because I had to read the statements of the students that attend Shenandoah Public Schools, so I took the students' statements into account because that was a big part of what helped me to reach my conclusions.  So the students attend the schools and they were the ones describing how comfortable or unwelcome they felt, how stressed they felt, how disappointed they were and frustrated that the school names reverted to Confederate generals.  So that's what I know about the schools is based on the students' statements.

Q    But if three Black students showed up today and told you that they don't view the school names as racist or discriminatory, would that affect your opinions at all?

A     No, sir.

Q     All right.

MR. DADAK:  No questions.  Thank you, Your Honor.

THE COURT:  Why not?

THE WITNESS:  I'm going to tell you why, Judge.  The literature shows that even if Black people do not necessarily conscientiously view and experience as racist, but it is an experience that most Black folk see as racist, those people still have, in the studies, physiologic responses to it as a stress response.  So people who tend to not see -- Black people who tend to not believe a racist experience is actually racist are those that often have internalized racism, according to the literature.  So they believe the stereotypes.  They believe in White supremacy.  It affects their health.

So conscientiously, they'll say, oh, I think, you know, Robert E. Lee was great.  He was a great leader.  And then when you look at how that person is doing physiologically, in the literature, they're not doing well because they have internalized a very negative view of themselves and their own racial group, and they believe in White supremacy and in Black inferiority and that affects their physiology, it affects their psychology, and it affects their DNA.

In fact, some of the worst cases of DNA changes in the literature are among Black people with internalized racism.  They have the most significant changes to their DNA.

THE COURT:  Thank you.

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Do my last questions, do the prompt any additional questions from counsel for the plaintiffs?

MS. BANNER:  No, Your Honor.

THE COURT:  Counsel for the defense counsel?

MR. DADAK:  No, Your Honor.  Just for the record, we renew our motion to strike her testimony.

THE COURT:  Yeah.  I've overruled that.  I overruled your motion in limine and I overruled your motion here in court.  Thank you for that.  And you don't have to renew it in federal court, so you're all good.  Your objection is on the record, Mr. Dadak.

Okay.  Dr. Spinks-Franklin, one other thing.

THE WITNESS:  Yes, sir?

THE COURT:  Could you provide -- if you haven't already done this -- to your counsel in this case all of the articles that you have referenced either as a footnote or in the bibliography to your report?

THE WITNESS:  Yes, sir.

THE COURT:  Could you do that?

THE WITNESS:  I can.  I can send it as a ZIP file, because it's a lot of them.

THE COURT:  I bet it is.  Okay.  Yeah.

All right.  Thank you for that.

May this witness be excused?

MS. BANNER:  Yes, Your Honor.

THE COURT:  Thank you.  Safe travels home.

THE WITNESS:  Thank you so much, Your Honor.

THE COURT:  All right.

Counsel, I'm going to request Dr. Spinks-Franklin, in her testimony, repeatedly referenced to this literature, repeatedly throughout.  And in fact, at one point during her testimony, she said -- see if I can find my quote.  In response to Mr. Dadak's cross-examination about identifying one particular study, she said it was a conglomeration of the data from all these various papers.  All right?

I would like you all to file on Box -- not as exhibits in the case -- but for the Court's purposes in assessing Dr. Spinks-Franklin's opinion, because she relied so much on this literature, I would like you to file on Box all that literature that's referenced in a footnote or in her bibliography because -- and the reason I'm asking you to do that -- I mean, I could go on and try to get some of this stuff, but in other cases in the past, I have tried to get academic research on experts by just Googling it, and sometimes I'm denied access to it because you have to be a member of a particular academic group in order to get it.

To make it easier for me in parsing this testimony

and giving it the appropriate weight, if you could file that literature on Box, I would appreciate it.

Any objection to that from plaintiffs?

MS. BANNER:  No objection, Your Honor.

THE COURT:  From the defense?

MS. BANNER:  We'd be happy to.

MR. DADAK:  No, Your Honor.

THE COURT:  Okay.  Maybe I'll have more reading to do.  There will be.  I have more reading to do, but I will do so.

MR. DADAK:  Will that be accessible to counsel, Your Honor?

THE COURT:  It's on Box.  It'll be accessible to both counsel.  Yes.  Okay.

Okay, ladies and gentlemen.  It's 1:35.  Let's take a one-hour recess.  Let's try to be back here at -- 55 minutes. Let's try to be here at 2:30.

Thank you all for, again, your professionalism in helping move this case along, particularly your communication and cooperation with each other.  It means a great deal.

We'll stand in recess until 2:30.

(A recess was taken from 1:35 until 2:34)

THE COURT:  Good afternoon.

Any housekeeping matters we need to take up before we take the next witness?

MS. BANNER: I do have just a quick one.

Your Honor, first, I just wanted to make a clarification about Exhibit 253, which was Dr. Spinks-Franklin's expert report. I think that I inadvertently included it on our list of stipulated exhibits this morning. We did intend to use it and to mark it today, but have not, I think, in this case entered in the expert reports as evidence. We've entered in the bibliographies, and so I think that was inadvertent this morning. And so I just wanted to clarify that. If the Court would like the plaintiffs to move it into evidence and have it in evidence, of course, we're happy to do that. But it was not an exhibit that us and defendants had agreed to, and I just wanted to make sure that we had some clarity on that point.

THE COURT: Okay. 253 won't be admitted then. The bibliography is admitted.

MS. BANNER: Thank you.

THE COURT: That was Exhibit B, I think.

MS. BANNER: It was Exhibit B.

And then I just wanted to update the Court on what we expect for the rest of the afternoon. Our next witness will be Reverend Cozy Bailey from the NAACP of Virginia, and then we have the Rutz designations. We believe that will take us sometime between after five but before six, and we think that it makes sense to end for the day at that point, if that works

for the Court, and for defendants to begin with their witnesses tomorrow. The plaintiffs have one more expert who will also go tomorrow, as we previously discussed.

THE COURT: Well, so you expect to call your last witness tomorrow morning?

MS. BANNER: Yes. I believe that we will call our witness first, and then defendants will go, pending travel --

THE COURT: Well, I'm sure the defendants will have a motion. They'll have a Rule 50 motion. I'm sure they will. They always do.

MR. GUYNN: Well, part of that became problematic with the way that we agreed that were going to call witnesses necessarily out of order and thus put -- I mean, yes, we want to make sure that there's something for the record, but we -- you know, we understand where we're headed.

THE COURT: Fair enough. I'll give you a chance to make your motion, then the Court will rule on it, and then we'll move on with your -- as appropriate, we'll move on with your evidence.

MS. BANNER: I would say, Your Honor, that I think what my colleague was referring to is that we did have an agreement, rather than us calling the school board members in our affirmative case and then recalling them in defendant's case. So plaintiffs aren't technically resting after our expert witness tomorrow.

THE COURT:  Oh, you're not?

MS. BANNER:  We are not, because some of our affirmative case is in the examination of the school board members, and that was an agreement between the parties.

THE COURT:  Okay.  Well, whenever the defense wants to make an appropriate motion, the Court will be happy to hear it.

MS. BANNER:  Thank you, Your Honor.

THE COURT:  All right.

MS. BANNER:  And then I would like to call --

THE COURT:  Call your next witness.

MS. BANNER:  -- Reverend Bailey to the stand, please.

THE CLERK:  Sir, if you would raise your right hand.

COZY BAILEY, CALLED BY THE PLAINTIFF, SWORN

THE WITNESS:  I do.

THE COURT:  Good afternoon, sir.

THE WITNESS:  Good morning.

                    DIRECT EXAMINATION

BY MS. BANNER:

Q    Could you please introduce yourself to the Court?

A    Yes.  I am Reverend Cozy Bailey.  I am the president of the Virginia State Conference NAACP.

Q    How long have you been in the role of president?

A    I have served one two-year term.  I was just reelected in October of this year to a second two-year term.

Q    And how long have you been a member of the Virginia State Conference of the NAACP?

A    I've been a member of the Virginia State Conference since I've been in the Commonwealth of Virginia, arriving some 30 years ago.

Q    Why did you decide to join the NAACP?

A    So all my life, my parents, when I was a young child, instilled in me community service.  My mother was a local organizer for alternately the Urban League or the NAACP, and so I worked in those kind of capacities prior to me going away to college and entering into the military.  Social justice advocacy is part of my DNA, and I have been performing those duties, again, my entire life.

Q    Have you had other leadership roles within the Virginian NAACP?

A    I have.  Prior to being elected as the State Conference president, I served as the regional vice president for the Northern Virginia area of the NAACP.  We have seven regions, Northern Virginia being one of them.  Prior to that, I served several terms as the branch president in my home county, Prince William County.  I've also served in a leadership role in the NAACP working with the political action committee of the NAACP.

Q    You mentioned you were in the military.  Can you tell us more about that?

A    Yes.  I'm a graduate of the United States Naval Academy,

once again, the commander-in-chief cup winners this past Saturday. Go Navy.

THE COURT: Fourth and goal.

THE WITNESS: Yes, sir.

THE COURT: Man.

THE WITNESS: Yes, sir.

THE COURT: Fourth and goal, right there. That was -- especially after they fumbled on third down.

THE WITNESS: Yes, indeed. But the outcome was a great outcome.

I graduated from the United States Naval Academy and decided to enter the United States Marine Corps, so I served in the Marine Corps for 23 years, and after retirement, stayed here in the Commonwealth of Virginia.

BY MS. BANNER:

Q    Have you had any other leadership or public service roles?

A    Yes. I currently serve on the Virginia's Judicial Inquiry and Review Commission. That is an organization that examines and adjudicates complaints about ethics or canon violations of the judges within the Commonwealth of Virginia. I was a charter member of the Virginia African-American Advisory Board where I served as both the chair and the vice chair serving up until June of this year. Locally, I helped to charter the Prince William County's Police Department's Community Advisory Board and, again, a policy recommendation type of board to the

police department within Prince William County.  And I currently serve on the Prince William County Jail Board which serves as an oversight organization for the adult detention center there in -- the regional adult detention center in Prince William County.

Q    Can you tell us a little bit more about the governor's African-American Advisory Board does?

A    Yes.  In the Commonwealth of Virginia -- and it is put into the statutes, the laws of the Commonwealth of Virginia -- are a variety of boards and commissions that are set up to provide policy guidance to the executive representing a variety of underserved communities.  The African-American Advisory Board was the latest one that was started in 2019, and the purpose is, again, to have a board of 21 members and about six ex-officio members from the executive's secretaries to bring our understanding, our experiences of working and living as African-Americans in the communities throughout the Commonwealth of Virginia and then create policy guidance for improvements on how to bring African-Americans and be more inclusive in the government and the society of the Commonwealth of Virginia.

Q    Have these experiences impacted your ability to assess how local policies impact or effect Black communities in Virginia?

A    Absolutely.  Of course, my experience begins because I am Black.  But living and working within the Black communities and

being focused on things that are meant to discover and highlight inequities or inequalities, things that continue to diminish the experience of African-Americans, first in the Commonwealth of Virginia, but in this country in general, are things that inform me and help me to do the jobs that I do, especially the work that we do in social justice advocacy with the NAACP.

Q    And you're also a reverend.  Is that right?

A    I am.  I am an ordained minister, a calling that came to me a little late in life, but it helped me to have a very good seminary experience in one of the top seminaries in the country, the School of Theology at Virginia Union.  Recently, I was granted a doctoral degree from the Eastern Theological Seminary in Lynchburg.

Q    I want to talk more about the Virginia State Conference of the NAACP.  When was it established?

A    The Virginia State Conference was established in 1935.  Of course, the Association itself was formed in 1909.

Q    When you say the Association itself, you mean the national NAACP?

A    National NAACP Association was established in 1909.

Q    And how does the Virginia State Conference relate to the National Association?

A    So all state conferences, including the Virginia State Conference, report in a hierarchal manner to our national

headquarters.  We get our policy guidance and our operational guidance from our national organization.  We are centrally managed but then dispersed in the way that we operate.  And so there is a single constitution and bylaws that governs all the activities of all the units in the NAACP, be they the state conference or the local branches.  And so we interact with the state -- with the national organization in that way.

MS. BANNER:  I'd like to pull up what's been admitted as Plaintiffs' Exhibit 56, which is --

BY MS. BANNER:

Q    Why don't you tell me what it is, Reverend Bailey?  What is this document?

A    This is the mission of the NAACP.  This mission is created and disseminated from our national headquarters, but it is the mission for each and every unit within the NAACP from our state conferences to our local branches and our youth in college as well.

Q    And can you read out to us what your mission is?

A    It says our mission is to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color.

Q    Reverend Bailey, what are the functions of the Virginia State Conference of the NAACP?

A    The Virginia State Conference has a multiplicity of jobs and responsibilities, but let me talk about the two primary ones.  The first one is, is that we are the organization that ensures consistency of operation of each one of the 72, 73 or so adult branches and about a dozen college branches and a plethora of youth associations as well.

What we do is ensure, first of all, that there is continuous education on how the NAACP goes about doing social justice advocacy in support of our mission.  We do a lot of logistical support to those branches throughout the Commonwealth on a yearly basis.  We come together -- we come together annually for our state convention where we, again, have training classes and workshops to, again, ensure consistency in how we do business, and we are responsible for -- at the state level, we are responsible for the interactions that are necessary to our political partners, be it the General Assembly and either the House or the Senate, our work with the Executive branch, the Judicial branch, and what have you.

The second primary thing that we're responsible for is assisting the local branches in what I call the tactical level of operations.  Most of what I just described is how the association does its strategic planning, its policy implementation.  But the part that really matters to the people who support the NAACP is the assistance that we give to

individuals, be they organizations or people at the local level, who feel that they have been discriminated against, unfairly treated, treated with inequities, and we go to work using the tools that we have in social justice advocacy to assist them to get a desired outcome.  The desired outcome is to relieve them of the pressures of the issues that they have of racial discrimination.

Q    I want to direct you to another statement in this document.  You say from classrooms to courtrooms to City Halls and Congress, our network of members across the country works to secure the social and political power that will end race-based discrimination.

You mentioned classrooms.  Does the Virginian NAACP do educational advocacy?

A    We absolutely do, beginning at the national level through the state level and at our local branches as well.

Q    How does the Virginian NAACP determine what issues to focus on at any given time?

A    Well, the first -- the first way we do that is we participate in the national convention every year where our policy documents, which are called resolutions, are created. The resolutions flow up to the national organization, beginning actually at the grassroots level, at the branches, and then through the state conference where they are approved for release and push on.  We're just making sure that, you know,

I's are dotted and T's are crossed, but they also are not duplicative of a policy that we already have in place.

And then we push that up to the national level where our national delegates, every year, get together and consider whether a new policy document is required to either address a new attack on civil and human rights or to reaffirm one that was already existing because the challenges that it addressed are on the increase.

Q    In addition to policy resolutions from the national NAACP, do you take direction from your membership?

A    We do.  We have a rhythm of meeting that requires an executive committee meeting on a once-a-month basis but then also requires a general membership meeting as well, and it's the general membership and the philosophy of the NAACP that drives how we do social justice advocacy.  The methods that we use and then the criteria that we use and those challenges that we pursue also, that comes from the grassroots and the general membership first.

Q    Do you have sort of a particular set of steps or ways that you engage when you're advocating on an issue?

A    Yes.  And there's actually two tracks.  Again, we have a standard set of instruction and education that takes place, probably three to four times a year, that talks about how to build a case for social justice advocacy.  And then, as we actually practice that, the first thing we do is we start off

with an engagement that talks about communication.  When we are -- when we have a challenge that is occurring, we first communicate with the entity, be it a governmental entity or sometimes a commercial entity, but primarily governmental entities -- and what I mean by that is school divisions, local town councils, boards of supervisors, or even the courts and police and sheriffs -- to explain to them that we have been informed or we have observed an issue that we feel is a violation of human and civil rights and that the outcome that we think should happen is whatever we describe that to be.

Q    What other --

A    That's the first step.

Q    What other steps might you take?

A    And we call that negotiation.  And generally, that's not seen by the public, and that's an important thing.  We do that trying to get a resolution.  If we are unsuccessful in doing that, then we do what is formally called a demonstration, but the way that that's is instantiated is that we will ensure now that the grievance, for lack of a better word, that we are talking about is made public.  We will do that through press releases or press conferences in order now to get the wider community aware that there is a challenge, that there is an attack on the human and/or civil rights of individuals within the community.

Q    How many members are there in the Virginia State

Conference of the NAACP?

A    There are about 12,000 members across the Commonwealth.

Q    How do you become a member of the organization?

A    It's very easy.  We call it a membership intake form. It's really one page.  All it is is it takes in the information that it takes to contact a prospective member and you can join for as little as $30 a year.  Once you do that, you are a member of the NAACP.

Q    You mentioned your youth and college division earlier. Can you tell us about that?

A    Yes.  We have an award-winning youth and college division, I'm happy to say.  For the past two years, the Virginia State Conference's youth and college division has been the number one youth and college division within these United States and within the association.  What that means is, is that our youth and college division has shown all of the leadership requirements, they've done all the right membership types of things, and they've been engaged in a manner that is greater than any of the other state conferences.

So yes, we have one association but two divisions, if you will.  An adult division and a youth and college division.  The youth and college division has a president that I work with on a daily basis.  As a matter fact, I have a 7 o'clock call with them this evening to talk about the things that we're doing, and they operate the goings-on of all of the college divisions

and the youth divisions, the high-school-level divisions as well.  Excuse me, units.

Q    Does the state conference operate under an organizational constitution or bylaws?

A    Yes.  Again, there's one single constitution and bylaws, and there's a set of what we call bylaws for units that every branch within the NAACP operates by.  It lays out how we go about the business of doing social justice advocacy.  It tells us how we are to conduct meetings.  If gives information about our membership and a variety of things.  But the important point is, is that there's a single bylaws for units.

Q    Is the state conference governed by elected officials?

A    Yes.  The state conference has elections every two years in odd-numbered years during the fall at our state convention.  As I just said, we had our state convention the last weekend of October, and in that convention, we elected a new president, or actually me returning as president, a new vice president, secretary, assistant secretary, treasurer, assistant treasurer, and a variety of what we call members at large who sit on our executive council.

Q    Who elects the officers at the state conference level?

A    Each branch, the 72 or so, 73 or so branches, sends delegates.  They vote locally on delegates that they send to the state convention, and then those delegates are responsible for electing the new officers, approving any new policy

documents, read the resolutions that we want to send forward, and essentially are in charge of the NAACP for that three-day period that we have that convention.

Q    As the president of the state conference, do you speak on behalf of the Virginia State Conference of the NAACP in your capacity?

A    In accordance with our constitution and bylaws, the presidents of each unit, no matter what level, are the single and sole spokesperson for the NAACP.  So, yes, I am the single spokesperson for the Virginia State Conference NAACP.

Q    Do you regularly communicate with your members regarding racial equity across Virginia?

A    We do.  We have set a rhythm of a meeting, virtual meeting, of all presidents, and we do that every month.  We especially have a meeting with them after our every-other-month executive committee meeting.  We continually send out missives that provide up-to-date information and other requirements. And so I would say that we meet and talk with presidents probably two dozen times a year, and that doesn't count the ones where I have individual conferences with presidents to help work them through challenges that they may have as well.

Q    Before we get into the case we're here to talk about today, has the Virginian NAACP been involved with issues related to discriminatory school names in the past?

A    We have, in a variety of places.  And let me start with my

home county of Prince William.  In 2020, without much urging required, but the NAACP did have a sitdown with members of the school board there.  We helped them understand that it was time to change the names of two schools within Prince William County, both of whom were named Stonewall Jackson; a high school and a middle school.  In quick order, they changed the names to begin with unity.  One was called Unity Reed.  That's the high school.  And the other one is called Unity -- it escapes me.  It was named after a Montford Point Marine, that school there.

We also have been involved previously with efforts to change the name of high schools in Hanover County.  All of those were related to schools that were named after Confederate generals.  In every case, Thomas Jefferson.  But in Prince William County also, we were able to advocate for the name change of a school that was named after a person who is an advocate for Massive Resistance.  And again, the school board there accepted our recommendation and changed that name, and those names have remained changed since those changes took place.

Q    Did these prior matters give you any insight about how school names affect the membership of the Virginian NAACP?

A    It did.  When the calls came for action for assistance and also just through examination by our membership, it caused me to have more and more conversations with the students, the

parents, and even the faculty members of those schools to understand, to ensure that my thoughts, my intuition were in line with the things that they were going through as people who had to go into those buildings each and every day. And so it gave me a better understanding, and then I was able to help to educate all of our social justice warriors so that we could do a better job.

Q    Do you have any personal experience, Reverend Bailey, with exposure to Confederate or segregationist symbology?

A    I'm sorry. When I was a plebe at the Naval Academy, my class had 40 or so people who came in. It was all male at the time. We were the largest African-American class that had ever been entered into the Naval Academy, and it was evident immediately that the large percentage of the people who were there did not want us there. A couple of things happened to me, and similar incidents happened to my Black classmates.

I woke up one morning with a Confederate flag on top of my blanket, and the upper-class in my company thought that that was hilarious. I obviously didn't. I woke up one morning. My roommates, both of whom were White, told me to be careful because someone had sprinkled watermelon rinds all over the floor of our room. You can tell that that's stuck with me. And it helped inform me, even though I was three years away from graduation, it helped inform me of how I would conduct myself as a professional Marine and the things that I would

use, again, that my mother put into me to do the best job I could in ensuring social justice advocacy.  They tried to -- they tried to run me out, but I refused.

Q    And you talked a little bit about this, but how have your personal experiences helped inform the work you do as the president of the Virginia State Conference?

A    Those personal experiences in conjunction with the other things that I have seen and experienced along with others have helped me to understand that, while this country continues to grow older in years, there are certain things that still are not fixed.  And one of those things is the -- the continued racism that exists in a variety of places.  And racism must be eradicated.

If Black people are to truly achieve the promise of the Constitution that I fought to defend, then there has to be somebody, an organization, that will continue to fight for those basic human and civil rights, to right those inequities, and that's why we do what we do.

Q    You mentioned before that the state conference of the NAACP has chapters.  Is that right?

A    That's correct.

Q    What is the relationship between the branches or chapters and the state conference?

A    Right.  And I allowed you to say chapter even though I schooled you not to.

Q    I know.  I'm sorry.

A    I'm sorry.  The relationship between the branches and?

Q    The state conference.

A    The relationship between the branches and the state conference.  Again, let's go back to the fact that the association was formed in 1909 nationally, and there were actually branches throughout the Commonwealth -- not 72 at that time -- that began to grow and pop up as they were fighting, you know, the challenges against human and civil rights.

There came a time, 1935, when it was necessary to create the state conference here and the model of state conferences other places, again, to consolidate and ensure consistency.  So what those branches do then is operate with a high degree of autonomy in their geographic areas because they are the ones on the ground.  They are the ones who can see the specific challenges to basic civil and human rights in the areas.  But they do so, again, under one constitution and bylaws, and the state conference then assists them in doing those things.

And the other way, the manpower from those individual branches, help to solidify the work that the state conference has in our purview.  What do I mean by that?  Every January, as the way the Commonwealth of Virginia operates, we have a legislative session.  During our state convention in October, the delegates vote upon a legislative agenda, a set of principles and concepts -- not necessarily specific laws --

that we would like to see considered by the legislative session.

Those branches send people to the capital during that period and help us as we go around and meet with as many of the 100 delegates and as many of the 40 Senators as we can in order to ensure that they understand -- whether they agree or not, understand what it is we would like to get done.  So it's a two-way street on how we interact together.

Q    You may have said this before, but how many branches are there?

A    There are about 72, 73 branches.

Q    Do you provide support for members who may live in a place where there is no branch?

A    Yes, we do.  And there are still a couple of places -- maybe be more than a couple -- within the Commonwealth that do not have an active chartered branch, but that doesn't mean if there is a challenge to someone in those areas, that they are without the help of the NAACP.

Q    Can people join the Virginian NAACP if they are in a place that doesn't have a branch?

A    Yes, they can.  They can be general members, but we would rather help them create and charter a branch in that area.

Q    Is there a branch in Shenandoah County?

A    There is.

Q    Can you tell me about when it was established?

A    It was established in 2024 following the process that we have for charting a branch, which is to have a minimum of 50 people who are interested.  But what we like to do in the Commonwealth of Virginia is challenge them to come up with at least a hundred.  Shenandoah exceeded that and they have a thriving branch.

Q    What is your understanding of why the Shenandoah branch was founded in 2024?

A    There was interest in the NAACP.  There were a couple of general members in Shenandoah.  But what occurred is an incident that they felt that they needed some very professional, if you will, social justice advocacy help, and they called upon us, and we answered that call.

Q    And what was that issue?

A    The renaming -- the renaming of a couple of schools -- one high school, one elementary school -- back to names that had been eradicated four years hence to honor Civil War generals.

Q    You stated earlier that your mission is to fight for the rights of Black people in Virginia and eliminate race-based discrimination.  Was the school renaming a threat to that mission, in your view?

A    Absolutely a threat.  It's a threat because -- we've heard testimony, but let me tell you the NAACP view.  It is a threat to the well-being of primarily those students, then their parents, and then the general community to commemorate, to have

the students and faculty have to daily, during the school year, enter into a building that is essentially a monument to people who fought, some to the death, to continue the institution of chattel slavery, which are the members of our race, and to think that that is something to celebrate is extremely harmful. Extremely harmful to those Black children and their parents and the entire community.

Q    Were you concerned at all about how reinstating the name would embolden discrimination or harassment against Black people in Virginia?

          MR. GUYNN:  Your Honor, I'm going to object.  We're really close to expert testimony here, and Reverend Bailey hasn't been identified as an expert.  And his testimony, while it might be fascinating, is none-the-less pretty much irrelevant to the issues in the case if he's not allowed to give an opinion.

          THE COURT:  Ms. Banner?

          MS. BANNER:  Reverend Bailey is testifying from his personal experience and knowledge about the issues that are impacting individuals in Virginia and in his capacity as the president of the NAACP.  He testified about his experience assessing local policies, the various ways in which he does that, the various ways in which he interacts with his members to know this.  So he is testifying from his personal knowledge. He's not offering expert opinions on this.

THE COURT:  He is also the representative of the party plaintiff in this case?

MS. BANNER:  He is also the representative of the party plaintiff in this case.

THE COURT:  Overrule the objection.  I'll allow him to -- he's not offering expert opinion testimony.  He may, as the representative of a party plaintiff, indicate the ways in which this school board decision has impacted the membership in his organization.  Overruled.

BY MS. BANNER:

Q   I'll repeat the question.  Were you concerned that --

THE COURT:  And it's plainly relevant to the first prong under the equal protection analysis, and that is disparate impact.

BY MS. BANNER:

Q   Were you concerned that reinstating the names would embolden people to discriminate or harass Black people in Shenandoah County?

A   Yes.  The NAACP, since its inception in 1909, has advocated against the public display and use of symbols of the Confederacy as a way of denigrating and keeping Black people down.

The first case that I can think of was the campaign that the very young NAACP had against the movie Birth of a Nation which came out in 1915.  And in that movie, Confederate symbols

were utilized to denigrate Black people, and Black people were very much denigrated.  So the NAACP began its campaign against Confederate symbols at that time.  And over time, up until today, we've continued to do the same thing.

Q    How did the school renaming in Shenandoah County impact the functions or workings of the NAACP?

A    Well, there was a significant impact in a variety of ways against the resources that we have, which are people, time, and money.  Because of the rapidity of what was taking place here, we were required to marshal forces in a very rapid way to meet the challenge here.  Even though I live relatively close in Prince William, I made several trips to help to organize a series of town halls as we responded to the request for assistance.

Our executive director, you know, traveled from Southwest Virginia up I-81 to do the same thing.  And a variety of our leadership continue to come into the county in a frequency that was not quite our normal rhythm of operation.  So from a time standpoint, there was quite a bit of time that we were putting in.  From a personnel standpoint, I had a quarter of our state leadership who was focused, you know, and continues to be focused on Shenandoah.

Q    You said it was outside of your normal rhythm.  Why was that?

A    As I described how we operate together, that normal rhythm

is intended to be able to handle the day-to-day business, if you will, although there's no such thing as a normal day of business for the NAACP, but to anticipate the requirements for resources, for challenges throughout the Commonwealth. And that takes a lot of dedication, a lot of time, and we are all volunteers. Not all of our members are retired. And so that's the reason that we have those frequency of meetings and that engagement. An issue like the one here that happened in Shenandoah took us out of that. So, again, it had a dramatic and it continues to have a dramatic effect on how we operate.

Q    How much time would you estimate that you spent on setting up the Shenandoah chapter in 2024?

A    Easily 2,000 hours and several thousand miles of travel that were involved in that as well.

Q    Did it take other resources from the NAACP?

A    So the NAACP has the flexibility to surge to meet a challenge, but that doesn't mean that we surge to stop doing something else. The work that we do has to continue. And so the way that we made up for that is as people allocated their time that they may say I'm going to do, you know, 20 hours for the NAACP and then ten hours for my church and then I've got my 40-hour job, they had to -- we had to pick that up.

    And so we had less leisure time, if you will. If we had created eight-hour days for ourselves, we were working 12-hour days because, again, social justice advocacy doesn't stop. You

know?  We can't say we're going to stop this production line over here for a moment in order to pick up this one.  We have to do it all.

Q    And after all that, you were able to establish a chapter in Shenandoah County?

A    Branch.

Q    Did it wrong again.  You'll get me by the end, I promise. How many members does that branch have?

A    It has over 100.  It started with over 100 and it has over 100 now.  It's a very vibrant branch.

Q    And, to your knowledge, do any of those members attend Stonewall Jackson High School?

A    Yes, they do.

Q    Are any of those members Black?

A    Yes, they are.

Q    And, to your knowledge, are they impacted by the school name change?

A    Yes, they are.

Q    Do any members attend Ashby-Lee Elementary School?

A    Yes, they do.

Q    And are those members Black?

A    Yes.

Q    And are those members also impacted by the name change?

A    Yes, they are.

Q    Can you describe, to your knowledge, how members at

Stonewall Jackson and Ashby-Lee are impacted by the decision to reinstate the school names?

MR. GUYNN:  Objection, Your Honor.  He's not an expert in the impact.

THE COURT:  He can testify from his personal knowledge provided there's a foundation to establish that he has personal knowledge of this.

MR. GUYNN:  But I haven't heard that part yet.

THE COURT:  Well, I haven't, either.

Go ahead.  See if you can establish a foundation.

BY MS. BANNER:

Q    How do you learn what is happening with your members in Shenandoah County?

A    Earlier, we talked about how we do social justice advocacy, and especially in an area that we don't have a branch, one of the first things that we do is ensure that we establish a near-perfect knowledge of the context of what has occurred.  So the first thing that we did with the utilization of all of those people who I told you that I brought into Prince -- I'm sorry; I'm from Prince William -- into Shenandoah County was to conduct a series of town halls with the students and the parents of those two schools that you just noted.

We did what some people would call listening sessions as they talked about how they felt when these two schools were being renamed.  They told us how they had been joyful in 2020

when the names were changed from the Confederate generals and how they were despaired now that they were about to experience, at the time that we were talking to them, this name change. And so as we understood that, we coupled that with our experiences in other places with like situations and developed a strategy on how we would help them from a social justice advocacy standpoint.

Q    Do you get reports from branch leadership in Shenandoah County?

A    Yes, we do.  And not because they are burdensome, but because of the significant challenge that they have right now, we are spending much more time and interaction with them than what is our norm.  There are other branches throughout the Commonwealth also who have issues going on that we also have the same level of interaction with.

Q    And do members from the Shenandoah NAACP also communicate with other members of the leadership team at the state conference?

A    Yes, they do.  And so conversations and communications flow.  Heavy use of e-mail.  Some use of text messages, but I prefer e-mails more.  Heavy use of virtual meetings using the Zoom technology as well.

Q    Is your testimony today based on all of those various ways you gather information about the impact to your members?

A    It is.

Q    Can you tell us a little bit more about how your members are impacted?

MR. GUYNN:  Objection.  It would be hearsay.

THE COURT:  Response?

MS. BANNER:  Because he is the -- acting as a representative capacity, he's testifying about the knowledge of the Virginian NAACP, and these are different things that they have gathered in the course of their ordinary course of business.

MR. GUYNN:  That's a discovery, 30(b)(6).  That's not trial, Your Honor.

MS. BANNER:  In response to that, I believe that the courts have allowed witnesses to testify to knowledge -- to information that they have personal knowledge about sort of imparting the 30(b)(6) framework for representative individuals who are testifying in the representative capacity in this way because these are facts within the Virginian NAACP's collective knowledge.

MR. GUYNN:  If I may?

THE COURT:  Sure, Mr. Guynn.

MR. GUYNN:  But it's gathered by hearsay regardless of who.  In the representative capacity, if there's someone who has firsthand knowledge or a member who's going to come in and say here's the problem, then it wouldn't be hearsay.

THE COURT:  Well, we've heard from four students who

have said that.

Perhaps you could lay a foundation for -- it sounded to me like you were making almost a business record exception under the hearsay rule, Ms. Banner.

You know what I'm going to do?  He's brought this lawsuit, and he has -- I believe he'll be able to testify based on his personal knowledge as to the reasons why he brought this lawsuit -- why he and the NAACP brought this lawsuit, so I'll allow him to testify as regards to that.  Overrule the objection.

BY MS. BANNER:

Q    So Reverend Bailey --

THE COURT:  Let me ask you this.  This information -- when you've talked about this fact-finding process --

THE WITNESS:  Yes, sir.

THE COURT:  -- these town hall meetings that you have.  This listening --

THE WITNESS:  Yes, sir.

THE COURT:  The listening sessions that you've talked about, is that part of the regularly-conducted business of the NAACP?

THE WITNESS:  Yes, sir, it is.

THE COURT:  And is that kind of practice of conducting these listening sessions investigation part of the NAACP's regular activity?

THE WITNESS:  Yes, sir, it is.

THE COURT:  Okay.  And did you personally hear some of these comments?

THE WITNESS:  Yes, sir, I have.

THE COURT:  Okay.

I'm going to allow him to testify as to the rational for the NAACP for bringing this lawsuit, and to the extent that that gets into the impact on -- the impact on African-Americans from the things that he has heard and from the perspectives of the representative of the NAACP, in terms of the impact on African-Americans, I'll allow the testimony.  But I'll certainly allow cross-examination to see whether he has a sufficient foundation for it.

Go ahead.

MS. BANNER:  Thank you.

BY MS. BANNER:

Q    Reverend Bailey, why did the Virginia State Conference bring this lawsuit?

A    So let me start with the infrastructure to some of the judge's comments about why we do what we do and how we do it, and then it bears directly on the question that's on the table right now.

We at the NAACP have evolved over the years to understand how to do social justice advocacy better than any other organization.  One of the things that we do, as I talked about

consistency, is, on a regular basis, two to three times a year, all of our leadership go through a course of instruction that describes how to conduct a social justice advocacy plan. There's several branch presidents in the courtroom right now who have done the same thing.

We utilize, then, that training here in Shenandoah County -- or I should say just north of here, in Shenandoah County, as we were asked to bring the expertise of social justice advocacy to that community, again, by the community in general and several members of the NAACP, and that's why we conducted, first, the listening sessions that we call town halls, held in a local church there, as people came in and gave us the information that we needed to construct a social justice advocacy plan.

Note that our plan was to have a social justice advocacy plan that ended in litigation, but we first went through the steps that we do of communication, demonstration, and hoping for the right outcome. We decided that, after those first two phases failed, based upon lack of response from the school board, that we needed to now go through litigation, because the objective is to restore the well-being of the Black students in Shenandoah County that they had experienced at even a greater degree since those names were changed in 2020. That's how we ended up where we are.

Q    In the course of doing that work, did you hear from

members who were impacted by the name change in Shenandoah County?

A    Yes, we did.  Constantly and consistently.

Q    And did that information lead you to file this lawsuit?

A    That information did in fact lead us to file this lawsuit, yes.

Q    And can you tell us what you learned from those members?

MR. GUYNN:  Objection, Your Honor.  It's hearsay.

THE COURT:  It is -- I'm not considering it for the truth of the matter asserted, so it's not hearsay.  It's going to be considered for the fact that it was said to the NAACP as to provide the motivation for the lawsuit.  It's not hearsay.  I'm not considering it for its truth.  I'm considering it for the fact that it was represented to the NAACP.

So go ahead.

THE WITNESS:  What we heard from the students and the parents was consistent with things that we had heard in Hanover County and in Prince William County when those school names were considered for change.  And that is, that it was -- it was hurtful, harmful.  They felt that they were being othered, especially here in Shenandoah, because the difference here in Shenandoah from those other cases that I talked about, is that Shenandoah had already changed the school names away from naming for Confederate generals.  That was one of the most impactful things that we found.

And so the students here, and their parents, were experiencing something far different than what those other cases were. They had achieved victory, victory being not having to go to a school that was a monument, if you will, for the oppressors of their ancestors. And then it went back the other way. They were devastated, and they felt that they were being treated as less than, especially since before the NAACP was asked to help them in a formal way, they had tried to advocate for themselves and their voices were either not heard or ignored.

BY MS. BANNER:

Q    What activities did the NAACP --

THE COURT:  Was the NAACP asked to help in a formal way before the vote to change the names back to the Confederate generals?

THE WITNESS:  Yes, sir.

THE COURT:  You were, before?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  All right.

I'm sorry.  Thank you for that.  Go ahead.

MS. BANNER:  Your Honor, you're teeing me up really nicely.

BY MS. BANNER:

Q    Because my next question is, what activities did the NAACP undertake in response to the board's decision to rename the

schools?

A    As that decision was made known, as we came and worked with the students and parents here in Shenandoah County -- I keep saying Shenandoah -- here in Shenandoah.  I know we're south of there -- what we did was sent a communication to the school board outlining why we thought this was a bad decision and asking them to change their impending decision.

Q    Did you also make any public statements?

A    We did.  Well, we went to the town of Woodstock and held a press conference basically explaining what it was we were doing and why.

MS. BANNER:  I'd like to pull up what's been admitted as Plaintiffs' Exhibit 321.

BY MS. BANNER:

Q    And do you recognize this document, Reverend Bailey?

A    Yes.

Q    What is it?

A    I'm sorry.  I talked over you.  Ask the question again?

Q    I said, what is it?

A    This is the text of a press release that was done by us on April 22nd of last year.

Q    Okay.  And what is the title of this document?

A    Virginian NAACP condemns efforts to name schools after Confederate generals.

Q    And is this one of the press statements that you were

talking about just now?

A    It is.

Q    And why did you decide to put out a press statement about this issue?

A    Again, following the continuing of social justice advocacy that we've always followed, we had attempted negotiation. Negotiation was the sending of that letter via e-mail.  We fully expected a response from the school board, but we received none, and so we moved to the next phase.  Make it public.

THE COURT:  No response at all?

THE WITNESS:  No, sir.

And so we --

THE COURT:  How did you send this communication, this letter to the school board?

THE WITNESS:  Via email, sir.

THE COURT:  By email?

THE WITNESS:  Yes, sir.  A letter written by me, and all letters -- any communication that I write are communicated through our director of administration.

THE COURT:  Okay.  And did you -- did it go to the school superintendent, did it go to the school board members? Do you know who it went to?

THE WITNESS:  We addressed it to the school board at the e-mail address that we were determined or found out was the

one that they consider any communication.

THE COURT:  Okay.  And then before the vote to rename the schools for Stonewall Jackson and Ashby-Lee, did you get a response?

THE WITNESS:  No, sir.

THE COURT:  None at all?

THE WITNESS:  No, sir.

THE COURT:  Go ahead.

MS. BANNER:  Actually, let's turn to Plaintiffs' Exhibit 228.

THE COURT:  What was that last exhibit?

MS. BANNER:  That was Exhibit 321.

THE COURT:  Is that admitted?

MS. BANNER:  It has been admitted, Your Honor, this morning.

THE COURT:  All right.  So 321 is the press release? All right.

Go ahead.

MS. BANNER:  I'd like to turn to Exhibit 228, which has also been admitted, and this is the letter from the Virginian NAACP.

BY MS. BANNER:

Q    Reverend Bailey, can you tell me what this -- are you familiar with this document?

A    I am.

Q    And can you tell us what it is?

A    It is the communication that we sent to the school board trying to -- and you can see it has all the school board members there.  Those are the email addressed that we were provided to tell them what our position was in support of the students and parents here in Shenandoah, and to ask them to reconsider the impending action.

Q    And what date did you guys send this letter?  What date did you send this letter?

A    The 8th of May 2024.

Q    And who sent this letter?

A    Sharon Jones who is our director of administration.

        MS. BANNER:  And if we scroll all the way down to the bottom.

BY MS. BANNER:

Q    Who signed this letter?

A    Signed by me.

Q    Why did you send this letter?

A    Again, to ensure now that we had a formal documentation of the association's position, formal documentation of the actions that the association was taking, and essentially an appeal to the school board to stop and desist and not take this action that they had promised to take.

Q    In this letter, you point out that after the 2020 vote, students were no longer required to learn in memorials to

Confederate leaders, and you talk about students being able to go through Mountain View and Honey Run without the inescapable reminders of Confederate legacies.  Why was it important to start with pointing out what happened in 2020 to you?

A    Again, because of the unique situation that was taking place in Shenandoah.  What I learned even more acutely in the town halls and conversations that I had with the students and parents here was that the 2020 action was one that many in the community, many people of color in the community, had hoped for for quite some time, and that the decision made by that 2020 school board meeting -- or decision that they made in 2020 was one that relieved them, made them come closer to feeling the sense of equality and being part of the community.

I felt necessary, then, to explain that to the school board and succinctly and shortly in this letter, so that they would understand how impactful this was going to be from a negative standpoint after a positive decision had been made just four years before, to try to get them to understand perhaps something that was not intuitive to the members of that school board and so that they would know what was going on explicitly.

Q    In your experience as the president of the Virginian NAACP, did you observe other schools changing their names away from Confederate symbology in 2020?

A    As a matter of fact, I did, yes.  As I said earlier, at

the same time in 2020, two schools that not coincidently were named Stonewall Jackson, in my home community, changed their names.  Changed their names from Stonewall Jackson to, again, names that begin with the word unity.  And that -- that was -- since I was a part of that advocacy, I know that that was a very specific and determined measure to show a change from disunity to unity to name them Unity Braxton and Unity Reed.

Q    And what's your sense of why this was happening in 2020?

A    A lot of things were happening in 2020.  I sometimes almost affectionately call 2020 the year and summer of discontent.  There was a lot of racial justice reckoning that was taking place, kicked off by several specific things that took place, first among those, of course, was the murder of George Floyd.

It caused communities throughout the nation to rethink how laws on the books, practices, statues, and the general use of Confederate symbols, which to Black people are symbols of hate, were a factor in divisiveness for the community as opposed to unity.  And so, many communities made decisions -- not just here in the Commonwealth of Virginia -- to rectify those things at that time.

Q    You also say in this letter to the school board that -- in the last line of the middle paragraph, memorializing that historic reality by naming your public schools after Confederate military leaders and sympathizers subverts part of

your district's mission that claims that all members of the learning community are valued and respected.

Can you tell us what you meant by that statement?

A    Well, obviously, first of all, we examined what the school district's mission was and the words that they use and compared that to what we felt was going on.  We were concerned, again, that perhaps -- perhaps the school division -- the members -- not the school division, actually the members of the school board were just not aware of the negative impact that making this change would have.

When I wrote this letter with consultation and help from our political action chair and our education committee chair, a lot of other things we thought about including in this, and one of them was to remind the school board in Shenandoah that just seven years before, in 2017, the Unite the Right demonstration in Charlottesville was a very divisive thing for the Commonwealth of Virginia and the nation because, primarily, of the use of hate symbols.

Primary among those was the use of Confederate symbols, specifically the Confederate battle flag.  All of those things were going into our thoughts here as we formulated this letter and told them that they needed to really, really focus on their promise of having a learning environment that was inclusive for all members.

Q    Is this the letter that you testified earlier that you

received no response to?

A     Yes, it is.

Q     How did you interpret that?

A     I interpreted it either that the NAACP carried no weight with this school board or they read what we had and found it insignificant and they were bound and determined to do what they were going to do anyway.

          MS. BANNER:  I'd like to pull up what's been marked and admitted into evidence as Plaintiffs' Exhibit 322.

BY MS. BANNER:

Q     And what is this document, Reverend Bailey?

A     It is the press release that we released post the school board in Shenandoah making their decision to change the names.

Q     And at that point, why were you issuing a press release?

A     Because we weren't giving up the fight.  We were notifying people that even though this decision hadn't gone the way that we had hoped that it would, that we were still in there, we were still going to work along the continuum of social justice advocacy and explore what possible next steps we could take.

Q     Did you communicate again to the school board following the issuance of this press release?

A     We did.

Q     And what did you communicate to them?

A     We communicated to them that we thought that this might be subject to further actions as we were consulting with folks

like you, Kaitlin.

Q    Did you receive a response to that letter?

A    We did not.

Q    You talked earlier --

THE COURT:  Is this in evidence?  322?

MS. BANNER:  This is in evidence, yes, Your Honor.

THE COURT:  And the 228 is evidence as well?

MS. BANNER:  228 is also, yes.

THE COURT:  Okay.  Thank you.

MS. BANNER:  Of course.

BY MS. BANNER:

Q    You mentioned earlier that the national NAACP has resolutions that guide the actions of the state conference.  Is there a resolution related to Confederate symbology?

A    Yes, there is.

MS. BANNER:  I'd like to pull up what's been admitted into evidence as Plaintiffs' Exhibit 55.

BY MS. BANNER:

Q    Are you familiar with this document?

A    I am.

Q    And what is this?

A    It is the resolution from 2024 titled condemning the display and commercialization of the Confederate battle flag.

Q    What is an NAACP resolution?

A    A NAACP resolution is the document that drives our policy

and potentially social justice campaigns for the year in which that resolution is approved. We have a mission that we have talked about earlier, but we also must evolve how we work and fight against new challenges to civil and human rights. So what we do, on an annual basis, is consider a variety of policy documents that are meant to address a new clear and present danger, if you will. This particular one actually is one that reinforces a resolution that we had had earlier.

Q    Do you know what prompted this resolution?

A    Yes. Again, the rise of the use of the Confederate battle flag as a hate symbol that was being used very oppressively to Black people. But it wasn't just the Confederate battle flag. It was all Confederate symbols that were occurring throughout the nation.

Q    Can you read the second whereas clause on this statement?

A    Whereas the Confederate battle flag has historical associations with slavery, segregation, and oppression, serving as a painful reminder of a shameful chapter in our nation's history.

Q    Can you talk a little bit more about why the NAACP associates the Confederate battle flag with slavery and segregation?

A    Yes. The Confederate battle flag was flown by the Confederate Army. The Confederate Army, as all Black people recognize, were fighting to preserve the institution of chattel

slavery in these United States, to the point where those states that fought with the Confederate Army tried to leave the United States of America.

The remembrance, even just of the institution of slavery to our ancestors, is a continuing reminder to Black people that we came here under force.  We were looked upon as less than, and that there are those today who would still look upon us as less than, as others, as not worthy of the respect of any other citizen.  And so, when we look at those symbols of hate, we do our best to suppress them and we came up with this particular resolution or policy statement to reinforce to the branches on how we would continue to operate to alleviate the challenges that we feel and that we experience based upon the utilization of this particular symbol.

Q    You also mentioned its association with segregation in the whereas clause.  Can you talk a little bit more about that?

A    Post-slavery, we entered into a period of history in this country where segregation was the key.  You know, now that the Union had been preserved and we were no longer -- our ancestors, that is, were no longer subject to chattel slavery, the next policy that was instituted was in order to keep Black people in their place, we will, you know, have segregated services and the policy of separate but equal, which was eventually determined to be illegal, was put in place.  So we remember those things also.

And when we get into the subject of segregation, many of our members are old enough to actually have experienced, you know, the degradation of segregation, so that's even more clear and a present issue to our case.  So that's another reason why this resolution was adopted and approved at our national convention.

Q    I want to scroll down on this document to the resolved clauses.  And are these the clauses that tell you, as the state conference president, what you have to do?

A    Yes, they are.

Q    And how did you interpret how this would guide the Virginia State Conference of the NAACP?

A    Well, the first thing that a president does after the national convention and then post the national convention, our national board, you know, puts its final stamp of approval on this.  Takes it about a month or two after the state convention meets in the middle of the summer.  Then it's incumbent upon the state -- the conference president -- in this case, myself -- to ensure that there is total awareness and education among all of the branches and the branch leadership and their general membership of what new policy statements have been approved and what implementation steps that we will take.  So we look at these whereas clauses, and these are included in the periodic training that we do to ensure, again, consistency in operations.

Q    This resolution doesn't mention specifically the Confederate battle flag.  Has the Virginian NAACP taken a position on commemorations or celebrations of the Confederacy beyond the battle flag?

A    Yes.  We actually have started with the battle flag, and we have a legislative agenda, part of our legislative agenda continuing has been to eliminate the use of the Confederate battle flag, the stars and bars if you will, on Virginia license plates.  But, you know, to the meat of your question, yes, we have.  Not only the Confederate battle flag, but all symbols of the Confederacy.  We have advocated and agreed with the removal of statues that commemorate the Confederacy.  Not necessarily the destruction of them, you know, because we're not about eliminating or changing history, but we certainly are about looking at history in the correct way.  And so yes, those are just a couple of examples of how we have advocated for the nonuse, if you will, of Confederate symbols.

Q    The first therefore be it resolved statement says that it's reaffirming a 2000 resolution.  Do you know why a resolution was passed about the Confederate flag in 2000?

A    Yeah.  And as I spoke earlier, this one is a reaffirmation of that resolution.  At that time, there was a rise in the use of the Confederate battle flag throughout these United States.  There were moments that we began to step up, if you will, we the association step up our advocacy because the Confederate

battle flag or portions of it were used in at least two state flags, and we thought that it was time for that to change as well, or the time was ripe for it to change.

So as we move forward 24 years, we saw, again, the rise of the use of the Confederate flag and other Confederate symbols as symbols of hate, so we reaffirmed that. So that's why that first resolve is in there.

Q    The defendant has suggested in this case that calls to remove the Confederate symbols were a recent fad just ushered in by, as you referred to it, the summer of discontent. Is that your understanding of cause for removal around Confederate symbology?

A    No. And let me go back to my earlier assertion. The NAACP has been advocating against the use of Confederate symbology at least since 1915, and any time there has been a rise -- and there has been, from time to time, peaks and valleys of the rise of the use of these hate symbols -- we increase our activity and advocating against the use of them. So no, it wasn't just those activities that were taking place then. It has been a consistent program of ours since our inception.

MS. BANNER: And I'd like to now pull up what's been marked as Plaintiffs' Exhibit 328 with apologies. This is a late-disclosed exhibit. We inadvertently left this off of our list and we do not have paper copies. I believe it's been

added to the Box.

(Plaintiffs' Exhibit No. 328 was marked for identification.)

BY MS. BANNER:

Q    And I will ask Reverend Bailey to identify this for us.

A    Yes.  This is a 2018 resolution entitled proscribing unsupervised Confederate flag displays in K-12 schools.

Q    And is this -- how do you know that's what this is?

A    I'm sorry.  Say again?

Q    How do you know that is what this is?

A    Because I was part of the national convention that helped, first of all, to approve this, and it is part of the library of resolutions that we have that are still in force.  This one was done to ensure that our branches and our leadership understood that in fact while we were being, at that time, accused of trying to change history and erase history that we were actually trying to ensure that history was taught in the correct way.

This particular resolution talks about how the Confederate battle flag should be used, how it should be taught, and how it should be, again, correctly taught to our students, especially in K-12.  The antithesis, if you will, of using it as a hate symbol.

MS. BANNER:  Your Honor, at this time, we'd like to move what's been marked as Plaintiffs' Exhibit 328 into

evidence.

THE COURT:  Any objections?

MR. GUYNN:  Yes, Your Honor.  It's a 2018 resolution regarding the flag.  We're not here about the flag.  It's irrelevant.

THE COURT:  Ms. Banner?

MS. BANNER:  It's relevant in the sense that it guides the NAACP's actions throughout the state.  It informs their understanding of how Confederate symbology is used, and we're going to talk about a couple of the other paragraphs in here I think that talks specifically about the importance of the symbology in K-12 schools.

THE COURT:  Yeah, I think it's relevant, and I will overrule the objection and allow admission of 328.

(Plaintiffs' Exhibit No. 328 was admitted.)

MS. BANNER:  I'd like to scroll down to the second page -- I think second page of this exhibit.

BY MS. BANNER:

Q    You talk here -- it says here on the top of the page that --

MS. BANNER:  Actually, can we go back to the first page?  I didn't realize it cut across the two pages.

BY MS. BANNER:

Q    The third whereas clause talks about how the Confederate flag has been used to stand for the segregation of races, the

Ku Klux Klan as a symbol of hatred and terror, and has continued to use it as a White supremacist agenda. Can you explain your understanding of those?

A    Sure. What it does, I guess, is it documents some of the things that I've been saying up here about how not only is it the understanding of Black people in America that the Confederate symbol, specifically the Confederate flag, are symbols of hatred and oppression, but it documents that there are at least two organizations -- one, the Dixiecrats and the other the KKK -- who absolutely publicly stated that the reason that they use these symbols is a symbol of segregation, a symbol, again, to keep Black people suppressed and oppressed as opposed to being part of and having our rightful place in the community of the United States.

Q    And then I want to look at the next clause, and I believe you already referenced the events in Charlottesville in 2017. This also references an event in 2015. Can you tell me a little bit more about how the Confederate flag has been used in more recent times?

A    Sure. I talked about the Unite the Right rally. It's important that we also stated there the Dylan Roof case that occurred in Charleston with the murder of all of those people at the prayer meeting there at the AME Church in Charleston. What we were reminding -- again, this is primarily, first, for our internal use, because it's a policy-driving statement that

our branches recognize and understood the basis for the policy about the proscription here of teaching the Confederate flag correctly.  And so we made sure we reinforced both that 2015 incident in Charleston and the 2017 incident in Charlottesville to ensure that we really took this on and internalized the reasons for the importance of our policy work, the importance of our advocacy work.

Q    Reverend Bailey, does the Virginian NAACP view the name Stonewall Jackson on the high school in Shenandoah and the name Ashby-Lee on the elementary school in Shenandoah as equivalent to the displays of the Confederate flag?

A    We do.

Q    Why is that?

A    Because it is just a different symbol of the same thing. We focused on the flag throughout our history because that was one of the most easy to see things.  But we have also always advocated against the commemoration of what these Confederate generals did or anyone who was a part of leadership of the Confederacy in their attempt to secede from the Union and fight for the continuation of the institution of slavery.  So we consider them both similar and we advocate against both just as hard.

         MS. BANNER:  Then I'd like to pull up another whereas clause, which is the third one down on the second page there which says -- no, sorry.  The next one down.

BY MS. BANNER:

Q    Whereas hate speech in schools such as open and school-sanctioned display of racist symbols, such as the Confederate flag, create a hostile learning environment for African-American schoolchildren, frightening many of them, and causing them to lose interest in education.

Is this another reason why the Virginian NAACP takes a position against the commemoration of the Confederacy?

A    It is.  It is, and this policy statement, this particular whereas clause, is based upon the same sorts of process throughout the nation that I talked about what we did here in Shenandoah, specifically sitting with the children, sitting with the parents, and getting them to explain things that our leadership may have felt was intuitive but verified by actual conversations with children.

Q    Thank you, Reverend Bailey.  I have no further questions for you today.

THE COURT:  All right.

Is there any cross-examination for Reverend Bailey?

MR. GUYNN:  Yes, Your Honor.

Just a couple of matters, though.  Exhibits 322 and 321 I don't think we ever got a copy of.  We agreed they were admissible, but we weren't ever given a copy, which I think we can remedy just if you --

MS. BANNER:  Yeah.  We can definitely get you a copy.

MR. GUYNN:  If you'll put them up or whatever.

(Off-record conversation.)

CROSS-EXAMINATION

BY MR. GUYNN:

Q    Reverend Bailey, it was a while ago, and I didn't hear real well.  Do you currently minister a church?

A    I am an associate minister of my church in Prince William County.  First Mount Zion Baptist Church.

Q    Okay.  And is your presidency of the Virginia State Conference of the NAACP a full-time position?

A    Well, it's a volunteer position.

Q    Okay.

A    And I'm always the president, so I'm not sure what you mean when you say a full-time position.

Q    I'm just curious if you were paid.  I didn't realize --

A    Oh, no --

Q    -- you weren't paid.

A    -- I'm not paid.

Q    You're not?

A    No, it's a volunteer position.

Q    Okay.  You're not full-time.  I got you.  It sounded like, from listening to you talk about it, that there is a definite organization to the NAACP, starting at the national level and working its way down.  Is that correct?

A    Yes.

Q    And that the State conference is essentially the next in line from the national hierarchy?

A    Yes.

Q    And then there are -- I believe there are branches, aren't there?  They're aren't any chapters, are there?

A    Branches, correct.

Q    I just wanted to make sure.  And those are on the local level?

A    Yes.

Q    Okay.  And it's important, isn't it, for the function of the NAACP for there to be processes in place for how things move from one level to the next?

A    Yes.

Q    Okay.  And the constitution that you mentioned lays out essentially ways that the NAACP functions and gets its work done, doesn't it?

A    Yes.

Q    And you do strive to follow that, don't you?

A    Yes.

Q    In fact, the organization itself generally strives to follow it, doesn't it?

A    Yes.

Q    In the -- so this is Exhibit 228.  Make sure we can see it all.  And that's the e-mail or the letter that you sent to the Shenandoah County School Board expressing concern with the

action that was proposed to the school board?

A     Yes.

Q     And it shows, it looks like, that it was sent by email May 8?

A     Yes.

Q     And if you would, if you need to -- for all I know, you're probably pretty familiar with it -- but let's read it, and I want you to tell me where in here that the NAACP asked for a response from the school board.

A     There is no explicit statement that says please respond.

Q     Well, was there an implication or an implied statement that you would expect a response?

A     We think so, yes.

Q     Which statement is that?

A     The fact that the e-mail was sent.  There's no one single statement that has that implication.  We understand, based upon previous practice, when we sent like correspondence to a variety of places, that they respond even if they just say acknowledge receipt.

Q     This is Exhibit 322, and again, I'm pretty sure you're familiar with it, but it begins -- that is the text begins, doesn't it, by saying on Thursday May 9, 2024, the Shenandoah County school board.  Correct?

A     Yes, it does.

Q     Okay.  So to make sure I understand, you sent a letter on

May 8th asking for a response about a vote that was taken on May 9?

A    Yes.

THE COURT:  You sent that letter on May 8th.  To your knowledge, did the leadership of the Virginia chapter of the NAACP try to reach out to the Shenandoah County School Board in other means -- phone calls, personal meetings -- outside of that letter of May 8?

THE WITNESS:  So here's what I can say to that question, Judge.  We knew that people that we were working with in Shenandoah County had made several outreaches to the school board, both with direct communications electronically and appearing at public commentary time at school board meetings with the same message that we had.

BY MR. GUYNN:

Q    Do you have those electronic communications, Reverend?

A    Some of them were shown earlier today in this courtroom.

Q    Okay.

A    Oh, excuse me.  Not earlier today.  On the first day of the court.

Q    Those from citizens in town were from your members?

A    Yes.

Q    Okay.

THE COURT:  But to answer my question, because you didn't really.  To answer my question, the leadership of the

NAACP, the state leadership, they're reaching out to the Shenandoah County School Board was by means of this May 8 --

THE WITNESS:  Yes.

THE COURT:  -- 2022 letter.  Correct?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Did you yourself try to reach any of the members of the school board before this vote?

THE WITNESS:  No, sir.

THE COURT:  Okay.  Or anybody on your behalf?  Did you ask anybody from the NAACP to reach out to the members of the school board before this May 9, 2024, vote?

THE WITNESS:  So, no, sir, but as I said earlier, we knew that members of the NAACP had reached out.

THE COURT:  Had already reached out?

THE WITNESS:  Had already reached out.  Yes, sir.

THE COURT:  And your formal effort --

THE WITNESS:  Yes, sir.

THE COURT:  -- was the May 8 letter?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  All right.

Go ahead, Mr. Guynn.

BY MR. GUYNN:

Q    And as I recall those emails from the first day, none of them were from people who identified themselves as NAACP members, did they?

A    Identified themselves as NAACP members --

Q    When they sent those emails that you said that you --

she's slowing me down.

THE COURT REPORTER:  One at a time, please.

BY MR. GUYNN:

Q    Yeah.  Let me start over and I'll do this better.

You referenced that you were aware of the e-mails that other folks had sent that were put into evidence Thursday. Correct?

A    Correct.

Q    Okay.  But as I recall those e-mails, none of them identified the sender as being -- as sending it as an NAACP member or on behalf of the NAACP?

A    Correct.

THE COURT:  Do I recall correctly that you spoke at a school board meeting?

THE WITNESS:  No, sir.

THE COURT:  You did not?

THE WITNESS:  No, sir.

THE COURT:  So I would be incorrect if I thought that?

THE WITNESS:  Yes, sir.  Not in Shenandoah, anyway.

THE COURT:  It wouldn't be the first time I've been incorrect, but thank you for that.

Do you know whether anyone spoke at the school board

meeting in 2024 on behalf of the NAACP?

THE WITNESS:  No, sir.  They may have identified themselves as members of the NAACP or being affiliated with the NAACP, but the only person who can officially speak on behalf of the NAACP is the branch president.  There wasn't a branch president at that time.

THE COURT:  There was not in Shenandoah County?

THE WITNESS:  Right.

THE COURT:  Right?  And you didn't go to the meeting, either?

THE WITNESS:  And I did not go to the meeting.

THE COURT:  All right.

I'm sorry, Mr. Guynn.  I keep interrupting you.  Please go ahead.

BY MR. GUYNN:

Q    In fulfilling your duties as the president of the state NAACP, you travel all around the state?

A    I do.

Q    And have you ever visited the Fifth Street Presbyterian Church in Roanoke?

A    I have not.

MR. GUYNN:  That's all I have, Your Honor.

THE COURT:  Okay.

Ms. Banner, do you have any redirect of Colonel Reverend Dr. Bailey?

MS. BANNER:  Just one or two questions.

THE COURT:  Or Cozy, as he prefers.

THE WITNESS:  Yes, sir.

THE COURT:  All right.

MS. BANNER:  Just give me a moment.

REDIRECT EXAMINATION

BY MS. BANNER:

Q    Reverend Bailey, do you remember when the State Conference of the NAACP found out about the effort to reinstate the school name?

A    It was either March or April of 2024.  Again, we felt that it was impending, and I think we were pointed to that May meeting as the time that that decision was going to be made.

MS. BANNER:  I would like to now bring up what's been marked for identification as Plaintiffs' Exhibit 229.

(Plaintiffs' Exhibit No. 229 was marked for identification.)

BY MS. BANNER:

Q    Do you recognize this document, Reverend Bailey?

A    I do.

Q    And what is it?

A    It is the demand letter sent to -- on our behalf to the Shenandoah County School Board.

Q    And how do you know that's what this is?

A    Because I reviewed it before it was sent.

Q    And when was this letter sent?

A    June the 3rd of 2024.

MS. BANNER:  At this point, I'd like to move what's been marked as 229 into evidence.

MR. GUYNN:  Your Honor, I would object to the relevance.  It's -- if it was to give notice, it's a month after the meeting.

THE COURT:  What is the relevance -- thank you, Mr. Guynn.

What is the relevance of this document?

MS. BANNER:  The relevance of this document is to continue to show the efforts that the Virginian NAACP to address the school names even afterwards.  Of course, the school board could have reversed course or changed the name at that point, and so it further shows the effort, and then I will -- excuse me.  I'm sorry.  And then I will ask Reverend Bailey an additional question or two about this.

THE COURT:  When was suit filed?

MS. BANNER:  Suit was filed -- that's a question I should know the answer to.  June 9th?  Eleventh.  June 11th.

THE COURT:  To the extent it is an effort by the NAACP to resolve the issue, it'll be admitted for that purpose.

(Plaintiffs' Exhibit No. 229 was admitted.)

BY MS. BANNER:

Q    Did you ever receive a response to this letter,

Reverend Bailey?

A    No.

THE COURT:  You know, if this is so important to the NAACP, this vote, why didn't someone go to that school board meeting on May 9?  Why didn't you go?

THE WITNESS:  I don't recall exactly what the reason was.  I know that we were -- we focused on attempting to do the communication, sir.  We knew, again, after meeting with the folks that there would be several people speaking, as some of them have testified here.

THE COURT:  Okay.  Thank you.

BY MS. BANNER:

Q    Reverend Bailey, at the time that the meeting was happening and the press releases were being issued, was that the same period of time in which you were working to establish the Shenandoah County chapter?

A    Yes.

Q    Was there a chapter in place on May 9?

A    No.

Q    No further questions.  Thank you.

THE COURT:  Mr. Guynn, do you have anything else you want to ask Reverend Bailey?

MR. GUYNN:  No, Your Honor.

THE COURT:  Thank you for being here with us this afternoon.  I appreciate it, and I appreciate your years of

service to the United States Marines Corp.  Thank you, sir.

THE WITNESS:  Thank you, sir.

THE COURT:  Okay.  Let's take about a five or seven-minute recess before I think we're going to play a video deposition of School Board Member Rutz.  Is that right?

MR. GUYNN:  That's my understanding, Your Honor.

MS. BANNER:  Yes, Your Honor.

THE COURT:  Okay.  All right.

Let's take a brief recess.  Thank you all.

(A recess was taken from 4:08 until 4:41)

THE COURT:  Good afternoon.

I wanted to go back a minute before we play Ms. Rutz's deposition and give you all a more fulsome explanation for my ruling on some of the objections, just so the record is clear.

I was clear this morning with regard to the objections that the plaintiff had made two playing portions of the deposition.  Most of the portions of Ms. Rutz's deposition that the plaintiff objected to I'm allowing into evidence. There's only one piece of Ms. Rutz's deposition that I granted the plaintiffs' objection to, and that was for lack of foundation as to her understanding of why the school was named Stonewall Jackson in 1959.  Maybe later on in the case, some more foundation can be laid for that, but at this point, there isn't any.  It's just Ms. Rutz saying I read a newspaper

article that said this.  Okay?  So I've excluded that.

There was a couple of -- let me just run through the other objections.  I didn't as fulsomely -- and I'm sorry, because I was focused on something else -- and I didn't as fulsomely address the objections raised by the defendants, and let me go ahead and do that at this time just real quickly before we play it.  I just want to make sure we've got a full record on this.

And I'm looking at the chart that you all filed -- and I thank you for it -- on the objections.  I dealt with the plaintiffs' ones -- 16, 20 -- and I'm talking about the numbers, not the pages right now -- 16, 23, 24, 37 this morning, and 39.  Okay.

Items number 43, 44 -- excuse me, 43, 45, and 46 dealing with testimony on Page 96, 100, 101, and 103 through 104, defendant objected to this testimony about a -- two of them have to do with Facebook posts.  The defendant says the Facebook post is only relevant to the extent it provides her personal beliefs to explain why she voted how she did, and that evidence is precluded by the ruling at ECF 215.  The plaintiffs responded by saying no, no, it said the defendant is barred by ECF 215 from offering evidence on the reasons for the vote, but plaintiff is not restricted from offering evidence as to the school board's discriminatory intent under *Arlington Heights*.

This morning, I may have referred to the defendant's

objection in a shorthand fashion as being absurd.  I didn't mean to offend anyone and I didn't at all.  But it just does seem to me incongruous that the school board would be seeking to keep out evidence as to Ms. Rutz's intent, even as to statements for which it did not claim legislative privilege.

The plaintiff argues that this evidence is relevant to discriminatory intent under *Arlington Heights*.  The defendant did not object to this testimony on legislative privilege grounds and can't use my ruling on legislative privilege, which keeps the defendant from using legislative privilege as a shield against discovery and a sword in this litigation.  It can't use that to keep otherwise admissible statements that might go to intent out of evidence in this case.

So therefore, the objections as to Pages 96, 100, 101, 103, and 104 of Ms. Rutz's deposition are overruled. Because legislative privilege was not asserted as to those, the plaintiff can't use my ruling on legislative privilege to keep otherwise admissible statements that may go to intent out of evidence because under *Arlington Heights*, the intent of the school board is important evidence in this case.

Okay.  On Pages 53 -- I'm sorry.  Items 53, 56, and 57 on your chart -- and that's going to be testimony at 137, 138, 142, 143, 145, and 147, that testimony goes to an e-mail that Ms. Rutz got on the school board concerning a

constituent's -- I think it was in 2022.  It may have been 2024 -- a constituent's views on the changing of the school names. Okay?  And the plaintiff says it lacks foundation and certainly it's not -- I agree with -- excuse me.  The defendant says it lacks foundation.  I agree with the defendant that it's not being offered for the truth of the matter asserted, but it is relevant because it's the views of someone in the community. It's relevant to the intent of the school board after receiving those views.  So that's admissible in evidence.

All right.  As to the objections that were made with regard to -- no, I'm sorry.  I made a mistake.  137 and 138 doesn't deal with that e-mail.  The e-mail is referenced on Pages 142, 143, 145, and 147 of Ms. Rutz's testimony.  Pages 137 to 138 really asks a question about Ms. Rutz's views on race.  The plaintiff that lacks -- the defendant argues it lacks foundation.  I believe that's relevant to intent.  The e-mail evidence from the community at Pages 142, 143, 145, and 147 doesn't go to intent of Ms. Rutz, but receipt of this e-mail about -- it goes to the second prong of the equal protection analysis on disparate impact.

So the e-mail won't be considered for the truth of the matter asserted, but it will be considered as evidence of the school board's awareness of impact.  Okay?  Likewise, there is an e-mail reference to Pages 219 and 220.  Again, goes to impact.  And then there was some testimony concerning

Ms. Rutz's communication with a teacher about whether or not it was appropriate when Mountain View was in -- when the school was named Mountain View to still refer to it as Stonewall Jackson.  That's at Pages 231, 233, and 235.  The objection to those are overruled because that is probative evidence of Ms. Rutz's intent.  So either as to intent or impact, those statements are admissible.  I hope I have more fulsomely addressed those objections.

Anything that the defense would like to say?

MR. FITZGERALD:  No, Your Honor.  Thank you for the --

THE COURT:  I'm sorry was shorthanded this morning. I apologize.

MR. FITZGERALD:  Quite all right.

THE COURT:  Okay.

All right.  With that, let's play Ms. Rutz's deposition.

MS. UPTON:  Thank you, Your Honor.

Elizabeth Upton-Duncan for the plaintiffs.

The parties will now play video designations from the deposition of former School Board Member Brandi Rutz.  We will also submit to the Court a color-coded and highlighted transcript with a cover index of all the designated citations.

I just want to mention, again, that the parties really appreciate that the Court took the time to review and

resolve the objections to the testimony over the weekend so that we could do this today.  The parties have agreed to move into evidence, without objection, certain exhibits that will be discussed in the video of the deposition designations that will be played today.

So as we did with Mr. Scheibe, we have prepared a binder of the exhibits that will come up in the video for the Court and the Court's clerk.  I will note, similarly, that the documents in the binder are stamped with the trial exhibit number which ties to the Box uploads, but because they will be referred to in the video by the deposition exhibit number, the tabs include that as well, and the documents do appear in the order in the binder that they will come up in video.

May I approach the Court?

THE COURT:  Yes, please.

MS. UPTON:  To ensure that we have a clean record, if acceptable to the Court, we think it makes sense that I wanted by the exhibits no for the record that will come up in the video as we did for Mr. Scheibe.  Two of these, the first two, were previously admitted, and the remainder are being submitted now.

The first one is Plaintiffs' Exhibit 23, previously admitted.  This is minutes of the June 9, 2022, school board meeting.

The second is Plaintiffs' Exhibit 72, also previously

admitted.  April 3, 2024, letter from the Coalition for Better Schools to the school board.

Plaintiffs' Exhibit 177.  It's a June 17, 2021, Facebook post from Ms. Rutz.

Plaintiffs' Exhibit 179 is a May 10, 2024, e-mail between school board members and a member of the community.

Plaintiffs' Exhibit 180 is an April 26, 2024, e-mail between Ms. Rutz and a teacher at Mountain View High School.

Plaintiffs' Exhibit 194 is a June 1, 2022, e-mail between school board members and a member of the community.

Plaintiffs' Exhibit 201 is a June 18, 2021, Facebook post by Ms. Rutz.

Plaintiffs' Exhibit 202 is a March 19, 2022, e-mail between school board members and representatives of the Freedom Press and community members.

Plaintiffs' Exhibit 216 is a May 9, 2024, e-mail from a community member to the school board.

Plaintiffs' Exhibit 237 is a June 25, 2020, school board resolution.

And finally, Plaintiffs' Exhibit 297 is an April 4, 2024, e-mail between members of the school board.

(Plaintiffs' Exhibit Nos. 177, 179, 180, 194, 201, 202, 216, 237, and 297 were marked for identification.)

MS. UPTON:  And we do understand that these are being admitted subject to the Court's limitations and purposes as

laid out in ECF 215.

Finally, there is one short designation at Page 215, Lines 6 through 12, where the video recording briefly failed, so we can't play that portion of the video for you. I can read it into the record now if you would like, or we can pause the video at the appropriate time and read it then. I will tell you, it is not terribly substantive to the flow of the video.

THE COURT: We're going to pause it and do it right when it comes in. Okay?

Is there any objection to that from the defense?

MR. FITZGERALD: No, Your Honor.

THE COURT: Okay.

MS. UPTON: That's all. I think we're ready unless you have any questions.

THE COURT: No, go ahead. Are these exhibits in this notebook agreed admitted by both sides?

Mr. Fitzgerald?

MR. FITZGERALD: Yes, Your Honor.

THE COURT: Okay. Thank you.

They'll be admitted.

(Plaintiffs' Exhibit Nos. 177, 179, 180, 194, 201, 202, 216, 237, and 297 were admitted.)

(Excerpts from a video deposition were played in open court. The text that follows was taken directly from the certified transcript of the deposition as taken and have not

been altered in any way by this reporter.)

Q.   Okay.  Now, let's talk a bit about you and your background.  Where do you currently live?

A.   Fort Myers, Florida.

Q.   And how long have you lived there?

A.   A year.

Q.   Where did you previously live?

A.   Strasburg, Virginia.

Q.   And how long did you live in Strasburg?

A.   13 years.

Q.   Strasburg is in Shenandoah County?

A.   Yes, ma'am.

Q.   And you have children?

A.   I do, three.

Q.   And your children attended Stonewall Jackson High School?

A.   They graduated from Stonewall Jackson High School, classes of 2023 -- no, 20 -- 2012, 2013 and 2015.

Q.   When did you join the School Board.

A.   I believe I was, you know, elected in November.  The election was in November of '21.  My service started in January of '22, I believe, is what those dates were.

Q.   What district did you represent?

A.   District 5 which is on the northern end of the county.  It pretty much encompasses part of Central High

School's enrollment in all of Strasburg High Schools, you know, the northern end, Sandy Hook Elementary, Signal Mountain Middle, their enrollment.

Q.    How long did you serve on the school board?

A.    Three years.

Q.    Why did you leave?

A.    My mother died.  I was going through a separation, and I had a new grandchild coming, so I packed up and moved.

Q.    So what's your understanding of the Civil War?

A.    My understanding of the Civil War is multifaceted. My understanding of the Civil War that it has to do a lot -- the political climate in 1865 isn't much different, believe it or not, as it is today.  While slavery was a point that was definitely used, I don't believe it was the focal point.  I think there was a lot of social and economically-driven reasons behind the Civil War.  We live in -- in Shenandoah Valley we live in a very historically, what's the word I want to look for, deep history.  I mean, Stonewall Jackson High School sits very near a battlefield.  I mean, the whole county is laden with the heart of the Civil War.  New Market Battlefield is -- is within, you know, a stone's throw.  Stonewall Jackson's encampment at Rude's Hill is within eyeshot of Stonewall Jackson High School.  The Battle of Cedar Creek, the Battle of -- you know, my home sat within 8 miles, you know, as the crow flies, of the Battlefield at Fisher's Hill.  It's -- it's real

hard not to understand that there were, you know, big activities that happened within that county and within that area.

Q.    So is it fair to say, in your opinion, the Civil War was partially about slavery but not completely about slavery?

A.    It is my opinion that it was.

Q.    Fair to say that it was good for the country overall that slavery ended?

A.    Yes.  And I think that we would have gotten there eventually.  Our constitution -- you know, slavery -- slavery was an inherited trait.  It's been going on since the Israelites.  Sadly, unfortunately, human trafficking still happens today.  Slavery never ended.  It just changed.  And, you know, it's never a good -- a good thing to enslave anybody. And I think we would have eventually gotten there without the Civil War, but I think it was a good thing that it -- it -- yes, slavery ended, absolutely.

Q.    Do you know why the Confederacy was formed briefly?

A.    The Confederacy was formed in part because of a government overreach.  Again, at that time, your Constitution says United States with an S, it's plural.  We operated -- we were independent states, so we operated as we wished to.

Q.    Is it fair to say that the Confederacy was formed in part to preserve slavery in the southern states?

A.    I would say it probably is not incorrect.

Q.    Are you aware that slavery is written in the Confederacy's founding documents as part of the reason that they are developing the Confederacy?

A.    Yes.

Q.    Tell us about Stonewall Jackson.  Briefly what do you know about him?

A.    Jackson was originally from West Virginia or that part of Virginia when it was one -- when we were all one.  My understanding he was a military genius.  He was a very good commander, and I know that he came to, I believe, the southern part of Virginia and, you know, set up shop.  He built a home. He started a -- you know, he -- I believe he was -- had gone to school.  He had began -- began a life in Virginia.

Q.    Can you tell us anything about Turner Ashby?

A.    Not a whole lot, no.

Q.    How about Robert E. Lee?

A.    Lee was a beloved general.  Again, another military -- military strong point.  Well-loved but not at the moment, no.

Q.    Slightly harder question.  How would you define racism?

A.    Definition of racism is when you discriminate -- discriminate mostly by someone's skin color.

Q.    Are you aware that Stonewall Jackson is -- was part of a slave owner?

A.    I was so was Ulysses S. Grant.

Q.    Based on the definition of racism that you just gave, would it be fair for someone to say that Stonewall Jackson who owned enslaved people was racist and discriminated against people based on the color of their skin?

A.    I would say that would be a fair assumption.

Q.    How do you feel about the name of the High School, Stonewall Jackson High School?

A.    It's just a name.

Q.    What does the name mean to you?

A.    Well, Stonewall Jackson for me is a High School in which I watched my kids grow.  I spent a lot of time in the concession stand selling hotdogs, watching soccer games, watching wrestling games and volleyball games.  And it's where the bittersweet part of my children leaving school and growing up and being adults -- it's the last part of -- of that era for me.  I have three red and white tassels.  I have three diplomas that read Stonewall Jackson High School.

Q.    What kind of -- what's the message of the school names?  Like what message is associated  with Stonewall Jackson High School?

A.    When you do some research and you find out that Stonewall Jackson High School, when they made plans to build that in the 19 -- early 1950s, it was only moments away of still being Mount Jackson High School -- Mount Jackson School

or Mount Jackson Middle School whatever -- or High School, whatever it was, that sat in the middle -- I believe sat in the middle of town.  If it were not for a gentleman named Coiner Rosen who was a prominent businessman, who ended up being a prominent businessman in Mount Jackson -- I think Mr. Rosen is a child who suffered through polio, and he spent a whole lot of time -- a whole lot of his days reading history books.  And, you know, for a young boy, I would imagine who -- who finds the military and -- and that kind of deal appealing, to know that that -- the -- the activities and the events that happened right in his backyard, because he is from Mount Jackson, that land had a historical significance.  And, you know, we kind of don't take those historical significances it seems as much today as we used to.  You know, rather it's traveling to Monticello or -- or Mt. Vernon and -- and -- so he started the -- started the -- what's the word I want to use?  He started a campaign to have it named Stonewall Jackson High School because it sat in proximity to Rude's Hill.

Q.    Are you aware that there were people excluded from attending Stonewall Jackson High School when it opened?

A.    Yes.

Q.    Okay.  So you mentioned mass resistance.  Can you say more about what is mass resistance?

A.    Mass resistance was a time in history where we did not allow our Black students to attend schools with our White

students.

Q.    And when you say "we," do you know who that we is specifically?

A.    It was government officials.

Q.    In way which states?

A.    I don't know about anyplace else other than Virginia, and Virginia was very much in that mind frame that we shouldn't -- that we shouldn't integrate.

Q.    And are you aware that this occurred after the Brown vs. Board Supreme Court decision mandating that schools be integrated?

A.    I am.

Q.    So for some period of time, schools in Virginia, through the Massive Resistance Movement, remained segregated despite the national law.

A.    Absolutely, they did.

Q.    And Shenandoah County, for some time, was a part of that Massive Resistance and remained segregated although there was a national law to integrate.

A.    I'm not sure what the timeline was.  Like I said, the Byrd machine was very much in cont -- you know, working its -- its -- you know, what it needed to do and what its mission was.  However, like I said, Vernon Shaffer was a representative from Maurertown, Virginia who served on, I forget the name of the commission, and we were the second integrate I think behind

Fairfax County in the state.  So I understand -- it's -- it's a -- Ms. Reed, there can be two right -- there can be two correct answers, two right things as opposed to a simple yes or a no or if that -- you know, it was definitely this way, especially when there's chaos and there's trans -- and there's transformation.  So while I agree with you that -- that Shenandoah County didn't change overnight, they also were in the process of being part of the change to the right side of history.

Q.    Shenandoah County was the second -- from your understanding, Shenandoah County was the second county in Virginia to integrate at schools and allow Black students to attend schools with White students?

A.    Correct.

Q.    Fair to say that Stonewall Jackson High School specifically opened in around the late 1950s?

A.    Yes.

Q.    And at the time that it opened, only White students were allowed to attend.

A.    Correct.  I believe that was the - that was how that -- that operated, yes.

Q.    I'm going to represent that Black students were not permitted to attend until 1963.  Would you agree with that?

A.    Yes, ma'am.

Q.    And in 1963 the school was integrated and both Black

and White students had been allowed to attend since then.

A.    Correct.

Q.    Is it fair to say that it was a good thing for Stonewall Jackson High School that the schools were integrated?

A.    Yes.

Q.    Is it fair to say that it's a good thing for Shenandoah County that schools are now integrated?

A.    Absolutely.

Q.    Is it fair to say that it's a good thing for Virginia and the United States that our schools are now integrated?

A.    Yes, ma'am.

Q.    At the time when the school was named, Ms. Rutz, you understand that, as you just described, Virginia was engaged in this Massive Resistance Movement.

A.    Correct.

Q.    And part of Massive Resistance meant discriminating against students on the basis of their skin color, is that correct?

A.    Yes, ma'am.

Q.    So would it be fair to say that the Massive Resistance Movement was at least in part racist?

A.    Mass resistance definitely was racist.

Q.    Okay.  And during that time as a part of Massive Resistance, Shenandoah County opened Stonewall Jackson High

School.

A.    They also opened Strasburg High School.  They did open -- they did open -- about that time, whether one had to do with the other, I don't know, but yes.

Q.    Okay.  So during Massive Resistance, Shenandoah County opened Strasburg High School.

A.    Correct.

Q.    And during Massive Resistance, Shenandoah County opened Stonewall Jackson High School.

A.    Correct.

Q.    Ms. Rutz, you were saying that Stonewall Jackson High School was named because of Coiner Rosen liked history and was interested in Stonewall Jackson, is that correct?

A.    Yeah.  I guess it's a -- he looked for a pedo -- what's the word pedological reasoning for, you know, the school being where it was, I guess.

Q.    How did you learn about that fact?

A.    Newspaper articles.

Q.    What made you want to look into that?

A.    I like to know the truth of things.

Q.    Do you remember about when you were researching that?

A.    Oh, I've researched that on and off, you know, since I was on the school board.  That article was actually fairly hard to find.  It's buried in, you know, things of that nature.

Again, like Vernon Shaffer, that's part of history, Shenandoah County history.  I had no idea.

Q.    You were -- pardon me, my cough.  You were specifically researching the history of the name of Stonewall Jackson High School when you were on the school board.

A.    I did.

Q.    And that's presumably because the name of Stonewall Jackson High School was a big issue when you were on the school board?

A.    It was.

Q.    And, Ms. Rutz, are you aware of any other reasons why Stonewall Jackson High School got its name?

A.    Not that I'm aware of, no.

MS. LOWERY:  Zach, I am marking for identification what has previously been marked as Exhibit 1.

Q.    Okay.  Have you seen this document before?

A.    I have.

Q.    Can you tell us about it?  How are you familiar with it?

A.    This is a resolution for racism that the 2020 school board used in the national outrage of George Floyd.  They started with this.

Q.    So can you tell me is a resolution a policy?

A.    No.

Q.    Can you explain the difference?

A.    Policy -- resolutions are just statements of -- of thought processes and -- and their beliefs.  It does not in any way, shape or form -- it has -- there's no action.  There's no -- there's no policy -- you know, there's no, what's the word, corrective action with this if no one follows it.  It's just a simple resolution or belief that the school board took a stand on this.

Q.    Paragraph 2 of the documents states: Whereas, racism and hate have no place in our schools or our society, and we must protect the Constitutional rights of every person who lives, works or learns in our community.  Do you see that?

A.    I do.

Q.    Do you agree with that statement?

A.    Yes.

Q.    Do you agree that racism and hate have no place in Shenandoah County public schools?

A.    I do.

Q.    Looking back at the document, I'm going to go to Paragraph 6.  Toward the middle of the page Paragraph 6 says: Whereas we must lead.  Each of us, individually and collectively, is responsible for creating and nurturing an anti-racist learning environment where every child is respected and valued for who they are, regardless of their skin color.  We must actively acknowledge, address and prevent racial bias that occurs as a result of division policies, practices and

actions.  Do you agree with that statement?

A.    Yeah, I do.  I -- I guess I question, though, when you talk about regardless of skin color, if that just excludes -- if it excludes a group of people.

Q.    Who might it exclude?

A.    Whites.

Q.    So why do you think White people are excluded if it says regardless of skin color?

A.    Because in the third paragraph it calls out Black people, specifically, and it doesn't talk about Latinos.  It doesn't talk about Asians.  It doesn't talk about anybody else but Black people.  So I've got to kind of wonder what is the term of racist and what the definition of racist is that they're using here.  If racist is based on a skin color, are they talking about -- I would think that racist is everybody, but it's -- clearly it's not.

Q.    Okay.  For the record, I'm going to read the third paragraph that you're referencing.  The third paragraph says: Whereas we cannot be silent.  We urgently must stop -- I'm sorry, whereas we cannot be silent.  We urgently must act to stop the racial injustice that harms and anguishes Black people who are our family, friends, neighbors, students, staff members and fellow Americans.  Did I read that correctly?

A.    You did.

Q.    Okay.  So that paragraph specifically references

Black people, correct?

A. Correct.

Q. And you're saying no other paragraph references any other color of people?

A. Correct.

Q. And because of that you think it might be excluding White people?

A. Well, it's excluding -- it looks like it's excluding Latinos. It looks like it's excluding Asians. It looks like it's excluding everybody but.

Q. Do you agree that racism has no place?

A. I can, against every race, correct.

Q. Okay. So racism against every race has no place?

A. Yes.

Q. And if someone -- someone were to say racism against Hispanic people has no place, are you okay with that statement?

A. I am.

Q. And if someone were to generally say racism against Black people has no place, are you okay with that statement?

A. I am.

Q. You recall things that were happening generally in the climate of America when this resolution was passed, around the time this resolution was passed?

A. I do.

Q. Can you say a little bit about what you recall?

MR. FITZGERALD:  Object to form.  You may answer.

A.  The country was shutdown in March due to COVID.  The school was closed due to COVID.  They closed in March, so we weren't in session.  I do not recall when the incident with George Floyd happened.  I want to say it was probably around May or June.  You could probably correct me if that was -- if that's not.  And police brutality became a thing and, you know, this incident was on every news channel and in every newspaper and it was the only thing that anybody was discussing.

Q.  So it's fair to say that at the time the country was specifically discussing Black people?

MR. FITZGERALD:  Object to form.

A.  Excuse me?

Q.  Is it fair to say that at the time the country was discussing racism against Black people?

MR. FITZGERALD:  Object to form

A.  I don't know that it was racism as much as it was police brutality.

Q.  Is it fair to say that at the time the country was discussing police brutality against Black people?

A.  Well...

Q.  Ms. Rutz, I also -- I don't want to push you into a specific statement.  You can -- if you can concisely say to me, you know, at the time the country was discussing X, that would be helpful.

A.    At the time the country was discussing this major event, but this newspaper -- you know, this -- this news article and surroundings of it.  And, yes, George Floyd was -- George Floyd was a Black man, so this became -- this became a -- a topic.

Q.    And people were discussing George Floyd in the context of his race, is that fair?

A.    It was -- it was -- yes.  Well, it was how he was treated in that incident.

Q.    And not everyone but some people were saying that people were discussing -- some people were saying that George Floyd was treated poorly because of his race?

A.    Some people came to that assumption, yes.

Q.    So irrespective of whether or not me or you agree, people were generally discussing George Floyd and his race?

A.    Correct.

MR. FITZGERALD:  Object to form.

A.    Correct.

Q.    And George Floyd was a Black man?

A.    He was.

Q.    And fair to say people in Shenandoah County, even though it was far away from George Floyd, were also discussing George Floyd and perhaps his race?

A.    The school Board apparently was discussing it.  I don't know that it was a topic that was generating throughout

the county.  The school board was discussing it.

Q.   Okay.  And are you aware that the then Governor of Virginia was also discussing matters of race at that time?

A.   I -- I was.  I was.  I think that's about the time that his -- his hooded picture showed up, floated around, but yes.

Q.   And that hooded picture was also related to an issue of race?

A.   Correct.

Q.   So fair to say there were multiple issues of race being discussed at that time?

A.   Yes.

Q.   And the issues of race at that time specifically related to Black people?

A.   Correct.

Q.   Okay.  I am going to read one more statement from the resolution where it says - and, sorry, so you can follow along, the last paragraph:  Therefore, be it resolved that we, members of the Shenandoah County School Board, stand steadfast in our commitment to foster an inclusive educational environment where every student, teacher, support professional, parent and community member is treated with dignity and respect as well as our commitment to fighting for racial justice and human and civil rights for all.  Do you see that statement?

A.   I do

Q.    Do you agree with that statement as it's written?

A.    Not in its entirety, no.

Q.    Okay.  Let's parse it out.  Which parts do you disagree with?

A.    The school board's job is -- is to educate, and it's to educate and it's to do that as fairly as it -- as it can. You know, it is -- it is not the school board's job to fight racial justice human and civil rights.  That's not its job. It's to educate to where a person leaves us in -- and makes those decisions as a -- as a functioning individual of society. It's not to tell individuals what to think.  It's to teach them how to think.  So in my opinion, the school board is taking a political stance here that it -- it didn't -- didn't need to take.

Q.    To be clear, do you think the political stance the school board is taking is a part of the statement that reads quote:  As well as our commitment to continue fighting for racial justice and human and civil rights for all, is that correct?

A.    Correct.

Q.    Sorry.  And you think it's not the school board's job to fight for racial justice and human and civil rights for all?

A.    I think it's their job to educate all races fairly.

Q.    Okay.  And that is something separate than fighting

for racial justice and human and civil rights for all?

A.    I do.  I do believe that.

Q.    Okay.  So fighting for racial justice and human and civil rights for all is not the school board's responsibility?

A.    It's to educate children.

Q.    Okay.  So Ms. Rutz, you're aware that in 2020 the school board voted to change the names of Stonewall Jackson High School and Ashby Lee Elementary School.

A.    It did.

Q.    When was the first time you became aware of that vote or that initiative?

A.    July -- the vote took place on July 9th.  I think I found out about it right around that same time.

Q.    Okay.  How did you become aware?

A.    Because the school system put the notice up on Friday at 3:30 over a holiday weekend and gave three days' notice and voted to change it in one night over electronic means while the school was closed, while no classes happened. It wouldn't happen until October, and it caused quite the uproar in the county.

Q.    What's your understanding of why that School Board voted to change the names of Stonewall Jackson High School and Ashby Lee Elementary School?

A.    Because of the resolution and the -- the nationwide outrage of George Floyd.

Q.    Can you say more?

A.    It is what they thought -- well, what they thought they needed to do to back up their statement there.

Q.    How is it what they thought they needed to do to back up their statement?

A.    Well, there -- the school board, again, jumped on a national -- well, it was actually more of Virginia.  Our governor at the time had a push to remove Civil War statues and had engaged the Virginia School Board Association to talk to school board members about retiring -- retiring Civil War names, and George Floyd provided the platform to do that.

Q.    What's your opinion about the way the school names were changed?

A.    There's -- we discussed earlier about a process and the processes that generally happen and how transparency for our public, as elected officials, come about.  There were several things that were going on at this moment.  One, schools, again, had closed.  There was no school in session.  There was a continuity statement put out by the governor as well as the county, that we were going to operate on an emergency basis.  Basically government wasn't going to do anything but pay the bills and keep the lights on.  Virginia FOIA for open meetings was still in effect.  The only way that this meeting was held was held electronically.  It was not -- it was posted on the three-day -- on the three-day statutory

requirement.  However, Mrs. Walsh was asked, I believe, a good three weeks or so if this was coming up for discussion and being put on the agenda, and she denied that it was.  There was no discussion about how this was done or that it was going to be done.  It was done in three days.

Q.    So --

A.    With -- yeah.

Q.    Please finish.

A.    It was done in three days with no public input.

Q.    So your objection to the school name change was the process in which it was done?

A.    Yes.

Q.    What do you think Stonewall Jackson is most known for?

A.    Probably that he was a Civil War General.

Q.    Okay.

A.    Yes.

Q.    So that's the relevance to the Civil War here. Obviously Stonewall Jackson is directly connected to the Civil War?

A.    Okay.  Yes.

Q.    When did you decide to run for the school board?

A.    In I guess it was early spring of 2021.

MS. LOWERY:  Zach, I've introduced Tab 6 which I've marked for identification as Exhibit 40.

(Exhibit 40 was marked.)

Q.    Okay.  We're now looking at a Facebook post dated June 17th, 2001, Brady Rutz, School Board District 5.  Ms. Rutz, do you recognize this post?

A.    Yes.

Q.    How do you recognize it?

A.    It is mine.

Q.    But you are aware of people who expressed that they had experienced racism, what they thought was racism in Shenandoah County Public Schools.

A.    What they thought was racism, yes, I do.

Q.    And some of those people began speaking up about the racism that they said they experienced, is that correct?

A.    Correct.

Q.    Do you believe it?

A.    I don't -- I don't know.  I can't say whether I -- you know, I -- I wasn't there to speak on it.  I -- I don't know those individuals.  I -- I don't know.  I can't speak to whether it was or if it wasn't.

Q.    Okay.  Looking back at the post, again, you say who will be the next victim of political correctness?  Who are the victims of political correctness you were referring to?

A.    For this post it was the students of Stonewall Jackson High School.

Q.    Why did --

A.    It was the County of Shenandoah.

Q.    Why did you think the students were 22  victims of political correctness?

A.    Because there was -- there was -- you know, going into 2020, again, into the 2020 school year, there was no thought process that nobody, you know, was knocking down the door or coming to school board meetings that I'm aware of and saying, hey, you need to change the name because, you know, we're upset by it.  The waters were pretty quiet until George Floyd.  So again, this I think in my opinion was -- was sparked because of the national outcry at the time that we don't want to be -- we need to do something.  We need something symbolic. You know, nobody is saying anything.  Nobody is upset.

Q.    Okay.  Ms. Rutz, previously you were saying that you thought the 2020 school board process to change the school names from the Confederate names to Mountain View High School and Honey Run Elementary High School were flawed?

A.    I do.

Q.    What could have been done to fix those things?  I'm sorry, what could have been done to fix that process?

A.    They could have given ample time for the -- for the public to weigh in.  They could have posted it.  Like I said, the fact that it went at a time that government was supposed to be locked down and not much had been done, had they -- had they waited until we were back in school and, you know, posted it

for the -- and given the reasons, you know, and then -- and done it -- again, the -- the outcome of public outrage wouldn't have changed.  However, it had been -- you know, and they could have even backed it up with a survey, but it was very clear that this is what they wanted to do.  Had they done it at a different time, you know, after -- after things had settled from COVID and kids were back in school, it probably would have been accepted a little bit more -- a little bit more widely accepted.  There's still -- people would have still gotten upset over it without a -- without a thought process.

Q.    So my question is:  Could you understand how in 1963 when the first Black student was allowed to attend Stonewall Jackson High School the name could make the uncomfortable?  Could you understand that?

A.    I can't speak to that.  I mean, you have -- you're living in the -- in the -- in the belt of -- of the Civil War.  There's -- you know, there's a marker right down the road that talks about the battlefield.  The town is Mount Jackson.  I can't dis -- I can't, let's see, discount what somebody might have felt in 1963 or what somebody might feel today.  Again, on either side of this, you know, there are people that feel that, you know -- that, you know, being made to start their - their high school career at Stonewall Jackson High School and finish it at Mountain View, after being in the county all their lives, is -- was -- was not fair either.  And there are folks of color

that thought that.  So, you know, there's both sides of the coin.  Again, I can't -- I can't -- I can't disagree with someone that feels that way, but I can't say that everybody feels that way.

Q.    So if a person who attended Stonewall Jackson High School in 1963 said to you, Ms. Rutz, the school name made me feel uncomfortable and unwelcome would you believe them?

A.    I would have to.

Q.    If a student who attended Stonewall Jackson High School in 2019 said, Ms. Rutz, the school name made me feel uncomfortable and unwelcome, would you believe them?

A.    I would have to.

Q.    I am wondering have you talked to like Black students about their experience at Stonewall Jackson High School since, you know, they began attending in 1963?

A.    I heard from some of them during the open -- the many meetings that I had.  Some of them said they never particularly cared for the name.  Some didn't have any problem with it.  I think it really came down to, you know -- you know, how you feel about it, and everybody is entitled to their -- to their opinions and their feelings.

Q.    Of the some who said they were not comfortable with the name, what were they expressing?

A.    Just that they, you know, never liked the name.  I don't know that they were ever -- I -- I probably should have

researched to see if they ever came forward when they were in school, if they've ever come forward prior to us changing the name or if this is just a -- just something that prompted them now to speak up. I don't know.

Q. Is there a right time to say when you experience racism or racial discomfort?

A. No. No. However -- I'll just say no. We'll just end it there.

Q. Is it possible that in a time where the country is open to discussions about racial discrimination, Shenandoah community members might feel comfortable talking about their experience with racism and racial discrimination?

A. Sure.

Q. The question is, again, is it possible that between the years of 1963 and today, Black students may have felt discomfort with -- discomfort with or unwelcome by the name Stonewall Jackson High School?

A. Yes.

MS. LOWERY: I'm introducing Tab 16 with Bates SCSB 036536 which I've marked as Exhibit 46.

(Exhibit 46 was marked.)

Q. Ms. Rutz, this is an email from Kira Jenkins from June 1st, 2022. If you look at the middle of the first page you can see that she's forwarding an email that she sent to you on June 1st, 2022. Do you see that?

A.    Okay.

Q.    The email is titled:  Forward:  School Name Change.
Do you have any reason to believe you did not participate in
this email exchange with Ms. Jenkins?

A.    No.

Q.    Okay.  Ms. Jenkins writes to you, I'm going to the
bottom of the email on Wednesday, June 1st:  I went to
Stonewall.  The name always bothered me.  My family is biracial
and my mom moved from the country (sic) my senior year.  She
did not want my younger siblings to go somewhere they did the
not feel comfortable.  I graduated in 1997.  I believe schools
should not be named for a person.  Do you see that?

A.    Uh-huh (affirmative).

Q.    Do you understand why Ms. Jenkins may not want to be
associated with Stonewall Jackson, the Confederate soldier?

A.    Yeah.

Q.    And do you believe Ms. Jenkins when she says to you
the name always bothered me, my family is biracial and my mom
moved from the country (sic) my senior year, she did not want
my siblings to go somewhere they did not feel comfortable?

A.    I would have a problem believing Mrs. Jenkins after
the way she indicated that she will forever tell people that
it's named after the Stonewall riots.  I'm betting that if I
look back at Mrs. -- in her -- in her history, she's never --
she's never said anything to anybody about the name, but that

is irrelevant.  The point is she's willing to lie and she's willing to tell me she'll lie about it.

Q.    So because what Ms. Jenkins is saying about the Stonewall riots is clearly untrue, you also don't believe her when she says she was always bothered by the name Stonewall Jackson?

A.    I don't -- I didn't say I didn't believe her.  What I said I would -- I would struggle to believe what she says.

Q.    Okay.  Do you believe that she says her mom moved from Shenandoah County her senior year so that her siblings wouldn't have to go somewhere they felt uncomfortable?

A.    She is -- I don't know.  I don't know.

Q.    Okay.  And --

A.    I have to take her at face value.  And at face value, she doesn't seem like somebody that would be trustworthy to tell me the truth.

Q.    Is it fair to say that Ms. Jenkins' statement did not sway your opinion about whether or not the school should be named Stonewall Jackson High School?

A.    It didn't.

Q.    Did you ever hear from Black students that the school name Stonewall Jackson made them feel uncomfortable?

A.    Prior -- at any time or after -- only after -- you know, during this time, I hadn't heard of anybody saying anything previous to the name change, no.

Q.    All right.  After the name change, did you hear from Black students saying that the name Stonewall Jackson made them feel uncomfortable?

A.    There were one or two that came to -- to the meetings, one or two, maybe three.  One didn't attend Stonewall at all, and I think one was at North Fork Middle at the time, so yes.

Q.    Do you recall Ms. Delores Ware?

A.    Ware.

Q.    Ware.  Ms. Delores Ware who did attend Stonewall Jackson High School testifying that the school name had made her -- made her feel uncomfortable?

A.    I do.

Q.    And is it correct in 2024 you voted to reinstate the name Stonewall Jackson to the high school?

A.    I did.

Q.    Today do you think the name Stonewall Jackson is appropriate?

A.    Appropriate for what?

Q.    For the name of a high school that contains children who may feel isolated or unwelcome by the name.

A.    I don't know how to answer that.  Am I okay with it still being Stonewall Jackson High School, yes.

Q.    Do you think it's irrelevant whether Black students feel that the name Stonewall Jackson makes them unwelcome?

A.    Do I find it to be irrelevant?  No.

Q.    How is it relevant?

A.    Say again?

Q.    How is it relevant?  Sorry, I know I said that really quickly.

A.    How is it relevant?  Ms. Reed, you know, there are situations that everybody enters that they may feel uncomfortable for.  And while those feelings are valid, I'm not sure that -- that everything has to change because of that.  I -- I hate the topic.  I hate the whole thing because it's divided everybody all over again.  It's divided everybody.  And -- and it's not -- it's not where -- what community should be.  It just isn't how we should operate.  I mean, where -- where is the line that we pick and choose who -- whose feelings are more important?  I don't know.  It's a tough place to be as far as a -- as a school board member.

Q.    Do you think it's possible for some Black students to feel completely fine with someone saying the N-word to them and other Black students being distraught about that same instance?

A.    My question would be before I answer that, let me look at your play list in your -- in your iPhone.  Because if you're listening to stuff that uses that word regularly, I'm not sure that -- you know, I really want to know that that's really offensive to you.  Becuase if you're buying somebody's

albums that say that, I don't know if that -- if that really offends you or you're just -- you know, you know want to be mad at somebody else.  You know, it's -- I don't -- and I'll be honest saying this to you.  I don't understand how that word okay is okay in some instances and then we use it in music and we use it in cultures where we banter back and forth with it.  And -- and it seems to be an okay for you all to use the word and a not an okay for us to use the word.  Let's just not use it.  Let's -- let's just not use it at all.  But that's -- again, rules change depending on who it is, when it is and what -- and what's going on.  So, you know, my kids were always taught never to use that word.  They don't use that word.  There's a lot of other words we don't use either.  But, you know, skin color is -- is something -- it's -- it's biology.  It really is.  It is all it is.  So, you know, you treat people with respect.

Q.    So it's fair to say students might receive -- different students might receive messages differently.

A.    Sure.

Q.    So if it's possible to accommodate a single student who was having an issue, who is harmed by some school policy, it would be your preference to accommodate that student, is that correct?

A.    Yeah.

Q.    If it were not possible to accommodate a single

student or a small group of students who was being harmed by a policy of the school, is it appropriate to change the policy in a way that impacts all of the students in order to prevent the harm of those few students?

A.    I would think so.

Q.    Is it a fair summary that even though the school name makes some Black students feel uncomfortable, you're okay with the name unless someone has proof that it caused issues or hindered their education?

A.    No.  That's not -- that's not how it -- that's now how it was framed, and that's not the meaning of it.  You know, again, like I said, it goes back to the hyperbole that the sky is falling and that we are ruining the future -- the futures of -- of students who leave Stonewall Jackson High School specifically because the name of Stonewall Jackson High School is on the side of the building.  I -- I don't believe that that data exists.  If it does, I haven't seen it.  Show it to me.

Q.    Is it possible that someone is negatively impacted by the school name, Stonewall Jackson High School, without their future having been ruined?

A.    Negatively impacted?  In which way?

Q.    They say it makes them uncomfortable, it makes them feel unwelcome, it makes them feel harmed, which is, you know, what you said the - you've heard Black students testify to over the years.

A.    Sure.

Q.    Okay.  Let's look at the next document.  There was a -- so we discussed that there was a subsequent 2022 vote to reinstate the names.  Do you recall receiving outreach from parents and students urging you to vote against reinstating the names, like this message from Mr. Skipper?

A.    Oh, there were tons of messages, tons.  As there was tons in -- in support of it.  There were tons against it.

Q.    Okay.  So fair to say you received --

A.    Too many emails.  Too many emails, yes.

Q.    How did you consider that outreach leading up to the vote?

A.    At that point how did I consider the outreach?  Tiresome, just tiresome.

Q.    Did those emails from community members sway your vote either way?

A.    I don't -- I don't -- I don't believe so.  I mean, I don't believe so, no.

MS. LOWERY:  I'm introducing Tab 137, which has been marked for identification as Exhibit 48.

(Exhibit 48 was marked.)

Q.    Ms. Rutz, this is a Facebook post from you dated January 18th, 2021 from your District 5 account.  Do you have any reason to believe you didn't make this post?

A.    No.

Q.    So I'm going to read, it says:  I asked for your --
I asked for your support of Kyle Gutshall and Dennis Barlow for
School Board in their districts.  If elected, I will openly
support a move to change the names back if funded with private
donations and coincide with the wishes of the parents and
students.  Do you see that?

A.    I do.

Q.    So you decided that you were in favor of changing
the names back prior to being elected to the Board.

A.    Okay.  With those caveats, yes.

Q.    So long as the name change was funded by private
donors and coincided with the wishes of parents and students,
you were open -- you campaigned on changing back the names, is
that correct?

A.    I did.

MS. LOWERY:  I'm introducing Tab 72 with Bates SCSB
004118, which has been marked for identification as Exhibit 50.

(Exhibit 50 was marked.)

Q.    Okay.  On the screen right now is an email titled
the Freedom Press dated March 19th, 2022, and on the chain are
several individuals and the email is from you.  Do you see
that?

A.    I do.

Q.    Do you have any reason to believe that you are not
the Brandi Rutz participating in this email exchange?

A.    No, ma'am.

MS. LOWERY:  I'm introducing Tab 5 -- oh, excuse me, Tab 75 with Bates SCSB 012818 which is marked for identification as Exhibit 51.

(Exhibit 51 was marked.)

Q.    Ms. Rutz, this is an email from you called -- titled Name Change Email with just one line as you can see.  Any reason to believe that you didn't write this email?

A.    No.

Q.    Okay.  Reading the email, it's very short, it says: Good evening can we add the Coalition for Better Schools email on name change for informational on our April 11th agenda? Please and thank you, Brandi.  Any -- any idea why you were adding Coalition of Better Schools to the name change email?

A.    Chances are they had lobbied us.  This was their -- they had written us and lobbied for us to consider restoration of the -- of the name.

Q.    Okay.  So Coalition for Better Schools was asking the school board to restore Stonewall Jackson and Ashby Lee?

A.    Correct.

Q.    And that's why they are being added to the agenda?

A.    For information, yes.

MS. LOWERY:  I'm introducing Tab 138 which I'm marking for identification as Exhibit 53.

(Exhibits 52 and 53 was marked.)

Q.    This document is titled:  Approved at the July 14th, 2022 School Board Meeting.  Shenandoah County School Board Meeting (Thursday June 9th, 2022) Generated by Kimberly D. Miller on Friday, June 17the, 2022.

Q.    And then it says:  Final resolution, motion not approved?

A.    Correct.

Q.    And it's listing three board members who voted yes, is that correct?

A.    Uh-huh (affirmative).

Q.    And then it lists three board members who voted no.

A.    Correct.

Q.    And it's your opinion that this 2022 vote to restore the names, Stonewall Jackson and Ashby Lee, was valid?

A.    Yes.

Q.    Okay.  Because the school board voted again, is that correct?

A.    Correct.

Q.    And they voted with the proper procedure that's consistent with the board norms, is that correct?

A.    They did.

Q.    And ultimately the vote failed and the names -- the previous names were not restored, is that correct?

A.    Correct.

Q.    So the 2022 process, although the original names

were not restored, was a valid process.

A.    Yes.

MS. LOWERY:  I'm introducing Tab 72 with Bates SCSB 018 --

excuse me 012815, which has been previously marked as Exhibit

5.

(Exhibit 5 was previously marked.)

Q.    Ms. Rutz, you previously testified that the

Coalition for Better Schools petitioned the School Board to

reconsider the name change and that's why you had sent that

email saying add them to the -- as an informational item, is

that correct?

A.    Correct.

Q.    I represent to you that this document is a letter

from the Coalition for Better Schools that you referred to

urging the School Board to restore the previous school names.

A.    Okay.

Q.    Do you recall any other requests to change the

school names back around the 2024 period before receiving this

request from the Coalition of Better Schools?

A.    There -- there was always -- always somebody out

there, you know, indicating that we should change it back.

Nothing formal, I don't believe, as this.

Q.    Okay.  And again, you've already said, but just for

the sake of the timeline, subsequently the school board did

vote to restore Stonewall Jackson and Ashby Lee to the names of

the two -- as of the names of the two schools, correct?

A.    In 2024 they did.

Q.    Leading up to the 2024 vote, did you receive letters and emails from community members urging you not to restore those names?

A.    Certainly.

Q.    Do you recall about how many?

A.    No.

Q.    Did you receive any letters from Black students at Stonewall Jackson High School encouraging you not to restore the names?

A.    You know, I'm not -- I'm not sure.  There might have been maybe one, maybe two.  I know I got -- I know I got an email from Mrs. Kohrs' son, Joe, but I don't -- I don't recall. Like I said, I got a ton of emails, so I don't -- I don't know.

Q.    Do you recall Black students at Stonewall Jackson High School -- I'm sorry, Black students at Mountain View High School at the time, testifying at the meeting urging the School Board not to return to the name Stonewall Jackson High School?

A.    Certainly.

MS. LOWERY:  I'm introducing Tab 80 with Bates SCSB 013765, which I've marked for identification as Exhibit 54.

(Exhibit 54 was marked.)

Q.    Ms. Rutz, this is an email from Samuel Gesford to most of the members of the School Board, including you, titled

Mountain View High School dated May 9th, 2024.  Any reason to believe you didn't receive this email?

A.    No.

Q.    Then the next paragraph he says:  I can holistically affirm from heartbreaking conversations I had with BIPOC students during my tenure as a teacher on the southern end of the campus, that numerous students and their families over the years felt frightened, intimidated and frustrated walking through the halls of and graduating from an institution named after a celebrated slave owner, one so dedicated to the cause of keeping and denigrating human chattel, that he fought and died for it.  Do you see that?

A.    I do.

Q.    Do you understand BIPOC to mean Black, Indigenous and People of Color?

A.    I do.

Q.    Okay.  Do you believe Mr. Gesford's representation that he's spoken with many students who attended Stonewall Jackson High School and that they felt frightened, intimidated and frustrated?

A.    I guess, you know, it's very possible.

MS. LOWERY:  I'm introducing Tab 121 with Bates SCSB 027958 which I've marked for identification as Exhibit 55.

(Exhibit 55 was marked.)

(Video deposition paused.)

MS. UPTON:  This is the part of the video that cuts out, so I'll read in.

Line 6, Question.  Ms. Rutz, this is an email -- I think it's an email -- this is an email from Jerry Jorgensen to you titled Decision to Change School names.  Any reason to believe that you're not the Brandi Rutz participating in this email exchange?  Answer, Oh, no.

(Video deposition resumes.)

Q.    Ms. Rutz, on Friday, May 10th, 2024, Mr. Jorgensen, emailed saying:  I am shocked at the stupidity of the school board and its decision to change the names of the schools in the southern part of the county back to racist confederate names.  Do you see that?

A.    I do.

Q.    He continues:  As of this day, I will do nothing to support the schools of Shenandoah County and will encourage my county commissioner to reduce school funding.  Do you see that?

A.    I do.

Q.    At the top of the page you replied:  Good morning. Please encourage the reduction of the spending especially to those minorities which reside on.  Do you see that?

A.    I do.

Q.    Mr. Jorgensen did not mention minorities in his email, is that correct?

A.    No.

Q.    And was this email -- this e-mail was sent on May 10th, 2024.  Is that when you were a member of the board?

A.    It was.

Q.    And this email at the top, the brutz@shenandoah.k12.va.us, is that your board email?

A.    It is.

Q.    So this is coming from your official board email?

A.    It is.

Q.    You disagree that the name Stonewall Jackson is racist?

A.    I do.

Q.    But previously you testified that Stonewall Jackson was racist, correct?

A.    I can -- looking back at Stonewall with today's eyes, probably everybody in 1865 was racist.  Again, the original name paid no homage to racism.

Q.    What support do you have for that statement?

A.    Again, I think we -- Mr. Fitzgerald might have it. There's -- like I said, there's -- there's a school board -- or there's a newspaper article that talks about Coiner Rosen, and -- and the historical -- the historical attachment to the battles that were there on that land or with -- with eyeshot within Rude's Hill.

Q.    And you believe his representation of why he was interested in the name Stonewall Jackson?

A.    Who?

Q.    Coiner Rosen.

A.    Yes.

Q.    Do you think there's an expiration date for which a person can express that they've experienced harm?

A.    Do I think there's an expiration date?  No.

Q.    Okay.  Let's look at another document.

MS. LOWERY:  I'm introducing Tab 6915 with Bates SCSB 024442, which I've marked for identification as Exhibit 56.

(Exhibit 56 was marked.)

Q.    Ms. Rutz, this is an email exchange between you and someone named Meredith Zirkle who represents themselves as a teacher at Stonewall Jackson High School.  The email is titled:  Restoration of School Names and dated April 26th, 2024.  Any reason to believe you didn't participate in this email exchange?

A.    No.

Q.    She says:  I am writing this as a former student of Stonewall Jackson High School and now as a teacher of Stonewall -- now as a teacher in the school.  My family graduated from Stonewall Jackson High School, two uncles, my mom, sister and myself.  One of my uncles still comes back to Stonewall Jackson and presents a scholarship to a deserving senior.  None of us experienced racism or racial tension throughout our attendance at the school.  I'm going to jump down to the last paragraph on

that page.  She says:  I am now a teacher at the school.  I returned to the school when it was called Stonewall Jackson High School.  I am proud to say that I returned to my alma mater Stonewall Jackson High School.  To come back to the school and say that I am a graduate is very hard because I have to say I'm a graduate of Stonewall Jackson High School and I went to the -- and that I went to that school because it is no longer called Stonewall Jackson High School.  It is now called Mountain View High School which is not where I attended.  I sometimes wonder if I will get in trouble for saying Stonewall Jackson High School.  Do you see that?

A.    I do.

Q.    Did read that correctly?

A.    Yeah.

Q.    Okay.  Continuing the paragraph, she says:  When I tell people I teach at Mountain View High School, many people look at me strange.  They question me and want to know if I teach at Mountain View Christian School that is in Winchester, Virginia.  I correct them and say, no, I teach at Mountain View High School in Quicksburg, Virginia that used to be called Stonewall Jackson High School.  The frowns on the faces of these people are interesting because most people don't understand why the name had to be changed in the first place.  Did I read that correctly?

A.    You did.

Q.    What are your thoughts on Ms. Zirkle's experience with the change of the name to Mountain View?

A.    I think her experience, you know, is -- is something that after the name change saying Stonewall Jackson High School for 40 years or 30 years can be a very difficult thing to do because it's just engrained in you to call it Stonewall.  And you see my response was, you know, I -- I always call it Stonewall.  It's just -- it's what it was and what it was to me.  To say Mountain View is a little -- is a little strange.  You know, again, she wasn't the only one that was afraid to call it Stonewall, you know, and I think because it was a -- again, being politically correct.

Q.    You mentioned your response.  Let's go to your response now.  You say:  Call it SJHS and that means Stonewall Jackson High School, right?

A.    Yeah, uh-huh (affirmative).

Q.    If anyone one says anything, tell them a board member has your back and then ask them to to call me.  Do you see that?

A.    Yes.

Q.    Okay.  So this was in April of 2024, is that right?

A.    Yes.

Q.    And at the time the school name was Mountain View High School, correct?

A.    It was.

Q.    And in 2022 your board voted to keep the name Mountain View High School, is that correct?

A.    It did.

Q.    Despite that, you still encouraged a teacher at the school to call the name Stonewall Jack -- call the school Stonewall Jackson High School, is that correct?

A.    Sure, correct.  That's where she went school.

Q.    Can you explain your rationale behind that encouragement?

A.    I guess my question is is, you know, if I walk through there, I would imagine there are some students there today that want to call it Mountain View.  I wouldn't correct them and say Stonewall Jackson.  If you want to call it Mountain View, call it Mountain View.  If you are attached to Stonewall Jackson High School, call it Stonewall Jackson High School.  That's where you went to school at.  It's -- it's the building.  So, you know, I'm -- do what -- do what makes you feel right.  It doesn't matter to me.  Again, I always called it Stonewall because I have an emotional attachment to Stonewall.

Q.    Did you consider the statements that you heard from the Black students in 2022 and leading up to that vote when you told this teacher to call the school Stonewall?

A.    No, because I wasn't -- no, why would I consider a one-on-one conversation, because she's teacher?

Q.    Because she's a teacher at the school, correct.

A.    You know what, I'm going to suggest that she probably can read the room when she needs to.  So, you know, no, I didn't give it consideration.

Q.    You don't know Ms. Meredith Zirkle well, right?

A.    No.

Q.    So what makes you believe she can read the room?

A.    Because she indicates that she is afraid to call it Stonewall Jackson High School, so I'm assuming that she uses Mountain View unless she knows that she's with someone that isn't going to reprimand her for saying the -- the wrong thing.

Q.    And you understand that she's coming to you in your capacity as a board member to ask you -- to present this issue that she doesn't feel comfortable calling the school Stonewall Jackson High School, is that correct?

A.    Yes.

Q.    And you understand that your reply is also in your capacity as a board member?

A.    I do.

Q.    And you're replying -- giving her permission in your capacity as a board member and also saying:  Tell them that a board member has your back and then ask them to call me, is that correct?

A.    Correct.

Q.    And that's giving her permission to call the school

that she works at a name that Black students have testified to the board it's harmful to them and that the board has voted to not assign to the school, is that correct?

A.    The name was not changed because we had Black students come to us saying that it had been harmful.  We changed it prior to hearing anything about those students.

Q.    Were you a member of the school board when the name was changed?

A.    Are we talking mid 2020 or are we talking mid 2024?

Q.    In 2020.

A.    Because this came in prior to the vote in 2024.

Q.    Right.  This is when the school is named --

A.    Mountain View.

Q.    -- mountain View High School, right?

A.    Right.

Q.    So the name was changed in 2020 to Mountain View High School.  That's what I'm referencing, is that correct?

A.    Correct, correct.  But we didn't change -- the name of the school was not changed because of -- we had complaints of Black students being harmed by it.  There is no indication in our resolution or anything else.  In fact our resolution for changing it goes back to George Floyd and fighting racism, but we didn't hear from any kids about the name Stonewall Jackson High School being harmful until after we changed - after the name changed.  So I guess it's the -- it's the way you framed

your question that I'm -- that I'm going to struggle to -- to be okay with is that we changed the name because -- because we had students saying it was harmful to them.  We changed the name of -- the name of the school was changed because it was a national movement based on George Floyd.  It was -- there's no evidence to say that there was a student that had been harmed by it.

Q.    Okay.  I can take it in part.  So to clarify, you were not on the school board in 2020 when the name was changed to Mountain View High School, correct?

A.    Correct.

Q.    You also did not attend the school board meeting that took public comment when the name was changed to Mountain View High School, correct?

A.    Correct.

Q.    You did hear testimony from students at and leading up to the 2022 vote on whether or not to change the school names, that they were harmed by the school names, correct?

A.    Correct.

Q.    And irrespective of that, you encouraged a teacher at Stonewall Jackson High School to continue to call the name of the school Stonewall Jackson High School in 2024 when the name was Mountain View High School, correct?

A.    Correct.

(End of video deposition testimony.)

THE COURT:  Hold on one second.

Okay.  I take it that concludes the reading of Ms. Rutz's deposition?

MS. UPTON:  It does, Your Honor.

THE COURT:  Okay.  Something struck me as I listened to it.  Okay?  And, you know, as I said earlier today, and as I told the lawyers -- they've known -- I read all of school board members' deposition over the Thanksgiving holiday week because there was this issue of legislative privilege that had to be addressed.

And in order to really glean the scope of the legislative privilege that was being invoked on behalf of the school board, I wanted to read all the testimony so that I could get a good sense of just exactly what happened.  It's not helpful, generally, just to read bits of depositions, so I read them all.  And then I issued a ruling on -- at ECF 216 on the scope of the legislative privilege and how it affects the evidence in this case, and then we've had some discussion about that since that time and today, including an e-mail I got yesterday afternoon, Sunday afternoon, and specifically focusing on the objections made by each side to Ms. Rutz's testimony.  And you all wanted me to look at it quickly so it can be added in and played here today, and I did that last night.

But I missed something last night, and I caught it

here today, and I want to correct this record.  Okay?  On Page 47 at lines 17 through 20, Ms. Rutz is asked -- and this was on the video -- and Ms. Rutz, are you aware of any other reasons why Stonewall Jackson High School got its name?  Answer, not that I'm aware of, no.

And when I heard that testimony on the video, it jumped out at me that reading this statement, in a vacuum, it is not appropriate because I excluded -- I sustained an objection as to parts of Ms. Rutz's testimony which I thought lacked a foundation in which she said she'd done some research from a newspaper article involving somebody named Rosen back in the '50s as to why the school was named that way.

So for this to sit on this record and for the Court of Appeals to look at it or the Supreme Court, however far this case goes -- maybe it will end with me.  I don't know.  I kind of doubt it.  It says, and Ms. Rutz, are you aware of any other reasons why Stonewall Jackson High School got its name?  No, that I'm not aware of.  That -- that's kind of misleading just sitting there by itself.  I think the record needs to be complete.

So because that portion has been designated, I think, for context reasons, even though I don't believe there's foundation for Ms. Rutz's testimony as to where she thinks the name Stonewall Jackson High School came from in 1959, I think to leave the record as it is, given the objections I sustained

this morning and given this testimony on Line -- at Page 4, Lines 17 through 20, is misleading. So I am going to reverse myself -- I get to do that, too. Okay? And I'm going to overrule the objections to certain other lines of Ms. Rutz's testimony where she talks about why she thinks the school was named Stonewall Jackson in 1959, and I'm going to read those now, and I'm going to admit that to complete the record.

So what that means, Counsel, is I am overruling all of your objections on both sides to the deposition designations. Okay? I'm just going to read these lines into the record now to complete the record because I just -- it just jumped all over me as I sat here and listened to this evidence that maybe that one question and answer on Page 47 was misleading. I'm going to read this, I'm going to consider this evidence. I'm the finder of fact. I'll consider it for what it's worth, and I'm just going to -- I'm going to read into the record now to complete the record.

MS. UPTON: Your Honor, may we be heard on this?

THE COURT: Sure. You can be heard on this.

MS. UPTON: Plaintiffs would like to propose that a more appropriate resolution to the issue that Your Honor has raised would in fact simply be to strike the portion of the testimony that you raised a concern with. Although, as you note, it was just one comment in isolation, and in isolation, it was not objected to, and so we did not ask Your Honor to

remove it.  We would argue that it's more appropriate that that actually be struck consistent with your other rulings on the related testimony.

THE COURT:  Well, that's a different way to do it.

Let's hear from the defendants.

You know, I read all of this.  I read every line of it.  I've already read it and, you know, I often wonder, when I have a jury trial and I tell the jury to disregard that bit of evidence, whether they're going to do it.  Well, I can do it. I can parse it.  I can disregard it.  Okay?  I have no problem with simply saying, for the sake of the record, that I'm striking Page 47, Lines 17 through 20, consistent with my prior rulings.  I can do that.

Let's hear from the defense.

MR. FITZGERALD:  Your Honor, obviously, we'd rather have Ms. Rutz's statement in there, but we agree that striking that small excerpt would solve the problem.

THE COURT:  Yeah, okay.  Then I will -- thank you for that, Mr. Fitzgerald.

This is what I'm going to do.  Rather than put in evidence what that I don't think has any foundation -- maybe the defendants will put in some evidence as to that later.  I don't know.  But I think a more appropriate thing to do is simply to state that the Court is not going to consider Page 47, Lines 17 through 20, because it is taken out of

context.  Okay?  And so I'm just not going to consider that.

Okay.  That deals with that.  Thank you all for helping me with that.

So Mr. Fitzgerald, yes, sir.  What can I hear from you, sir?

MR. FITZGERALD:  Just one more note while we're --

THE COURT:  Yeah.  Sure.

MR. FITZGERALD:  -- that the record's complete here. I'm confident this was totally unintentional on plaintiffs' counsel's part, but the video was missing one of our designations, and that was on Page 217, Line 12 through 218, Line 11.  That is very important context --

THE COURT:  Hold on one second.  Let me just pull that up, if you would.

MR. FITZGERALD:  Sure.

THE COURT:  You said 217?

MR. FITZGERALD:  217, Line 12 through 218, Line 11.

THE COURT:  217, Line 12.  Well, for whatever -- 218, Line 11?  For whatever reason, it's not highlighted on my -- on the transcript that I got yesterday.

MR. FITZGERALD:  Yes, Your Honor, and it's not on ours, either.  However, in our chart where we were going back and forth with plaintiffs' counsel, they agreed to include that excerpt.

THE COURT:  Okay.

Let's hear from the plaintiffs.

MS. UPTON:  Your Honor, it does appear that that was an oversight on our part.  Perhaps we could pull that clip up to play?

THE COURT:  Perhaps we could what?

MS. UPTON:  I think we can pull it up to play now.

THE COURT:  Oh, great.

MS. UPTON:  If that would be okay.

MR. FITZGERALD:  And can we play it with the context of what came before it, because I think it's important to see the full context.

THE COURT:  Let me ask you this.  Okay?  At Page 216, there's a break.  Okay?  Look at the transcript.  Page 216, there's a break.  Should you start there?

And how far do you want to read, Mr. Fitzgerald?

MS. UPTON:  Yes, Your Honor.  Not to speak for Mr. Fitzgerald, but yes, starting where you suggested is -- makes sense, and we would propose to concluded at the end of defendant's designation, which is Page 218, Line 11.

MR. FITZGERALD:  Agreed, Your Honor.

THE COURT:  Okay.  So what we'll do then is we'll go back and let's fix the -- let's fix the one you give to the Court for the purposes of the record.  So we're going to read, now -- play Page 216, Line 18 through --

MR. FITZGERALD:  218, Line 11.

THE COURT:  218, Line 11.  Yes, absolutely, I'll do that.  Thank you.

MR. FITZGERALD:  Thank you, Your Honor.

THE COURT:  Thank you for noting that.

So let's go ahead and do that if we can.  If not, I'll just have it read into the record.

(Excerpts from a video deposition were played in open court.  The text that follows was taken directly from the certified transcript of the deposition as taken and have not been altered in any way by this reporter.)

Q.    Ms. Rutz, on Friday, May 10th, 2024, Mr. Jorgensen, emailed saying:  I am shocked at the stupidity of the school board and its decision to change the names of the schools in the southern part of the county back to racist confederate names.  Do you see that?

A.    I do.

Q.    He continues:  As of this day, I will do nothing to support the schools of Shenandoah County and will encourage my county commissioner to reduce school funding.  Do you see that?

A.    I do.

Q.    At the top of the page you replied:  Good morning. Please encourage the reduction of the spending especially to those minorities which reside on.  Do you see that?

A.    I do.

Q.    Can you explain what you mean by reduce funding

especially to those minorities?

A.    Yeah.  Actually, I was being facetious here.  I'm not sure where Mr. Jorgensen lives.  But we had several folks say, you know, we're not supporting the -- the school.  We're not supporting anymore money going to the school because of the names.  And, you know, it's counterproductive to say, hey, we're not -- we don't want to send any more money to the -- to the southern campus or anywhere else because the school board changed the names back.  You know, you're telling me that you're in support of minorities and yet your first response is to take funds them for their education.  So, yeah, this was -- this was me being facetious because it doesn't -- it doesn't make sense to me to tell people to, you know, reduce -- reduce spending because of the name of the school because we didn't -- it doesn't agree with you, so, you know, let's not give any students any more money for their education, so...

(End of video deposition testimony.)

THE COURT:  Okay.  All right.  I think that -- does that conclude the reading of Ms. Rutz's deposition from the plaintiffs?

MS. UPTON:  It does, Your Honor.

THE COURT:  From the defense?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Everybody satisfied with it the way it's come in?  I want to say, from a technology standpoint, well

done.  Man, I couldn't have done that.  Really -- really well done that we were able to read that and play that.  Appreciate you all.

Okay.  Anything else we need to do for the good of the -- of this litigation tonight?  Anything else from the plaintiffs?  Defense?

Okay.  Tomorrow morning we're going to start with plaintiff's next expert.  Correct?  Is that right?

MS. REED:  Yes, Your Honor.  Tomorrow we'll start with Dr. Amy Bass.

THE COURT:  Yes.

MS. REED:  Final witness.

THE COURT:  And that's your final witness?

THE CLERK:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Great.

If anything comes up overnight, you know how to reach me.  We'll stand in recess.

(Proceedings concluded for the day at 6:21 P.M.)

CERTIFICATE

I, Whitney M. Stier, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Whitney M. Stier                    Date:  1/2/2026