UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

HARRISONBURG DIVISION


```
* * * * * * * * * * * * * *
VIRGINIA STATE NAACP          * CIVIL ACTION 5:24-CV-40
                              * DECEMBER 17, 2025   8:58 A.M.
            Plaintiff,     * BENCH TRIAL
                              * VOLUME V OF V
vs.                           * REDACTED
                              *
SHENANDOAH COUNTY             * Before:
                              * HONORABLE MICHAEL F. URBANSKI
            Defendant.     * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiff:        KAITLIN BANNER, ESQUIRE
                          Washington Lawyers' Committee for
                          Civil Rights and Urban Affairs
                          700 14th Street, NW, Suite 400
                          Washington, D.C. 20005



For the Defendant:        JIM H. GUYNN, JR., ESQUIRE
                          Guynn & Waddell, PC
                          415 S. College Avenue
                          Salem, VA 24153


Court Reporter:           Whitney M. Stier, CVR-CM-RVRM/CCR-VA/MO
                          116 North Main, Room 314
                          Harrisonburg, Virginia 22802
                          (540)434-3181, Ext. 8510



Proceedings recorded by voice stenography.  Transcript produced
by computer.

APPEARANCES CON'T:

For the Plaintiff :      KEVIN B. COLLINS, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         JASON C. RAOFIELD, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         LI REED, ESQUIRE
                         COVINGTON & BURLING, LLP
                         800 10th Street
                         Washington, D.C. 20001

                         MARJA PLATER, ESQUIRE
                         Washington Lawyers' Committee for
                         Civil Rights and Urban Affairs
                         700 14th Street, NW, Suite 400
                         Washington, D.C. 20005

                         SAMUEL J. GREELY, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         LAUREN T. SMITH, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         MELISSA COLON, ESQUIRE
                         Washington Lawyers' Committee for
                         CivilRights and Urban Affairs
                         700 14th Street, NW, Suite 400
                         Washington, D.C. 20005

                         ELIZABETH UPTON, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         AMBER LOWERY, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 10th Street
                         Washington, D.C. 20001

APPEARANCES CON'T:


For the Plaintiff :      STEPHANIE U. NNADI, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         RYAN C. DOWNER, ESQUIRE
                         Washington Lawyers' Committee for
                         Civil Rights and Urban Affairs
                         700 14th Street, NW, Suite 400

                         ASHLEY J. CHAVOUS, ESQUIRE
                         COVINGTON & BURLING, LLP
                         800 10th Street
                         Washington, D.C. 20001

                         ALYSSA GREENSTEIN, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001

                         ANALESE M. BRIDGES, ESQUIRE
                         COVINGTON & BURLING, LLP
                         850 Tenth Street
                         Washington, D.C. 20001


For the Defendant :      JOHN R. FITZGERALD, ESQUIRE
                         Guynn & Waddell, PC
                         415 S. College Avenue
                         Salem, VA 24153

                         CHRISTOPHER S. DADAK, ESQUIRE
                         Guynn & Waddell, PC
                         415 S. College Avenue
                         Salem, VA 24153

* * * * * * * * *

INDEX


WITNESSES ON BEHALF OF THE DEFENDANT:

WITNESS NAME                                                    PAGE

MICHAEL DORMAN

     Direct Examination By Mr. Guynn . . . . . . . . . . . . . 17

     Cross-Examination By Ms. Plater . . . . . . . . . . . . . 49

     Redirect Examination By Mr. Guynn . . . . . . . . . . . . 82

GLORIA CARLINEO

     Direct Examination By Mr. Fitzgerald  . . . . . . . . . . 87

     Cross-Examination By Ms. Banner . . . . . . . . . . . . .159

     Redirect Examination By Mr. Fitzgerald  . . . . . . . . .202

     Recross-Examination By Ms. Banner . . . . . . . . . . . .210


* * * * * * * * *

INDEX OF EXHIBITS

For the Plaintiffs:

| Exhibit No. | Marked | Received |
|---|---|---|
| No. 41 | 86 | 86 |
| No. 44 | 9 | 9 |
| No. 45 | 9 | 9 |
| No. 61 | 9 | 9 |
| No. 62 | 74 | 80 |
| No. 69 | 9 | 9 |

                        INDEX OF EXHIBITS CONT.

For the Plaintiffs:

| **Exhibit No.** | **Marked** | **Received** |
|---|---|---|
| No. 70  | 9  | 9  |
| No. 71  | 86 | 86 |
| No. 73  | 86 | 86 |
| No. 78  | 9  | 9  |
| No. 95  | 53 | 55 |
| No. 99  | 86 | 86 |
| No. 100 | 55 | 56 |
| No. 102 | 56 | 57 |
| No. 105 | 86 | 86 |
| No. 106 | 9  | 9  |
| No. 107 | 9  | 9  |
| No. 158 | 9  | 9  |
| No. 160 | 9  | 9  |
| No. 167 | 86 | 86 |
| No. 178 | 86 | 86 |
| No. 181 | 9  | 9  |
| No. 182 | 86 | 86 |
| No. 195 | 9  | 9  |
| No. 203 | 86 | 86 |
| No. 206 | 9  | 9  |
| No. 212 | 86 | 86 |
| No. 217 | 9  | 9  |

INDEX OF EXHIBITS CONT.

For the Plaintiffs:

| Exhibit No. | Marked | Received |
|-------------|--------|----------|
| No. 218 | 9 | 9 |
| No. 233 | 86 | 86 |
| No. 236 | 86 | 86 |
| No. 240 | 9 | 9 |
| No. 241 | 86 | 86 |
| No. 242 | 86 | 86 |
| No. 246 | 86 | 86 |
| No. 253A | 11 | 12 |
| No. 330 | 86 | 86 |
| No. 331 | 9 | 9 |
| No. 333 | 9 | 9 |
| No. 335 | 9 | 9 |
| No. 337 | 9 | 9 |
| No. 338A | 10 | |
| No. 338B | 10 | |
| No. 339A | 10 | |
| No. 339B | 10 | |
| No. 340 | 162 | 201 |

INDEX OF EXHIBITS

For the Defendant:

| **Exhibit No.** | **Marked** | **Received** |
|---|---|---|
| No. 18 | 14 | |
| No. 18, Pages 6171-6175 | | 15 |
| No. 19 | 124 | |
| No. 21 | 145 | 148 |

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

(Proceedings commenced at 8:58 A.M.)

THE COURT:  Good morning.

Anything we need to take up in terms of housekeeping matters before we hear some more evidence?

Anything from the plaintiffs?

MS. REED:  Yes, Your Honor.

THE COURT:  Ms. Reed, good morning.

MS. REED:  Good morning, Your Honor.

First, plaintiffs would like to enter into the record a list of exhibits to which defendant has not objected.

THE COURT:  Okay.

Is that all right with you, Mr. Guynn or Mr. Fitzgerald?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Okay.

MS. REED:  My colleague, Lauren Smith, will read the exhibit numbers into the record.

THE COURT:  Ms. Smith, is that right?

MS. SMITH:  Yes, sir.

THE COURT:  Good morning.

MS. SMITH:  Good morning.

Plaintiffs are entering Exhibit 44, Plaintiffs' Exhibit 45, Plaintiffs' Exhibit 61, Plaintiffs' Exhibit 69, Plaintiffs' Exhibit 70, Plaintiffs' Exhibit 78, Plaintiffs' Exhibit 106, Plaintiffs' Exhibit 107, Plaintiffs' Exhibit 158,

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Plaintiffs' Exhibit 160, Plaintiffs' Exhibit 181, Plaintiffs' Exhibit 195, Plaintiffs' Exhibit 206, Plaintiffs' Exhibit 217, Plaintiffs' Exhibit 218, Plaintiffs' Exhibit 240, Plaintiffs' Exhibit 331, Plaintiffs' Exhibit 333, Plaintiffs' Exhibit 335, and finally, Plaintiffs' Exhibit 337.

(Plaintiffs's Exhibit Nos. 44, 45, 61, 69, 70, 78, 106, 107, 158, 160, 181, 195, 206, 217, 218, 240, 331, 333, 335, and 337 were marked for identification.)

THE COURT:  Thank you, Ms. Smith.

Mr. Fitzgerald, I'll ask you -- Mr. Guynn, you can answer if you want to -- any objection to that?

MR. FITZGERALD:  No, Your Honor.

THE COURT:  Thank you.  Those will be admitted.

(Plaintiffs' Exhibit Nos. 44, 45, 61, 69, 70, 78, 106, 107, 158, 160, 181, 195, 206, 217, 218, 240, 331, 333, 335, and 337 were admitted.)

MS. REED:  Thank you, Your Honor.

Additionally, the parties played deposition designations for both Brandi Rutz and Mike Scheibe in Court. As discussed, we will submit the highlighted transcripts, as well as a corresponding cover sheet and the chart showing the designations of each party.  We want to read those exhibit numbers into the record now as well.

THE COURT:  Okay.  All right.

MS. REED:  So Exhibit 338A is the deposition

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

transcript from Mike Scheibe.

Exhibit 338B is the deposition designation video of Mike Scheibe.

Exhibit 339A is the deposition transcript for Brandi Rutz.

And Exhibit 339B is the deposition designation video for Brandi Rutz.

(Plaintiffs' Exhibit Nos. 338A, 338B, 339A, and 339B were marked for identification.)

MS. REED:  Additionally, Your Honor, the parties previously docketed the transcript for Melody Sheppard.  Would Your Honor like the parties to docket the transcripts for these two deponents as well?

THE COURT:  Please.

MS. REED:  Yes, Your Honor.

THE COURT:  Okay.

Any objection to that, Mr. Fitzgerald?

MR. FITZGERALD:  Your Honor, we haven't had the time to look through those designations just yet.  However, with plaintiffs' counsel's representation that they have not changed since our last agreed version, we do not object.

THE COURT:  Okay.  Well, there's no hurry here, right?  Okay.  You all take your time, whatever, agree on -- make sure those pages are right and then just submit them. Okay?  You can docket them after you have a chance to review

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

them to make sure we get this right.

MR. FITZGERALD:  Yes, Your Honor, thank you.

THE COURT:  Okay.  I have no problem with that.  We can leave the record open for that purpose.

MS. REED:  Thank you, Your Honor.

Plaintiffs' submitted to the court Exhibit B of expert witness Dr. Aidaha Spinks-Franklin as Plaintiffs' Exhibit 253, and we became aware that there's an error on that document.  It's missing one source.  The correct document has been sent to defendant -- was sent at the time.  And we would just like to make a correction.  So we would like to enter Plaintiffs' Exhibit 253A, which is the same document, Exhibit B of Dr. Spinks-Franklin's report, adding the one source that was missing from the previous version.

(Plaintiffs' Exhibit No. 253A was marked for identification.)

THE COURT:  What's the position of the defendant?

MR. FITZGERALD:  No objection to that, Your Honor.

THE COURT:  Okay.  I mean, she was here to testify that was her list of sources.  Did she mention that source during her testimony?

MS. REED:  She did, Your Honor.

THE COURT:  She did?

MS. REED:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Well, without

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

objection, I have -- normally that wouldn't be appropriate, but without -- since she mentioned it during her testimony and there's an objection, I'll permit it.

(Plaintiffs's Exhibit No. 253A was admitted.)

MS. REED:  Thank you, Your Honor.

Lastly, there's a list of Defendant's Exhibits --

THE COURT:  Do you know what source that was?

MS. REED:  That was D.D.'s deposition transcript.

THE COURT:  Okay.  D.D.'s deposition transcript?

MS. REED:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  It wasn't like another bit of literature for me to pour through?

MS. REED:  No, Your Honor.

THE COURT:  No?  Okay.  Good.

MS. REED:  Lastly, defendant entered a list of exhibits yesterday, and we would just like to inform the Court for the record the corresponding Plaintiffs' Exhibit numbers for those documents.

THE COURT:  Okay.  That would be fine.

MS. REED:  Okay.  And once again, I'm going to ask my colleague, Lauren Smith, to read those exhibits in.

THE COURT:  All right.

Ms. Smith?

MS. SMITH:  Yes, Your Honor.  The cross-references are as follows.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Defense Exhibit 5 corresponds to Plaintiffs' Exhibit 19.

Defense Exhibit 6 corresponds to Plaintiffs' Exhibit 18.

Defense Exhibit 7 corresponds to Plaintiffs' Exhibit 72.

Defense Exhibit 8 corresponds to Plaintiffs' Exhibit 10.

Defense Exhibit 10 corresponds to Plaintiffs' Exhibit 20.

Defense Exhibit 11 corresponds to Plaintiffs' Exhibit 17.

Defense Exhibit 12 corresponds to Plaintiffs' Exhibit 1.

Defense Exhibit 13 corresponds to Plaintiffs' Exhibit 2.

Defense Exhibit 14 corresponds to Plaintiffs' Exhibit 3.

And finally, Defense Exhibit 15 corresponds to Plaintiffs' Exhibit 294.

THE COURT:  Okay.

Any objection to that cross-referencing being noted for the record, Mr. Fitzgerald?

MR. FITZGERALD:  No, Your Honor.

THE COURT:  Thank you.  I appreciate that.  That may

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

help me as I sort through this evidence.

MS. REED:  Thank you, Your Honor.  Nothing further from plaintiffs.

THE COURT:  Thank you, Ms. Reed.

How about from the defense side?  Any housekeeping matters we need to take up?

MR. FITZGERALD:  Yes, Your Honor.

I would just like to confirm that the five pages submitted to the Court and plaintiffs' counsel, that plaintiffs' counsel approved admission of yesterday, was indeed entered as Exhibit 18, Defense Exhibit 18.

(Defendant's Exhibit No. 18 was marked for identification.)

MR. RAOFIELD:  We have no objection to that, Your Honor.  That's the one we entered by agreement.

THE COURT:  DX 18?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Does the Clerk have that?

THE CLERK:  I do.  I have the whole exhibit.  You're talking about certain pages though?

MR. FITZGERALD:  Yes.  SCSB 006171 through --

THE COURT:  I'm sorry.  Could you give me those numbers again, Mr. Fitzgerald?  I'm sorry.  SCSB?

MR. FITZGERALD:  006171 through 006175.

THE COURT:  Okay.  So those Bates numbered pages will

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

be Defendant's Exhibit 18, and that's admitted.  Is this the

ones that were admitted instead of Defendant's Exhibit 2?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Okay.  Got it.  Okay.  Thank you.  And

that's admitted by agreement.

(Defendant's Exhibit No. 18, Pages 6171-6175 was

admitted.)

MR. FITZGERALD:  Defendant also will seek to admit an

Exhibit 19 today.  We understand that there is an objection to

that exhibit.

THE COURT:  Okay.  We'll take it up when it comes in.

MR. FITZGERALD:  Thank you, Your Honor.

THE COURT:  All right.  Two points of housekeeping

for me, if you all would permit me to do this.

One, before everybody leaves Harrisonburg and gets on

the road back to where you're going, let's make sure that each

side takes the time to confirm with the Clerk to make -- and

before I leave.  Okay?  Before we close this record, make sure

that all your exhibits are in.  Okay?  Let's just double check

with the Clerk on each side and make sure the numbers that you

want in the record are actually admitted.  In other words, as a

double check.  Let's just make sure we do that before we all

hit the road and the record of this bench trial gets closed.

That's the first thing.  It's always a good idea in any trial

to do that during breaks and recess, but let's just do that

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

here because there's been so many exhibits.

Secondly, when we're done with the evidence today, I've been thinking about an issue and I have a question I'm going to pose to you, and it may -- it may relate to an issue as to whether I can take judicial notice of a fact.  So we'll do that at the end.  Okay?  And I'll be happy to hear your -- I don't know the answer to the question and I don't know what I would be taking judicial notice of, but I am interested in hearing what you all have to say about that.  So that's a little surprise for the end.  Don't let me forget.  Okay?  Don't let me forget, because I might forget, but I have it written it down, but I might -- you know, we get into the middle of this and sometimes I leave things out.  But there is an issue that I'm thinking about and I want to ask -- I just want to ask you all about it before the record's closed.

Okay.  All right.  If there's nothing else, you all can remain in suspense until then.  I will ask the defense to call your next witness.

MR. GUYNN:  Thank you, Your Honor.  We call Michael Dorman.

THE CLERK:  Sir, can you raise your right hand?

MICHAEL DORMAN, CALLED BY THE DEFENDANT, SWORN

THE WITNESS:  Yes, ma'am.

THE CLERK:  Thank you.  Have a seat right there.

THE COURT:  Good morning, sir.

THE WITNESS:  Good morning.

MR. GUYNN:  Your Honor, sort of as a preview I guess, part of Mr. Dorman's testimony and what I'm going to try to do is move it to the end, will probably include references and names with regards to the plaintiffs, and when I get to that point I will, you know, let the Court know and then I think we would want to clear the courtroom again.  Mr. Dorman and I have talked, and he understands to do his best not to mention any names until we get to that point.

THE COURT:  Yeah.  Names of students or their parents.

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

Thank you for thinking about that, Mr. Guynn.  I appreciate it.

DIRECT EXAMINATION

BY MR. GUYNN:

Q    You're Michael Dorman?

A    Yes, sir.

Q    You go by Mike though, don't you?

A    Mostly Mike, yes.

Q    Mr. Dorman, are you currently employed?

A    No, sir.  I'm retired.

Q    What are you retired from?

A    Shenandoah County Public Schools, administrator,

principal.

Q   Okay.  What school were you the administrator and principal of?

A   Stonewall Jackson High School.

Q   Okay.  How long were you the principle of Stonewall Jackson?

A   Seventeen years.

Q   Okay.  What was the last year that you were the principal?

A   It would have been last year.

Q   The last school year, so the school year that ended in '25?

A   Yes, sir.

        THE COURT:  So you retired after that school year?

        THE WITNESS:  Yes, sir.

        THE COURT:  So what month did you retire?

        THE WITNESS:  May.

        THE COURT:  May of 2025?

        THE WITNESS:  Yes, sir.

        THE COURT:  Okay.  Well, congratulations on your retirement.

        THE WITNESS:  Thank you.

        THE COURT:  I'm working on it.

        THE WITNESS:  I would recommend it.

BY MR. GUYNN:

Q   And did you have a history with Stonewall Jackson prior to

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

becoming the principal?

A     Yes, sir.  I was a student there as well.

Q     Okay.  Is it fair to say that was just several decades ago?

A     Several decades.  And my sons also attended there so I was also a father of students there.

Q     All right.  Let's talk a little bit about the student body at Stonewall Jackson.  My understanding is there are three high schools in Shenandoah County?

A     Yes, sir.

Q     And as far as those high schools are concerned, how would Stonewall Jackson rank with regard to, I don't know, socioeconomic or economic wealth, whatever?

A     I think it would be pretty fair to say we're the least affluent.

Q     Okay.

A     And we probably have a pretty high poverty rate.

Q     Okay.  And do you also have a fairly high free lunch rate?

A     Yes, sir.

Q     Okay.  As a result -- well, scratch that.

      How did that manifest itself in the student body?

A     I don't know.  The kids got along very well, to be honest with you.  I mean, it was just a normal day every day with them to whatever walk of life they came from.  They got along very well.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Q    Okay.  Was the number of students at Stonewall Jackson who were college-bound, did that differ from the other two schools as well?

A    To be honest, we was probably higher if you took it on a percentage basis.

Q    I'm sorry, that came on.  I didn't hear you.

A    It was probably higher of our -- percentage of our kids going to two-year or four-year schools or vocational schools if you use a percentage basis than the other two schools.

Q    All right.  And while you were at Stonewall Jackson both as a student parent and administrator, did you have the opportunity to work with folks in the community who were also graduates of Stonewall Jackson?

A    Constantly.

Q    Okay.  And how would you describe the attitude of the folks who live in that district toward Stonewall Jackson?

A    They may not have the money, but they didn't mind rolling up their sleeves if we needed to get a project done, and we got a lot of projects done at our school and it was just calling dads or moms or whoever had a skill set for the project that needed to get completed, and they would show up on the weekend and I would be there with them and we'd get the job done.

Q    Was the -- was there a sense that -- maybe not even a sense, was there -- that was the case that funding for amenities at Stonewall Jackson was handled differently than the

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

other two schools?

A    At times.  At times.

Q    What sort of projects did the community pitch in and help build at Stonewall Jackson?

A    Well, some dads and I got together and we built a build barbecue pit for our booster club.  We put lights on the auxiliary field for our sports teams and the Little League program in our community, and that was just, you know, finding materials whether it was calling Shentel for the poles, light poles, talking to our summer league baseball team who got a new set of lights.  They gave us their old lights and then just some dads showing up with their electrical trucks on the weekend and just getting it done.

Also building a brand new concession stand for our school and the Little League program that also is there, and it was just, you know, us and pouring concrete with the Triplett Tech kids, which is our vocational school, putting up the block and other folks just pitching in and donating time and materials to get it done.

Q    How would you describe the commitment of the citizens in the school district for Stonewall Jackson to the school?

A    Very committed.  Very bought in.

Q    Okay.  I want to take you to the summer of 2020, in particular, late June, early July.  Do you recall being consulted with regard to changing the name of Stonewall

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Jackson?

A    It would probably be even prior to that if we would back up into May.  I can remember when I had heard -- you know, you'd kind of get rumblings that, you know, something might be going on.  So I had called our superintendent in May because I knew I was going to be at the epicenter if that happened and I wanted to be as prepared as possible of what was going to come to us.  And he said, no, I don't think that's going to happen.  And that would have been in May.  And then by June, that was coming to fruition.

Q    Okay.  Were you told prior to it being placed on the agenda in July that that was when it was going to be considered?

A    Or maybe just a little earlier into June.

Q    Okay.  All right.  Did you attend the meeting where the change was made?

A    No, sir.

Q    What happened -- what impact did it have on you after the name was changed?

A    Well, pretty much most of the logistics to make it happen, you know, the housekeeping stuff, the getting names off the wall and various materials, uniforms ordered all fell on my shoulders.

Q    Did you receive any complaints about the name being changed?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    Yes.

Q    Okay.

A    Numerous.

Q    I'm sorry?

A    Numerous.

Q    And were those -- how were those communications handled?
Were they by phone or by text?

A    All.  Mostly not as text, but mostly e-mail and phone
calls.

Q    And were these people you knew?

A    Oh, of course, yes.

Q    What was the general tenor of those calls?

A    Can you clarify that question a little bit?

Q    Yeah.  Were people calling up and saying we are really
glad this happened?

A    No, not at all.  They were very upset.

Q    What appeared to have made them upset?

A    You know, something they had been a part of for years was
going to change.

Q    Did any of them complain about the lack of notice?

A    Oh, yes.  Oh, yes.

Q    All right.  Now, if I recall correctly, at one time, there
was an emblem or mascot or something for Stonewall Jackson that
was a guy on a horse?

A    Yes, sir.

Q    Okay.  Was that mascot or emblem in place in 2020?

A    I don't believe so.  I don't believe so.

Q    Why not?

A    We were transitioning that emblem out anyway, and that happened way before 2020.  It was probably back in 2015, because it was in the middle of our gym floor.  So, you know, every year, we get our gym floors, you know, refinished or done.  So we had that taken off and we transitioned that from that symbol to an interlocking SJ.

Q    Now, once the name was --

THE COURT:  You said that may have been sometime around when, sir?

THE WITNESS:  Roughly, 2015, 2016, in there.

THE COURT:  Okay.  Thank you.

BY MR. GUYNN:

Q    And was the --  did the -- has the Generals been the nickname of the school for as long as you've known?

A    Since the dawn of -- since its existence, yes.

Q    Okay.  And did that change once the name of this school changed from Stonewall Jackson to Mountain View?

A    No, sir.

Q    Okay.  Why not or why?

A    Well, I think there's a couple reasons.  One was a financial reason.

Q    Were you involved in that decision?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

A    Somewhat, yes.

Q    Tell us about that.

A    Well, part of the plan the superintendent had would be I would comprise committees of students and community members to come up with a new name and what the mascot was going to be. Well, some of the choices the kids came up for the mascot was not -- folks didn't like.  So they said, well, let's just stick with the Generals.  If anything happened here, that seemed to be the one thing that folks on both sides of this coin agreed with for different reasons.  For different reasons.

The Mountain View folks, obviously, that was going to be a much easier fix financially, because a lot of our things had Generals on it, and for the folks that were pro-Stonewall, you know, that was still a piece of them that was still left.

Q    So the opinion sort of coalesced on keeping Generals on both sides?

A    Yeah.  If there was any point in juncture of this whole thing that those two groups compromised on, that was it.

Q    Okay.  All right.  Were there any provisions made for kids who had been at the school for a period of time with regard to diplomas and graduation?

A    Yeah.  And I had to lobby pretty hard for that one.  I would have liked to have seen the diplomas for kids have a choice from ninth or whatever through -- if they started with Stonewall, at least have that choice.  But the most I could get

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

that was the current junior class, that would be the last time they would have a choice of what diploma they got.

So after that, every kid got a Mountain View diploma.  But I did have some kids come to me that would have been a sophomore and under that wanted Stonewall diplomas and I would just tell them, I said, if you want one, you're going to have to get a Mountain View diploma at graduation.  That's what I'm going to give you.  But I'll put your name on a list and if you want a Stonewall diploma, I will also have one printed for you that you can come get after graduation.

Q    Now, are those printed forms or something that you have and then write in the name?  How does that -- how --

A    We order them from Jostens.  Are you familiar with Jostens who does class rings and so forth?

Q    I am.

A    Yes.  And they were very -- they knew, you know, the dynamic and what we were working with, you know, trying to keep the peace a little bit.  And so they were very welcoming to helping me out when I needed those.

Q    They also charged you for it, didn't they?

A    I don't think they did.

Q    Oh, good.

A    I don't think they did.  They're great people to work with.

Q    They have a more of a heart than a lot of commercial

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

establishments.

A    A lot of companies.  No, they were great to work with.

Q    Okay.  So the agreement was that people who were juniors as of the time of the name change had their choice of diploma names?

A    Yes.

Q    And then sophomores and freshmen basically you had it set up --

A    They got a Mountain View diploma when they walked across the stage, but I had a number of kids come to me and ask for Stonewall diplomas.  And not to reiterate what I just said, but they could pick it up after graduation.  I didn't advertise that, and I just let them make that decision via word-of-mouth with the student body.

Q    Approximately how many students came to you for a Stonewall diploma?

A    It was probably at least 50, right at 50.

Q    And how many students -- and how many students were in the class?

A    Roughly around 110.  It varies.  I'm just trying to think. 110, 115.

Q    And this cohort of 50, how -- did they include all different students?

A    Yes, it did.

Q    Did you have -- did you have African-American students ask

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

for Stonewall Jackson diplomas?

A    One, yes.

Q    All right.  Any other minorities who asked for a Stonewall Jackson?

A    Several Latino students.

Q    As time went on from 2020, did you continue to hear complaints about the name?

A    Yes, but it wasn't as pronounced as it was.  But yes, that was constant through the whole time.

Q    Okay.  Are there -- are there a lot of folks in Shenandoah County who -- that you've observed that sort of live and breathe the high school?

A    Of course.  No different than any small town, rural community that that is the center of the community and it's what they have.

Q    And these folks that are -- that you've just described, do you have any reason to consider them racist?

A    No.  No.  Most of them I've known for 40-some years and have worked on a lot of those projects with them.

Q    Now, going forward to 2022, do you recall that there was another vote with regard to the name?

A    Uh-huh.

Q    Yes?

A    Another school board vote?

Q    Yes.

A    Yes.

Q    I'm sorry.  I thought you said huh-uh, and I was --

A    No, sir, I'm sorry.

Q    She can't --

A    I've got a heavy accent sometimes, so.

Q    Okay.  All right.  Did the number of calls that you received ramp-up during that period?

A    Oh, astronomically.

Q    Okay.  And what was the tenor of those calls?

A    Very contentious.  Very contentions.  Ugly.  Some even borderline threatening.

Q    And were those from -- were those from supporters of one name or the other?

A    Yes.

Q    And were they from local folks?

A    Some local, some not.  A lot of e-mails that I got came in overnight because it was daily -- I almost hated to open my e-mail each day -- were out of county and other folks, you know, around the nation.

Q    So it had made news, I guess, in '22?

A    Yes, it did.

Q    All right.  And do you recall the result of that vote in '22?

A    To change the name back to Stonewall.

Q    Yes.  And that was the tie vote?  Do you recall that one?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    I do not.  I do not.

Q    Okay.  So then '24, there was another effort?

A    Yes.

Q    And that may have been the effort you were just talking about.

A    It was.  It was.  I'm sorry.

Q    So you were receiving communications, let's say, from people on both sides?

A    Uh-huh.

Q    And when you say they were contentious, were they threatening?

A    Some borderline, yes.  Yes.  Very ugly.

Q    Did the threatening e-mails come from one side or the other?

A    It depend -- both.  Both.

        THE COURT:  Folks felt strongly about this on both sides.  Is that fair to say, Mr. Dorman?

        THE WITNESS:  Yes, sir.

        THE COURT:  Okay.  Thank you for that.

BY MR. GUYNN:

Q    It was May of 2024 the school board voted to change the name back to Stonewall Jackson?

A    Yes, sir.

Q    All right.  And at that point, you were just getting ready to start your last year at the high school?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A      Yes, sir.

Q      Did you have any thought about not retiring?

A      No, not a bit.

Q      And if you did, that took care of it?

A      That plan was in place years ago.

Q      So what happened after the vote?  Did you keep getting calls and --

A      Yeah, for a while.  And then they started to subside a little bit.

Q      Okay.  And I take it that the names had to be changed on the building, inside, and the like?

A      Yes.  And the plan was to have it done by the time school would open.  So already having gone through this once, I thought holy moly.  How is this going to get done in that short of period of time?  It did, but, yes, that was the goal, that this be done by the time school started in August.

Q      And was it done as an expense to the school board?

A      Not to my knowledge, no.

Q      Okay.  How was it done?

A      Private citizens.

Q      And what role did you have with the private citizens?

A      Just overseeing, making sure the facilities were taken care of and things were done right, and just, you know, being that kind -- and if I had an issue with how something was done I would say, no, I need this done like this.  But just making

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

sure the facilities was taken care of.

Q    Okay.  So you didn't have anything to do with deciding who the contractors were.  Correct?

A    Nothing.

Q    But you worked with them once they got there?

A    Yes.

Q    Now, we'll come back to summer when the school's out in a minute.  Let's go forward to school being back in.

A    Okay.

Q    Was there any conflict among your student body over the name having been changed again in 2024?

A    Not really.  I mean, the kids handled it better than the adults, if you want to know the God's honest truth.  I was proud of my kids and how they, you know, could stay focused at school with all the stuff going around and, you know, the ugliness and just -- you know, just what they were hearing in the news and all that.  But predominantly it stayed out of school.  I think I've only -- I only had two incidences about, you know, where a kid made a comment that I had to address or a staff member made a comment I had to address.

Q    Tell me about the kid making the comment.  Was that a racial conflict?

A    No, not at all.

Q    Okay.

A    It was between two White students, and the kid basically

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

just went by and said, hey, so and so, who was pro-Mountain View, what do you think about the name now changing back? And that was it. And then that parent reached out to me and said, my kid's being harassed. So I followed up with that student and I said, I don't want to hear any more of that. And I have good relationship and rapport with my kids. And he said, yes, sir, I won't do that.

Q    And so did you hear any more of it?

A    No.

Q    Okay. Have you had -- you said you had a good relationship with your kids. Have you -- have any of the African-American kids at the school come to you and expressed their feelings on the name change and how they feel about it?

A    No, other than the only one I can remember is a young lady that wanted a Stonewall diploma, and she came up to me, you know, just in the hall like I asked the others to do and just asked I put their name on a list. But nobody came and complained.

Q    Okay. And did you -- it sounds like you're pretty involved with all these children. Were you aware of any slip in academic performance among any students after the name change?

A    No. Our kids excel. We've gotten an exemplary or distinguished award about every year. I'm pretty proud of our kids because most of them come from very blue-collar means and

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

are definitely first-generationers to go to college.  As an educator, that warms your heart when you see your kids, you know, excelling and, you know, the mantra if you put the work in, you're going to get the reward, and they see that.

Q    I think the school just got another award this year, didn't it?

A    Yes, sir.

Q    Okay.  What was that?

A    A distinguished rating from the state.

Q    What's a distinguished rating?

A    There's a lot of different variables.  Your academic rigor, how your subgroups perform, because you don't just look at the student body.  You break it down into different subgroups and how those children perform.  How they perform on predictor tests.  And it's a lot -- it's a huge formula.  But anyway, we have mechanisms in place, especially with our dual-enrollment program, that, you know, we had probably -- we've had double-digits kids get an associate's degree before I gave them a high school diploma.  And that is factored into that, and you get points for that.  So that really helped us.

Q    And when you say subgroups, how are the subgroups divided?

A    You break it out and, you know, you kind of tease out the data between, you know, your special needs kids, your minority kids, your economically disadvantaged kids, and you also look at how they perform in comparison to the group as a whole.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Q    So in order to get this distinguished rating, do all the subgroups have to perform well?

A    Yeah.  I mean, within reason or you're going to get dinged in points.  Now, some may not perform as well, but there's other categories that, you know, you can get points for as well.  But you're not going to get -- if you have a subgroup that is not doing very well at all, you're not going to get a distinguished rating.

Q    And is that a -- so the minority subgroup, is it broken down beyond just minority?  Is it broken down to Latino, African-American --

A    Yes, sir.

Q    -- and the like?

A    Yes, sir.

Q    How have your African-American students performed through all of this name change?

A    They've done pretty well, but, you know, we have so few.  You have to have at least 15 kids in that testing session for that to count.  Some years we do, some years we didn't.

Q    Okay.

        THE COURT:  I'm sorry.  When you said -- I'm sorry, Mr. Dorman.  When you said some years we did, and some years we didn't --

        THE WITNESS:  Yes, sir.

        THE COURT:  -- what were you referring to?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE WITNESS:  For that data to get factored into your score, you have to at least have an end number -- it used to be 30 kids -- in order for that data to count.  And if you didn't, you had too few students, so that data didn't count toward your rating.

THE COURT:  Okay.  And how does that -- Mr. Guynn was asking you about the minority -- the African-American minority subgroup, how does that minimum number of data points, okay, or students compare to the African-American population at your high school?

THE WITNESS:  Like I said, some years we would have enough for that minority group, like 15 kids you would need to have that testing session to count, and some years we would not.

THE COURT:  Okay.  So some years you would have 15 or more African-American students, and some years you would not?

THE WITNESS:  Right.

THE COURT:  Now, is that in each grade or is that across the --

THE WITNESS:  Across.

THE COURT:  Across the whole school?

THE WITNESS:  It would be across, yes.

THE COURT:  Okay.  Can I ask you another question? During the years we're talking about, let's just go 2020-2024. Okay?  During those years, how many -- how many grades were at

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

the high school?

THE WITNESS:  At one point, we were eight through 12, and I think two years ago, or maybe three now, the eighth-graders went back to the middle school.

THE COURT:  Okay.  So during that period, part of it was eighth through 12 --

THE WITNESS:  Yes, sir.

THE COURT:  -- and then part of it was nine through 12?

THE WITNESS:  Yes, sir.

THE COURT:  And either in those five grades -- eight, nine, ten, 11, 12 or nine, ten, 11, 12, during those years, sometimes you had less than 15 African-American students at the high school?

THE WITNESS:  Potentially, but there were times that I know that we would have less than 15 testing, but, you know, like, for an example --

THE COURT:  I'm just trying to get an idea of the numbers in terms of the African-American student population at the high school.

THE WITNESS:  Okay.  I'm just probably, maybe three to five percent.

THE COURT:  Okay.

THE WITNESS:  Just to clarify it.

THE COURT:  Okay.  Thank you, sir.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Sorry, Mr. Guynn.  Go ahead.

MR. GUYNN:  I think we have that numbers as one of the stipulations.

THE COURT:  There's a stipulation as to that, I just thought I would ask him.  Sorry.

BY MR. GUYNN:

Q    How is the athletics program at the high school?  Do you win a lot of state championships?

A    No, sir, we don't.  We're a small school and usually have to compete against much bigger schools.

Q    And which group between, say, boys and girls, have had more success over the last couple of years?

A    Our girls program, by far, have been better -- the better athletes over the years than our boys program.

Q    When the school name was changed in 2020 to Mountain View then it was changed back in 2024, where did the -- for lack of a better term, where did the stuff come from to put the new names and all that up?

A    Which time?  2020 or 2024?

Q    Both.  First in 2020.

A    In 2020, that was totally done by the school board office. I would procure estimates and invoices about whatever needed to be changed and whatever, and submit those to the school board office, and then I don't know where it went from there.  I wasn't privy to that information.

39

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

2024, I would get the invoice -- or I didn't even have to get the invoice because it would be done and the Coalition took care of that. I didn't have to deal with any of that.

Q   Did the name that went back up in 2024, was that the same as it was in 2019?

A   I mean it was Stonewall, but I believe it was, because I kept a lot of the stuff, just as I kept the Mountain View stuff that's still out in the barn, in case something happens again so. But yes.

Q   So basically just put back up the stuff that you had before?

A   That we could. Some of it was so old that just trying to get down the first time, it got destroyed or it was messed up. So some new stuff needed to be got.

THE COURT: Mr. Guynn, let me ask a question.

You just used the -- you just said -- I mean, it was Stonewall. Okay? A couple of other times, you've referred to -- during your testimony as the high school as being Stonewall. Is that how you referred to the high school, as Stonewall?

THE WITNESS: Yeah. Most of the kids do and, you know, for years that's just locally the term that's gotten used.

THE COURT: So the high school is just referred to as Stonewall?

THE WITNESS:  Most of the time for short, yes. Somebody would say, hey, where are you going?  I go to Stonewall.

THE COURT:  Okay.  Thank you for that.

MR. GUYNN:  Your Honor, I think we're at a point where some of the answers to the questions might be identifiable or -- if that's the right term -- identifying of the plaintiffs.

THE COURT:  Okay.  Thank you, Mr. Guynn.

Let me ask the folks who are not counsel or in this case or a party representative in this case, because the next bit of testimony might identify some of the individual students that the Court has ruled are allowed to proceed by pseudonym, we're going to clear the courtroom for this bit of the testimony.  As I have previously said, once the transcript is prepared, and the lawyers and the Court have an opportunity to review it, all the testimony will be docketed, but we'll just redact the names so that the public has a -- consistent with its First Amendment and common law right, will have a fulsome opportunity to review all the testimony should they want to do that.  So I'd ask you all to briefly leave at this time.  Thank you.

(The courtroom was cleared of all spectators.)

THE COURT:  Thank you, Mr. Guynn.

MR. GUYNN:  Thank you, Your Honor.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

BY MR. GUYNN:

Q    Just to make sure I understood, Mr. Dorman, when we were talking about the threatening and the complaining phone calls that you would get about the name changes, did they seem to come predominantly from one side or the other?

A    The more threatening, you know, types of, you know, those kind of calls or e-mails came from the folks that were pro-Mountain View.  The Stonewall folks, when that was changed it was more of just frustration and kind of that and, you know, just mad and needed somewhere to vent.

The threatening stuff was more so probably from people that were outside our community.  Not that it wasn't as frustrating for the Mountain View folks, because it was and it would flip-flop back and forth.  Believe me, I got my share of phone calls and folks that needed to vent from that side as well.

Q    Did it ever get serious enough for you to alert law enforcement?

A    Yes, sir.  One time.  Just it was more -- I wasn't afraid for my life for anything like that.  It was more so the guy just sounded, like, extremely crazy with some of the stuff that he was saying.  And I recorded it on my phone and I shared that with law enforcement, and they followed up.

Q    Was that the one you sent me?

A    Yes, sir.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Q    Okay.  Because I was going to say if it's crazier than that.

A    Oh, there were a few.  Not quite, but there were a few on par.  Trust me.

Q    All right.  So let's look at the summer of 2024.  The name has been changed back to Stonewall Jackson and you described that there were contractors that private citizens were putting up to do some work there.

A    Yes.

Q    When were they doing the work?

A    During the summer hours, during work hours.  Sometimes, depending on what needed to be done and who was doing it, because some of them were dads that also worked, that they would come in on the weekends and do it.

Q    And were there students in the building at the time?

A    Rarely.  Sometimes, towards the end, we were starting with our offseason work -- our preseason workouts, but that would have been the only time.  It wouldn't have been like school was in session.  Maybe some kids using the weight room or something like that.

Q    Did you ever get a complaint from a family about a daughter who was at the school in the gym --

A    Yes, sir.

Q    -- who reported -- you've got to wait until I finish, or she'll --

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    I know.  She's going to get me.

Q    Yeah.  I'm told court reporters have ways of evening this up, so I want make sure we don't get on that list.  Not this time of year.  But anyway.

So was there an incident where parents complained that they felt that their child is in danger from a contractor?

A    Yes, sir.

Q    Okay.  Tell us about that.

A    Well, I had gotten a call from our superintendent and -- can I use names?

Q    Yes.

A    Okay.  And she said, Mike, I want you to know ▇▇▇▇▇ just called me and was very mad and rude, and he's on his way down to see you.  And I was like, okay.  ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ I mean, I knew him pretty well.

But he came down and he was pretty upset and said his daughter was not safe here.  And I'm like, ▇▇▇, what's going on?  And he's like, Mike, she's just not safe.  I said, well, how is she not safe?  I can't help you if you don't tell me.  And then he made mention -- I'm just going to tell you it's not safe, but it has to do with one of your contractors.  And the only other contractor that was in the building was with

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Jonathan Heishman.

So his daughter was out on the field -- and this was outside -- and saw, I guess, Jonathan and his crew working on putting some of the signage backup and things in the new gym area.  So she called her dad, and then that's what prompted the call to Ms. Sheppard, Dr. Sheppard, and then that's when she called me and he came down and started talking.

He wasn't very happy with me, either.  And I'm like, I can't help you, ████, if you don't tell me, you know, what's going on.  And that's when he said the contractor.  I said, what has he done?  Because I wasn't aware of anything.  I know both those gentlemen, get along with both those gentlemen, have worked with both of them for years.  And he said, you know, I fear, you know, about Jonathan Heishman.  He still wouldn't tell me.

And I said, okay, well, I said, you know, ████ was just working out ████████████, they were kind of done with the off-season workout and it was not uncommon for them just go down into the new gym and shoot around ████████████. ████████████████████████████ So they'd just go down and shoot a round with a couple other kids.

Q    Now, is that common among players?

A    Here and there.  Here and there.  I mean, it's not like all the kids do that, no.  No.  But, you know, a couple kids, ████ and another girl were down there just, you know,

shooting foul shots, doing what kids do.  And long story short, I was like, well, ███, if that's the issue, I said, I'll just, you know, we'll move them down to our auxiliary gym.  Which is not, you know, uncommon to do when we have other construction folks in the building.  If we need to move kids to another area, we just do that so they can use that facility.  And he wasn't very happy with me at that point.

He told me, if I can remember correctly, it was just -- this is segregation all over again because you're not letting my daughter use the new gym.  And I'm like, ███, I'm trying to come up with a compromise here.  And he just started -- he would snicker at me.  And I finally had had enough at that point and was like, ███, if you're just going to laugh at me and snicker every time I try to come up with a solution or a compromise, I said, then we're just going to have to end the meeting.  I said, I just can't.

So that toned it down a little bit, and then I told him I would go down and see Mr. Heishman, Jonathan, and then I would get his schedule and I would try to get with the coaches to make sure their off-season workouts were not going to coincide with when Jonathan did work.  So I did that and I went down and said, Jonathan, I'm sorry.  I'm going to need you to stop work or just tell me when your people are going to be here, so that I can coordinate some things.  And he goes, why, what's wrong?

And I said, well, I'm not going to lie.  There's a

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

complaint that, you know, a student doesn't feel safe around you or your -- you know, your workers.  And he said, Mike, I'm going to tell -- I said, I have no idea what it was about.  Nobody would elaborate with me.  And he said, I have an issue with ████████ outside of school.  We have some legal things going on and I feel like this is more of a personal thing between me and him than it has anything to do with, you know, me doing the work here at school.

Q    Did -- did you also meet with the player's mother?

A    Yes.  She was -- ████ brought his wife, ████, yes.

Q    So it was both of them there talking to you?

A    Yep.

Q    How did you finally resolve it?

A    I said, ████, I promise you I will do everything I can, you know, to make sure that your daughter is safe.  You feel she is not safe.  But I needed a little more information, but it has to do with Jonathan.  I can, you know, separate schedules and so forth to make sure they are not around each other.

Q    So did she go stay in the main gym?  Did she go to the auxiliary gym?

A    I went down at that point because I wanted to make sure, you know, that they were separated at that point because, you know, things were heated.  And ████████████████, I said, hey, can you, just for today, until I can get this

schedule thing resolved and get it taken care of, just take ████ and it was another young lady that were shooting ball, down to the auxiliary gym, and then I'll take care it from there.  And he was like, no problem, Mike.

Q    Have you heard anything else from the parents about that incident?

A    No, sir.

MR. GUYNN:  That's all I have, Your Honor.

THE COURT:  Okay.

I don't want to interrupt the flow of how you plan to cross-examine this witness, but since the folks are already excluded, it might be helpful if you asked any questions that might refer to the names of the students involved now before I bring the folks back in.  But if that's going to interrupt the flow of your cross, we can do it another way.

MS. PLATER:  Good morning, Your Honor.  Marja Plater for the plaintiffs.  Can we have a brief recess before we begin cross-examination?

THE COURT:  Okay.  I'm sorry.  Your name is Plater?

MS. PLATER:  Yes, sir.  P-L-A-T-E-R.

THE COURT:  I was going to write it down.  Okay.  You want a brief recess?

MS. PLATER:  Sure.  Just a couple of minutes.

THE COURT:  Okay.  Should we bring the folks in, or are you going to talk about that issue?  What are you going

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

to -- I'm just trying to decide what to do with the public that we've sent out.

MS. PLATER: Sure. Let's keep them out. And I can inform the Court as soon as we return.

THE COURT: Let's take about a five-minute recess. Okay?

Oh, wait a minute. While we are in recess, Mr. Dorman, you can't discuss -- since we're in the middle of your testimony, you can't discuss your testimony with anyone, including counsel for the school system. Okay?

THE WITNESS: Yes, sir. So do I go back there and sit or do I sit here?

THE COURT: You can -- you can sit here. You can -- you can sit wherever you want. I just don't want you talking to anybody about your testimony. Thank you, sir.

We'll stand in recess for five minutes.

(A recess was taken from 9:58 until 10:08)

THE COURT: Okay. Ms. Plater, how would you like to proceed?

MS. PLATER: Yes, Your Honor. We can proceed with an open courtroom at this point.

THE COURT: Okay. Thank you Ms. Plater.

Mr. Marshal, let's bring any folks who are out there in the hallway back into the courtroom if they want to rejoin us. Thank you.

(Spectators were readmitted into the courtroom.)

THE COURT:  Okay.  Any cross-examination?

MS. PLATER:  Yes, Your Honor.

THE COURT:  Please proceed.

MS. PLATER:  Thank you.

CROSS-EXAMINATION

BY MS. PLATER:

Q    Good morning, Mr. Dorman.

A    Good morning.

Q    So Stonewall Jackson was opened in 1959 as a school for all White students.  Isn't that correct?

A    I believe so.

Q    And you understand that that was actually five years after *Brown v. Board of Education* was decided.  Isn't that true?

A    I believe so.

Q    And your understand that *Brown v. Board of Education* held that schools should be desegregated.  Isn't that right?

A    Yes, ma'am.

Q    Are you aware that Shenandoah County Public schools were segregated until 1963?

A    I knew they were segregated.  I didn't know the year.

Q    And are you also aware that if a Black student wanted to attend and get a high school education at that time, that prior to 1963, they had to actually go to school outside of Shenandoah County?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

A     Yes, ma'am.

Q     And you understand that the name Stonewall Jackson was selected for the school during the period of Massive Resistance.  Isn't that true?

A     Yes.

Q     And you understand that Massive Resistance was an effort to prevent desegregation in Virginia and --

A     I'm not sure why the name was selected, if that was.  I don't know enough of history, but the timeline lines up with what you're saying.

Q     But you understand Massive Resistance was related to preventing desegregation.  Correct?

A     Yes.

        MS. PLATER:  If I could bring up Plaintiffs' Exhibit 94 at this time, please.

BY MS. PLATER:

Q     I'm showing you what's been marked as Plaintiffs' Exhibit 94.  It's been previously entered into evidence.

    Are you aware that during construction of Stonewall Jackson, the Confederate flag was actually flown?

A     Yes.  I saw that exact picture as well.

Q     And you're aware that the Confederate flag has been used on the cover of Stonewall Jackson yearbooks historically.  Correct?

A     Historically, yes, I have seen that.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Q    Okay.

MS. PLATER:  We can take this exhibit down, and now turn to Plaintiffs' Exhibit 95.

BY MS. PLATER:

Q    I'm showing you what's been marked as Plaintiffs' Exhibit 95.  It was stipulated to this morning.  Do you see that this is a yearbook cover from 1963?

A    Yes, ma'am.

Q    And on this yearbook cover, you see that we have Stonewall Jackson on a horse?

A    Yes, ma'am.

Q    And you see he's carrying a Confederate flag?

A    Yes, ma'am.

Q    And you see the cover says Jacksonian Heritage, if we zoom out a bit?

A    Yeah, I got it.

Q    Okay.

MS. PLATER:  Now, if we could take this down and moved to Plaintiffs' Exhibit 100.  This was also stipulated to this morning.

BY MS. PLATER:

Q    Do you see that this is a yearbook cover from 1967 here?

A    Yes, ma'am.

Q    And this also depicts Stonewall Jackson on a horse with the Confederate flag.  Isn't that true?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A     Yes, ma'am.

Q     You also see Jacksonian Heritage marked on this cover here?

A     Yes, ma'am.

Q     And, you know, as the principal of Stonewall Jackson High School, you understand that Stonewall Jackson fought to preserve slavery historically.  Isn't that true?

A     I don't think that was the sole reason, no.

Q     Okay.

          MS. PLATER:  We can take this exhibit down.  Now moving to Plaintiffs' Exhibit 102.  This exhibit was also stipulated to this morning.

BY MS. PLATER:

Q     Do you see that this is a yearbook cover for Stonewall Jackson from 1983.  Isn't that true?

A     Yes, ma'am.

Q     And, again, here we have Stonewall Jackson depicted on a horse carrying the Confederate flag.  Isn't that true?

A     Yes, ma'am.

Q     And there's also Jacksonian Heritage printed on this cover as well, too?

A     Yes, ma'am.

          THE COURT:  The Clerk has advised me that 95, 100, and 102 that you've just asked the witness about, were not stipulated to this morning.  Were they previously stipulated?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

MS. PLATER:  No, Your Honor.  We thought it was this morning on the list that was --

THE COURT:  They were not read this morning, according to my notes.

MS. PLATER:  Your Honor, the witness has identified the exhibits.  I would like to move all three of these in now.

THE COURT:  That would be 95, 100, and 102?

MS. PLATER:  Yes, Your Honor.

THE COURT:  Okay.  Any objection?

MR. RAOFIELD:  Yes, Your Honor.  I don't think he identified them.  I think he was told that they were admitted and told what they were.  He never said I know these or I've seen them.

THE COURT:  I'll sustain the objection.

Let's -- if you want to go back, Ms. Plater, and have him identify these, please, you may do so.

MS. PLATER:  Thank you, Your Honor.  If we could return to Plaintiffs' Exhibit 95.

(Plaintiffs' Exhibit No. 95 was marked for identification.)

BY MS. PLATER:

Q    Mr. Dorman, is this a yearbook from 1963?

A    I don't know specifically the year, but it looks like a Stonewall yearbook.

Q    And do you see where it says 1963 on the cover of this?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    I do.  I just don't know that that's -- we have a library full of the yearbooks from, you know, '60 to then.  So I don't know that I've laid eyes on this specific yearbook.  But if that's what it says, then yes.

Q    And it is a yearbook from Stonewall Jackson High School.  Correct?

A    It looks to be.  Yes, ma'am.

THE COURT:  What year did you graduate?

THE WITNESS:  '89.

THE COURT:  1989?  Okay.  When you graduated, do you remember what was on the cover of your yearbook?

THE WITNESS:  I don't.  That's a long time ago, Your Honor.

THE COURT:  All right.  I'm sorry.  I don't mean to interrupt.  Thank you.

Go ahead.

THE WITNESS:  Maybe there was a reason I needed to retire.  Right?  Memory.

THE COURT:  Not that long ago.

MS. PLATER:  Your Honor, at this time I would like to move Exhibit 95 into evidence.

MR. GUYNN:  I mean, technically, he's basically just said if it is what it says it is then --

THE COURT:  Yeah.  I'm going to -- I'm going to allow the admission of the Exhibit 95 as identified by the witness.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

I'm going to allow its admission for what it's worth.  The 1963 yearbook cover.

(Plaintiffs' Exhibit No. 95 was admitted.)

THE COURT:  Go ahead.

MR. GUYNN:  Can I say by standing up, I'm just objecting to the rest of the yearbooks on the same basis at this point?

THE COURT:  Certainly, and I'm going to overrule all those objections.  I'm going to allow these yearbook covers in.  Okay.  Thank you.

MS. PLATER:  If we could return to Plaintiffs' Exhibit 100.

(Plaintiffs' Exhibit No. 100 was marked for identification.)

BY MS. PLATER:

Q   And Mr. Dorman, is this a yearbook cover from 1967?

A   It seems to be, yes, ma'am.

Q   And is this a yearbook from Stonewall Jackson High School?

A   I would say yes.  I don't know, again, like the others, if I've specifically seen this yearbook, but it does follow suit.

THE COURT:  Do you know whether in recent times -- let's just say before 2020.  Okay?

THE WITNESS:  Okay.

THE COURT:  Before 2020, before the name was changed to Mountain View.  Okay?  Do you remember what was on the cover

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

of the yearbook at that time?

THE WITNESS:  I don't, I'm sorry.

THE COURT:  Okay.  Do you know whether it bore the same --

THE WITNESS:  I don't think it had the same theme, no.

THE COURT:  The same symbol with Stonewall Jackson on a horse with the Confederate battle flag?

THE WITNESS:  I don't believe so.  I think it was more of student candid shots, if my memory serves me correctly. But it's been a while.

THE COURT:  On the cover?

THE WITNESS:  On the covers, yes.

THE COURT:  Okay.  Well, thank you, sir.

Keep going.  I'm sorry to interrupt, Ms. Plater.

MS. PLATER:  No worries, Your Honor.

I would like to, at this time, move to admit Plaintiffs' Exhibit 100.

THE COURT:  Yeah.  100 is admitted.  He sufficiently identified it.

(Plaintiffs' Exhibit No. 100 was admitted.)

MS. PLATER:  And now, if we can return to Plaintiffs' Exhibit 102.

(Plaintiffs' Exhibit No. 102 was marked for identification.)

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

BY MS. PLATER:

Q    And Mr. Dorman, is this a yearbook from 1883?

A    It what seems to be, yes, ma'am.

Q    And this is a yearbook from Stonewall Jackson High School?

A    Yes, ma'am, it seems to be.

MS. PLATER:  At this time, I would like to move for the admission of Plaintiffs' Exhibit 102.

THE COURT:  Yes.  Overrule Mr. Guynn's objection and I'll admit 102.

(Plaintiffs' Exhibit No. 102 was admitted.)

MS. PLATER:  Thank you.

BY MS. PLATER:

Q    Now, Mr. Dorman, you testified earlier that you attended Stonewall Jackson High School?

A    Yes, ma'am.

Q    And you also mentioned that you graduated from high school in 1989 from Stonewall Jackson High School?

A    Yes, ma'am.

Q    And you also mentioned that the Confederate flag was on the gym floor at one point.  Is that correct?

A    Yeah.  That would have been, probably, like I said 2015, in that range.

THE COURT:  So until then, what was on the gym floor until, I think you said, 2015-2016?

THE WITNESS:  It would have been a symbol similar to

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

what was on --

THE COURT:  The yearbook covers?

THE WITNESS:  Yes.

THE COURT:  With a figure on a horse?

THE WITNESS:  A figure on a horse.

THE COURT:  With the Confederate battle flag?

THE WITNESS:  With a flag.  I don't know if you could say it was a Confederate, but it was a pseudo -- I mean, it was enough that you knew what -- you could see what it represented, yes.

THE COURT:  Okay.

BY MS. PLATER:

Q    Didn't the Confederate flag also hang in the gym for about 20 years?

A    I believe it did, but that was way beyond my time there.

Q    Eventually, that Confederate flag was removed.  Right?

A    Yes, ma'am.

Q    And like you testified earlier, eventually the emblem on the floor was removed?

A    Yes.  We took it off also.  Yes, ma'am.

Q    And you understand that the Confederate flag was removed from the gym because it was offensive to Black students and families.  Isn't that true?

A    I believe that's what the -- I knew the principal -- the gentleman that was the principal then, and I think that's

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

exactly why.  I would have probably been in my early twenties,
so.

Q    Do you have any idea how long Black families and students
were asking for that flag to be removed from the school?

A    No.  I was in my early twenties in college and it was,
kind of, removed from the school setting at that point.

Q    And going back to the emblem on the gym floor that you
mentioned.

A    Yes, ma'am.

Q    It eventually being removed in 2015, was it?

A    Roughly.  Roughly.

Q    Why was it removed then?

A    I just didn't like -- and I could say, kind of, what that
symbol -- because other groups use that, hate groups use that
flag as a symbol, and we're going to move away from that and go
to the interlocking SJ.

Q    Thank you.

     So earlier today, you mentioned that you've been a
principal -- or you were the principal at Stonewall Jackson
High School for roughly 20 years.  Right?

A    Seventeen.

Q    And you retired just this past school year from --

A    Yes, ma'am.

Q    -- being the principal.  And you were the final
decision-making authority as the principal during your tenure

at Stonewall Jackson High School.  Right?

MR. GUYNN:  I'm going to object, Your Honor.

THE WITNESS:  No.  No, ma'am.

THE COURT:  I'm sorry.

Mr. Guynn, could I have the basis for your objection, sir?

MR. GUYNN:  It's a legal term.  She's asking him the definition of the final decision-maker, and that's a legal term.  He's not here as a legal expert.

MS. PLATER:  Your Honor, if I may respond?

THE COURT:  Yes, ma'am, Ms. Plater.  I'm happy to hear from you.

MS. PLATER:  Your Honor, I'm not asking or calling for a legal conclusion.  I'm merely asking for a definition of his role as a principal.  He was the principal.  He would have been the one to make any final administrative decisions on behalf of the school, and I'm just getting that into the record.

THE COURT:  Okay.  Well, I'm going to sustain the objection and I'm going to -- I think there are other ways you can ask the question to determine -- to determine the scope of his authority as principal.  Thank you.  Sustain the objection.

Please proceed.

MS. PLATER:  I'm not sure if the witness answered that question.  May I --

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE COURT:  Well, I sustained the objection.  So you need to ask a different question.

MS. PLATER:  Sure.

THE COURT:  Let me ask you this question.  When you said you didn't like what that symbol --

THE WITNESS:  The flag would represent what the different hate groups use that --

THE COURT:  What the flag represented because hate groups used that flag?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Tell me what about that symbol that you didn't like.

THE WITNESS:  That you would have your hate groups, Nazis and folks, that would use that flag and fly that, you know, and that wasn't us.

THE COURT:  Okay.  And in terms of the decision when that floor got refinished and that symbol got removed.  Okay?  Who made that decision?

THE WITNESS:  When I had the thought and I wanted to move to that, of course, I knew there would probably be some backlash, and I just called up and I talked to superintendent.  I said -- just because that's where complaints would go.  And I said, hey, this is what I'm thinking about doing.  I want to move us from this symbol to the interlocking SJ, and I said, you have any objections?  And they said, no.  So that's the

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

final authority, is our school board and our superintendent.

Now, I do have some, you know, latitude, but as an experienced administrator, I know when I need to call upstairs and ask versus just making a decision.

THE COURT:  Okay.  So in 2015 or 2016 when that happened, do you know whether there was any school board vote on this?

THE WITNESS:  No, sir.

THE COURT:  It was just something that you and the superintendent decided?

THE WITNESS:  I gave the superintendent a heads up. Do you have any reservations about this?  And there were none.

THE COURT:  Okay.  And that superintendent at that time was Mark Johnston?

THE WITNESS:  I think it might have been Keith Roland.

THE COURT:  So that was before Mark Johnston?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Thank you, sir.

All right.  Please proceed.

MS. PLATER:  Thank you, Your Honor.

BY MS. PLATER:

Q    Prior -- prior to removing the emblem in 2015, many of Stonewall Jackson's items had the school's logo of a soldier on a horse at least until 2020.  Is that correct?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    Some did and, you know, obviously, as I've said before, you know, we weren't very affluent and things cost money.  So as money and uniforms and those kinds of things run on cycles, like you don't get a new uniform every year.  So as new uniforms were, you know, being bought, we would transition to things, transition that out and go to the interlocking SJ.

Q    And sometimes the soldier on the horse also had a Confederate flag.  Is that true?

A    Yeah, I think we established that.

        MS. PLATER:  If I could now turn to Plaintiffs' Exhibit 107.

        THE WITNESS:  Yes.

BY MS. PLATER:

Q    Mr. Dorman, is this a Stonewall Jackson High school commencement pamphlet?

A    Yes, ma'am, it is.

Q    And this commencement pamphlet is from May 2020.  Is that correct?

A    Yes, ma'am.

Q    And is it fair to say that there's a depiction of Stonewall Jackson High School with the Confederate general on a horse carrying a Confederate flag on this?

A    Yes, ma'am.

Q    And you've seen this before.  Right?

A    Yes, I have.  I remember this well.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

MS. PLATER:  Okay.  Your Honor, I'd like to move this into evidence at this time.

THE COURT:  107 is already in by agreement.  It was read in this morning, so 107 is in evidence.

MS. PLATER:  Now I would like to turn to Plaintiffs' Exhibit 106.

BY MS. PLATER:

Q    And Mr. Dorman, is this the cover of the commencement pamphlet in May 2025?

A    Yes, ma'am.  An African-American on our Gov Council designed that.

Q    Okay.  And it's fair to say that this depicts a general on a horse?

A    Yes, ma'am.  She's very artistic and so the Gov Council asked her to come up with what they wanted to put on there and that's what the young lady did.

Q    Okay.  Thank you.

MS. PLATER:  At this time -- I believe this has already been moved into evidence, Exhibit 106.

THE COURT:  106 is in.

MS. PLATER:  Thank you.

THE COURT:  And when you say Gov -- Gov Council, what are you referring to?

THE WITNESS:  We get a group of our seniors together, of senior leadership, and they kind of make decisions for the

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

class, like senior trip, where they want to go.  What they're

senior T-shirt, what those things are going to look like.  And

that was the emblem that young lady designed for, like, their

senior T-shirt and what would be on the cover.

THE COURT:  Is it like an advisory council?

THE WITNESS:  Yeah.  That's a great way to put it.

THE COURT:  To who?

THE WITNESS:  To the guidance department and then if

it's larger issues, you know, I would sit in on those meetings

as well.

THE COURT:  To the principal.  Okay.  All right.

Thank you.

MR. GUYNN:  Your Honor, if I could, because I am

facing the court reporter.

Mr. Dorman, you've got to wait until they finish or

she's just going to pop a gasket here, and we're all going to

pay for it.

THE WITNESS:  I can't see her face, so thank you for

telling me that.  I'll try to be more conscious.

THE COURT:  Please wait until they finish.  Thank

you.

MR. GUYNN:  Thank you, Mr. Guynn.

BY MS. PLATER:

Q   So Mr. Dorman, now turning to the time around the 2020

name change, you already testified that the school board

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

removed the name Stonewall Jackson from the school in 2020.
Isn't that right?

A      Yes.

Q      And this was done as a part of a school board meeting in
July of 2020.  Isn't that true?

A      I think so.  I wasn't really privy to much information.

Q      Did you attend that meeting in July of 2020?

A      No, ma'am.

Q      Are you aware that Black students and families spoke out
against the name Stonewall Jackson and how it made them feel
unwelcome and they were harmed by that name?

A      I saw some of the minutes of the meeting, yes.

        THE COURT:  All right.  Can I ask you a question?

        THE WITNESS:  Yes, sir.

        THE COURT:  Counsel used the word attend, and I just
want to make sure we are clear about this.  July of 2020, we're
just a few months into COVID.  Right?  And that meeting was
done virtually.  It was not in a room.  It was done over the
Internet because of the pandemic.  Right?  You remember those
days?

        THE WITNESS:  I certainly do.

        THE COURT:  And did you -- obviously, you were not in
a room where the school board met, but did you participate in
that virtual meeting over the Internet?

        THE WITNESS:  No.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE COURT:  The school board meeting --

THE WITNESS:  At times I might have logged back on because they record them just to see portions of it, but no.

THE COURT:  When it was ongoing live, you were not online looking at it?

THE WITNESS:  No.  Maybe a little here or there, but I didn't -- if I needed to, I would go back at a later date and watch the meeting.

THE COURT:  Okay.  Thank you.

BY MS. PLATER:

Q    And you also mentioned being aware of a subsequent vote in 2022 about returning to the name Stonewall Jackson?

A    Yes, ma'am.

Q    And you're aware that that vote was a three-three tie vote.  Is that true?

A    Yes, ma'am.

Q    Did you attend that meeting in 2022?

A    No, ma'am.

MS. PLATER:  If I could now turn to Plaintiffs' Exhibit 1 and direct your attention to stipulation 31.  And these have already been admitted.

BY MS. PLATER:

Q    This is a statement from School Board Member Marty Helsley where he's quoting a letter from a woman where he mentioned no one will ever want to bring a family member here or come to

work in our education system.  Lots of people feel this way, but don't want to say it because of how the people acted the last time.  The people that want to keep the names of Ashby-Lee and Stonewall Jackson were very threatening to the people that did not want to change back.

Do you see that here?

A    I do.

Q    And did you attend the school board meeting in May of 2024 where there was another vote to restore Stonewall Jackson?

A    No, ma'am.

Q    And are you aware that Black families at that time testified that they did not want the names to be restored?

A    Yes.

Q    And are you aware that Black students and families testified that the school name was discriminatory and caused them harm at that time?

A    Yes.  Yes.

THE COURT:  Was it your practice, sort of generally, just not to go to school board meetings?

THE WITNESS:  It was.  I got beat up so bad during the day and dealt with some of this stuff.  I knew as soon as I walked into one of those meetings, it was just going to be a continuation.

THE COURT:  So it was just your practice over the years you were principal, you just didn't go to school board

meetings?

THE WITNESS:  Unless the superintendent needed me to go there for some certain reason or the school board requested my presence.

THE COURT:  Thank you.

MS. PLATER:  And now if we could turn to Plaintiffs' Exhibit 245.

BY MS. PLATER:

Q    So I'm showing you what's been marked as Plaintiffs' Exhibit 245, and is this a student handbook from 2023-2024?

A    Yes, ma'am.

Q    And this says Mountain View High School on it.  Correct?

A    Yes, ma'am.

MS. PLATER:  And if we could turn to I believe it is Page 6.

BY MS. PLATER:

Q    If we scroll down to the bottom, is that an emblem of Stonewall Jackson carrying a sword?

A    Yes, ma'am.

Q    In Confederate general uniform?

A    I'm not sure about the uniform.  I guess it would be.  I don't know that for fact.  I mean, I'm not super well-versed on history of Confederate uniforms, so.

Q    And -- but this student handbook was in place while the school was named Mountain View High School.  Isn't that

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

correct?

A    I believe so, ma'am.

        MS. PLATER:  I believe I need to move this into evidence at this time, Your Honor.

        THE COURT:  245?

        MS. PLATER:  Okay.  Thank you, Your Honor.  Sorry for that.

        THE COURT:  245 is in?

        MS. PLATER:  245 is already in.

        THE COURT:  All right.

        MS. PLATER:  Thank you.  Sorry for that.

        THE COURT:  I remember we talked about it with another witness, I just can't remember which one.

BY MS. PLATER:

Q    You mentioned that you were responsible for implementing the name changes once the name was retired in 2020.  Isn't that true?

A    Yes, that --

Q    And you also were responsible for implementing the name changes at Stonewall Jackson once the name was restored in 2024.  Is that true?

A    Oversee it, not responsible.  My role in doing that was minimal compared to what I had to do in 2020.  I was responsible for all the ordering and all that stuff to get it, you know, changed to Mountain View, but not so much in 2024.  A

private group took care of that.

Q    And you mentioned a private group, I believe you said it was the Coalition?

A    Yes.

Q    Is that the Coalition For Better Schools?

A    Yes, ma'am.

Q    And is it fair to say you were responsible for communicating with the Coalition for Better Schools about the work that was needed to be done to restore the names at Stonewall Jackson?

A    Yes.  Me and the athletic director, yes, ma'am.

Q    And is it fair to say that Mike Scheibe was the representative from the Coalition for Better Schools --

A    Yes, ma'am.

Q    -- that you had to communicate with?

A    I'm sorry, I cut you off again.  He was one of them.

Q    And Mike Scheibe and the Coalition for Better Schools handled all of the costs associated with restoring the names. Isn't that true?

A    Yes, ma'am.  That's where the invoices went.

Q    And you allowed Mike Scheibe and the various contractors to have access to the school premises to complete the work. Isn't that true?

A    Yes, ma'am.  I would schedule that with them.

Q    And does Shenandoah County Public schools have any

requirements for vetting school volunteers when students will be present at the school?

A    They do.  They do.  Contractors are vetted, and a lot of the contractors we use were people that also worked in our booster club, so I did know them.

Q    Were you aware that Mr. Scheibe has a criminal record?

A    I am now.

MR. GUYNN:  Your Honor, I'm going to object to at this point.  There's no evidence.  There's no foundation to this question.  There's no evidence in the record that he's been convicted.  We're basically -- it's rumor and innuendo and it's -- there's just no basis for the question.  It's inappropriate.

THE COURT:  Well, we heard lots of evidence about it yesterday without objection, and I think the witness may be asked whether there was any vetting of Mr. Scheibe before he was allowed on the premises consistent with school board policy as to his background and what this witness knows about Mr. Scheibe's background based on that vetting.  So I'll sustain a part and overrule in part the objection.

You may rephrase your question.

MR. GUYNN:  But to suggest something, as well kind of makes a witness.  I think we're on the same page.

THE COURT:  I sustain that aspect.

MR. GUYNN:  Okay.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE COURT:  I sustain that aspect of your objection. Counsel may inquire from the witness what the witness knows about this.  Thank you, Mr. Guynn.

Ms. Plater, please proceed.

BY MS. PLATER:

Q    Was Mr. Scheibe ever present on Stonewall Jackson's campus while students were present?

A    Not while he was not in the company of somebody else, a school member.  Now, he was there after hours by himself.

THE COURT:  You know, you said you knew these contractors were vetted.  Did you do any vetting of Mr. Scheibe?

THE WITNESS:  No, sir.

THE COURT:  Okay.  Do you know whether anyone else from the school system did any vetting of Mr. Scheibe?

THE WITNESS:  Typically our maintenance department would do the vetting for the contractors because it is not typical for a principal to do the contractor vetting.

THE COURT:  Do you know whether or not anyone on behalf of the school system, before Mr. Scheibe was let on the school there by himself, did any vetting of Mr. Scheibe in 2024?

THE WITNESS:  Not to my knowledge, no.

THE COURT:  Okay.  All right.  And do you know -- do you have any personal knowledge of any facts with regard to

Mr. Scheibe's background?

THE WITNESS:  Nothing that I didn't get from the news.

THE COURT:  Okay.  Thank you, sir.

Please go ahead.

BY MS. PLATER:

Q    So Mr. Dorman, you're not testifying today that as a principal of Stonewall Jackson that you are aware of every experience a Black student had involving racism.  Right?

A    No, I'm not aware.  I can't -- you know, I wish I had that kind of ability, but I don't, ma'am.

Q    And you would agree that there are things that happen at the high school that for any number of reasons students may not report to you or your staff.  Right?

A    Yes, ma'am.

MS. PLATER:  At this time, I'd like to turn to Plaintiffs' Exhibit 62.

(Plaintiffs' Exhibit No. 62 was marked for identification.)

BY MS. PLATER:

Q    I'm showing you what's been marked as Plaintiffs' Exhibit 62.  This is an e-mail from July of 2022.  Do you see this e-mail?

A    I'm trying, ma'am.  Thank you.

Q    And this is an e-mail from superintendent Mark Johnston to

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

the Sheriff's Department.

A    Okay.

Q    And do you see where there's a report that some Stonewall Jackson High School students --

MR. GUYNN:  I will object, Your Honor.  We haven't agreed to this one.

THE COURT:  Well, I understand that there was an objection as to this and I understand that you haven't agreed to it.  What's the nature of your objection, sir?

MR. GUYNN:  That it's a hearsay document.  There's nobody here or even expected to be called about the document.

THE COURT:  Well, let's -- I assume the witness is going to be asked if he knows anything about this particular incident and to see if there can be any foundation laid for it. It's obviously a hearsay document.  It's not being offered for the truth of the matter asserted, but this witness may have some facts about it.  So I'm going to -- it is also a document sent from the superintendent of the school system, so it would be a party admission anyway.  But let's just see if he has any knowledge of it.

BY MS. PLATER:

Q    Mr. Dorman, do you remember --

THE COURT:  It's a party admission under the hearsay rule.

MR. GUYNN:  He shouldn't be shown the document before

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

he knows -- before he says he has any knowledge of it.

THE COURT:  I'll allow counsel to proceed.

Please proceed.

He can be shown this document and be asked if he knows anything about it.  Happens every day.

BY MS. PLATER:

Q    Mr. Dorman, are you aware of this incident?

A    I do vaguely remember it, ma'am.  I do remember something about it.  I don't know a lot of the details to it, but does ring a bell, and since you showed it to me that's what kind of jogged my memory.

THE COURT:  What do you remember about it?

THE WITNESS:  There were so many instances, I'm going to be honest with you, about things that happened on both sides of this.  A lot of things run together.  But I do remember Mark asking me if I knew or had any information about this.

THE COURT:  Mark being the superintendent of the schools?

THE WITNESS:  Yes, sir.  Dr. Johnston.

THE COURT:  Okay.  What did you find out?

THE WITNESS:  I don't remember.  I don't know if I did find out anything.  It was over on the bridge.  It wasn't around the school, so I don't --

THE COURT:  It was on the Route 11 interstate bridge?

THE WITNESS:  I believe so, I mean --

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

THE COURT:  It says Route 11 interstate bridge here. I don't know whether there's one or two.  Do you know whether there was more than one?

THE WITNESS:  One, I think.  If it's the one I'm thinking, it's just one bridge, one lane each way.

THE COURT:  Does Route 11 go over the interstate up in Shenandoah County?  Is that the bridge there that he's talking -- because he says Route 11 --

THE WITNESS:  Route 11, the one I'm thinking is if it would be -- would be the one coming into school off Caverns Road.

THE COURT:  Of what road?

THE WITNESS:  Caverns Road.  It's the road that comes into Stonewall, and 81 runs under it and there's a bridge there.  So I'm thinking that might be what it alludes to, but I don't know.

THE COURT:  Okay.  All right.  81 runs under the -- you said it was called Caverns Road?

THE WITNESS:  Yes.

THE COURT:  Okay.  All right.

Sorry to interrupt the examination, Counsel.  You may ask Mr. Dorman anything you want about what he knows about this incident.

MS. PLATER:  Thank you, Your Honor.

BY MS. PLATER:

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Q    And Mr. Dorman, you see where it says some Stonewall Jackson High School students have been out along the roadways, Route 11, I-81 bridges, waving Confederate flags to protest the retiring of the school names.  Is that correct?

A    Yes.

Q    You see that in the e-mail?

A    I do, ma'am?

MS. PLATER:  At this time, Your Honor, I would like to move this into evidence.

THE COURT:  Do you remember the superintendent sending -- sending -- well, did this e-mail go to you?

MR. GUYNN:  No.

THE COURT:  It doesn't look like it went to you.  Do you have any recollection this e-mail?

THE WITNESS:  I think he may have called me to ask me if I knew anything.  It does -- I do remember something, but I just can't remember the details.

THE COURT:  Okay.  So you remember, generally, that the superintendent called you about a complaint that students were waving a Confederate flag over the interstate.  Right?

THE WITNESS:  Yes.  And this would have been one of I couldn't tell you how many of these phone calls or e-mails I got from the superintendent about a complaint that he wanted more information about.

THE COURT:  Okay.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE WITNESS:  It was a tremendous amount at that time.

THE COURT:  Now, were there other complaints that the superintendent may have called you about or wanted more information about concerning the students protesting by using the Confederate flag?

THE WITNESS:  No.  But if something happened within the school and, you know, once -- it's kind of like the situation where one gets a certain story.  Somebody else tells the story, it's different.  Somebody else tells the story, it's different.  I was constantly getting those phone calls to clarify things for him.

THE COURT:  Okay.  And that was related to a wide variety of subjects?

THE WITNESS:  All kinds of things.

THE COURT:  Right.  Okay.  Do you remember -- obviously, you remember this incident where the superintendent was concerned about the protest using the Confederate battle flag.  Do you recall other similar episodes around this time?

THE WITNESS:  No.  No.  If it had been outside of school, I wouldn't.  You know, more so inside the four walls I'd have a better -- you know.

THE COURT:  Do you recall episodes of students protesting the name change decision in 2020 by bringing Confederate flags onto the school property?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE WITNESS:  I don't recollect.

THE COURT:  Okay.  All right.

I'm going to allow this to be admitted.  It is  -- he has testified about the incident, generally.  It is not subject to the hearsay because it's an e-mail from the superintendent of the schools.  Party admission.  I'll allow it to be admitted for what it's worth.  Overrule the objection.

(Plaintiffs' Exhibit No. 62 was admitted.)

THE COURT:  Please proceed.

MS. PLATER:  Thank you, Your Honor.

BY MS. PLATER:

Q   I just have one last question for you, Mr. Dorman.

THE COURT:  And let me just say, his testimony about it provides me, under the hearsay rule, with sufficient assurance as to its authenticity based on his testimony.  Thank you.

Go ahead.

MS. PLATER:  Thank you.

BY MS. PLATER:

Q   So Mr. Dorman, do you recall a Black student feeling uncomfortable when a student came into their classroom, asked a teacher about how they felt about Stonewall Jackson, the name Stonewall Jackson, and if the teacher wanted the name to remain and also then turned to the classroom and asked the classroom that same question?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    I think I do.  Do you have any more information that you could help clarify if I'm thinking the same situation?

Q    If you recall that incident, that was the question.

A    Yes.  A student barged -- I believe it's the same thing we're talking about -- into a classroom and started talking about it.  The teacher shut it down and called me and said, hey, this just happened, and I went up and addressed it with the student that went in the classroom or -- it's what we call a general block which would have been like homeroom back in my day.  Maybe not your day, but my day.

        MS. PLATER:  No further questions, Your Honor.

        THE COURT:  Tell me -- I'm just not clear, Mr. Dorman -- thank you.  What did the student barge into the classroom -- what was the nature of the incident, if you could provide me with any other details that you have.

        THE WITNESS:  I just got a call from the teacher, because it was during our homeroom, and said, hey, Mike, I need you to know that this just happened.  Here's what the student did.  Came in and started talking about the name change.  I shut it down and called you.  I said, all right, do you know where the student went?  And he said, no.  And I just remember looking up the student in the computer and going and addressing it with the kid.  But I don't remember many of the details.

        THE COURT:  All right.  Do you remember what the student said when the student went into the classroom?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE WITNESS:  I don't remember the details.  I know it was something revolving around the name change.

THE COURT:  Around the name change?  Okay.

THE WITNESS:  Yes.

THE COURT:  Okay.  Went into a particular classroom and said something, teacher called you, you talked to the student yourself?

THE WITNESS:  Yes, sir.  I went and addressed it.

THE COURT:  And what was it that you -- when you say you addressed it, what did you do with that student?

THE WITNESS:  I don't really remember, to be honest with you.  It was probably conversation that this better not happen again or there will be discipline, you know, progressive discipline.  If you continue to do this stuff, then there will be more consequences.

THE COURT:  Okay.  Thank you, Mr. Dorman.

All right.  Do my questions raise any other questions from you, Ms. Plater?

MS. PLATER:  No, Your Honor.

THE COURT:  Okay.

Mr. Guynn, do you have any redirect of Mr. Dorman?

MR. GUYNN:  Yes, Your Honor.

THE COURT:  Okay.  Please proceed.

REDIRECT EXAMINATION

BY MR. GUYNN:

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Q    Mr. Dorman, as principal of a school, do you have any authority over the name of the school?

A    No, sir.

Q    That's the school board's bailiwick?

A    Yes, sir.

Q    And have you personally ever taken any action to make any student at Stonewall Jackson feel unwelcome?

A    Never.

MR. GUYNN:  That's all I have, Your Honor.

THE COURT:  And while he's here, does the -- do the plaintiffs have any additional questions for, Mr. Dorman?

MS. PLATER:  No, Your Honor.

THE COURT:  All right.  May this witness be excused?

MR. GUYNN:  Yes, Your Honor.

THE COURT:  May he resume his retirement?

MR. GUYNN:  To the fullest.

THE WITNESS:  Happily.  Happily.  I'm going to go cut wood.

THE COURT:  Mr. Dorman, nice meeting you, and good luck with your retirement.  I hope you have a fulsome retirement experience, and I wish you the best.

THE WITNESS:  Thank you, Your Honor.  I appreciate it.

THE COURT:  Thank you.  Take care.

Okay.  Do you want to take a brief recess before you

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

call your next witness, or do you want to move right to it?

MR. FITZGERALD: Your Honor, if may we just address one housekeeping matter before we recess.

THE COURT: Sure. Happy to hear that, Mr. Fitzgerald.

MR. FITZGERALD: I neglected to mention that this morning, but we would like to move Gibson Kerr's deposition designations into the record as agreed by plaintiffs' counsel.

MR. RAOFIELD: No objection, Your Honor.

THE COURT: Okay. Do I know -- because, you know, he was the subject of a motion in limine and I made certain rulings regarding the appropriate confines of his testimony. Do we -- is there agreement as to the pages and lines of his that are going to be available for the Court to consider?

MR. FITZGERALD: Yes, Your Honor.

THE COURT: Okay. Yes, I'll consider Mr. Kerr's testimony. Let's make it an exhibit. Okay? Let's actually make it an exhibit so it will be part of the public record. Okay? Because otherwise, his testimony wouldn't be part of the public record if it was just -- but let's go ahead and make it an exhibit, those pages and line that you all have agreed to, subject to my ruling on the motion in limine.

MR. FITZGERALD: Yes, Your Honor.

THE COURT: Okay. And I'll consider that. Thank you.

MR. FITZGERALD:  Thank you.

THE COURT:  All right.  And let's just make sure before we leave we get all these things in the record so that when I go through the massive task of reviewing this record, and in light of the burden of proof and the legal issues that remain in this case, that I'm -- that we've got the right things that have been admitted.  So thank you all for that.  Okay.

Ms. Reed?

MS. REED:  Your Honor, one more thing from the plaintiffs.  With defendant's agreement, we have an additional list of exhibits that we should have read in this morning, and we'd like to read those in now.

THE COURT:  Yes, for sure.  Happy to write down that list of exhibits as well.

MS. REED:  Thank you, Your Honor.

THE COURT:  You all just want me to read more stuff, don't you?

MS. REED:  We do, Your Honor.

THE COURT:  Let me tell you what.  I'm going to review every page.  I am.  I'm going to do my homework, trust me.

MS. REED:  We have plaintiffs' Exhibit 41, Plaintiffs' Exhibit 71, PTX 73, PTX 99, PTX 105, PTX 167, PTX 178, PTX 182, PTX 203, PTX 212, PTX 233, PTX 236, PTX 241, PTX

242, PTX 246, PTX 289, and lastly, Plaintiffs' Exhibit 330 to

accompany the Gibb Kerr deposition designations.

(Plaintiffs' Exhibit Nos. 41, 71, 73, 99, 105, 167, 178,

182, 203, 212, 233, 236, 241, 242, 246, and 330 were marked for

identification.)

THE COURT:  Okay.  I'm going to turn to you,

Mr. Fitzgerald, to see if you all are in agreement as to those

exhibits just read by Ms. Reed.

MR. FITZGERALD:  Yes, Your Honor.  We're in

agreement.

THE COURT:  Okay.

(Plaintiffs' Exhibit Nos. 41, 71, 73, 99, 105, 167, 178,

182, 203, 212, 233, 236, 241, 242, 246, and 330 were admitted.)

THE COURT:  Again, folks, it's incumbent upon

counsel, before we all leave court today, to make sure that

these exhibits are in, and I will -- and I want you to know how

much I appreciate the parties working to reach agreement on

these because the record is huge and I just want you to know I

appreciate your efforts.

Let's take about a five- or ten-minute recess before

we hear from our next witness.

(A recess was taken from 10:54 until 11:05)

THE COURT:  Okay.  Call your next witness.

MR. FITZGERALD:  Your Honor, defense calls Gloria

Carlineo to the stand.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE COURT:  All right.

THE CLERK:  If you'd raise your right hand pleased to be sworn.

GLORIA CARLINEO, CALLED BY THE DEFENDANT, SWORN

THE WITNESS:  I do.

THE COURT:  Good morning.

THE WITNESS:  Good morning.

MR. FITZGERALD:  Court's indulgence, sorry.  One moment.

THE COURT:  Take your time, Mr. Fitzgerald.

DIRECT EXAMINATION

BY MR. FITZGERALD:

Q    Good morning, Ms. Carlineo.  How are you?

A    Good morning.  I'm doing good, thank you.

Q    Good.  I hope you've been well since we last spoke and that last week's school board meeting was a productive one.

A    Yes, it was.

Q    That was on Thursday night.  Right?

A    That's correct.

Q    First day of trial?

A    That's correct.

Q    Well, thank you for agreeing to be here and to give your testimony today.  From where are you joining us?

A    Here in Harrisonburg, Virginia, at the Federal Courthouse.

Q    No, I'm sorry.  From where did you come today to join us

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

here?

A    Oh, I came from Fort Valley, Virginia.  That's where I live.

Q    All right.  And where abouts is that in Shenandoah County?

A    That's about in the center of Shenandoah County.  It's about 20, 25 minutes from Woodstock towards the east.

Q    How long have you lived in Fort Valley?

A    Well, we've had that property for about 11, 12 years, living on-and-off.  But full-time, we've been living there since about 2019 or so.

Q    Where did you reside before that?

A    We were living in Loudoun County.

Q    That's Loudoun County, Virginia?

A    That's correct.

Q    And before Loudoun County?

A    Well, before Loudoun County, we lived in Pennsylvania for about nine years, and before that, we were living in Prince William County, Virginia.

Q    All right.  So I see you've lived in many different places.  Let's just start at the beginning.  Where were you born?

A    I was born and raised in Puerto Rico.  San Juan, Puerto Rico.

Q    What grade level were you when you left Puerto Rico?

A    I was -- I had just finished my junior year in high

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

school, so I moved for my senior year.

Q    And where did you move?

A    We moved to Tampa, Florida.

Q    Did you finish high school?

A    I did.

Q    Where did you graduate from high school?

A    I went to Vivian Gaither High School in Tampa.

Q    Did you go to university or college after high school?

A    I did.

Q    Where did you go?

A    I went to the University of Florida in Gainesville for four years and then I actually transferred at the end to University of Cincinnati where I went to law school.

Q    Okay.  And what was your -- what was your degree at the University of Cincinnati?

A    It was international affairs, and I have minors in Russian studies and Latin American studies.

Q    And then you said you -- after you got your degree from University of Cincinnati, you enrolled in their law school?

A    That's correct.

Q    Okay.  And did you graduate from University of Cincinnati College of Law?

A    I did.

Q    All right.  Then after you graduated from law school, if you think it might be relevant, can you tell me about your work

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

experience during or immediately after law school?

A    Yes, I mean, I -- well, during law school, one of the externships I had was actually for the Ohio Civil Rights Commission.  So I was an intake officer for cases of discrimination at the state level for employment and also housing.  So I would take the, you know, daily cases to see whether there was any discrimination in employment and housing. It's kind of the equivalent of the EEOC at the federal level, but this is at the state level.

After that, as I was in law school, I was also -- after I finished that externship, I was actually named by the governor of Ohio, Governor George Voinovich, to the actual board of the Ohio Civil Rights Commission which is actually the state board that sees the ultimate cases before granting the right to sue.

Then after that -- during that time after I graduated from law school, I worked briefly for a law firm, decided that that's not really what I wanted to do.  So then I moved to D.C. and I worked mostly in legislative stuff.  I worked for the governor of Puerto Rico in the Federal Affairs office in D.C. for two-and-a-half years.

And then I went on worked for Chairman Dan Burton in the Capitol Hill.  He was from Indiana but he was also the chairman of the Government Reform Committee.  And so I did mostly legislative stuff and I also was appointed at the time by Governor Gilmore here in Virginia to the Ohio Council on Human

Rights.

Q    Okay.  Can you go back to -- you mentioned the Ohio Civil

Rights Commission.  You were appointed by Governor Voinovich?

A    Voinovich, yes.

Q    Can you spell that for me, please.

A    V-O-I-N-I -- no.  N-O-V-I-C-H, Voinovich, George.

Q    Thank you.  And the Virginia Council of Human Rights, you

said you were appointed by the governor of Virginia at the

time?

A    That's correct.

Q    Can you repeat that name, because --

A    Gilmore, Jim Gilmore.

Q    Jim Gilmore?

A    Yes.

Q    Is that G-I-L-M-O-R-E?

A    That's correct.

Q    Okay.  All right.  So I'm sorry for interrupting.  You

were just saying after the Virginia Council of Human Rights.

What did you do next?  You worked at a law firm?

A    It was a law firm in Cincinnati, then the Governor of

Puerto Rico, then Capitol Hill for Dan Burton and the

Government Reform Committee.  I split my time between the

office and the committee.  And then after that, that's when I

got pregnant with my daughter and realized that I couldn't find

any affordable daycare and decided to stay at home and raise my

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

kids.

Q    And you said the Government Reform Committee?

A    That's correct.

Q    And so that was part of your time when you were working as -- what were you doing for Dan Burton of Indiana?

A    I was legal counsel.

Q    Legal counsel?

A    Uh-huh.

Q    Okay.  And so a part of the time you were working in Dan Burton's office.  Did I understand that right?

A    That's correct.  Yeah.  So I would split my time between his personal office -- that's what they call it -- for him as a congressman from Indiana, and then half the time on committee work doing investigations for the committee.

Q    Okay.  And then circling back to your experience on the -- let's start with the Ohio Civil Rights Commission.  What were some of the takeaways from your experience at the Ohio Civil Rights Commission?

A    Well, it was -- it was a very eye-opening position to have, especially as an intake officer, because I worked -- it was a great office.  I worked for a wonderful attorney that was the director in charge of all the -- deciding whether the cases were going to go through or not.  Her name was Lorice Carter. And it was great to learn when we would have an intake case, when somebody would come to us, a claimant, whether there was a

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

case or not a case.

So for example, if we had somebody coming over -- let's just say for example if it was a Black claimant saying that they had been discriminated against in a job, then we would have to see, well, first of all, is there harm?  Was that person harmed or not harmed?  And then we would have to kind of determine if that harm was because of race.  So it wasn't just one or the other, we had to kind of prove both before we actually granted that right to actually investigate that claim.

And all along, I did this with this attorney who was the Director of Cincinnati.  It was in Cincinnati -- the Cincinnati branch or office, you should say, of the Civil Rights Commission.

Q   Okay.  So presumably there were some cases that came to you where you found that there was discrimination and you investigated it and so on?

A   Yeah.  Interestingly, most of the cases actually did not warrant an investigation because there were certain criteria that she taught us how to use.  So for example -- let me just give you one example.  If a claimant came in and said that they were discriminated against on the job and they got fired, and they would say well, it's because I wore a green sweater, but then we find out that the company had a policy that said, well, no green sweaters at all.

So then we would have to see, well, was there a harm?

Well, this person was fired, so we need to look into that. Then we would have to look if 20 people wore green sweaters and they were not -- 19 of them were not fired, so then we would have look. Who are those 19? If the 19 were the same race as the one that was fired, then we would say, well, there is no discrimination. You were just fired for some other reason.

So that kind of a process of analyzing those cases really helped me kind of go through life and understand, well, it's not just a claim that warrants action. You have to also look at the legal procedures and whether there's a harm, whether it was due to discrimination. So that's kind of the criteria that I've used throughout my life.

Q    And who did you work with in that office?

A    Her name was Lorice Carter, and she was the head of that Cincinnati office, and it provided a great experience.

Q    And how was your experience at the Virginia Council of Human Rights different from your experience at the Ohio Civil Rights Commission?

A    So at the Virginia -- in Virginia, I was serving at the intake level in Virginia, and then when I was appointed at the Ohio Civil Rights Commission as the board. That's actually after a claimant has gone and the case has been granted and there's been an investigation. Those councils will actually look at -- be kind of like the -- kind of the Supreme Court before granting the right to sue. And that's why we would look

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

at the cases, look at the facts and decide, well, yes this should be granted, they should be allowed to sue, or no, there's not enough evidence of that and we are going to deny the chance to sue.

Q   So that was your time on the board of the Ohio Civil Rights Commission?

A   Yes.  And like I said, we would travel.  So for the Human Rights -- the Council on Human Rights, we would travel to see those cases.  So we would travel to Roanoke or, you know, Newport News or whatever.  We would travel and have those council-like hearings.

Q   And I think earlier you mentioned that in 2001, your daughter was born and you decided to stop practicing law?

A   That's correct.

Q   I presume -- are you married?

A   Yes, I am.

Q   Do you have any other children besides your daughter?

A   I have two, yes.

Q   Who is your other child?

A   My son.

Q   You don't have to say his name, but --

A   My son.  He's younger.  He's 22.

Q   So why did you and your family decide to move to Shenandoah County from Loudoun County?

A   Well, we wanted peace.  We just wanted to get some land

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

and get away from the hecticness of -- Loudoun County was starting to get more crowded, and we just wanted to have some land and we found this great plot of land in the mountains of Virginia and there's nothing like it.  So basically, we just wanted to have some peace.

Q    Did you have any family connection in the area?

A    Oh, not at all.

Q    Did your children enroll in Shenandoah County schools?

A    My youngest son did attend Shenandoah County schools on and off.

Q    Okay.  And where did he attend?  Which Shenandoah County schools did he attend?

A    He went to Central High School in Woodstock.

Q    What was your impression as his mom of his experience at Central High School?

A    Well, it was -- it was a little bit skewed because he was there in 2020.  So, you know, he had been there for one semester when COVID broke out, and he was basically not getting any education during that time.  It was unfortunate that our administration at the time was not prepared for what was happening and they basically were not getting any kind of education whatsoever.  So we decided to enroll him in a school in Maryland that was actually still open.  So we were kind of commuting back and forth to Maryland so he could attend that school.

Then after COVID and after the schools opened up, we came back for his -- I think it was his junior year, and it was -- you know, for the most part, it was positive.  We did have one instance that was the reason why I decided to run for school board where I felt that there was more indoctrination than there was education going on, and that's why I decided to run for school board.

Q    Can you tell us about that incident?

A    Sure.  It was actually -- he was taking, as a senior, an American government class, and as somebody who has worked in American government, that is something that I've actually always been very interested in and I've always talked to my sons and my daughters about this.  I homeschooled for a while, so that's something that I always liked to teach my kids about, the history of our great country.

And at the time, you know, these classes are one semester long, and at the time, this particular teacher spent, like, three-and-and-a-half weeks just focusing on gun control instead of teaching the whole Constitution or the history of our American government.  And what is worse is she was using an article from the *New York Times* that was very pro-gun control to teach the subject.  And I have no problem with a teacher teaching about that if you're also going to teach the opposite side.  So if you're going to teach about gun control, then also teach about the Second Amendment and what it stands for.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

So it was a situation where I had been getting, you know, complaints from my son, and finally, you know, it came to a point where she was also upset that I was talking to my son and helping him with his homework and I went in there and -- and, you know, made a complaint about it, and they changed him to a different class.  But it still upset me that there were teachers that were doing that.  And that shouldn't be happening, especially when at the time our schools were doing very badly with the standards of learning testing and our kids were not getting prepared, which, thankfully, we changed around in the last couple of years.  But that's what was happening at the time.

Q    Okay.  So that -- what you describe as indoctrination as opposed to a balanced view of things being presented?

A    That's correct, because it was one-sided.  There weren't two sides being presented.  And, in fact, when the teacher was questioned about this, she said, well, I thought that this -- even though it is a clearly pro-gun control article -- she said, well, you know, I thought it was balanced because the author would say, well, the opposition will say blah, blah, blah.  Which clearly is not -- it's not giving a balanced education.

Q    And so that incident, that's what motivated you to run for school board in 2023?

A    2023, that's correct.

Q    When were you elected to the Shenandoah County School Board?

A    It was in November 2023.

Q    And which district were you elected to represent?

A    I represent District 3.

Q    When did your term begin?

A    The term began in January 2024.

Q    How many Shenandoah County Public schools are in District 3?

A    District 3 has basically all the schools in Shenandoah County.  It's -- my district is pretty spread out.  It's basically all the places that are not big enough to have their own district got put into District 3.  So I have mostly the -- mostly the schools in the center.  Central and that campus.  But I have some students from the southern campus, and I have some students from the northern campus.  So officially, I represent all of them.

Q    So at least some of the students in your district attend the schools at issue in this case?

A    That's correct.

Q    How influential was the name change in 2020 to your choice to run for school board?

A    Not really.  Not really an issue I was considering at the time, no.

Q    When did you first learn about that?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    So, as I said, we were going back and forth to Maryland for my son to attend a school when the previous board made that decision in 2020.  And since my son didn't attend that school, that was not really something that was on the radar for me.  I was not really connected into the community that much.  So I must have heard about it sometime after it happened, maybe -- I don't know.  I can't remember.  Probably early fall of 2020.

Q    And do you remember how you learned that?

A    I'm trying to remember.  I can't remember if I read that somewhere or if somebody just kind of commented it because, like I said, I didn't really know that many people, and I don't really subscribe to the papers.  I really don't remember.  I just remember people talking about it, and that's when I first heard about it.  I really wasn't sure what exactly went on until much later.

Q    What was your understanding of why those names were changed in 2020?

A    Well, like I said, in 2020, I'm not -- I wasn't as plugged in from what I heard from people.  They thought that it was a reaction from that board, which was very left-leaning Democrat, that were kind of influenced by the riots that were going on in 2020, which was an election year.  But we had a lot of riots going on around that time.  And I think people felt that that's what influenced that board to make that change.  But, again, that's just what I was hearing.  I was not really aware of it

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

at that time.

Q    Did you have an opinion about the name change?

A    Yes, I did.  I mean, I have a strong feeling about our history.  It's not perfect as a country, but I think we need to teach the whole history, and I have a feeling -- I have strong feelings against people trying to take down monuments or trying to erase parts of our history just because they may not fit in their narrative or they may not like it.

THE COURT:  All right.  Can I ask that you -- so that we have a clean record here, you need to slow down a little bit.

THE WITNESS:  Okay.  It's my Puerto Ricanness.  I'll try.

THE COURT:  We've done it with lots of other witnesses here.  If you could just try to help the court reporter out if you could just slow down a little bit.

THE WITNESS:  I apologize.  No problem.  I will try my best.

THE COURT:  Take your time.

BY MR. FITZGERALD:

Q    Believe it or not, you're actually slower than Mike Dorman.

A    Is that right?  Wow, okay.

Q    All right.  So let's fast-forward to 2023 when you decided to run for school board.  While you were on the campaign trail,

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

did you have conversations with potential voters regarding the name change issue?

A    Yes, I did.  I ran -- I mean, when I was campaigning I knocked on over 400 --

THE COURT:  I'm sorry.  I'm sorry.  Is there an objection?

MS. BANNER:  Your Honor, we just want to raise today what we raised yesterday, our standing objection regarding the legislative privilege motion to the extent that this testimony is about Ms. Carlineo's motivations for voting in 2024 for the name change.  We understand Your Honor will weigh the evidence, but wanted to make it clear on the record we are starting to veer into that territory.

THE COURT:  Your objection is noted.  I have that point firmly in mind.

MS. BANNER:  I understand, Your Honor.

THE COURT:  I have that firmly in mind.  Your objection is noted and continuing.

MS. BANNER:  Thank you.

THE COURT:  Thank you.

Go ahead, Mr. Fitzgerald.

MR. FITZGERALD:  Thank you, Your Honor.

BY MR. FITZGERALD:

Q    I'll repeat the question.  While you were campaigning for school board in 2023, did you have conversations with potential

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

voters regarding the name change?

A    Yes.  As I also testified in my deposition, I knocked on many doors.  I mean, I knocked on over 400 doors in Shenandoah County.  Like I said, my district is very spread out, and I would talk to a lot of people, and they would tell me what the concerns were.  And, yes, some people did raise the issue of the name change, particularly when they were closer to that area that represents the schools, but also people from the central campus and the northern campus were also concerned about that.

THE COURT:  What district are you from in the school board?  What school board district?

THE WITNESS:  Your Honor, I'm on District 3.  So District 3 has Saint Luke, Edinburg, and Fort Valley.

THE COURT:  Okay.  Any high schools?

THE WITNESS:  All of the high schools.  All three of them.

THE COURT:  All three high schools?

THE WITNESS:  Uh-huh.

THE COURT:  Students from District 3 go to all three high schools?

THE WITNESS:  Yes, that's correct.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Yes.

BY MR. FITZGERALD:

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Q    Yeah.  Let's talk about that for a second.  So there's

a -- there's been a sort of common understanding in this case

that Stonewall Jackson High School and Ashby-Lee Elementary

School belonged to Districts 1 and 2.  Can you just -- can you

provide any clarity on that?

A    Sure.  Well, it's because the -- so we have three

campuses.  We have the northern campus, the central campus, and

the southern campus.  District 1 and 2 are strictly southern

campus.  Districts 5 and 6 are strictly Strasburg.  District 4,

if I'm not mistaken, is strictly the central campus.

But like I said before, my district actually has some

pieces from different parts of the county.  So for example, if

I go from my house, my district, over to Saint Luke district,

which is part of my district, it's 45 minutes away.  So people

in Saint Luke may go to either Central or maybe Strasburg.  In

Fort Valley, we have -- Fort Valley is 17 miles long of road

that I actually represent.  The southern part of Fort Valley is

the central campus.  The northern part of Fort Valley is the

northern campus.

Then when we go to Edinburg, which is the third part of my

district, most of those people go to the central campus, but a

portion of them go to the southern campus.  So that's how I

ended up having every school in my district.  It's kind of like

a wastebasket, is what I like to say, where they toss

everything that didn't fit somewhere else.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE COURT:  Can I ask a question?

THE WITNESS:  Sure.

THE COURT:  When you are elected to the school board in Shenandoah County, is it a countywide vote or a districtwide vote?

THE WITNESS:  Districtwide.

THE COURT:  So the doors that you knocked on would have been within the District 3?

THE WITNESS:  That's correct.

THE COURT:  Okay.  Thank you.

I'm sorry, Mr. Fitzgerald.  Go ahead.

MR. FITZGERALD:  No problem, Your Honor.

THE WITNESS:  May I explain myself correctly about why I ended up having all of them?

THE COURT:  If you want to add something, go ahead.

THE WITNESS:  Yeah.  No, it's just so that's why a lot of people don't realize that my district actually includes all of them, because I do have portions from the northern campus.  I have portions from the southern campus, but the majority of them are central campus.  But I do have all the schools in my district including the Vo-Tech as well.

BY MR. FITZGERALD:

Q    And if I heard you correctly, you said it was a portion of Edinburg?

A    That's correct.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Q     Can you spell that for me?

A     Edinburg, E-D-I-N-B-U-R-G.

Q     Okay.  Do you have a sense of what proportion of Edinburg students go to the southern campus schools?

A     I actually don't know.  I've asked that, but I've not been able to find that answer.  It's a smaller proportion. Obviously, Districts 1 and 2 have the majority of those students.

Q     Okay.  So it's a minority.  What about the percentage of the southern campus schools -- let's just -- the schools at issue in this case, Stonewall Jackson and Ashby-Lee, do you have an idea of what percentage of the student bodies of those schools are from District 4?

A     Three.

Q     Three, I'm sorry.  Three.

A     I am not sure.

Q     Okay.

A     I'm not sure.  I just know -- I mean, I -- and I -- honestly, this is just what I've heard.  I think part of the problem was the central campus has really big schools and we have a huge elementary school that at one point had over a thousand students, which is one of the reasons why we're trying to get another elementary school built.  So I think at some point, a lot of those kids were districted down to the southern campus to kind of relieve some of that pressure from the

central campus.

Q    I see.  So circling back to your conversations with potential voters in 2023 regarding the name change, did you make any commitments or promises to reconsider the school names?

A    I mean, I made no promises.  I just said if the issue came before us, I would certainly take a look at it and look at it, yes.

Q    Okay.  So if the issue was brought before the board, you would consider it?

A    Of course, yes.

Q    Okay.  But did you commit to restoring the names at that point in your campaign?

A    No.  I never committed to doing that.

        MR. FITZGERALD:  I would like to read in a joint stipulation into the record at this time.  Or Your Honor, if it's okay with you, I could just reference the number of the stipulation.

        THE COURT:  However you want to proceed, Mr. Fitzgerald.  I've got them.

        MR. FITZGERALD:  All right.

        THE COURT:  Which one is it?

        MR. FITZGERALD:  It's joint stipulation number 66.

        THE COURT:  That's in the second set?

        MR. FITZGERALD:  I believe that's correct.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE COURT:  Yes, it is.  Okay.

MR. FITZGERALD:  So without reading it into the record, I'll just refer to that.

THE COURT:  Okay.  That's fine.  I can read it.

MR. FITZGERALD:  Thank you.

THE COURT:  And I'll note that you referenced it.

MR. FITZGERALD:  Thank you, Your Honor.

BY MR. FITZGERALD:

Q    So Ms. Carlineo, who ran in opposition to you when you were campaigning for school board in 2023?

A    So I ran against Mr. Bosserman (sic).

Q    And can you tell us a little bit about Joy Bosserman?

A    Yeah.  She is -- I don't know if she's a Valley native.  I mean, that's what they like to say to people who live in the Valley and they have Valley names, you know, from the area. But I do know she -- I believe she's from there.  She taught at Central High School for years.  She was also married to the central college football coach for many years.  And she has always been very -- from what we can see, she's involved with the Democratic Party in Shenandoah County, and that's the person who I ran against, which made it interesting because I was the one, the Hispanic girl from -- clearly not from the area.

Q    And she was -- you said she's a local.  She's from that area?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A     That's correct.

Q     And not only that, but you said that she has a Valley name?

A     She has a Valley name.  Bosserman's are a big family in that area.  And like I said, she taught for many years at the school, and her husband was a high school coach.  So she was -- she was fairly well-known, which is why probably a lot of people thought that I -- that my race was going to be a little bit harder than -- than it was.

Q     So you were ultimately elected?

A     I was.

Q     And do you recall what the margin of victory was?

A     I think the margin was 25 percent.  It was 62 to 37, I believe, the final tally.

Q     Do you recall whether the other current school board members who ran in 2023 committed to restoring the names in their campaigns?

A     I don't recall that.  It was just not an issue that was brought up very often, so I don't know exactly what they committed or didn't commit to.

        THE COURT:  Mr. Fitzgerald, could I ask?  The Clerk has a question about which joint stipulation you were referring to.  I thought you were referring to number 6 in ECF 96.  Number 66 is in the second set of joint stipulations in ECF 96.

        THE CLERK:  Which is Plaintiffs' 2.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

MR. FITZGERALD:  That's correct, Your Honor.

THE COURT:  Thank you.

MR. FITZGERALD:  Sixty-six.

THE COURT:  The Clerk just wanted clarification.

Thank you.

MR. FITZGERALD:  Absolutely.

BY MR. FITZGERALD:

Q    So none of the current school board members who ran in 2023, to your recollection, committed to restoring the names, but did any of them commit to reconsidering as you did?

A    I'm trying to remember.  I know the question was asked of us in the questionnaires for the Freedom Press for all the candidates, and I can't remember if they did or not.  They may have said that they would consider it, but I can't remember.

Q    Were all the 2020 school board members who voted to retire the names, were they replaced by January 2024 when you took office?

A    Yes.  Yes, they were all replaced.

Q    While you were on the board but prior to your vote in May 2024, did you discover any additional information regarding the 2020 name change?

A    Yes, I did.

Q    And what did you discover?

A    Well, we were given a lot more information regarding the situation in 2020, which included some documents that had been

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

FOIA'd with conversations -- well, not conversations -- e-mail exchanges between the chair and vice-chair from 2020 regarding that vote and how it came about.

Q   I'd like to show you what's been admitted as Exhibit 18.

THE COURT:  Is this is exhibit you talked about this morning?  Is this the four- or five-page exhibit that's been admitted by -- that the parties have agreed to?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Okay.  Exhibit 18?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. FITZGERALD:  Your Honor, does the Court have a copy of Exhibit 18, Defense Exhibit 18?

THE COURT:  I don't.

MR. FITZGERALD:  Would you like one?

THE COURT:  Yes.  Do you want to use the ELMO?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Thank you, Mr. Fitzgerald.

MR. FITZGERALD:  No problem.

BY MR. FITZGERALD:

Q   Ms. Carlineo, I'm showing you what's been admitted as a Defense Exhibit 18.

THE CLERK:  Hold on a second.

THE COURT:  And just so I'm clear on this exhibit, we

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

went round and round yesterday with regard to Defense Exhibit 2 and I did not admit it.  But the Plaintiffs have decided to agree to the admission of Defense Exhibit 18 despite my ruling on Defense Exhibit 2.

Is that correct, Ms. Banner?

MS. BANNER:  Yes, Your Honor.  That's correct.

THE COURT:  Thank you.

BY MR. FITZGERALD:

Q   Ms. Carlineo, do you recognize this e-mail exchange?  Oh, wait.  It's not displayed.  I'm sorry.

(Technical interruption.)

THE WITNESS:  It's blurry.  It's a little hard to read, but -- you don't happen to have any written copy?

MR. FITZGERALD:  Oh, I'm sorry.  Yes.

THE WITNESS:  Because this is really, really hard to read.

MR. FITZGERALD:  Thank you.

THE COURT:  She can have mine.

MR. FITZGERALD:  I'd rather you have it, Your Honor.

THE COURT:  It's okay.

THE WITNESS:  Yeah.  It's really blurry.  Yeah, there we go.  Thank you.

MR. FITZGERALD:  I'm sorry about that.

THE COURT:  I'm pretty familiar with this.

BY MR. FITZGERALD:

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

Q    I'll give you a minute to read through it.

A    Okay.  I think I know what these are, yeah.

Q    So remind me.  You -- you did receive this e-mail exchange while you were on the board?

A    I believe these were part of a packet that we received with a lot of the FOIA documents from that time, yes.

Q    Okay.  And do you recall who you received that packet from?

A    I actually do not recall.  I don't even know when it was given to us, if it was -- if they were, like, given to us by hand at a meeting or before a meeting or if it was -- I just remember getting these and other people talking about it, yes. I mean other board members.

Q    Now that you've had a chance to read through it, does it -- do you recall reading this e-mail exchange?

A    Yeah.  These are part of -- these are part of the e-mail exchanges that I also testified during the deposition, and I also spoke about them in my comments at the meeting on the day of the vote regarding what was transpiring during that 2020 -- what led to the 2020 vote, including, you know, how quickly it was done, how they were trying to keep the community out and not be allowed to speak out during that time, and how some of the board members were actually on record saying -- you know, asking that they should have delayed it a little bit more so that they would allow the community to speak out because

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

otherwise the community was not -- was going to feel betrayed

and be angry.  And we had other members of that board ignoring

that request and just going through with the vote in less than

a week.

Q    I appreciate the summary.  Can you point us to particular

e-mails from this exchange that stood out to you?

A    Yes.  There were several.  Like I said, I think there were

more that are not here that were between the chair and the

vice-chair talking about who they were going to exclude also,

because they were trying to exclude -- or they did exclude one

of the board members at the time.  And also the timing of it,

because like you can see here, this all happened on July 3rd

when the vote was on the following week, and this is the first

time they brought it up.

But it talks about -- you know, they're talking about, you

know, that they didn't want to delay it.  It says that the

superintendent at the time is saying if we delay a month, we

will attract outsiders who are not a part of our community

which will create an even more fractious environment, which,

ironically, is what happened during our vote.  The anti-name

change contingent has distributed petitions to keep the names

in numerous south county businesses, which I understand those

petitions were not allowed by that board.

Q    Which petitions are you referring to?

A    It's a petition that Dr. Johnston talks about.  He says

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

the anti-name change contingent has distributed petitions to keep the name -- the names in numerous south county businesses. And it is my understanding, I believe -- I saw the stack of petitions.  I think there were over a thousand signatures in there that they wanted to present to the 2020 board, and the 2020 board did not allow it.

Q    So you recall seeing that petition?

A    I saw it subsequently.

          MS. BANNER:  Your Honor --

          THE WITNESS:  Somebody did show that petition.

          THE COURT:  Hold on.

          Yes, ma'am?

          MS. BANNER:  I know we made our standing objection, Your Honor, based on legislative privilege, but this is getting into very specific details of the things that were considered by the 2020 school board, and, I believe, also into the information that Ms. Carlineo considered before her vote, and it's a selective use of privilege issue that we've continued to discuss.

          THE COURT:  Yeah.  I will sustain the objection.

          Let's move on.

BY MR. FITZGERALD:

Q    Were there any other messages in this -- before we move on from in this exhibit, were there any other messages in here that stood out to you?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    I'm trying to see if this one has -- I think they had the one about -- the reason why they excluded one of the board members is because they expected him to vote no.

Q    Which board member was that?

A    That would have been Marty Helsley, and Dr. Johnston here talked about I expect him to vote no.  My recommendation to Karen and Cindy, who were the chair and vice-chair at the time, was that if they thought that they would get a no vote, not to vote.  I'm trying to see here if -- I'm trying to see here if this is where Mr. Keller, who was also a board member, asked to delay the vote and the Vice-Chair Walsh said that -- you know, declined and decided not to.

Q    I'll direct you to Page 1.

THE COURT:  Okay.  You know what?  We're not going to.  This is cumulative.  This is also -- I don't know the relevance of this because the issue to be determined is the intent of the School Board of Shenandoah County in 2024 when they changed the names back from Mountain View and Honey Run to Stonewall Jackson and Ashby-Lee.  Okay?  And as I have said innumerable times in this case, the defense made the decision not to allow the plaintiffs to probe, pursue, test whether or not -- their reasons for that vote in 2024.

And as I have said in writing in my written opinions, as I have said over and over in this courtroom, that choice in this case to invoke the legislative privilege and not allow the

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

plaintiffs to test the true motive for the school board in 2024 in making this change cuts across the burden of proof and the elements of the claims in this case.  And I just want to be very clear.  This evidence that you're putting in now is neither relevant nor admissible on that issue of intent, and it will not be considered by the Court as the reason for the school board vote in 2024.

The defense has chosen to put no evidence in as to the reason for the school board vote in 2024.  So in that -- as I used yesterday, an evidentiary void -- in that evidentiary void, the Court is going to consider whether the plaintiffs have met their burden of proof, and if they have or they have not, how that affects equal protection analysis.  Whether or not the burden -- if they have met their burden of proving discriminatory intent, how that -- in that burden shifting framework, how that impacts the defense's burden of showing that they would have made the same decision regardless.

By the same token, if the plaintiffs are not able to prove discriminatory intent, if the Court were to find that after studying all this evidence in this case, that doesn't end the story either -- because you have to look then to the question of whether strict scrutiny or rational basis applies. And the question is, under the rational basis test, because the defenses chosen to put forward no basis for its decision in 2024, whether the rational basis test can even be satisfied in

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

this case.

That's why I have said and maintained throughout this case that the decision of the school board to invoke legislative privilege cuts across the evidence in this case and the shifting burden of proof in this case. It is an important part of the way this case is going to be resolved, and it's complicated. And it is -- it involves the shifting burden of proof on this. But I cannot -- because of the way this case has been litigated, I cannot, as the finder of fact, consider this witness' -- this 2024 school board member's view of what happened in 2020 as a reason for the vote in 2024. I can't do it. I will not do it.

So I think we should move on to something relevant. Okay? Thank you.

BY MR. FITZGERALD:

Q    Ms. Carlineo, did you give any public statements at any of the meetings leading up to the vote to restore the names regarding your issues with the process of the 2020 vote?

THE COURT: No. Did you not hear what I just said?

MR. FITZGERALD: I'm sorry, Your Honor. I must have misunderstood.

THE COURT: No. Let's move on to something relevant. Okay? I understand you all have -- that the defense wants to put in the back door what you have precluded by your own defense strategy from the plaintiffs probing at the front door.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

You can't do it.  Not relevant.  Move on.

BY MR. FITZGERALD:

Q    Ms. Carlineo, during your deposition, did you invoke the legislative privilege?

A    I answered absolutely every single question that was asked of me during that deposition.

Q    Okay.  But my question --

A    It was not --

Q    But my question was, did you invoke the legislative privilege?

A    I reserved the right to invoke it, but then I went ahead and I answered absolutely every single question that was asked of me during the deposition.  I did not invoke it to not answer any single question whatsoever.

Q    Ms. Carlineo, as a school board member, do you represent the school board?

A    No.  I represent my constituents on the school board.  I'm one of six.

Q    So when you're at meetings of the school board, if you vote yes to something, does it pass?

A    Not necessarily, and I think we have plenty of evidence of that.  I've been on the losing end many times at that school board.

Q    Did I advise you or did you choose to not answer any questions during your deposition regarding the 2020 name

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

change, regarding your thoughts on the 2020 name change?  Did

you assert privilege, legislative privilege, and refuse to

answer any of those questions?

A    No, I did not.

THE COURT:  Mr. Fitzgerald, you know full well -- I'm

sorry.  Counsel, approach.

(Begin bench conference.)

THE COURT:  The issue of the implication of the

legislative privilege is not limited to Ms. Carlineo's

deposition, but it was asserted by the school board and the

individual school board members in responses to written

discovery as well.  Okay?  So I appreciate what you have done

here, but that argument is for the Fourth Circuit Court of

Appeals.  Okay?  I have ruled.  All right?

That argument -- if you think I got wrong in

legislative privilege, then you may take it up to those folks

in Richmond.  Okay?  That's out of my hands.  Right?  That's

why they're there.  But let's move on.  Okay?  Because it

wasn't just in her deposition.  It was in written discovery.

It was in Request for Admissions.  It was -- for example, I

remember one off the top of my head.  Was the survey that was

done in 2024 a factor in the school board's decision?  And you

all didn't answer it and asserted legislative privilege on it.

So you can't have it both ways.  It can't be sword

and shield.  You can't get in through the back door when you

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

precluded the plaintiffs from probing at the front door. So I've addressed this enough in this case.

Let's move on. Okay? Thank you.

Mr. Guynn, did you want to say something? I'm happy to hear from you.

MR. GUYNN: I do. The concern I have is, Your Honor, we believe the standard is that you can consider what they know at the time. And if we can't put in what they knew at the time, then there is no way for you to consider it. But the real problem there is because of the Fourth Circuit, when it gets to the Fourth Circuit, that Fourth Circuit is not going to have anything to look at. You're going to have to come back and try the case again.

THE COURT: No.

(Crosstalk.)

THE COURT: No. No. I don't agree with that. I think there's plenty of evidence on this record, and I've let your witnesses go a long way down this road towards their complaints about what happened in 2020. Okay?

But where the line get drawn, okay, is if the burden shifts to you to show that the decision would have been made regardless of discrimination. That's where the Court is going to have to assess the impact of this evidentiary void. But we're not there yet. Okay? Because we have -- the Court has not assessed whether the plaintiffs' have made their prima

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

facie case.  That's all to be sussed out.  All I'm saying is we've been -- we've been beating this issue to death here today and in this case.  Okay?

So I believe it's time to move on, and thank you.

MR. FITZGERALD:  Your Honor, just to be clear, I was planning on introducing another segment of that e-mail exchange into evidence.  Oh, I'm sorry.  Yes, Your Honor.  I was planning on introducing another segment of that e-mail exchange into evidence.

THE COURT:  Isn't the entire e-mail exchange already in evidence?

MR. FITZGERALD:  No, Your Honor, because you did not admit Exhibit 2.

THE COURT:  You're right, I didn't.

MR. FITZGERALD:  What we did is we found the unredacted versions that we did produce to plaintiffs in discovery, and we found those specific pages from that long e-mail exchange exhibit that were pertinent.  And so we've already had --

MR. GUYNN:  It had been turned over.

MR. FITZGERALD:  Yeah.  And we already had admitted Exhibit 18, so we would just seek to have this next exhibit -- I won't ask Ms. Carlineo any questions about it, but if I could just lay some foundation and have that admitted as well into the record.  That would give the Fourth Circuit a chance to

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

assess all the facts.

THE COURT:  What's the plaintiffs' position about this?

MS. BANNER:  The plaintiffs' position is that that's the substance of the email that Your Honor ruled was not allowed in because of legislative privilege yesterday.  We agreed to Exhibit 18 to be cooperative and to try to move things along, but we don't agree to admit another exhibit.

THE COURT:  Okay.  Thank you for that.

What I'm going to do with that is Exhibit 18 is admitted by agreement.  I didn't admit Exhibit 2.  I didn't -- and so if you want to seek to put in portions of Exhibit  2, you may do it by proffer.  Okay?  I'll allow you to proffer that, but it's not coming into evidence.  Okay?

I have ruled you cannot selectively use the legislative privilege as a sword and a shield.  I really don't want to say that again.  Okay?  And so I'll allow you to proffer it, but I'm not admitting it.  Okay?

MR. FITZGERALD:  I think we did proffer it.  By proffer do you mean --

THE COURT:  You proffered it -- no.  To seek to introduce it.

MR. FITZGERALD:  To seek to introduce it.

THE COURT:  But if you want to move the introduction and mark for identification purposes whatever it is you want to

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

mark, okay, you can do that.  All right?  We will mark it for

identification purposes.  It's not coming into evidence and we

will just note it in the record as an exhibit that the Court

declined.  Okay?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  So your record is preserved.  Okay?

MR. FITZGERALD:  Thank you.

THE COURT:  Thank you.

(Bench conference end.)

THE COURT:  All right.  Go ahead, Mr. Fitzgerald.

MR. FITZGERALD:  Thank you, Your Honor.

May I approach the witness?

THE COURT:  Certainly.

THE WITNESS:  Thank you.

BY MR. FITZGERALD:

Q    Ms. Carlineo, I'd like you to take a look at what has been

previously marked as Defendant's Exhibit 19.

(Defendant's Exhibit No. 19 was marked for

identification.)

THE COURT:  Do you have one for me?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  I'm sure I'm familiar with it.

THE CLERK:  Is this Defense 2 that you previously

presented?

MR. FITZGERALD:  No.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

THE COURT:  No.  This is a small portion of Defense 2 that was not --  2 is not admitted into evidence.

THE CLERK:  Right.

MR. FITZGERALD:  And Ms. Ayersman, I did upload to Box Defense Exhibit 18 and 19.

THE CLERK:  Okay.

THE COURT:  Eighteen's in.  Now we're talking about 19.  Right, Mr. Fitzgerald?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Thank you, sir.

BY MR. FITZGERALD:

Q    Ms. Carlineo, now that you've had a chance to read that, do you recognize it as part of that packet of materials that you received?

A    I believe they were in there.  Like I said, there were a lot of e-mails in there, so, I do remember seeing some of these, yes.

MR. FITZGERALD:  Your Honor, at this time, I'd like to request that what's previously been marked as Defense Exhibit 19 be entered into evidence.

THE COURT:  Okay.

Position of the plaintiffs?

MS. BANNER:  The plaintiffs object to this exhibit on a couple of different bases, Your Honor.

The first basis is that this document is only

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

relevant to go to the school board's intent which the

defendants have asserted selective legislative privilege over.

We also believe that this document is hearsay and unless

they're offering it for something other than the truth, there's

no exception of hearsay that we see here.  If they're trying to

say that there's an effect on the listener, that can only go to

the effect for the vote in 2024.

          And lastly I'll just note a foundation objection

because the witness testified that she thought she was familiar

with some of the statements which I feel like is not enough for

foundation.

          THE COURT:  All right.  Thank you, Ms. Banner.

          Mr. Fitzgerald, would you like to respond, please?

          MR. FITZGERALD:  Yes, Your Honor.  These e-mails are

also not being offered for the truth of the matter asserted and

they're also not being offered as evidence of the 2024 school

board's intent in its vote because there are no 2024 school

board members on that e-mail chain.  And it's only being

offered as factual information that was available to

Ms. Carlineo at the time that she was on the board, and

Ms. Carlineo has made multiple statements, public statements at

board meetings that are on the record that are stipulated by

the parties that she did see flaws in the process.  And so this

is factual information that goes to whether or not Your Honor

gives weight to those public statements.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

THE COURT:  Thank you, Mr. Fitzgerald.

This document is not admitted into evidence.  This document is a portion of excerpts from Defendant's Exhibit 2 that I talked about at length yesterday afternoon, just talked to you about a minute ago at the sidebar.  This exhibit -- I agree with all three of the objections made by the plaintiff as to this exhibit.

And even though the defense says they're not offering it for the truth of the matter asserted, the only way this is relevant is to get in the back door the reasons for the 2024 vote which you -- the school board throughout this case and the members of the school board throughout this case barred in its discovery in this case.

And, you know, to go back to some of your examination that you did a minute ago when you said -- when you asked this witness, did I ask all of the questions -- did I answer all of the questions that were posed to me, and she reserved the right to exercise legislative privilege, well, that may have been the case.  But there were lots of other school board defendants -- school board members in this case who were deposed who did invoke the legislative privilege in this case.  And in the written pleadings in this case, the school board did invoke the legislative privilege in this case.

And as a result, the plaintiffs have not been able to test whether or not concerns that school board members in 2024

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

had as to the process in 2020 was in fact the true reason for their vote in 2024.  And because they've not been able to test it, this is not admissible because it would be -- because you didn't produce the e-mails, as I understand it, e-mail communications between the board members about the 2024 vote on legislative privileges grounds.  You didn't produce it in 2022. So you can't -- simply because the school board chose to waive this and produce it in FOIA does not allow the school board to selectively waive some parts of its privilege and some parts of it -- and invoke other parts of its privilege.  I've said this ten times throughout this case.  It is my ruling.

We will mark this particular exhibit as offered and refused.  Exhibit Number 19, I think.

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Okay.  And the Fourth Circuit can determine whether or not my ruling is an abuse of discretion.

Please proceed.

MR. FITZGERALD:  Thank you, Your Honor.  Because I know I'm on thin ice here, I just want to -- before I proceed with the next questions here, I plan on asking Ms. Carlineo about her views of what the flaws were with the 2020 process.

THE COURT:  Why isn't that the same thing that I said you couldn't do?

MR. FITZGERALD:  Okay.  Understood.

THE COURT:  And it is cumulative.  Mr. Barlow

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

testified at length about it.  I think also the other school board member who testified yesterday afternoon also mentioned concerns.  I understand the issue.  Okay?

MR. FITZGERALD:  Your Honor, if I may just read in a joint stipulation of the parties.

THE COURT:  Certainly.

MR. FITZGERALD:  This is joint stipulation 105 from Defense Exhibit 14 that's the third joint statement of stipulated facts.

THE CLERK:  I'm sorry.  Did you say 13 or 14?

MR. FITZGERALD:  Fourteen.

THE COURT:  This is Defense 14.  And I know it's in the plaintiffs' case, too.  105?

MR. FITZGERALD:  Yes, Your Honor, and I'll just read this and move on.

THE COURT:  Yes, sir.

MR. FITZGERALD:  At the April 22nd, 2024, school board meeting, School Board Member Gloria Carlineo stated, and the irony is, if it had been done right, if we had taken all the people's input, if we had done it that way and they had changed the names, we wouldn't be here today.  The names would have been changed.  That would have been the end of it.  However, because it was done in that process, for me, personally, I think we need to rectify that mistake.  If moving forward we have a groundswell of people saying those needs are

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

too divisive, that we should be using those names, then let's do it properly.  Let's go ahead and ask the people.

And if at that point you want to change the names again, then go for it.  But we have to do it in a way that everyone gets heard and that we are following the procedures that we have set forth in the school board.  So for me, the surveys, you know, they may be nice and they may advocate for one way or another, but it really doesn't sway me about much.  In the end, it's just about how it was done, how it was coordinated, how it was done.  Sneaky.  They were trying to be very sneaky.  When you read these emails and hear people's comments of this, you can definitely see that.  Let's fix a mistake.  After that, if the community feels like the names have to be changed, then we do it the right way and not just hidden and not this sneaky way that we did it before.

BY MR. FITZGERALD:

Q    Ms. Carlineo, can you describe the process you used in 2024 to restore the names and how that differed from -- scratch that.  Can you describe the process used in 2024?

A    Yes.  So in 2024, we had members of the community bringing the concern to the board about rectifying what was believed to be a flawed process in 2020.  So the board considered it as a board.  Then the chair or the vice-chair -- well, actually the chairman had a meeting with the vice-chair and the superintendent has to decide whether to put it in the agenda or

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

not.  And we did.

The process that we have right now for passing policies is very clear.  We actually put it in the agenda which usually has to be -- we usually submit the issue several weeks before, but it has to be, at the latest, the week before a hearing that we have.  And that issue is going to be put in for an informational agenda, which means we're going to put it out there for the public to see it and, you know, talk about it, and people can talk about it.  They can have public comment on that during the informational agenda and they can bring their concerns to it.

Then after that, we'll have one or two meetings.  It could be the following meeting when we put it on the action agenda.  So it's usually, like, a month later that we actually put it for the action, and during action, again, we allow the public to come in and speak.  And that's something that we as a board under Chairman Barlow, we actually kind of codified that in the board norms through the last couple of years to rectify the problems in the past.  Like, for example, in 2020, when this issue was brought in and, you know, less than a week before and it was informational and action at the same time, so, you know, that's what we're trying to fix and allow the community to have a say.

Q    You mentioned that an issue is presented as -- an agenda item is presented as an informational item.  Do you recall the

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

date of the meeting at which the name restoration was presented as an informational item?

A    I don't recall exactly.  I know it was the beginning of April.

Q    Does April 11 sound accurate?

A    That sounds about right.  I'm not sure.  I know it was the beginning of April.

Q    And was there an intervening meeting by the school board between that April 11 meeting and the May 9?

A    Yeah.  My recollection is that we actually did have a work session where we spoke about this.

Q    Did you also receive public comments at that meeting, that work session?

A    Yeah.  I'm trying to remember if we did or didn't.  We usually -- in a situation like this, we usually do allow it. But I can't remember exactly if that one did or didn't.  But I know we had at least two meetings where people were able to speak, maybe three.

Q    And at the meeting where the names were actually restored, where the board took action, was there public comment at that meeting, too?

A    Yes, there were.  I mean, we have several hours of public comment, and at the time, unfortunately -- since, we've kind of fixed this -- but at the time, we allowed anybody to comment. So we had a lot of people from out of town that came in to

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

speak.  Since then, we've actually kind of limited to only Shenandoah County residents.  So they have to provide proof of residence before they actually testify.

So that particular meeting, there was a rally by the people who were opposing the restoration of the names right before our meeting.  So there were a lot of people that came from other jurisdictions and we allowed them to speak at our meeting.

Q    How did you know they came from other jurisdictions?

A    Because we knew some of the people.  I mean, we knew a lot of them came from Front Royal or they came from Northern Virginia or they came from Prince William County.  And the people who actually organized the rally -- I can't remember if it was the Shenandoah County Democrats or the NAACP.  I'm not really sure exactly who exactly was the one who organized it. But the rally was before our meeting on May 9.  So there were a lot of people and they all kind of rushed in and signed up first to speak before the residents of Shenandoah County were able to.

Q    Do you know approximately how many people signed up to speak at that meeting?

A    I don't remember.  There were a lot.  I just know we were there for several hours.  In fact, if I may add, there were so many that -- and it was taking so long that towards the end, a lot of the people who had signed up to speak ended up leaving

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

or not speaking at all.

MR. FITZGERALD:  Your Honor --

MS. BANNER:  Your Honor --

THE COURT:  I'm sorry.

MS. BANNER:  That's okay.  No problem.  I just would ask -- I know that this is a bench trial, but I would ask that the witness try to keep her answers to the questions that are being asked.  That will keep us moving along.

THE COURT:  Yes.  Let's try to keep this in a question-and-answer format and please proceed.  Thank you.

MR. FITZGERALD:  Yes, Your Honor.

BY MR. FITZGERALD:

Q    So you just testified that there was a rally that took place prior to the May 9 board meeting and that was a Democrat rally.  Is that right?

A    That's correct.  I mean, it was mostly the people from the Democratic Party of Shenandoah County who had organized it.

Q    Okay.  And how did you learn that members of that rally had rushed in prior -- earlier than the board meeting started and filled up the sign-in sheet for public comment?

A    That's usually how we do.  We usually have the sign-up sheet outside for people to sign in, and we actually were there a little bit earlier that day for that meeting.  And the reason I know a lot about this is because we had to ask for a police presence to be there at that meeting, and they explained to us

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

that's why they were there.

Q    Was there anyone that signed up to speak at the May 9 meeting who did not ultimately end up speaking?

A    Yes.  There were several people.  I mean, especially towards the end.  I think it was really late.  I think that meeting was done well past 1 o'clock in the morning on a Thursday, so I think a lot of people ended up -- you know, they had to work the next day.  I don't know why, but they left.  I do remember Chairman Barlow calling a lot of names and names not being there or people saying that they were just not going to speak, you know, after all.

Q    Were there comments from students of Shenandoah County schools?

A    There were a few.  We know that there were a few students that came with their teacher from the Governor's School.

          MR. FITZGERALD:  I just want to remind you to be careful not to identify -- give any identifying information regarding any anonymous plaintiffs.

          THE WITNESS:  Yes, sir.

          MS. BANNER:  Thank you.

          THE COURT:  Thank you, Mr. Fitzgerald.  I appreciate that.

          MR. FITZGERALD:  Thank you.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

BY MR. FITZGERALD:

Q    Of those students who spoke at the meeting, do you recall which specific Shenandoah County school or schools those students were -- identified themselves as attending when they spoke?

A    Yes.  Like I said, they were mostly from -- most of them from the Governor's School.

Q    Okay.  Okay.  All right.  Let's move on.  Did you listen to all the public comments that were given at the April 22nd and May 9 board meetings?

A    Yes.  I was sitting there, so I listened to all of them.

Q    And did you respond to those public comments during the meetings?

A    No.  We're not allowed to respond to public comment.

Q    Is that -- when you say are not allowed, is that part of your board norms?

A    That's correct.

Q    Generally speaking, are public comments something that you

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

consider in your decision-making process?

A    Am I allowed to answer this?  Yes.  I mean, we listen -- I listen to everybody.  So I do take their opinions into consideration.

Q    Throughout the time period between April 11 when the name restoration was raised as an informational item and the May 9 meeting where the names were actually restored, did you receive any other forms of public input besides public comments at the meetings?

A    Oh, yes.  We received a lot of them.  We received a lot of e-mails.  Received texts, phone calls.  We would meet people on the street that would recognize us.  I mean, it's a small community.  So we talk to people on the streets or at church or whatever.  So yeah, there were a lot of people that would approach us with their views on this matter.

Q    So people approached you, but did you also receive any letters or e-mails?

A    Yes, I did.

Q    Did you respond to those letters or e-mails?

A    Well, there a lot of them.  I tried to respond, especially in the beginning before we were diluted with so many e-mails and stuff.  I did try to respond to them, mostly if they're constituents.  If we were receiving stuff from national organizations or who -- people who were not constituents, then they were not a priority.  And, again, my priority -- for me,

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

my priority are my constituents and the residents of my
district.

Q    Did the sum total of public input in all its forms --
public comment, e-mails, letters, in-person conversations, et
cetera -- regarding the name change specifically, did they seem
to favor one side over the other?

A    Yes.  They were overwhelmingly -- they were for the
restoration of the names.  And in fact, our colleague, Mike
Rickard, did actually talk about this in his comments at the
meeting where he actually tallied all the e-mails that we had
received and he actually showed that they were overwhelmingly
for the restoration of the names to Stonewall Jackson and
Ashby-Lee.

Q    Did you say who that colleague was?

A    Mike Rickard.

Q    Were you aware of any surveys or petitions regarding the
school names during this time?

A    During the time I'm aware of, a couple of surveys and at
least one petition at the time.

Q    What was that one petition?

A    That petition was the petition that I referenced that I
think Dr. Johnston had referenced in that e-mail.  It was a
petition that was collected around the time where there was
suspicion that the names were going to be changed.  So I
believe that that petition was mostly done of the southern

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

district, southern campus, and my understanding is that there were over a thousand signatures in there.  I may be wrong on the number, but it was a substantial petition.

Q    Okay.  And what about surveys?  What surveys were you aware of?

A    So I'm aware of at least two surveys.  One is a survey that was sent by the Coalition for Better Schools, which I think was a postcard mostly sent to residents of the people who attend the schools in the southern campus.  And there was also another survey that was done by phone, which I believe was countywide, and that survey it was done anonymously.  So we don't really know who did it and we never got to see the results of that survey, although there were lots of rumors as to who may have done it and what the results were.

Q    Okay.  We won't talk about what the rumors were, but the first survey that you mentioned, did you receive the results of that survey?

A    I believe I did.  I was told about it.

        MS. BANNER:  Your Honor, I'm really sorry.  I just feel like we're getting very close to the line.  I've been patient with getting into evidence what was before the school board in 2024.  But this specific issue of whether she relied on the survey was explicitly objected to on legislative privilege.

        THE COURT:  It was, and I -- and we've heard

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

testimony about this throughout the case.  I'll allow him to put this evidence in, but I can parse it.  Okay?  I can parse it for burden of proof.  I can parse it for reasons for its admission.  I am fully capable of that, but I will allow him -- I think these questions were asked of the other school board members who testified, so I'll allow.

Go ahead.  Thank you.

MS. BANNER:  Understood, Your Honor.

THE COURT:  I understand the objection.  I understand the concern.  I've got this firmly in mind, and I will address it in my opinion.

Go ahead, Mr. Fitzgerald.

MR. FITZGERALD:  Thank you, Your Honor.

THE COURT:  I got this.

BY MR. FITZGERALD:

Q    So the survey, you said you did receive the results of that survey?

A    That's correct.  I think, yeah.

Q    Do you recall how you received the results?

A    I'm trying to remember.  I know I was told verbally.  I think we talked about it at the school board meeting.  And I think several members of the community also related it.  I think there was also an article maybe written on that.  That's how I found out about it.

Q    Okay.  Do recall who conducted that survey?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

A    It's my understanding that it was at least funded by Coalition for Better Schools.

Q    And was that survey requested by the school board?

A    No, it was not.

Q    What is your recollection of the results, approximate results, of that survey?

A    That they were overwhelmingly in favor of the restoration of the names.  I want to say over 90, 92 percent of the people wanted maybe the restoration of the name.  I can't remember exactly the percentage, but I know it was overwhelming.

Q    And I'm forgetting.  When I asked you about the survey in the beginning, what you know about it, did you say whether or not -- or did you say which districts that survey went to?

A    It's my understanding that it went to the first, second, and at least the people who attend those schools in the third.

Q    And as you testified earlier, the first, second, and third districts are served by Stonewall Jackson High School and Ashby-Lee Elementary School?

A    That's correct.

Q    Let's switch gears a little bit.  What does the name Stonewall Jackson High School mean to you personally?

A    To me, personally, I mean, I don't have any connections or feelings one way or the other.  I just understand that Stonewall Jackson was a general, a Virginian, somebody who was a big part of the Virginia history as well as the United States

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

history.  I understand that his tactics were -- I'm not a
military expert, but I understand that his tactics were
actually lauded even today.  They're taught at places like West
Point and the U.S. Naval College.  I know that questions about
knowledge of General Jackson are asked on the SOL's.  So I just
know generally who he is and the importance of his history as
part of our history.

Q    Do you have any feelings about the name Ashby-Lee
Elementary School?

A    Same thing.  For the long longest time, I didn't even know
that it actually alluded to Turner Ashby and Robert E. Lee, but
it's the same thing.  Again, part of the history of Virginia
and, you know, part of the history of this area.  I mean we
live -- Shenandoah County is a very -- a place very rich in
Civil War history.  I mean, we have several battlefields and
markers everywhere you go.  You can't go anywhere without
seeing a Civil War marker, and that's the importance of those
names to that area.  Yeah.

Q    What message do you think those names send to citizens of
Shenandoah County?

A    Well, like I said it's just a reminder of, you know, a
county that was a very important part of the Civil War.  The
battlefields, Stonewall Jackson is actually right next to New
Market, which is one of the major battles.  Again, I'm not an
expert, but I've been to those places.  So I've seen -- I know

there's a history there.

I understand that Stonewall Jackson was actually camped in the area where the school is and he was -- from what I understand, he was camped there for, like, over a month.  So there is a historical attachment to that area where you can place Stonewall Jackson in that area.  And it is my understanding that that's the reason why that school was named Stonewall Jackson.

MS. BANNER:  Objection, Your Honor.  There's no foundation for this.

THE COURT:  Yes.  There is no foundation for that.

Do you want to lay a foundation, Mr. Fitzgerald?

MR. FITZGERALD:  Certainly, Your Honor.

THE COURT:  Okay.  Go ahead.

BY MR. FITZGERALD:

Q    Ms. Carlineo, how did you learn this fact that you just testified to about why the Stonewall Jackson High School was named due to the historical connections?

A    Well, I had -- well, like I said, I've been to those places.  I've done tours, you know, New Market and all that. I've watched movies.  But I've also talked to people who are experts in the area.  I've talked about my father-in-law is also somebody who's very knowledgeable on the Civil War.  So I've heard from him and, in fact, I've gotten corrected several times for mistakes that I made.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

But also there was -- we've -- I've seen the evidence, especially from newspaper articles of the time, which memorialized the reason why Stonewall Jackson was named Stonewall Jackson, that actually speak to the fact that it was named Stonewall Jackson because of the proximity to the area where Stonewall Jackson was encamped.

Q    Are those -- the articles you just referred to, are those the articles that you sent me?

A    That's correct.

Q    I wish I had the ELMO so I could display them, but I only have the one copy.

MR. FITZGERALD:  I'll show it to plaintiffs' counsel now.

MS. BANNER:  I don't believe that this has been produced to us or that we've ever seen it.  Have we, John?

MR. FITZGERALD:  No, you haven't.  And I'm not seeking to enter it as an exhibit.

THE COURT:  It's not been produced yet?

MR. FITZGERALD:  No, Your Honor.

THE COURT:  Not produced in discovery?

MR. FITZGERALD:  No, Your Honor.  I'm not seeking to enter it as an exhibit.

THE COURT:  Okay.  Well, then let's move on.

MR. FITZGERALD:  I was just going to use it to lay a foundation for her historical knowledge of the area in her

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

testimony earlier.

MS. BANNER:  I still believe this is calling for something that's beyond her expertise.  She testified that she doesn't really know about the history.  She's not really learned about that history.  She's talked to people and read a newspaper article.  I don't think that qualifies her to give her opinion as to why the school was named at its original naming.

THE COURT:  Well, it's certainly not the subject of expert testimony if -- and, you know, I don't -- it's certainly not the subject of expert testimony under 702 and it does not appear to me to be the basis of a lay opinion under 701.  Not rationally, based on your presumption reading it in the newspaper article.  I don't think it's admissible.

Please proceed.

MR. FITZGERALD:  Your Honor, I'd like to introduce the newspaper articles referenced by Ms. Carlineo as Defendant's Exhibit 21, I believe, since Gibb Kerr's deposition designations were 20.

(Defendant's Exhibit No. 21 was marked for identification.)

THE COURT:  Okay.  Any objection?

MS. BANNER:  I believe the same objection that we just made.  The documents -- first of all, let me take a look at them again.

MR. FITZGERALD:  Sure.

MS. BANNER:  Having them produced, it is not clear why they are relevant to the case.  They're not clear why they would be relevant to this witness' speculation on why the name is named, and so I would object on that basis.

THE COURT:  Okay.  Perhaps I can look at them.

MR. FITZGERALD:  Certainly, Your Honor, and I'll just respond that --

THE COURT:  And they were -- they hadn't been produced in discovery?  This is all new to everybody this morning.  Right?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Okay.

MR. FITZGERALD:  And I only received them last night, late last night.  And they're not being offered for the truth of the matter asserted, just as Ms. Carlineo's -- yes, and they also fall under the ancient document exception to the hearsay rule and they are being offered as --

THE COURT:  Yeah, they are almost as ancient as me.

MR. FITZGERALD:  And they are also being offered as Ms. Carlineo's knowledge of the historical background which is one of the *Arlington* factors that it goes to intent.

MS. BANNER:  I believe, Your Honor, that they're just not relevant because this goes -- as Mr. Fitzgerald just said, goes to her understanding and reasons for voting for the name,

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

her intent.  So that intent evidence, as we've discussed at length, is not relevant in this case.  Not relevant in terms of --

MR. FITZGERALD:  Your Honor, the document itself does not contain Ms. Carlineo's --

THE COURT:  All right.  I'm going to admit it as Exhibit 21 for what it's worth, provided you can establish a foundation.

MR. FITZGERALD:  Thank you, Your Honor.

BY MR. FITZGERALD:

Q    Ms. Carlineo, how did you obtain those newspaper articles that I just showed you?

A    Well, I was aware that they existed and, in fact, I think one of the persons who is referenced there, the historian Mr. Rosen, is the father of one of my constituents and she had spoken about this before.  So when I found out that this has not been introduced into evidence before, I started making some phone calls last night --

THE COURT:  Last night?

THE WITNESS:  To get the information, yes, the article, a copy of it.

THE COURT:  Okay.  Were you aware of this article in 2024?

THE WITNESS:  Yes, I was aware of it, and I --

THE COURT:  But you haven't seen it?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

THE WITNESS: I had -- no, I had been read -- Ms. Rosen had spoken to me about it. She had read it to me, but I didn't have -- I thought it was part of that packet that we had given to counsel. So like I said, Ms. Rosen is a friend, is somebody, a constituent.

MR. FITZGERALD: And, Your Honor, to be clear, there were a lot of documents produced in discovery, over 80,000. So we very well may have produced it. We just haven't -- since we just got a copy from Ms. Carlineo last night, we haven't had the time to comb through all those documents and find the Bates stamped version, if they indeed were Bates stamped and produced.

THE COURT: Okay.

Anything else you want to say, Ms. Banner?

MS. BANNER: I think we made our objections official for the record.

THE COURT: Yeah. Your objection is noted. Admitted, Defendant's Exhibit 21.

(Defendant's Exhibit No. 21 was admitted.)

Please proceed.

MR. FITZGERALD: Yes, Your Honor.

BY MR. FITZGERALD:

Q    Ms. Carlineo, to your knowledge, are -- are there any Confederate battle flags flying at any Shenandoah County schools?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    No, sir.

Q    Other than the school names at issue in this case, are you aware of any of the references to the Confederacy at Shenandoah County Public schools?

A    Not at our public schools.  I mean, we do have, like I said, monuments and plaques all over Shenandoah County, but not produced by our school, no.

Q    What's your historical understanding of Robert E. Lee and his significance to Shenandoah County?

A    Well, similar to Mr. Jackson, except that I think there was more of a presence from Stonewall Jackson in the area than maybe Mr. Lee.  I'm not sure.  But the same thing.  That he was supposed to be a military tactician and that he was revered for that.  That he was a highly decorated general, you know, for the United States before he decided to leave the Confederate Army and that he was, again, a proud Virginian that decided to side with Virginia because that was -- that was his home state.

Q    Now, a little bit tougher question.  What is your historical understanding of Turner Ashby?

A    Yeah.  That one is a little bit harder.  I knew a little bit less about that except that I -- in the last couple months, I saw there was a marker for him right here in Harrisonburg of where he was -- I guess was mortally wounded and which I guess is why there's a high school here in Harrisonburg that is named after him.  And that he was actually originally from Front

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

Royal, which is very close to Strasburg.  So I guess he's also somebody from the area.

Q    What is your understanding of the historical background regarding school segregation in Shenandoah County?

A    So my understanding is that at the time this was going on in Virginia overall and that in fact Shenandoah County was one of the first counties in the whole entire state to actually desegregate, which is a lot when you consider we have about 95 counties, and I think we have, like, 38 different municipalities and different school districts.  To have Shenandoah County be the second one is -- I think is something to be proud of.  And at the time, you know, that the schools were actually opened, it was in the middle of that desegregation that was going on in the whole entire Commonwealth of Virginia.

Q    What's your historical understanding of the period in the United States known as Massive Resistance?

A    So I'm not as familiar with that except to the extent that I've learned about it throughout this whole process.  But it is my understanding that these were mostly Democrat leaders at the time that were against desegregation and they had come up with different ideals on how to kind of protest the courts that were trying to desegregate the schools either by, you know, asking for the schools to be closed down or by maybe naming them after -- this is what I hear -- for the Confederacy.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Which is another reason why, even for our district, it makes me proud that even in Shenandoah County we had three schools that opened at the same time. We had Strasburg, Central, and Stonewall Jackson. And if we had been doing it as part of the Massive Resistance, then maybe Strasburg would have been named Turner Ashby or Central would have been named something else. Instead, they had Strasburg and Central's names, and only Stonewall Jackson was named after the General.

MS. BANNER: Your Honor, I'm sorry. I'm just going to object again on speculation because this witness testified that she did not know about Massive Resistance or have very much knowledge --

THE COURT: Sustained. Sustained.

Let's move on to something relevant.

BY MR. FITZGERALD:

Q    During this process, did you ever hear from any Black people who attended the school back when it was segregated -- or I'm sorry -- yes, back when it was segregated and the school was first named?

A    No. I don't recall anybody from when the school was segregated, no.

Q    Okay.

THE COURT: And let me just say with regard to the last objection, the witness was simply providing her opinion as to which it's not admissible under Rule 701. That's why I

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

sustained it.  Opinion testimony is her view as to why the schools may have been named something in 1959.  Simply not admissible.  So I just thought I'd provide that further explanation.  Please move on.

MR. FITZGERALD:  Thank you, Your Honor.

BY MR. FITZGERALD:

Q    Ms. Carlineo, you don't know for a fact why Stonewall Jackson High School was named the way it was named, do you?

A    The only fact that I know is, again, what I have read.

THE COURT:  This is exactly what I just said you -- that I sustained the objection on.

MR. FITZGERALD:  I'm sorry, Your Honor.  I'll move on.

THE COURT:  She doesn't know why it was named in 1959.  I think she said that.

Right?

THE WITNESS:  Well, except to the extent that I saw the article which said that it's because of Stonewall Jackson being in the vicinity.

THE COURT:  Thank you.  Please proceed.

MR. FITZGERALD:  Thank you, Your Honor.

BY MR. FITZGERALD:

Q    What's your understanding of why the plaintiffs in this case claimed that their civil rights are being violated?

A    That's a good question.  I really don't understand why

exactly this claim has been made given that we have seen, again, when I go back to, you know, the harm and all that.  Our schools are very welcoming to everybody and we have -- the plaintiffs, like -- you know, many of our students are flourishing and succeeding.  I don't understand why this claim was made.

Q    Without naming specific plaintiffs, do you have assumptions about who the anonymous plaintiffs are?

        MS. BANNER:  Objection, Your Honor.  This is -- the names were protected as attorneys eyes only under the protective order.  I don't think it's appropriate for the witness to speculate as to who the identity of the anonymous plaintiffs are under the Court's protective order.

        THE COURT:  And why in the world is this relevant, Mr. Fitzgerald, as to whether she guesses who the plaintiffs are?  Not relevant.  Move on.  Sustain the objection.

BY MR. FITZGERALD:

Q    Ms. Carlineo, earlier, you testified that you are Puerto Rican?

A    That's correct.

Q    Is Puerto Rican a race?  Pardon my ignorance.

A    No.  If anything, it would be an ethnicity.  I mean, usually, you know, when we're made to fill out those forms as to where you're raised and ethnicity, it would be as Hispanic.

Q    What races comprise or make up Puerto Rico?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    Puerto Rico is mostly -- it's mostly Spanish and African, Black.  That's the majority of the people.  But, you know, we -- our Native American population was decimated early on. It wasn't very big.  But it is very much a multicultural melting pot.  So for example, in my family, half my family is Black, half my family's White.  We're just very -- a very mixed racially society.

Q    Was there segregation in Puerto Rico, to your knowledge?

A    Not to my knowledge, no.

Q    If you had been a child -- pardon the question -- but if you had been a child in a segregated part of the United States in the early- to mid-1900s, do you know whether you would have been allowed to attend all-White schools?

        MS. BANNER:  Objection, Your Honor, on speculation and relevance grounds.

        THE COURT:  Yes.  Sustain the objection.

        Let's move on to something that this witness has personal knowledge, please.

        MR. FITZGERALD:  Yes, Your Honor.

BY MR. FITZGERALD:

Q    Do you believe that Shenandoah County should bring back segregation?

A    Of course not.

Q    Are you glad segregation ended?

A    Absolutely.

Q    Are you familiar with the 2020 school board's resolution condemning racism and affirming the division's commitment to a more inclusive school environment for all?

A    Is this something I can talk about?

Q    Well, just are you familiar with that?

A    Yeah.  I've heard about it, yes.

Q    Did you know about it -- were you aware of it prior to voting to restore the names in 2024?

A    Yes, I had heard about it.

Q    Okay.  When, approximately, did you learn about it?

A    I don't remember.  If I remember correctly, it was part of -- you know, we got all the packages and the FOIA and all that, but honestly, I don't remember exactly when I got it.

Q    Do you condemn racism when you see it?

A    Absolutely.

THE COURT:  Where did you get the FOIA package from? Who gave it to you?

THE WITNESS:  Like I said, I don't recall who gave it to us.  I don't remember.  I know all the school board members got it, so I don't remember if it was handed to us in person or if it was just a package that we got there.  I have -- if I remember correctly, it was a community member that had actually collected them, but I honestly cannot remember exactly who it was.

THE COURT:  Thank you.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

BY MR. FITZGERALD:

Q    What does racism mean to you?

A    So racism, to me, is when somebody is using somebody's race to not just judge that person but act against their best interest.  So it's when you're actually judging someone just solely based on the color of their skin.

Q    And so you condemn that?

A    I absolutely do.

Q    Do you believe that Shenandoah County school should be inclusive environments for people of all races?

A    Absolutely, and they are.

Q    Have you ever received any reports of racially-discriminatory behavior by staff or students at Stonewall Jackson High School.

A    Not while I've been there, no.  I've not heard of any.

Q    What about at Ashby-Lee Elementary School?

A    No.

Q    Has anyone complained directly to you that they were discriminated by staff or faculty of either of those schools based on their race?

A    Never.

Q    Are you aware of any instances of racism or racial discrimination in Shenandoah County schools?

A    No.

Q    Have you ever experienced racism yourself?

A    Yes, many times.

Q    Were any of those experiences in Shenandoah County?

A    Yes.

Q    Can you talk about how those experiences impacted you.

A    Well, you know, my whole life, especially since I moved from Puerto Rico, you know, I've had to deal with -- you know, obviously, I have an accent.  So there's a lot of -- a lot of bias just because of that, so I've kind of gotten used to that. In Shenandoah County itself, it happened during my campaign and it was very specific.  You know, there was a lot of specific name-calling.  You know, filthy Puerto Rican, trash, go back to Puerto Rico, all that kind of stuff, which I'd be happy to look into it a little bit more.

       But, you know, while it was something that even came to a point where it was a little bit threatening because a person actually showed up when I was by myself at the county fair.  It was something that I, you know, dealt with and, you know, I attribute ignorance to the people who are racist either based on, you know, skin color or ethnicity or anything else. So I'm not going to let it affect me.

Q    I think you just answered this, but how did those experiences of racism impact you as a person?

A    Like I said, in that particular instance, it was a little bit worse because the person was physically threatening and actually, you know, came to me and was actually making threats.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

But other than that, I don't believe that becoming a victim is going to make me any stronger, so instead I just attribute it to their ignorance, and I just keep on living my life.

Q    Thank you, Ms. Carlineo.  I'll pass the witness.

THE COURT:  Okay.  Thank you, Mr. Fitzgerald.

It's 1 o'clock.  I will -- let me ask.  Ms. Banner, would you like to start and do your cross right now, or would you like to have a lunch break?  I'd be happy to hear what you think.

MS. BANNER:  I think for the sake of all of us, a lunch break would probably be most welcome.

THE COURT:  Okay.

Mr. Fitzgerald, do you have any problem with that?

MR. FITZGERALD:  Not at all, Your Honor.

THE COURT:  Okay.  Let's take a lunch break until 2 o'clock, and then we'll have the cross-examination in this case.

Ms. Carlineo, since we're in the middle of your testimony, during the lunch break, I ask that you not speak to anyone about this case or any of the subject matter of your testimony, and that includes counsel for the school board.  Okay?

THE WITNESS:  Okay.

THE COURT:  You can't speak to anyone about this case at all because we are in the middle of your testimony.  Do you

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

understand that?

THE WITNESS:  I do, yes.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Okay.  Thank you.

THE COURT:  We'll stand in recess for one hour.

(A recess was taken from 12:58 until 2:02).

THE COURT:  Ms. Carlineo, come back up.  You're still under oath.

THE WITNESS:  Yes, sir.

THE COURT:  Cross examination.  I hope everyone had a good lunch.

MS. BANNER:  Thank you, Your Honor.  You, too.

CROSS-EXAMINATION

BY MS. BANNER:

Q    Ms. Carlineo, hello.

A    Hello.

Q    You recall in your deposition that you asserted legislative privilege and stated that you didn't want to waive that legislative privilege.  Right?

A    I invoked it, and then I answered every single question.

Q    But you stated that you invoked it and didn't want to waive it.  Is that right?

A    That I wanted to reserve it.  I do have questions about this, because it was our understanding that the legislative process was something that we could retain and reserve for

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

questions, but then by answering them, I thought that I had

basically waived that right.

Q    Ms. Carlineo, it's a yes or no question.  You asserted the

legislative privilege in your deposition and stated that you

wanted to -- didn't want to waive it?

A    Reserve it.  Yeah, that I wanted to reserve it, yes.

Q    I'd like you to pull up your deposition transcript, and

I'd like to go to Page 34 and 35.  And I'll start with the

question.  It's starting on Line 16.

Does it ever happen where there's a school board member

that submits something for an agenda and it doesn't make it to

the agenda?  It has happened.  Do you know a reason why that

would happen or -- Mr. Fitzgerald, objection.  At this time I'd

like to advise Ms. Carlineo to invoke her legislative privilege

and to assert -- and assert her intention to waive her

privilege while complying with the Court's order in the

memorandum opinion on legislative privilege.  The witness,

okay.  Ms. Plater.  John, I'm asking generally about the

process of how things work for the school board.  I'm not

asking about any particular vote or decision.  I am just not

seeing -- I'm just not understanding how the legislative

privilege applies.  The witness.  Well, I'll take my attorney's

advice and I will invoke my legislative privilege.  I don't

want to waive it with my answers.

That's what you testified at your deposition.  Is that

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

right?

A    Yes, to the process of how things work at the school board.

Q    Okay.  And, Ms.  Carlineo, you testified that the name Stonewall Jackson, what it means to you is that it's a historical figure.  Is that right?

A    That's correct.

Q    And that's also the same with Robert E. Lee?

A    That's correct.

Q    Turner Ashby?

A    That's correct.

Q    You understand that those were historic figures who fought in the Confederate Army.  Right?

A    That is correct.

Q    And you've acknowledged that preserving slavery was at least part of the purpose of the Confederacy?

A    It may have been part of the reason, yes.

Q    Okay.  Ms. Carlineo, also on your direct exam, you testified that you read an article about Coiner Rosen.  Is that right?

A    That's correct.

Q    And why he wanted to name the schools after Stonewall Jackson?

A    That's correct.

Q    Did you read anything else by him?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    No.  I just read those two articles that we -- that I have given today.

MS. BANNER:  I'd like to bring up and mark for identification Plaintiffs' Exhibit 340.  We sent this to defense counsel shortly before the break.

(Plaintiffs' Exhibit No. 340 was marked for identification.)

BY MS. BANNER:

Q    Ms. Carlineo, this is a letter to the editor from 1956 in *The Northern Virginia Daily*.  The date was December 8, 1956.  Do you see where it says on the bottom, sincerely, D. Coiner Rosen?

A    Yes.

Q    Okay.

A    It's very blurry, so it's kind of hard to read.

Q    We can blow it up, if that would be helpful.

A    That would be great.

Q    And this is a letter -- and the title this letter is Say Southerners Hold Heads High Speak for Right to Segregate, and this is by Coiner Rosen who talked about the naming of Stonewall Jackson?

A    Apparently.  I've never seen this before.

Q    Okay.

MS. BANNER:  Okay.  We can take this down.

BY MS. BANNER:

Q    Ms. Carlineo, you talked a little bit about your background on direct.  You testified that you worked at the Ohio Civil Rights Commission.  How long did you do that?

A    Well, I worked -- as I said, I worked as an intake officer for an externship and I can't remember if it was one semester or two semesters during law school and then was appointed to the commission after I had finished that externship and I served --

Q    Was -- oh, I'm sorry.

A    No, that's okay.  I was going to say I served there until I moved to D.C.

Q    How many years was that that you served on the commission?

A    I honestly -- well, all -- all put together, probably over a year.

Q    Over a year?

A    Yes.

Q    Was it more than three years?

A    Not more than three years.  It's somewhere between one and two years.

Q    Between one and two years?

A    That's what I would think, yeah.

Q    Was that a full-time job?

A    Well, the externship was not a full -- well, it was an externship.  And then the appointment to the commission was an appointment, so it's not a job.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

Q    Did you do that work full time?

A    No.  It's an appointment for a commission, so those are not full-time jobs.

Q    About how many hours a week would you estimate you spent on that?

A    I can't remember.  I mean -- you mean for the externship? I don't remember.  I mean that was 25 years ago, but I would think maybe between 20-25 a week.

Q    What about when you were appointed to the commission, about how many hours a week commitment was that?

A    That was more of a -- I can't remember if it was like quarterly meetings that they would have and they would call us together and we would actually make decisions on that, of the cases before us.

Q    So it wasn't a weekly activity?

A    No.

Q    It wasn't a daily activity?

A    No.

Q    It wasn't even a monthly activity?

A    I can't recall.

Q    Okay.  You also testified that you were appointed to the Virginia -- I think it's Commission on Human Rights --

A    Council on Human Rights.  That's correct.

Q    Council on Human Rights.  Sorry about that.  About how long did you serve in that role?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

A    I can't remember either.  That was -- I want to say I was there for a year or so.

Q    Same question.  Was that a full-time commitment?

A    The same thing, the same answer.  It's a council, so we just get together.  I can't remember if it was monthly or quarterly.  I can't remember.

Q    Okay.  No more than monthly?

A    No.  No.

Q    Okay.  Ms. Carlineo, you testified that you're a lawyer.  Right?

A    That's correct.

Q    Do you have a license to practice currently?

A    I do, but it's inactive.  But I am admitted to the bar in D.C.

Q    In D.C.?  And it's inactive?

A    It's inactive right now.  In good standing, but inactive.

Q    Okay.  I want to turn to 2022 for a quick second.  You testified in your deposition that before you joined the board, you didn't know anything about the school board's vote in 2022 regarding the reinstatement of the names.

A    I'm sorry.  Could you repeat that question?

Q    You testified in your deposition that before you joined the board, you didn't really know anything about the school board's vote in 2022 regarding reinstating the Confederate names.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A     I don't remember testifying to that.  I think what I testified was I was not aware of it at the time of the vote in 2020, but subsequently to that, as I testified earlier today, I had heard about the situation and doing -- like I said, when I was campaigning, I did hear from a lot of people regarding that case and that situation.

Q     I may have misspoke or you may have misheard me.  I'm talking about the vote in 2022.

A     What vote in 2022?

Q     Do you remember that there was a school board vote 2022 to reinstate the names Stonewall Jackson and Ashby-Lee?

A     I was not on the board in 2022.

Q     Do you remember, from being in the community, that there was a vote to reinstate the names Stonewall Jackson and Ashby-Lee in 2022?

A     I don't recall that.  I think there may have been something, but I can't even remember if there was a vote or not.  No, I was not there.

Q     Okay.  And you testified some about the July 2020 meeting that you learned about after you got onto the school board.  Is that right?

A     I'm sorry.  Can you repeat that and give me the year, because I'm not sure what you're talking about.

Q     Sure.  You testified about the July 2020 --

A     Twenty?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

Q    And you said you learned about that after you got on the school board?

A    No, I did not testify that.  I said I heard about that after the 2020 vote, and I think I testified earlier that it was sometime in the fall, maybe?  I can't remember exactly when, but I heard about it after it happened before --

Q    Do you know anything -- oh, I'm sorry.  Please finish.

A    Before I was on the board.

Q    Do you know anything about a September 2020 vote by the school board?

A    I'm not aware of what vote you're talking about.

Q    Let's go back to -- let's go to your election.  You testified on direct about some of your reasons for running for school board.  I want to bring up what's been admitted in evidence as Plaintiffs' Exhibit 197, which is an article entitled Why I'm Running for School Board in District 3.  This article is by you.  Right, Ms. Carlineo?

A    Where was this published?  I've written many articles. I'm not sure which one.  Is this the -- what publication is this?

Q    I believe it was the Freedom Press, but I'm not positive. But is that your name there by --

A    That is my name, so it -- but yeah.  It most likely is. I'm just trying to put it in perspective as to which one this is.

Q    And I'm just going to help out our court reporter, and I'm going to try not to talk over you but also ask that you let me finish my questions before you answer them.

THE COURT:  All right, Ms. Banner.  You need to slow down a little bit, too.  Okay?

MS. BANNER:  I sure will.

THE COURT:  Will you slow down your questioning, because you're going pretty fast, too, and I don't want to wear out the court reporter.  So let's both the lawyer and the witness take a beat and try and talk a little slower to help out the court reporter.  Thank you all so much.

THE WITNESS:  Thank you.

MS. BANNER:  Understood.

BY MS. BANNER:

Q    So, Ms. Carlineo, that's your name as the author of this article.  Is that right?

A    That is correct.

Q    And it's entitled Why I'm Running For School Board in District 3?

A    That is correct.

Q    I want to direct your attention to a paragraph that starts, most democrats have adopted a far-Left ideology that seeks to completely remove true Christian values from society and erase God from our daily lives.  This is in large part -- is in large part what the man-made climate change and

transgender movements are about.  Examples of leftist attempts at denying God and his creation.

That's part of this article.  Right?  Part of your reasons for running for the school board?

A    That is correct.

Q    You also state that, we need strong leaders with unwavering values to lead the charge against a demonic agenda that seeks to rob our children and grandchildren of their future.

That's part of why you ran for school board?

A    That's correct.

Q    And you also ran for school board because you disagreed with what you described as the Left's position on diversity. Is that right?

A    Where is that?  Sorry.

Q    We can start that there is no doubt that the Left derives much of its power from the malleable youth who they have been -- they have able to influence you.  For decades, the Left has been imposing its values on our impressionable youth starting at a very young age.  It began innocently enough using the Trojan horse of diversity and acceptance before turning it into a tool to introduce pot use and drug abuse, sexual immorality, and the rejection of traditional values that corrupt and change our society.

That was also part of your reason for running for the

school board?

A    That is correct.  Well, yeah.  That's what I stated here, yes.

Q    Then you go on to say that, many school boards -- many schools, excuse me, unabashedly promote those Leftist ideals and indoctrinate the children they are entrusted to teach.  On a daily basis, we hear about this happening all around country from preschool to college.

And that's also why you were running.  Right?  You testified specifically to that in your direct.

A    Yes.

Q    Okay.

MS. BANNER:  I'd like to next pull up what's been admitted into evidence as Plaintiffs' Exhibit 181.

BY MS. BANNER:

Q    And Ms. Carlineo, this is a commentary that you wrote on *The Northern Virginia Daily* on June 12, 2020.  Is that right?

A    That's correct.

Q    And it's entitled Commentary: A Letter to Demonstrators?

A    That is correct.

Q    Okay.  In this article, I'm going to direct your attention to the sentence beginning with they say the road to hell.  Can you read that out loud for us?

A    Absolutely.

They say the road to hell is paved with good intentions.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Never has that been more evident than now as drones of woke White privileged Americans attend protests in the name of racial justice.  Isn't it ironic that they pretend to fight racism by reaffirming the lines of Black and White -- I'm sorry -- Black versus White.  A world seen and judged through skin color.  The simple truth is that these people are not fighting racism.  They attend these demonstrations to feel better about themselves and show everyone just how virtuous they are.

Q    Then you go on to say that, a movement such as Black Lives Matters is intrinsically racist and just like the term White privilege.  Is that right?

A    That's correct.

Q    And then I'm going to ask you to read another sentence that starts with, it's impossible to claim we are all equals.

A    Yes.

Q    Do you see that?

A    Yes, I do.

    It's impossible to claim we are all equals and that you are blind to skin color when you state time and again the differences.

Q    Can you continue through the end of disparate treatment?

A    Sure.

    You would think such a concept would be easy to understand, yet clearly it is not.  And thus, you have people

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

mindlessly demanding racial equality through disparate treatment.  An oxymoron at best, evil at worst.  They support BLM's demand, which have nothing to do with racial justice and everything to do with far-Left radical political ambitions without thinking that in the end, those policies will hurt the Black and minority communities the most.  Why should they care?  They all -- they will all go back to their safe communities where they will be able to call police if they feel threatened.

Q    Thank you.  I want to turn to Page 2 of this document.  In this document -- on this page of this document, you talk about how the Black Lives Matter movement is leading to the destruction of Black communities.  Is that right?

A    Can you show where it is?

Q    The first two sentences.  I wouldn't care about the hypocritical virtue-signaling if it didn't have real ramifications on racial relations.  I'm not even talking about the destruction of Black communities during the riots.

      Do you mean the BLM riots there, the Black Lives Matter riots?

A    Yes, that's correct.

Q    Okay.  And you said, something even the KKK never did.  Is that right?

A    That's correct.

Q    And then I just want to read the last part of this paragraph.  You say, few people have been angrier at the

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

demonstrations, the censoring, the shaming, than those of us on the fence looking down at both the White privilege crowd -- oh, I'm sorry.  We did not pull that up yet.

A    I'm not sure where you are.

Q    I'm sorry about that.  It's a little further down.  There we go.  Few people -- thank you.

Few people have been angrier at the demonstrations, the censoring, and the shaming than those of us on the fence, looking down at both the White privilege crowd and the radical extremist BLM crowds.  These two groups are the reasons we have a problem in this country.

I read that correctly.  Right?

A    Let me see where you are.  Hold on.

Q    It should be highlighted on the screen.

A    So, yes.  That was in response to the previous two sentences that you did not read, yes.

Q    Okay.  The sentences I did not read, that humans by nature and not just in the U.S. discriminate.  That sentence, you mean?

A    Yeah.  Yeah.  I'm not Black.  I'm Puerto Rican born and raised who has been subject to her fair share of discrimination, just as most Puerto Ricans probably have been.  Humans by nature, and not just in the U.S., discriminate for other immutable characteristics as well such as speaking with an accent, having slanted eyes, or even having a skin color

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

that is neither Black nor White.

Q    Okay.  Thank you.

A    Few people have been --

Q    I think we have that part on the record there.

And just to clarify, too, when you say BLM here, you're referring to Black Lives Matter crowds?

A    The movement Black Lives Matter.  That's Correct.

Q    And I know I jumped from 2023 to your election back to this 2022 article.  I want to go back your election for a minute.  Your campaign was endorsed by the Freedom Press.  Is that right?

A    That's correct.

Q    I want to pull up what's been marked -- excuse me.  What's been introduced into evidence as Plaintiffs' Exhibit 206.

BY MS. BANNER:

Q    This is a Facebook post by your school board campaign account.  Is that Right, Ms. Carlineo?

A    That is correct.

Q    And it's dated November 3, 2023?

A    Yes.

Q    And you say, thank you to the Freedom Press for its endorsement in its election edition.  Is that right?

A    That is correct.  I mean, I don't know if I say that expressly, but that's the sentiment of the post.

Q    Okay.  And then you share this picture which is from the

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

Freedom Press and the little star saying that you're endorsed?

A     That's correct.

Q     Ms. Carlineo, what is the Freedom Press?

A     The Freedom Press is a -- I don't know if it's a newsletter or newspaper -- that is sent out to families all across Shenandoah County.  Residences, I should say.

Q     It's run by Mike Scheibe?

A     I believe he is the editor, or has been the editor.  I think he was the editor at that time.  I don't know if he still is.  I'm not sure.

Q     Is Freedom -- Freedom Press is associated with the Coalition for Better Schools.  Right?

A     It's my understanding -- I'm not entirely sure exactly who runs it, but it is my understanding that the Freedom Press is put out by Coalition for Better Schools.

Q     Okay.  So they're associated with each other?

A     I believe so, but I don't know that for a fact.

Q     I think you testified earlier that you took your school board seat in January 2024?

A     That is correct.

Q     And in April of 2024, the Coalition for Better Schools sent a letter requesting that the school board add a resolution to reinstate the name Stonewall Jackson and Ashby-Lee to their agenda.  Is that right?

A     That's correct.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

Q    You asked the chair to add this letter to the agenda?

A    I believe I -- I believe another board member asked for it and I seconded that request.

        MS. BANNER:  I'd like to pull up what's been admitted as Plaintiffs' Exhibit 70.

Q    Ms. Carlineo, was this your e-mail address, your school board e-mail address on the top line?

A    Yes.

Q    Gloria Marcus, GE Marcus?

A    Yes.  That is correct, yes.

Q    And it looks like this is being sent to the other members of the school board and also Melody Sheppard?

A    That is correct.

Q    Melody Sheppard was the superintendent at the time?

A    That's correct.

Q    And you say, hello, all.  I agree with Mike about adding the name change to the agenda for next week and would add that we include the results of the survey by the Coalition for Better Schools.  Is that right?

A    That is correct.

Q    And the school board did add the name change and the survey results to the agenda.  Right?

A    I believe they did, but I can't recall exactly.

Q    Is this an issue that you voted on in 2024?

A    The issue of the restoration of the names?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Q    Yes.

A    That is correct, yes.

Q    And that was as a result of this letter?

A    You're going to have to be more specific as to what exactly you are asking.

Q    Did you add -- ask that the name change be added to the agenda in response to receiving this letter from the Coalition for Better Schools?

A    We asked that it be added to the agenda.

Q    Right.  And it was added to the agenda?

A    It was added to the agenda.

Q    That's all I was trying to understand.

A    Oh, I thought you asked about the actual vote.

Q    Oh, no.  I was just trying to understand if it was added to the agenda.

The Coalition for Better Schools had conducted a survey regarding the names.  Right?

A    Yes.  It's a survey that was -- that I spoke about earlier today.

Q    And I think you testified that it's your understanding the school board had no role in that survey?

A    I'm sorry.  Can you repeat that?

Q    It's your understanding that the school board had no role in administering that survey?

A    As a school board member, I'm not -- I'm not aware of it

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

being part of the school board at all.

Q    The school board doesn't typically conduct surveys before votes like this.  Right?

A    You're going to have to -- well, you're going to have to be more specific, because we have done internal surveys of our board members and school division for other issues such as teacher pay raise.  So what exactly are you asking?

Q    Have you done a community survey like the one done by Coalition for Better Schools before conducting a vote?

A    Not while I'm there, no.  I'm not sure of before.

Q    You said not that you're aware of?

A    Not while I have been there.

Q    Oh, not while you have been there?

A    No.  Exactly.

Q    Okay.  I understand.  You received the results from the survey in a letter from the Coalition for Better Schools.  Is that right?

A    I do not remember how I received the results of the survey.  I can't remember if they were included in that letter or not.  I haven't read that letter in a while, so I can't remember.

Q    You didn't see any survey cards?

A    I have seen the survey cards, yes.

Q    Did you see those before they were filled out or after?

A    Filled out by whom?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

Q    By the participants in the survey.

A    Well, I saw a blank card.  So I received it in my PO Box because my PO Box is in the area that is affected.

Q    But you didn't -- you didn't see the survey cards that were filled out in response to the survey?

A    No.  No.

Q    Do you know how the survey cards were collected?

A    I don't know.

Q    Do you know how they were counted?

A    I don't know.

Q    Ms. Carlineo, you testified on direct that if an issue was brought to the school board you would, of course, consider it. Is that right?

A    You're going to have to be more specific.  I mean, are you talking about when an issue is already presented to the board or when somebody from the community brings something up?  I'm not sure what you're asking.

Q    I believe you said on direct that if an issue was brought to the school board you would, of course, consider it?

A    So if there is --

        MR. FITZGERALD:  Objection, Your Honor. Mischaracterizes the witness's testimony.

        THE COURT:  Hold on a second.

        MR. FITZGERALD:  I'm happy to elaborate on that, if you'd like.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

THE COURT:  Yeah.  I'll sustain the objection.

Please, restate your question.

MS. BANNER:  I'm happy to.

Can we pull up what's been admitted into evidence as Plaintiffs' Exhibit 54?

BY MS. BANNER:

Q    Ms. Carlineo, this is an e-mail that was sent on April 17, 2024.  Was this sent to your e-mail address in that top line there?

A    Yes.

Q    And that's the gemarkus e-mail address?

A    That's correct, yes.

Q    And this is a letter asking the school board to consider an issue to leave the current names alone on April 8, 2024?

A    Uh-huh.

Q    Is that right?

A    Actually, could you repeat your question again?  I was reading it, sorry.

Q    This is a letter asking the school board to leave the current names alone.  Is that right?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE WITNESS: ██████████████████

So this was -- this person is asking -- is saying

that we should not consider the letter because it's from an

organization that she deems not to be incorporated in the state

of Virginia.  Is that what you are asking?

BY MS. BANNER:

Q    That's your understanding of this letter?

A    That's correct.

Q    And you didn't move this letter onto the school board's

agenda in 2024, did you?

A    Well, we already had the issue on the agenda.  So we had

the issue on the agenda.  We could either vote for the

restoration, which is what the Coalition wanted, or we could

vote against the restoration, which is what this person wanted.

So this issue was already on the agenda.

Q    You did not add this letter to the agenda.  Is that right,

Ms. Carlineo?

A    We already had the issue on the agenda.

Q    You did not add this letter to the agenda?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A    No, because it was already an agenda.

Q    It's a yes or no question.  Did you add this letter to the agenda?

A    Yes, it was on the agenda already.

Q    This letter was on the agenda?

A    Well, like I said, it's the same issue.

Q    But was this letter on the agenda, Ms. Carlineo?

A    Well, no letters are ever on the agenda.  There's an issue on the agenda.  So even, you know, when we are talking about the Coalition making a request, it's not the Coalition on the agenda.  It's the issue that they requested that was put on the agenda, which is also related to this particular letter.

Q    Thank you.

     Ms. Carlineo, you testified during your deposition that you believe that some people were hurt psychologically and emotionally by the removal of the original names in 2020.  Is that correct?

A    That is correct.

Q    Is it fair to say that you're also aware that some students in this case have testified or submitted public comments that they were hurt by the restoration of the names in 2024?

A    They submitted -- they spoke at our meeting about that.

Q    You've also testified in your deposition that from your perspective, you've seen no evidence of discrimination stemming

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

from the school names.  Is that right?

A    That is correct.

Q    You've testified that in your mind that you would need to test whether the student complaints were legitimate complaints.  Is that right?

A    Can you repeat that again?

Q    You testified at your deposition that you would need to test whether the students' complaints were legitimate complaints.

A    I would like to see the evidence.  I think what I testified to in the deposition was I would like to see what harm was done to the plaintiffs.

Q    And you'd have to do that to know if it was a legitimate complaint?

A    Well, it would certainly help.  I mean, so for example if, you know --

Q    It would help for you to know?

A    It would certainly help, yes.

Q    And when you are determining whether the school names are offensive, you try to ascertain whether people have a valid reason to be offended.  Is that right?

A    That is correct.

Q    And you also testified at your deposition that you didn't understand why people would all of a sudden be feeling unwelcome by the school names.  Is that right?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

A     I don't recall, but probably.  I mean, what -- can you bring that up, please?

Q     I'm happy to, yeah.

        MS. BANNER:  If we can bring up the deposition transcript at Page 91 through 93.  It's 91 -- actually, it might be 91 through 92.  Starting at Line 13.

BY MS. BANNER:

Q     So if they told you today that they felt that the school names made them feel unwelcome because of its ties to the Confederacy, that wouldn't change your mind about the school?

     And you say, well, like I said, I would have to see how legitimate -- you know, if it's a legitimate complaint.  And why would they feel unwelcome by a name that has been there for 66 years, why all of a sudden they're feeling unwelcome about it.

A     That is correct.

Q     So is it fair to say that you've generally been a little skeptical of the students who said they felt unwelcome because of the names?

A     Well, I am skeptical to the degree that some of the students attended the schools before and there were no complaints.  And also we have -- I have seen evidence of some of the students, for example, wearing the Stonewall Jackson shirts with the logos even after they said that they felt oppressed by that -- by those jerseys.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

I am skeptical because I have seen photographs and other evidence to the contrary.

Q    Ms. Carlineo, you heard public comments from students at the May 9 meeting saying how they opposed the names because it made them feel unwelcome.  Right?

A    I testified to that earlier, yes.

Q    And you heard students say that they would not feel valued and respected if the school board voted to reinstate the name Stonewall Jackson and Ashby-Lee?

A    There were some students who claimed that, yes.

Q    There were also some family members who testified about how their students might feel?

A    There were some -- yes, family members who were very active in that, yes.

Q    And you don't believe these people are sincere?

A    I'm not saying that they're not sincere.  I'm just trying to realize -- you know, I'm trying to question whether this is something that really is affecting them the way that they have said because, like I said just now, I happen to have seen pictures of one of the persons who said that those jerseys would make them feel inferior actually wearing those jerseys at a time that they weren't -- didn't have to do it.  They were

voluntarily wearing them.  So I would like to know how can it claim one thing one day and then do something different after you've already claimed that.

Q    Ms. Carlineo, at the May 9, 2024, school board meeting, you gave some comments at the end of the meeting.  Right?

A    During the meeting, I did.

Q    During the meeting?

A    Yes.

Q    Towards the end of the meeting?

A    Yeah.  Well -- yeah, during the debate part of the meeting, yes.

       MS. BANNER:  Excuse me.  I'd like to turn now to what's been introduced into evidence as Plaintiffs' Exhibit 24.

BY MS. BANNER:

Q    This is the transcript of that May 9 meeting, Ms. Carlineo, and I want to turn first to Page 195 to 196.  And I want to begin with a quote that says, we are never going to achieve --

A    Hold on.  Where is that?

Q    Let me see if I can find exactly where it is.  I neglected to write down the line number.  I'm sorry.  Give me one second. Here we go.  It's at the very bottom of the page.  Thanks.

     We are never going to achieve racial harmony or any other kind of harmony as long as we insist on keeping this label and its divisions.  What's more, the baseless accusations and

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

colleagues do the opposite.  They create resentment and racial divides that is becoming really hard and increasingly hard to overcome.  So I encourage you to please, if you really want to stop this racism and prejudice, let's just stop fighting racism and prejudice into everything.  Is that right?

A    That's -- that transcript is incorrect.  I said, let's just stop injecting racism and prejudice into everything.

Q    Missing that injecting?

A    But overall, this is part of my -- of my comments that I made at the meeting, and this is all -- if you had been able to read the previous part of that to get this into context.  The context is, even from my own personal experience with racism, having lived in places where the racism is not as -- as prominent as it is here in this country, it is my contention that, yes, the more that you keep labeling everything according to race or ethnicity, the more you actually keep talking about this, the more you're promoting that.

Q    Let's turn to some of your comments from earlier in the evening, which are on Page 173 through 174 of that same document.  I'm here starting on Line 11.

You say, that same ideology victimizing people of color and finding racism everywhere is the same ideology that has taken God out of the public square, wants us to believe that a biological boy can become a girl, and that we should open our borders to all, which, incidentally, affects -- adversely

affects Hispanic community most of all.  What has this victimization accomplished?  Racial divisions among Blacks and Whites are about as bad as they have been since desegregation, despite the fact that we've had a Black president, a Black Attorney General, and some of our richest billionaires are, in fact, Black.

Was that part of your comments on May 9?

A    That was -- those were part of my comments, yes.

Q    Okay.  And I know you've testified that --

MS. BANNER:  We can take this down for now, but we might be coming back to it in a moment.

BY MS. BANNER:

Q    You testified, I think on direct, that there was quite a number of public comments at that May 9, 2024, meeting.  Is that right?

A    That's correct.

Q    But you heard them all and you sat and listened to them. Right?

A    Yes.

Q    Okay.  During your deposition, you stated that you did not know that Stonewall Jackson High School was segregated when it was opened.  Is that right?

A    That is correct.

Q    Okay.

MS. BANNER:  I'd like to pull up that document again,

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Plaintiffs' Exhibit 24, which is the transcript of the May 9,

2024, school meeting.  This time I'd like to turn to Page 15 to

17.

BY MS. BANNER:

Q    Starting at the bottom of the page, there's a statement by

someone named Ms. Keane, and then going onto the second page on

Line 12.  She says in her public comment, in 1959, as CPS --

which I think it's supposed to be SCPS for Shenandoah County

Public Schools -- conducted the southern campus -- and the

southern campus is Stonewall Jackson High School.  Right?

A    Yes.

Q    And conveniently, in 1960, in the height of Massive

Resistance in Virginia, it was formally dedicated as Stonewall

Jackson High School.  Shenandoah County Public Schools didn't

fully integrate until 1964, ten years after the *Brown v. Board*,

and two years after the NAACP filed a lawsuit for an

African-American student to attend Central High School.  This

was the historic climate when these schools were named.

     This was part of the public record at the May 9 meeting.

Right?

A    It probably was.  I don't -- I don't know that for a fact.

Q    Do you have a reason to doubt this transcript is accurate?

A    Well, I already saw mistakes in what I said, so I don't

know how accurate it is.  But yeah, I will take your word that

it was part of that.  I know some people spoke about this.  I

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

don't know who Ms. Keane is or what her expertise is or where she got this data.  I have no idea.  It could be her opinion.  It could be fact.  She never presented any -- she or he, I don't know -- presented any facts.  So I don't know who this person is.

Q    I want to go to end part of Ms. Keane's testimony, and she says at the bottom of Page 17, the restoration of this name is going to set us back 70 years, and my heart breaks for the children that are going to have to walk into schools named after people that wanted them and their families enslaved by the White man.  I urge the school board to make the right choice and uphold these names.

Also part of the public record.  Right?

A    So that was -- yeah, apparently, her opinion.

MS. BANNER:  I want to look at Page 96 of this same document, lines two through ten.

BY MS. BANNER:

Q    And this is from -- it says female four.  It says, hello. Thank you for hearing me, as we've been here before.  I was the first person of color to step foot in Stonewall Jackson High School in 1964.  That day I walked in and scarred me for life. Right now, I'm trying to deal with it.  I was fine in the last two years when the names went to nice names.  But now I have two grandchildren on the end of the county.  One is at North Fork, which I think -- and one is at Honey Run.  It is going to

hurt me again if we have to go through what I went through.  I do not want their lives scarred.

This is also part of the testimony from the public you received that day.  Right?

A    Probably, yes.

Q    Ms. Carlineo, you stated at deposition that you didn't know that the name Stonewall Jackson High School had a connection to the Confederacy.  Is that right?

A    I'm sorry.  Can you repeat that again?

Q    You stated at your deposition that you didn't know that the name Stonewall Jackson had a connection to the Confederacy?

A    That's not correct.  I believe when I answered the question, I knew that he was a Confederate general, and I was asked several times.

Q    So you know that he was a Confederate general?

A    That's correct.

Q    Did you know that the history of the construction of Stonewall Jackson had any connection to the Confederacy?

A    I'm sorry.  Can you repeat that?

Q    Did you know that the history of the construction of Stonewall Jackson High School had any connection to the Confederacy?

A    I am aware that Stonewall Jackson was constructed at the same time as all the high schools in Shenandoah County, including Strasburg and Central.  So I don't understand how

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

those are tied to the Confederate -- what did you say?  That they are connected to the Confederate what?

Q    I just said to the Confederacy.

A    Yeah, to the Confederacy.  So I'm not -- they were built in 1959, well, almost a hundred years after the Civil War.  So no, they were not connected to the Confederacy.

Q    I want to pull back up what's been marked for -- marked as -- excuse me.  Admitted as Plaintiffs' Exhibit No. 24, which is the transcript, and I just want to turn briefly to Page 130 through 132.

And this is a statement from Mr. Kaufman, and he says, throughout the past few weeks at the board meetings -- this is starting on Line 2.

Throughout the past few weeks at the board meetings, each of you have talked ad nauseam about the process of 2020.  But next to nothing has been said about the actual names some want the schools changed back to or the appropriateness of Confederate general names on school buildings in the 21st century.

And then it goes on -- onto the next page.  And it says -- excuse me.  It's actually onto the next page and starts with, if Shenandoah County were to build a new school today.

MS. BANNER:  If we can go to Page 133.

THE COURT:  It's at the bottom of Page 130.

MS. BANNER:  The bottom of 130?

THE COURT:  That's what it says.  If Shenandoah County were to build a new school today.

MS. BANNER:  Thank you.

BY MS. BANNER:

Q    If Shenandoah County were to build a new school today in 2024, would you consider naming it after a Confederate general? My guess is the answer would be no.

Would you, Ms. Carlineo, name a new school after a Confederate General today?

A    I don't know.  We have not had that -- the opportunity to do that.  Clearly, this is somebody's opinion on that, that Stonewall Jackson is still -- that area, that school, is still near New Market.  So I don't know that we wouldn't do that. But we are not doing it.  That's not what we did.

When we restored the names, it was the name that was originally given to the schools since 1959, just like Central was given to Central and Strasburg was given to Strasburg at the same time.

Q    You also testified at your deposition that you were not familiar with the original process to name Stonewall Jackson High School.  Is that right?

A    You'll have to be more specific.

Q    I'm happy to pull up the question and answer which is in your transcript, but what we asked you is, are you familiar with the original process to name Stonewall Jackson High

School, and you said no.

A    Yeah.  I mean, I'm assuming that it was a school board,
but I guess I don't know what the process was used back then,
no.

Q    But you testified today that you are aware of this article
by Mr. Rosen that we talked about earlier.  Right?

A    I'm familiar with the two articles that we gave -- that I
gave to our attorney, yeah.

Q    And it's also fair to say that you received a lot of
public comments in May 9 of 2024 about the history of the
names.  Is that right?

A    We received a lot of testimony pro and against all night
for several hours.

Q    Okay.  And some of those talked about the history of the
naming of Stonewall Jackson High School?

A    I think most of them, even the ones for the restoration,
were talking about the history.

Q    I want to pull up what's been introduced as Plaintiffs'
Exhibit 24, the transcript of the meeting again, on Page 17
through 19.

     And this is a statement by Carol Kidwell, and Ms. Kidwell
says, thank you chairman and board members.  My name is Carol
Kidwell, and I am a concerned Virginia resident and member of
the NAACP of Winchester City, Frederick, Warren, and Clark
counties.  In 1954, our courts gave us the landmark *Brown v.*

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

*Board of Education* decision which said maintaining racially --

racial segregated schools was unconstitutional.

Almost immediately, our federal government began

supporting Black students, integrated the segregated schools,

and gave a voice to civil rights leaders.  And in response to

that, White supremacists across the South were not able to let

our beautiful little Black children ever forget their place.

So between 1954 and 1970, at least 45 new schools from Virginia

to Florida were named after Confederate generals and soldiers.

In 1959, Shenandoah County Virginia built their own

reminder to Black students, Stonewall Jackson High School, and

that preserved bigotry over history.

This was also part of the record at the May 9, 2024

meeting.  Is that right?

A    So I don't know who Ms. Kidwell is, but obviously, this is

her opinion.

Q    And this was part of the record in -- from the May 9,

2024?

A    I'm sure it was.  There were a lot of people talking, so.

Q    Okay.  Ms. Carlineo, at your deposition, you testified

that Stonewall Jackson High School -- excuse me.  You testified

that the fact that Stonewall Jackson High School was

constructed as a Whites-only school was not relevant to you

today.  Is that right?

A    I believe that in my deposition I said that that was not

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

relevant to me today because it is not a Whites-only school. And we have been very welcoming of our students and our students do very well and, in fact, that is our school right now that is the most diverse of all the schools that we have.

Q    Ms. Carlineo, you testified earlier that there aren't any Confederate flags at Shenandoah County Public Schools.  Is that right?

A    Not that I'm aware of, no.

Q    And we heard testimony that there used to be a Confederate flag on the gym floor.  Do you know about that?

A    I'm not familiar with that, no.

Q    Do you know why there are no Confederate flags displayed at Shenandoah County Public Schools?

A    I'm not familiar with that, but I can tell you that right now, there's not, because I passed a policy that does not allow any other -- I mean, I didn't pass it.  We passed it, but I introduced a policy that does not allow any other flags other than the state or county and -- yeah, pretty much, and the United States flags.

Q    Why did you pass that policy?

A    Because those are the only flags that we want to be seen flown in our schools.

        MS. BANNER:  Court's indulgence for just a moment, Your Honor.

BY MS. BANNER:

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

Q    One last question about your deposition testimony.  You testified at your deposition that even if you assumed that it was true that the reasons for the names Stonewall Jackson and Ashby-Lee was to intimidate Black students, you still wouldn't think that history was relevant.  Is that right?

A    Can you pull that up?  I want to see that again as written.

Q    Yes, of course.  That is your deposition at Line 88 -- Page 88-07.  And the question starting at Line 7.

And assuming it's true that at the time, the school was named as part of the Massive Resistance campaign against school integration, would that be relevant to your opinion about the school name?

And after your counsel objected to form, you said, again, no.  I'm looking at what it means right now and what is happening right now.

And then it goes on.  Assuming that it is true that the name -- that at the time, the name made Black students feel unwelcome in the school, would that be relevant to you and your opinion on the school name?

And you say, no, same answer.

Then it goes on.  Assuming that today the school name makes Black students feel unwelcome, would that be relevant to you and your opinion on the school name?

And you say, specifically how?  On what basis?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

MR. FITZGERALD:  Your Honor, I'd like to renew my objection from the deposition.  I was objecting because the questions were calling for speculation based on assumptions.

THE COURT:  I'll overrule those objections.  That's proper cross-examination.

Please proceed.

BY MS. BANNER:

Q    So you testified, right, that the history of these names and how the students feel wasn't relevant to you today?

A    I -- that was my testimony, because, again, what I was talking about is -- and I think we spoke about it just now -- focusing on what the schools mean today.  I mean, right now, if we were going to be objecting to names just because somebody objects to it, we're going to be objecting on a lot of things here in the United States.  We have a flawed history.

But right now, we have a name that we had on that school for over 60 years and we've had no instances, as far as I know, of any kind of racism or kids being discriminated against. People have been welcome.  And that's what we have right now in the schools.  So that's what I'm focusing on right now, is what are our schools today.

Q    And your testimony is that that history would not be relevant to you?

A    Well, if I -- no.  Because, again, we're focusing on what it is right now.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Q    Okay.

MS. BANNER:  I'd now like to pull up what's been marked for identification, I believe, as Plaintiffs' Exhibit 337, which is a video.  Apologizes, I'm not sure if this has been admitted -- it's been admitted, and the transcript of this video is also available at Plaintiffs' Exhibit 217.

THE COURT:  Which exhibit?  I'm sorry.

MS. BANNER:  The transcript is Exhibit 217, Your Honor.

THE COURT:  Thank you.

BY MS. BANNER:

Q    Do you remember giving an interview to NewsNation on May 13, 2024, Ms. Carlineo?

A    I don't remember the interview, but I do remember giving it, yes.

Q    Okay.  And you discussed the reinstatement of the name Stonewall Jackson and Ashby-Lee at that meeting?

A    I believe so, yes.

MS. BANNER:  I'd like to play this video at this point, beginning -- we can cut out a little bit of the introduction.  Just about 36 through the end of the video.

(A video was played in open court.)

BY MS. BANNER:

Q    Ms. Carlineo, in that video you testified that we are a nation of laws, or you say that we are a nation of laws.  Is

that right?

A     That's correct.

Q     Those laws include the U.S. Constitution?

A     That is correct.

Q     They also include Title VI of the Civil Rights Act of 1964?

A     That's correct.

Q     And they also include the Equal Educational Opportunities Act.  Is that right?

A     That's correct.

         MS. BANNER:  I have no further questions for this witness, Your Honor.

         Before I step down, I realize that I did not move Plaintiffs' Exhibit 340, which was the letter to the editor by Mr. Rosen, into evidence and I would like to do that at this time.

         THE COURT:  Any objections?

         MR. FITZGERALD:  Yes, Your Honor.  Sorry for interrupting you.  We object on -- that letter is not relevant.

         MS. BANNER:  I think, Your Honor, it's relevant in response to the articles that defendant produced during Ms. Carlineo's direct and shows a little bit more about what motivations of that gentleman may have been.

         THE COURT:  Mr. Fitzgerald, anything else you would like to say, sir?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

MR. FITZGERALD:  Your Honor -- yes, Your Honor. Ms. Carlineo was not even permitted to testify regarding those articles.  You know, she's only testified to her knowledge of those two articles.  She didn't testify to her knowledge of Coiner Rosen the man and everything he's written in every newspaper.

THE COURT:  Thank you.

The Court will admit over the plaintiffs' objection the article that Ms. Carlineo mentioned about Coiner Rosen back from the 1950s, and I'm going to do the same thing with Plaintiffs' Exhibit 340 over the defendant's objection.  I'm going to admit that as well, and it is relevant to this issue that Ms. Carlineo raised about the reason for the naming of Stonewall Jackson High School.

And so I do believe it's relevant and the Court will give it what weight that's appropriate.  But I'm going to -- just as I admitted the Coiner Rosen article from the defense side, I'm going to admit the Coiner Rosen letter to the editor -- editorial on the plaintiffs' side and we'll give Coiner Rosen and -- the Court will give it just what weight the Court deems is appropriate in its evaluation of the evidence in this case.

(Plaintiffs' Exhibit No. 340 was admitted.)

Thank you, both.

MS. BANNER:  Thank you, Your Honor.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE COURT:  Okay.

Mr. Fitzgerald, do you have any redirect you'd like to ask Ms. Carlineo?

MR. FITZGERALD:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. FITZGERALD:

Q   Ms. Carlineo, the -- in the NewsNation interview that was just played for the Court, you said that, you know, we are a country of laws.  We have policies on the board and those policies require us to take the community's input into account when we're naming the schools.  Do you recall that?

A   Yes.

Q   Okay.  Do you know off the top of your head what policy that is?

A   For taking the input from the community?

Q   Yes.

A   Are you talking about, like, public comments during the meeting?

Q   The policy that you're referring to.

A   I mean, generally speaking, we have board norms that rule our meeting, and it's my understanding that as a board, we don't have to accept public comment, and I know some other boards do not accept it.  In our case, we do.  And that news clip, for example, showed that and showed actually the student who has actually written to us and has appeared in many news

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

segments, including CNN.  And if I were allowed to say something about that --

Q    As long as you do not identify that person.

A    That person wasn't identified in there.  But I can say that's the same student who has been seen wearing the Stonewall Jackson uniform.  Is that allowed?  You know, since I'm not identifying the student that has been recently seen just wearing the uniform without been having to do it.  Just during their spare time.

MR. FITZGERALD:  Your Honor, I'd like to read what the parties have jointly stipulated as facts into the record.  Joint stipulations 131, 132, 133, and 168.  And these are from Defense Exhibit 15, the fifth joint statement of stipulated facts.

THE COURT:  Are you going to ask the witness any questions about them?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. FITZGERALD:  131.  Policy FFA outlines the school board's policy regarding naming schools or changing the names of schools.  Policy FFA expressly requires the school board to seek input from the public prior to changing the names of schools.  This policy was in effect in 2020 at the time the school board retired the names Stonewall Jackson High School and Ashby-Lee Elementary School.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

132.  Policy FFA was not referenced on July 9, 2020, agenda item regarding the school board retirement of the school names Stonewall Jackson High School and Ashby-Lee Elementary School.

133.  Policy FFA states the board will solicit and accept input from the public regarding the names of schools or school facilities.  In fulfilling this responsibility, the board shall make every effort to respect the preference of the local school community.

Joint stipulation number 168.  The July 9, 2020, school board meeting had a virtual citizen comment period that immediately preceded the vote to retire the names of Stonewall Jackson High School and Ashby Lee Elementary School.  Policy FFA required that the school board solicit and accept input from the public regarding the names of schools or school facilities and make every effort to respect the preference of the local school community.

BY MR. FITZGERALD:

Q    Ms. Carlineo, is that the policy you're referring to?

A    Yes.  And that was the policy that I was referring in the video that the plaintiffs just showed from NewsNation when I was saying that we were objecting to the process that was used by the 2020 board.

Q    I want to go back to the Claim the Names letter that plaintiffs' counsel displayed for you during your testimony.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Were you the board chair at the time?

A    I've never been the board chair, no.

Q    Where you the vice-chair at the time?

A    I've never been the vice-chair, either.

MR. FITZGERALD:  Your Honor, I'd like to read into the record the parties' joint stipulation number 119, and that is also from the fifth joint statement of stipulated facts, Defense Exhibit 15.

119.  Under this policy -- excuse me. Let me read -- I'd like to read 118, as well, for context.

THE COURT:  Sure.

MR. FITZGERALD:  Joint Stipulation 118.  Policy BDDC, agenda preparation and dissemination, outlines the policy of the school board -- outlines the policy the school board follows when considering and voting on new items.

119.  Under this policy, the superintendent, school board chair, and school board vice chair decide what items will be on the agenda for a particular meeting.  In doing so, they consider input from other members of the school board.  School board members can reach out to the superintendent, chair, and vice chair via e-mail, phone call, or text message to request that an item be added to the agenda.

BY MR. FITZGERALD:

Q    Ms. Carlineo, you didn't decide whether or not the Claim the Names letter would be placed on the agenda, did you?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

A    No, I did not.

Q    Which letter did the board receive first?  The letter from the Coalition for Better Schools or the letter from Claim the Names?

A    I honestly can't number exactly the order, but that letter today was referring to the Coalition.  So I'm going to assume that the Coalition letter came in first.

Q    Referring to the Claim the Names letter, what action did the Claim the Names letter request from the board?

A    If you can put it up again, because I can't remember.  Basically, it was just saying that we should not consider the other letter.  If you can pull it up again, because I can't remember exactly what the language was.

Q    Unfortunately, the ELMO is not working, and that's our only display method.

          THE CLERK:  What defense exhibit number was it?

          MR. FITZGERALD:  Well, the Claim the Names letter is not a defense exhibit.

          THE COURT:  Is it Plaintiffs' Exhibit 54?  Can we pull up Plaintiffs' Exhibit 54?  I'd ask our technology person to help us.

          THE WITNESS:  It's up here.  It's up here now.

          THE COURT:  Is this what you were referring to, Mr. Fitzgerald?

          MR. FITZGERALD:  One moment, Your Honor.  Let me just

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

confirm.

I believe this is the e-mail chain, but the letter itself may be on subsequent pages.

THE COURT: I don't know. That's the best I can do.

THE WITNESS: I can say I'm not sure what the Claim the Name letters said.

MR. FITZGERALD: Okay.

BY MR. FITZGERALD:

Q    Do you recall, generally, what it was requesting?

A    I don't. No, sorry. I was just going by what this one said since I know it was the same person.

Q    But your understanding, as I believe you testified, was that they were essentially requesting the exact opposite of what the Coalition had asked for?

A    That's correct.

Q    Okay. Is it common for a school board to include two items that are mutually exclusive on the agenda?

A    Generally, I mean, the way we saw this is, you know, these are both the same issue. One is if it passes. One side is claiming if it doesn't pass what the other side is claiming. So it's from my perspective at least -- I'm not going to speak for the whole board -- but at least from my perspective, it's the same request, just one is a yea vote and the other is a nay vote.

Q    Is it fair to say it would be redundant to include both?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

A    That's correct.

Q    You were asked about and you testified about all of the public comments that you heard.  I believe you said that you listened to scores of comments on the night of May 9, 2024. Right?

A    That is correct.

Q    Thank you.  Is it possible that, after hours and hours of people talking to you, that you didn't remember every word?

A    That is not just possible, it's an accurate statement.

Q    And even if you did remember it, can you hear and listen to a public comment without believing every word is truth?

A    Well, and that's my point is we took every one of those statements as an opinion, unless there were any facts offered. Which like I said, most of them -- pretty much all of them were opinions.

Q    Does your current -- the board's current policy on flags that you mentioned during your testimony, does that prohibit the use of Confederate flags in Shenandoah County Public schools?

A    That is correct.

        MR. FITZGERALD:  No further questions, Your Honor. Thank you, Ms. Carlineo.

        THE WITNESS:  Thank you.

        THE COURT:  While she's here, Ms. Banner, I'll certainly give you a chance, if you want, to ask her any

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

additional questions.

MS. BANNER:  Court's indulgence for just a minute, Your Honor.

THE COURT:  Take your time.

MS. BANNER:  Your Honor, we're trying figure out the Claim the Names letter and making sure that we have introduced the right things.  So just give us one moment.  We are going to see if we can sort that out for the record.  Otherwise, I'll close out.

THE COURT:  Let's take a five-minute recess while we sort out anything else we want to ask Ms. Carlineo.

Ms. Carlineo, while we're in recess, again, since we're in the middle of -- we're hopefully near the end of your testimony, but while we are in your testimony, please don't discuss the case with anyone.  Okay?  All right.

We'll stand in recess for five minutes.

(A recess was taken from 3:18 until 3:21)

THE COURT:  Okay.  Back on the record.  Ms. Carlineo, you're still under oath.

MS. BANNER:  Okay.  I'd like to pull up Plaintiffs' Exhibit 54 again, which is the Claim the Names letter that we were discussing earlier.  I'd like to scroll first just to the bottom of this page.  It says, dear Shenandoah County School Board members and superintendent, I represent a group of 467 concerned citizens.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

RECROSS-EXAMINATION

BY MS. BANNER:

Q    You see that.  Right, Ms. Carlineo?

A    I see the letter, yes.

Q    All right.  And then I want to go on to the next page and in the middle of the page it says, you have asked for information and we are ready to provide it.  Please accept this information and the attached letter, which I have copied and pasted below, with the same weight you are considering the letter from April 3, 2024, from the Coalition for Better Schools.  Is that right?

A    That is correct.

Q    And then if you scroll down a little bit more, it says copy of the attached letter.

A    Yes.

Q    And then there is a subject, request to leave the current non-divisive school names alone, Mountain View High School and Honey Run Elementary School.  That letter is dated April 8, 2024.  Is that right?

A    Yes.  Just to be clear, so the letter from the Coalition was April 3rd and then this one was April 8?  Yes.

Q    And then scrolling through the rest of this document, this is that letter that is pasted below.  Is that right?

A    I assume so.

Q    And we can go all the way to the last page.  One more

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

page.  And it says, sincerely, Claim the Names Shenandoah County?

A    That's what it says, yes.

Q    Okay.  No further questions on this.  Thank you.

MS. BANNER:  And no further questions for this witness.

THE COURT:  Okay.

Mr. Fitzgerald, anything further?

MR. FITZGERALD:  Your Honor, may we have just a moment of indulgence to look at these documents real quick before I ask a question?

THE COURT:  Certainly.

MR. FITZGERALD:  Thank you.

No further questions, Your Honor.

THE COURT:  Thank you.  May this witness be excused?

MR. FITZGERALD:  Yes, Your Honor.

THE COURT:  Okay.

Thank you, Ms. Carlineo.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Okay.

Are there any other witnesses for the defendant?

MR. GUYNN:  No, Your Honor.

THE COURT:  Okay.

Does the plaintiff have any rebuttal evidence that they want to put on?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

MS. BANNER:  We do not, Your Honor.

THE COURT:  Okay.

Mr. Guynn, any motions?

MR. GUYNN:  Just that I'll renew my Rule 50 motion on the same grounds as yesterday that I understand the Court will take under advisement again.

THE COURT:  Well, what is the basis for your Rule 50 motion?

MR. GUYNN:  That they haven't proven any discriminatory intent, Your Honor.

THE COURT:  Well, that doesn't go to Count Three -- that doesn't go to the Equal Educational Opportunities Act. That only goes to Title VI and the Fourteenth Amendment.

Do you have a motion on the Equal Educational Opportunities Act?

MR. GUYNN:  That would be under the vestiges.  It can't be a vestige in 2024 because it was put in place in 2024, therefore it's not a vestige.

THE COURT:  Okay.  I'm taking under advisement the Rule 50 motion -- I'm sorry.  Did you want to say anything about it before I do that?

MS. BANNER:  Did you see my paper here, Your Honor?

THE COURT:  No.  I want to hear what you have to say before I do that.

Thank you, Mr. Guynn.

MS. BANNER:  Yeah.  Thank you.

Plaintiffs would oppose the motion.  Of course, the Court may weigh the credibility and evidence.  The judgment is only appropriate if the evidence cannot support findings in the plaintiffs' favor.  Here, the record clearly permits such findings, and just briefly for the record, Your Honor, because I understand you'll be taking it under advisement, are equal protection --

THE COURT:  Well, I haven't -- I mean, we talked about doing that yesterday, but I did not hear the basis for the motion yesterday.  So don't presume that's how I'm going to rule.

MS. BANNER:  Okay.  I will not presume that and I will share some facts and then I'm happy to answer questions about any of them.

Your Honor, on the equal protection claim and the Title VI claim, which, as we've noted, rise and fall together with the exception of the undisputed fact that the county receives federal funds, our equal protection claim requires proof of two things, discriminatory impact and discriminatory intent.

We've presented substantial evidence over the course of this trial and the entire record of both of those things. Multiple Black and biracial students have testified credibly and consistently over time about the harms that they experience

from the Confederate school names.  That testimony has been corroborated by parents and by the president of the NAACP who also testified about the harm to the multiple members in Shenandoah County.

And the plaintiffs have had two experts to testify about how this harm is not just speculative, but the research supports that these Confederate symbols uniquely burden Black students in Shenandoah County, they undermine their sense of belonging and their well-being, and they can have true long-term impacts on their health.

With respect to intent, Your Honor, discriminatory intent is usually proven by circumstantial evidence, and the Supreme Court and the Fourth Circuit has recognized that it's very rare to have explicit demonstrations in 2024 of racial intent.  In this case, Your Honor, we've heard a number school board members make racially insensitive, at best, comments about the reason for the 2020 school board decision to reverse the names and about other things in Shenandoah County in their personal e-mails and texts and comments at public board meetings.

In addition to that evidence, Your Honor, the evidence shows almost all of the -- all of the factors under *Arlington Heights*.  It shows that the schools were originally named during Massive Resistance and Confederate symbols to signal exclusion.  The plaintiffs have had experts testify

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

creditably and with great detail about the history of those names and also about the history of the use of Confederate symbology to intimidate and send messages to Black people especially in times when their civil rights are being recognized.

The sequence of events here is critical because in 2020, the school board, who is the defendant here, concluded that the names were discriminatory and removed them in order to promote inclusion for its Black students. And then in 2024, the school board reinstated those names and they made no findings on the record as to what had changed or why those names were no longer discriminatory. And, in fact, the record has shown that there has been a full record explaining to the school board members that those names continued to be harmful and they ignored that.

The school board's contemporary statements talked about how they understand how Black students could feel unsettled or unwelcome or harmed by these names. And then finally, the school board hid their real intent behind this sham survey which we heard testimony about. It was a survey that was done by a third-party group that's outside of the procedures that the school board normally relies on. In fact, they don't normally rely on surveys at all. But no one from the school board inquired as to how those things were tallied or counted, and many of them have actually run away from saying

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

that they relied on that survey to the extent that we have public information about that.

Taken together, Your Honor, the Court could reasonably find that the reinstatement of these school names violates Equal Protection and Title VI.

With respect to the EEOA claim, there's a clear chain between the time of segregation and the current names. And although that chain was briefly broken, it's clear that the 2024 school board was reinstating those names. These are not the school names. The use the language of restoring, reinstating, and those come with all of the history that we heard about from Dr. Brian Daugherity.

So in short, Your Honor, plaintiffs believe they've presented sufficient evidence to move on from this point and are happy to answer any questions, but respectfully request that the Court deny the motion.

THE COURT: Okay.

Mr. Guynn, do you want to say anything else, sir?

MR. GUYNN: Yes, Your Honor. Maybe I must have misunderstood the Court. I understood yesterday that you were saying that you would take it under advisement today and that it would all be rolled into the briefing that is sure to come.

THE COURT: Yeah. I think there's two ways I can do this. I can rule on the Rule 50 now and then we'll just do it, but I think I'm going to -- I think I'm going to take it under

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

advisement.  And then what we'll do is -- we will -- it will all be part and parcel of the proposed findings of fact and conclusions of law that each side wants to present.

I would like to take a brief recess in a minute.  Okay?  I want to do two things.  Okay?  One, I want to give you all a chance to make sure you got all your exhibits in.  Okay?  Talk with the Clerk, make sure we do that.  Then I want to, before we all, in the words of Mr. Barlow, skedaddle, what I'd like to do is have a conversation about next steps.  Okay?  Obviously, there's a lot to be done.  Okay?

A bench trial, in some respects, is a lot more work than a jury trial because it requires findings of fact and conclusions of law by the Court.  But for the relief side -- as I wrote in an opinion -- the relief sought by the plaintiffs, a jury trial is not available.  And so I -- we have this bench trial, and you all have given me a ton of information to sort through, and I've done my level best to stay on top of it.  I have.

Like I said, I read all the depositions of all the school board members.  I've read all -- you know, you have motions in limine on most, but not all, of the experts.  I read all the reports, looked at all their deposition, have spent many nights and weekends, Thanksgiving holiday working on all these issues.  I'm familiar with many of these exhibits.  I watched, as I told you the other day, the 2022 and 2024

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

school board meetings and watched what the school board members said. I've got to go back and look at 2020, and I will do that. There's a lot here. Okay? And I intend -- this is an important case to both sides.

This is not a case about what was the cause of the Civil War. This is not a case about what should be the name of this high school. This is a case about whether -- whether the vote in 2024 to rename or restore these Confederate names to these two high schools violates the Constitution and laws of the United States. That's what this case is about. And there's a variety of elements that go into that.

One, I've already ruled that the First Amendment was violated as regards the name Stonewall Jackson High School. I've ruled on that. When this case is over with, you can take that up to the Fourth Circuit Court of Appeals. But I've already ruled that there's a First Amendment violation in this case.

So the question that this trial has dealt with -- and the parties moved for cross-motions for summary judgment enabling me to rule on that -- this trial has dealt with three claims. The Fourteenth Amendment, the denial of -- the issue of equal protection, the Title VI of the Civil Rights Act of 1964, and the Equal Educational Opportunities Act.

And what I have to drill down on and what I will drill down on with your help, once you get your briefings and

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

proposed findings of fact and conclusions of law, is whether the plaintiffs have met their burden of proof to establish the elements of these claims.  I will drill down.  It's purely a facts burden of proof law exercise.  That's what we'll do. Everybody's got an opinion about these school names and everybody's got opinions about lots of things, but that's not what this case is about.  This case is about the facts established, the burden of proof under the law, and the law. That's what I'm going to decide.  Okay?  And so I have a lot of work to do.  Okay?  I have a lot of work to do to do that, and I appreciate you all's help in doing that.

I'm going to take under advisement the Rule 50 motions and we'll roll the issue of Rule 50 right into the issue about how this case should be decided.  In other words, whether the plaintiff has met the plaintiffs' burden of proof and if, under uncertain circumstance, because we have a burden shifting environment as regards intent on the intent aspect of equal protection, there's a burden shift and if the burden does shift whether the defense has met its burden.  You know, I can parse all that.  All right?

It's going to be a lot of work.  It's going to be a massive undertaking.  But I'll do it.  That's my job.  It's what I took this oath to do, and I'll do it consistent with the Constitution and laws of the United States to the very best of my ability.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

Now, before we break -- thank you all for that, but we've just got -- we've got a lot more work to do.  We finished this portion of it.  I thank you.  And I really want to thank counsel on both sides for the cooperation that you all have done to get this evidence together and get it in front of me much of it by stipulation and agreement.  And I truly appreciate that.  You know, we've had some disagreements throughout the course of the trial about various evidentiary issues.  Well, you know, that's the way things are in trials and you all make your arguments and then I make my rulings and then there is that -- I take great comfort from the fact that there's a Court of Appeals there because I'm just doing the best I can.

Now, I have a question, and you may not know the answer to this question, but I have a question and then I want to take about -- let's take until 4 o'clock.  You all get all your stuff together, make sure all your exhibits are in, then I want to talk to you about next steps.  Okay?  Briefing and a hearing on, if you all want one, a hearing on the sort of, like, closing arguments.  Okay?

All right.  Here's my question.  And it came up -- can you pull up exhibit -- can you pull up Exhibit 24, Page 16?  I'm sorry, Plaintiffs' Exhibit.  You didn't -- you didn't get to 24, Mr. Fitzgerald.  I didn't ask Mr. Guynn because he doesn't know.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

MR. GUYNN:  If I did, I forgot, Your Honor.

THE COURT:  All right.  Right down there in that second full paragraph.  It says, two years after the incident -- this is from, I think, the public comment of the school board meeting.  And it says, the NAACP filed a lawsuit for an African-American student to attend Central High School.  Okay?  In Shenandoah County.  All right.  And this is what I want to ask you all if you know.  Okay?

And that is, do you all know whether -- and I don't know this, but I can find this out -- was Shenandoah County subject to a court-ordered desegregation plan?  And that might be relevant to the Equal Educational Opportunities Act claim, and I didn't see that stipulated, but it would be interesting for me to know that.

MS. BANNER:  I do know the answer to that, Your Honor.

THE COURT:  All right.

MS. BANNER:  And it's actually -- it is for certain in Professor Daugherity's report.

THE COURT:  Well, yeah.  But I didn't ask Professor Daugherity about it.  He talked about Warren County, he talked about some of other the counties, but I don't -- if I missed it, I missed it.

MS. BANNER:  No.  The reason -- it may not even have come up in testimony, Your Honor, and that's because there was

222

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

not a desegregation order in Shenandoah County.  The case was withdrawn.  I think it's unclear from the historical records whether it was settled or withdrawn or some procedural thing happened.  It's unclear why the case went away, but there was never a desegregation order in Shenandoah County.

THE COURT:  There's one in Warren?

MS. BANNER:  There's one in Warren.

THE COURT:  And there was one in Charlottesville I think Dr. Daugherity talked about.

MS. BANNER:  That's correct.

THE COURT:  Okay.  So there was never a -- this court, sitting right here in this building, in this chair, did not enter a desegregation plan for Shenandoah -- there was a suit filed, but no plan entered.  Is that correct?

MS. BANNER:  That is my understanding, Your Honor.

THE COURT:  Okay.  Thank you for that information.

All right.  Let's take about a 20-minute recess.  You all check to see if all your exhibits are in.  Work with Kristin, and we'll gather up all our stuff, and then I'd like to talk to you -- at 4  o'clock, I'd like to talk to you about what you think makes sense for next steps.

Thank you all so much.

(A recess was taken from 3:40 until 3:58)

THE COURT:  Okay.  Good afternoon folks.  I know everybody's anxious to start their holidays.  We've been busy

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

here helping me out.  I was thinking -- let's see if you all have any suggestions for how you want -- in terms of timing and how you'd like to get things before the Court for next steps. Do you all have any agreement or any suggestions for me?

MR. GUYNN:  I guess, Your Honor, we ought to clarify and make sure we know what it is you're looking for.  And our understanding would be a memorandum of law, of an argument, proposed findings of fact, and proposed conclusions of law. Three different -- basically three different documents?

THE COURT REPORTER:  Yeah.  I think that makes sense. Ms. Banner?

MS. BANNER:  Yes, Your Honor.  That's what we were just speaking about and wanted to check with your preference.

THE COURT:  On the findings of fact, I think we can make it easier on ourselves.  You all have done a ton of work in all these stipulations.  So what I was thinking that the Court's ultimate work product would look like would be a memorandum opinion which would be the conclusions of law. Okay?  Findings of facts, which would have two parts.  One, the stipulations, and I just attach the stipulations to -- I'm not retyping them.  I'll attach the ones that you all filed.  And then the findings of fact regarding the facts that were beyond those in the stipulated facts.

What do you think about that?  Does that make sense, or is that going to unduly complicate matters?

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

MR. GUYNN:  I mean, just off the top of my head, there's not going to be a lot of dovetailing between the stipulations and the proposed findings of fact.  I guess I just wonder if, when it's all said and done, if we won't be happier if we have done that and maybe have a way to designate which one's stipulated on a proposed findings of fact and --

THE COURT:  Okay.  You mean just do proposed findings of fact and --

MR. GUYNN:  Intersperse the stipulations.

THE COURT REPORTER:  Okay.  In other words, not have two separate documents?

THE COURT:  Yeah.  I wonder if you're not going to -- and the other thing I was going to suggest is, when you look at the stipulations, they could be rearranged a little bit to be a little bit more chronological or whatever order that would fit more with findings of fact, if that makes sense.

THE COURT REPORTER:  Yeah, because they came in --

MR. GUYNN:  Right.

THE COURT REPORTER:  -- in indifferent tranches. Okay.

What do you think, Ms. Banner?

MS. BANNER:  I think what my colleague proposes makes sense, that having one document and we can, in the proposed findings, if it's a stipulated fact, we just cite to the stipulation will make it easy for everybody.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

THE COURT:  Okay.  Then I'm going to want you all to, when you docket your proposed findings of fact and conclusions of law, also e-mail me Word versions.  Okay?  Because if I'm going to be pulling from each document, rather than having to retype the whole thing.  Or maybe I'll just retype the whole thing.

MR. GUYNN:  Hopefully we're going to have -- they're going to look very similar.  There's just going to be portions that are, you know, going to have proposed findings of fact there are going to be a little different.

THE COURT:  There's likely to be some that are going to be different.

MR. GUYNN:  On that part, for sure.  But as far as the stipulated ones, they're all going to be the same.

THE COURT:  Yeah, let's do that.  Let's just do -- file a proposed finding of fact and conclusion of law, and the conclusion of law is really going to be your brief on -- actually, I want proposed findings of fact and then I want a brief from you on what the conclusions of law should look like.

MR. GUYNN:  Two documents?

THE COURT:  Okay.  Two documents.  Okay?  When would you like to do that by?

MR. GUYNN:  Well, I think we're going to need the transcript.  Sorry.

THE COURT REPORTER:  The transcript is currently set

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

to be due on January 2.

MR. GUYNN:  Okay.  Is that convenient?

THE COURT REPORTER:  It's doable.

MR. GUYNN:  It's the holidays.

THE COURT:  Okay.  How much time would the parties like to get me proposed findings of fact and conclusions of law?  Look, we had five days of evidence.  Right?  And we have boxes of exhibits.  It's a -- I'd like to get it done this -- I'd like to get this done as soon as I can, but it's a big job for you and it will be a big job for me.

So how much time would you like?

MR. GUYNN:  I'd really like six weeks from January 2.

THE COURT REPORTER:  What do the plaintiffs say?

MS. BANNER:  Plaintiffs, I think, would hope to do it a little bit earlier than that.  We were thinking maybe January 30, which I think is about four weeks.  But we understand that this was a big undertaking with a lot of evidence, and we want to be respectful.

THE COURT REPORTER:  Let me come down and look at the calendar over my clerk's shoulder.  And then what I'd like to do is pick a date when we can come here and have argument, if that's what you want to do.  If you don't want to have argument, then I'll just decide it on paper.  I kind of assumed you all would like to have argument.

MR. GUYNN:  I'm pretty sure about that, yeah.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

THE COURT:  Okay.

Ms. Banner?

MS. BANNER:  Yes.  I'm sorry.  I was looking at my calendar.  I think we would like to have arguments as well, Your Honor.

THE COURT REPORTER:  That's fine.  We can do that. That just means everyone has to travel back here.

MS. BANNER:  Maybe it will be a little bit warmer when we come back in the spring.

THE COURT:  Doubtful.

Whitney, you said the transcript is going to be ready January 2?

THE COURT REPORTER:  That's what is in ECF, that it will be done by the end of the day on the 2.

THE COURT:  Okay.  Proposed findings of fact and conclusions of law, March 2.  I'm going to give you all 60 days.  Okay?  This is a big job.

MR. GUYNN:  I know it is.

THE COURT:  It's going to be a ton of work.  So let's get it right.  Okay?  Sixty days.  And then we're going to set a hearing in March.  Okay?

MR. GUYNN:  Do you want any responses?

THE COURT:  No.  You give it your best shot.  Okay?

MR. GUYNN:  Okay.

THE COURT:  We'll do responses at oral argument.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

MR. GUYNN:  Okay.

THE COURT:  Well, I said that.  I said that.  What would you all like?  Would you like responses to the proposed conclusions of law?  Would you like to file a reply brief?

MS. BANNER:  Your Honor, I think we were contemplating that we would file responses but not replies, so one round, not two.

THE COURT REPORTER:  One round.

MS. BANNER:  But I will also say the plaintiffs are open to just doing it at oral argument.  I think, as you've said, we've had a lot of stipulated facts, and so we'd be fine with that.

THE COURT:  No, let's have responses.  Okay?

MR. GUYNN:  We were thinking simultaneous initial filing and then a simultaneous second filing.

THE COURT REPORTER:  Yes.  But let me go back.  How long would you like for the response -- the briefs in opposition?

MR. GUYNN:  And that's -- is that only going to be the legal arguments?

THE COURT REPORTER:  Just do legal.  Yeah.  Yeah.  And I'm going to have to parse the facts.  You guys give me your best shots and I'll parse it.  Just the legal argument.

MR. GUYNN:  Another thirty days?

MS. BANNER:  We were going to say three weeks.

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

THE COURT REPORTER:  All right.  That's not too far apart.

MS. BANNER:  That's not too far apart.

THE COURT:  Okay.  Let's go, like, to the end of March for a hearing date here in Harrisonburg.

MR. GUYNN:  It's going to put you in real spot, isn't it?  If we have a minimum of three weeks after the March 1 date?

THE COURT:  Well, I'm thinking about moving your initial briefs up a little bit.

MR. GUYNN:  Yeah.  Six weeks for each.

THE COURT REPORTER:  You started at six, Mr. Guynn.  I gave you eight.  So I've got two weeks of grace there.

MS. BANNER:  I think that generally the last -- it's the last week in March you're thinking, Your Honor?

THE COURT REPORTER:  What about Tuesday, March 31?  Do you know?

MR. GUYNN:  I don't know.  Just put it down and I'll figure it out.

THE COURT:  What about from the plaintiffs?

MS. BANNER:  I think -- I'm seeing some hods, so I think that we'll be okay.  We will be able to make it work, Your Honor.

THE COURT:  Okay.  All right.

Let's do this.  We'll set the hearing here.  What

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 -
REDACTED

time suits you all?  You've got to drive.  You've got to drive.
What time suits you?

MS. BANNER:  Eleven?

THE COURT:  11 o'clock.  11 o'clock, provided we have a courtroom, Tuesday, March 31.  Okay?

So let's go backwards.  Let's work backwards.  Okay. Briefs on -- proposed findings of fact and briefs on conclusions of law are now due February 23.  It's a Monday.  I moved it back a week.

MR. GUYNN:  Your Honor, can I have two extra days on that?  I'm on vacation the week before.

THE COURT:  Okay.  Proposed findings of fact and conclusions of law due March 25, Wednesday.

Now, is that okay with you Mr. Guynn?

MR. GUYNN:  Yeah.  I thought you said February.

THE COURT:  Is that February?  Sorry.  February 25.

MR. GUYNN:  That'd be fine.

THE COURT:  Okay.  February 25.  Mr. Fitzgerald is going to do all the work, anyway.

MR. FITZGERALD:  Absolutely.

MR. GUYNN:  Yeah, but he always wants me to read it.

THE COURT:  As well he should.

February 25, the briefs due.  I want there to be proposed findings of fact and the briefs on the legal issues. Let's go -- and let's see.  Oppositions.  File your oppositions

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

by Friday, March 20.  I'm going to give you three and-a-half weeks.  Okay?

MR. GUYNN:  Thank you.

THE COURT:  That's three and-a-half weeks, and that way I will have two weekends and a full week.  I have a trial set that week, but I don't know if it's going or not.  I think that's the one I don't know if it will go or not.

Okay.  Let's do that.  So initial -- I'll do an order tomorrow.  Proposed findings of fact and conclusions -- and briefs on conclusions of law.  You don't have to state the conclusion.  Give me your briefs.  I'll write the brief as well.  Due March 25 --

THE WITNESS:  February.

THE COURT:  February 25.  Oppositions just I don't need, on the findings of fact -- unless you have a burning desire to do so.  You file whatever you want in opposition by March 20.  Okay?  And then we'll have a hearing on March 31 at 11 o'clock right here.  Okay?

Let's just see if we have a courtroom.  It looks like we're good.  March 31 right here.  Okay?

Thank you all so much.  Everybody, happy holidays, safe travels, and take care of yourself.  See you.

MR. GUYNN:  Thank you, Your Honor.

(Proceedings concluded at 4:14 P.M.)

12/17/2025 - *NAACP v. Shenandoah* - Bench Trial - Day 5 - REDACTED

CERTIFICATE

I, Whitney M. Stier, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/   Whitney M. Stier                    Date:   1/2/2026