**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED

8/6/2026

LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

| | |
|---|---|
| **VIRGINIA STATE CONFERENCE NAACP, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | **Case No. 5:24-cv-00040** |
| ) | |
| **v.** ) | **By: Michael F. Urbanski** |
| ) | **Senior United States District Judge** |
| **COUNTY SCHOOL BOARD OF SHENANDOAH COUNTY,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

This memorandum opinion addresses whether the County School Board of Shenandoah County ("School Board") violated plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause, Title VI of the Civil Rights Act of 1964, and the Equal Educational Opportunities Act when it restored the names of Confederate officers to two schools in Shenandoah County in 2024.[1] The court held a five-day bench trial in Harrisonburg, Virginia, reviewed post-trial briefing, and heard closing argument.

Having considered all of the admissible testimony and documentary evidence, including the jointly stipulated facts,[2] the evidence establishes that the School Board's decision

---

[1] By memorandum opinion entered September 9, 2025, the court found in favor of plaintiffs on their First Amendment compelled speech claim concerning Stonewall Jackson High School. Mem. Op., ECF No. 171.

[2] Joint Statement of Stipulated Facts will be abbreviated to JSSF. The paragraphs are enumerated 1-225, spread over five sets of jointly stipulated facts.

1

to reinstate the Confederate school names violated the Equal Protection Clause of the Fourteenth Amendment, Title VI, and the Equal Educational Opportunities Act.

This case is unique for two reasons. First, the 2024 School Board's restoration of the Confederate names marked an abrupt reversal of its decision four years earlier to eliminate the Confederate names as its "next steps" to implement its June 25, 2020, "Resolution condemning racism and affirming the division's commitment to an inclusive school environment for all." First JSSF, ECF No. 242-1, ¶¶ 3, 14, 19. As such, this is not a case in which students brought a lawsuit to change a school name that had been continuously in place for many years.[3] Rather, it is a case about students suing over the School Board's 2024 decision to reinstate school names that the School Board itself removed four years earlier as being racially discriminatory. Nor is this case about the appropriate legacy of the three Confederate officers for whom the schools were named. While that debate casts cultural, historical, and political shadows over this case, often evoking strong emotions, the issues to be decided here are entirely legal in nature and turn on the elements of the legal claims, burden of proof, and evidence presented.

Second, the 2024 School Board members declined to respond to discovery about their reasons for reinstating the Confederate names, invoking legislative privilege. As a pretrial ruling on this issue noted, the law does not allow the School Board to shield from discovery the motivation for their 2024 vote to restore the Confederate names yet present trial testimony on the topic. See Order, ECF No. 215. In short, the School Board members made the choice

---

[3] To be sure, there are plenty of other institutions, highways, and landmarks named for Confederate leaders. This case stands apart because the School Board discarded the Confederate names as symbols of discrimination and racism in 2020, only to reinstate them four years later.

to limit their evidence as to their reasons for the 2024 vote. To be clear, the court draws no adverse inference from the School Board's invocation of legislative privilege. The parties stipulated to the authenticity and admissibility of various documentary and video evidence regarding the School Board meetings in 2020, 2022, and 2024 concerning the Confederate school names issue, which included statements from School Board members about their decisions.[4] The court has studied the documents relating to these meetings and viewed the videos of the 2020, 2022, and 2024 School Board meetings admitted into evidence.

As noted in the court's earlier memorandum opinion, the court is fully mindful that "the 'federal courts should not lightly interfere with the day-to-day operation of schools.'" Coal. for TJ v. Fairfax Cnty. Sch. Bd., 68 F.4th 864, 887 (4th Cir. 2023) (quoting Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 440 (4th Cir. 2013)). The Supreme Court has "recognized that local autonomy of school districts is a vital national tradition." Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410 (1977); see Milliken v. Bradley, 418 U.S. 717, 741 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools . . . ."). However, as the Supreme Court explained in Epperson v. Arkansas, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." 393 U.S. 97, 104 (1968) (quoting Shelton v. Tucker, 364 U.S. 479, 487 (1960)). Accordingly, federal courts, including the Supreme Court, routinely decide cases involving public schools, often with the goal of ensuring public schools serve

---

[4] See July 9, 2020 Meeting Documents, ECF Nos. 242-19, 242-20, 242-28; September 10, 2020 Meeting Documents, ECF Nos. 242-31, 242-32; June 1, 2022 Meeting Documents, ECF Nos. 242-23, 242-27, 242-30; June 9, 2022 Meeting Documents, ECF Nos. 242-22, 242-24, 242-26; April 11, 2024 Meeting Documents, ECF Nos. 242-33, 242-34; April 22, 2024 Meeting Documents, ECF Nos. 242-17, 242-35; May 9, 2024 Meeting Documents, ECF Nos. 242-18, 242-21, 242-25.

their essential role in our democracy in compliance with constitutional principles of political neutrality and equality. See W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 637 (1943) ("Free public education, if faithful to the idea of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction."). When a local school board commits an action that amounts to a constitutional violation, "[t]here is no doubt that federal courts have authority to grant appropriate relief . . . ." Dayton, 433 U.S. at 410. With this admonition in mind, the accompanying Order provides the School Board with a reasonable opportunity to remedy the constitutional and statutory violations.

The following constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.[5]

## I.    Evidence Presented

At trial, plaintiffs offered testimony from the following fact witnesses: plaintiff D.D. and plaintiff J.D., students at Stonewall Jackson High School and Ashby-Lee Elementary School; Kay Doe, the parent of D.D. and J.D.; plaintiff Brianna Brown ("B.B."), a former student at Stonewall Jackson High School; plaintiff A.D. Carter ("A.C."), a former student at Stonewall Jackson High School; and the Reverend Cozy Bailey, President of the Virginia State

---

[5] At trial, defendants made an oral motion for judgment as a matter of law under Fed. R. Civ. P. 50, but that rule does not apply to a bench trial. See Vincent v. United States, No. 22-3019, 2024 WL 5202240, *1 (D. Md. Dec. 23, 2024) (citing cases). Instead, Rule 52 applies to bench trials, requiring findings of fact and conclusions of law. Nonetheless, the court will construe defendant's motion as a motion under Rule 52(c). For the reasons stated in the findings of fact and conclusions of law which follow, that motion is **DENIED**.

Conference of the National Association for the Advancement of Colored People ("VA

NAACP").[6]

Plaintiffs also offered testimony from the following expert witnesses: Brigadier General

Ty Seidule (U.S. Army, ret.), Dr. Brian Daugherity, Dr. Adiaha Spinks-Franklin, and Dr. Amy

Bass. Gen. Seidule was admitted as an expert in the history of the Confederacy, the lives of

Confederate generals, and Confederate commemoration. Seidule Test., ECF No. 277 at 154:7-

9. Dr. Daugherity was admitted as an expert in the history of school desegregation and

integration in Virginia. Daugherity Test., ECF No. 277 at 245:11-13, 245:24-246:4. Dr. Spinks-

Franklin was admitted as an expert in the field of developmental behavioral pediatrics and on

racism as a health determinant in children. Spinks-Franklin Test., ECF No. 279, at 77:11-14,

77:19-22, 161:24-162:10. Dr. Bass was admitted as an expert on the benefit of scholastic sports

participation for K-12 students and its intersection with culture, including, among other things,

how symbols associated with Confederate figures shape student experience in school-based

athletics. Bass Test., ECF No. 280, at 15:18-21, 16:5-15.

In sum, the court found plaintiffs' evidence credible and compelling, meeting their

burden of proof on all elements of the legal claims alleged.

Defendant called several members of the School Board as fact witnesses, including

Dennis Barlow, Kyle Gutshall, and Gloria Carlineo. The School Board also called Michael

---

[6] Plaintiffs B.B. and A.C. attended the Massanutten Regional Governor's School for their junior and senior years of high school, which is located within the building that is named Stonewall Jackson High School. See A.C. Test., ECF No. 279, at 25:8-26:23, B.B. Test., ECF No. 278, at 133:21-134:8. As explained herein, because B.B. and A.C. have graduated and their lawsuit seeks only declaratory and injunctive relief, their claims are now moot. While their claims are moot, their testimony regarding discriminatory impact remains relevant and probative.

Dorman, the former principal of Stonewall Jackson High School. The parties designated the deposition testimony of the following fact witnesses: School Board member Brandi Rutz, Shenandoah County Superintendent Melody Sheppard, and Coalition for Better Schools leader Michael Schiebe.[7]

The court also admitted the deposition designations of defendant's expert, Gibson Kerr, on the issue of "Robert E. Lee's motivation to fight for the Confederacy and his position on slavery." See Order, ECF No. 226, at 18.

Defendant's evidence was neither fully credible nor persuasive on the issues of discriminatory impact and intent.

## II.    Standard of Review

In a non-jury case, "[t]he trial judge has a function of finding the facts, weighing the evidence, and choosing from among conflicting inferences and conclusions those which he considers most reasonable." Taylor v. Republic Servs., Inc., 968 F. Supp. 2d 768, 775 (E.D. Va. 2013) (citing Penn-Texas Corp. v. Morse, 242 F.2d 243, 247 (7th Cir. 1957)); see Burgess v. Farrell Lines, Inc., 335 F.2d 885, 889 (4th Cir. 1964). In serving as the finder of fact in a non-jury trial, "[t]he trial judge has the inherent right to disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias." Taylor, 968 F. Supp. 2d at 775 (citing Penn-Texas Corp., 242 F.2d at 247). "[O]nly the trial judge can be aware of the variations in

---

[7] The designated portions of the depositions of Brandi Rutz and Michael Schiebe were played via video during the trial. The designated portions of Melody Sheppard's deposition were introduced into evidence as an exhibit but were not read or played during trial.

demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985).

To comply with Rule 52(a)(1), the court "must do more than announce statements of ultimate fact," United States ex rel. Belcon, Inc. v. Sherman Constr. Co., 800 F.2d 1321, 1324 (4th Cir. 1986), but is not required "to make findings on all facts presented or to make detailed evidentiary findings." Darter v. Greenville Cmty. Hotel Corp., 301 F.2d 70, 75 (4th Cir. 1962) (quoting Carr v. Yokohama Specie Bank, Ltd., 200 F.2d 251, 255 (9th Cir. 1952)). "The ultimate test as to the adequacy of findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." Id.

### III.    Summary of the Trial Evidence

Stonewall Jackson High School, built between 1957 and 1959, was named by the Shenandoah County School Board to honor the Confederate General Stonewall Jackson. First JSSF, ECF No. 242-1, ¶¶ 3-4. Ashby-Lee Elementary School, built between 1973 and 1975, was named by the School Board in 1974 in honor of Confederate Officer Turner Ashby and Confederate General Robert E. Lee. Second JSSF, ECF No. 242-2, ¶¶ 59-62.

In order to help the court assess whether the restoring of the Confederate school names violated the Equal Protection Clause or federal statutes, the parties introduced evidence as to the historical context and meaning associated with those names. By means of expert testimony, the parties introduced historical evidence bearing on the relation of the Confederacy to slavery, the Reconstruction era, racial segregation in the South, Massive Resistance, and school desegregation and integration. Across this timeline, the historical experts testified as to the role

played by Confederate symbols. The court will first outline the historical expert evidence presented at trial.

## A. The Three Names at Issue and the Commemoration of the Confederacy

### 1. Stonewall Jackson, Turner Ashby, and Robert E. Lee

Plaintiffs offered retired U.S. Army Brig. Gen. Ty Seidule[8] as an expert on Confederate commemorations and the complex history surrounding the Lost Cause narrative. Based on his historical research, Gen. Seidule testified that the single animating purpose of the Confederacy was the preservation and expansion of slavery.[9] Seidule Test., ECF No. 277, at 156:7-19. In response to those who suggest that the Confederacy did not primarily fight for slavery, or that the Civil War was actually about "states' rights," Gen. Seidule countered that the "states' rights" motivating the South to secede were the states' rights to maintain the institution of slavery. Id. at 157:1-11. Gen. Seidule bolstered his opinion by referencing Confederate states'

---

[8] Gen. Seidule is a Visiting Professor of History at Hamilton College in Clinton, New York. He previously served as a professor and head of the Department of History at the United States Military Academy at West Point, and taught Civil War history, American history, and European history. Gen. Seidule served in the U.S. Army from 1984 to 2020. He received a bachelor's degree in history from Washington and Lee University, and a master's degree and Ph.D. in history from The Ohio State University. His scholarship and public speaking focus on U.S. military history, the Confederacy, and Confederate commemoration. Gen. Seidule authored Robert E. Lee and Me: A Southerner's Reckoning with the Myth of the Lost Cause, and Promise Delivered: Ten American Heroes and the Battle to Rename Our Nation's Military Bases. From 2021 to 2023, Gen. Seidule served as Vice Chair of the Commission on the Naming of Items of the Department of Defense that Commemorate the Confederate States of America or Any Person Who Served Voluntarily with the Confederate States of America. Gen. Seidule's opinions in this case are based on his education, scholarship and research, experience, and review of various materials identified in the evidentiary record, including School Board meeting minutes as well as yearbook and other images taken from Stonewall Jackson High School. See generally Seidule CV, ECF No. 242-63 and Seidule Test., ECF No. 277, at 143:8-154:11.

[9] The parties stipulated that "[t]he Confederacy existed, in part, to preserve slavery." First JSSF, ECF No. 242-1, ¶ 2.

secession documents that mention slavery as a priority, as well as the Confederate Constitution that explicitly guaranteed slavery in perpetuity. Id. at 157:12-24; 160:11-13.

Gen. Seidule also provided details about Turner Ashby, Robert E. Lee, and Stonewall Jackson, and testified that their primary legacies are their roles in the Confederate military. Id. at 194:16-24.[10]

Stonewall Jackson was a Confederate general. First JSSF, ECF No. 242-1, ¶ 1. He owned slaves and was a religious man, known to teach Sunday school to Black children, even when it was illegal for enslaved people to read and write. Seidule Test., ECF No. 277, at 167:18-168:14; 227:10-23. Gen. Seidule testified that this teaching was done in the context of a society founded on slavery. Id. Gen. Seidule testified that Jackson was a West Point graduate who earned his nickname "Stonewall" at the Battle of Bull Run. Id. at 167:18-168:11. Gen. Seidule testified that Jackson later "bravely and brilliantly" led the Valley Campaign, before ultimately being fatally wounded. Id. at 168:5-14. According to Gen. Seidule, Jackson's primary legacy to historians is as "a Confederate general fighting to create a slave republic." Id. at 168:15-17.

Turner Ashby was a Confederate officer and Virginia cavalry commander in the Civil War. Id. at 162:13; Second JSSF, ECF No. 242-2, ¶ 59. He led a cavalry unit that fought under Stonewall Jackson's command and was killed in battle. Seidule Test., ECF No. 277, at 162:12-

---

[10] The concept of a primary legacy arose throughout Gen. Seidule's testimony. Although there are other celebrated figures in our nation's history who were slaveholders, Gen. Seidule emphasized the distinction that can be drawn when considering the primary legacies of people such as Stonewall Jackson and Robert E. Lee and the legacies of other common namesakes. For example, "we have to talk about the fact that [Washington] was an enslaver, but it's not his primary legacy." Seidule Test., ECF No. 277, at 215:1-12. President Washington led "the Continental Army that gave us our country" and "he gave up power when he had complete power. . . .Those are the two most important things in creating the system that we have now. Washington's primary legacy is that." Id.

25. Gen. Seidule testified that Ashby's primary legacy is his role as a Confederate officer. <u>Id.</u> at 163:1-4.

Robert E. Lee was the leading Confederate military figure. Second JSSF, ECF No. 242-2, ¶ 60. He was offered command of the U.S. Army, but he declined after Virginia voted for secession, and he left the U.S. Army to lead the Confederate Army. Seidule Test., ECF No. 277, at 164:23-165:13. Gen. Seidule acknowledged that in years past, he sensed that there was a "reverential belief among Virginians that [Lee] was the greatest human that ever lived." <u>Id.</u> at 169:16-17. In Gen. Seidule's view, Robert E. Lee "is worthy of study, but he is not worthy of commemoration." <u>Id.</u> at 167:14-15.

The School Board designated Gibson Kerr as a rebuttal expert witness to Gen. Seidule's testimony and expert report.[11] Kerr asserted that "Lee was opposed to slavery" and "was opposed to secession," and he fought in the Civil War "solely to defend his home state of Virginia." Kerr Dep., ECF No. 242-211, at 31:1-8. According to Kerr, Lee "was the leading voice for reconciliation trying to restore peace and harmony between the North and the South." <u>Id.</u> at 31:10-12.

---

[11] Mr. Kerr did not testify at trial, but the parties stipulated to the admission of his testimony by deposition designation, limited to topics authorized by the court. <u>See</u> Order, ECF No. 226. Mr. Kerr works in commercial real estate, but considers himself a lifelong historian, particularly in the study of General Robert E. Lee. Kerr Dep., ECF No. 242-211, at 20:13-22, 21:17-20. Mr. Kerr indicated that he attended Washington and Lee University, which led to his curiosity about Lee and his ultimate fascination with Lee as "a revered figure." <u>Id.</u> at 22:2-18. In 2024, Mr. Kerr wrote and published the book <u>Un-Cancel Robert E. Lee</u> because he "thought someone needed to tell the truth about Robert E. Lee." <u>Id.</u> at 29:25-30:2, 30:13-14. Mr. Kerr was motivated to write the book because he felt that "history was being erased" as statues of Lee in Richmond and Charlottesville were taken down and Lee's name was removed from streets and schools throughout Virginia. <u>Id.</u> at 30:10-25.

### 2.   Reconstruction, Segregation, and Confederate Commemoration

Gen. Seidule's testimony traced the history of Reconstruction in the South, segregation, and the Jim Crow era. Gen. Seidule explained the development of the Lost Cause narrative, grounded on the notion that the Civil War was fought over states' rights, and not slavery. Seidule Test., ECF No. 277, at 173:7-23. Gen. Seidule testified that expanded political rights of freed slaves during Reconstruction led to an era of violence and lynchings. Id. at 172:13-14, 174:1-2. Gen. Seidule explained how legal decisions undermined the Fourteenth Amendment and allowed for de jure and de facto segregation in the South. Id. at 172:15-16. Gen. Seidule testified that from approximately 1890 to 1910, Southern states refashioned their state constitutions and laws to establish a two-tiered, Jim Crow system for society. Id. at 172:17-19. This involved enacting laws to prevent the integration of society in Southern states and suppressing Black political participation through means such as poll taxes. Id. at 175:13-23, 179:11-16. Gen. Seidule testified about the Lost Cause narrative which provided justification for the Civil War and bolstered Jim Crow segregation. Id. at 172:24-25, 173:7-23. He testified that both Lee and Jackson were extensively commemorated by Lost Cause adherents. Id. at 176:21-177:16.

Gen. Seidule testified that countless cities, counties, streets, and schools were named after Confederate leaders, and statues and monuments were erected to honor Confederates in public places, frequently in front of courthouses. Id. at 176:10-11, 177:5-16. There are two main time periods in which commemorating Confederate figures was most common: from 1890 to 1920, and from 1948 to the early 1960s. Id. at 177:18-25. To Gen. Seidule, "they're

11

both two sides of the same coin, which is the support of or celebration of White supremacy."
Id. at 186:19-21.

Gen. Seidule explained that between 1890 and 1920, the commemorations celebrated the end of Reconstruction and the return of the White South to dominant political power. Id. at 186:14-21. Gen. Seidule noted that the second major spike in Confederate commemorations followed the Supreme Court's decision in Brown v. Board of Education ("Brown I"), 347 U.S. 483 (1954). Seidule Test., ECF No. 277, at 177:20-25. In response to those developments, Virginia Senator Harry Byrd urged "Massive Resistance" to prevent integration of Virginia's schools. Id. at 189:5-23; 191:4-6. Gen. Seidule explained that the Southern states used "every means, judicial and extrajudicial, to ensure that Black students and White students didn't come together, didn't have to study and go to the same school." Id. at 189:18-21. Gen. Seidule testified that during this period, additional monuments were erected and schools were named after Confederates as a way of fighting for segregation. Id. at 202:19-20.

## B. History of Public School Segregation in Shenandoah County

Dr. Brian Daugherity's[12] scholarship "revolves around Brown v. Board of Education and the school desegregation process, primarily within the state of Virginia." Daugherity Test.,

---

[12] Dr. Daugherity is a Professor of History at Virginia Commonwealth University in Richmond, Virginia. He teaches courses on the history of the civil rights movement, the history of Virginia, and the history of the United States since 1865. He has a bachelor's degree and Ph.D. in history from the College of William and Mary, a master's degree in history from the University of Montana, and a master's degree in education from the University of Mississippi. His scholarship focuses on the implementation of the Supreme Court's 1954 Brown v. Board of Education decision in Virginia. He published the book, Keep On Keeping On: The NAACP and the Implementation of Brown v. Board of Education in Virginia, a collection of essays about the implementation of Brown around the country in which he wrote a chapter on Virginia. He also has served on several advisory boards related to African American studies and history, including co-chairing the Desegregation of Virginia Education ("DOVE") project, which documents, publicizes, and preserves historical records related to school desegregation in Virginia, including first-person accounts from people who experienced

12

ECF No. 277, at 242:13-15. In preparing to testify, Dr. Daugherity did extensive research about the history of Shenandoah County and its public school system. Id. at 256:1-5.

Dr. Daugherity testified about the history of racial segregation and discrimination in the Shenandoah County school system. Id. at 266:25-267:3. Virginia's State Constitution mandated that public schools throughout the state be segregated at their inception. Id. at 256:8-23. Accordingly, public schools in Shenandoah County were segregated by race when they first opened in the 1870s. Id. at 257:5-21. The Supreme Court later upheld segregation in Plessy v. Ferguson, 163 U.S. 537 (1896), permitting separate but equal public facilities. Daugherity Test., ECF No. 277, at 260:12-19. So, as required by state law and permitted by federal law, Black children in Shenandoah County attended separate schools from their White peers. Id. at 260:20-23.

From his research, Dr. Daugherity determined that during the period when schools were segregated, the Shenandoah County School Board operated a public school system that was separate but unequal. Id. at 258:4-10. Compared to White students, Black students experienced significant disparities in their educational opportunities. Id. School buildings for Black students were less likely to have indoor plumbing or cafeterias. Id. at 258:13-16. Black teachers were frequently assigned to teach much larger classes and were paid less than their White counterparts. Id. at 258:16-20. Black students were typically given hand-me-down textbooks and supplies. Id. at 258:20-21.

---

desegregation. Daugherity's opinions in this case are based on his education, scholarship, professional experience, and review of various materials identified in the evidentiary record, including School Board meeting minutes, Stonewall Jackson High School yearbook images, and historic local newspaper articles. See generally Daugherity CV, ECF No. 242-65 and Daugherity Test., ECF No. 277, at 239:16-252:20.

But the most glaring educational disparity facing Black students in Shenandoah County was that they did not have a high school at all. Id. at 258:22-25. The county operated several high schools for its White students but no high schools for Black students. Id.; SCSB Meeting Minutes, May 23, 1958, ECF No. 242-50, at 1. Black students who lived in Shenandoah County and sought a high school education were forced to leave the county. They were required to take buses several miles and hours away in order to attend segregated high schools administered by neighboring school districts—experiencing higher barriers to participation in extracurricular activities and athletics than their White peers. Daugherity Test., ECF No. 277, 259:1-17. See Kay Doe Test., ECF No. 277, at 89:23-90:13.[13]

In 1954, the Supreme Court unanimously held in Brown v. Board of Education that racial segregation in public schools violated the Equal Protection Clause of the Fourteenth Amendment. Daugherity Test., ECF No. 277, at 267:14-23. The court rejected Plessy's separate but equal doctrine and concluded that segregated schools were inherently unequal and detrimental to Black children's educational and personal development. Brown I, 347 U.S. at 494-95; Daugherity Test., ECF No. 277, at 267:14-23. One year later, the Supreme Court issued Brown II, directing state and local authorities to implement desegregation "with all deliberate speed." Brown v. Bd. of Educ., 349 U.S. 294, 301 (1955); Daugherity Test., ECF No. 277, at 267:14-23.

---

[13] Kay Doe testified that her father and his siblings were bused to Black schools: "My father was bused out to a tiny school in Woodstock that housed several grades. A couple of his siblings were bused with him. Some of his other siblings were bused to Harrisonburg to attend the high school there at the expense of my grandparents." Doe Test., ECF No. 277, at 89:23-90:13.

14

But instead of complying with the Supreme Court's ruling, Virginia officials openly declared their intention to oppose public school desegregation through a practice known as Massive Resistance. Historical Newspaper, ECF No. 242-68, at 2 ("The commission retreats in no way from its announced goal of avoiding enforced integration in the public schools."); Daugherity Test., ECF No. 277, at 274:14-23. Massive Resistance was a set of measures employed by the state and local governments designed to prevent school desegregation in Virginia following the Brown decisions. Id. at 271:12-272:3. Segregationists in Virginia saw their leadership of the Massive Resistance movement as akin to their role during the Civil War era—leading the South against federal mandates. Id. at 271:25-272:3. "The intended purpose of Massive Resistance was to preserve school segregation within the state of Virginia." Id. at 273:22-23.

As a result, during the period of Massive Resistance, Confederate symbols—which had originally represented the pro-slavery cause—took on new salience as signifiers of resistance to federal desegregation mandates. Daugherity Test., ECF No. 278, at 16:2-17. A central component of the Massive Resistance era was the renewed invocation of "states' rights," the doctrine historically associated with the defense of slavery and later used by the Confederacy to justify secession during the Civil War. Id. Segregationists reframed this ideology to argue that states possessed sovereign authority to maintain racially segregated public spaces, portraying Brown as an illegitimate federal intrusion on that authority. Id. Dr. Daugherity testified that this link between the Confederate argument and the segregationists' argument tied the two groups and positions together. Id. Dr. Daugherity explained:

> The argument that's made during this time period is that it was the states' rights to segregate and that the Brown v. Board of

15

> Education [decision] was therefore an imposition on that state's right. That is a highly important relationship between the Massive Resistance era and the era of the Civil War. There's a connection there that I think is important to emphasize. The individuals that were talking about states' rights in the 1950s are reflecting back on that same argument that was used during the period of the Civil War and, particularly, during the period of secession.

Id. at 16:8-17. See Letter to the Editor of the Northern Virginia Daily, ECF No. 242-213 ("In 1861 Virginians fought and died for what they deemed right and after it was over they hung their heads in sorrow . . . but never in shame. Today Southerners hold their heads high and speak again for States rights.").[14]

The language of Massive Resistance often contained references to the Civil War and the Lost Cause narrative. Daugherity Test., ECF No. 277, at 253:17-20. Virginia's Senator Harry Byrd used military language when discussing opposition to school desegregation, asserting that "if Virginia's line is broken then the rest of the South will go down, too." Id. at 253:21-25. Mid-1950s newspaper coverage and political cartoons frequently depicted Civil War battles, uniforms, and soldiers in their discussions of the school desegregation issue. Id. at 254:1-3. There was a resurgence in the public display of the Confederate battle flag, and an increase in the use of Confederate names on schools at that time. Id. at 254:3-5, 254:21-255:11; Daugherity Test., ECF No. 278, at 38:15-39:4.

Although several school districts in Virginia took steps to comply with Brown despite the broader Massive Resistance movement, Shenandoah County was not one of them. Daugherity Test., ECF No. 277, at 276:15-22; ECF No. 278, at 25:15-20. In Dr. Daugherity's

---

[14] One of the authors of this letter, D. Coiner Rosen, was reported to be the first to suggest that the new high school be named Stonewall Jackson High School. Northern Virginia Daily article, March 14, 1957, ECF No. 242-212.

view, Shenandoah County strongly opposed the Supreme Court's decision requiring desegregation. Daugherity Test., ECF No. 278, 9:4-7. He testified: "The Shenandoah County School Board took no steps that I was able to discern to comply with Brown v. Board of Education until the County School Board was forced to do so by African-American parents and students in the county who requested transfers into the formerly all-White schools." Id. at 9:9-14.

Dr. Daugherity's review of the historical Shenandoah County School Board Meeting Minutes revealed that the School Board continued to operate a dual-school system and made affirmative decisions that would preserve segregation within its schools, even after Brown II. Daugherity Test., ECF No. 278, at 9:16-24; 25:15-20. Dr. Daugherity explained:

> In Shenandoah County, the School Board continued to make all decisions made based on the preservation of segregation within the public schools. You see this reflected throughout the meeting minutes of the mid-to-late 1950s and into the early 1960s when school board members made it clear that their intent was to maintain racial segregation in the public schools.

Id. at 10:5-11.

In 1959, School Board minutes recorded that the Board authorized the Superintendent "to continue to explore possibilities of . . . taking the colored students in New Market [in Shenandoah County] to school in Harrisonburg [in Rockingham County]." 1959 SCSB Meeting Minutes, ECF No. 242-50, at 9; Daugherity Test., ECF No. 278, at 11:18-12:7. Notwithstanding the additional costs associated with constructing and funding two separate school systems, Shenandoah County chose to incur these costs instead of integrating their schools. See Historical Newspaper, ECF No. 242-44, at 4; Daugherity Test., ECF No. 278, at 22:11-15. Despite the relatively small number of high school-aged Black students in

17

Shenandoah County, the School Board continued to force those students to take buses to neighboring counties to attend high school rather than integrate Shenandoah County's schools. Daugherity Test., ECF No. 278, at 18:5-19:16. See Historical Newspaper, ECF No. 242-44, at 1; see also Transfer Request Letter, ECF No. 242-69 (a 1962 request to the Superintendent by parents seeking their daughter's admission to Strasburg High School so that "she does not have to make the eighteen-mile bus trip every day to go to school in Winchester"). Dr. Daugherity explained:

> The reason I think that's particularly relevant in a county like Shenandoah, where we're talking about a relatively small number of African-American students, is this. The county was paying for two school systems. The economic cost of segregation was substantial. The county could have saved an amount of money in addition to generating goodwill and bringing about a society in which, you know, individuals from all backgrounds could study together, work together, essentially live together into the future.

Id. at 22:11-19.

During this period, the Shenandoah County School Board approved the construction of three new high schools to serve exclusively White students, and named them Strasburg High School, Central High School, and Stonewall Jackson High School. 1958-59 SCSB Meeting Minutes, ECF No. 242-50, at 1, 6; Daugherity Test., ECF No. 278, at 11:5-17. Stonewall Jackson High School was built between 1957 and 1959. First JSSF, ECF No. 242-

18

1, ¶ 3. The Confederate battle flag flew over its construction. See id. ¶ 5; Daugherity Test.,

ECF No. 278, at 45:9-46:1.



SJHS Images, ECF No. 242-47 (above excerpt from SJHS yearbook images, in a section titled

"Realization of a dream"). Dr. Daugherity testified that naming a school after a Confederate

military leader was a departure from the School Board's previous naming practices, as other

schools had been named after towns, communities, geographic features, or local educators

and community leaders. Daugherity Test., ECF No. 278, at 44:9-12. Dr. Daugherity testified

that "the naming of Stonewall Jackson High School was undertaken by the Shenandoah

County School Board, in part, to dissuade [Black] students from requesting transfers into the

newly constructed and newly opened high school." Id. at 44:3-6.

Stonewall Jackson High School opened to White students in the fall of 1959. First JSSF, ECF No. 242-1, ¶¶ 6-7. Its mascot was a soldier on horseback carrying a Confederate flag, and Stonewall Jackson's portrait was depicted on educational facilities and present throughout extracurriculars and athletics. See 1960 Yearbook Cover, ECF No. 242-46; SJHS Images, ECF Nos. 242-48, 242-49. Black students were not permitted to enroll in Stonewall Jackson High School when it opened in 1959—they still had to take buses to other counties if they wanted a high school education. Daugherity Test., ECF No 278, at 18:14-21; Fifth JSSF, ECF No. 242-5, ¶ 162.

Nearly a decade after Brown, Black students were permitted to enroll at Stonewall Jackson High School for the first time in the fall of 1963. First JSSF, ECF No. 242-1, ¶ 9. Dr. Daugherity explained that even once Black students in Shenandoah County were admitted into the formerly all-White schools, there were inordinate challenges that Black students faced within the "now desegregated" school system. See Daugherity Test., ECF No. 278, at 36:1-6. Dr. Daugherity testified:

> At this point in time, in the mid-1960s, we have a wide variety of evidence from the county that demonstrates that there were still vestiges of the segregated school system, that there were inordinate challenges that African-American students faced within the, quote-unquote, now desegregated school system. There were no African-American teachers in the school system nor administrators, to my opinion. There was never an African-American on the school board during any of this time period. And African-American students talked about, in detail, their challenges, their discomfort, their isolation. The fact that their grades fell despite previous academic success and on and on.

Id. at 36:1-12.

20

Beginning in 1968 through the early 1970s, federal law shifted from requiring the formal end of segregation policies to mandating the active integration of public schools. Id. at 54:3-55:9. Local districts were no longer permitted to rely on gradual or symbolic efforts but were required to eliminate all vestiges of the former dual school system and to do so immediately. Id. See Green v. Cnty. Sch. Bd. of New Kent Cnty., 391 U.S. 430 (1968). Dr. Daugherity testified that in the school desegregation context, the term "vestiges" describes "remnants," "signs," or "legacies" of a formerly segregated school system. Daugherity Test., ECF No. 278, at 60:20-61:7. Federal courts emphasized measurable results and identified specific factors for determining whether a school system had achieved a truly unified structure. See Alexander v. Holmes Cnty., 396 U.S. 1218 (1969); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1 (1971). Dr. Daugherity testified that "[i]n Virginia, this unleashed a tremendous debate over compliance." Daugherity Test., ECF No. 278, 55:10-11. Dr. Daugherity explained that these decisions "engendered tremendous opposition within the White Virginia community at the time. Many White Virginians were upset about the busing experience and mandate." Id. at 56:2-4. He continued:

> That takes place in roughly 1970, 1971. So during the time period that we're talking about, there is a new federal mandate with regard to achieving, within the school systems, truly integrated systems in which students would be able to participate in all aspects of the school experience without reflection of race, meaning athletics, extracurriculars, transportation, curriculum, the disciplinary systems within the school, as well as the integration of teaching staff, which is most relevant in Shenandoah County because it was still an all-White teaching staff. Administrators as well, and other aspects of the school experience.

Id. at 56:8-19.

21

Against this backdrop, in 1972, the Shenandoah County School Board planned for the construction of a new primary school, neighboring Stonewall Jackson High School. Id. at 56:21-23. The School Board at the time, which was comprised of many of the same members as in 1959, began to refer to the new elementary school as "Stonewall Jackson Primary School" or "Stonewall Jackson School." Id. at 57:7-19. In 1974, the School Board officially named the school "Ashby-Lee Elementary School" to honor Confederate officer Turner Ashby and General Robert E. Lee, a name that had previously been considered for Stonewall Jackson High School. Id. at 58:8-15; Second JSSF, ECF No. 242-2, ¶ 62. Dr. Daugherity stated, "[s]o there is, in my opinion, a connection to the 1950s with regards to the naming process because that name was essentially resurrected." Daugherity Test., ECF No. 278, 58:13-15.

In Dr. Daugherity's view, even though the new elementary school admitted Black students when it opened in 1974, "the naming of Ashby-Lee Elementary School was chosen in part to reflect the county's opposition to federal mandates with regard to school integration and the broader movement for racial change at the time." Id. at 59:13-19. Accordingly, Dr. Daugherity testified that the school naming decisions by the School Board in 1959 and 1974 were made in part to discourage Black families from attending these schools and that the selected school names function as vestiges of the formerly segregated, dual school system. Id. at 62:3-63-7; 82:17-83:3; 94:8-17.

## C. Shenandoah County School Board Actions in 2020

### 1. The 2020 School Board Passes a Resolution Condemning Racism

In 2020, in the midst of the COVID-19 pandemic and following the death of George Floyd, a reckoning with racism and discrimination was taking place in the United States and

22

within the Shenandoah County community. See Kay Doe Test., ECF No. 277, at 59:7-22. There was momentum across the country and in Virginia supporting the removal of Confederate monuments and symbols, particularly in response to recent national events. Id. at 63:12-22; Bailey Test., ECF No. 279, at 215:9-21.

Specifically, on June 6, 2020, Virginia Secretary of Education Atif Qarni told local elected officials—including city councils, boards of supervisors, and school boards—to "change school names and mascots that are offensive or that memorialize confederate leaders or sympathizers." First JSSF, ECF No. 242-1, ¶ 11. Qarni stated, "[t]he offensive names have a traumatizing impact on the psyche of our children, families, teachers, and staff of color." Id. ¶ 12.

On June 25, 2020, the Shenandoah County School Board voted 6-0 in favor of a "Resolution condemning racism and affirming the division's commitment to an inclusive school environment for all." School Board Resolution, ECF No. 242-42; First JSSF, ECF No. 242-1, ¶ 13. This Resolution references the sadness and outrage felt by members of the School Board and across the school community regarding "recent events that demonstrate the prejudice and injustice that persists in our country." ECF No. 242-42. Among other things, it proclaims, "racism and hate have no place in our schools or our society, and we must protect the Constitutional rights of every person who lives, works and learns in our community." Id. The Resolution concludes with a commitment by the School Board "to foster an inclusive educational environment where every student, teacher, support professional, parent and community member is treated with dignity and respect," and a commitment "to continue fighting for racial justice and human and civil rights for all." Id.

Following the passage of this Resolution, Shenandoah County community members, including Kay Doe, a biracial resident and mother of two biracial children in the school system, met with School Board members and "asked them to live into the resolution and to change the school names." Kay Doe Test., ECF No. 277, at 62:18-22. She testified that other members of the community who had previously defended the Confederate names were starting to recognize their racist implications and were speaking out against the names. Id. at 63:17-22.

### 2. Next Steps for the Resolution—School Name Change

On July 4, 2020, the School Board published an agenda for the July 9, 2020, School Board meeting that included the action item "Next Steps for Resolution condemning racism and affirming the division's commitment to an inclusive school environment for all." First JSSF, ECF No. 242-1, ¶ 14. The recommended action stated: "that the names of Stonewall Jackson High School and Ashby-Lee Elementary School be retired as well as the Rebel mascot at North Fork Middle School." Id. ¶ 17. It continued: "The Board directs the Superintendent to develop a process and timeline in accordance with Board Policy FFA for selection of new names and a new mascot to bring back to the Board at their August 13 Meeting." SCSB Meeting Agenda, ECF No. 242-20, at 15; Fifth JSSF, ECF No. 242-5, ¶ 167.

Board Policy FFA places the responsibility for naming the schools on the School Board: "The Board will solicit and accept input from the public regarding the names of schools or school facilities but reserves the right to make the final decision regarding the name of any school or school facility." Third JSSF, ECF No. 242-3, ¶ 81. Further, "[i]n fulfilling this responsibility, the Board shall make every effort to respect the preference of the local school

community; however, final decisions on the naming of school facilities and the dedicating of areas of school facilities or grounds shall rest entirely with the Board." Id.

In further support of the momentum to change the names of the schools, on July 6, 2020, Virginia Governor Ralph Northam wrote a letter to the chairs of Virginia school boards stating that the school boards should "change school names and mascots that memorialize Confederate leaders or sympathizers." Governor Northam 2020 Request, ECF No. 242-60; First JSSF, ECF No. 242-1, ¶ 15. The letter explained:

> [T]he names of public places, streets, and schools send messages to our children about what we value most as a society. When those names reflect our broken and racist past, they also perpetuate the hurt inextricably woven into this past. When our public schools are named after individuals who advanced slavery and systemic racism, and we allow those names to remain on school property, we tacitly endorse their values as our own. This is no longer acceptable.

Governor Northam 2020 Request, ECF No. 242-60; First JSSF, ECF No. 242-1, ¶ 16.

### 3. July 9, 2020 School Board Meeting

The Shenandoah County School Board meeting was held virtually on July 9, 2020, due to the COVID-19 pandemic. There was a public comment period that immediately preceded the vote to retire the names of Stonewall Jackson High School and Ashby-Lee Elementary School, which, except for the meeting being held virtually, complied with the regular process for allowing public comment at school board meetings. Fifth JSSF, ECF No. 242-5, ¶¶ 168-69. The public comment portion lasted approximately 80 minutes and drew approximately 25

25

speakers on the action item regarding next steps pertaining to the recently passed Resolution condemning racism. First JSSF, ECF No. 242-1, ¶ 18.[15]

After the public comments were received, the School Board voted 5-1 to retire the names Stonewall Jackson High School and Ashby-Lee Elementary School. First JSSF, ECF No. 242-1, ¶ 19. While there was some discussion of postponing taking action on the Resolution, a motion to defer the vote until the next School Board meeting did not pass. Fifth JSSF, ECF No. 242-5, ¶ 166; see Emails Between School Superintendent Mark Johnston and School Board Member Andrew Keller, ECF No. 242-190.

The School Board retired the names Stonewall Jackson High School and Ashby-Lee Elementary School in part to implement the June 25, 2020, Resolution Condemning Racism and Affirming the Division's Commitment to an Inclusive School Environment for All. Fifth JSSF, ECF No. 242-5, ¶ 157.

At trial and in their briefing, the School Board points to emails in 2020 as suggestive of a rushed and secretive process. Superintendent Johnston's emails with School Board member Keller discuss whether to push ahead with voting on the name change or to delay the action until August. See ECF No. 242-190.[16] During the meeting on July 9, 2020, School Board member Marty Helsley made a motion to postpone taking action on the Resolution

---

[15] Dennis Barlow, Chairman of the School Board in 2024, spoke publicly in opposition to the name change at this meeting and submitted a written statement. See Barlow 2020 Statement, ECF No. 242-107.

[16] Although not admitted at trial, see Trial Tr., Day 4, ECF No. 280, at 83:25-91:11, and Day 5, ECF No. 281, 124:23-128:17, there were similar emails on July 1 and 2, 2020, between School Board members Cynthia Walsh, Karen Whetzel, and Superintendent Mark Johnston, about the timing of the vote to retire the Confederate school names, which the court, in the exercise of its discretion, has reviewed and considered. See DTX-2, DTX-19.

condemning racism, but that motion failed, 5-1. See SCSB Meeting Minutes, ECF No. 242-19. While critics contrast the virtual public input obtained prior to the 2020 vote with the live public input obtained prior to the 2022 and 2024 votes, it must be remembered that the COVID-19 pandemic was at its zenith in the summer of 2020, requiring public meetings to be virtual.

### 4. Public Statements of 2020 Board Members

Members of the School Board in 2020 made public statements at the meeting, immediately preceding the vote to retire the Confederate names.[17]

At the meeting, School Board member Andrew Keller stated: "There's no way to preserve the traditions and heritage of one group and ease the inequity that another group may have felt. You can't keep a name and remove racist implications from it. You can't claim to be inclusive, which we do, and have students who feel like they're excluded." First JSSF, ECF No. 242-1, ¶ 21. He went on to say: "Which is more important: someone's heritage regarding a school's name or someone's inclusion into that school, their right to feel welcome?" Id. ¶ 22.

School Board Chair Karen Whetzel stated: "As one high school student from Stonewall Jackson challenged me today, 'if you vote to keep the name, you would be making a conscious decision to maintain a symbolic reference to a time of inequality and racism. School should be welcoming to all; a place of education, forward thinking, and bettering ourselves.'" Id. ¶ 23.

---

[17] Several of the public statements by members of the School Board in 2020 are included in the JSSF, but none of the 2020 School Board members testified in this case.

The student continued: "'How can we move forward if our school's name is only looking

backwards[?]'" Id.

Board member Cynthia Walsh also shared her sentiments before she cast her vote to

retire the names. She stated:

> The issue before us tonight is not the product of recent national events, although I do think that some of the rhetoric on both sides is informed somewhat by those events. The Board does not enter into this vote lightly. We were not forced to do this by a commentary piece in the local paper or a recent graduate doing a petition or anything like that. It became a more pressing issue, for me at least, when alumni of Stonewall Jackson High School, Black, biracial, and White, came to us with their stories. Some endured outright racism. Some endured other racial tension. [Third JSSF, ECF No. 242-3, ¶ 82]. . . . Whether you think of Stonewall Jackson as a great man who did some bad things or a bad man who did some good things, the fact remains that he was a Confederate general and the Confederacy was all about states' rights, but people keep forgetting to finish that sentence, and to finish that sentence is, the Confederacy was all about states' rights to continue the practice of slavery in our country. [First JSSF, ECF No. 242-1, ¶ 20]. . . . Fast forward 100 years to 1959 when Stonewall Jackson High School was built. It was after Brown v. Board of Education. It was a time when schools were being integrated, but many southern states, including Virginia, were practicing Massive Resistance to integration. . . . [S]urely, Superintendent and School Board at the time had to know that naming a high school after a Confederate general would send a clear message to Black families that they were not welcomed in that brand-new school that they had to drive by every day to drive to their Black school in Harrisonburg. Here we are, present day, and we're still struggling to make sure that every student in our school feels safe, welcome, and included. [Third JSSF, ECF No. 242-3, ¶ 83.]

SCSB Meeting Video, PTX 290.[18]

---

[18] The video of the July 9, 2020, School Board meeting is accessible via the link on page 2 of ECF No. 242-28, which contains the transcription of the video of this School Board meeting. The transcript encompasses only a portion of the meeting and does not include these comments, but viewing the

Marty Helsley was the lone School Board member opposed to retiring the Confederate names. Helsley questioned, "where is this going to end," and voiced frustration over the School Board's unwillingness to delay the vote by one month. SCSB Meeting Video, PTX 290.

Board Chair Karen Whetzel quoted a letter from one of the first Black students to attend Stonewall Jackson High School:

> To me, Stonewall Jackson, as a Confederate soldier, and Confederate flags, make people of color hurt. These symbolize hatred. People don't think about how this makes others feel until it's too late. I don't want it to be too late. In recent years, my children and I have experienced heightened acts of hatred from our peers in the community. This has taken the form of hate speech, in social media and in person. With the experiences I and my five children had at and after leaving Stonewall Jackson High School, the name should be changed to something more appropriate to comply with this new age. I know it's old history, but it's hate history, and we don't need to continue that way.

Third JSSF, ECF No. 242-3, ¶ 85; SCSB Meeting Video, PTX 290.

### 5. September 2020 Vote to Reaffirm Name Change and Select New Names

At the School Board meeting on September 10, 2020, the School Board approved a motion that "reaffirm[ed] its July 9, 2020 action" to retire the Confederate school names and any derivations of those names, in a 5-1 vote. First JSSF, ECF No. 242-1, ¶ 24. That motion also sought public input into new school names and adopted a process for the re-naming of the schools. See SCSB Meeting Minutes, ECF No. 242-31. Policy FFA expressly requires the School Board to seek input from the public prior to changing the name of schools. Fifth JSSF, ECF No. 242-5, ¶ 131. This policy was in effect in 2020 at the time the School Board retired

---

video reveals the comments of the School Board members immediately preceding their votes. Additionally, these quotes appear in various paragraphs throughout the JSSF, as cited above.

the names Stonewall Jackson High School and Ashby-Lee Elementary School. Id. ¶ 131. In keeping with the policy, the Superintendent and School Board established a committee comprised of students, staff, and community members from each of the schools to gather input on possible new school names and present recommendations to the School Board. See School Board Process for Renaming Schools/Mascots, ECF No. 242-43, at 3-7.

Community members were given the opportunity to submit school name suggestions via an online form. Id. at 3-7. After almost a month of receiving suggestions, the School Board chose the names Mountain View High School to replace Stonewall Jackson High School, and Honey Run Elementary School to replace Ashby-Lee Elementary School. First JSSF, ECF No. 242-1, ¶¶ 25-26. On January 14, 2021, the School Board held a public hearing on the new school names and passed a resolution that established the names of Mountain View High School and Honey Run Elementary School, and the names took effect on June 1, 2021, nearly eleven months after the July 9, 2020, vote to retire the Confederate names. Fifth JSSF, ECF No. 242-5, ¶ 150; First JSSF, ECF No. 242-1, ¶ 25; Shenandoah County Public Schools FAQ page, ECF No. 242-209.

**D. Campaign to Reinstate the Confederate Names**

While some members of the community were pleased with the retiring of the Confederate names, others were upset with the School Board. In response to the name change, individuals and groups began a campaign to restore the Confederate names.

**1. Coalition for Better Schools**

The Coalition for Better Schools was a group formed by Lewis Michael Schiebe and Richard Moomaw in response to the retiring of the Confederate names. Schiebe Test., ECF

No. 278, at 185:09-19, 186:16-24. The Coalition for Better Schools is affiliated with the Freedom Press, a local publication that began publishing articles shortly after the Confederate school names were retired. Id. at 187:13-21. The newspaper was started by a "loose-knit group" of "citizens who were concerned about how the name change was facilitated." Id. at 187:22-188:3. Schiebe testified that he writes a majority of the posts on the Freedom Press website and manages the Freedom Press Facebook page. Id. at 190:2-191:2.

Before the new names of the schools had even taken effect, the Coalition for Better Schools was involved in campaigning to reinstate the Confederate names. Dennis Barlow, who would later be elected to the School Board, wrote in an email in March 2021:

> I am working with a citizens group to fend off the vicious attacks of woke democrats in Shenandoah County.
>
> They have already almost sealed the deal on renaming our schools (the end of Stonewall Jackson High School!) and are on the march.
>
> We have developed a citizens group called the "Coalition for Better Schools" to counterattack.

Email from Barlow, ECF No. 242-163, at 1; see also Barlow Test., ECF No. 280, at 153:18-154:9.

### 2. Election of Three New School Board Members

In 2021, three School Board seats were up for election, and none of the incumbents who had voted to retire the Confederate school names sought re-election. Barlow Test., ECF No. 280, at 97:18-20. The three board members who ultimately were elected in November 2021 were Dennis Barlow, Kyle Gutshall, and Brandi Rutz. Id. at 97:21-22. All three opposed the removal of the Confederate school names. Barlow 2020 Statement to School Board, ECF

31

No. 242-107; Rutz Facebook Post, ECF No. 242-136; Gutshall Test., ECF No. 280, at 219:18-20.

Barlow submitted a written statement and spoke during the public comment portion at the July 9, 2020, School Board meeting against retiring the Confederate school names. Barlow 2020 Statement to School Board, ECF No. 242-107; Barlow Test., ECF No. 280, at 190:2-19. He decided to run for the School Board in part because of the "local uproar" that occurred when the Confederate names were retired. Id. at 78:1-80:8.

Before his election to the School Board, Barlow played an active role with the Coalition for Better Schools, including reviewing their Mission Statement and organizing the creation of their logo. See Email from Barlow, ECF No. 242-163, at 1; Emails between Moomaw and Barlow, ECF No. 242-113, at 1; Barlow Test., ECF No. 280, at 152:15-19. Barlow emailed Rutz on August 18, 2021, introducing her to a group he had been meeting with over the past several months who "were instrumental in getting The Freedom Press going and sounding the alarm early in the name-change fiasco." Email from Barlow to Rutz, ECF No. 242-203. See also Email from Barlow to Rutz and Denman Zirkle of the Freedom Press, ECF No. 242-115, at 1, in which Barlow wrote:

> Probably the most efficient way to work this might be for The Freedom Press to set up a roundtable with its staff hearing a summary of actions and challenges from SB members; followed by questions and concerns of FP staff.
>
> It would be difficult for 3 school board members to be there at once (that might constitute an official meeting of the SB), but 2 of us could do it.

While Barlow was on the School Board in 2022, he communicated with a constituent about the renaming of the schools, Stonewall Jackson's legacy, and the Confederacy. See

Barlow Emails with Constituent, ECF 242-106. In one email exchange, Barlow shared an enumerated list of what he views as Stonewall Jackson's laudable accomplishments and debated whether the Civil War was about slavery. Id. at 2-3. When the constituent introduced the concept of Massive Resistance and the time period in which the school was named, Barlow responded: "If there was a so-called 'massive resistance' movement, it was neither massive nor actively pursued. In any case, any resentment over the issue has evaporated long ago and is therefore now irrelevant." Id. at 3.

Brandi Rutz believed that the students at the renamed Mountain View High School were victims of "political correctness" and that no one was upset about the school names until the death of George Floyd and the resulting "national outcry" and movement based on his death. Rutz Test., ECF No. 279, at 268:20-269:13, 293:18-294:7; Facebook Post, ECF No. 242-132. Rutz agreed that racism and hate have no place in Shenandoah County Public Schools. Rutz Test., ECF No. 279, at 258:15-17. But she disagreed with portions of the School Board's Resolution Condemning Racism because she believed "the School Board's job is – is to educate . . . [and] do that as fairly as it – as it can," and "it is not the School Board's job to fight for racial justice [and] human and civil rights." Id. at 264:5-14. She believed that the School Board took "a political stance" that it "didn't need to take" when it passed the Resolution Condemning Racism. Id. Once Rutz was elected to the School Board, she continued to work with members of the Coalition for Better Schools and its affiliate, the Freedom Press, on efforts to reinstate the Confederate school names. Emails between Rutz and Freedom Press, ECF No. 242-137, at 2 (Rutz writes: "I would like to see the Freedom

33

Press be used as more than a 'hit piece' instrument. I am hoping to prep the masses for what's coming."); Denman Zirkle Emails to Gutshall, Rutz, and Barlow, ECF No. 242-115.

Kyle Gutshall believed that the name change in 2020 was "rushed" and that the majority of people wanted the school to be named Stonewall Jackson but those people were ignored. Gutshall Test., ECF No. 280, at 219:18-24. He also is not "a fan of" names being changed in general. Id. at 219:25-220:1.

### 3. Firing the School Board's Attorney

Email communications between new School Board members Rutz and Barlow and persons associated with the Freedom Press and Coalition for Better Schools in March 2022 revealed a plan to submit a resolution for a name change following "removal and replacement of legal counsel." Email from Keven Walker[19] to Rutz, Barlow, Freedom Press, and Coalition for Better Schools, ECF No. 242-137, at 1-2. On March 19, 2022, Rutz emailed Barlow and others associated with the Coalition for Better Schools and the Freedom Press, announcing that the School Board had dismissed its legal counsel and replaced her with new counsel who "at least seemed to 'say the right things'. The name change was a topic." Id.

Walker's response, two hours later, states:

> Hi Brandi,
>
> I think many of us are thrilled to learn that the school board has finally begun to take definitive steps toward real change with the removal and replacement of legal counsel.
>
> A plan was outlined by our group in our letter to you and the other members of the school board and it is my understanding that we have decided that we would be submitting our resolution

---

[19] Barlow testified at trial that Keven Walker was affiliated with both the Freedom Press and Coalition for Better Schools. Barlow Test., ECF No. 280, at 163:24-164:5.

> related to name change following the change of the board's attorney. I imagine that that resolution, which has been drafted and approved for several weeks, could come to you as soon as this week.

Id. at 1-2.

At trial, Barlow testified that the three new members of the School Board were "interested in replacing our attorney." Barlow Test., ECF No. 280, at 165:11-13. He explained that "the attorney had been espousing liberal positions and working with the superintendent." Id. at 170:15-17. When asked about the "liberal positions," Barlow stated that "I'm sure the name change was included" and a "general feeling that – that the attorney was – and the superintendent were working hand in glove on other positions for the school – for the school board." Id. at 170:21-171:3.

Two days later, on March 21, 2022, Rutz and Barlow exchanged emails about Virginia Education Association materials addressing a number of topics, including "White Supremacy Culture" and "Black Lives Matter." See Gmail VEA Emails, ECF No. 242-201. Rutz emailed Barlow: "It will however be interesting to see if the BLM gets a revival. It may not play well into the name change." Id. at 13.

**E. Failed 2022 Vote to Reinstate the Confederate Names**

After replacing the School Board's attorney, the new members of the School Board moved forward with efforts to reinstate the Confederate names. On May 6, 2022, Keven Walker of the Freedom Press emailed Barlow and Rutz to say that "[w]e will be sharing our proposed process for the renaming of schools with the school board and encourage you to adopt this or a similar policy following the immediate restoration of the school names on the

southern campus," and attached suggested language for a motion to restore the school names. Walker Email, ECF No. 242-204.

The School Board held a Special Called Meeting on June 1, 2022, and debated whether to conduct an official survey of the community about the school name change. Fifth JSSF, ECF No. 242-5, ¶ 182. New Shenandoah County School Superintendent Melody Sheppard brought a proposal about how the survey could be conducted to the June 1, 2022, meeting. Id. ¶ 182. The School Board learned that its retained survey consultant declined to conduct a survey on the school names and considered whether to obtain a survey from another group. SCSB Meeting Minutes, ECF No. 242-30, at 1.

At the June 1, 2022, meeting, the School Board decided not to conduct a survey. Id. ¶ 183. Three out of the six board members—incumbents Keller, Walsh, and Helsley— indicated that they no longer wished to proceed with a survey regarding the name change. Id. Nevertheless, Barlow confirmed at this meeting that he would make a motion "to restore the name to Stonewall Jackson" at the regularly scheduled June 9, 2022, School Board meeting. SCSB Meeting Video Transcription, ECF No. 242-27, at 47. That motion was placed on the agenda for the June 9, 2022, meeting. Fifth JSSF, ECF No. 242-5, ¶ 184.

The School Board voted on a motion to restore the names Stonewall Jackson High School and Ashby-Lee Elementary School at the June 9, 2022, School Board meeting. Id. ¶ 185. The Action Item in the meeting minutes was titled "School Names," and the motion was made by Barlow and seconded by Rutz. See SCSB Meeting Minutes, ECF No. 242-24, at 9. Over 40 individuals participated in the public comment portion at this meeting, voicing their opinions both for and against restoration of the Confederate names, lasting approximately 2

hours. See SCSB Meeting Minutes, ECF No. 242-24, at 2-4. Unlike the 2020 virtual meeting, the 2022 meeting was conducted in person.[20] Prior to the vote, board members made comments to explain their perspective and foreshadow their votes.

Dennis Barlow opened by outlining some thoughts on history and the legacy of Stonewall Jackson. SCSB Meeting Video Transcription, ECF No. 242-26, at 135-40.[21] He concluded his remarks by describing his military and diplomatic career abroad, and then said he had "never seen a less racist area of this country or this world" [than Shenandoah County]. Id. at 174. Barlow stated that "[b]y 2020, equality and civil rights had achieved remarkable progress in the United States," but that "with the death of George Floyd, we kind of forgot what we had built" and "looked for radical solutions." Id. at 174-75. Barlow was critical of people who wanted to implement their political agenda through the educational system. Id. at 177.

Brandi Rutz stated that she understood "the passion on both sides" of the issue and offered some views on race and racism. Id. at 142-43. In her view, the issue was about democracy. Id. at 143.

Cynthia Walsh noted that she received many emails and appreciated the passionate input on both sides. Id. at 150. Walsh noted there is no precedent for putting Confederate names back. Id. at 151. She said that she would have done a few things differently than the

---

[20] In contrast to criticism raised over the 2020 School Board process, those opposing the retirement of the Confederate school names have raised no concerns regarding the process employed by the School Board in 2022 when the motion to restore the Confederate names failed due to a tie vote.

[21] The pages referenced in the SCSB Meeting Video Transcription Exhibit at ECF No. 242-26 are the pages of the transcript document, rather than the ECF document pages.

way they were done in 2020, particularly making sure that all school board members were involved in the discussion of the process and to make sure the School Board "didn't blindside the Board of Supervisors." Id. at 152. Walsh mused:

> I think I would probably support slowing it down a little bit, but . . . then I remember the sense of urgency that the Board felt at that time period, because of what was going on in the United States. . . . And that sense of urgency was to make sure our schools are inclusive and welcoming to all.

Id. at 152-53. Walsh stated that school names "should not be controversial." Id. at 154.

Kyle Gutshall noted the perspectives of both sides and felt that they "dropped the ball" on not conducting a survey. Id. at 155-57.

Andrew Keller declined to comment at length, but he said he appreciated that there has been "civility . . . throughout a difficult process." Id. at 159.

Marty Helsley stated that the 2020 process was "horrible" and "too fast." Id. at 160. Helsley expressed his disappointment and said that it was "probably the worst action this county school board has ever had as long as we've had a school board." Id. at 161. He noted that the 2020 Board's representation that it would not use tax dollars to pay for the name change turned out not to be true, as some $300,000 was spent. Id. at 163. Helsley unsuccessfully offered a compromise of naming the school after a former student who died while playing football. Id. at 164-65. He closed by acknowledging that "the process was wrong, but we can't go back." Id. at 166.

Helsley quoted a handwritten letter from a constituent that stood out in his mind: "No one will ever want to bring a family here or come to work in our education system. Lots of people feel this way but don't want to say it because of how the people acted the last time.

38

The people that want to keep the names of Ashby-Lee and Stonewall Jackson were very threatening to the people that did not want to change back." First JSSF, ECF No. 242-1, ¶ 31; SCSB Meeting Video Transcription, ECF No. 242-26, at 170. Helsley then indicated that he agreed with the constituent's sentiments, and despite voting against the retirement of the Confederate school names when he was on the School Board in 2020, he voted against the reinstatement of the Confederate school names in 2022. SCSB Meeting Minutes, ECF No. 242-24; First JSSF, ECF No. 242-1, ¶¶ 29-30.

Barlow, Rutz, and Gutshall voted in favor of reinstating the Confederate names at this meeting. SCSB Meeting Minutes, ECF No. 242-24. The incumbent members, Walsh, Keller, and Helsley, voted to keep the names Mountain View and Honey Run. Id. The vote resulted in a 3-3 tie, and the motion to restore the Confederate names failed for lack of a majority. Fifth JSSF, ECF No. 242-5, ¶ 185.

### F. Sequence of Events Leading Up to the 2024 Vote to Restore the Names

The schools in Shenandoah County went by the names of Mountain View High School and Honey Run Elementary School for the 2021-22, 2022-23, and 2023-24 school years. Fifth JSSF, ECF No. 242-1, ¶ 26. Some members of the community still felt strongly about pushing to reinstate the Confederate names and continued to take action to advance that position.

### 1. Three More New Board Members Elected

During the 2023 School Board election cycle, three new School Board members were elected: Gloria Carlineo, Michael Rickard, and Thomas Streett. Barlow Test., ECF No. 280, 97:23-98:02. The Freedom Press endorsed all three of their campaigns. Schiebe Test., ECF No. 278, 266:24-267:9; see also Facebook Post, ECF No. 242-179.

39

The Freedom Press also published Carlineo's article, titled "Why I'm Running For School Board in District 3," in which she shared her concern that some teachers at the Shenandoah County schools were "teach[ing] our children legally and factually incorrect principles and alternate facts," "failing in their duty to teach our children," and "creating unsafe educational environments that are not conducive to learning." Gloria Carlineo Article, ECF No. 242-59. Carlineo's article also stated that "diversity and acceptance" were used by the Left as a "Trojan horse" to "introduce pot use and drug abuse, sexual immorality, and the rejection of traditional values." Id. Carlineo wanted to join the School Board so that she could "re-prioritize our children's education and review the curricula they are being taught from" and "stop indoctrination," among other things. Id.

Even before Carlineo was elected in 2023, she exchanged text messages about changing the school names with School Board members Rutz and Barlow. Carlineo texted:

> Ultimately, we need to frame this issue in terms of what the right thing to do is: the actions of the previous school board were absolutely wrong and harmed the community. We know this because many people were hurt (whether psychologically or emotionally) by that decision. And it also eroded the faith that the community had in the SB and government in general. So what do we do? Do we ignore it and tell people to get over it or do we try to involve the community and fix things?

Short Message Report, ECF No. 242-111, at 2. Barlow responded: "That's sound thinking. As long as we do not get chivied into a core issue fight over the name change. And I think our default position is that the process was unethical and wrongfully accomplished." Short Message Report, ECF No. 242-112.

40

Carlineo, Rickard, and Streett[22] campaigned, at least in part, on restoring the Confederate names to the schools. Schiebe Test., ECF No. 278, 237:13-21. They were elected in November 2023 and began their term in January 2024.

### 2. Coalition for Better Schools Survey

On April 3, 2024, the School Board received a request from the Coalition for Better Schools asking it to reinstate the names Stonewall Jackson High School and Ashby-Lee Elementary School. Coalition for Better Schools Letter, ECF No. 242-74. The letter stated: "We understand that the decision to rename these schools was made in response to discussions surrounding Confederate symbols. However, we believe that revisiting this decision is essential to honor our community's heritage and respect the wishes of the majority." Id. The letter represented that the Coalition for Better Schools had conducted a survey that showed overwhelming support for the restoration of the Confederate school names. Id.

The Coalition for Better Schools' survey, which was drafted and organized by Schiebe, was a postcard mailer that asked recipients to vote for their preferred name for each school by checking a box and mailing the card back to the Coalition for Better Schools' P.O. Box address. See Tabulation of Survey, ECF No. 242-78, at 111-12. Each survey card bore the Freedom Press logo and stated that it was "From Coalition for Better Schools." Id. A portion of the postcards are re-printed below.

---

[22] Rickard and Streett did not testify at trial and no deposition testimony was introduced into evidence.

41

  

Stonewall Jackson        Robert E. Lee        Turner Ashby

With support from the Coalition for Better Schools and *The Freedom Press*, **YOU** have elected a new School Board for Shenandoah County. Now it is time for the citizens of Districts 1 and 2 to **come together to decide how we want our high school and elementary school to be named.**

We urge you to mail the attached reply card as soon as possible.

Sincerely,
*Coalition for Better Schools*

## THE NAMES CAN BE RESTORED
# AT NO EXPENSE TO THE TAXPAYER
*(Please indicate your choice of one name for each school.)*

☐ Stonewall Jackson High School        ☐ Ashby-Lee Elementary School
☐ Mountain View High School            ☐ Honey Run Elementary School

Sincerely,

_____        _____

_____        _____

Name(s)                                Address (optional)

Tabulation of Survey, ECF No. 242-78, at 111-12.

Although the survey cards were only intended for households in the two districts with children who attended the schools at issue, the survey cards were sent to all addresses, both residential and nonresidential, within certain zip codes in the southern part of Shenandoah County. Schiebe Test., ECF No. 278, at 192:12-193:24. When counting the survey cards and tallying up the votes, there was no way to verify that the returned survey cards were from people in the targeted zip codes. Id. at 204:21-205:4. There were no written procedures for how to count votes; methods were devised in the moment, when volunteers arrived to begin counting. Id. at 216:8-15. Some survey cards were returned with multiple individuals' names listed, and it was not clear whether those cards counted as one vote per household or as one vote for each name listed on the card. Id. at 206:9-25. Some survey cards had both high school name choices checked off, with no elementary school names selected, which the survey volunteers decided how to count "on the fly." Id. at 207:23-208-14. Ultimately, returned survey cards were counted even when the information provided was not sufficient to determine how many individuals were voting, where the votes were coming from, or if they were duplicate votes, such as when no names or addresses were provided. Id. at 203:10-205:4; see Tabulation of Survey, ECF No. 242-78.

Out of the 8,507 survey cards that were mailed, 1,160 (13.6%) were returned. Third JSSF, ECF No. 242-3, ¶ 89; Fifth JSSF, ECF No. 242-5, ¶ 190. The survey results indicated that 91.3% of respondents voted in favor of restoring the original names of the schools. See Coalition for Better Schools Letter and Survey Results, ECF No. 242-74. During his deposition, Schiebe acknowledged that people may have declined to respond to the survey

cards because they disagreed with the Freedom Press, or because they did not agree with other messages on the face of the survey cards. Schiebe Test., ECF No. 278, at 232:21-234:23.

The Shenandoah County School Board did not request that the Coalition for Better Schools conduct a survey. Fifth JSSF, ECF No. 242-5, ¶ 189. Accordingly, the School Board did not know how the survey cards were mailed out or how the Coalition for Better Schools verified the addresses to which they mailed the survey cards. Id. ¶¶ 191-92. The School Board did not have any input in the survey drafting process, nor did it conduct any due diligence on the survey's reliability. See id. ¶ 193; Barlow Test., ECF No. 280, at 181:20-182:17. In fact, the School Board has not conducted any kind of survey or poll of the public to aid in their consideration of policies or agenda items from 2020-2024. See Fifth JSSF, ECF No. 242-5, ¶ 154.

Nevertheless, when the Coalition for Better Schools reached out to the School Board to provide their survey results and request that the School Board restore the Confederate names, there was consensus from the School Board members to add the letter and the survey results to the agenda for the upcoming meeting. Third JSSF, ECF No. 242-3, at ¶ 86.

### 3.  Other Groups Communicating with the School Board Prior to the Vote

#### a.  Claim the Names Seeks to Maintain Non-Confederate Names

On April 8, 2024, the School Board received another request, one from a group called "Claim the Names." Claim the Names Email to School Board, ECF No. 242-141. The letter, which had over 450 signatures, asked the School Board to consider maintaining the names of Mountain View High School and Honey Run Elementary School. Id. The letter emphasized

44

that the names "Mountain View" and "Honey Run" are "non-divisive," and asserted that the names of Confederate leaders cannot be untangled from the history of Massive Resistance. Id.

When the School Board meeting agenda for the May 9, 2024, meeting was published, the Coalition for Better Schools' letter and request to restore the names were included on the agenda, but Claim the Names' letter and request to maintain the names were not. SCSB Meeting Agenda, ECF No. 242-21. The community member that sent the letter on behalf of Claim the Names followed up with the School Board, asking again for the Claim the Names request to be added to the agenda. Claim the Names Email to School Board, ECF No. 242-141.[23] The School Board never added the Claim the Names request to the agenda. SCSB Meeting Agenda, ECF No. 242-21; Gutshall Test., ECF No. 280, at 250:23-25.

### b. Virginia State Conference of the NAACP Weighs in on Pending Vote

As news of the impending vote on the school names spread, the Virginia State Conference of the NAACP issued a press release on April 22, 2024, condemning efforts to name schools after Confederate generals. NAACP Press Release, ECF No. 242-119; Bailey Test., ECF No. 279, at 210:12-211:2. The press release explained that the mission of the NAACP is to work to eliminate discrimination, and "[r]eturning names of Confederate leaders to public buildings runs counter to this mission." NAACP Press Release, ECF No. 242-119.

Additionally, on May 8, 2024, the Virginia State Conference of the NAACP contacted members of the Shenandoah County School Board ahead of the vote to reinstate the Confederate school names and urged School Board members to keep the non-Confederate

---

[23] Emailing board members to ask that a particular topic be added to a School Board meeting agenda is a valid way to request the addition of agenda items. Gutshall Test., ECF No. 280, at 250:19-25, 262:10-16.

names. NAACP Email to School Board, ECF No. 242-116. In particular, the email explained to board members:

> When students walk through the halls of Mountain View High School and Honey Run Elementary School, they do so without inescapable reminders of Confederate legacies that privileged the assertion that individual states had the right to enslave and otherwise pillage people of African descent. Memorializing that historical reality by naming your public schools after Confederate military leaders/sympathizers subverts part of your District's mission that claims that "All members of the learning community are valued and respected." Students must believe they are valued and protected in order to thrive. We implore you to foster the climate you have memorialized in your mission.

Id. The email was signed by the Rev. Cozy Bailey, President of the Virginia State Conference of the NAACP. He testified that he never received a response to the email. See Bailey Test., ECF No. 279, at 216:25-217:2.[24]

## G. School Board Votes to Reinstate Confederate Names in 2024

The April 3, 2024, request from the Coalition for Better Schools to consider restoring the Confederate school names was placed on the School Board's April 11, 2024, agenda by consensus. See Third JSSF, ECF No. 242-3, at ¶ 86; SCSB Meeting Agenda, ECF No. 242-33. The minutes of the April 11, 2024, meeting reflect that public comment was received on the issue of restoring the Confederate school names, nearly evenly divided between those seeking to keep the Mountain View and Honey Run names and those seeking to restore the Confederate names. SCSB Meeting Minutes, ECF No 242-34, at 3-6.

---

[24] Although his email did not expressly request a response, Rev. Bailey thought that it warranted one. Bailey Test., ECF No. 279, at 231:10-19. He interpreted the lack of response to mean "either that the NAACP carried no weight with this school board" or that they read the letter and "found it insignificant and they were bound and determined to do what they were going to do anyway." Id. at 217:4-7.

The School Board discussed the request from the Coalition for Better Schools to restore the Confederate school names at its April 22, 2024, work session as an information item. School Board member Michael Rickard noted the "compelling arguments on both sides." SCSB Meeting Minutes, ECF No. 242-17, at 5. The minutes reflect the following comments by Rickard: "He said the emails show that all of this took place during COVID, behind closed doors, emails going back and forth. He said the emails show that the previous superintendent was pulling strings and even telling School Board members how to vote on this subject." Id. The minutes continue: "Mr. Rickard said that if we decide to go back, he sees it as righting a wrong and giving the public an opportunity again. He said if they want to change the names then do it the right way." Id. Rickard added that "he feels that we are doing a disservice to Stonewall Jackson High School if we let it be portrayed this way, that it is about racism." Id. at 6.

The minutes reflect that School Board member Rutz stated that "the arguments on both sides are compelling," and that "she has compassion for both sides of the issue." Id. at 5. Rutz read from July 2020 emails between School Board members and Superintendent Johnston, concluding that "there was an obvious thought process to get this pushed and done as soon as possible." Id. "She said a year and a half ago members of this Board pushed for a survey and the other members basically said they did not want to be held to what the survey results might be." Id. The minutes continued: "She said we had some political games on the Board and ended up not doing the survey and the motion failed. She said it is a touchy subject

and it is not going to make everybody happy. She said the way the process was done was

wrong." Id.; see Third JSSF, ECF No. 242-3, ¶ 92.[25]

School Board member Gutshall indicated that the 2020 emails reflected that the

process was "completely rushed." Third JSSF, ECF No. 242-3, ¶ 93. Gutshall stated:

> But here we are, four years later, this is now, we talked about it
> two years ago, here we are again, it's definitely frustrating, but
> when you have a broken process like this, and it has to do with
> something that people grew up, part of their identity, I can
> understand it. . . . I do understand that when you have something
> taken away from you, you feel like it's an unethical and unfair
> process. I can see the frustrations as well.

Id. ¶ 94. Gutshall continued: "I don't support changing names of things, and if you're going

to, you have to check with the community. And that wasn't done here." Id. ¶ 99. Gutshall

---

[25] The minutes also reflect that Rutz spoke about a recent Virginia Supreme Court decision, which she called "Mod Z," that she believed indicated that non-essential business was not permitted during the COVID pandemic, rendering the non-essential name change in 2020 void. The court has located this case. Berry v. Bd. of Supervisors of Fairfax Cnty., 302 Va. 114, 884 S.E.2d 515 (2023), addressed a county's decision to adopt a zoning modification, known as "Z-Mod," during an electronic meeting that took place during the COVID-19 pandemic. The statute pertaining to public bodies holding electronic meetings at that time indicated that electronic meetings were permissible during a state of emergency provided that the purpose of the meeting was to address the emergency. See Berry, 302 Va. at 135, 884 S.E.2d at 524. Since the zoning modification in that case was not undertaken to address the COVID-19 emergency, the Virginia Supreme Court held that "Z-Mod" was void ab initio. 302 Va. at 147-48, 884 S.E.2d at 531.

In response, the Virginia General Assembly amended the statute in 2024 to validate any otherwise lawful action taken by public bodies during the pandemic at virtual meetings. See S.B. 244, 163rd Gen. Assemb., 2024 Sess. (Va. 2024).

> For any meeting by a public body using electronic communication
> means occurring from [March 20, 2020] until July 1, 2021, the meeting
> and any otherwise lawful action taken at it is hereby validated with
> respect to the Virginia Freedom of Information Act (§ 2.2-3700 et seq.
> of the Code of Virginia, as amended by this act) if the body provided
> public notice, public access, and public comment commensurate with
> the requirements of § 2.2-3708.2 of the Code of Virginia . . . .

See also Va. Code § 2.2-3708.2.

48

commented on the issue of surveys and added: "But moral of the story, if it was done right, we wouldn't be here talking about it today. It's unfortunate and we're going to have to come to some sort of conclusion to try to put an end to this at some point." Id. ¶ 100; see also SCSB Meeting Minutes, ECF No. 242-17, at 6.

School Board member Streett addressed two issues, process and racism. Streett said the "process was done wrong." SCSB Meeting Minutes, ECF No. 247-17, at 6. Streett stated that "[The 2020 vote to retire the school names] just wasn't done right. Wasn't done fair, as far as I'm concerned. It wasn't done ethically." Third JSSF, ECF No. 242-3, ¶ 104. On the topic of racism, Streett said "I called some old classmates, and we couldn't recall any racism that really stood out. I can't recall any, and I went there five years." Id. ¶ 103.

School Board member Carlineo stated that the 2020 process was a mistake that needs to be rectified and "hates that it was done under the cover of COVID." SCSB Meeting Minutes, ECF No. 247-17, at 6. She stated:

> In the end, it's just about how it was done. How it was coordinated. How it was done. Sneaky. They were trying to be very sneaky. When you read these emails and hear peoples' comments of this, you can definitely see that. . . . Let's fix a mistake. If after that, the community feels like the names have to be changed, then we do it the right way and not just hidden and not this sneaky way that we did it before.

Third JSSF, ECF No. 242-3, ¶ 105.

School Board Chair Barlow termed the process in 2020 "a case study in tamping down democracy." Id. ¶ 106. Barlow explained:

> Because during a nine [ ] day window, something was brought before this board, put on an agenda over the Fourth of July weekend with three days off, and it was voted on the next week and went into effect in that one-week span, a nine-day span.

49

> During that time, somehow the citizens of this county got together and got 4,000 signatures to try and fight it. And one of the reasons it was passed so quickly, according to the messages we have from the School Board, was that they wanted to get it done quickly before that petition could be dropped. That's pretty sad. That's pretty sad. One of the School Board members was looped out entirely, ignored, because it was feared that he wouldn't vote for the new names, so he was just ignored and not given the information about what was happening. It did happen during the pandemic.

Id. ¶ 106. On the of issue racism, Barlow stated:

> If I were looking through the eyes of a black student or parent I'd be unsettled, I'd be unsettled about going back. But I have to be honest with you. If I felt or see in the future any whiff of racism in this, you'd be surprised how fast I'm going to switch my vote the other way. So if we have a group of people out there making a statement for White supremacy, they better beware.

Second JSSF, ECF No. 242-2, ¶ 72.

On May 9, 2024, the School Board held its meeting in which the members voted 5-1 to restore the Confederate school names. First JSSF, ECF No. 242-1, ¶ 42. The Agenda Item in the minutes was titled "Request from the Coalition of Better Schools to Restore School Names." SCSB Meeting Minutes, ECF No. 242-18, at 21. Prior to voting on the motion, the Board heard public comments from a variety of citizens. Id. at 3-14. Then each member of the School Board made their own statements. Id. at 22-25.

### 1. Public Statements by Citizens and Students

During the open session of the May 9, 2024, School Board meeting, the Board heard over three hours of public comments from more than 75 individuals regarding the proposed reinstatement of Confederate school names. First JSSF, ECF No. 242-1, ¶ 32; SCSB Meeting Minutes, ECF No. 242-18. Roughly 50 spoke in opposition to reinstating the Confederate

school names, while nearly 30 sought to restore the names, reflecting the divisive nature of this issue in the community. SCSB Meeting Minutes, ECF No. 242-18.

Common themes emerged as community members made comments in support of keeping the names Mountain View and Honey Run. At least seven people specifically mentioned Massive Resistance and its connection to the time period in which Stonewall Jackson High School was originally named, and several others referred more broadly to the history of segregation in Shenandoah County. See SCSB Meeting Video Transcription, ECF No. 242-25. A vast majority of speakers in support of maintaining the names indicated that a vote to go back to the Confederate names was synonymous with going backward in time. One speaker challenged the board to consider whether they would name a newly built school after a Confederate general in 2024. SCSB Meeting Video Transcription, ECF No. 242-25, at 130-31.[26] Another speaker referred to the decision to name the school after Stonewall Jackson in 1959 as a racist act, and then said, "This is 2024, and if you rename the schools for Confederate leaders again, after 65 or so years, your actions will be doubly racist and wrong." Id. at 86. When confronted with other perspectives that seemed to suggest that racism was not a problem in Shenandoah County schools, speakers were quick to remind the room that "just because you did not experience or recognize racism does not mean that it didn't happen." Id. at 67.

DeLois Warr shared that she was among the first students of color to attend Stonewall Jackson High School in 1964. She spoke in favor of keeping the current "nice names," and

---

[26] The pages referenced in the SCSB Meeting Video Transcription Exhibit at ECF No. 242-25 are the pages of the transcript document, rather than the ECF document pages.

said that if the Board reinstates the Confederate names, her grandchildren will grow up attending a school named for Stonewall Jackson and be scarred just like she was. Id. at 96.

Suetta Freeman shared that she was one of the original 21 Black students "that walked up the hill to Warren County High School in Front Royal, past hecklers and policemen, on February 18, 1959," five years after Brown v. Board of Education was decided. Id. at 21. She explained that those moments are forever etched in her mind and the insults hurled at the Black students were "almost unbearable." Id. She spoke of Massive Resistance and described it as "a terrible time in the state and our communities." Id. at 22. She concluded, "[n]aming public buildings after Confederate soldiers is a slap in the face for civil rights." Id.

Students who spoke in favor of maintaining the names highlighted that "keeping the name Mountain View High School does not have any negative impact on current or future students" but "changing the name back to Stonewall Jackson High School has potential to negatively impact current or future students." Id. at 61-62. One also stated, "as a current student, it is hard to imagine a scenario where reverting the name back to Stonewall Jackson would improve the education received by any student attending the school." Id. at 62.

Some students were exasperated that the school names are still a topic of discussion at all. One student told the board that the "vast amount of attention from the county" on this topic "deeply disappoint[ed]" her and led her to wonder if the board was "operating in the best interest of our students or the preservation of our parents' pride." Id. at 64.

On the other hand, the comments in favor of reinstating the Confederate names focused on their view that the 2020 process was flawed, the perceived majority in favor of the name Stonewall Jackson, and the positive characteristics of Stonewall Jackson himself.

52

Speakers expressed frustration that the School Board in 2020 made decisions "behind closed doors," in a span of eight or nine days, and without public input. See id. at 85, 104, 132. At least one speaker used words like "dishonest" and "wrong" to explain the process in 2020. Id. at 25, 82, 93. Particular disapproval was expressed at the School Board's use of budgeted funds in 2020 to carry out the name change to Mountain View when their efforts to raise money came up short. See id. at 92.

Many community members focused on their feeling that a majority of people in the county want the high school's name to be Stonewall Jackson: "This whole county was upset and is still upset today about the name change." Id. at 91. See also id. at 85, 132. One speaker asked the School Board to "listen to the voices of the people who elected you to represent them, the people whose families built and have sustained this county for generations, the people who are the majority in every petition, every poll, every survey, and . . . every school board meeting. We are the majority." Id. at 53.

There were a number of voices in favor of discussing Stonewall Jackson as a person: "We need to teach people about the man." Id. at 89-91. Those individuals touted their respect for their ancestors, with one declaring that taking care of their families, their neighbors, and their community were actions that embodied the ideals promoted by Jackson, Lee, and Ashby. Id. at 82.

Several White speakers took umbrage at the implication that they should be considered racist for supporting the name Stonewall Jackson. Id. at 118-19. Still others mentioned that they went to Stonewall Jackson High School and graduated in the late 1970s or the early 1980s and they never saw or even thought about racism. In particular, one participant said, "when I

went to school there, I swear I never one time thought about racism at all, nothing. And we had black guys, we had white guys, and we didn't think that way." Id. at 118. Another former student said, "I never saw any racism in school. I'm a firm believer if there's racism, it's being taught." Id. at 119. Finally, another speaker pointed out that some of the Black individuals who spoke at the meeting about experiencing racism during their time at Stonewall Jackson High School had attended many of their class reunions: "if it was so bad, why would these people come back?" Id. at 88.

### 2. Contemporaneous Statements of Board Members

Following public comment, the School Board members took up the motion on the request from the Coalition for Better Schools to restore the school names to Stonewall Jackson High School and Ashby-Lee Elementary School. See SCSB Meeting Minutes, ECF No. 242-18. Before they cast their votes, each member of the School Board had an opportunity to comment on the motion and express their views about the school names.

Thomas Streett began the board member comment period, and stated that his takeaway was that the process was not done correctly in 2020, referring to the decision to retire the Confederate names as a "knee-jerk reaction." SCSB Meeting Video Transcription, ECF No. 242-25, at 161. He referenced some criticism of the Coalition for Better Schools survey as not having received enough responses, and noted that there is no minimum number of participants required to consider the survey an official vote. Id. at 163. Streett said there were "actually three issues, I said two to three, the procedure, the racism, and who the name, who this is all about." Id. at 198. As for the latter topic, Streett stated:

> The character of this individual, Thomas Jackson . . . I find it very interesting when you read about this man, who he was, what he

> stood for, his character, his loyalty, his leadership, how Godly [a]
> man he was, those standards that he had were much higher than
> any leadership of the school system in 2020, and are higher than
> anybody now. But yet we want to put that individual down, we
> don't want to look at him as a person.

Id. at 198-99.

As for "the topic of racism," Streett said, "I don't really like to talk about it a lot because I don't believe in it." First JSSF, ECF No. 242-1, ¶ 36; SCSB Meeting Video Transcription, ECF No. 242-25, at 199. "Racism is a point or problem if you make it a point." SCSB Meeting Video Transcription, ECF No. 242-25, at 202. He recalled attending Stonewall Jackson High School when there was a Confederate flag in the gym: "We never understood what was up there. I kind of wish they would have took it down, because it wouldn't have mattered. We didn't see that as racism. That wasn't – we didn't see that as – as a symbol, as a message." Id. at 200-01.[27]

Gloria Carlineo expressed disapproval of the actions by the School Board in 2020, stating: "my decision to vote for restoring the names of Stonewall Jackson High School and Ashby Elementary simply comes down to the process of how the names were changed in the first place." Id. at 165. She explained: "This was not an innocent mistake by some inexperienced school board. No, this was a carefully choreographed machination[] of a school

---

[27] The Confederate flag hung in the gym for many years and the emblem of a Confederate general on a horse holding the Confederate battle flag was on the gym floor until about 2015. See Michael Dorman Test., ECF No. 281 at 57:13-63:9. At trial, former principal of Stonewall Jackson High School Michael Dorman testified that the flag was taken down before his time there, and he organized the removal of the emblem on the gym floor because "hate groups, Nazis and folks, [] would use that flag" and "that wasn't us." Id. at 61:13-15.

board colluding to ignore the people they represented. This is what political indoctrination in our schools look[s] like." Id.

Carlineo spoke of "the ugly accusations of racism and even White supremacy. I've heard from hundreds of people, and not once have I witnessed any instances of racism coming from those who want to restore the names." Id. at 168.

Carlineo expressed that she knows what it is to be "the subject of prejudice and discrimination for being Puerto Rican," id. at 170-71, but "the difference, again, is that I choose not to be a victim." Id. at 172. Carlineo continued: "And what has this victimization accomplished? Racial division among Blacks and Whites are about as bad as they have been since desegregation, despite the fact that we've had a Black President, a Black Attorney General, and some of our richest billionaires are Black. Is that what oppression looks like?" Id. at 173-74; Second JSSF, ECF No. 242-2, ¶ 69; SCSB Meeting Minutes, ECF No. 242-18, at 22. She continued:

> It is not lost on me, though, that the majority of the people hoping to keep their current names and making the accusations of racism and white supremacy are also the same ones who support and vote for the current president of the White House, a man known for his support of segregation and opposition to busing, who complained about not wanting his kids to grow up in a racial jungle, and who referred to Barack Obama as the – quote, the first sort of mainstream African American who is articulate and bright and clean, end of quote. He also not long ago referred to Black felons as predators who are too psychopathic to be rehabilitated.

SCSB Meeting Video Transcription, ECF No. 242-25, at 175. Before the vote, Carlineo again addressed the issue of race, stating, "if you really want to stop this racism and prejudice, stop

playing racism and prejudice into everything." First JSSF, ECF No. 242-1, ¶ 37; SCSB Meeting Minutes, ECF No. 242-18, at 22.

Brandi Rutz offered comments next. She disagreed with the process of changing the school names in 2020, stating, "[t]he name changed in six days, over a holiday weekend, violating Virginia laws." SCSB Meeting Video Transcription, ECF No. 242-25, at 178.[28] She wished that there was a solution that "worked for everybody." Id. But she also noted that many of the people who came to Shenandoah County, known as "come-heres," stayed in the county even though the name of the school was Stonewall Jackson High School. SCSB Meeting Minutes, ECF No. 242-18, at 23. She said those people made the county their home anyway, and "they did not find offense enough to pack up" and go elsewhere. Id.

Michael Rickard explained that his vote was not based on how he feels, but was based on how the people he represents felt. SCSB Meeting Video Transcription, ECF No. 242-25, at 180-81. He mentioned that 260 people emailed him and "had 118 of you vote to keep the names the way they are, but I have 144 of you asked to restore the names." Id. at 182. He also thought about the students who came to speak from Massanutten Governor's School, which was previously housed at Triplett Tech, another high school in the area. He said, "When they were at Triplett, there was no issue. And yet at Triplett, he was a slave owner as well. And there was no request to change the name of Triplett. So I think all of this was politically driven." SCSB Meeting Video Transcription, ECF No. 242-25, at 183. Rickard added: "I'm sorry that four years ago, the process wasn't followed. It puts us in a bad position. Two years

---

[28] See footnote 25.

ago, they could have done the survey and everything would have been done." Id. at 185; SCSB

Meeting Minutes, ECF No. 242-18, at 23.

Kyle Gutshall remarked that "[t]hings like this really come down to perspective and

how you view things." SCSB Meeting Video Transcription, ECF No. 242-25, at 186. Gutshall

noted that there has been "some sort of process this time around. We've heard the community,

we're hearing perspectives from both sides of this issue." Id. Even though he made clear that

"it's a very tough decision because" he has his own "thoughts and beliefs on certain matters,"

he noted that his district had been "overwhelmingly in support of retaining the names the way

they are." Id. at 188; SCSB Meeting Minutes, ECF No. 242-18, at 23-24.

Dennis Barlow, School Board Chair, said he was old enough to remember 1959, but

he did not remember it as "the – as the – as an era of – what's it called? Massive resistance? Is

that it?" SCSB Meeting Video Transcription, ECF No. 242-25, at 190. He acknowledged that

"some of those things really happened. . . . [T]here were people using the schools and so forth

at that – at that point for kind of a last-ditch effort to save what they saw as their own world."

Id. at 190-91; First JSSF, ECF No. 242-1, ¶ 40.

Barlow addressed the comment he made at the April 22, 2024, School Board work

session: "Yes, I did say I would feel unsettled if I were Black and going through this. Are you

kidding? Of course I would be unsettled." First JSSF, ECF No. 242-1, ¶ 41; SCSB Meeting

Minutes, ECF No. 242-18, at 24. He continued to explain that "unsettled" would not be "the

most horrible thing that ever happened. I mean, most of the Black soldiers that I soldiered

with, I don't think that they would think that going to Stonewall Jackson High School was the

biggest threat that ever happened to them." Second JSSF, ECF No. 242-2, ¶ 71; SCSB Meeting Minutes, ECF No. 242-18, at 24.

Barlow reiterated that the process for changing the names in 2020 was wrong and "there has to be redress for that." SCSB Meeting Video Transcription, ECF No. 242-25, at 195. He finished by stating: "Racial strife is everywhere. Cultural strife is everywhere. Americans are better than that. We really are. And we have to celebrate that and not divide ourselves along these lines and calling each other names without even knowing who – who we are." Id. at 194-95.

### 3. The Vote and the Aftermath

The May 9, 2024, School Board meeting went past midnight, into May 10, 2024. SCSB Meeting Minutes, ECF No. 242-18. After hearing public comments for several hours, the Shenandoah County School Board voted 5-1 to restore the Confederate names. First JSSF, ECF No. 242-1, ¶ 42. The names Stonewall Jackson High School and Ashby-Lee Elementary School were reinstated before the 2024-2025 school year began. First JSSF, ECF No. 242-1, ¶ 44. In fact, by May 31, 2024, less than three weeks after the vote, the Stonewall Jackson signs on the building were being re-installed. Texts from A.C., ECF No. 242-103. By June 5, 2024, the sign at the main entrance to the high school included the words, "Stonewall Jackson High School." First JSSF, ECF No. 242-1, ¶ 43. By June 6, 2024, the sign at the main entrance to the elementary school included the words, "Ashby-Lee Elementary School." Second JSSF, ECF No. 242-2, ¶ 73. The signs were replaced by private contractors, organized by the Coalition for Better Schools. See Michael Dorman Test., ECF No. 281, at 31:17-32:6, 42:5-9, 70:15-71:24.

### H. Impact and Harm to Plaintiffs in Shenandoah County

All four student plaintiffs testified about the harm they experienced as a result of the school name changes, and two experts testified to provide context to the students' experience and perception of the Confederate names in the school environment. A few School Board members provided their perspective on impact in their trial testimony.

### 1. D.D.

D.D. provided the court with details about the impact of the Confederate school names on her mental health and academic experience.[29] D.D., sixteen at the time of testifying, identifies as biracial, part Black and part White, and is a member of the NAACP. D.D. Test., ECF No. 278, at 99:22-23, 100:1-4. D.D. currently attends Stonewall Jackson High School as a sophomore. Id. at 100:5-8. When she was in middle school, she took Algebra I and played three sports at the high school, when it was named Mountain View High School. Id. at 100:11-21. Now, she plays basketball and soccer at the recently renamed Stonewall Jackson High School. Id. at 114:09-13.

D.D. understands that Stonewall Jackson fought to preserve the institution of slavery and believed that the Black race was inferior to the White race. Id. at 101:23-102:01, 107:5-6, 110:13-15. She testified that her high school was "originally named Stonewall Jackson to make Black people feel unwelcome." Id. at 101:23-102:4. D.D. explained that she disagrees with and is negatively impacted by the name Stonewall Jackson High School because it honors a Confederate general who fought to keep Black people, including her ancestors, enslaved. Id.

---

[29] All of the minor plaintiffs were permitted to testify remotely via Zoom with the courtroom closed to the public to protect their identities pursuant to the court's order on pseudonymous plaintiffs in this case. See Order, ECF No. 214.

at 99:15-21. She learned about this history both in school and through her parents. Id. at 111:11-14. When asked why the issue of the school names was important to her, she answered: "Because some of my ancestors were slaves, and if slavery was still a thing, me and my family could have been slaves." Id. at 99:19-21.

When D.D. became aware of the campaign in 2024 to reinstate the Confederate names, she was "upset" because the school names "offend[] [her] and make[] [her] feel unwelcome and uncomfortable." Id. at 101:12-19. D.D. sent a text message to her friends stating, "If they change the high school[']s name back to [S]tonewall [J]ackson [I']m not going to that school." Id. at 104:7-8, 104:17-18; D.D. Text Messages, ECF No. 242-70, at 3.

Kay Doe, D.D. and J.D.'s mother, testified that she sent an email to the School Board speaking on behalf of her daughters before the vote took place. Kay Doe Email to School Board, ECF No. 242-40. This email made it clear that to Doe, the original naming of the schools after Stonewall Jackson, Robert E. Lee, and Turner Ashby "was an act of white supremacy" designed to "intimidate and belittle black families." Id. Doe described how her grandparents had to bus her father and his siblings to other schools because they were not allowed to attend the "brand new facility ten minutes from their home." Id. She explained that the removal of those names in 2020 "was a long overdue correction that denounced white supremacy" and acted as a "balm to families like mine who were so harshly discriminated against by the public school system . . . ." Id. She wrote: "To me, a biracial resident and registered voter of District 2, who attended both schools and whose black children currently attend these schools, a vote to reinstate the names is a direct act of discrimination against my family." Id. She expressed the sadness she felt that neighbors in her community were

61

demonstrating such bias and implored the School Board members not to fall into the same

"ugliness along with them." Id.

D.D. sent her own email to the School Board, detailing her view of the harmful impacts

of the Confederate school names. D.D. Test., ECF No. 278, at 107:2-24. She wrote:

> Hello. My name is D.D. and I am currently an 8th grade student at North Fork Middle School. I am emailing you to tell you my opinion on the name change. I would like to start off by reminding you of something that was said repeatedly at the last school board meeting. A lot of the adults that spoke had said that none of the students care about the name change but they were wrong. I am a student and I care very much about the name change. Stonewall Jackson, Robert E. Lee, and Turner Ashby were all soldiers who fought for slavery. If they had won my family and I would not have the opportunities we have now. I play three sports at Mountain View including volleyball, basketball and soccer (which is still in season). Every time I put on one of those jerseys I am asked to proudly represent my school which is something I cannot do if my school is named after someone who fought for something so horrible and cruel. I am also a devoted student in school and I am taking algebra at the high school. I cannot keep devoting my time to a school that represents these people. Changing the name back doesn't just [a]ffect me or my family but it [a]ffects our community and schools. Changing the name also makes our community seem like a place full of racist, ignorant, and selfish people because the names of racist, ignorant, and selfish people are all around whether it's on shirts, sweaters, the schools etc. Mountain View and Honey Run are amazing names for the high school and elementary school so please take the words I have said into consideration and keep the names how they are.

D.D. Email to Carlineo, ECF No. 242-71.

A few days before the meeting at which the vote was to occur, Kay Doe, speaking on

behalf of her daughters D.D. and J.D., sent another email to the School Board and

Superintendent Melody Sheppard, offering to meet or talk on the phone. See ECF No. 242-

39. She urged them to consider how their actions were affecting Black families and informed

them of the harassment her family was already facing as a result of vocally opposing the restoration of the Confederate names. Id.

At the May 9, 2024, School Board meeting, D.D. spoke during the public comment portion, along with her mother and father, and many other citizens of Shenandoah County. Her statement at the meeting mirrored much of what she wrote in her email to the School Board, but she called on the board members to make decisions that are in the best interests of all students, imploring them not to ignore the feelings of Black students just because they are the minority. SCSB Meeting Video Transcription, ECF No. 242-25, at 39-40. She stated: "The names Mountain View and Honey Run do not devalue and disrespect an entire race of people, but the names Ashby, Lee, and Stonewall do." Id.

After the School Board voted to reinstate the Confederate names, D.D. believed that the School Board "didn't really listen [to] or care" about her statement that the name made her feel "unwelcome," "uncomfortable," and of "less value." D.D. Test., ECF No. 278, at 112:1-7. Because she "told [the School Board]" that the name Stonewall Jackson High School "made [her] feel unwelcome and uncomfortable" and the School Board chose to "change [the name] back anyway," D.D. felt like the School Board did not take her statements about the impact of the Confederate school name on Black students into consideration. Id. at 108:18-24.

Following the vote to restore the Confederate school names, D.D. and her family faced significant retaliation from the community for speaking out against the Confederate school names. Kay Doe Test., ECF No. 277, at 106:16-24. When asked if she experienced retaliation after the 2024 vote, Kay Doe testified:

63

> Yes. The same stuff. . . . [Y]ou know, we were still followed. Members of the community, again, were taking pictures of us, posting about us, trying to get my husband fired. There were a series of Confederate flags hung up right outside of our property on our property line. Just intimidated. Felt like people wanted us gone.

Id. at 106:16-24; Photo of Confederate Flags, ECF No. 242-164.

While attending school, D.D. encounters the Confederate name and symbols throughout the day. D.D. Test., ECF No. 278, at 112:14-24. Students and teachers wear clothing that bears the name of Stonewall Jackson, teachers display the name Stonewall Jackson and Confederate symbology in their classrooms, and the name Stonewall Jackson or SJ is present around the school, including on the front of the building, on the scoreboards in the gym, on the bench in the school gym, and in display cabinets around the school. Id. See also Photos at ECF Nos. 242-52, 242-53, 242-54, 242-55, 242-57. D.D. shared that seeing the Confederate name all over the school makes her feel unwelcome because she is Black and "Stonewall Jackson thought that Black people were less than and he fought for slavery," and because the schools "were originally named Stonewall Jackson to make Black people feel unwelcome." D.D. Test., ECF No. 278, at 101:25-102:4.

D.D. testified that seeing other students wearing clothes that say Stonewall Jackson is upsetting because it makes her feel like she does not have people that she trusts that she can "talk to about the names," and she feels that if she says how she feels about the names then "they'll think of [her] differently or be mean to [her] about it." Id. at 113:2-8. Seeing teachers wearing clothes that say Stonewall Jackson makes her feel as though she cannot share her thoughts with them either. Id. at 113:9-15.

64

One day while D.D. was in history class, a student who was not in the class came into the classroom and asked her teacher if he wanted the school's name to be Stonewall Jackson High School or Mountain View High School. Id. at 113:19-21. D.D.'s teacher said that he did not want to answer and would rather answer in private. Id. at 113:21-23. The student then asked everyone in the class to raise their hands if they liked the name Stonewall Jackson, and a majority of the class raised their hands. Id. at 113:23-25. The student then asked if anyone did not like the name Stonewall Jackson, and nobody raised their hand. Id. at 113:25-114:4. D.D. explained that she did not raise her hand at all, but the incident made her "feel uncomfortable and upset knowing that so many people in the class liked the name Stonewall Jackson" and she "felt like [she] couldn't say that [she] didn't like it because [she] would be bullied or people would be mean to [her]." Id. at 114:3-8.

D.D. testified that her academic experience also has been impacted, as she gets distracted in class by having to think about the school name. Whenever she sees the name Stonewall Jackson in classrooms or on people's clothes, "it's just a reminder" that she does not "feel welcome or valued" at school and that she feels "uncomfortable" with the school's name. Id. at 117:21-23. These thoughts distract her throughout the day because it is an "extra thing" to think about, making it even harder to focus on learning. Id. at 117:23-118:1. Nevertheless, she earns good grades despite the impact of the names on her learning. Id. at 118:2-11.

Encountering the Confederate name while attending school each day negatively impacted D.D.'s mental health. Beyond the impact of feeling isolated from her peers, seeing the name "reminds [her] of everything [her] ancestors" and she and her family "have gone

65

through," which upsets her throughout the day. Id. at 118:14-19. She explained that her ancestors were slaves, her grandfather and his siblings were bused to non-White schools when they were younger, her mother was uncomfortable while attending Stonewall Jackson High School, and her family has been mistreated in the community for speaking out against the Confederate school names. Id. at 118:23-119:6. In this environment, she feels "inferior" to her White peers "because Stonewall Jackson thought that Black people were inferior to White people." Id. at 119:7-13.

As D.D. is a multi-sport athlete, she also has to confront the Confederate name in her extracurricular activities. When she plays basketball and soccer, she is announced as a Stonewall Jackson General before running out onto the court or field. Id. at 116:11-17; First JSSF, ECF No. 242-1, ¶¶ 50, 54. It makes her feel "conflicted" to be associated with the name Stonewall Jackson while playing sports because whenever she achieves an accomplishment, it feels like she is doing well and achieving the accomplishment for Stonewall Jackson, a name that makes her feel uncomfortable and unwelcome. D.D. Test., ECF No. 278, at 116:18-25. At the same time, she wants to do well when she plays sports, which compounds the conflict she feels. Id. at 116:25-117:2. She tried to explain exactly why this upsets her:

> I still have to represent a man who fought for slavery and who thought Black people were inferior to White people, and everything good that I do, it goes to him, saying that I'm doing something good for him, even though he thought Black people were inferior. So it makes – it makes me feel bad because I'm doing good things for him. So I guess it just feels like more people are, like, proud of the name whenever I do something good, but I don't want it to be that way because the name makes me feel less – like I have less value and unwelcome and uncomfortable.

Id. at 121:19-122:3.

She testified that the jerseys that say "Generals" on them bother her less than jerseys that say "Stonewall Jackson," but she still knows that "Generals" means Confederate generals. Id. at 119:18-22. Nonetheless, to D.D., "Generals" is preferable to "Stonewall." Id.

On cross-examination, D.D. acknowledged that she was an excellent student as well as a student athlete in a leadership role. Id. at 120:10-25.

## 2. J.D.

J.D., D.D.'s sister, also provided the court with her perspective about the decision to reinstate the Confederate school names. J.D., who was eleven at the time of testifying, identifies as Black and is a member of the NAACP. J.D. Test., ECF No. 278, at 125:12-13, 125:24-126:2. J.D. currently attends North Fork Middle School, but she formerly attended Ashby-Lee Elementary School, and plans to attend Stonewall Jackson High School because it is her neighborhood high school. Id. at 125:14-23. J.D. understands that Ashby-Lee Elementary School is named after Robert E. Lee and Turner Ashby, who were Confederate generals, which she learned about in her history class. Id. at 127:2-10.

J.D. testified that she did not think about the name of her school very much when it was called Honey Run Elementary School, but felt "sad" when the School Board voted to reinstate the name Ashby-Lee Elementary School because "[her] family gave them good reasons" not to restore the Confederate names, including the harmful impact of the names on Black students, and the School Board "didn't listen." Id. at 126:11-23. The decision to restore the names, even after J.D.'s family told the School Board of the harmful impact of the Confederate names, signaled to J.D. that the School Board "might not want [her] or [her] sister to attend [Shenandoah County Public Schools]." Id. at 126:16-127:01. More than that, J.D. felt

67

as though the School Board's decision indicated that "they might want schools to still be segregated." Id. at 127:11-16.

Once the school name was changed to Ashby-Lee, J.D. noticed that students and teachers began to wear t-shirts that said "Ashby-Lee" instead of "Honey Run." Id. at 127:17-21. When she saw students wearing Ashby-Lee shirts, she felt "sad." Id. at 127:22-128:3. Similarly, when she saw her teachers wearing Ashby-Lee shirts, she also felt "sad" because she thought that those teachers understood what the name Ashby-Lee represents and wore the shirts anyway. Id. at 127:22-128:6. Further, J.D. thought that those students and teachers "might want the schools to be segregated, too." Id. J.D. used words such as "uncomfortable" and "intense" to describe the primary feelings she experienced as a result of attending a school named after Ashby and Lee. Id. at 130:12-14.

J.D. testified that she got "good grades" when the school was named Honey Run, and that she still earned "good grades" when the school was named Ashby-Lee, but the Confederate naming of the school made her "put extra effort into [her] schoolwork" because she was distracted by thoughts about the school's name. Id. at 129:4-14.

On cross-examination, J.D. acknowledged that she is still playing sports and still earning good grades. Id. at 131:13-19.

### 3. B.B.

B.B. testified in person at trial and described how the reversion to the Confederate school names impacted her mental health and academic experience. B.B. identifies as mixed race, half Black and half White, and is a member of the NAACP. B.B. Test., ECF No. 278, at 133:2-3, 135:21-22. B.B. is currently in college, but she attended the Massanutten Regional

68

Governor's School ("Governor's School") during her junior and senior years of high school. Id. at 133:20-23. The Governor's School is an integrated learning program for environmental sciences and math for students seeking "an extra challenge." Id. at 133:24-134:5. Students apply to the Governor's School during their sophomore year of high school, and admission is based on grades and teacher recommendations. Id. at 134:9-20. During B.B.'s junior year, the Governor's School was housed within Mountain View High School. Id. at 135:8-19. During her senior year, the Governor's School was housed within the same building, the newly renamed Stonewall Jackson High School. Id. B.B. did not have the option to attend Governor's School at a location other than Stonewall Jackson High School. Id. at 150:6-10.

B.B. testified that she understands Stonewall Jackson to be a Confederate general that fought to "keep Black people like [her] enslaved." Id. at 139:8-16. She also understands that the name Stonewall Jackson was "originally given to the school to deter Black students from attending." Id. at 142:24-143:13.

When B.B. learned that the School Board voted to retire the name Stonewall Jackson High School in 2020, she felt like it was a "step in the right direction" and she was excited to see what changes would come after the Confederate names were removed. Id. at 138:14-23. The vote in 2020 signified to her that all students could feel welcome in Shenandoah County Public Schools. Id.

When B.B. heard about the campaign to restore the Confederate names to the schools, she felt "disappointed and confused" because the School Board previously retired the names due to their understanding of the harmful impact of the names on Black students. Id. at 137:12-138:3. It made her "second guess" whether the School Board "really care[d]" about the

perspectives of Black students and wonder whether the School Board had "ulterior motives" behind changing the name back to Stonewall Jackson. Id. at 137:22-138:3.

Once the School Board voted to reinstate the name Stonewall Jackson High School in 2024, B.B. testified that she was "very confused" because "the School Board was aware that the name Stonewall Jackson made people feel uncomfortable and unwelcome at the school." Id. at 138:24-139:5. B.B. was confused about how the School Board could make this decision, knowing that Stonewall Jackson fought for the Confederacy and the institution of slavery, and that his name on the school made some students feel unwelcome. Id. at 139:6-14. She testified that it made her feel like the School Board did not care about racism. Id. The vote to restore the name "communicated to [her] that they may have some of the same racist ideals as Stonewall Jackson, and they don't care about minority students." Id. at 139:17-22.

Following the 2024 vote, B.B. spoke to multiple news outlets to share her frustration with the decision. She chose to speak to the news because she knew there were people who could not do so, or would not feel safe doing so, but she also wanted to speak out because she "care[s] about the community feeling inclusive and welcoming to everybody." Id. at 140:2-17. In various interviews, B.B. shared that the decision to restore the Confederate names was a "huge step in the wrong direction" that made her feel unwelcome at a place that she attends every day. Id. at 147:18-148:18; News Article, ECF No. 242-72, at 2; News Article, ECF No. 242-73, at 1-2. See also News Article, ECF No. 242-51, at 5; (B.B. explaining that she was speaking out so that students of color who came after her could feel comfortable attending their school); B.B. Test., ECF No. 278, at 152:3-19.

70

B.B. testified that the decision to change the name of the school to Stonewall Jackson made her feel unsafe and unwanted. She explained that "the name Stonewall Jackson, to me, kind of makes the school a place that is accepting of racist ideas" and is accepting of people who have racist ideals. B.B. Test., ECF No. 278, at 144:15-24. She said that she never knew how people who held those "racist ideals" would react to her, her opinions, or anything she had to say. Id. She also explained that changing the name of the school back to Stonewall Jackson "ties back to the – the history of the school and . . . how I most certainly wouldn't have been welcome there back when it was, you know, first named. And it still . . . makes me feel just as unwanted and uncomfortable being there today." Id. at 144:25-145:9.

B.B. testified that seeing the name Stonewall Jackson on the front of the school and printed on clothing items and jerseys, and hearing the name chanted and called out at sporting events were encounters that made her feel "small," "unwelcome," and "unsafe" "in a place where [she] should have felt very comfortable being able to attend every day." Id. at 152:23-153:2. In particular, these feelings were amplified by the fact that the name was changed to Mountain View initially "to make everybody feel welcome and safe," but the School Board still decided to reinstate the Confederate names anyway. Id. at 153:2-7. B.B. reiterated that the 2024 vote made her feel as though she was not being supported by the School Board and that the board members did not seem to care about how she felt in the school environment. Id. at 153:7-9.

Encountering the Confederate name while attending school each day negatively impacted B.B's mental health. She testified that she was more anxious at school, and especially anxious when it came to meeting or talking to new people. Id. at 156:10-15. Feeling like she

71

was not welcome or did not fit in took a toll on her self-esteem and self-worth. Id. at 156:15-17. She was constantly thinking about how she did not feel "comfortable" or "seen" in her community, and she worried about how people would perceive and treat her. Id. at 154:1-6, 156:16-157:11. This anxiety and worry ultimately made her academic experience more difficult, even though she acknowledged that she had some support systems that helped her to succeed in spite of the challenges. Id. at 154:1-12. Although B.B.'s experience as a Black student attending a predominately White school had sometimes made her feel anxious about whether people would hold prejudice against her, the restoration of the Confederate school name "definitely amplified" her anxiety and her feelings of being unwelcome and unsafe at school. Id. at 153:10-21. The restoration of the Confederate school name made her feel like the school was "becoming a safe space for . . . people to be racist." Id. at 153:21-25.

B.B. testified that she was "always wary" about interacting with new people, especially after she spoke out against the Confederate school names. Id. at 155:6-9. She found herself constantly second guessing whether she was "even meant to be in the building" and "be at the school in the first place" because of the school's name. Id. at 155:15-23. She explained that she felt "inferior to [her] White peers" because she had to worry about feeling unwelcome at school and how she would be perceived by others. Id. at 155:24-156:4. She testified that her feelings of inferiority were also linked to the history of slavery and the oppression of Black people, and the connection between the school name and that history of oppression. Id. at 156:4-9. She felt like she was personally impacted by the Confederate school name and its racist connections in a way that White students were not. Id.

72

On cross-examination, B.B. acknowledged that she earned a higher grade in calculus during her senior year, when the school was named Stonewall Jackson, than she earned in precalculus during her junior year, when the school was named Mountain View. Id. at 159:22-160:21. She also clarified that even though her grades did not reflect a downturn in response to the name change, she felt that her educational experience was diminished by having to worry about feeling like she did not belong. Id. at 171:10-172:18.

### 4. A.C.

A.C. was the final student to testify and he, too, described the impact that the reversion to the Confederate school names had on his mental health and academic experience. A.C. identifies as mixed race, or "mixed with Black and White," and is a member of the NAACP. A.C. Test., ECF No. 279, at 24:11-14. Although A.C. is currently in college, he attended the Governor's School during his junior and senior years of high school. Id. at 25:6-10. During his junior year, the Governor's School was housed within Mountain View High School, and during his senior year, the name Stonewall Jackson High School was reinstated, and the Governor's School was then housed within Stonewall Jackson High School. Id. at 26:8-16. A.C. attended the Governor's School every day of the school week. Id. at 26:17-20. He did not have the option to attend Governor's School at any high school other than Stonewall Jackson High School. Id. at 26:21-23.

A.C. learned about the Civil War, the Confederacy, and Stonewall Jackson both in school and from his parents, as a product of growing up in close proximity to particular historic battlefields, as well as growing up as a mixed race student in Shenandoah County. Id. at 29:15-25. He understands that the Confederacy was a group of states that broke away from

the United States in an attempt to preserve the institution of slavery in the South. Id. at 29:5-8. He explained that Stonewall Jackson was a general in the Confederate army who fought to preserve the institution of slavery and earned a nickname for his fighting ability. Id. at 29:9-13. A.C. testified that Stonewall Jackson High School was named "in the wake of Massive Resistance" to discourage Black students from attending the school. Id. at 47:9-20.

When A.C. heard about the campaign in 2024 to reinstate the Confederate names, he testified that he never dreamed that the community would consider returning to the names of those men on the schools. Id. at 30:12-18. Given that his mother taught at a high school in a neighboring county that had also retired the Stonewall Jackson name in 2020, he was surprised to learn that Shenandoah County was planning to vote again on the names in 2024. Id. at 28:5-14, 30:14. His mother sent an email to the School Board on his behalf, imploring the board members not to move backwards into the past but rather "take steps towards inspiring unity, resilience, and hope for a better future" by voting to keep the names Mountain View and Honey Run. A.C.'s Mother's Email, ECF No. 242-102, at 1; A.C. Test. ECF No. 279, at 31:13-33:3. "A name that conjures up people who fought to preserve slavery and to break apart our union, is not unifying, nor does it bring hope to the many minority students that attend these schools." A.C.'s Mother's Email, ECF No. 242-102, at 1.

A.C. spoke at the May 9, 2024, School Board meeting. He testified that the prospect of the Shenandoah County School Board voting to restore Stonewall Jackson's name to the school "put a knot in [his] stomach, at the very least." A.C. Test., ECF No. 279, at 35:17. A.C. testified that, to him, his comments were "sort of something [the School Board] had to sit through." Id. at 36:7-15. After the board members voted to reinstate the Confederate names,

A.C. testified that "initially, it didn't even feel real" and he was "stunned" that "any community would take such a big step backward." Id. at 36:20-37:2. He felt like he and other community members who discussed the harmful impact of the Confederate school names "just weren't heard." Id. at 36:20-37:9.

After the restoration of the names, A.C. felt unwelcome attending the Governor's School with the Stonewall Jackson name on the building. Id. at 48:13-16.

> [W]alking under the name every day . . . was a reminder of the fact that . . . they had named it that in the [phase] of Massive Resistance to try to disincentivize people of color from attending the school, and then also the fact that Stonewall Jackson was who he was and fought for what he fought for.

Id. at 48:18-24. He said that the name "was certainly achieving its goal of making [him] feel unwelcome." Id. at 50:15-21.

The name change also negatively impacted A.C.'s social interactions and relationships with his peers at school. He became uncomfortable having conversations with peers who may have supported the restoration of the Confederate names, so he would consciously "steer away" from the topic of school names to avoid confrontation. Id. at 50:22-51:7. Once the school was renamed after Stonewall Jackson, A.C. said he felt like he was "experiencing it differently from many other people" because of his race. Id. at 51:25-52:11. Even though he would do his best to focus on his school work and engage with friends, the fact of the name restoration "was always there" and "it just weighed on [him]," "almost like an invisible ball and chain." Id. at 52:21-53:4. He felt like the weight he carried was invisible to many of his peers because they did not experience the same harm from encountering the Confederate name. Id. at 53:5-15.

75

A.C. felt "held back" mentally by the fact that he did not feel welcome in his school because of the Confederate name, and his academic endeavors were made more difficult because he was always aware that he was inside a building named Stonewall Jackson High School. Id. at 53:24-54:7. His grades "drop[ped] off a little bit" during his senior year, partially due to more advanced coursework, but also due to the weight he carried every day. Id. at 52:12-20.

On cross-examination, A.C. acknowledged that although he attended the Governor's School at Stonewall Jackson High School, when he played sports, he played at Strasburg High School. Id. at 57:18-20. In football, soccer, and swimming, A.C. was a "Strasburg Ram," and never a "Stonewall Jackson General." Id. at 57:21-25. He admitted that when Strasburg played Stonewall in soccer and swimming, he felt a "little more competitive against" them or a little more "internal motivation to beat them." Id. at 58:21-59:4, 59:15-60:18. When asked why he felt this way, he mostly attributed his competitive spirit to the friendships he shared with many of the soccer players on the Stonewall Jackson team from their younger days playing in a travel league together. Id. at 60:15-18. He had "extra motivation" to beat them, even though he did not hold it against them that their school was named after a Confederate general because "[i]t's not their choice." Id. at 60:23-61:1. He noted that all of the players on the Stonewall Jackson soccer team "displayed perfectly fantastic sportsmanship." Id. at 61:8-10.

### 5.  Virginia State Conference of the NAACP

Rev. Bailey testified that the restoration of the Confederate school names threatened the VA NAACP's mission to fight for the rights of Black people in Virginia and eliminate race-based discrimination. Bailey Test., ECF No. 279, at 196:18-22. He explained that the

mission of the NAACP is to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." Id. at 183:19-23; NAACP About webpage, ECF No. 242-105. In addition, the NAACP gives assistance to individuals and organizations who believe "they have been discriminated against, unfairly treated, [or] treated with inequities" and works on their behalf to achieve a desired outcome and "relieve them of the pressures of the issues that they have of racial discrimination." Bailey Test., ECF No. 279, at 184:24-185:7.

Specifically, the restoration of the Confederate school names threatened the wellbeing of the students at those schools, their parents, and the community at large because students and faculty are required to attend school each day in a building that serves as a monument to people who fought to preserve the institution of slavery. Id. at 196:22-197:7. Rev. Bailey was concerned that the restoration of the Confederate school names would embolden people to further discriminate against or harass Black people in Shenandoah County. Id. at 198:16-199:04.

The Shenandoah County NAACP branch includes Black students that attend Stonewall Jackson High School and Ashby-Lee Elementary School. Id. at 201:11-24. In Rev. Bailey's view, from conversations he had with these students at town halls and during "listening sessions," these students were and are impacted by the school name change. Id. at 201:21-24, 202:12-22. Students shared with him that they had been "joyful in 2020 when the names were changed from the Confederate generals" but then they "despaired now that they were about to experience" the reinstatement of those names. Id. at 202:23-203:3. "They were devastated,

77

and they felt that they were being treated as less than, especially since before the NAACP was asked to help them in a formal way, they had tried to advocate for themselves and their voices were either not heard or ignored." Id. at 209:6-10.

Rev. Bailey explained that the NAACP "first went through the steps that we do of communication, demonstration, and hoping for the right outcome." Id. at 207:15-18. He continued: "We decided that, after those first two phases failed, based upon lack of response from the School Board, that we needed to now go through litigation, because the objective is to restore the well-being of the Black students in Shenandoah County . . . ." Id. at 207:18-22.

### 6. Impact of Confederate Symbols and Racism on Health of Black Students

Dr. Adiaha Spinks-Franklin[30] testified as an expert in the field of developmental behavioral pediatrics and on racism as a health determinant in children. In order to form her opinions in this case, Dr. Spinks-Franklin reviewed a variety of scholarly sources, covering topics such as Black student experiences with racism in the school environment, the effect of racism on the physiological, mental, and behavioral health of Black students, and the correlation between living in a region of the country that has Confederate iconography and the health of Black Americans. Spinks-Franklin Test., ECF No. 279, at 80:22-81:15. In her

---

[30] Dr. Spinks-Franklin is a board-certified Developmental-Behavioral Pediatrician with more than 20 years of clinical experience. She completed medical school at Meharry Medical College School of Medicine and received a master's in public health from the Harvard School of Public Health. Her research focuses on the impact of racism on child development, behavior, and health, transgenerational transfer of racial and colonial trauma, developmental disabilities, and behavioral health conditions. She has published peer-reviewed articles on the effect of trauma and racism on the development, behavior, and health of children. Her opinions were based on her education, scholarship, professional experience, and review of various materials identified in the evidentiary record, including transcripts from the School Board meetings, media interviews of D.D., B.B., and A.C., and transcripts from the depositions of D.D., B.B., and A.C. See generally Spinks-Franklin CV, ECF No. 242-118 and Spinks-Franklin Test., ECF No. 279, at 69:18-77:23.

opinion, Black students are disproportionately affected by Confederate school names compared to their White peers. Id. at 102:15-17.

Dr. Spinks-Franklin testified that the medical literature is clear that racism and racially discriminatory messages have a significant negative impact on the development, behavior, and health of Black children, adolescents, and adults. Id. at 81:21-82:2; 114:7-117:7. Dr. Spinks-Franklin explained that cultural racism casts Black individuals as inferior and as having negative stereotypes. Id. at 97:4-25.

Dr. Spinks-Franklin testified at length regarding race-based traumatic stress and its effect on the body, id. at 82:20-25, causing a variety of psychological and physiological harms in the bodies of Black individuals, occurring in the brain, the nervous system, the endocrine system, the immunological system, and the cardiovascular system. Id. at 83:5-7, 83:15-21. Dr. Spinks-Franklin explained that experiences of racial discrimination are perceived by the human brain as social rejection. Id. at 84:8-85:15. She testified that when Black people experience racism or discrimination, the regions of the brain that light up are the same regions that light up when experiencing a severely painful event. Id. The brain perceives the event as a threat and the amygdala sends fight or flight signals to the brain. Id.

But, she testified, when Black people experience racial discrimination on a daily basis, those stress hormones produced by the brain go into overdrive, alerting the rest of the body to begin producing additional stress hormones. Id. at 85:16-24. Research indicates that Black people who live in environments where they experience racism regularly have higher levels of stress hormones compared to Black people who do not live in such environments. Id. at 85:25-86:7. This toxic stress can negatively impact developing brains of children and adolescents,

79

making it harder for Black students to learn and recall what they have learned. Id. at 86:16-87:2. Combatting these effects requires students to expend extra effort for concentration and organization. Id.

Dr. Spinks-Franklin referred to studies that indicate that Black children who experience racism in school settings show higher levels of anxiety, depression, difficulty concentrating and completing work, and difficulty with academic achievement in general. Id. at 92:6-12. Black adolescents experience greater difficulties with interpersonal relationships when they experience racism at school; they feel like second-class citizens, have difficulty getting along with their peers, and have difficulty trusting their teachers. Id. at 92:13-18; 93:16-22. They report that the school environment feels hostile and unwelcoming, and a number of students even reported suicidal thoughts. Id. at 92:15-21. Still others simply report that it is preferable to remain silent in the face of microaggressions because it is too uncomfortable to speak up. Id. at 96:3-9.

Dr. Spinks-Franklin testified that Black students who experience racism in school may often be high achievers who maintain a strong ethos of excellence and achievement. Id. at 118:6-15. These students strive for high academic performance in an effort to counter narratives of Black inferiority. Id. at 118:18-24. Some students use academic success as a means of coping with or resisting the effects of a racist educational environment. Id. at 118:15-17. But even though those students may excel academically, racial stress manifests in other ways. Id. at 118:25-121:1. These students carry ongoing stress associated with feeling inferior at school, experiencing racial spotlighting or racial invisibility, limiting interpersonal interactions with peers and teachers, and carefully managing their behavior to avoid being stereotyped as

aggressive or angry when responding to acts of racism or microaggressions. Id. These students often feel unable to simply attend school and learn; instead, they experience pressure to disprove stereotypes of intellectual inferiority by studying longer hours, sacrificing sleep, and remaining constantly vigilant. Id. at 120:11-121:1. Over time, this sustained effort results in racial battle fatigue, as students become worn down by the continuous need to navigate and resist racism in their school environment. Id.

Dr. Spinks-Franklin explained that Confederate iconography constitutes a form of cultural racism because it communicates the superiority of White people and the inferiority of Black people. Id. at 97:17-99:4. Black individuals overwhelmingly perceive such symbols as racist and harmful. Id. at 97:18-20. Research reflects high rates of poor physical health outcomes, depression, anger, frustration, and lower self-esteem among Black individuals living in regions where Confederate iconography is prevalent, as compared to Black individuals residing in regions without such iconography. Id. at 98:16-22; 100:3-7.

Dr. Spinks-Franklin testified that "Black students are disproportionately affected by the Confederate school names compared to their White peers." Id. at 102:15-17. She explained:

> So across all the studies, the vast majority of Black folks viewed Confederate iconography very negatively, saw it as a reminder of slavery and Jim Crow, saw it as a signal that they are second-class citizens, that they are inferior to Whites. And then among the White populations who live in areas where there is Confederate iconography, they overwhelmingly view it as positive, as a symbol of their White identity and of their culture. Now, in some studies, Whites were not aware of the negative effect that Confederate iconography had on the Black residents. In other studies, they had awareness but did not have empathy for the experiences, the negative experiences of Black people living under Confederate iconography.

81

Id. at 112:15-113:3. Dr. Spinks-Franklin described the Confederate school names and symbols in Shenandoah County as trauma triggers for Black students. Id. at 102:1-8.

On cross-examination, Dr. Spinks-Franklin acknowledged that she did not interview or diagnose any of the student plaintiffs in this case with any particular medical condition. See id. at 135:10-16, 141:25-142:3, 158:22-159:2. She reiterated that her "medical opinion is that these experiences with racism in the school setting and being exposed to Confederate iconography increases the risk for having learning problems and memory problems in Black students." Id. at 134:20-23. But she confirmed that she could not opine as to whether any specific plaintiff in this case suffers from cognitive issues, inhibited learning, impaired memory, impaired abstract thinking, or impaired self-control. See id. at 134:8-17, 135:3-9. Similarly, she could not opine as to whether any specific plaintiff in this case suffers from impaired social skills, impaired interpersonal relationships, negative attitudes toward authority figures, or suppressed creativity. See id. at 136:15-137:3. On re-direct, Dr. Spinks-Franklin explained that she was not asked to diagnose the specific plaintiffs as part of her work as an expert witness in this case, and when she does "expert work" she does not have "a personal doctor-patient relationship with the folks." Id. at 169:9-170:18.

### 7. Impact of Confederate Symbols on Student Extracurricular Participation

Dr. Amy Bass[31] testified as an expert on the benefit of scholastic sports participation for K-12 students and its intersection with culture, including, among other things, how

---

[31] Dr. Bass is a Professor of Sport Studies at Manhattanville University in Purchase, New York, where she chairs the Division of Social Science and Communication. She also serves as Manhattanville's Faculty Athletics Representative to the National Collegiate Athletic Association. Her scholarship and teaching focuses on the intersection of sports, culture, and politics, and she possesses an expertise in

symbols associated with racial hierarchies, such as Confederate figures, shape student experience in school-based athletics. Bass Test., ECF No. 280, at 15:18-16:10. She was offered to highlight the substantial research that supports the developmental benefits of sports participation and provide additional context about the impact of the name change on students' extracurricular experiences at Stonewall Jackson High School. See id. at 18:12-19:12.

Relevant to Dr. Bass's opinion are the following stipulated facts pertaining to the schools' mascots and team names: The official team name for Stonewall Jackson High School is the "Generals." First JSSF, ECF No. 242-1, ¶ 45. The Stonewall Jackson High School logo reads "SJ Generals," where "SJ" stands for "Stonewall Jackson." Id. ¶¶ 46-47. Stonewall Jackson High School sports teams and student groups are sometimes referred to as "Stonewall Jackson," "Stonewall Jackson High School," or "Generals" in official written communications or announcements at sporting events. Id. ¶¶ 48-51. Students at Stonewall Jackson High School and Ashby-Lee Elementary School see signs, apparel, and school materials bearing these words daily. Second JSSF, ECF No. 242-2, ¶¶ 77-78.

In Dr. Bass's opinion, Confederate symbols undermine "the principles of inclusivity and equality that school athletics should promote" and "can discourage students from engaging in sport activities, whether as athletes or spectators." Bass Test., ECF No. 280, at

---

African American history, gender equity, identity politics, and sports culture and ethics. Dr. Bass's research includes evaluating how cultural and political symbols in sports environments can affect certain racial groups differently. Her teaching also includes looking at symbols associated with racial hierarchies, such as Confederate figures, and how it shapes student experiences in school-based athletics. Her opinions are based on her education, scholarship, professional experience, and review of various materials identified in the evidentiary record, including Stonewall Jackson High School yearbook images and athletic policies. See generally Bass CV, ECF No. 242-146 and Test. of Bass, ECF No. 280, at 9:3-17:23.

18:25-19:4. "Deterring students from participating in sport can have detrimental effects on physical health, cognitive development, and socioemotional well-being, all of which can undermine pathways to future opportunity and success." Id. at 18:18-22. She further testified:

> Students should not be made to choose between sitting out or representing symbols that encompass racist and oppressive ideologies. It is then imperative that schools carefully navigate the balance between tradition and growth to encourage unity over division by embracing inclusive symbols that promote a positive athletic environment, strengthen team culture, and ensure all students, athletes or not, feel supported, included, and valued.

Id. at 19:5-12. Dr. Bass explained that sports can provide positive environments for students but only when students feel as though they can participate fully. Id. at 26:6-14. Students should not participate in sports in spite of something. Id. "[I]f a uniform, a mascot, [or] a team name is something that they have to do something in spite of, then you are changing that experience for that student." Id. The goal should be "to create space that feels safe for every student to participate equally to the best of their ability," rather than burdening students with names or mascots that feel heavy. Id. at 26:17-25. Once students are forced to take on such a burden, they are not experiencing the activity equally. Id. at 27:1-4. Students who feel excluded by a team uniform, mascot, or team name, cannot engage in the same cognitive or physical manner as their teammates who are not thinking about these things. Id. at 26:12-14.

Dr. Bass also opined on the concept of students being asked to personify their team name or mascot. When students put on uniforms or jerseys, "they are taking on the brand of the school [and] of the mascot. It's a personification." Id. at 24:18-20. By requiring students to wear uniforms that convey the "brand" of the school, Dr. Bass suggests that the School

Board is "creating a barrier for students to have the same degrees of comfort or ability to participate in sport." Id. at 24:15-25.

### 8. School Board Testimony on Impact

In their trial testimony, School Board members generally discounted any impact of the Confederate school names on Black students. Barlow noted that "I would feel unsettled if I were Black and going through this," First JSSF, ECF No. 242-1, ¶ 41, even though he testified that he was never notified of any discrimination in Shenandoah County schools, clarifying that no one ever brought "an event or specific occurrence or person involved" to his attention. Barlow Test., ECF No. 280, at 138:17-140:8. Despite Kay Doe's communications with Barlow via email and over the phone, he understood her to have "feelings" and concern about racially discriminatory "atmospherics" in the schools her biracial daughters attended, but he did not come away from their conversation with any ability to pinpoint "an event or a particular issue." Id. at 139:10-22.

Gloria Carlineo testified at trial that she "would like to see the evidence" or "what harm was done to the plaintiffs." Carlineo Test., ECF No. 281, at 183:3-12. She maintained that she was "skeptical" of some of the students who said they felt unwelcome as a result of the Confederate names because those students "attended the schools before and there were no complaints." Id. at 184:17-22. Carlineo also questioned any negative impact on Black students, stating that she has seen them in Stonewall Jackson High School attire in casual settings. Id. at 185:18-25.

During her deposition, Carlineo testified that the history of the school's naming during the Massive Resistance period, assuming it is true, would not be relevant to her opinion about

85

the school's name today. Id. at 197:1-25. Upon cross-examination at trial, Carlineo repeated that the history of the names and how the students may feel about that history is not relevant to her because she believes the focus should be on what the schools mean today:

> [R]ight now, we have a name that we had on that school for over 60 years and we've had no instances, as far as I know of any kind of racism or kids being discriminated against. People have been welcome. And that's what we have right now in the schools. So that's what I'm focusing on right now, is what are our schools today.

Id. at 198:8-21.

When Rutz was asked during her deposition if she could understand how, in 1963, when the first Black student was allowed to attend Stonewall Jackson High School, the name of the school could make them uncomfortable, she responded, "I can't speak to that," but noted "on either side of this . . . there are people that feel that . . . being made to start their – their high school career at Stonewall Jackson High School and finish it at Mountain View, after being in the county all their lives, is – was – was not fair either." Rutz Test., ECF No. 279, at 270:11-25.

At trial, Kyle Gutshall acknowledged that the perspective of Black students was important, and in making the decision to reinstate the Confederate school names, "we had to consider that as something when we make a decision to that magnitude." Gutshall Test., ECF No. 280, at 247:12-22.

## IV.    Findings of Fact

The foregoing evidence was presented at trial, which the court synthesizes as follows:[32]

1.  In Virginia, the years following the <u>Brown v. Board of Education</u>, 347 U.S. 483 (1954), decision were characterized by Massive Resistance to public school desegregation.

2.  Shenandoah County was no exception, operating segregated schools until 1963.

3.  Before 1963, Black students in Shenandoah County seeking a high school education had to leave the county to obtain one as no public high school was open to Black students.

4.  Stonewall Jackson High School was constructed from 1957-1959 during the period of Massive Resistance. During construction, a Confederate battle flag was displayed.

5.  Robert E. Lee, Thomas J. "Stonewall" Jackson, and Turner Ashby were Confederate officers whose primary legacies are their roles in the Confederate military. The parties stipulated that the Confederacy existed, in part, to preserve slavery.

6.  The original naming of the school for Stonewall Jackson in 1959 was in furtherance of Massive Resistance to public school desegregation and was done for the purpose of racial discrimination, discouraging Black students from seeking admission.

7.  Ashby-Lee Elementary School, named for Confederate General Robert E. Lee and Confederate officer Turner Ashby, opened in 1974, following an active period of federal school integration enforcement. Expert testimony made a connection between its naming and "the county's opposition to federal mandates with regard to school integration."

8.  In June and July 2020, in the immediate aftermath of George Floyd's death, Virginia Secretary of Education Atif Qarni and Governor Ralph Northam issued statements calling on localities to change school names that memorialized Confederate leaders or sympathizers.

9.  On June 25, 2020, the Shenandoah County School Board passed a "Resolution condemning racism and affirming the division's commitment to an inclusive school environment for all."

---

[32] These enumerated findings are not intended to be exclusive; rather, the court's conclusions of law are based upon all of the evidence presented at trial as reflected in the foregoing 80-page summary of trial evidence.

10. Certain school board members and the Superintendent exchanged emails on July 1-3, 2020, about the timing of the vote to retire the Confederate names and whether to delay the process a month.

11. On July 4, 2020, the School Board published an agenda for the July 9, 2020, School Board meeting including retirement of the Confederate school names as a "next step" for the Resolution condemning racism.

12. On July 9, 2020, the Shenandoah County School Board voted to retire the Stonewall Jackson and Ashby-Lee school names in a 5-1 vote.

13. Because of the COVID-19 pandemic, the July 9, 2020, School Board meeting was conducted virtually. Nevertheless, the public comment session related to retiring the Confederate school names lasted approximately 80 minutes and drew approximately 25 speakers, including subsequently elected School Board member Dennis Barlow.

14. Statements of the School Board members at the time noted that the names symbolize hatred and were a symbolic reference to a time of inequality and racism. They voted to retire the names so that the schools would be welcoming to all.

15. The vote to retire the Confederate names was reaffirmed at a September 10, 2020, School Board meeting by another 5-1 vote.

16. Over the next few months, the School Board engaged in a public process to choose new school names, culminating in the selection of Mountain View High School and Honey Run Elementary School on January 14, 2021. The new names took effect on June 1, 2021, and were in place for the 2021-2022, 2022-2023, and 2023-2024 academic years.

17. After the Confederate school names were retired, a campaign to restore the names began, led by the Coalition for Better Schools and its affiliate, the Freedom Press.

18. During the next two election cycles, new School Board candidates, supportive of restoring the Confederate school names, were elected. Three new School Board members were elected in November 2021 and were backed by the Coalition for Better Schools and the Freedom Press.

19. In March 2022, emails exchanged with two of the new School Board members and persons associated with the Coalition for Better Schools and the Freedom Press mention a plan to replace the School Board's attorney and then take up the issue of restoring the Confederate school names.

20. At a Special Called School Board Meeting held on June 1, 2022, the School Board decided not to conduct a survey on restoring the school names. Although no survey

was approved, new School Board member Dennis Barlow indicated that he would make a motion to restore the Confederate names at the next School Board Meeting.

21. On June 9, 2022, Barlow made a motion to restore the Confederate school names, seconded by new School Board member Brandi Rutz. The School Board heard in-person, public comment on the motion to restore the Confederate names. Over forty individuals spoke during the public comment portion, which lasted approximately two hours. The vote on the motion tied 3-3 and failed due to a lack of majority.

22. In November 2023, three new School Board members supportive of restoring the Confederate school names were elected.

23. In early 2024, the Coalition for Better Schools conducted a postcard survey of the community, which included portraits of Jackson, Lee, and Ashby in their Confederate military uniforms. The survey was not professionally conducted, and testimony suggested concerns regarding the accuracy of its results. Only 13.6% of the postcards were returned, and the Coalition reported that 91.3% of respondents supported restoring the Confederate names.

24. On April 3, 2024, the Coalition for Better Schools requested that the School Board consider its survey and restore the Confederate names.

25. While the request and survey by the Coalition for Better Schools was placed on the School Board agenda, an April 8, 2024, request by another group, Claim the Names, seeking to keep the Mountain View High School and Honey Run Elementary School names, was not placed on the School Board agenda.

26. On May 8, 2024, the Virginia State Conference of the NAACP emailed the School Board urging retention of the non-Confederate school names. No member of the School Board responded.

27. At the May 9, 2024 School Board meeting, the School Board considered the agenda item titled: "Request from the Coalition of Better Schools to Restore School Names" and heard more than three hours of public comment on the issue of restoring the names Stonewall Jackson High School and Ashby-Lee Elementary School.

28. The majority of the public comments at the May 9, 2024, meeting were opposed to restoring the Confederate names. Some speakers at the meeting made the connection between Massive Resistance and the naming of Stonewall Jackson High School, voicing opposition to restoring names evoking segregation and racism. Approximately 50 persons spoke opposing restoration of the Confederate names.

29. Others disagreed, asserting that the 2020 process was done too fast and without enough public input, claiming no evidence of racism in Shenandoah County, citing positive

attributes of Stonewall Jackson and Robert E. Lee, and the will of the majority. Nearly 30 persons spoke in favor of restoring the Confederate names.

30. The recording and transcription of the May 9, 2024, School Board meeting was stipulated by the parties and is in evidence. Each School Board member made a public statement prior to the vote. Even though the School Board members asserted legislative privilege so that the motivation for their 2024 vote was not subject to complete discovery and the crucible of cross-examination, these statements were considered by the court.

31. In their public statements, most of the School Board members in 2024 took issue with the process for the 2020 name change and several cited the 2020 process as the reason for their vote. But the concerns about the 2020 process cannot credibly be considered as the only motivation or factor considered by the School Board, as there was an intervening, unobjectionable process in 2022. As such, the court cannot conclude that concerns about the 2020 process were the sole reason for the School Board's 2024 vote to restore the Confederate names.

32. The court finds the concerns voiced by School Board members in 2024 about the 2020 process to be, at least in part, pretextual, as the real issue in 2024 was not how the Confederate names were retired in 2020, but rather was the fact that they were changed at all.

33. The issue of racial discrimination was prominently discussed at the School Board meeting by the public and the School Board in 2024. The School Board members who addressed racism in their public comments dismissed it. One stated, "racism is a point or problem if you make it a point." Another stated, "if you really want to stop this racism and prejudice, stop playing racism and prejudice into everything." Still another said, "I think all of this was politically driven."

34. The totality of the circumstances establishes that race and racial discrimination were motivating factors in restoring the Confederate school names.

35. The May 9, 2024, School Board meeting went past midnight and into May 10, 2024. After hearing passionate public comments on both sides for several hours, the Shenandoah County School Board voted 5-1 to restore the Confederate school names.

36. Within a month, the signs at the main entrances of the schools were changed by private contractors, paid for by the Coalition for Better Schools.

37. At the time the lawsuit was filed, plaintiffs J.D. and D.D. attended Ashby-Lee Elementary School and Stonewall Jackson High School, respectively. Plaintiffs B.B. and A.C. attended Governor's School at Mountain View and then Stonewall Jackson High School.

90

38. The four Black student plaintiffs are members of the VA NAACP, and the issue of retiring the Confederate school names is germane to the VA NAACP's purpose.

39. Restoring the Confederate school names has had a negative impact on Black students, including plaintiffs, who testified that the Confederate names upset them, made them feel unwelcome, unwanted, uncomfortable, unsafe, small, inferior, and of less value. One student testified that the return to the Confederate names left her "disappointed and confused" because the School Board previously retired the names due to their understanding of the harmful impact on Black students. The vote to restore the names "communicated to [her] that they may have some of the same racist ideals as Stonewall Jackson, and they don't care about minority students." Although the students who testified were high achievers, they testified that going to a school with a Confederate name negatively impacted their mental health. One stated that she constantly felt "conflicted" when playing sports because the school name Stonewall Jackson reminded her of "everything [her] ancestors have gone through" and her accomplishments during a game were attributed to Stonewall Jackson. Another stated that the fact of the name restoration "was always there" and "it weighed on [him]," "almost like an invisible ball and chain." The Black students' testimony as to discriminatory impact was compelling.

40. Expert testimony established that Confederate symbols are a form of cultural racism and that exposure to racism can produce stress and traumatize Black students resulting in various psychological and physiological harms. Expert testimony confirmed the testimony of the Black students that they are disproportionately affected by the Confederate school names compared to their White peers.

41. Expert testimony established that Confederate symbols undermine the principles of inclusivity and equality that school athletics should promote and can discourage students from engaging in sports activities, whether as athletes or spectators. Dr. Bass testified that "[s]tudents should not be made to choose between sitting out or representing symbols that encompass racist and oppressive ideologies."

## V.    Conclusions of Law

The following constitutes the court's conclusions of law pursuant to Federal Rule of Civil Procedure 52. The court makes conclusions of law regarding standing, as well as plaintiffs' Equal Protection, Title VI, and Equal Educational Opportunities Act claims.

## A. Standing

Defendant School Board asserts in its reply brief that A.C. and B.B. no longer have standing to seek an injunction because they have graduated and their injury would not be redressed by a favorable decision. See Def.'s Br., ECF No. 265, at 3.

It is well-established that Article III of the Constitution provides that federal courts may consider only actual cases and controversies. Buscemi v. Bell, 964 F.3d 252, 258 (4th Cir. 2020). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (citing Raines v. Byrd, 521 U.S. 811, 818 (1997)). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Id.

The "irreducible constitutional minimum" of standing consists of three elements. Id. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. When plaintiffs seek prospective injunctive relief, they must show a sufficiently imminent injury in fact or an ongoing injury. See Deal v. Mercer Cnty. Bd. of Educ., 911 F.3d 183, 188-89 (4th Cir. 2018). When assessing standing to sue, a court accepts all the allegations in a complaint as true and construes the allegations "'in the light most favorable to the plaintiff.'" Buscemi, 964 F.3d at 258 (quoting Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017)). Only one plaintiff must have standing for a claim to proceed.

92

S.C. State Conf. of the NAACP v. Weaver, No. 25-2216, 2026 WL 1957010, at *7 (4th Cir. July 7, 2026) (citing Bostic v. Schaefer, 760 F.3d 352, 370 (4th Cir. 2014)).

Mootness "is another offshoot of Article III's case-or-controversy requirement." Weaver, 2026 WL 1957010, at *6. A case becomes moot when a party no longer has a legally cognizable interest in the outcome. Id. (citing Robinson v. Nat'l Collegiate Athletic Ass'n, 172 F.4th 271, 282 (4th Cir. 2026)). The doctrine of standing generally assesses whether a plaintiff has a personal interest in a dispute at the outset of the litigation. Uzuegbunam v. Preczewski, 592 U.S. 297, 282 (2021). The doctrine of mootness considers whether the interest exists throughout the proceedings. Id. If, during the course of litigation, "a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot." Id.

A.C. and B.B. attended Mountain View High School and Stonewall Jackson High School while in Governor's School during their junior and senior years. Both A.C. and B.B. have graduated from high school and attend college. Although they had standing at the time the complaint was filed, because they seek only declaratory and injunctive relief, their claims became moot upon graduation. Mellen v. Bunting, 327 F.3d 355, 364 (4th Cir. 2003). "When students challenge the constitutionality of school policies, their claims for declaratory and injunctive relief generally become moot when they graduate." Id. (collecting cases). See also Weaver, 2026 WL 1957010 at *6-7 (finding that claims of student seeking only declaratory and injunctive relief relating to her status as a high school student became moot upon graduation). Although A.C.'s and B.B.'s individual claims are now moot, their testimony remains relevant and probative as to the discriminatory impact of the Confederate school names.

The court finds it appropriate to address standing of the remaining plaintiffs sua sponte. See Buscemi, 964 F.3d at 258 (noting that court must assure itself of subject matter jurisdiction and may address standing sua sponte).

Individual plaintiffs D.D. and J.D. have standing in this case. At the time the lawsuit was filed, D.D. was a 14-year-old Black student who had just completed eighth grade. While in middle school, she took Algebra I and played high school sports at what was then Mountain View High School. She now attends Stonewall Jackson High School and testified at trial as to the harm she alleges she has suffered because of its renaming. J.D. was a nine-year-old Black student in the fourth grade at the time the lawsuit was filed. She attended what was then Honey Run Elementary School and will eventually attend Stonewall Jackson High School based on where she lives. She also testified as to the harm caused to her by the return of the Confederate names to her school. Thus, D.D. and J.D have standing and may proceed as plaintiffs in this lawsuit.

An organizational plaintiff such as the VA NAACP must show representational standing to bring a claim on behalf of its members, which it can do by alleging "'that (1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit.'" Weaver, 2026 WL 1957010, at *6 (quoting S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013)). The first and second prongs are constitutional requirements, while the third is a prudential requirement. See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544, 555 (1996).

Regarding the first prong of the test, members of the VA NAACP, including D.D. and J.D., and other members of the NAACP who attend Stonewall Jackson High School and Ashby-Lee Elementary School have standing to sue in their own right, as they have alleged injuries caused by the School Board's conduct. Indeed, D.D. and J.D. are already named individual plaintiffs. See also Weaver, 2026 WL 1957010, at *12 n.11 (noting that an organization need only identify one member who would have standing individually). The VA NAACP meets the first requirement of the test.

As to the second prong of the test, Rev. Bailey, president of the VA NAACP, testified that the mission of the NAACP is to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." Bailey Test., ECF No. 279, at 183:19-23. In addition, the NAACP gives assistance to individuals and organizations who believe "they have been discriminated against, unfairly treated, [or] treated with inequities" and works on their behalf to achieve a desired outcome and "relieve them of the pressures of the issues that they have of racial discrimination." Id. at 184:24-185:7. Given the allegations in this lawsuit, the court concludes that the interests that the VA NAACP advances in this lawsuit are germane to its purpose.

The third prong of the test, that neither the claim nor the relief sought requires the participation of individual members in the lawsuit, "is not met when conflicts of interest among members of the association require that the members must join the suit individually in order to protect their own interests." Md. Highways Contractors Ass'n, Inc. v. State of Md., 933 F.2d 1246, 1252 (4th Cir. 1991). In that case, an association of contractors challenged a

95

Maryland program that gave preferential treatment to minority-owned businesses in awarding state procurement contracts. Id. The court found that members of the plaintiff association had conflicting interests because some of them were minority-owned businesses that would benefit from the Maryland program, and the actual conflicts of interest required that individual members join the lawsuit to protect their interests. Therefore, the organization did not have standing to sue. Id. at 1253.

Establishment of this prong often depends upon the type of relief sought. "Typically, when an organization seeks a 'declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.'" Int'l Bottled Water Ass'n v. Eco Canteen, Inc., No. 3:09-cv-299, 2010 WL 3719313, at *6 (W.D.N.C. Sept. 17, 2010) (quoting Warth v. Seldin, 422 U.S. 490, 515 (1975)). An organization satisfies this requirement when it shows that it can adequately represent its membership. NAACP Anne Arundel Cnty. Branch v. City of Annapolis, 133 F. Supp. 2d 795, 803 (D. Md. 2001). Rev. Bailey testified at length as to the issues the VA NAACP considered prior to bringing this lawsuit and how the allegations brought in the complaint reflect the concerns of the organization's membership. Bailey Test., ECF No. 279 at 206:17-238:23. The court finds that the VA NAACP is adequately representing its membership and that no conflicts of interest exist in its representation of its members in this lawsuit. Accordingly, the three-prong test for standing is satisfied in this case, and the VA NAACP may proceed as an organizational plaintiff.

## B. Equal Protection

The court holds, as a conclusion of law, that the Shenandoah County School Board's 2024 decision to restore the racially discriminatory Confederate names violated the Equal Protection Clause of the Fourteenth Amendment.

### 1. Legal Standard

The Equal Protection Clause of the Fourteenth Amendment provides, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has explained that the "central purpose" of the Equal Protection Clause is to "prevent the States from purposefully discriminating between individuals on the basis of race." Shaw v. Reno, 509 U.S. 630, 642 (1993) (citing Washington v. Davis, 426 U.S. 229, 239 (1976)); see also Hirabayashi v. United States, 320 U.S. 81, 100 (1943) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."). The command of the Equal Protection Clause applies to local government bodies, like the School Board. See Brown v. Bd. of Educ. ("Brown I"), 347 U.S. 483 (1954).

In Brown I, the Supreme Court held that the Equal Protection Clause prohibits racial discrimination in public education, as discriminating against children based on race "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." Id. at 494. The Court also acknowledged that "[a] sense of inferiority affects the motivation of a child to learn." Id.

This case does not involve explicit racial classification. Even so, facially neutral policies violate Equal Protection when a plaintiff can show "(1) that the policy exacts a

97

disproportionate impact on a certain racial group, and (2) that such impact is traceable to an 'invidious' discriminatory intent." Coal. for TJ v. Fairfax Cnty. Sch. Bd., 68 F.4th 864, 879 (4th Cir. 2023) (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977)). If the plaintiff can demonstrate both disproportionate impact and discriminatory intent, the policy will be subject to strict scrutiny review, "in which event the state entity defending the challenged policy bears the burden of showing that its policy is narrowly tailored to serve a compelling interest." Id. (internal quotation marks omitted).

For the first prong, "an Equal Protection plaintiff must prove that the challenged state action 'bears more heavily on one race than another.'" Id. (citing Arlington Heights, 429 U.S. at 266). "Searching for a racially 'disproportionate' impact necessitates a relative inquiry among racial groups, not a simple appraisal of one group's performance over time." Id. at 881.

For the second prong, an Equal Protection plaintiff must establish that a discriminatory purpose was a motivating factor in the decision. See id. at 883. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Arlington Heights, 429 U.S. at 265. "Determining whether a statute was enacted with discriminatory intent is a factual question involving a two-step process." N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections, 155 F.4th 298, 309 (4th Cir. 2025) (quoting N.C. State Conf. of the NAACP v. Raymond, 981 F.3d 295, 303 (4th Cir. 2020)). "At step one, the challenger must show 'that racial discrimination was a "substantial" or "motivating" factor behind enactment of the law.'" Id. At this stage, "the district court must afford the state legislature a presumption of good faith." Raymond, 981 F.3d at 303 (internal quotation marks omitted). "If the challenger succeeds at step one, the burden shifts to the law's defenders to demonstrate that

98

the law would have been enacted without racial discrimination." <u>N.C. A. Philip Randolph Inst.</u>, 155 F.4th at 309 (internal citations omitted). "It is only then that judicial deference to the legislature 'is no longer justified.'" <u>Raymond</u>, 981 F.3d at 303 (quoting <u>Arlington Heights</u>, 429 U.S. at 265-66).

## 2. Disproportionate Impact

The court must consider the "impact of the official action"—that is, whether "it bears more heavily on one race than another." <u>Arlington Heights</u>, 429 U.S. at 266. After a thorough review of the impact of the restoration of the Confederate school names, the court concludes that the decision to reinstate the names imposes a disproportionate burden on Black students in Shenandoah County by subjecting them to race-based educational, psychological, and dignitary harms that their White peers do not bear.

Courts recognize that Confederate symbolism has a specific negative impact on Black students, especially when it appears in public schools. <u>See</u> <u>Crosby by Crosby v. Holsinger</u>, 816 F.2d 162, 163 (4th Cir. 1987) ("[B]lack students undoubtedly view[] the Confederate symbols as a persistent affront, given the association between those symbols and the history of slavery in this country."); <u>Smith v. St. Tammany Parish Sch. Bd.</u>, 316 F.Supp. 1174, 1176 (E.D. La. 1970) ("The Confederate battle flag, since the decision by the U.S. Supreme Court on May 17, 1954 in <u>Brown v. Board of Education</u> . . . has become a symbol of resistance to school integration, and to some, a symbol of white racism in general."); <u>Banks v. Muncie Cmty. Schs.</u>, 433 F.2d 292, 297 (7th Cir. 1970) (repeating the district court's recommendation that the school authorities should "bring about the elimination of school symbols which are offensive to a racial minority"); <u>Augustus v. Sch. Bd. of Escambia Cnty.</u>, 361 F. Supp. 383, 388 (N.D.

Fla. 1973) (concluding that the name "Rebels" and the use of the Confederate flag "were a source of irritation to many of the black students" and "inhibited their full participation at the school" and so long as the symbols remained, racial tension at the school would "have a continuing, visual focal point"); Augustus v. Sch. Bd. of Escambia Cnty., 507 F.2d 152, 158 (5th Cir. 1975) (noting that "[i]t may have been better for all concerned had the school board eliminated all ethnically and racially irritating symbols from possible consideration").

Less has been said about the impact of the name "Stonewall Jackson," particularly when it appears on a public building, but it, too, falls within the category of Confederate symbolism that has a unique and specific impact on Black individuals. In Shenandoah County, the history of the display of the Confederate flag and the name Stonewall Jackson are deeply intertwined. See, e.g., SJHS Images, ECF No. 242-46, 242-47, 242-174, 242-191, 242-192, 242-193, 242-198, 242-200.

The historical record is clear that the Shenandoah County School Board named their newly-constructed high school after Stonewall Jackson in 1959 in furtherance of Massive Resistance to desegregation. Though Black students are no longer literally excluded from public schools, to them the choice to resurrect a Confederate name in 2024 invokes the same message of exclusion that the name carried when it was first given to the school. The witnesses in this case detailed how that message of exclusion made them feel as Black students who attended school in those buildings, indicating that they were made to feel "unwelcome" and "inferior." Plainly, the School Board's decision to return to the Confederate school names falls more harshly on Black students than White students.

The evidence establishes that plaintiffs' educational experience, extracurricular activities, relationships with peers and adults, and physical and mental health are all disproportionately impacted by the Confederate school names. During the school day, Black students were distracted in class by the return of the Confederate school names. As Dr. Spinks-Franklin testified, Black students experiencing racism often have difficulty concentrating and completing their assignments. In racially discriminatory environments, they must work harder, put extra effort into their schoolwork, and they are less likely to speak up in class. J.D. testified that she had to put extra effort into her schoolwork because she was preoccupied by the school names. D.D. testified that she had to work hard to stay focused in class because she sees Stonewall Jackson references throughout her school day. A.C. discussed his grades taking a drop due to the weight of confronting the Confederate school names daily. B.B. said she struggled to complete her coursework in a school that she felt like was fostering a safe place for racists.

Several of the Black students who testified are high-achievers, leading sports teams and earning top grades, a fact that defendant School Board has emphasized to argue that there is no disproportionate impact. This fact does not change the impact analysis. Dr. Spinks-Franklin explained that many high-achieving students aim for excellence as a way of coping with external racial stress. Simply because a student earns straight A's does not undermine the discriminatory impact they have encountered as a result of the School Board's decision to reinstate the Confederate names. As the testimony of Dr. Spinks-Franklin and these students establish, Black students have to work harder to achieve their successes in the face of the additional race-based pressures imposed by the Confederate names.

101

The reinstatement of the Confederate names also disproportionately impacts Black students who want to participate in sports and extracurricular activities. Dr. Bass made clear that extracurricular activities are an essential part of a student's educational experience, and Confederate symbols appearing in the context of extracurricular teams undermine inclusivity and discourage participation. This puts Black students in the unfair position of having to choose between representing symbols that they believe encompass racist and oppressive ideologies and forgoing the opportunity to participate at all. D.D. testified about how conflicted she felt every time she put on the "Generals" jersey. She wants to perform well as an athlete but is distraught that each time she scores a point for her team, her accomplishment is attributed to "Stonewall Jackson."

Black students' relationships with their peers and teachers are also negatively impacted by the reinstatement of the Confederate names. J.D. testified that the return to the names Stonewall Jackson and Ashby-Lee made her think that the School Board, teachers, and peers may want the schools to be segregated. Even if the teachers and the School Board stated that they did not in fact want the schools to be segregated, J.D. presumed this to be their mentality based on their advocating for and celebration of the Confederate names. As a result, J.D. did not feel comfortable around certain adults or other students. Similarly, D.D. was struck by the informal student poll in one of her classes about whether the school name should or should not be Stonewall Jackson. Seeing almost all of her classmates raise their hands in support of Stonewall Jackson left D.D. feeling isolated and stung. A.C. also experienced difficulties with peer relationships by having to avoid discussions about his views of the Confederate school names so as to prevent confrontations with other students.

102

Finally, Black students' mental and physical health is disproportionately impacted by the reinstatement of the Confederate school names. As Dr. Spinks-Franklin explained, Confederate names and iconography are forms of cultural racism, and Black students' chronic exposure to cultural racism leads to race-based traumatic stress, which causes physiological and psychological harm. Persistent exposure to racially negative messages, images, and symbols has short-term and long-term impacts on Black students' psychological and physical health and development. Short-term impacts can include stress-related symptoms, including headaches, stomach aches, and difficulty completing work. Long-term impacts amount to a weathering of the systems of the body that lead to chronic conditions like anxiety, depression, sleep disruption, and low self-esteem. Black students are also susceptible to internalized racism when racially discriminatory messaging is all around them—a subconscious belief in their own inferiority—which causes low self-esteem and poor racial identity.

The social and medical research Dr. Spinks-Franklin presented is manifested in the Black students' testimony. A.C. described the feelings associated with the name change as an "invisible ball and chain," and said that he felt held back by feeling unwelcome at the school. D.D. testified that the school names are a constant reminder of her family's history of being enslaved and unable to attend Stonewall Jackson High School because of their race. B.B. explained that she experienced increased anxiety and often worried about how she would be perceived or treated as a Black student at a school where Stonewall Jackson's legacy was celebrated. Given the consistency between the student plaintiffs' actual experiences and Dr. Spinks-Franklin's medical and academic expert testimony, the court is not persuaded that these

students have failed to demonstrate harm simply because Dr. Spinks-Franklin did not clinically examine and diagnose them.[33]

The evidence shows that the student plaintiffs suffer from a host of issues associated with the reinstatement of the Confederate names: they feel unwelcome and uncomfortable attending school, they feel inferior to their White peers or feel as though they have less value than their White peers, they are unable to trust peers and teachers at school, they are constantly reminded of their ancestors' history of enslavement, and they experience harassment and intimidation in the community for speaking out against the Confederate school names.

Accordingly, the court concludes that the reinstatement of the Confederate school names has a disproportionate impact on Black students in Shenandoah County.

### 3. Discriminatory Intent

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266. "Discriminatory purpose 'may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.'" N.C. State Conf. of NAACP v. McCrory, 831 F.3d 204, 220 (4th Cir. 2016) (quoting Washington v. Davis, 426 U.S. 229, 242 (1976)). Discriminatory purpose implies that the decisionmaker, in this case, the School Board, "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979).

---

[33] The fact that Dr. Spinks-Franklin did not clinically examine the student plaintiffs was raised by defendant School Board in their briefs, their motions in limine, and at trial. Nevertheless, the court found her expert testimony both credible and persuasive.

However, Feeney does not require a showing of "racial hatred or animosity." McCrory, 831 F.3d at 233. "Challengers need not show that discriminatory purpose was the 'sole[]' or even a 'primary' motive for the [decision], just that it was 'a motivating factor.'" McCrory, 831 F.3d at 220 (quoting Arlington Heights, 429 U.S. at 265-66). When assessing discriminatory intent, "[t]he inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid. Often it is made clear from what has been called, in a different context, 'the give and take of the situation.'" Feeney, 442 U.S. at 279 n.24 (citing Cramer v. United States, 325 U.S. 1, 32-33 (1945)).

In Arlington Heights, the Court set forth a non-exhaustive list of factors to consider in making this sensitive inquiry. These factors include: "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," "[d]epartures from normal procedural sequence," the legislative history of the decision, and the disproportionate "impact of the official actions—whether it bears more heavily on one race than another." Arlington Heights, 249 U.S. at 266-67; McCrory, 831 F.3d at 220-21.

The Fourth Circuit has acknowledged the importance of taking a "holistic approach" and considering the broader context surrounding the challenged action, since "outright admissions of impermissible racial motivation are infrequent" and "discrimination today is more subtle than the visible methods used in 1965." McCrory, 831 F.3d at 221 (internal citations omitted).

If there is sufficient evidence that the challenged action was motivated in part by a racially discriminatory purpose, the burden shifts to the defendant to establish "that the same decision would have resulted even had the impermissible purpose not been considered."

105

Arlington Heights, 429 U.S. at 270 n.21. At this step, "judicial deference to the [Board] 'is no longer justified.'" Raymond, 981 F.3d at 303 (quoting Arlington Heights, 429 U.S. at 265-66). The district court "must scrutinize the [Board]'s actual nonracial motivations to determine whether they alone can justify the [Board]'s choices." N.C. A. Philip Randolph Inst., 155 F.4th at 309 (citing Raymond, 981 F.3d at 303).

### a.  Historical Background of the Decision

"[H]istorical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes," Arlington Heights, 429 U.S. at 267, and includes "any history of discrimination by the decisionmaking body or the jurisdiction it represents." Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 819 (4th Cir. 1995). In this analysis, the legislature must be afforded a presumption of good faith, even if the historical background indicates that a past decision was made with discriminatory intent. See Raymond, 981 F.3d at 303; see also Abbott v. Perez, 585 U.S. 579, 603-04 (2018) ("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination.").

The Fourth Circuit recently stated:

> Under Arlington Heights, past discrimination may be relevant to the historical background of a law enacted during a subsequent legislative session. But as the Supreme Court made clear in Abbott v. Perez, "past discrimination" by an earlier legislature "cannot, in the manner of original sin, condemn subsequent governmental action that is not itself unlawful." Even if the later legislature does not "expressly disavow the prior act's racism," it is still entitled to its own presumption of legislative good faith, regardless of the sins of its predecessor.

106

N.C. A. Philip Randolph Inst., 155 F.4th at 309 (cleaned up). The court begins a review of the

historical background of the decision at issue with this presumption of legislative good faith.

The stated history of Confederate commemoration and Massive Resistance is

undeniably important in understanding the decision to rename the school Stonewall Jackson

High School in 2024. The court heard extensive expert testimony linking Stonewall Jackson,

Robert E. Lee, and Turner Ashby's roles during the Civil War to the Lost Cause narrative.

During Massive Resistance, these names came to represent the fight against desegregating

schools.

As with many other localities in Virginia, in the years following the Brown v. Board of

Education decision, Shenandoah County resisted desegregation as part of Massive Resistance.

Until 1963, Shenandoah County Public Schools remained segregated, and no Black student

could attend high school in Shenandoah County. The Confederate battle flag flew over the

school's construction site, and when it opened in 1959, Stonewall Jackson High School was

for White students only. Although Ashby-Lee Elementary School opened in the early 1970s,

after Shenandoah County Public Schools were integrated, expert testimony linked its naming

to an active period of federal public school integration enforcement in the late 1960s and early

1970s.

This history of racial discrimination in Shenandoah County Public Schools is relevant

historical background under the Arlington Heights framework. Notwithstanding the

presumption of legislative good faith, it is inescapable that the School Board's decision to

restore the Confederate school names rests on a historical foundation of racial discrimination.

107

### b. Specific Sequence of Events Leading Up to Decision

Along with the historical background pertaining to Shenandoah County Public Schools, "[t]he specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." Arlington Heights, 429 U.S. at 267.

The relevant actions in this case did not occur in a vacuum. Just as the School Board in 1959 was motivated to act in repudiation of the Brown decision, the School Board in 2020 was galvanized by the death of George Floyd to reconsider their community's commitment to racial inclusivity. Exactly one month after George Floyd's death sparked a national conversation about racism, the Shenandoah County School Board issued their Resolution condemning racism. Virginia state leadership, including Governor Ralph Northam, specifically called upon school boards to "change school names and mascots that memorialize Confederate leaders or sympathizers" so that public schools do not continue to "tacitly endorse their values." First JSSF, ECF No. 242-1, ¶ 16.

As a "next step" to implement its "Resolution Condemning Racism and Affirming the Division's Commitment to an Inclusive School Environment for All," Fifth JSSF, ECF No. 242-5, ¶¶ 157, 166, the Shenandoah County School Board voted on July 9, 2020, to retire the names of Stonewall Jackson High School and Ashby-Lee Elementary School, expressly acknowledging the historical record, the enduring discriminatory legacy associated with those names, and the negative impact on Black students. Although the July 9, 2020, School Board meeting was held virtually due to the COVID-19 pandemic, it included a lengthy session of public comments on the name change. The School Board reaffirmed its decision to retire the Confederate names in another vote taken on September 10, 2020. The School Board

108

subsequently sought input from the community to select new names for the schools, and the names Mountain View High School and Honey Run Elementary School were implemented almost eleven months after the vote to retire the Confederate names.

Immediately following the vote to retire the Confederate names in 2020, however, community members began organizing in protest of the name change and campaigned to restore the Confederate names. Three new board members were elected in November 2021, and one of them, Dennis Barlow, moved on June 9, 2022, to restore the Confederate names. After another lengthy session of public comment, this time in person, the ensuing School Board vote tied 3-3, stalemating the motion to restore the Confederate names.

With the election of three new board members in November 2023, the School Board again pursued restoring the Confederate names. Critically, the record contains no evidence to refute the School Board's conclusion in 2020 that the Confederate names were racially divisive and had a discriminatory impact on Black students. No new information emerged between the vote to retire the Confederate school names in 2020 and the vote to reinstate the Confederate school names in 2024 that would negate the names' discriminatory effect on Black students and families. In fact, the evidence demonstrates that the School Board continued to receive evidence of the discriminatory effect of the names, including during the many hours of public comments, both in 2022 and 2024, from students and families who found the names racist.

In other words, the Confederate names did not suddenly become less racially divisive between 2020 and 2024, justifying their return to the front of the school buildings. Instead, the decision to reinstate the Confederate names in 2024 appears to be a "strange about-face," pointing to evidence of discriminatory intent, rather than a "natural response to a newly

109

identified problem." See Mi Familia Vota v. Hobbs, 608 F. Supp. 3d 827, 867 (D. Ariz. 2022) (quoting Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 35 (2020)) ("Courts distinguish a 'strange about-face,' which might be evidence of discriminatory intent, from a 'natural response to a newly identified problem.'").

This is not a case in which historical names were left in place "in spite of" their effects on Black students. See Feeney, 442 U.S. at 279. Rather, this is a case in which the School Board deliberately chose to return to the Confederate names just four years after they were removed—expressly because they were racially discriminatory. The School Board's action to restore the names in 2024 was motivated by the School Board's decision to remove the names in 2020. The motivation for those disparate actions cannot be considered in isolation. Put another way, inasmuch as the School Board's decision to retire the Confederate school names in 2020 was solely motivated by considerations of race, it is impossible to conclude, in the absence of any intervening event negating those racial connotations, that the restoration of those names in 2024 was not motivated, at least in part, by race. This unique sequence of events "implies that the [School Board] . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Id. In Feeney's terms, discriminatory intent is apparent from "the give and take of the situation." Id. at 279 n.24.

With the School Board's 2020 recognition that Confederate names have a discriminatory effect unimpeached, this swift reversal of course indicates that the School Board acted in 2024 with the opposite intent with which it acted in 2020—the intent to reinstate the discriminatory effect. The extraordinary sequence of events in Shenandoah

110

County leading up to the reinstatement of the Confederate school names supports a finding that race discrimination was a motivating factor in the decision, recognizing the reality that the School Board's actions in 2024 were taken in direct response to the School Board's decision in 2020 to advance racial equity in the schools—much like the original namings were a backlash to Brown v. Board of Education and public school desegregation.

### c.  Departures from Normal Procedural Sequence

After considering the specific sequence of events leading up to the decision, the court may subsequently examine "[d]epartures from the normal procedural sequence" that "might afford evidence that improper purposes are playing a role." Arlington Heights, 429 U.S. at 267.

In this case, one procedural departure stands out. The court is struck by the scheme devised by the Coalition for Better Schools to replace the School Board's attorney before proceeding to restore the Confederate names. The formulation and implementation of this plan raise red flags as to procedural impropriety.

According to a March 19, 2022, email from new School Board member Rutz to fellow new member Barlow and others associated with the Coalition for Better Schools and the Freedom Press, the School Board replaced its legal counsel with new counsel who "at least seemed to 'say the right things'. The name change was a topic." Email, ECF No. 242-137, at 1.[34] A person associated with the Coalition for Better Schools and the Freedom Press, Keven Walker, responded two hours later, that "many of us are thrilled to learn that the school board

---

[34] At trial, Barlow testified consistently that "it was believed that . . . the attorney had been espousing liberal positions and working with the superintendent. . . . I'm sure the name change was included." Barlow Test., ECF No. 280, at 170:15-17, 170:25.

111

has finally begun to take definitive steps toward real change with the removal and replacement of legal counsel." Id. The email continued:

> A plan was outlined by our group in our letter to you and the other members of the school board and it is my understanding that we have decided that we would be submitting our resolution related to the name change following the change of the board's attorney. I imagine that resolution, which has been drafted and approved for several weeks, could come to you as soon as this week.

Id. (emphasis added). The fact that these emails suggest timing the resolution to restore the Confederate school names after the removal and replacement of legal counsel for a public body is extraordinarily troubling. It cannot be overstated that, to the finder of fact, this scheme casts a long negative shadow over the motivation for the name change resolution.

In fact, the Coalition for Better Schools and the Freedom Press were deeply entangled in the School Board's decision to restore the Confederate school names. Before he was elected to the School Board, Barlow helped organize the Coalition for Better Schools and introduced Rutz to the group. See Emails, ECF Nos. 242-163, 242-203. The School Board's involvement with the Coalition for Better Schools began several years before the 2024 vote and consisted of meeting, planning, and coordinating ways to advance the issue of reinstating the Confederate names. For example, in May 2022, Keven Walker emailed Barlow and Rutz that "[w]e will be sharing our proposed process for the renaming of schools with the school board and encourage you to adopt this or a similar policy following the immediate restoration of the school names on the southern campus." Walker Email, ECF No. 242-204.

Moreover, the School Board's acceptance of the methodologically questionable Coalition for Better Schools' survey is telling. While the Coalition for Better Schools' letter

112

and survey were placed on the School Board meeting agenda, a request by Claim the Names, a group seeking to keep the existing school names, was not. After the School Board voted to restore the Confederate names, the Coalition for Better Schools arranged for contractors to change the signage on the schools.

To be sure, the involvement of interest groups in the political process is ordinary. But the pervasive involvement of the Coalition for Better Schools—especially concerning the plan to time taking up the restoration of the Confederate school names after replacing the School Board's attorney—is extraordinary, and suggests that "improper purposes are playing a role" in the reinstatement of the Confederate names. McCrory, 831 F.3d at 227.

### d. Legislative History of the Decision

Arlington Heights also suggests that the legislative history of a decision "may be highly relevant" to determining whether the decision was made with discriminatory intent, "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports" that tend to shed light on the considerations of the decisionmakers. Arlington Heights, 429 U.S. at 268. Here, the parties stipulated to the admission of transcripts and minutes from several School Board meetings and included many of the board members' contemporaneous statements in their jointly stipulated facts.[35]

---

[35] While the court's pretrial ruling on legislative privilege made clear that the School Board could not use the legislative privilege to shield its true motivations from discovery and the crucible of cross-examination while offering board members' public statements as evidence of their intent, Order, ECF No. 215, the stipulation of the parties as to contemporaneous statements that appear on the public record of these meetings allows the court to examine them under the Arlington Heights framework.

113

In 2020, contemporaneous statements by School Board members established that the School Board voted to retire the Confederate school names solely because of their harmful and racially discriminatory effect on Black students. Board member Andrew Keller explained his vote to retire the Confederate school names in 2020 by recognizing the "heritage" and historical ties the name Stonewall Jackson evokes, but then admitted: "You can't keep a name and remove racist implications from it. You can't claim to be inclusive, which we do, and have students who feel like they're excluded." First JSSF, ECF No. 242-1, ¶ 21. He further considered the Black students' concerns about the Confederate school names, and added: "Which is more important? Someone's heritage regarding a school name or someone's inclusion into that school, their right to feel welcome?" Id. ¶ 22.

Board member Cynthia Walsh shared that the issue of the Confederate school names became "more pressing" for her when alumni from the school—"Black, biracial, and White— came to us with their stories." Third JSSF, ECF No. 242-3, ¶ 82. She went on: "Some endured outright racism, some endured other racial tension." Id.

> [S]urely, Superintendent and School Board at the time had to know that naming a high school after a Confederate general would send a clear message to Black families that they were not welcomed in that brand new school that they had to drive by every day to drive to their Black school in Harrisonburg.

Id. ¶ 83. She concluded: "Here we are, present day, and we're still struggling to make sure that every student in our school feels safe, welcome, and included." Id.

The legislative record also reflects that the School Board was told, repeatedly in both written and oral comments, about the discriminatory impact of the Confederate school names. The harmful effect of these names on Black students resounded during the virtual public

comment session in 2020, and the lengthy in-person public comment sessions in 2022 and 2024. Having reviewed the minutes, transcripts, and videos of the 2020, 2022, and 2024 School Board meetings introduced in evidence at which public comment on the school name change was received, it is manifest that race and racial discrimination were on the table. Indeed, racial segregation was the reason for naming the high school after Stonewall Jackson in 1959. Ending racial discrimination was the reason the school name was retired in 2020. This theme was repeated in the public debate surrounding the 2022 and 2024 votes. Given this history, the conclusion is inescapable that race and racial discrimination were at least factors in the restoration of the Confederate school names.

### e. Disproportionate Impact of the Decision

Arlington Heights makes clear that the impact of the official action and whether it bears more heavily on one race than another "serves as an 'important starting point' for the ultimate inquiry as to 'invidious racial discrimination.'" Coal. for TJ, 68 F.4th at 879-80 (quoting Arlington Heights, 429 U.S. at 265-66). Further, a finding of disproportionate impact "suffices to establish one of the circumstances evidencing discriminatory intent." McCrory, 831 F.3d at 231.

As discussed infra, the Black student plaintiffs testified at length about the impact of the names on their academic experience and the harm they felt that their White peers did not bear. Expert testimony was consistent. The impact on plaintiffs is magnified by their testimony that they relished in the new name, Mountain View, and the progress, inclusion, and forward-movement it represented to them, and then had that name and all that it represented taken away. These Black students did not just go to a school named for Stonewall Jackson—they

115

lived in a community in which a battle was waged to restore the name Stonewall Jackson during the four years after the school name had been changed to something less racially divisive. These Black students witnessed the tension within the community, ultimately leading to the 2024 School Board's decision to downplay their concerns of race-based harm and vote to restore the Confederate names. The court concludes that the vote to restore the Confederate names in 2024 had a disproportionate impact on Black students attending Stonewall Jackson High School and Ashby-Lee Elementary School.

Under the totality of the circumstances analysis required by Arlington Heights, and considering "the give and take of the situation," Feeney, 442 U.S. at 279 n.24, the court concludes that the School Board's decision was motivated, at least in part, by discriminatory intent, as demonstrated by the historical background of the decision, the sequence of events leading to the decision, departures from the normal procedural sequence, legislative history of the decision, and the disproportionate impact of the decision on Black students.

### 4. Unexplainable On Grounds Other Than Race

Arlington Heights acknowledges that "sometimes a clear pattern . . . emerges from the effect of the state action" that is "unexplainable on grounds other than race." 429 U.S. at 266.

Here, the school names are so inextricably bound up with racial discrimination in Shenandoah County that restoring them can only be understood as a decision, at least in part, about race.

> It is the sincerely held view of many Americans, of all races, that the confederate flag is a symbol of racial separation and oppression. And, unfortunately, as uncomfortable as it is to admit, there are still those today who affirm allegiance to the confederate flag precisely because, for them, that flag is identified with racial separation.

116

United States v. Blanding, 250 F.3d 858, 861 (4th Cir. 2001). The Black student plaintiffs' testimony established that, to them, as in Blanding, the Confederate school names convey the same symbol of "racial separation and oppression." Id.

The School Board insists that the decision to restore the Confederate names may be explained by its criticism of the rushed and virtual process leading up to the retirement of the names in 2020. But concerns about the 2020 process cannot credibly be considered as the only motivation or factor considered by the School Board. That is because in 2022, the School Board did not approve a motion to restore the Confederate school names. Yet no issue has been raised as to the 2022 process. In the court's view, credible concerns about the 2020 process were extinguished by the process conducted in 2022, which left the Mountain View and Honey Run names in place. Instead, the court finds the concerns by the School Board members in 2024 about the 2020 process to be, at least in part, pretextual, as it is clear that the real issue in 2024 was not how the Confederate names were retired in 2020, but rather the fact that they were retired at all.

School Board members also made references in their 2024 comments to democracy and the will of the majority. But whether the School Board followed its perception of the public will does not excuse a constitutional violation. Constitutional rights "withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities . . . ." W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638 (1943). The relevant inquiry is thus whether the decision to reinstate Confederate school names, however popular the decision may or may not have been in the community at large, was enacted with impermissible racial motivation, disproportionately impacting the Black students in the

117

community. The evidence conclusively established that plaintiffs met their burden of proof as to this inquiry.

In McCrory, the Fourth Circuit considered whether the will of the majority or a desire for a previous way of doing things was sufficient justification for racial discrimination. McCrory concerned North Carolina's enactment of an election law that disproportionately impacted Black votes. The district court found that the law was not enacted with discriminatory intent, particularly because one of the legislature's stated purposes in enacting SL 2013-381 was simply to "move the law back to the way it was." 831 F.3d at 226. The district court explained that "the voting mechanisms that SL 2013-381 restrict[ed] or eliminate[d] were ratified 'relatively recently,' 'almost entirely along party lines,' when 'Democrats controlled' the legislature; and that SL 2013-381 was similarly ratified 'along party lines' after 'Republicans gained control of both houses.'" Id.

But the Fourth Circuit disagreed with the district court's consideration of SL 2013-381 as "an appropriate means for one party to counter recent success by another party." The Fourth Circuit explained:

> We recognize that elections have consequences, but winning an election does not empower anyone in any party to engage in purposeful racial discrimination. When a legislature dominated by one party has dismantled barriers to African American access to the franchise, even if done to gain votes, "politics as usual" does not allow a legislature dominated by the other party to re-erect those barriers.

Id.

Although this case does not deal with legislation that restricts voting, many of the principles that support the Fourth Circuit's decision are applicable to the facts here. The

118

School Board was fixated on "restoring" and "reinstating" the Confederate names, rather than selecting a new name for the school, very similar to the North Carolina legislature's stated purpose of moving the law "back to the way it was." Id. Further, the 2020 School Board removed the Confederate names as a way of condemning racism and supporting the Black members of the community, and then the 2024 School Board voted to bring back the Confederate names in a manner that can only be understood as "re-erect[ing] . . . barriers" that previously existed. Id.

In short, the decision to rename the schools after Confederate leaders cannot be divorced from racial discrimination. Lee, Jackson, and Ashby fought to preserve a political system that enslaved Blacks, and their legacy was used as a tool to fight school desegregation. Had the Confederate cause succeeded, the United States would look much different today, and the plaintiffs may not have the very rights exercised in this lawsuit to petition the Government to redress grievances. U.S. Const. amend. I. In 2020, the School Board recognized the racially divisive symbolism that the Confederate leaders represent and removed their names from its schools. The School Board's subsequent vote to reinstate the names necessarily embraces the ideals for which Lee, Jackson, and Ashby fought—including the enslavement of Black people—an ideology patently inconsistent with the letter and spirit of the Fourteenth Amendment and the Civil Rights Act of 1964.

### 5. Burden Shifts to the Defendant

The evidence establishes that the issues of race and racial discrimination were inextricably bound up in the School Board's naming decisions in 2020, 2022, and 2024. As such, "under the totality of the circumstances analysis required by Arlington Heights,"

119

McCrory, 831 F.3d at 233, the court is compelled to conclude that race and racial discrimination were at least motivating factors in the School Board's decision to reinstate the Confederate school names.

Because plaintiffs have met their prima facie burden, the burden shifts squarely to the School Board to prove that the challenged policy "would have been enacted without this factor." Hunter v. Underwood, 471 U.S. 222, 228 (1985). When determining if this burden has been met, "the judicial deference accorded to legislators when 'balancing numerous competing considerations' is 'no longer justified.'" McCrory, 831 F.3d at 221 (citing Arlington Heights, 429 U.S. at 265-66). "Once the burden shifts, a court must carefully scrutinize a state's non-racial motivations to determine whether they alone can explain enactment of the challenged law." Id. at 233 (citing Arlington Heights, 429 U.S. at 265-66). In making this determination, "[a] court assesses whether a law would have been enacted without a racially discriminatory motive by considering the substantiality of the state's proffered non-racial interest and how well the law furthers that interest." Id. at 233-34 (citing Hunter, 471 U.S. at 228-33). The School Board is required to show that the Confederate school names "would have been [reinstated] without considerations of race," not merely that there are legislative justifications that are "plausible" and "not unreasonable." McCrory, 831 F.3d at 234.

Considering all of the evidence in this case, including the testimony of the School Board members at trial and their public statements made at the 2020, 2022, and 2024 School Board meetings, the School Board has not met its burden to show that the Confederate school names "would have been [reinstated] without considerations of race." McCrory, 831 F.3d at 234. Because racial inequality was the sole reason the School Board retired the Confederate names

120

in 2020, its argument that race was not a factor when restoring the names in 2024 falls flat. To be sure, as soon as the Confederate names were retired in 2020, opponents cried foul over the speed and virtual nature of the process employed by the School Board in 2020. The decision of the School Board was made in 2020 at the zenith of the COVID-19 pandemic, with its restrictions on in-person meetings. Still, the School Board held a virtual public meeting on July 9, 2020, which lasted 80 minutes and drew approximately 25 speakers, both supporting and opposing retiring the Confederate names.[36] Two months later, on September 10, 2020, the School Board approved a motion to "reaffirm its July 9, 2020 action" to retire the Confederate school names and thereafter engaged in a several months-long process to select new names, which were not implemented until June 1, 2021.

But any credible concerns over the 2020 process were extinguished when the School Board again considered the issue of the Confederate school names in 2022. As discussed earlier, after three new School Board members took office in 2021, Barlow made a motion to restore the Confederate school names which was placed on the School Board agenda and was the subject of two hours of public comment on June 9, 2022. Following exhaustive public debate, the motion to restore the Confederate names failed due to a lack of a majority. None of the proponents of the Confederate school names have voiced any concerns over the 2022 process. Defendant's reliance on the concerns over the 2020 process simply ignores the intervening process in 2022. Because of the unobjectionable process employed by the School Board in 2022, which left the Mountain View and Honey Run names in place, the court cannot

---

[36] Although he was a critic of the 2020 process, School Board member Barlow participated in that process, both by submitting a written statement, ECF No. 242-107, and speaking at the virtual School Board meeting on July 9, 2020.

fully credit the School Board's argument that its 2024 decision was motivated solely by its criticism of the 2020 process.

In the court's view, after watching and considering the entirety of the more than three-hour School Board meeting on May 9-10, 2024, it is clear that what happened then was not solely driven by concerns over the 2020 process. Rather, this evidence reveals that the School Board's action in 2024 was outcome driven—to restore the Confederate names.

To the extent that the School Board claims that its legitimate, non-discriminatory basis for restoring the Confederate names was to correct or reverse the process employed by the 2020 School Board, it has merely shown that this is a "plausible" or "not unreasonable" legislative justification for the decision. See McCrory, 831 F.3d at 234. This is "a far cry" from showing that the Confederate school names "would have been [reinstated] without considerations of race," as Arlington Heights demands. Id. Since race and racial discrimination were at least motivating factors in the decision to reinstate the Confederate school names, the School Board cannot show that the same decision would have been made without consideration of race.

To be clear, the court makes no finding that any individual board member was motivated by "racial hatred or animosity," and the case law requires no such finding for plaintiffs to prevail on their Equal Protection challenge. See McCrory, 831 F.3d at 233 ("Our conclusion does not mean, and we do not suggest, that any member of the General Assembly harbored racial hatred or animosity toward any group."). Rather, the totality of the circumstances in this case "cumulatively and unmistakably reveal," that race was a factor that motivated the return of the Confederate names. Id.

122

### 6. Strict Scrutiny Analysis

Given that plaintiffs have shown both impermissible racial motivation and racially disparate impact, the School Board's decision is "constitutionally suspect" and thus subject to strict scrutiny review. Coal. for TJ, 68 F.4th at 879; see Louisiana v. Callais, 146 S. Ct. 1131, 1146 (2026) (explaining "if race played a role in a decision made by a government actor, strict scrutiny applied"). Under strict scrutiny review, the School Board has the burden of showing that its decision to restore the Confederate names is "narrowly tailored to serve a compelling interest." Coal. for TJ, 68 F.4th at 879; see Callais, 146 S. Ct. at 1146-47 (explaining that in "racial-discrimination cases under the Equal Protection Clause . . . the government needed to assert a compelling interest that justified its use of race; and if the analysis progressed beyond this point, the government had to show that its use of race was narrowly tailored to vindicate that interest").

The School Board argues that the compelling government interest supporting its decision to restore the Confederate names is the "restoration of public trust in the legitimacy of the School Board." See Def.'s Br., ECF No. 262, at 21. The School Board further argues that it "reversed the 2020 School Board's undemocratic act of public betrayal to restore the public's trust in their government." Id. But that argument is entirely based on criticism of the process employed by the School Board in 2020, and constituents' "perceived lack of opportunity to participate," and ignores what happened in 2022. Id. at 22. The intervening process in 2022—which included significant public comment and participation—undercuts the School Board's argument that it was motivated to restore the public trust in the School

123

Board. Rather, what is clear is that the School Board was motivated to restore the Confederate names. And restoration of Confederate school names is not a compelling government interest.

Further, the compelling interest that the School Board asserts in its brief on this claim does not pass constitutional muster. "[T]he Constitution almost never permits the Federal Government or a State to discriminate on the basis of race. Such discrimination triggers strict scrutiny, and our precedents have identified 'only two compelling interests' that can satisfy that standard." Callais, 146 S. Ct. at 1131 (citing Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll., 600 U.S. 181, 207 (2023)). "One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute." Id. (citing Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 720 (2007)). "The second is avoiding imminent and serious risks to human safety in prisons, such as a race riot." Id. (citing Johnson v. California, 543 U.S. 499, 512-13 (2005)). See also Callais, 146 S. Ct. at 1153 (referencing "our very short list of compelling interests that can justify racial discrimination"). Here, the School Board's articulated rationale for restoring the Confederate school names falls outside of the compelling interests identified by the Supreme Court. In Students for Fair Admissions, the court explained:

> Our acceptance of race-based state action has been rare for a reason. Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. That principle cannot be overridden except in the most extraordinary case.

600 U.S. at 208 (internal quotation marks and citations omitted). The School Board's rationale falls well short of this standard.

124

Accordingly, the Shenandoah County School Board's restoration of the Confederate school names at Stonewall Jackson High School and Ashby-Lee Elementary School does not satisfy strict scrutiny and violates the Equal Protection Clause of the Fourteenth Amendment.

## C.  Title VI of the Civil Rights Act of 1964

Title VI of the Civil Rights Act of 1964 provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages." Alexander v. Sandoval, 532 U.S. 275, 279-80 (2001). Moreover, the Supreme Court has stated that "Title VI itself directly reach[es] only instances of intentional discrimination." Id. at 281.

Given that the parties have jointly stipulated that "Shenandoah County Public Schools receive federal financial assistance for education and some extracurricular activities," see ECF 242-5, ¶ 225, and the court has determined that the School Board's actions in this case amount to a violation of the Equal Protection Clause, the court concludes that the School Board's actions also violate Title VI. See Students for Fair Admissions, Inc., 600 U.S. at 198 n.2 ("We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." (quoting Gratz v. Bollinger, 539 U.S. 244, 276 n.23 (2003)).

## D.  Equal Educational Opportunities Act

Plaintiffs claim a violation of the Equal Educational Opportunities Act ("EEOA"), which prohibits educational agencies from denying an equal educational opportunity to any

125

individual on account of race. 20 U.S.C. §§ 1701 et seq. Enacted in 1974, the EEOA codifies

the Supreme Court's holding in <u>Brown I</u> and <u>Brown II</u> that school systems segregated by race

violate the Fourteenth Amendment. <u>See</u> 20 U.S.C. § 1702 ("The Congress finds that . . . the

maintenance of dual school systems in which students are assigned to schools solely on the

basis of race, color, sex, or national origin denies to those students the equal protection of the

laws guaranteed by the fourteenth amendment[.]"). "[T]he EEOA's substantive protections

'considerab[ly] overlap . . . those provided under the fourteenth amendment.'" <u>New York by</u>

<u>Schneiderman v. Utica City Sch. Dist.</u>, 177 F. Supp. 3d 739, 752-53 (N.D.N.Y. 2016) (quoting

<u>United States v. City of Yonkers</u>, 96 F.3d 600, 619 (2d Cir. 2011)); <u>see also</u> <u>Hanover Cnty.</u>

<u>Unit of the NAACP v. Hanover Cnty.</u>, 461 F. Supp. 3d 280, 299 (E.D. Va. 2020) ("'As a

substantive matter, the EEOA provides protections similar to those provided by the Equal

Protection Clause.'" (quoting <u>Yonkers</u>, 96 F.3d at 620)).

The statute provides a six-part definition of what amounts to a denial of equal

educational opportunity, which includes, in relevant part:

> No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by--
>
> (a) the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools; [or]
>
> (b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system;
> . . . .

20 U.S.C. § 1703.

Plaintiffs seek to show that Shenandoah County School Board, as "an educational agency which has formerly practiced . . . deliberate segregation," failed to "take affirmative steps . . . to remove the vestiges of a dual school system" when the School Board reinstated the Confederate names in 2024. Pls.' Proposed Concl. of Law, ECF No. 260 at 48-49; 20 U.S.C. § 1703(b). Such failure, if shown, amounts to an unlawful denial of equal educational opportunity. 20 U.S.C. § 1703. The School Board counters that the school names chosen in 2024 cannot be vestiges of segregation because (1) they are not "so real that they have a causal link to the de jure violation being remedied" (quoting Freeman v. Pitts, 503 U.S. 467, 496 (1992)); (2) Shenandoah County removed all vestiges of segregation when it integrated its schools; and (3) the retirement of the school names in 2020 cut out any causal link to Shenandoah County schools' former status of de jure segregation that might have still existed. Def.'s Proposed Concl. of Law, ECF No. 262 at 23-27.

As an initial matter, the court finds that the School Board is subject to the EEOA because it is an "educational agency" under the EEOA, 20 U.S.C. § 1720(a), that formerly practiced deliberate segregation by race.[37] First JSSF, ECF No. 242-1, ¶ 10; see Hanover, 461

---

[37] The current statute, 20 U.S.C. § 1720(b), incorporates by reference the definition of "local educational agency" "as defined by section 801(f) of the Elementary and Secondary Education Act of 1965." However, for reasons which appear to be related to amendments to the act and subsequent renumbering of sections, the definition appears in § 601(f) of the Act, rather than § 801(f), and provides the following:

> The term 'local educational agency' means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools. Such term also includes any other public institution or agency

127

F. Supp. at 299 (holding that a School Board that operated segregated schools until 1963 is subject to the EEOA).

The questions for the court to determine, therefore, are (1) whether the Confederate school names are "vestiges of a dual school system" under the statute; and, if so, (2) whether the School Board's reinstatement of those names amounts to a "failure . . . to take affirmative steps . . . to remove the vestiges of a dual school system." See 20 U.S.C. § 1703(b).

### 1. Vestiges of a Dual School System

Plaintiffs argue that the Confederate school names are vestiges of Shenandoah County's segregated school system. The word "vestiges" is not defined in the statute. Hanover, 461 F. Supp. 3d at 300 (citing Jackson v. Waller Indep. Sch. Dist., No. H-07-3086, 2009 WL 3078439, at *12 (S.D. Tex. Sept. 24, 2009), and 20 U.S.C. § 1720). Referencing a dictionary definition, the Hanover court noted: "Vestige is generally defined as a trace, mark, or visible sign left by something (such as an ancient city or a condition or practice) vanished or lost." Hanover, 461 F. Supp. 3d at 300. However, courts implementing Brown I and Brown II have discussed the meaning of "vestiges," and the parties do not dispute that the definition of "vestiges" in the Fourteenth Amendment desegregation context applies to the EEOA. See, e.g., United States v. Roberts, 787 F. Supp. 3d 219, 233 (E.D. Va. 2025) ("Typically, when a term is not defined in the text, courts must endeavor to accord the term its ordinary,

---

having administrative control and direction of a public elementary or secondary school.

Elementary and Secondary Education Act of 1965, § 601(f), Pub. L. 89-10, 79 Stat. 56.

contemporary, common meaning, absent an indication Congress intended [it] to bear some different import." (internal citations omitted)).

In Brown II, the Supreme Court provided a framework for implementing desegregation. Following that decision, "[s]chool boards . . . then operating state-compelled dual systems were . . . clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. Cnty. Sch. Bd. of New Kent Cnty., 391 U.S. 430, 435-38 (1968) (identifying six factors, the "Green factors," as "facet[s] of school operations" instituting segregation: student assignment, faculty assignment, facilities and resources, transportation, staff assignment, and extracurricular activities).

Neither Brown II nor Green uses the word "vestiges," but the Supreme Court later used the term in school desegregation cases. For example, in Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 15 (1971), the Court stated:

> The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation. Segregation was the evil struck down by Brown I as contrary to the equal protection clause of the Constitution. That was the violation sought to be corrected by the remedial measures of Brown II. That was the basis for the holding in Green that school authorities are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." 391 U.S. at 437-438.

Id. at 15. Similarly, the Court stated in Freeman:

> The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional de jure system. This is required in order to ensure that the principal wrong of the de jure system, the injuries and stigma inflicted upon the race disfavored by the violation, is no longer present.

129

503 U.S. at 485; see also Trump v. Barbara, 609 U.S.___, 2026 WL 1870543, *24 (June 30, 2026) (Jackson, J., concurring) (quoting Justice Harlan's dissent in Plessy v. Ferguson, 163 U.S. 537, 559 (1896)) (explaining that in addition to repudiating "the notion that there is a 'superior, dominant, ruling class of citizens,'" the Fourteenth Amendment stands for "a willingness to see, and strive to eliminate, all remaining vestiges of historical subjugation").

Desegregation cases teach that "[a] vestige of segregation is a policy or practice which is traceable to the prior de jure system of segregation and which continues to have discriminatory effects." United States v. Yonkers Bd. of Educ., 123 F. Supp. 2d 694, 700-01 (S.D.N.Y. 2000) (citing United States v. Fordice, 505 U.S. 717, 727-28 (1992)); Freeman, 503 U.S. at 495-96. "Within the school segregation context, 'vestiges are those effects of intentional discrimination, which, if left unremedied, perpetuate the hallmarks of the regime of school segregation.'" Hanover, 461 F. Supp. 3d at 301 (quoting G. Scott Williams, Unitary School Systems and Underlying Vestiges of State-Imposed Segregation, 87 Colum. L. Rev. 794, 800 (1987)).

In Freeman, the Court noted that "[t]he vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the de jure violation being remedied." 503 U.S. at 496. History plays an important role in that calculus:

> In one sense of the term, vestiges of past segregation by state decree do remain in our society and in our schools. Past wrongs to the black race, wrongs committed by the State and in its name, are a stubborn fact of history. And stubborn facts of history linger and persist. But though we cannot escape our history, neither must we overstate its consequences in fixing legal responsibilities.

Id. at 495-96.

The Court directs that courts examining "the vestiges of de jure segregation . . . should look not only at student assignments, but 'to every facet of school operations—faculty, staff, transportation, extra-curricular activities and facilities.'" Bd. of Educ. of Okla. City Pub. Schs., Indep. Sch. Dist. No. 89, Okla. Cnty., v. Dowell, 498 U.S. 237, 250 (1991) (quoting Green, 391 U.S. at 435). In his dissenting opinion in Dowell, Justice Marshall added:

> Although the Court has never explicitly defined what constitutes a "vestige" of state-enforced segregation, the function that this concept has performed in our jurisprudence suggests that it extends to any condition that is likely to convey the message of inferiority implicit in a policy of segregation. So long as such conditions persist, the purposes of the decree cannot be deemed to have been achieved.

Dowell, 498 U.S. at 260-61 (Marshall, J., dissenting).

The Green factors are not exclusive. Depending on the circumstances of a particular case, the court may exercise discretion to consider other factors. Freeman, 503 U.S. at 492-93. See, e.g., Belk v. Charlotte-Mecklenberg Bd. of Educ., 269 F.3d 305, 317-32 (4th Cir. 2001) (examining Green factors as well as "ancillary factors" identified by the court); Wessmann v. Gittens, 160 F.3d 790, 800-09 (1st Cir. 1998) (examining whether disparities in achievement were vestiges of de jure segregation); Coal. to Save Our Child. v. State Bd. of Educ. of State of Del., 90 F.3d 752, 776-78 (3d Cir. 1996) (examining Green factors, adherence to "ancillary relief" programs prescribed by the district court, as well as "performance disparities" that were purported to be vestiges).[38]

---

[38] The parties have stipulated that "[i]n 1962, the NAACP filed and later withdrew a lawsuit challenging segregation in Shenandoah County Schools, which later were integrated." First JSSF, ECF No. 242-1,

Whether the School Board's decision to restore segregation-era Confederate school names violates the EEOA is a question of first impression. Although a similar issue—mascot and school names as vestiges—was raised in Hanover, the court did not reach it. 461 F. Supp. 3d at 299, 302. But in the context of desegregation cases, a few courts have addressed whether a Confederate name or symbol is a vestige of segregation.

One early case was Smith v. St. Tammany Parish Sch. Bd., 316 F. Supp. 1174, 1176 (E.D. La. 1970). As part of a school desegregation order, the district court had ordered that "[a]ll Confederate flags, banners, signs expressing the school board's or its employees' desire to maintain segregated schools, and all other symbols or indicia of racism shall be removed from the schools and shall not be officially displayed at school functions of any kind." Id. When the principal of the high school refused a request by Black students to remove the Confederate battle flag from his office, plaintiffs moved the court to remove from the system's schools "all Confederate battle flags and any other symbols or indicia of racism displayed by the faculty or staff of the schools." Id. at 1175. The court granted the requested relief, stating that the intent of the order was "crystal clear. Not only is the school board to operate a unitary system but the system must be racially non-discriminatory." Id. at 1176. The district court commented further:

---

¶ 8. As such, Shenandoah County Public Schools were not subject to a desegregation order and no court has entered an order finding that Shenandoah County Public Schools has achieved unitary status or removed all vestiges of a dual school system. Consistent with the expert testimony of Dr. Daugherity, the court does not view the parties' stipulation that Shenandoah County Public Schools are integrated as establishing that all vestiges of past discrimination have been eliminated. See Stanley v. Darlington County Sch. Dist., 879 F. Supp. 1341, 1412 (D.S.C. 1995) rev'd on other grounds, 84 F.3d 707 (4th Cir. 1996) (noting that part of the affirmative duty imposed on school officials is the obligation to not take any action that impedes efforts to disestablish the former dual system). "[P]ost-Brown actions that have the effect of increasing or perpetuating segregation constitute a violation of the affirmative duty." Id.

132

> The Confederate battle flag, since the decision by the U.S. Supreme Court on May 17, 1954 in <u>Brown v. Board of Education</u>, 347 U.S. 483 (<u>Brown I</u>), has become a symbol of resistance to school integration and, to some, a symbol of white racism in general.
>
> *          *          *          *
>
> In <u>Green</u>, . . . the Supreme Court stated: "School boards such as the respondent were clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."
>
> The retention of Confederate flags in a unitary school system is no way to eliminate racial discrimination "root and branch" from the system. The Confederate battle flags must be removed from all schools in the St. Tammany Parish school system.

<u>Id.</u> at 1176-77. On appeal, the Fifth Circuit affirmed, holding that the order on Confederate flags "is fully warranted." 448 F.2d 414, 415 (5th Cir. 1971).

The issue of Confederate symbols and names arose again a few years later in <u>Augustus v. Sch. Bd. of Escambia Cnty.</u>, 361 F. Supp. 383 (N.D. Fla. 1973). Black students complained that the high school's use of "Rebels" as its official name, the use of a Confederate battle flag as a school symbol, and the singing of "Dixie" at school events violated the Fourteenth Amendment. <u>Id.</u> at 384. Black students alleged "that the use of these symbols represented symbolic resistance to th[e] court's order requiring the maintenance of a unitary school district, that the symbols generated a feeling of inequality and inferiority among the black students, and that the symbols were a cause of violence and disruption in the school." <u>Id.</u>[39]

---

[39] As was the case with the original naming of Stonewall Jackson High School, the use of the Confederate symbols in Escambia County started when the high school opened in the late 1950s. However, the facts in the Escambia County case differ from those in Shenandoah County in at least two respects, including the presence of racial violence in Escambia County, which has not happened

133

The district court ordered the Confederate symbols removed:

> On the basis of its findings of fact, the court concludes, and holds, that the name "Rebels" and the use of the Confederate Battle Flag seriously interfered with the effective operation of a unitary school system at this school. Regardless of the intent of many white students or that of the defendants, these symbols were a source of irritation to many of the black students, inhibited their full participation at the school, and eventually were a source of racial violence. While it is unfortunate that the use of the symbols took on the significance now attached to them, that significance is now firmly implanted in this school. Removal of the symbols may not eliminate racial tension at the school. However, as long as the symbols remain, this tension will have a continuing, visual focal point. A unitary educational system cannot be maintained under such conditions.

Id. at 388. The district court also barred use of Confederate symbols by individual students, finding "that the use of the Confederate Battle Flag by individual students was a source of violence and disruption at the school . . . ." Id. at 389. The court further noted that "[i]t is here evident that the private use of the symbols was also preventing the effective operation of a unitary school system." Id. On appeal, the Fifth Circuit found the "total ban" "drastic," and remanded the case to give the school board "the opportunity to reach a solution to the problems created by abusive use of the school symbols . . . ." 507 F.2d 152, 157 (5th Cir. 1975). The Fifth Circuit noted:

> The elimination of racial tension is a complex problem and a problem with which the school board had begun to grapple. Although it is no doubt regrettable that a majority of the white students appeared insensitive at the time to the feelings and perceptions of many of their black schoolmates, the school board's adherence to its permissive symbol selection policy should be evaluated in conjunction with its regulations for insuring against abusive or disruptive use of the symbols selected.

---

in Shenandoah County, and the fact that the student body at Escambia High School, as opposed to the school board, chose the Confederate symbols. Augustus, 361 F. Supp. at 385.

134

> It may have been better for all concerned had the school board simply eliminated all ethnically and racially irritating symbols from possible consideration.

Id. at 157-58.

In arguing that the Confederate school names in Shenandoah County are not vestiges of segregation, the School Board relies on Gray v. Lowndes Cnty. Sch. Dist., 900 F. Supp. 2d 703 (N.D. Miss. 2012). In Gray, the issue facing the court was whether the historic use by Caledonia High School of the "Confederates" nickname and playing of the song "Dixie" after a touchdown precluded a finding of unitary status and dismissal of a forty-year-old desegregation case. The district court stated:

> Of all the issues raised in the motion for declaration of unitary status, the one which concerns the court the most is the continued use of the "Confederates" nickname at Caledonia High School. Simply stated, the court can discern no good reason why a Mississippi public school would wish to associate itself with any divisive nickname or symbol.

Id. at 710. The court reflected:

> The use of words and symbols in a pejorative sense hardly advances the cause of education or personal and community growth. On the one hand, some will say "we mean no harm, we are only honoring our heritage." On the other hand, another will say "this is a heritage which demeans me."
>
>            \*              \*              \*              \*
>
> There is nothing harmful in essence in pictures of Confederates or the playing of a tune. The harm comes to institutions and individuals when such symbols are used to purposely offend, provoke or hurt another. Such outcomes are not legitimate aims of public education.
>
> This court seriously considered denying a declaration of unitary status based upon this issue, before ultimately deciding not to do so. After viewing the evidence at the hearing, it is the court's

135

> impression that inertia and an unwillingness to address a controversial issue have more to do with the continued use of the "Confederates" nickname at CHS than any official resistance to a unitary system. It is apparent that there are strong feelings on both sides of this issue, and, in such a situation, simple inaction is often the political path of least resistance.

Id. at 711.

Ultimately, the court declined to delay granting unitary status on this issue due to a failure of proof, stating:

> This court would have been more inclined to deny unitary status if the Private Plaintiffs had made a stronger showing at the hearing, but, to reiterate, no resident actually showed up to testify on this (or any other) issue.
>
>     *        *        *        *
>
> In light of the foregoing, the court concludes that, while this issue is a troubling one, it is one regarding which the District is making steady progress and should not serve as a basis for denying declaration of unitary status. In particular, the court finds that the limited use of the Confederate nickname and the playing of Dixie are not vestiges of segregation that are "so real that they have a causal link to the de jure violation being remedied." Freeman, 503 U.S. at 485-486. Further, there is no proof that the diminished use of the word "Confederate" or the playing of "Dixie" represent official resistance to a unitary system or were the source of racial tension.

Id. at 712.

The facts of Gray are a far cry from those of this case. First, Gray did not concern, as here, action by the School Board to restore Confederate names after they had been removed because they were racially discriminatory. Rather, the nickname in Gray had been in use for many years, which impressed the court as stemming from "inertia and an unwillingness to address a controversial issue" more than "any official resistance to a unitary system." Id. at

136

711. Second, no county resident "actually showed up to testify on this (or any other) issue." Id. at 712. The absence of proof in Gray lies in stark contrast to the many hours of public comment by students and others about the harmful impact wrought by restoration of the Confederate school names and the overwhelming evidence in this case.

The unique facts of this case are compelling. This is not a case, like Gray, about a long-standing nickname, left in place by inertia and the path of least resistance. Rather, it concerns whether the act of restoring a school name which had been removed because it was linked to racial division and segregation violates the School Board's affirmative duty to eliminate racial discrimination "root and branch." Green, 391 U.S. at 438. The factual findings in this case establish that the Confederate school names are "traceable to the prior de jure system of segregation" and "continue[] to have discriminatory effects." U.S. v. Yonkers Bd. of Educ., 123 F.Supp.2d at 700 (citing Freeman, 503 U.S. at 495-96).

From the voluminous record in this case, the court can readily trace the connection between the Confederate names and the de jure system of segregation. Shenandoah County operated a dual school system for several years after Brown II ordered schools to desegregate "with all deliberate speed." In the face of the Supreme Court's mandate that public schools be desegregated, Virginia and Shenandoah County engaged in Massive Resistance to integration efforts and continued to operate segregated schools until 1963.

The School Board originally chose the name Stonewall Jackson in furtherance of Massive Resistance to public school desegregation. The name was chosen for an all-White high school, which Blacks were not permitted to attend when it opened in 1959. The selection of the name Stonewall Jackson High School was intended to dissuade Black students from

137

requesting transfers into that school, in furtherance of the dual school system. The School Board also named another school, Ashby-Lee Elementary School, in 1974, following an active period of federal school integration enforcement.

And, as compelling testimony from the Black student plaintiffs demonstrates, these names "continue[] to have discriminatory effects." Yonkers Bd. of Educ., 123 F. Supp. 2d at 700. Plaintiffs provided extensive testimony about the disproportionate impact of these names on their educational and extracurricular experiences as well as their physical and mental health that White students do not suffer. Plaintiffs testified to the feelings of inferiority the names engendered, the difficulty they experienced concentrating on their school work, and the extra effort they had to expend to do well in class. Plaintiffs also explained the strain on their relationships with teachers and peers, and the anxiety with which they struggled when the Confederate name discussion came up. Plaintiffs further discussed the impact of the Stonewall Jackson name during sports and other extracurricular activities. Expert testimony described how persistent exposure to racism or racially discriminatory messaging also impacts physical health and stress responses in the body. These present effects are "so real as to have a causal link," Freeman, 503 U.S. at 496, and are demonstrably not, as defendant argues, "too attenuated from the school system's former dual status in order to be causally connected thereto." Def.'s Proposed Concl. of Law, ECF No. 262 at 26. All of these impacts from the restoration of the Confederate names diminish and ultimately deny plaintiffs the equal educational opportunity to which they are entitled.

The causal link is clear. Shenandoah County's Confederate school names are traceable to the de jure system of segregation in Shenandoah County and constitute vestiges under the meaning of the EEOA.

**2. Failure to Take Affirmative Steps to Remove the Vestiges of a Dual School System**

The Shenandoah County School Board's 2024 decision to restore the names of Stonewall Jackson High School and Ashby-Lee Elementary School constitutes a failure to take affirmative steps to remove those vestiges of a segregated school district.

The EEOA imposes an affirmative duty to remove conditions that are causally related to the former dual school system. 20 U.S.C. § 1703(b). The School Board's decision to restore the Confederate names to the schools—four years after retiring them for being racially divisive—runs contrary to that duty. By restoring the Confederate names, the School Board revived symbols of the Massive Resistance movement, and with it, the exclusionary messaging and harms associated with the dual school system.

The School Board argues that the Confederate names cannot be considered vestiges or conditions that are causally linked to the former dual school system because the causal link to the original Massive Resistance era naming was broken when the School Board retired the names in 2020. Def.'s Proposed Concl. of Law, ECF No. 262 at 27. But this argument is unsupported by the evidence in this case. There was no showing that the Confederate names ceased to have a discriminatory impact at the time the School Board chose to restore them— in fact, the information before the School Board, and the evidence before the court, indicates quite the opposite. The brief period in which the Confederate names were not on the buildings did not erase the history of the original selection of the names, nor did it erase the impact of

139

the names on Black students. Rather, the Confederate names were restored with complete awareness of their historic legacy and ongoing discriminatory impact. In the court's view, the affirmative act of reinstating these vestiges of segregation is far more problematic than a passive failure to remove a long-standing name or symbol. Cf. Gray, 900 F. Supp. 2d at 711. That is because in this case, the School Board did not simply fail to take affirmative steps to remove the vestiges of a dual school system. Rather, in acting to restore such a vestige, it took a step in the other direction.

On these idiosyncratic facts, the School Board's 2024 decision to restore the Confederate school names violates the School Board's affirmative duty under § 1703(b) of the Equal Educational Opportunities Act. 20 U.S.C. § 1703(b).

## VI. Conclusion

For these reasons, the court finds that the Shenandoah County School Board's decision to reinstate the Confederate school names violates the Equal Protection Clause of the Fourteenth Amendment, Title VI, and the Equal Educational Opportunities Act.

The memorandum opinion filed today is a legal opinion, based upon the evidence introduced at trial, the elements of the legal claims, and the burden of proof. At the same time, the court is mindful of aspects of this dispute that transcend the legal issues, including the historical, cultural, and political overtones that continue to divide the Shenandoah County community.

In that regard, the Eleventh Circuit recently recognized: "Confederate memorials are a pressure point. Some say they are significant historical markers that should remain undisturbed—preserved, even. Others are deeply offended by what they see as outdated and

140

offensive reminders of a shameful time in our history. Still others give the question little thought." Johnson v. Mayor, City of Jacksonville, No. 23-11937, 2026 WL 1676195, at *1 (11th Cir. June 10, 2026). To be sure, the Confederate school names have become a "pressure point" in Shenandoah County.

At the same time, it cannot be overstated that the Confederate names here are not located on memorials—they are school names. And schools are different. As the Court stated in Brown I, "education . . . is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." 347 U.S. at 493. Following Brown I these many years later, this memorandum opinion recognizes the primacy of providing an equal opportunity for all children to "awaken," "prepar[e]", and "adjust" in an educational environment free of vestiges of racial discrimination.

A separate order addressing remedies will be entered.

Entered: August 6, 2026

Michael F. Urbanski
U.S. District Judge
2026.08.06 16:12:36
-04'00'

Michael F. Urbanski
Senior United States District Judge

141